1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
     Adrian M. Pruetz (Bar No. 118215)
2    Jeffrey N. Boozell (Bar No. 199507)
   865 South Figueroa Street, 10th Floor
3  Los Angeles, California  90017-2543
   Telephone:     (213) 443-3000
4  Facsimile:     (213) 443-3100
   E-Mail:        adrianpruetz@quinnemanuel.com
5                 jeffboozell@quinnemanuel.com

6    Robert W. Stone (Bar No. 163513)
     TJ Chiang (Bar No. 235165)
7  555 Twin Dolphin Drive, Suite 560
   Redwood Shores, California  94065
8  Telephone:  (650) 801-5000
   Facsimile:  (415) 801-5100
9  E-Mail:        robertstone@quinnemanuel.com
                  tjchiang@quinnemanuel.com
10

11 Attorneys for Defendants and Counterclaimants
   Roche Molecular Systems, Inc.; Roche
   Diagnostics Corporation; and Roche Diagnostics
12 Operations, Inc.

13                  UNITED STATES DISTRICT COURT

14                 NORTHERN DISTRICT OF CALIFORNIA

15  THE BOARD OF TRUSTEES OF THE LELAND          CASE NO. C-05-04158 MHP
    STANFORD JUNIOR UNIVERSITY,
16
                     Plaintiff,
17                                               DEFENDANTS' ANSWER AND
          vs.                                    COUNTERCLAIMS
18
    ROCHE MOLECULAR SYSTEMS, INC.; ROCHE
19  DIAGNOSTICS CORPORATION; ROCHE
    DIAGNOSTICS OPERATIONS, INC.; ROCHE
20  DIAGNOSTIC SYSTEMS, INC.,

21                   Defendants.

22  ROCHE MOLECULAR SYSTEMS, INC. ROCHE
    DIAGNOSTICS CORPORATION; ROCHE
23  DIAGNOSTICS OPERATIONS, INC.,

24                   Counterclaimants,

25        vs.

26  THE BOARD OF TRUSTEES OF THE LELAND
    STANFORD JUNIOR UNIVERSITY; AND
27  THOMAS MERIGAN.

28                   Counterclaim Defendants.

Dockets.Justia.com

## ANSWER

Defendants Roche Molecular Systems, Inc. ("RMS"); Roche Diagnostics Corporation; and Roche Diagnostics Operations, Inc. (collectively "Answering Defendants"), state for their Answer and Affirmative Defenses to the Complaint of plaintiff The Board of Trustees of The Leland Stanford Junior University ("Plaintiff" or "Stanford"), as follows:

## Nature of the Action

1.      Answering Defendants admit that Plaintiff's Complaint alleges patent infringement, but Answering Defendants deny liability with respect to such claims.

## Parties

2.      Answering Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 2 of the Complaint, and on that basis deny each and every allegation.

3.      Answering Defendants admit the allegations of paragraph 3 of the Complaint.

4.      Answering Defendants admit the allegations of paragraph 4 of the Complaint.

5.      Answering Defendants admit the allegations of paragraph 5 of the Complaint.

6.      Answering Defendants deny the allegations of paragraph 6 of the Complaint.

## Jurisdiction and Venue

7.      Answering Defendants admit that this Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

8.      Answering Defendants admit that RMS; Roche Diagnostics Corporation; and Roche Diagnostics Operations, Inc. do business in this district and that personal jurisdiction is proper in this Court but deny that the Complaint states a cause of action for patent infringement against them and that they have committed the acts of infringement complained of in the Complaint.  Answering Defendants further deny that Roche Diagnostics Systems, Inc. does business in this District and that personal jurisdiction is proper in this Court.

1    9.    Answering Defendants admit that venue is proper in this Court with respect to

2  RMS; Roche Diagnostics Corporation; and Roche Diagnostics Operations, Inc. under the

3  provisions of 28 U.S.C. § 1391(c) and 28 U.S.C. § 1400(b), but deny that venue is proper as to

4  Roche Diagnostics Systems, Inc.

5

6                   **Intradistrict Assignment**

7    10.    Answering Defendants admit the allegations of paragraph 10 of the Complaint.

8

9                  **Count 1:  Patent Infringement**

10                **(U.S. Patents No. 5,958,730)**

11    11.    Answering Defendants admit that the United States Patent and Trademark Office

12  issued Patent No. 5,968,730 (the "'730 Patent") on October 19, 1999, and that a copy of the '730

13  Patent is attached to the Complaint as Exhibit A.  Answering Defendants deny that the '730 Patent

14  was duly and legally issued.

15    12.    Answering Defendants lack sufficient knowledge or information to form a belief as

16  to the truth of the allegations in paragraph 12 as to whether Thomas Merigan, M.D., David

17  Katzenstein, M.D., and Mark Holodniy, M.D. were employed by Plaintiff at that time of the filing

18  of the patent application which resulted in the '730 Patent and on those grounds deny those

19  allegations.  Answering Defendants further deny the remaining allegations in paragraph 12 of the

20  Complaint including, but not limited to, the allegation that Drs. Merigan, Katzenstein, and

21  Holodniy are the sole and true inventors of the '730 Patent and that Stanford owns the entire right,

22  title, and interest to and in the '730 Patent.

23    13.    Answering Defendants deny the allegations in paragraph 13 of the Complaint.

24    14.    Answering Defendants deny the allegations in paragraph 14 of the Complaint.

25    15.    Answering Defendants deny the allegations in paragraph 15 of the Complaint.

26    16.    Answering Defendants deny the allegations in paragraph 16 of the Complaint.

27

28

1

2

**Count 2:  Patent Infringement**

**(U.S. Patents No. 6,503,705)**

3

4

5

6

17.    Answering Defendants admit that the United States Patent and Trademark Office issued Patent No. 6,503,705 (the "'705 Patent") on January 7, 2003, and that a copy of the '705 Patent is attached to the Complaint as Exhibit B.  Answering Defendants deny that the '705 Patent was duly and legally issued.

7

8

9

10

11

12

13

14

18.    Answering Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 18 as to whether Thomas Merigan, M.D., David Katzenstein, M.D., Mark Holodniy, M.D., and Michael J. Kozal, M.D. were employed by Plaintiff at that time of the filing of the patent application which resulted in the '705 Patent and on that ground deny those allegations.  Answering Defendants further deny the remaining allegations in paragraph 18 of the Complaint including, but not limited to, the allegation that Drs. Merigan, Katzenstein, Holodniy, and Kozal are the sole and true inventors of the '705 Patent and that Stanford owns the entire right, title, and interest to and in the '705 Patent.

15

19.    Answering Defendants deny the allegations in paragraph 19 of the Complaint.

16

20.    Answering Defendants deny the allegations in paragraph 20 of the Complaint.

17

21.    Answering Defendants deny the allegations in paragraph 21 of the Complaint.

18

22.    Answering Defendants deny the allegations in paragraph 22 of the Complaint.

19

20

**AFFIRMATIVE DEFENSES**

21

22

23

Further answering the Complaint and as additional defenses thereto, Answering Defendants assert the following Affirmative Defenses, without assuming the burden of proof when such burden would otherwise be on Plaintiff.

24

25

**FIRST AFFIRMATIVE DEFENSE**

26

**(Failure to State a Claim)**

27

28

23.    The Complaint fails to state a cause of action against Answering Defendants upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

### (Non-Infringement)

24.     Answering Defendants are not infringing and have not infringed the '730 and '705 Patents either directly or by inducing others to infringe or contributing to others' infringement of any valid claim of the '730 or '705 Patents.

25.     Answering Defendants are not willfully infringing and have not willfully infringed any valid claim of the '730 or '705 Patents.

## THIRD AFFIRMATIVE DEFENSE

### (Invalidity)

26.     The claims of the '705 and '730 Patents are invalid for failure to meet one or more of the requirements for patentability set forth in 35 U.S.C. §§ 101, 102, 103 and/or 112.

## FOURTH AFFIRMATIVE DEFENSE

### (Ownership)

27.     Answering Defendants are not liable for the acts that Plaintiff alleges infringe the '730 and '705 Patents because RMS is the owner of the '730 and '705 Patents by virtue of at least one or more of the following: (1) the consulting/confidentiality agreements entered into between RMS's predecessor-in-interest, Cetus Corporation ("Cetus"), and Dr. Thomas Merigan of Stanford, among others; and/or (2) the collaboration between employees of RMS's predecessor-in-interest, Cetus, and employees of Plaintiff, and the inventive contributions of those Cetus employees to the subject matter claimed in the '730 and '705 Patents which requires that Cetus employees be named as joint inventors of the '730 and '705 Patents.

## FIFTH AFFIRMATIVE DEFENSE

### (Unenforceability)

28.     On information and belief, the '730 and '705 Patents are unenforceable by Plaintiff due to Plaintiff's and the named inventors willful violation of the provisions of 37 C.F.R. 1.56 in

1   procuring the '730 and '705 Patents.  Answering Defendants believe that further investigation and

2   discovery will provide additional evidentiary support showing that Plaintiff and the named

3   inventors willfully misrepresented and omitted information from the United States Patent and

4   Trademark Office ("PTO") that was material to the PTO's decision to grant the '730 and '705

5   Patents, including at least the following:

6            a.      Plaintiff and the named inventors failed to disclose to the PTO the

7   collaboration between employees of RMS's predecessor-in-interest, Cetus, and employees of

8   Stanford, and the inventive contributions of those Cetus employees to the subject matter claimed

9   in the '730 and '705 Patents.  Despite the fact that inventorship is material to patentability, Plaintiff

10  and the named inventors actively concealed from the PTO the contributions of Cetus employees to

11  the subject matter of the claimed inventions, including that Cetus employees played key roles in

12  the development of:  (1) the specific steps in the method developed for quantitating HIV using

13  PCR; (2) the first-of-their-kind standards or controls for quantitation of HIV RNA which made

14  quantitation possible; (3) the 30 cycle assay for detection and quantitation of HIV; and (4) the

15  amplification of RNA extracted from plasma samples.  Although, these contributions entitled

16  Cetus employees to be named as joint inventors on the '730 and '705 Patents, Stanford and the

17  named inventors affirmatively misrepresented to the PTO that they were the only true inventors of

18  the claims in the '730 and '705 Patents.  The initial application listed only Drs. Thomas Merigan

19  and Michael Kozal as inventors.  Subsequently, in November 1992, the applicants petitioned to

20  correct inventorship and sought to add Drs. Mark Holodniy and David Katzenstein as joint

21  inventors.  In connection with the petition, Merigan declared under penalty of perjury that at the

22  time of filing, he did not discuss the issue of inventorship with his counsel.  Thereafter, however,

23  Merigan began to question whether Katzenstein and Holodniy also should be included as

24  inventors.  After discussing this issue with both counsel and Katzenstein and Holodniy, the

25  decision was made to add Katzenstein and Holodniy as inventors.  According to the declaration of

26  Barry Elledge, Stanford's prosecution counsel, Holodniy had the following comments concerning

27  his inventorship role:

28           Dr. Holodniy stated that he was until the summer of 1991 a research fellow in the Division

of Infectious Disease at Stanford University.  His inventive contribution to the subject matter of the present application occurred (sic) during this period, and principally concerns quantitation of HIV RNA in plasma of AIDS patients.

These statements and omissions were intentional and were designed to mislead the PTO with respect to the true inventorship of the '730 and '705 Patents.

b.    Plaintiff and the named inventors failed to properly disclose to the PTO an April 1991 article authored by Stanford's Drs. Merigan, Katzenstein, and Holodniy entitled *Detection and Quantification of Human Immuno-deficiency Virus RNA in Patient Serum by Use of the Polymerase Chain Reaction*, 163 J. INFECT. DIS. 862-866 (1991) (the "Serum Paper").  The Serum Paper disclosed each of the features that Stanford claims in the '730 and '705 Patents more than one year prior to the filing of the application which resulted in the '730 and '705 Patents.  The Serum Paper describes the PCR amplification and quantitation of HIV RNA extracted from blood of patients and discloses exactly the same quantitative PCR method that is described in the '730 and '705 Patents, including the use of 30 cycles of amplification and the same PCR standard for quantitation.  The paper also demonstrates that there is a correlation between the level of HIV RNA molecules in the blood and the clinical status of the HIV-positive patient - i.e., HIV RNA level is a "marker" of disease progression.  Despite its clear materiality and the fact that it would likely have supported a rejection of the claims in the '730 and '705 Patents, Plaintiff failed to properly highlight this prior art in its information disclosure statements and failed to bring it to the attention of the examiners during the prosecution of the '730 and '705 Patents with the intent to mislead the PTO.

## SIXTH AFFIRMATIVE DEFENSE

### (License)

29.    Answering Defendants are not liable for the acts that Plaintiff alleges infringe the '730 and '705 Patents because Answering Defendants hold a non-exclusive, irrevocable, royalty-free, worldwide license under both the '730 and '705 Patents from the date of alleged invention of the subject matter claimed in the '730 and '705 Patents by virtue of at least one or more of the

following:  (1) the materials transfer agreement entered into between RMS's predecessor-in-interest, Cetus, and Plaintiff, Dr. Thomas Merigan and others at Stanford; and/or (2) the consulting/confidentiality agreements entered into between RMS's predecessor-in-interest, Cetus, and Dr. Thomas Merigan, among others.

## SEVENTH AFFIRMATIVE DEFENSE

### (Standing)

30.    By virtue of the consulting/confidentiality agreements entered into between RMS's predecessor-in-interest, Cetus, and Dr. Thomas Merigan of Stanford, Dr. Merigan assigned all right, title and interest in the claimed invention that is the subject matter of the '730 and '705 Patents to Cetus prior to his assignment of those same rights to Stanford.  Cetus's rights to the claimed invention and the '730 and '705 Patents were acquired by Hoffman-LaRoche, Inc. under a 1991 Acquisition agreement with Cetus and subsequently transferred to RMS.  On information and belief, Stanford had notice of this prior assignment and did not purchase the subsequent assignment for valuable consideration.  Accordingly, RMS is the sole and exclusive owners of the '730 and '705 Patents, and Stanford lacks standing to sue for the infringement of those patents.

## EIGHTH AFFIRMATIVE DEFENSE

### (Estoppel)

31.    Plaintiff is estopped from asserting the claims of the '730 or '705 Patents against Answering Defendants.

## NINTH AFFIRMATIVE DEFENSE

### (Laches)

32.    The purported claims for relief set forth in the Complaint are barred by the doctrine of laches.

## TENTH AFFIRMATIVE DEFENSE

### (Waiver)

33.   Plaintiff has waived its right to seek the relief set forth in the Complaint.

## COUNTERCLAIMS

Defendants and Counterclaimants Roche Molecular Systems, Inc. ("RMS"); Roche Diagnostics Corporation; and Roche Diagnostics Operations, Inc. (collectively "Counterclaimants"), for their Counterclaims against Plaintiff and Counterclaim Defendant The Board of Trustees of The Leland Stanford Junior University ("Stanford") and Counterclaim Defendant Thomas Merigan (collectively "Counterclaim Defendants"), alleges as follows:

### Jurisdiction and Venue as to Counterclaim Defendant Stanford

1.   The counterclaims below as to Counterclaim Defendant Stanford arise under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.* and the patent laws of the United States, 35 U.S.C. § 1, *et seq.*

2.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

3.   Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)-(c) and 1400(b) because this suit was filed in this district by Counterclaim Defendant Stanford and Counterclaim Defendant Stanford is found in this district.

4.   Counterclaim Defendant Stanford claims to be the assignee and owner of the entire right, title and interest in and to United States Patent Nos. 5,968,730 (the "'730 Patent") and 6,503,705 (the "'705 Patent").

5.   An immediate, real, and justiciable controversy exists between and Counterclaimants and Counterclaim Defendant Stanford with respect to validity and infringement of the '730 and '705 Patents.

1  **Jurisdiction and Venue as to Counterclaim Defendant Merigan**

2  6.  This Court has supplemental jurisdiction over the claims against Counterclaim

3  Defendant Merigan pursuant to 28 U.S.C. § 1367.

4  7.  Personal jurisdiction over Counterclaim Defendant Merigan is proper in this Court

5  because the acts giving rise to this action took place within this district and, upon information and

6  belief, Counterclaim Defendant Merigan resides in this district.

7  8.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)-(c) and 1400(b) at

8  least because, on information and belief, Counterclaim Defendant Merigan resides in this district.

9

10  **General Allegations**

11  9.  Cetus Corporation ("Cetus") was one of the earliest recombinant DNA

12  biotechnology start-ups.  Cetus was founded in 1971 by Drs. Ronald Cape, Peter Farley, and

13  Donald Glaser, the winner of the 1960 Nobel Prize in physics.  By the late 1980s, Cetus had

14  become one of the most pre-eminent biotech companies in the world.

15  10.  Cetus researchers are universally recognized as the discoverers of PCR - or

16  Polymerase Chain Reaction.  In the mid-1980s, Kary Mullis, a Cetus scientist, conceived of a

17  method for making billions of copies any DNA or RNA in the laboratory.  Ultimately, Dr. Mullins

18  would share the Nobel Prize for this discovery.  The development of this method by Cetus

19  researchers allowed scientists for the first time to practically detect, examine, and manipulate

20  DNA and RNA that were only available in a few molecules.

21  11.  Shortly after conceiving PCR, Cetus turned its attention to potential applications

22  for the technique.  One such application concerned the use of PCR as a diagnostic tool for HIV.

23  By historical coincidence, HIV, the primary virus that causes AIDS, was discovered at the time

24  that PCR emerged as a new technology.  As a result, it was an attractive target for the early use of

25  PCR.

26  12.  Beginning in 1985, Cetus began a project aimed at developing methods and

27  techniques for detecting HIV extracted from blood using PCR.

28

13.     At that time, Counterclaim Defendant Merigan was the Director of the Center for AIDS Research ("CFAR") at Stanford University.  The CFAR was established in 1988. Counterclaim Defendant Merigan, a long time collaborator with Cetus, was also a member of Cetus' Scientific Advisory Board - a post he held from 1979 through 1991.

14.     In connection with his work on the Cetus Scientific Advisory Board and as a consultant to Cetus, Counterclaim Defendant Merigan executed a number of consulting/confidentiality agreements, including agreements dated April 13, 1984 and April 19, 1991.  These agreements gave Counterclaim Defendant Merigan unfettered access to Cetus facilities, confidential materials, employees, and know-how and provided that any invention made pursuant to those agreements would be the sole and exclusive property of Cetus.

15.     In addition, by letter dated December 19, 1988,  Cetus, on the one hand, and Drs. Merigan, David Schwartz, and Stanford, on the other, entered into a Materials Transfer Agreement (the "MTA") pursuant to which Cetus provided Counterclaim Defendant Stanford with certain research substances and know-how for the purpose of scientific collaboration relating to HIV research using PCR including physical products, biological materials, and technical know-how relating to HIV and PCR.  The MTA also provides that should Counterclaim Defendant Merigan's, or any other Stanford scientist's research, involving material or know-how transferred under the MTA result in an invention or substance that may be commercially useful, Counterclaim Defendant Stanford will, among other things, give Cetus the right to either an exclusive license to the invention, at a reasonable royalty, or a non-exclusive license, at Cetus' option.

16.     As the MTA suggests, Cetus and Counterclaim Defendant Stanford began jointly exploring techniques for detecting and quantitating HIV extracted from blood using PCR. "Detection" refers generally to the ability of a researcher to ascertain whether a target DNA or RNA exists in a sample.  By contrast, "quantitation" refers generally to the ability of one to ascertain how much of a target DNA or RNA exists in a sample.  Dr. Mark Holodniy, a Stanford post-doctoral fellow working with Drs. Merigan and Schwartz, was principally responsible for interfacing with Cetus concerning this effort and gained access to Cetus as a result of the MTA.

17.    Accordingly, Holodniy first began working with Cetus around the time of the MTA, and, like Counterclaim Defendant Merigan, Holodniy signed a consulting/confidentiality agreement with Cetus, dated February 14, 1989. As a result, Holodniy spent many days working at the Cetus facilities in Emeryville, California where he too had unfettered access to Cetus researchers, equipment, and technical expertise. Holodniy's first efforts with Cetus involved learning basic PCR techniques and went on to include learning PCR methods for detecting HIV RNA. In conjunction with that effort, Holodniy and Counterclaim Defendant Stanford were provided with Cetus HIV primers (a critical reagent required for PCR amplification and detection of HIV) and other materials used in the PCR process.

18.    Once Holodniy had knowledge concerning the basics of PCR and its application for detecting HIV RNA, he and Cetus employees collaborated on techniques needed to quantitate HIV RNA. Together they eventually developed a PCR method for quantitating HIV RNA and refined it through experiments with HIV RNA that was extracted from both patient serum and plasma.

19.    Beginning in or about late 1987, Cetus employees also worked to develop first-of-their-kind standards or controls for quantitation by PCR of any type of RNA and DNA. Cetus employees spent many months constructing, testing, and validating that standard. Without such a standard, PCR quantitation of HIV RNA was not possible.

20.    Armed with the knowledge and experience provided to him by Cetus, in late 1989 Holodniy, along with Counterclaim Defendant Merigan, sought to publish the results of the Cetus/Stanford work relating to the PCR quantification of HIV RNA extracted from serum. In December 1989, as required by the MTA, Holodniy sought permission from Cetus to publish an abstract at a UCLA symposium. Although Cetus contributors were initially excluded from the abstract, after correcting this omission, permission to publish was granted. The abstract, entitled *Quantitation of HIV-1 RNA in Serum and Correlation with Disease Status Using the Polymerase Chain Reaction*, concludes that the authors have demonstrated that PCR can be used to detect and quantitate HIV viral RNA extracted from patient serum and that such quantitation may be a useful marker for AIDS disease progression or the monitoring of anti-HIV therapy.

21.    This abstract later formed the basis of an article published in the Journal of Infectious Diseases in April 1991, entitled *Detection and Quantification of Human Immunodeficiency Virus RNA in Patient Serum by Use of the Polymerase Chain Reaction* (the "Serum Paper").  Listed authors include Stanford and Cetus researchers.  As the title suggests, the Serum Paper describes the results of joint work conducted by Cetus and Counterclaim Defendant Stanford relating to HIV RNA quantification.

22.    The April 1991 article begins by noting that HIV RNA was detected and quantified after extraction from the serum of HIV positive individuals by PCR and that such quantification "may be useful as a marker for disease progression or in monitoring antiviral therapy."  The article then describes the work that Cetus did which made PCR quantification of HIV RNA possible.  The article goes on to refer to unpublished work by the authors that suggests that the virus may be recovered even more easily from plasma.  Finally, the article concludes that "[s]erum PCR may provide an additional marker of disease progression and drug efficacy that could improve our ability to monitor the course of HIV infection."

23.    Despite Counterclaim Defendant Stanford's obligations to Cetus, Holodniy and Counterclaim Defendants Merigan and Stanford, after the publication of the Serum Paper, repeatedly took sole credit for work conducted jointly with Cetus.  For example, in May 1991, Holodniy submitted a paper to the Journal of Clinical Investigation entitled *Reduction in Plasma Human Immunodeficiency Virus Ribonucleic Acid after Dideoxynucleoside Therapy as Determined by the Polymerase Chain Reaction* (the "Plasma Paper").  The named authors are Holodniy, David Katzenstein, and Counterclaim Defendant Merigan from Stanford.  No Cetus employees were identified as authors, and there is no evidence that Counterclaim Defendant Stanford sought approval from Cetus in connection with this publication.

24.    In the Plasma Paper, which was first published in November 1991, the authors describe the use of PCR to detect and quantitate HIV RNA extracted from plasma.  The methods and reagents used are virtually identical to those described in the Serum Paper for PCR detection and quantitation of HIV RNA extracted from serum.  Nonetheless, Cetus researchers are given no credit for their critical contributions.

25.     The Plasma Paper was only the beginning of Counterclaim Defendant Stanford's efforts to take sole credit for the parties' joint work.  In published paper after published paper that followed, including those that reference earlier joint publications, Counterclaim Defendant Stanford intentionally omits reference to Cetus - either by claiming independent invention or by deleting reference to Cetus employees as authors, or both.  Internal Stanford documents also routinely credit only Counterclaim Defendant Stanford for the parties' joint work.  Moreover, such claims are also contained in statements made to government agencies related to grants obtained by Counterclaim Defendant Stanford concerning its AIDS-related work.

26.     Counterclaim Defendant Stanford also sought credit for the joint Stanford/Cetus work in the United States Patent & Trademark Office (the "PTO").  On May 14, 1992, Stanford's counsel submitted the parent for the '730 Patent Family application ("the May 1992 Application").  U.S. Patent No. 5,968,730, which ultimately issued on October 19, 1999 is entitled "Polymerase Chain Reaction Assays for Monitoring Antiviral Therapy and Making Therapeutic Decisions in the Treatment of Acquired Immunodeficiency Syndrome."  The named inventors of the '730 Patent are Drs. Thomas Merigan, Mark Holodniy, and David Katzenstein.  The methods claimed in the '730 Patent were the subject of the joint collaboration between Cetus and Stanford researchers and were covered by, among other things, the MTA, and the 1984 and 1991 consulting/confidentiality agreements between Counterclaimant RMS's predecessor, Cetus, and Counterclaim Defendant Merigan.

27.     Subsequently, U.S. Patent No. 6,503,705, a continuation of the '730 Patent, issued on January 7, 2003.  The '705 Patent contains claims that are substantially the same as those found in the '730 Patent.  The named inventors of the '705 patent are Drs. Thomas Merigan, Mark Holodniy, David Katzenstein and Michael Kozal.  As with the '730 Patent, the methods claimed in the '705 Patent were the subject of the joint collaboration between Cetus and Stanford researchers and are covered by, among other things, the MTA, and the 1984 and 1991 consulting/confidentiality agreements between Counterclaimant RMS's predecessor, Cetus, and Counterclaim Defendant Merigan.

28.    The May 1992 Application is also the parent of several additional patents/patent families and pending applications.  Through a series of continuations and divisions the May 1992 Application ultimately resulted in:  (1) U.S. Patent No. 5,631,128 entitled "Polymerase Chain Reaction Assays for Monitoring Antiviral Therapy and Making Therapeutic Decisions in the Treatment of Acquired Immunodeficiency Syndrome" issued on May 20, 1997 (the "'128 Patent"); (2) U.S. Patent No. 5,856,086, a continuation of the '128 Patent, entitled "Polymerase Chain Reaction Assays for Monitoring Antiviral Therapy and Making Therapeutic Decisions in the Treatment of Acquired Immunodeficiency Syndrome" issued on January 5, 1999 (the "'086 Patent"); (3) U.S. Reissued Patent No. US RE38,352 E, a reissue of the '086 Patent, entitled "Polymerase Chain Reaction Assays for Monitoring Antiviral Therapy and Making Therapeutic Decisions in the Treatment of Acquired Immunodeficiency Syndrome" issued on December 16, 2003 (the "'352 Patent"); (4) U.S. Patent No. 5,650,268, entitled "Polymerase Chain Reaction Assays for Monitoring Antiviral Therapy and Making Therapeutic Decisions in the Treatment of Acquired Immunodeficiency Syndrome" issued on July 22, 1997 (the "'268 Patent"); (5) U.S. Patent Application Publication No. US 2001/0018181 A1, entitled "Polymerase Chain Reaction Assays for Monitoring Antiviral Therapy and Making Therapeutic Decisions in the Treatment of Acquired Immunodeficiency Syndrome" filed on February 13, 2001 (the "2001 Patent Application"); and (6) U.S. Patent Application Publication No. US 2003/0118986 A1, entitled "Polymerase Chain Reaction Assays for Monitoring Antiviral Therapy and Making Therapeutic Decisions in the Treatment of Acquired Immunodeficiency Syndrome" filed on December 16, 2002 (the "2002 Patent Application").  The named inventors of the '128, '086, '352, and '268 Patents are Merigan and Kozal.  The named inventors on the 2001 Patent Application are Merigan, Katzenstein, Holodniy, and Kozal, and the named inventors on the 2002 Patent Application are Merigan, Katzenstein, and Holodniy.  The methods claimed in the '128, '086, '352, and '268 Patents and the 2001 and 2002 Patent Applications comprise the result of Counterclaim Defendant Merigan's and Holodniy's work at Cetus and are therefore covered by, among other things, the MTA, and the 1984 and 1991 consulting/confidentiality agreements between Counterclaimant RMS's predecessor, Cetus, and Counterclaim Defendant Merigan.

29.    Through a December 1991 Acquisition agreement, Hoffman-LaRoche, Inc. acquired Cetus' PCR business together with its PCR patent portfolio, both of which were subsequently transferred to Counterclaimant RMS.  As a result of that acquisition and subsequent transfer, Counterclaimant RMS was assigned rights in all the agreements between and among Stanford, Merigan, Holodniy and Cetus and the related intellectual property identified above.

**First Counterclaim for Relief**

**(Declaratory Judgment of Non-Infringement of the '730 and '705 Patents by All Counterclaimants against Counterclaim Defendant Stanford)**

30.    Counterclaimants reallege and incorporate by reference their Affirmative Defenses and paragraphs 1 through 29 of their Counterclaims, inclusive, as if fully set forth in this paragraph.

31.    As evidenced by the allegations in the Complaint, Counterclaim Defendant Stanford alleges that it is the owner of all right, title and interest in the '730 and '705 Patents and that the '730 and '705 Patents were duly and lawfully issued.  Counterclaim Defendant Stanford also alleges that Counterclaimants have infringed, and continue to infringe, the '730 and '705 Patents.

32.    Counterclaimants deny Counterclaim Defendant Stanford's allegations of infringement.  Accordingly, there exists a substantial and continuing justiciable controversy as to the infringement of the '730 and '705 Patents.

33.    Counterclaimants seek a declaratory judgment that the '730 and '705 Patents are not infringed, either directly, indirectly, under the doctrine of equivalents, or by contributory infringement or inducement, by any act of Counterclaimants either individually or collectively.

34.    On information and belief, Counterclaim Defendant Stanford served the Complaint on Counterclaimants with knowledge that the '730 and '705 Patents were not infringed.

**Second Counterclaim for Relief**

**(Declaratory Judgment of Invalidity of the '730 and '705 Patents by All Counterclaimants**

**against Counterclaim Defendant Stanford)**

35.     Counterclaimants reallege and incorporate by reference their Affirmative Defenses and paragraphs 1 through 34 of their Counterclaims, inclusive, as if fully set forth in this paragraph.

36.     As evidenced by the allegations in the Complaint, Counterclaim Defendant Stanford alleges that it is the owner of all right, title and interest in the '730 and '705 Patents and that the '730 and '705 Patents were duly and lawfully issued.

37.     Counterclaimants deny that the '730 and '705 Patents are valid.  Accordingly, there exists a substantial and continuing justiciable controversy as to the validity of the '730 and '705 Patents.

38.     Counterclaimants seek a declaratory judgment that the '730 and '705 Patents are invalid and/or unenforceable for failure to satisfy one or more of the requirements of Title 35, including without limitation, Sections 101, 102, 103, 112 and/or 282.

39.     On information and belief, Counterclaim Defendant Stanford served the Complaint on Counterclaimants with knowledge that the '730 and '705 Patents were invalid.

**Third Counterclaim for Relief**

**(Declaratory Judgment of Inventorship of the '730 and '705 Patents by Counterclaimant**

**RMS against Counterclaim Defendant Stanford)**

40.     Counterclaimant RMS realleges and incorporates by reference its Affirmative Defenses and paragraphs 1 through 39 of its Counterclaims, inclusive, as if fully set forth in this paragraph.

41.     As evidenced by the allegations in the Complaint, Counterclaim Defendant Stanford alleges Counterclaim Defendant Merigan, Katzenstein and Holodniy are the sole and true inventors of the '730 Patent and that Counterclaim Defendant Merigan, Katzenstein, Kozal and Holodniy are the sole and true inventors of the '705 Patent.

42.     Former employees of Counterclaimant RMS's predecessor-in-interest, Cetus, are joint inventors of the '730 and '705 Patents by virtue of the collaboration between those employees and employees of Counterclaim Defendant Stanford, and the inventive contributions of those Cetus employees to the subject matter claimed in the '730 and '705 Patents.

43.     As such Counterclaimants seeks declaratory relief that certain former employees of Counterclaimant RMS's predecessor-in-interest, Cetus, are joint inventors of the '730 and '705 Patents.

**Fourth Counterclaim for Relief**

**(Declaratory Judgment of Ownership of the '730 and '705 Patents by Counterclaimant RMS against Counterclaim Defendant Stanford)**

44.     Counterclaimant RMS realleges and incorporates by reference its Affirmative Defenses and paragraphs 1 through 43 of its Counterclaims, inclusive, as if fully set forth in this paragraph.

45.     As evidenced by the allegations in the Complaint, Counterclaim Defendant Stanford alleges that it is the owner of all right, title and interest in the '730 and '705 Patents by assignment from the named inventors.

46.     Counterclaimant RMS is the owner of the '730 and '705 Patents by virtue of at least one or more of the following: (1) the consulting/confidentiality agreements entered into between Counterclaimant RMS's predecessor-in-interest, Cetus, and Counterclaim Defendant Merigan, among others; and/or (2) the collaboration between employees of Counterclaimant RMS's predecessor-in-interest, Cetus, and employees of Counterclaim Defendant Stanford, and the inventive contributions of those Cetus employees to the subject matter claimed in the '730 and '705 Patents which requires that Cetus employees be named as joint inventors of the '730 and '705 Patents.

47.     As such Counterclaimant RMS seeks declaratory relief that it is the sole and exclusive owner of the '730 and '705 Patents or, in the alternative, that it owns a pro rata undivided interest in the '730 and '705 Patents.

1

2                                **Fifth Counterclaim for Relief**

3      **(Declaratory Judgment of Unenforceability of the '730 and '705 Patents by All**

4                **Counterclaimants against Counterclaim Defendant Stanford)**

5          48.    Counterclaimants reallege and incorporate by reference their Affirmative Defenses

6   and paragraphs 1 through 47 of their Counterclaims, inclusive, as if fully set forth in this

7   paragraph.

8          49.    On information and belief, the '730 and '705 Patents are unenforceable by

9   Counterclaim Defendant Stanford or any of the named inventors due to Counterclaim Defendant

10  Stanford's and the named inventors' willful violation of the provisions of 37 C.F.R. 1.56 in

11  procuring the '730 and '705 Patent.  Counterclaimants believe that further investigation and

12  discovery will provide additional evidentiary support showing that Counterclaim Defendant

13  Stanford and the named inventors willfully misrepresented and omitted information from the

14  United States Patent and Trademark Office ("PTO") that was material to the PTO's decision to

15  grant the '730 and '705 Patents, including at least the following:

16              a.    Counterclaim Defendant Stanford and the named inventors failed to

17  disclose to the PTO the collaboration between employees of Counterclaimant RMS's predecessor-

18  in-interest, Cetus, and employees of Counterclaim Defendant Stanford, and the inventive

19  contributions of those Cetus employees to the subject matter claimed in the '730 and '705 Patents.

20  Despite the fact that inventorship is material to patentability, Counterclaim Defendant Stanford

21  and the named inventors actively concealed from the PTO the contributions of Cetus employees to

22  the subject matter of the claimed inventions, including that Cetus employees played key roles in

23  the development of:  (1) the specific steps in the method developed for quantitating HIV using

24  PCR; (2) the first-of-their-kind standards or controls for quantitation of HIV RNA which made

25  quantitation possible; (3) the 30 cycle assay for detection and quantitation of HIV; and (4) the

26  amplification of RNA extracted from plasma samples.  Although these contributions entitled Cetus

27  employees to be named as joint inventors on the '730 and '705 Patents, Counterclaim Defendant

28  Stanford and the named inventors affirmatively misrepresented to the PTO that they were the only

1    true inventors of the claims in the '730 and '705 Patents. The initial application listed only

2    Counterclaim Defendant Merigan and Kozal as inventors. Subsequently, in November 1992, the

3    applicants petitioned to correct inventorship and sought to add Holodniy and Katzenstein as joint

4    inventors. In connection with the petition, Merigan declared under penalty of perjury that at the

5    time of filing, he did not discuss the issue of inventorship with his counsel. Thereafter, however,

6    Merigan began to question whether Katzenstein and Holodniy also should be included as

7    inventors. After discussing this issue with both counsel and Katzenstein and Holodniy, the

8    decision was made to add Katzenstein and Holodniy as inventors. According to the declaration of

9    Barry Elledge, Stanford's prosecution counsel, Holodniy had the following comments concerning

10   his inventorship role:

11   
12       Dr. Holodniy stated that he was until the summer of 1991 a research fellow in the Division
         of Infectious Disease at Stanford University. His inventive contribution to the subject
         matter of the present application occured (sic) during this period, and principally concerns
13       quantitation of HIV RNA in plasma of AIDS patients.

14   Upon information and belief, these statements and omissions, among others, were intentional and

15   were designed to mislead the PTO with respect to the true inventorship of the '730 and '705

16   Patents.

17           b.      Counterclaim Defendant Stanford and the named inventors failed to

18   properly disclose to the PTO an April 1991 article authored by Stanford's Drs. Merigan,

19   Katzenstein, and Holodniy entitled Detection and Quantification of Human Immuno-deficiency

20   Virus RNA in Patient Serum by Use of the Polymerase Chain Reaction, 163 J. INFECT. DIS. 862-

21   866 (1991) (the "Serum Paper"). The Serum Paper disclosed each of the features that Stanford

22   claims in the '730 and '705 Patents more than one year prior to the filing of the application which

23   resulted in the '730 and '705 Patents. The Serum Paper describes the PCR amplification and

24   quantitation of HIV RNA extracted from blood of patients and discloses exactly the same

25   quantitative PCR method that is described in the '730 and '705 Patents, including the use of 30

26   cycles of amplification and the same PCR standard for quantitation. The paper also demonstrates

27   that there is a correlation between the level of HIV RNA molecules in the blood and the clinical

28   status of the HIV-positive patient - i.e., HIV RNA level is a "marker" of disease progression.

1   Despite its materiality and the fact that it would likely have supported a rejection of the claims in

2   the '730 and '705 Patents, Counterclaim Defendant Stanford and the named inventors failed to

3   properly highlight this prior art in its information disclosure statements and failed to bring it to the

4   attention of the examiners during the prosecution of the '730 and '705 Patents with the intent to

5   mislead the PTO.

6        50.    Accordingly, Counterclaimants seek declaratory relief that the '730 and '705 Patents

7   are unenforceable by Counterclaim Defendant Stanford.

8

9                    **Sixth Counterclaim for Relief**

10   **(Declaratory Judgment of License to the '730 and '705 Patents by Counterclaimant RMS**

11                **against Counterclaim Defendant Stanford)**

12       51.    Counterclaimant RMS realleges and incorporates by reference its Affirmative

13   Defenses and paragraphs 1 through 50 of their Counterclaims, inclusive, as if fully set forth in this

14   paragraph.

15       52.    Counterclaimants RMS holds a non-exclusive, irrevocable, royalty-free, worldwide

16   license under both the '730 and '705 Patents from the date of alleged invention of the subject

17   matter claimed in the '730 and '705 Patents by virtue of at least one or more of the following:

18   (1) the materials transfer agreement entered into between Counterclaimant RMS's predecessor-in-

19   interest, Cetus, and Counterclaim Defendant Merigan and others at Counterclaim Defendant

20   Stanford; and/or (2) the consulting/confidentiality agreements entered into between

21   Counterclaimant RMS's predecessor-in-interest, Cetus, and Counterclaim Defendant Merigan,

22   among others.

23       53.    Accordingly, Counterclaimants seek declaratory relief that Counterclaimant RMS

24   holds non-exclusive, irrevocable, royalty-free, worldwide license in the '730 and '705 Patents.

25

26

27

28

**Seventh Counterclaim for Relief**

**(Declaratory Judgment of Ownership of the '128, '086, '352, and '268 Patents by**

**Counterclaimant RMS against Counterclaim Defendant Stanford)**

54.    Counterclaimant RMS realleges and incorporates by reference its Affirmative Defenses and paragraphs 1 through 53 of its Counterclaims, inclusive, as if fully set forth in this paragraph.

55.    According to the Patents, Counterclaim Defendant Stanford holds all right, title and interest in the '128, '086, '352, and '268 Patents by assignment from the named inventors.

56.    On information and belief, Counterclaimant RMS is the owner of the '128, '086, '352, and '268 Patents by virtue of the consulting/confidentiality agreements entered into between Counterclaimant RMS's predecessor-in-interest, Cetus, and Counterclaim Defendant Merigan, among others.

57.    As such Counterclaimant RMS seeks declaratory relief that it is the sole and exclusive owner of the '128, '086, '352, and '268 Patents.

**Eighth Counterclaim for Relief**

**(Declaratory Judgment of Ownership of the 2001 and 2002 Patent Applications by**

**Counterclaimant RMS against Counterclaim Defendants Stanford and Merigan)**

58.    Counterclaimant RMS realleges and incorporate by reference its Affirmative Defenses and paragraphs 1 through 57 of its Counterclaims, inclusive, as if fully set forth in this paragraph.

59.    On information and belief, Counterclaimant RMS is the owner of the 2001 and 2002 Applications and the subject matter claimed therein by virtue of the consulting/confidentiality agreements entered into between Counterclaimant RMS's predecessor-in-interest, Cetus, and Counterclaim Defendant Merigan, among others.

60.    As such Counterclaimant RMS seeks declaratory relief that it is the sole and exclusive owner of the 2001 and 2002 Patent Applications.

**Ninth Counterclaim for Relief**

**(Declaratory Judgment of License to the '128, '086, '352, and '268 Patents by**

**Counterclaimant RMS against Counterclaim Defendant Stanford)**

61.    Counterclaimant RMS realleges and incorporates by reference its Affirmative Defenses and paragraphs 1 through 60 of their Counterclaims, inclusive, as if fully set forth in this paragraph.

62.    Counterclaimants RMS holds a non-exclusive, irrevocable, royalty-free, worldwide license under the '128, '086, '352, and '268 Patents from the date of alleged invention of the subject matter claimed in the Patents by virtue of at least one or more of the following:  (1) the materials transfer agreement entered into between Counterclaimant RMS's predecessor-in-interest, Cetus, and Counterclaim Defendant Merigan and others at Counterclaim Defendant Stanford; and/or (2) the consulting/confidentiality agreements entered into between Counterclaimant RMS's predecessor-in-interest, Cetus, and Counterclaim Defendant Merigan, among others.

63.    Accordingly, Counterclaimants seek declaratory relief that Counterclaimant RMS holds non-exclusive, irrevocable, royalty-free, worldwide license in the '128, '086, '352, and '268 Patents.


**Tenth Counterclaim for Relief**

**(Declaratory Judgment of License to the 2001 and 2002 Patent Applications by**

**Counterclaimant RMS against Counterclaim Defendants Stanford and Merigan)**

64.    Counterclaimant RMS realleges and incorporates by reference its Affirmative Defenses and paragraphs 1 through 63 of their Counterclaims, inclusive, as if fully set forth in this paragraph.

65.    Counterclaimants RMS holds a non-exclusive, irrevocable, royalty-free, worldwide license under the 2001 and 2002 Patent Applications from the date of alleged invention of the subject matter claimed in the Patents by virtue of at least one or more of the following:  (1) the materials transfer agreement entered into between Counterclaimant RMS's predecessor-in-interest, Cetus, and Counterclaim Defendant Merigan and others at Counterclaim Defendant Stanford;

1  and/or (2) the consulting/confidentiality agreements entered into between Counterclaimant RMS's

2  predecessor-in-interest, Cetus, and Counterclaim Defendant Merigan, among others.

3      66.    Accordingly, Counterclaimants seek declaratory relief that Counterclaimant RMS

4  holds non-exclusive, irrevocable, royalty-free, worldwide license in the 2001 and 2002 Patent

5  Applications.

6

7  **Eleventh Counterclaim for Relief**

8  **(Breach of Contract by Counterclaimant RMS against Counterclaim Defendant Merigan)**

9      67.    Counterclaimant RMS realleges and incorporates by reference its Affirmative

10  Defenses and paragraphs 1 through 66 of its Counterclaims, inclusive, as if fully set forth in this

11  paragraph.

12      68.    By virtue of the 1984 and 1991 consulting/confidentiality agreements entered into

13  between Counterclaimant RMS's predecessor-in-interest, Cetus, and Counterclaim Defendant

14  Merigan of Stanford, Counterclaim Defendant Merigan was required upon the termination of the

15  agreements, or at any time upon Cetus's request, to, among other things, surrender to Cetus all

16  confidential information in Counterclaim Defendant Merigan's possession after the termination of

17  the consulting/confidentiality agreements.

18      69.    Cetus performed all of its obligations under its agreements with Merigan and as

19  Cetus's successor-in-interest, Counterclaimant RMS is entitled to the return of all of Cetus's

20  confidential information in Counterclaim Defendant Merigan's possession.

21      70.    Counterclaimant RMS demanded, among other things, the immediate return of all

22  Cetus's confidential information in Counterclaim Defendant Merigan's possession by letter dated

23  November 4, 2005.  Counterclaim Defendant Merigan has refused to comply.

24      71.    Accordingly, Counterclaim Defendant Merigan is in breach of the terms of the

25  1984 and 1991 consulting/confidentiality agreements and, as a result of that conduct,

26  Counterclaimant RMS has been damaged in an amount to be proven at trial.

27

28

1

**Twelfth Counterclaim for Relief**

2

**(Specific Performance by Counterclaimant RMS against Counterclaim Defendant Merigan)**

3    72.    Counterclaimant RMS realleges and incorporates by reference its Affirmative

4  Defenses and paragraphs 1 through 71 of its Counterclaims, inclusive, as if fully set forth in this

5  paragraph.

6    73.    As set forth above, by virtue of the 1984 and 1991 consulting/confidentiality

7  agreements Counterclaim Defendant Merigan was required upon termination of the agreements

8  and/or at any time upon Cetus's request to return all Cetus confidential information in

9  Counterclaim Defendant Merigan's possession.

10    74.    In addition, by virtue of the 1984 consulting/confidentiality agreement entered into

11  between Counterclaimant RMS's predecessor-in-interest, Cetus, and Counterclaim Defendant

12  Merigan, Counterclaim Defendant Merigan was also required upon demand at any time to assign

13  and convey to Cetus the sole and exclusive right, title, and interest in and to any inventions (and

14  patents thereon) made or completed during the seven year consulting period covered by the

15  agreement, or made during the consulting period and completed within one year of the expiration

16  of the consulting period, which inventions were:  (1) made or conceived using Cetus's equipment,

17  facilities, supplies, or confidential information; (2) made or conceived during hours in which

18  Counterclaim Defendant Merigan was performing work for Cetus; or (3) which resulted from

19  work performed by Counterclaim Defendant Merigan for Cetus during the consulting period.  On

20  information and belief, the inventions claimed in the '730, '705 '128, '086, '352, and '268 Patents

21  and the 2001 and 2002 Patent Applications are covered by this agreement.

22    75.    Cetus performed all of its obligations under its agreements with Merigan and

23  Counterclaimant RMS, as Cetus's successor-in-interest, demanded, among other things, the

24  immediate return of all of Cetus's confidential information in Counterclaim Defendant Merigan's

25  possession by letter dated November 4, 2005.  Counterclaim Defendant Merigan has refused to

26  comply.  Counterclaimant RMS also hereby demands that Counterclaim Defendant Merigan take

27  all steps necessary to effectuate an assignment of all right, title, and interest in the '730, '705 '128,

28  '086, '352, and '268 Patents and the 2001 and 2002 Patent Applications to Counterclaimant RMS.

76.    The Cetus information of Cetus possessed by Counterclaim Defendant Merigan, and the '730, '705 '128, '086, '352, and '268 Patents and the 2001 and 2002 Patent Applications are unique such that the legal remedy for Counterclaim Defendant Merigan's breach of his obligations under the 1984 and 1991 consulting/confidentiality agreements is inadequate and, therefore, Counterclaimant RMS is entitled to specific performance of the agreements.

**PRAYER FOR RELIEF**

Wherefore, Defendants and Counterclaimants Roche Molecular Systems, Inc.; Roche Diagnostics Corporation; and Roche Diagnostics Operations, Inc. (collectively "Counterclaimants") pray for entry of judgment:

(1)    dismissing the Complaint with prejudice;

(2)    that Counterclaim Defendant Stanford take nothing by way of its Complaint;

(3)    declaring that Counterclaimant RMS is the sole and exclusive owners of all right, title and interest in the '730, '705, '128, '086, '352, and '268 Patents and the 2001 and 2002 Patent Applications;

(4)    declaring that Counterclaimant RMS holds an undivided pro rata ownership interest in the '730 and '705 Patents;

(5)    declaring that Counterclaimant RMS is entitled to retroactive and non-exclusive, irrevocable, royalty-free, worldwide license under the '730, '705, '128, '086, '352, and '268 Patents and the 2001 and 2002 Patent Applications;

(6)    ordering Counterclaim Defendant Merigan to return of all Cetus Corporation's confidential information in Counterclaim Defendant Merigan's possession to Counterclaimant RMS, and to take all steps necessary to assign all right, title and interest in the '730, '705, '128, '086, '352, and '268 Patents and the 2001 and 2002 Patent Applications to Counterclaimant RMS as required by the consulting/confidentiality agreements between Cetus and Counterclaim Defendant Merigan;

1        (7)    awarding damages in an amount to be proven at trial to Counterclaimant

2    RMS for Defendant Merigan's failure to return of all Cetus Corporation's confidential information

3    in Counterclaim Defendant Merigan's possession;

4        (8)    ordering disgorgement of all profits realized by Counterclaim Defendants

5    due to the licensing of the '730, '705, '128, '086, '352, and '268 Patents and subject matter claimed

6    in the 2001 and 2002 Patent Applications;

7        (9)    ordering that Counterclaim Defendants hold and have held the '730, '705

8    '128, '086, '352, and '268 Patents and the 2001 and 2002 Patent Applications and any royalties or

9    other profits derived from licensing the Patents or the subject matter claimed in the Patents or

10   Patent Applications in trust for Counterclaimants;

11       (10)    declaring that the '730 and '705 Patents have not been infringed by

12   Counterclaimants;

13       (11)    declaring that each claim of the '730 and '705 Patents is invalid;

14       (12)    enjoining Counterclaim Defendant Stanford, its officers, agents, servants,

15   employees, and attorneys, and all persons in active concert or participation with them, from

16   directly or indirectly charging infringement, or instituting any further action for infringement of

17   the '730 and 705 Patents against Counterclaimants or any of their customers;

18       (13)    declaring that this case is exceptional pursuant to 35 U.S.C. § 285, and

19   awarding Counterclaimants their reasonable attorneys' fees, expenses and costs incurred in this

20   action; and

21

22

23

24

25

26

27

28

1          (14)    awarding to Counterclaimants such other and further relief as may be just

2    and proper.

3

4    DATED:  November 17, 2005          QUINN EMANUEL URQUHART OLIVER &
                                        HEDGES, LLP
5

6                                       By_____/s/_____

7                                          Robert W. Stone (Bar No. 163513)
                                           Attorneys for Defendants and Counterclaimants Roche
8                                          Molecular Systems, Inc.; Roche Diagnostics
                                           Corporation; and Roche Diagnostics Operations, Inc.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28