QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  Adrian M. Pruetz (Bar No. 118215)
  Jeffrey N. Boozell (Bar No. 199507)
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:    (213) 443-3000
Facsimile:    (213) 443-3100
E-Mail:        adrianpruetz@quinnemanuel.com
              jeffboozell@quinnemanuel.com

  Robert W. Stone (Bar No. 163513)
  Brian C. Cannon (Bar No. 193071)
  TJ Chiang (Bar No. 235165)
555 Twin Dolphin Drive, Suite 560
Redwood Shores, California  94065
Telephone:  (650) 801-5000
Facsimile:  (415) 801-5100
E-Mail:        robertstone@quinnemanuel.com
              tjchiang@quinnemanuel.com

Attorneys for Defendants and Counterclaimants
Roche Molecular Systems, Inc.; Roche
Diagnostics Corporation; and Roche Diagnostics
Operations, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY,<br><br>    Plaintiff,<br><br>    vs.<br><br>ROCHE MOLECULAR SYSTEMS, INC.; ROCHE DIAGNOSTICS CORPORATION; ROCHE DIAGNOSTICS OPERATIONS, INC.,<br><br>    Defendants. | CASE NO. C-05-04158 MHP<br><br><br>DEFENDANTS' BRIEF ON STANFORD'S WAIVER OF THE ATTORNEY-CLIENT PRIVILEGE AND WORK PRODUCT PROTECTION CONCERNING INVENTORSHIP |
| ROCHE MOLECULAR SYSTEMS, INC. ROCHE DIAGNOSTICS CORPORATION; ROCHE DIAGNOSTICS OPERATIONS, INC.,<br><br>    Counterclaimants,<br><br>    vs.<br><br>THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY; AND THOMAS MERIGAN.<br><br>    Counterclaim Defendants. | |

**PRELIMINARY STATEMENT**

In order to convince the United States Patent and Trademark Office to correct inventorship and approve its patent applications, Stanford deliberately disclosed communications between the alleged inventors and Stanford's lawyers.  Now that the patents have issued, Stanford seeks to prevent discovery concerning communications between the named inventors and their lawyers concerning inventorship.  Stanford's efforts to raise this shield are improper.  Stanford's waiver was knowing and complete.  Since the issues here are related to ownership, Roche will be severely prejudiced by Stanford's waiving that which it deems helpful and withholding that which it deems not.  Accordingly, Defendants now seek the production of all documents concerning inventorship, without temporal limitation.

**STATEMENT OF FACTS**

On May 14, 1992, Stanford's lawyers, Pennie & Edmonds, filed United States Patent Application No. 07/883,327 (the "'327 Application") in the United States Patent and Trademark Office ("PTO") on behalf of Drs. Michael J. Kozal and Thomas C. Merigan. The '327 Application is the common ancestor of all of the patents-in-suit.  As originally filed, it listed only Drs. Merigan and Kozal as inventors.

On December 7, 1992, while the '327 Application was pending in the PTO, Pennie & Edmonds filed a petition to change the inventorship of the '327 Application.  The petition sought to add Drs. Mark Holodniy and David A. Katzenstein as inventors.  The applicants submitted several declarations to support the petition to correct inventorship, including those by Dr. Merigan and attorney Barry Elledge of Pennie & Edmonds.  The explanation presented to the PTO was that the error in failing to name Drs. Holodniy and Kozal principally occurred because the application was filed under extreme time pressure.  See Declaration of T.J. Chiang ("Chiang Decl."), Ex. B, ¶ 11.

Dr. Merigan submitted a declaration to show that he had "never attempted to mislead or deceive the law firm of Pennie & Edmonds, the PTO, Stanford University or the scientific community . . . ."  Chiang Decl., Ex. A, ¶ 10.  In support of that contention, Dr. Merigan detailed

numerous communications he had with the attorneys at Pennie & Edmonds and the legal advice he received from them. <u>See generally id.</u> In particular, Dr. Merigan declared:

- "I supplied to Pennie & Edmonds a copy of an unpublished manuscript that was to be used as a source of information for the application." <u>Id.</u>, Ex. A, ¶ 2.

- "A copy of the Invention Disclosure and an abstract by Dr. Kozal and me were provided to Pennie & Edmonds in late April, 1992, for use in preparing the above referenced patent application." <u>Id.</u>, Ex. A, ¶ 4.

- "I contacted attorney Laura Coruzzi at Pennie & Edmonds about inventorship. At her suggestion, I requested Drs. Katzenstein and Holodniy to review the patent application and determine whether in their opinions they should be included as inventors." <u>Id.</u>, Ex. A, ¶ 8.

- "Drs. Katzenstein and Holodniy communicated to me their opinions that their contributions should entitle them to be named as coinventors. I informed attorney Laura Coruzzi of these opinions, and requested Pennie & Edmonds to pursue whatever action needed to be done to name the proper coinventors." <u>Id.</u>, Ex. A, ¶ 9.

Chiang Decl., Ex. A, ¶¶ 2–9.

Attorney Barry Elledge of Pennie & Edmonds also submitted a declaration in support of the petition. In that declaration, Elledge stated his belief that the error in inventorship in the original application occurred principally because of extreme time pressure. Chiang Decl., Ex. B, ¶ 11. In addition, Elledge provided a detailed account of his conversations with Drs. Merigan, Holodniy, Katzenstein and Kozal regarding their inventive contributions, his state of mind concerning inventorship as well as the states of mind of his colleagues, and his own beliefs and opinions as to the inventive contributions of the named inventors. <u>See Id.</u>, Ex. B, ¶¶ 5, 7–9. Specifically, Elledge declared:

- "I am an associate attorney at the law firm of Pennie & Edmonds. In September 1992, attorney Laura A. Coruzzi at Pennie & Edmonds requested that I investigate the inventorship issue . . . ." <u>Id.</u>, Ex. B, ¶ 1.

- "Dr. Kole [of Pennie & Edmonds] stated that, to the best of her recollection, Dr. Merigan and Kozal were listed as inventors of the above-referenced application because they were the persons named on the Information Disclosure statement, and with whom she had discussed the invention." <u>Id.</u>, Ex. B, ¶ 3.

- "Dr. Holodniy stated that he was until the summer of 1991 a research fellow in the Division of Infectious Disease at Stanford University. His inventive contribution to the

subject matter of the present application occured [sic] during this period, and principally concerns quantitation of HIV RNA in plasma of AIDS patients." Id., Ex. B, ¶ 7.

- "Dr. Katzenstein has indicated that his inventive contribution principally concerns the relationship between the quantity of HIV RNA in plasma of AIDS patients and disease progression." Id., Ex. B, ¶ 8.

- "On the basis of the above materials and conversations, I believe that both Dr. Holodniy and Dr. Katzenstein have made an inventive contribution to the subject matter of one or more claims of the above-referenced application." Id., Ex. B, ¶ 10.

Chiang Decl., Ex. B, ¶¶ 1–10.

The PTO accepted the affidavits, and, after finding "the error in inventorship occurred without deceptive intent," granted the petition for correction of inventorship on May 10, 1994. See Chiang Decl., Ex. C.

## ARGUMENT

I.    STANFORD'S ATTORNEY-CLIENT PRIVILEGE AND WORK PRODUCT IMMUNITY HAVE BEEN WAIVED BY ITS DISCLOSURES TO THE PTO.

A.    Federal Circuit Law Governs.

"Federal Circuit law applies when deciding whether particular written or other materials are discoverable in a patent case, because they relate to an issue of substantive patent law." In re Spalding Sports Worldwide, Inc., 203 F.3d 800, 803-04 (Fed. Cir. 2000) ("[A] determination of the applicability of the attorney-client privilege to Spalding's invention record clearly implicates, at the very least, the substantive patent issue of inequitable conduct."). In the Federal Circuit, the "attorney-client privilege evaporates upon any voluntary disclosure of confidential information to a third party." Carter v. Gibbs, 909 F.2d 1450, 1451 (Fed. Cir. 1990) (en banc). Similarly, when a party discloses attorney work product, "the criteria for waiver of the work product and attorney client privileges are equivalent." Id.

Once the privilege is waived, "the privilege is generally lost for all purposes and in all forums." Genentech, Inc. v. U.S. Intern. Trade Comm'n, 122 F.3d 1409, 1416 (Fed. Cir. 1997). This applies to waiver before government agencies, outside of litigation, as it is nonetheless a waiver of the privilege. See In re Pioneer Hi-Bred Intern., Inc., 238 F.3d 1370, 1374-75 (Fed. Cir.

2001) (disclosure to Securities and Exchange Commission of counsel's tax advice waived privilege "with respect to all documents which formed the basis for the advice, all documents considered by counsel in rendering that advice, and all reasonably contemporaneous documents reflecting discussions by counsel or others concerning that advice").  Particularly for the purposes of this case, waiver before the PTO is waiver for all other forums.  Winbond Elecs. Corp. v. Int'l Trade Comm'n, 262 F.3d 1363, 1376 (Fed. Cir. 2001) ("This court has held that a patentee's inadvertent waiver of attorney-client privilege in a patent infringement litigation is a general waiver 'for all purposes.'") (quoting Genentech).

> B.    Stanford waived all privileges and immunities by voluntarily disclosing and putting "at issue" the substance of attorney-client communications, attorney advice, attorney work product and mental impressions, and attorney legal conclusions.

In this case, Stanford knowingly and voluntarily disclosed both confidential attorney-client communications and attorney work product concerning inventorship to the PTO.  Thus, a finding of waiver is warranted.

In his declaration, Dr. Merigan disclosed the contents of confidential attorney-client communications to the PTO.  In particular, he recounted discussions and communications with his counsel relating to the details of his inventive contributions as well as the inventive contributions of Drs. Katzenstein and Holodniy.  See Chiang Decl., Ex. A, ¶¶ 2–4, 9.  He also recounted legal advice provided to him by his counsel.  Id., Ex. A, ¶ 8 (counsel requested that Dr. Merigan contact Drs. Holodniy and Katzenstein as part of an effort to determine if they should be named as inventors).

Similarly, attorney Barry Elledge revealed the substance of confidential communications with his clients regarding inventorship and inventive contribution.  See Chiang Decl., Ex. A, ¶¶ 7–9 (describing alleged inventive contributions of Holodniy, Katzenstein and Kozal).  In addition, he also revealed the substance of confidential communications with his colleagues involved in preparing the application.  Id., Ex. B, ¶¶ 1–4 (describing communications with attorney Coruzzi and law clerk Kole).  Furthermore, he also disclosed the mental processes of the attorneys and staff who prepared the application.  Id., Ex. B, ¶¶ 3–4 (the listing of inventors in the initial

1  application was based on the persons named in the Information Disclosure).  Finally, Elledge

2  disclosed his opinion regarding inventorship based on his investigation and the discussions

3  disclosed above:  "On the basis of the above materials and conversations, I believe that both Dr.

4  Holodniy and Dr. Katzenstein have made an inventive contribution to the subject matter of one or

5  more claims of the above-referenced application."  Chiang Decl., Ex. B, ¶ 10.

6        The Federal Circuit has consistently held that disclosures, like those above, waive

7  privilege.  For example, in GFI, Inc. v. Franklin Corp., 265 F.3d 1268 (Fed. Cir. 2001), the court

8  held:

> The district court properly found that GFI waived privilege when its patent attorney
> testified in [a prior] litigation about his state of mind, knowledge of prior art, and
> communications with his client. On cross-examination, he discussed his
> conversations with Sproule regarding the duty of disclosure, discussions they had
> prior to an interview with the PTO, and various items of prior art Sproule had or
> had not told him about. We see no error in the district court's order to GFI to
> release the allegedly privileged information.

14  Id. at 1273; Fort James Corp. v. Solo Cup Co., 412 F.3d 1340 (Fed. Cir. 2005) (document stating

15  "legal counsel has advised a bar was not established during experimental trials" waived privilege);

16  In re Pioneer, 238 F.3d at 1374 (statement that discussion of tax consequences "is the opinion of

17  Skadden, Arps, Slate, Meagher & Flom LLP" waived privilege); Winbond, 262 F.3d at 1376.

18  Accordingly, controlling precedent establishes that Stanford's actions in this lawsuit are improper.

19        C.    *Winbond Elecs. Corp. v. Int'l Trade Comm'n is directly on point.*

20        The present dispute is virtually identical to that resolved by the Federal Circuit in

21  Winbond, 262 F.3d 1363 (Fed. Cir. 2001); if anything, the waiver here is more extensive.  In

22  Winbond, the patentee Atmel initially petitioned the ITC for enforcement of its patent, but then

23  discovered that the patent had improper inventorship.  Atmel petitioned the PTO to correct

24  inventorship by adding Anil Gupta as an inventor.  In support of Atmel's petition, Gupta

25  submitted a declaration stating: "The standard of inventorship as it relates to the '903 patent has

26  been explained to me.  Based on my understanding of that standard, I hereby state that I have

27  made an inventive contribution to the subject matter claimed in the '903 patent . . . ."  Id. at 1373.

28

In a subsequent enforcement action, the ITC found that the attorney-client privilege and work product protections were waived, and the Federal Circuit affirmed, holding:

> In affirming the administrative law judge's determination that Atmel waived its attorney-client privilege and work product protection for documents and communications relating to inventorship of the '903 patent, the Commission stated:
>
> "By expressly relying on Mr. Gupta's statement as a central part of its effort to obtain a certificate of correction and then using that certificate to convince the Commission to reconsider the enforceability of the '903 patent, Atmel explicitly placed the legal advice to Mr. Gupta—and the fact that Mr. Gupta had obtained that advice—"at issue" in these proceedings."
> . . .
> Atmel continued by explaining that Mr. Gupta understood that he was an inventor upon receiving an explanation of the law enunciated by this court's *Ethicon* opinion.  Thus, the Commission correctly found that Atmel put at issue Mr. Gupta's, and thus its attorneys', understanding of inventorship law both before and after the Commission's initial decision.

Id. at 1375-76.

The statement by Gupta in Winbond ("The standard of inventorship as it relates to the '903 patent has been explained to me.  Based on my understanding of that standard, I hereby state that I have made an inventive contribution . . .") and the statement by Elledge in this case ("On the basis of the above materials and conversations, I believe that both Dr. Holodniy and Dr. Katzenstein have made an inventive contribution . . .") are functionally equivalent.  Both statements were presented to the PTO in support of a petition to correct inventorship; both state that a certain inventor made an inventive contribution; both rely on attorney opinion in supporting that assertion and avoiding a finding of deceptive intent; both patentees successfully obtained the correction of inventorship; and both now rely on the corrected inventorship to assert the patent in subsequent proceedings.  The Federal Circuit in Winbond held that the patentee waived its "attorney-client privilege and work product protection for documents and communications relating to inventorship." Id. at 1375.  The same conclusion and finding is justified here.

D.    Stanford's improper actions prejudice Roche.

After disclosing some attorney-client communications to the PTO to successfully obtain its patents, Stanford now seeks to shield all other communications on the same subject matter.  A

1   finding of waiver of both the attorney-client privilege and work product protection is essential

2   under these circumstances to prevent prejudice to Defendants.  If Stanford is permitted to assert

3   attorney-client privilege or work product protection, Roche would be unfairly disadvantaged in

4   attempting to challenge the accuracy of the declarations submitted by Stanford.  To prepare its

5   case, Roche needs to be able to question the named inventors and Stanford's lawyers about all the

6   conversations they had concerning inventorship.  Stanford cannot selectively disclose the portions

7   of the conversations it deems helpful but shield those it does not.  How can Roche challenge

8   Elledge's assertion, "I believe that both Dr. Holodniy and Dr. Katzenstein have made an inventive

9   contribution," without access to related notes, memos, and other work product of those involved

10  attorneys and named inventors that reflect the basis of that belief?  In this case, Roche asserts an

11  ownership interest in the patents based on Drs. Holodniy's and Merigan's contracts with Cetus

12  (Roche's predecessor-in-interest) and their interactions with Cetus scientists.  The information

13  sought by Roche is directly related to this issue; for example, to determine whether the alleged

14  inventive contribution falls within the terms of the contracts with Cetus.

15  II.    THE SCOPE OF THE WAIVER EXTENDS TO ALL INFORMATION RELATING TO
       INVENTORSHIP, WITHOUT TEMPORAL LIMITATION.

16

17         A.    The waiver extends to all information related to inventorship.

18         "The widely applied standard for determining the scope of a waiver of attorney-client

19  privilege is that the waiver applies to all other communications relating to the same subject matter.

20  . . .  It would be unfair to permit Fort James to rely on favorable legal opinions, but protect the

21  communications on which those opinions depend."  Fort James, 412 F.3d at 1349.  On its face, the

22  Elledge declaration discloses that he consulted *all four* named inventors regarding the

23  "inventorship question," and opines on the nature of their inventive contribution.  See Chiang

24  Decl., Ex. B, ¶¶ 5, 7-9.  Thus the subject matter plainly encompasses at least the inventorship of

25  the '327 Application and the inventive contributions of each of the named inventors.  More

26  directly, in Winbond, with virtually identical facts, the scope of the waiver was determined to be:

27  "attorney-client privilege and work product protection for documents and communications relating

28  to inventorship."  Id. at 1375.

1    Accordingly, Defendants request and order that Stanford has waived the attorney-client

2  privilege and work product protection for documents and communications relating to the

3  inventorship of each of the patents and applications that derive from the '327 application,

4  including, for example, the invention disclosure for each of those patents and applications.[1]

5    B.    The temporal scope extends to the present day.

6    At the very least, the temporal scope of the waiver of privilege extended from the first

7  contact between the named inventors with Pennie & Edmonds regarding the '327 application

8  (according to Dr. Merigan's declaration, in March 1992) up until the PTO granted the petition for

9  correction of inventorship on May 10, 1994.  However, in Defendants' view, the waiver extends

10  well beyond that to the present day.  Stanford continues to place the communications with counsel

11  and its attorneys' opinions regarding inventorship of the '327 Application before the PTO.

12    The issue of the inventorship of the '327 Application remains before the PTO because

13  Stanford continues to file continuation and divisional applications that trace their parentage

14  directly to the '327 Application, most recently on Jan. 23, 2006.  In those continuation and

15  divisional applications, Stanford asserts not only that Drs. Holidniy and Katzenstein are inventors,

16  it continues to rely on the Merigan and Elledge declarations to prove that fact.  Those declarations

17  thus form part of the PTO file for those subsequent applications.  See, e.g., Chiang Decl., Ex. A &

18  B (the Merigan and Elledge Declarations, from the file history for the '705 patent, filed on Feb.

19  13, 2001, with a date stamp showing that it was resubmitted to the PTO in 1995).  Because

20  Stanford continues to place attorney-client communications and attorney work product and

21  opinion at issue before the PTO, Roche is entitled to discover whether subsequent attorney-client

22  communications or attorney work product undermine the veracity of the Merigan and Elledge

23  declarations when they are presented again in the later proceedings.

24    This Court has held unequivocally that, once a waiver has occurred, "it is not appropriate

25  thereafter for the waiving parties or judge to limit the waiver on a temporal basis."  McCormick-

26  _____

27    [1]    The invention disclosure is but the clearest example, given that Dr. Merigan referenced it
in his declaration, and it was relied upon by Lisa Kole to determine the original inventors.

28

1  Morgan, Inc. v. Teledyne Indus., Inc., 765 F. Supp. 611, 613 (N.D. Cal. 1991); see Starsight

2  Telecast, Inc. v. Gemstar Development Corp., 158 F.R.D. 650, 655 n.5 (N.D. Cal. 1994) (holding

3  that although certain "documents post-date the issuance of the '713 patent, they are within the

4  scope of the subject matter waiver" and ordering their production); accord Smith v. Alyeska

5  Pipeline Serv. Co., 538 F. Supp. 977, 982 (D. Del. 1982), aff'd, 758 F.2d 668 (Fed. Cir. 1984),

6  cert. denied, 471 U.S. 1066 (1985) (rejecting temporal limitation on waiver of privilege).

7          Federal Circuit jurisprudence is fully in accord with this Court's rejection of temporal

8  limits on privilege waiver.  In Winbond, the patentee argued that its waiver of privilege should be

9  limited to "the period when Atmel's counsel explained inventorship law to Mr. Gupta," contending

10  that "only this time period is relevant to the attorney-client communication put 'in issue' by Mr.

11  Gupta's statement to the PTO."  Winbond, 262 F.3d at 1376.  The Federal Circuit rejected this

12  contention, holding: "the Commission correctly found that Atmel put at issue Mr. Gupta's, and

13  thus its attorneys', understanding of inventorship law both before and after the Commission's

14  initial decision."  Id.

15                                      **CONCLUSION**

16          For the foregoing reasons, Defendants request that the Court order Stanford to produce all

17  documents related to inventorship and inventive contribution for each of the patents and

18  applications claiming priority to the '327 Application, without temporal limitation, and permit the

19  examination of witnesses concerning inventorship without limitation by the attorney-client

20  privilege or attorney work product protection.

21  DATED:  May 30, 2006                    QUINN EMANUEL URQUHART OLIVER &
                                            HEDGES, LLP
22

23
                                           By     /s/ Robert W. Stone
24                                              Robert W. Stone
                                                Attorneys for Defendants and Counterclaimants
25                                              Roche Molecular Systems, Inc.; Roche Diagnostics
                                                Corporation;   and   Roche   Diagnostics
26                                              Operations, Inc.

27

28