UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY,<br><br>Plaintiff,<br><br>v.<br><br>ROCHE MOLECULAR SYSTEMS, INC.; ROCHE DIAGNOSTICS CORPORATION; ROCHE DIAGNOSTICS OPERATIONS INC.,<br><br>Defendants.<br>─────────────────────────<br>ROCHE MOLECULAR SYSTEMS, INC.; ROCHE DIAGNOSTICS CORPORATION; ROCHE DIAGNOSTICS OPERATIONS INC.,<br><br>Counterclaimants,<br><br>v.<br><br>THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY,<br><br>Counterclaim Defendants. | No. C 05-04158 MHP<br><br>**MEMORANDUM & ORDER**<br>**Re: Defendants' Motion to Compel** |

On October 14, 2005, plaintiff The Board of Trustees of the Leland Stanford Junior University ("Stanford") filed a complaint alleging patent infringement (the "Complaint") by defendants Roche Molecular Systems, Inc., Roche Diagnostics Corporation, Roche Diagnostic Operations, Inc., and Roche Diagnostic Systems, Inc. (collectively the "Roche defendants"). On November 17, 2005, defendants filed an answer and counterclaim against plaintiff and counterclaim defendant Thomas Merigan (the "Counterclaim"), denying infringement and further alleging that the patents in question are not duly and lawfully issued to the plaintiff. Now before the court is the issue

1  of whether Stanford waived its attorney-client privilege and work product protection as to the
2  subject of inventorship of United States Patent Application No. 07/883,327 (the "'327 Application")
3  and patents and applications claiming priority from the '327 Application.
4      Having considered the parties' arguments and submissions, and for the reasons set forth
5  below, the court enters the following memorandum and order.

BACKGROUND[1]

    The instant motion concerns an incident that occurred more than a decade prior to the commencement of the current litigation.  On May 14, 1992, Stanford's lawyers at Pennie & Edmonds filed the '327 Application with the PTO on behalf of Drs. Michael J. Kozal, who at the time of the patent application in April 1992 was a post-doctoral research fellow in the Division of Infectious Diseases at Stanford University, and Thomas C. Merigan, Professor of Medicine and Director of the Center for AIDS Research at Stanford University.  The '327 Application is the parent of the two disputed patents at the heart of the current action, namely United States Patent Nos. 5,968,730 and 6,503,705 (the "'730 Patent" and "'705 Patent," respectively).  In submitting its initial patent application to the PTO, Stanford omitted the names of two of the original co-inventors, Drs. Mark Holodniy and David A. Katzenstein.  On December 7, 1992, Stanford sought to correct the inventors named on the application.  PTO rules require that Stanford submit facts sufficient to establish that the initial omission of the two inventors was through error rather than deceptive intent. Stanford submitted three declarations to the PTO that included a detailed factual explanation of how the initial error occurred, was discovered, and was subsequently investigated as required under 37 C.F.R. section 1.324(b)(2).  The three declarations were authored by Thomas C. Merrigan, Michael J. Kozal, and Barry W. Elledge, who at the time of the initial patent application in April 1992 was an associate at Pennie & Edmonds.

    In his declaration to the PTO, Dr. Merigan explained that he had "never attempted to mislead or deceive the law firm of Pennie & Edmonds, the PTO, Stanford University or the scientific community . . . ."  Declaration of T.J. Chiang in support of Roche's Brief on Stanford's Waiver of

2

the Attorney-Client Privilege and Work Product Protection Concerning Inventorship ("Chiang Dec."), Exh. A ¶ 10. During the course of preparing the application, Dr. Merigan initiated numerous communications with his attorneys, and he included details of the legal advice he received in his declaration to the PTO.

> Drs. Kazenstein and Holoniy communicated to me their opinions that their contributions should entitle them to be named as coinventors. I informed attorney Laura Coruzzi of these opinions, and requested Pennie & Edmonds to pursue whatever action needed to be done to name the proper coinventors.

Id., Exh. A ¶ 9. Barry Elledge also described attorney-client communications in his declaration:

> Dr. Kole [of Pennie & Edmonds] stated that, to the best of her recollection, Dr. Merigan and Kozal were listed as inventors of the above-referenced application because they were the persons named on the Information Disclosure statement, and with whom she had discussed the invention."

Id., Exh. B ¶ 3.

In the declarations, Stanford explained that the extremely short time frame for preparing the original patent application resulted in the omission of the two individuals who should have been named as co-inventors in the original filing to the PTO. See id., Exh. B. On May 10, 1994, the PTO accepted the affidavits after concluding that "the error in inventorship occurred without deceptive intent." Id., Exh. C.

The Roche defendants claim that Stanford has waived its attorney-client privilege and work product immunity with regards to inventorship of the '327 Application because the declarations submitted to the PTO contain segments of privileged communication between Stanford and its attorneys at Pennie & Edmonds. Therefore, the Roche defendants argue that Stanford should be compelled, without temporal limitation, to produce all documents related to the inventorship of each and every patent or application claiming priority from the '327 Application. The Roche defendants maintain that they are entitled access to these documents because further investigation and discovery will provide additional evidentiary support that Stanford failed to disclose to the PTO the collaboration between Roche and its predecessor-in-interest, Cetus, and employees of Stanford, and the inventive contributions of the relevant Cetus employees to the subject matter claimed in the '730 and '705 Patents. Stanford counters that the doctrine of subject matter waiver does not apply in this

3

1  instance because the disclosures made to the PTO were done outside the context of litigation and
2  without prejudice to the Roche defendants.  Furthermore, Stanford argues that even if the court finds
3  a waiver of the attorney-client privilege and work product protection, the scope of the waiver should
4  be limited to the subject matter upon which the information was disclosed—namely, the error which
5  led to the omission of two inventors.

LEGAL STANDARD

I. Scope of Discovery

Federal Rule of Civil Procedure 26(b)(1) provides that

> [p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter.  For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action.  Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(1).  The scope of discovery permissible under Rule 26 should be liberally construed; the rule contemplates discovery into any matter that bears on or that reasonably could lead to other matter that could bear on any issue that is or may be raised in a case.  Oakes v. Halvorsen Mar. Ltd., 179 F.R.D. 281, 283 (C.D. Cal. 1998).  However, the broad scope of permissible discovery is limited by the attorney work product doctrine[2] and any relevant privileges, including the attorney-client privilege.  See Fed. R. Civ. P. 26(b)(1), (3).

II. Attorney-Client Privilege

The attorney-client privilege protects the confidentiality of communications between attorney and client made for the purpose of obtaining legal advice.  See American Standard Inc. v. Pfizer Inc., 828 F.2d 734, 745 (Fed Cir. 1987).  The purpose of the attorney-client privilege is "to encourage 'full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice.'"  Swidler &

4

Berlin v. United States, 524 U.S. 399, 403 (1998) (quoting Upjohn Co. v. United States, 449 U.S. 383, 389 (1981)).  In determining whether disclosure of privileged communications is required, the burden of persuasion rests on the party claiming the privilege.  See Fisher v. United States, 425 U.S. 391, 402–403(1976).   Generally disclosure of confidential communications or attorney work product to a third party, such as an adversary in litigation, constitutes a waiver of privilege as to those items.  See Carter v. Gibbs, 909 F.2d 1450, 1451 (Fed. Cir. 1990) (in banc), cert. denied, 498 U.S. 811 (1990).

III.     Work Product Doctrine

"The work product doctrine, codified in Federal Rule of Civil Procedure 26(b)(3), protects 'from discovery documents and tangible things prepared by a party or his representative in anticipation of litigation.'"  In re Grand Jury Subpoena, 357 F.3d 900, 906 (9th Cir. 2004) (quoting Admiral Ins. Co. v. United States Dist. Court, 881 F.2d 1486, 1494 (9th Cir. 1989)); see also Zenith Radio Corp. v. United States, 764 F.2d 1577, 1580 (Fed. Cir. 1985) ("The work product privilege protects the attorney's thought processes and legal recommendations.").  Rule 26(b)(3) further divides work product into two categories.  The first general category is subject to disclosure in discovery upon an adverse party's showing of "substantial need for the materials and undue hardship in obtaining the substantial equivalent of the materials by other means."  Grand Jury Subpoena, 357 F.3d at 906  (quoting Fed. R. Civ. P. 26 (b)(3)) (internal alterations and quotation marks omitted).  The second category, "opinion work product," includes the "mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation."  Fed. R. Civ. P. 26(b)(3).

The work-product privilege is intended to promote a fair and efficient adversarial system by protecting "the attorney's thought processes and legal recommendations" from the prying eyes of his or her opponent.  Genentech, Inc. v. United States Int'l Trade Comm'n, 122 F.3d 1409, 1415 (Fed. Cir. 1997) (citations omitted); accord Hickman v. Taylor, 329 U.S. 495, 511–14 (1947) ("Proper preparation of a client's case demands that he assemble information, sift what he considers to be the

1  relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and
2  needless interference . . . . Were such materials open to opposing counsel on mere demand, much of
3  what is now put down in writing would remain unwritten . . .").

4  However, like the attorney-client privilege, protection for attorney work product may be
5  waived by disclosure or by other conduct, such as the testimonial use of the materials. United States
6  v. Nobles, 422 U.S. 225, 239–40 (1975).

DISCUSSION

I.  Choice of Law

The two sides disagree as to which circuit's law governs the present motion. The Roche defendants argue that Federal Circuit Law governs because the dispute surrounding the waiver of attorney-client privilege and work product protection concerning inventorship relates to an issue of substantive patent law. See In re Spalding Sports Worldwide, Inc., 203 F.3d 800, 803–04 (Fed. Cir. 2000). Stanford maintains that this court should follow Ninth Circuit law, which construes subject matter waiver more narrowly. See, e.g., Chevron Corp. v. Penzoil Co., 974 F.2d 1156, 1162 (9th Cir. 1992) (holding that disclosure of information resulting in the waiver of attorney-client privilege constitutes a waiver "only as to communications about the matter actually disclosed.") (citing Weil v. Investments/Indicators, Research & Mgmt., Inc., 647 F.2d 18, 25 (9th Cir. 1981)).

"Federal circuit law applies when deciding whether particular written or other materials are discoverable in a patent case, if those materials relate to an issue of substantive patent law." In re Echostar Communs. Corp., 448 F.3d 1294, 1298 (Fed. Cir. 2006) (quoting Spalding, 203 F.3d at 803); see also Chiron Corp. v. Genentech, Inc., 179 F. Supp. 2d 1182, 1185–86 (E.D. Cal. 2001) ("the district court in a patent litigation shall apply Federal Circuit law when resolving discovery issues that occur in the unique context of patent litigation."). If a discovery issue does not implicate substantive patent law, then the court applies the "law of the circuit in which the district court sits." Spalding, 203 F.3d at 803 (citing Institut Pasteur v. Cambridge Biotech Corp., 186 F.3d 1356, 1358 (Fed. Cir. 1999)). However, "a procedural issue that is not itself a substantive patent law issue is

6

1  nonetheless governed by Federal Circuit law if the issue pertains to patent law . . . ." Id. at 803
2  (citing Midwest Indus., Inc. v. Karavan, 175 F.3d 1356, 1359 (Fed. Cir. 1999)).
3        Stanford does not directly address the choice of law issue in its brief.  One of Stanford's cited
4  authorities however, suggests that regional circuit law should apply because an order compelling
5  discovery does not fall exclusively in the realm of patent law.  See GFI, Inc. v. Franklin Corp., 265
6  F.3d 1268, 1272 (Fed. Cir. 2001) (citing Dorf & Stanton Communs., Inc. v. Molson Breweries, 100
7  F.3d 919, 922 (Fed Cir. 1996)).  In GFI, the district court found that the patentee waived its attorney-
8  client privilege when its patent attorney testified in an earlier litigation concerning "his state of
9  mind, knowledge of prior act, and communications with his client." Id. at 1273.  The Federal Circuit
10 concluded that "waiver by the disclosure of privileged material" was not a substantive patent issue
11 and therefore the law of the regional circuit applied to govern the standard of review of the district
12 court's order. Id. at 1272; see also Dorf, 100 F.3d at 922 ("Because an order compelling discovery
13 is not unique to patent law, we agree that Second Circuit law must be considered for the proper
14 standard of review.").
15       Here, unlike in both GFI and Dorf, the disclosures in question took place during
16 communication with the PTO regarding inventorship.  The Federal Circuit has consistently held that
17 disclosures in patent-law-specific contexts are evaluated under Federal Circuit law.  See Spalding,
18 203 F.3d at 803–04 ("[A] determination of the applicability of the attorney-client privilege to
19 Spalding's invention record clearly implicates, at the very least, the substantive patent issue of
20 inequitable conduct."); see also Echostar, 448 F.3d at 1298 (Federal Circuit law applies in a case
21 involving the extent to which "a party waives its attorney-client privilege and work-product
22 immunity when it asserts the advice-of-counsel defense in response to a charge of willful patent
23 infringement.").  Issues that relate to discovery disputes and other procedural issues, which are
24 unique to patent cases, should be decided pursuant to Federal Circuit law. See Martin Marietta
25 Materials, Inc. v. Bedford Reinforced Plastics, Inc., 227 F.R.D. 382, 391 (W.D. Pa. 2005) (holding
26 that the issue of  "whether [the patentee's] invention record was protected by the attorney-client
27 privilege was 'unique to patent law because the invention record relates to an invention submitted

7

for consideration for possible patent protection . . . clearly implicat[ing] substantive patent law.'") (quoting Spalding, 203 F.3d at 804). Plaintiff's citations to opinions from other circuits will accordingly be given less weight.

II.     Waiver[3]

The Roche defendants argue that as part of the declarations submitted to the PTO, Stanford and its attorneys disclosed the contents of confidential attorney-client communications, including discussions and communications regarding inventorship for the '327 Application, and therefore have waived this privilege entirely.

Although Stanford concedes that the declarations contained privileged material, Stanford argues that no waiver occurred for two reasons. First, Stanford maintains that since the disclosures were made in a non-judicial context and have not subsequently been placed at issue in this litigation, there has been no waiver of attorney-client privilege. Second, Stanford argues that the declarations were submitted to the PTO more than ten years prior to the current litigation, and therefore that the Roche defendants have suffered no prejudice.

A.     Judicial Context

Stanford asserts that the declarations in question have not been "placed at issue" during litigation against Roche or any other adversary, citing In re von Bulow, 828 F.2d 94 (2d Cir. 1987). In In re von Bulow, a criminal defendant and his defense attorney published a book about the events surrounding von Bulow's criminal trial and subsequent acquittal. See id. at 96. The book included details of at least four confidential communications between von Bulow and his attorney. Id. at 101. The Second Circuit ruled that the district court had abused its discretion by allowing discovery of unpublished portions of attorney-client communications. Id. at 102. The appellate court noted that the where "the privilege-holder or his attorney has made extrajudicial disclosures, and those disclosures have not subsequently been placed at issue during litigation," the doctrine of subject matter waiver is inapplicable. Id.

8

In contrast to In re von Bulow, where publishing a book did not secure a legal right for the criminal defendant, by submitting the declarations to the PTO to correct inventorship of the '327 Application, Stanford actively sought to gain a legal advantage by obtaining an enforceable patent. Since ownership and enforceability of the two asserted patents are at the heart of the dispute between Stanford and the Roche defendants, Stanford's initial application to the PTO and subsequent filing of a corrected petition must be viewed as adversarial from Roche's perspective despite having taken place in a prior proceeding. See Winbond Electronics Corp. v. Int'l Trade Comm'n, 262 F.3d 1363, 1368–69 (Fed. Cir. 2001) (holding that the patentee waived its attorney-client privilege and work product protection for documents and communications submitted to the PTO to correct inventorship of a contested patent, even though the disclosures were made in a separate administrative proceeding); see also In re Pioneer Hi-Bred Intern., Inc., 238 F.3d 1370, 1374–75 (Fed. Cir. 2001) (holding that pre-litigation disclosure to Securities and Exchange Commission of counsel's tax advice waived privilege "with respect to all documents which formed the basis for the advice, all documents considered by counsel in rendering that advice, and all reasonably contemporaneous documents reflecting discussions by counsel or others concerning that advice").

Stanford argues that Winbond is distinguishable because in Winbond the International Trade Commission denied the patentee's request to enforce a patent in the context of ongoing litigation before the patentee sought to obtain a corrected inventorship from the PTO. By contrast, Stanford argues that it submitted its declarations to the PTO ten years prior to the current litigation with the Roche defendants. As a result, Stanford maintains that it has not placed the disclosures contained in the declarations to the PTO "at issue" and therefore the Roche defendants are not entitled to a broad waiver of the attorney-client privilege. However, the court is not persuaded by this distinction. Winbond did not depend on the timing of the disclosures to the PTO or hold that any such disclosures have to be made in a concurrent proceeding during the course of ongoing litigation in order to constitute a waiver of privilege. 262 F.2d at 1375. Similar to the patentee in Winbond, Stanford relied on its declarations to the PTO to obtain a certificate of correction and is now

attempting to use that certificate to enforce the '730 and '705 Patents in the context of its infringement dispute with the Roche defendants.

B. Prejudice

In its brief, Stanford argues that the contents of the declarations do not unfairly prejudice Roche. However, the declarations were submitted to the PTO in order to correct authorship and ensure Stanford's ownership of enforceable patents, which are now asserted against Roche. Since Roche stands to suffer significant legal harm if it is found to infringe those patents, it is disingenuous for Stanford to conclude that Roche has suffered no prejudice.

In sum, Stanford disclosed the contents of privileged attorney-client communications and work product protection to the PTO to successfully obtain ownership of the contested patents, and cannot now attempt to shield all other communications on the same subject matter, as this would unfairly prejudice Roche. See Fort James Corp. v. Solo Cup Co., 412 F.3d 1340, 1349 (Fed. Cir. 2005) (holding that a party cannot selectively choose to disclose information that supports its position, while withholding information that might damage its case). Thus, Stanford's submission of the declarations to correct inventorship on the original patent application to the PTO was a waiver of privilege.

III. Subject Matter Scope of the Waiver

Stanford asserts that even if the court finds a waiver, the waiver should be construed as narrowly as possible and be limited to the inadvertent omission of Drs. Holodniy and Katzenstein from the initial '327 Application. The Roche defendants argue that the subject matter of the waiver should be construed broadly, i.e., all documents and communications related to the correct inventorship on the '327 Application.

The scope of a waiver of attorney-client privilege extends the privilege to all communications on the same subject matter. See Genentech, 122 F.3d at 1416; In re Grand Jury Proceedings, 78 F.3d 251, 255 (6th Cir. 1996); In re Cont'l Ill. Sec. Litig., 732 F.2d 1302, 1314 n.18

10

(7th. Cir. 1984). The rationale for such a broad mandate has been justified "so that a party is prevented from disclosing communications that support its position while simultaneously concealing communications that do not." Fort James Corp., 412 F.3d at 1349 (citing Weil, 647 F.2d at 24.). However, "[t]here is no bright line test for determining what constitutes the subject matter of a waiver, rather courts weigh the circumstances of the disclosure, the nature of the legal advice sought and the prejudice to the parties of permitting or prohibiting further disclosures." Id. at 1349–50.

The Federal Circuit considered a similar privilege waiver in Winbond, 262 F.3d at 1363. In Winbond, the patentee Atmel, which acquired ownership of United States Patent No. 4,451,903 (the "'903 Patent") in 1994 from the original assignee, SEEQ, discovered during the course of subsequent patent litigation that the patent application was defective as it failed to properly list all the inventors. Id. at 1367. Atmel petitioned the PTO to correct inventorship by adding Mr. Anil Gupta, who had been omitted as an inventor in the original patent application. Id. at 1368. Atmel then moved for the United States International Trade Commission (the "Commission") to enforce its patent. Id. at 1368–69. The Commission found that Atmel had not submitted an incomplete authorship in the patent application with an "intent to deceive." Id. at 1374. However, "Atmel placed at issue the advice of counsel by its affirmative act of petitioning the Commission for reconsideration of the inventorship issue based on the certificate of correction of the '903 Patent issued by the PTO." Id. at 1369 (internal quotations omitted). As a result the court concluded that Atmel had waived any attorney-client privilege and work product protections "for all documents concerning the '903 patent's inventors." Id. The Commission specifically found that:

> [B]y expressly relying on [Mr.] Gupta's statement as a central part of its effort to obtain a certificate of correction and then using that certificate to convince the Commission to reconsider the enforceability of the 903 patent, Atmel explicitly placed the legal advice to [Mr.] Gupta – and the fact that [Mr.] Gupta had obtained that advice – "at issue" in these proceedings.

Id. at 1375.

Here, as in Winbond, Stanford submitted a petition to correct inventorship and relied on attorney opinions in supporting its assertion that it lacked deceptive intent. Stanford relied on the corrected inventorship to enforce the patent in subsequent proceedings. Thus, under Winbond,

11

Stanford waived its "attorney-client privilege and work product protection for documents and communications relating to inventorship." See id. at 1375.

Weil, cited by Stanford, is distinguishable. In Weil, a defendant in a securities litigation disclosed to opposing counsel during a deposition that he had received incorrect advice from counsel regarding local registration requirements. 647 F.2d at 23. Plaintiffs argued that this disclosure served as a broad waiver of privilege as to all communications regarding compliance with those requirements. Id. The court acknowledged that "voluntary disclosure of the content of a privileged attorney communication constitutes waiver of the privilege as to all other such communications on the same subject." Id. at 24. Noting that the disclosure had occurred early on in the litigation and was made to opposing counsel as opposed to the court, the court ruled that the scope of the defendant's waiver was limited to the substance of counsel's advice regarding local registration requirements. Id at 25. Indeed, the court made a point of stressing that the disclosure did not unfairly prejudice opposing counsel. Id.

Here in contrast, the disclosures were made deliberately in order to secure a legal advantage—an enforceable patent—which provides the basis for Stanford's suit against Roche. In any event, Federal Circuit law is controlling in the present case as the dispute between the parties concerns an issue of substantive patent law, and therefore the reasoning and conclusion of Winbond are controlling.

In its brief, Stanford further asserts that policy considerations warrant a narrow scope of waiver. Stanford argues that it should not be penalized for abiding by PTO's regulations that require submission of both confidential attorney-client communications and attorney work product to correct inventorship on a patent application. See 37 C.F.R. § 1.324(a) ("[whenever] through error an inventor is not named in an issued patent and such error arose without any deceptive intention on his or her part," the party requesting a correction of inventorship is permitted to submit a proper petition.); see also Coleman v. Dines, F.2d 353, 357 (Fed. Cir. 1985) (holding that a party is required to submit specific facts to explain the error as opposed to conclusory statements of innocent error.).

12

However, Stanford was only required to include segments of privileged information in its declarations to the PTO to correct its own failure to include two of the original co-inventors on the '327 Application to the PTO in May 1992. Even though the PTO ruled that the initial omission was an inadvertent error, it was an error nonetheless, and Stanford was compelled, as a matter of law, to abide by PTO rules in correcting its own mistake.

As was the case in Winbond, the subject matter scope of Stanford's waiver of its attorney-client privilege extends to documents and communications surrounding inventorship on the '327 Application and patents subsequently issuing thereon.

IV.   Temporal Scope of the Waiver

Stanford argues that any waiver should be limited to the communications that directly address Stanford's omission of two of the original co-inventors on its May 14, 1992 patent application to the PTO. The problem with this position is, as Roche correctly notes, Stanford has continued to rely on the declarations in divisional and continuation applications derived from the '327 Application. See Chiang Dec., Exhs. A, B (indicating that the Merigan and Elledge Declarations were submitted as part of the file history for the '705 Patent, filed on February 13, 2001, and includes date stamps showing that the declarations were resubmitted to the PTO in 1995). Stanford has renewed its waiver each time it submitted the privileged declarations to the PTO.

Winbond is again instructive. In Winbond, the patentee Atmel waived attorney-client privilege and work product protection with respect to a declaration by Mr. Anil Gupta, who had been omitted as an inventor in the original application. 262 F.3d at 1375. Mr. Gupta's declaration was subsequently used to obtain a certificate of correction from the PTO to lawfully enforce a patent in ongoing litigation. Id. Despite the finding of a waiver, Atmel was not required to produce any documents filed before January 1997, when it filed its initial complaint alleging patent infringement with the Commission. Id. Furthermore, the patentee was not required to furnish attorney-client communications or attorney work product prepared in anticipation of a reconsideration hearing scheduled for September 1998 before the Commission. Id. at 1369, 1375. However, Atmel wanted

13

1   to further restrict the scope of the waiver to between July 9, 1998 to August 13, 1998, since this
2   represented "the period when Atmel's counsel explained inventorship law to Mr. Gupta." Id. at
3   1376. Since Mr. Gupta's declaration was central to the patentee's efforts to gain a certificate of
4   correction, the patentee maintained that "only this time period is relevant to the attorney-client
5   communication put 'in issue' by Mr. Gupta's statement to the PTO." Id.

6         The Federal Circuit disagreed with this argument, countering that "the Commission correctly
7   found that Atmel put at issue Mr. Gupta's, and thus its attorneys', understanding of inventorship law
8   *both before and after* the Commission's initial decision." Id. (emphasis added). Rather than grant
9   an unrestricted waiver, however, the Commission expressly delineated the period of the privilege to
10  extend from the patentee's preparations for the Commission's initial investigation, "up to
11  communications and documents pertaining to Atmel's preparations for the Commission's
12  reconsideration hearing." Id. In reviewing the Commission's findings, the Federal Circuit found
13  that the Commission "did not abuse its discretion in limiting Atmel's waiver . . . ." Id. Yet, there
14  was also no specific requirement that the Commission expressly limit the scope of Atmel's waiver
15  up until the period of its preparations for the Commission's reconsideration hearing. Id.

16        In the present case, Stanford continues to place the issue of inventorship of the '327
17  Application before the PTO as it files continuation and divisional applications that claim priority
18  from the '327 Application. In these applications, Stanford asserts that Drs. Holodniy and
19  Katzenstein are among the proper inventors, and it uses the Merigan and Elledge declarations to
20  prove that fact. Once a waiver has occurred, "it is inappropriate to limit waiver on a temporal
21  basis." McCormick-Morgan, Inc. v. Teledyne Industries, Inc., 765 F. Supp. 611, 613–14 (N.D. Cal.
22  1991) (Conti, J.); see also Starsight Telecast, Inc. v. Gemstar Development Corp., 158 F.R.D. 650,
23  655 n.5 (N.D. Cal. 1994) (Infante, Mag. J.) (holding that a waiver of attorney-client privilege can
24  extend to documents and communications that post-date the issuance of a patent because they fall
25  within the scope of subject matter waiver).

26        Stanford's waiver of attorney-client privilege with respect to documents and communications
27  on the subject matter of inventorship on the '327 Application clearly extends from the initiation of
28

14

contact between the inventors and Pennie & Edmonds in March 1992 up until the PTO granted the petition for correction of inventorship on May 10, 1994. Also, to the extent that the declarations submitted in support of corrected inventorship concerning the inadvertent omission of the two co-inventors are placed "at issue" by Stanford in subsequent applications derived from the '327 Application, the Roche defendants are entitled to discovery to later documents and communications that directly cover the issue of inventorship, even though they might post-date the issuance of the '730 and '705 Patents.

V.   Conclusion

In summary, Stanford knowingly and voluntarily submitted the contents of confidential attorney-client communications to correct inventorship on its original patent application to the PTO submitted on May 14, 1992. In accordance with Federal Circuit law, this court finds a waiver of the attorney-client privilege by Stanford with regards to communications on the subject of inventorship on the '327 Application, the parent application to the disputed '730 and '705 Patents. The temporal scope of the privilege extends from initial contact between the named inventors and Pennie & Edmonds regarding the filing of the '327 Application in March 1992 to at least May 10, 1994, when the PTO accepted the petition for corrected inventorship. Stanford is further compelled to produce any subsequent documents and communications that relate to the correctness of the declarations as

//
//
//
//
//
//
//
//
//

15

used in pursuing subsequent patents and applications claiming priority from the '327 Application, from May 10, 1994 until the present.

IT IS SO ORDERED.

Dated: July 31, 2006

_____
MARILYN HALL PATEL
District Judge
United States District Court
Northern District of California

16

# **ENDNOTES**

1. Unless other specified, background facts are taken from plaintiff's Complaint and defendant's Answer and Counterclaim, and are assumed to be true for the purposes of this motion only.

2. The court recognizes that the work-product doctrine is not an evidentiary "privilege," Admiral Ins. Co. v. United States Dist. Court, 881 F.2d 1486, 1494 (9th Cir. 1989), but may at times refer to it as such for convenience.

3. The parties' briefs do not clearly distinguish between attorney-client privilege and work product protection as they relate to the issue of subject matter waiver. The work product doctrine is "a 'privilege' related to but distinct from the attorney-client privilege." Carter v. Gibbs, 909 F.2d 1450, 1451 (Fed. Cir. 1990). However, in cases where the voluntary disclosure of attorney work product to an adversary or third party substantially increases the possibility of an opposing party obtaining the information, this would "defeat the policy underlying the privilege." Id. (citing United States v. American Tel. & Tel. Co., 642 F.2d 1285, 1298–99 (D.C. Cir. 1980)). In these instances, "the criteria for waiver of the work product and attorney client privileges are equivalent." Id. The Court will restrict its analysis to the attorney-client privilege in the body of the motion, with the understanding that this applies, where relevant, to work product protection as well.