**CONFIDENTIAL**

## Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

THE BOARD OF THE TRUSTEES OF
THE LELAND STANFORD JUNIOR
UNIVERSITY,
                    Plaintiff,

vs.                        No. C-05-04158 MHP

ROCHE MOLECULAR SYSTEMS, INC.;
ROCHE DIAGNOSTICS CORPORATION;
ROCHE DIAGNOSTICS OPERATIONS,
INC.; ROCHE DIAGNOSTIC SYSTEMS,
INC.,
                    Defendants.
_____

AND RELATED COUNTERCLAIM.
_____

CONFIDENTIAL
VIDEOTAPED DEPOSITION OF THOMAS C. MERIGAN, M.D.
Palo Alto, California
Monday, September 11, 2006
Volume 1

Reported by:
SUZANNE F. BOSCHETTI
CSR No. 5111
Job No. 3-52871

## Page 2

1    UNITED STATES DISTRICT COURT
2       NORTHERN DISTRICT OF CALIFORNIA
3
4  THE BOARD OF THE TRUSTEES OF
   THE LELAND STANFORD JUNIOR
5  UNIVERSITY,
6             Plaintiff,
7      vs.          No. C-05-04158 MHP
8  ROCHE MOLECULAR SYSTEMS, INC.;
   ROCHE DIAGNOSTICS CORPORATION;
9  ROCHE DIAGNOSTICS OPERATIONS,
   INC.; ROCHE DIAGNOSTIC SYSTEMS,
10 INC.,
11            Defendants.
12 _____
   AND RELATED COUNTERCLAIM.
13 _____
14
15      Videotaped deposition of THOMAS C. MERIGAN,
16 M.D., Volume 1, taken on behalf of Defendants and
17 Counterclaimants Roche Molecular Systems, Inc., et
18 al., at 5 Palo Alto Square, Palo Alto, California,
19 beginning at 9:08 a.m. and ending at 1:01 p.m. on
20 Monday, September 11, 2006, before SUZANNE F.
21 BOSCHETTI, Certified Shorthand Reporter No. 5111.
22
23
24
25

## Page 3

1  APPEARANCES:
2
3  For Plaintiff and Counterclaim Defendants The Board of
   the Trustees of the Leland Stanford Junior University,
4  et al.:
5      COOLEY GODWARD LLP
       BY:  RICARDO RODRIGUEZ
6      Attorney at Law
       Five Palo Alto Square, 3000 El Camino Real
7      Palo Alto, California 94306-2155
       (650) 843-5000
8
   For Defendants and Counterclaimants Roche Molecular
9  Systems, Inc., et al.:
10     QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
       BY:  ROBERT W. STONE
11     BY:  BRIAN C. CANNON
       Attorneys at Law
12     555 Twin Dolphin Drive, Suite 560
       Redwood Shores, California 94065
13     (650) 801-5001
14 Videographer:
15     RAY TYLER
       SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
16     San Francisco, California
       (415) 274-9977
17
18
19
20
21
22
23
24
25

## Page 4

1                    INDEX
2  WITNESS:                    EXAMINATION
3  THOMAS C. MERIGAN, M.D.
   Volume 1
4
5      BY MR. STONE              6
6                  EXHIBITS
7  DEPOSITION                        PAGE
8  350 Letter to Jeffrey Boozell, from Ricardo      5
       Rodriguez, July 19, 2006, 1 page
9
10 351 Agreement made the 1st day of May, 1980,     99
       between Cetus Corporation and Thomas
11     Merigan, Bates Nos. RMS 0063947 - 0063952;
       6 pages
12 352 Agreement effective this 15th day of        101
       December, 1980, between Cetus Immune
13     Corporation, and Thomas C. Merigan, Bates
       Nos. CH0001386 - CH0001390; 5 pages
14
15 353 Agreement and Plan of Merger, August 20,    105
       1982, Bates Nos. RMS 0063903 - RMS 0063944;
16     42 pages
17 354 Letter to Dr. David Mark, from Thomas C.    110
       Merigan, M.D., Teresa Basham, Ph.D., Joe S.
18     Dylewski, M.D., Bates No. RMS 0064032;
       1 page
19 355 Letter to Dr. Thomas C. Merigan, from       136
       Jeffrey S. Price, Ph.D., RMS 0063945 - RMS
20     0063946; 2 pages
21 356 Consulting Agreement, made this 13th day    140
       of April, 1984, Bates Nos. RMS 0064037 -
22     RMS 0064050; 14 pages
23
24
25

1  (Pages 1 to 4)

**CONFIDENTIAL**

| | |
|---|---|
| 09:28:33 1 Q. The San Mateo group wasn't at Stanford. | 09:31:47 1 THE WITNESS: Yes, I think it did. |
| 09:28:36 2 A. No, nobody else at Stanford. | 09:31:47 2 BY MR. STONE: |
| 09:28:37 3 Q. Okay. | 09:31:49 3 Q. How did it evolve over time? |
| 09:28:38 4 A. Well, there's a little bit of a misnomer | 09:31:51 4 MR. RODRIGUEZ: Same objection. |
| 09:28:41 5 here. San Mateo had an affiliation with Stanford. So | 09:31:58 5 THE WITNESS: HIV was still quite difficult |
| 09:28:44 6 in the greater sense, San Mateo was a part of | 09:32:00 6 to grow, even today, and therefore, precisely |
| 09:28:48 7 Stanford. | 09:32:05 7 quantitating the virus takes new chemical methods. |
| 09:28:50 8 Q. But -- okay. What was the nature of your | 09:32:09 8 And they had to be more and more demanding in the |
| 09:28:59 9 contribution to the work that's reflected in the | 09:32:15 9 sense of sensitivity and specificity. |
| 09:29:00 10 abstract? | 09:32:15 10 BY MR. STONE: |
| 09:29:01 11 MR. RODRIGUEZ: Objection. Vague. | 09:32:21 11 Q. And did you communicate -- strike that. |
| 09:29:06 12 THE WITNESS: I was the intellectual leader, | 09:32:24 12 And did it further evolve over time, your |
| 09:29:10 13 the person that had the original idea, and supported | 09:32:27 13 idea? |
| 09:29:14 14 the work on my grants and directed the work on an | 09:32:27 14 MR. RODRIGUEZ: Objection. Vague. |
| 09:29:22 15 overall basis. | 09:32:30 15 THE WITNESS: Well, by 1989 and '90 we were |
| 09:29:27 16 BY MR. STONE: | 09:32:35 16 working with chemical methods including PCR. |
| 09:29:27 17 Q. What was the original idea that you're | 09:32:53 17 BY MR. STONE: |
| 09:29:30 18 referring to? | 09:32:54 18 Q. And when you say "we were working with |
| 09:29:31 19 MR. RODRIGUEZ: Objection. Vague. | 09:32:55 19 chemical methods including PCR," you're referring to |
| 09:29:37 20 THE WITNESS: That we could precisely | 09:32:59 20 people in your group at Stanford? |
| 09:29:38 21 quantitate HIV in the blood of patients. | 09:33:01 21 A. That's correct. |
| 09:29:38 22 BY MR. STONE: | 09:33:01 22 Q. And your group at Stanford, what was your |
| 09:29:54 23 Q. When did you come up with that idea? | 09:33:04 23 group at Stanford in 1989, 1990? |
| 09:29:57 24 MR. RODRIGUEZ: Same objection. Objection. | 09:33:06 24 MR. RODRIGUEZ: Objection. Vague. |
| 09:30:00 25 Vague. | 09:33:10 25 THE WITNESS: Do you mean technicians? |
| **Page 21** | **Page 23** |

| | |
|---|---|
| 09:30:02 1 THE WITNESS: Perhaps as early as 1984. | 09:33:12 1 Fellows? Faculty? |
| 09:30:02 2 BY MR. STONE: | 09:33:14 2 BY MR. STONE: |
| 09:30:17 3 Q. How did you come up with that idea? | 09:33:14 3 Q. Actually, just kind of backing up. What group |
| 09:30:19 4 A. Because I was working with other chronically | 09:33:20 4 were you in in 1989, 1990 at Stanford? |
| 09:30:22 5 infecting viruses where we needed chemical methods for | 09:33:24 5 A. I had been awarded two large grants from the |
| 09:30:26 6 detecting the virus. | 09:33:26 6 National Institutes of Health by that time. One was |
| 09:30:36 7 Q. Sitting here today, can you peg for me with | 09:33:30 7 to create the AIDS Clinical Trials Group at Stanford, |
| 09:30:38 8 any specificity exactly when you came up with this | 09:33:36 8 which used new therapy on patients to try and control |
| 09:30:41 9 idea? | 09:33:42 9 the infection. And I also had a center -- I directed |
| 09:30:45 10 A. I already said 1984. Is that precise enough? | 09:33:42 10 a Center for AIDS research which involved other |
| 09:30:49 11 Q. Can you provide me any more specificity? | 09:33:46 11 faculty at Stanford and myself in a number of |
| 09:30:52 12 A. I wrote an article that was in the Journal | 09:33:52 12 immunologic and virologic and epidemiologic and |
| 09:30:56 13 of -- New England Journal of Medicine. It was an | 09:33:57 13 clinical studies of HIV. |
| 09:31:00 14 editorial commenting on Robert Gallo's work at that | 09:34:01 14 Q. And you were also a professor at Stanford at |
| 09:31:04 15 time. And I suggested that there would be new | 09:34:04 15 this time? |
| 09:31:07 16 diagnostic tests that would be important in treatment | 09:34:04 16 A. I have been a professor at Stanford for 44 |
| 09:31:10 17 and management of HIV patients. | 09:34:08 17 years. |
| 09:31:14 18 Q. Did you identify any such new diagnostic tests | 09:34:08 18 Q. So in 1989 to 1990, you were a professor at |
| 09:31:18 19 in connection with that paper? | 09:34:11 19 Stanford? |
| 09:31:19 20 A. No. | 09:34:11 20 A. Yes. |
| 09:31:23 21 Q. You just suggested that in the future there | 09:34:11 21 Q. What were you a professor of at that time? |
| 09:31:26 22 may be such tests? | 09:34:17 22 A. Medicine and infectious disease. |
| 09:31:28 23 A. Had to be. | 09:34:26 23 Q. Have you always been a professor of medicine |
| 09:31:39 24 Q. Did your idea evolve over time? | 09:34:29 24 and infectious disease at Stanford? |
| 09:31:42 25 MR. RODRIGUEZ: Objection. Vague. | 09:34:31 25 A. That's -- |
| **Page 22** | **Page 24** |

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

CONFIDENTIAL

09:34:31 1    MR. RODRIGUEZ: Objection.
09:34:32 2    THE WITNESS: -- correct.
09:34:32 3    MR. RODRIGUEZ: Vague.
09:34:32 4    BY MR. STONE:
09:34:33 5    Q. Were you also the director of the infectious
09:34:36 6    disease department at Stanford?
09:34:38 7    A. That's correct.
09:34:38 8    Q. When were you first the director of the
09:34:40 9    infectious disease department at Stanford?
09:34:42 10   A. I guess about 1966.
09:34:47 11   Q. When did you cease being the director of the
09:34:50 12   infectious disease department?
09:34:52 13   A. During the 1990s.
09:34:57 14   Q. Mid 1990s?
09:34:59 15   A. Yeah, I think so.
09:35:00 16   Q. Was there any reason why you stepped down from
09:35:03 17   that position?
09:35:05 18   A. Well, I was getting older, and I felt that
09:35:11 19   the division would profit from new leadership.
09:35:22 20   Q. When was the Center for AIDS Research started
09:35:28 21   at Stanford?
09:35:32 22   A. The work began about 1984, and the award
09:35:43 23   for -- from the NIH was, I think, in later 1980s.
09:35:54 24   Q. As a result of the award from the NIH,
09:35:58 25   Stanford was able to institute the Center for AIDS

Page 25

09:35:58 1    Research?
09:36:02 2    A. No --
09:36:02 3    MR. RODRIGUEZ: Objection. Mischaracterizes
09:36:04 4    the testimony.
09:36:05 5    THE WITNESS: No. I said that we started in
09:36:08 6    1984 with several different investigators working
09:36:14 7    together to functionally be a center, but the funding
09:36:21 8    didn't -- the funding came because we had a
09:36:24 9    preexisting relationship that would be promising for
09:36:31 10   working on HIV.
09:36:31 11   BY MR. STONE:
09:36:34 12   Q. Was the Center for AIDS Research formally
09:36:38 13   created in 1984?
09:36:39 14   A. No. It had a physical structure that took
09:36:43 15   place about 1987, '88, I believe.
09:36:48 16   Q. When you say "physical structure," what do you
09:36:50 17   mean?
09:36:51 18   A. Well, we got grants from the National
09:36:58 19   Institutes of Health to both renovate the structure we
09:37:02 20   had to make it safer for managing viruses. At that
09:37:07 21   time, most every pharmaceutical country -- company in
09:37:11 22   the country wasn't really able to work with HIV. They
09:37:15 23   had fears, and it took a biohazard facility to do it.
09:37:27 24   And we had experience with working with hazardous
09:37:32 25   viruses demand from our clinical laboratory, and

Page 26

09:37:37 1    therefore we just needed the physical facility in
09:37:41 2    which many more people could work in safety. And we
09:37:47 3    got it through two grants.
09:37:49 4    One grant was for an infrastructure grant
09:37:53 5    from the National Institutes of General Medical
09:37:56 6    Sciences, and the other was to the Allergy and
09:37:59 7    Infectious Disease Institute, which funded formally
09:38:02 8    about half the structure, including the area we had
09:38:05 9    for nurses and doctors as well as the laboratory
09:38:14 10   itself.
09:38:15 11   Q. So when -- when did the Center for AIDS
09:38:19 12   Research formally open its doors?
09:38:22 13   MR. RODRIGUEZ: Objection. Vague.
09:38:26 14   THE WITNESS: It never -- it -- it had to
09:38:27 15   begin only partially completed facilities.
09:38:34 16   Fortunately, the dermatology department had additional
09:38:38 17   space for us, and David Schwartz was working there.
09:38:40 18   And we used some of the clinical facilities of the
09:38:43 19   hospital.
09:38:44 20   And then we began to move them over into the
09:38:49 21   S10 -- 1 -- 156 general area, the first floor of the
09:38:58 22   Grant Building. And that's where both -- we were
09:39:00 23   adjacent to the Clinical Research Center and could use
09:39:03 24   their facilities for management of the patients, but
09:39:07 25   we also had places for our nurses and doctors who were

Page 27

09:39:10 1    doing these controlled trials. And in very close
09:39:15 2    apposition was the research labs where there was
09:39:19 3    sufficient biohazard arrangement to allow personnel to
09:39:24 4    work.
09:39:25 5    BY MR. STONE:
09:39:25 6    Q. You mentioned that it opened when all of the
09:39:29 7    infrastructure wasn't entirely complete.
09:39:32 8    What time frame are you speaking about there?
09:39:34 9    A. That's when David Schwartz came. It was
09:39:41 10   1985, '86.
09:39:48 11   Q. And the infrastructure grant that was received
09:39:51 12   from NIH, when was that work done?
09:39:53 13   A. It wasn't work. You mean physical work?
09:39:56 14   Q. Yes.
09:39:57 15   A. I can't place it precisely. As I say, it was
09:40:02 16   in the late 1980s.
09:40:04 17   Q. Did it carry over into the 1990s?
09:40:07 18   A. I don't know. Some things -- as you know,
09:40:11 19   any physical development can take time and might have
09:40:16 20   served our purposes partially but then was improved
09:40:19 21   even with time. So I think the grant might have been
09:40:22 22   extended an extra six months or a year to help us
09:40:27 23   because, of course, there were also state and local
09:40:33 24   laws to be dealt with about being sure we had the
09:40:37 25   right protective environment.

Page 28

7 (Pages 25 to 28)

CONFIDENTIAL

09:46:39 1    THE WITNESS: Maybe a little earlier. Maybe
09:46:40 2 around 1986.
09:46:40 3 BY MR. STONE:
09:46:50 4    Q. What was the nature of the work that the AIDS
09:46:53 5 Clinical Trials Group did at Stanford?
09:46:54 6    A. It was a nationally organized group where we
09:47:00 7 took part in trials that were either senior center or
09:47:05 8 multicenter. And the members of the group defined the
09:47:17 9 specific protocols.
09:47:22 10    Q. How long did the AIDS Clinical Trials Group
09:47:26 11 work continue at Stanford?
09:47:28 12    A. It is still active now.
09:47:31 13    Q. Was there someone at Stanford who was
09:47:36 14 primarily responsible for the work of the AIDS Clinical
09:47:40 15 Trials Group at Stanford?
09:47:41 16    A. I was.
09:47:42 17    Q. Did you have a title in connection with that?
09:47:49 18    A. I was the principal investigator.
09:47:52 19    Q. Did you have a title in connection with the
09:47:54 20 work that you did for the Center for AIDS Research?
09:47:56 21    A. I was the director of the Center for AIDS
09:48:19 22 Research.
09:48:19 23    Q. The idea that you had about quantitating HIV,
09:48:30 24 did you ever document the evolution of your idea?
09:48:34 25    MR. RODRIGUEZ: Objection. Vague.

Page 33

09:48:35 1 Mischaracterizes testimony.
09:48:42 2    THE WITNESS: I -- that's a -- a rather, for
09:48:45 3 me, diffuse question. I think you need to be more
09:48:48 4 specific.
09:48:49 5 BY MR. STONE:
09:48:49 6    Q. Well, you mentioned this idea that you had and
09:48:52 7 that your idea had evolved over time. And I'm
09:48:55 8 wondering if you did anything over the time that your
09:48:58 9 idea was evolving to document that?
09:49:01 10    MR. RODRIGUEZ: Objection. Vague.
09:49:03 11    THE WITNESS: We wrote papers. We wrote
09:49:07 12 abstracts. We had conversations with the national
09:49:16 13 group.
09:49:16 14 BY MR. STONE:
09:49:23 15    Q. Did you maintain any internal Stanford
09:49:28 16 writings relating to that?
09:49:32 17    A. I don't believe so.
09:49:33 18    Q. Did you ever maintain a lab notebook?
09:49:38 19    A. People who worked for me did.
09:49:40 20    Q. Right. And my question is, did you ever
09:49:42 21 maintain a lab notebook?
09:49:44 22    A. No.
09:49:44 23    Q. So there wouldn't be a lab notebook that would
09:49:48 24 reflect the evolution of this idea?
09:49:51 25    A. No.

Page 34

09:49:51 1    Q. You mentioned that you reviewed lab notebooks
09:49:54 2 in preparation for your testimony today that refreshed
09:49:57 3 your recollection; is that correct?
09:49:59 4    A. Yes.
09:49:59 5    Q. Which lab notebooks did you review?
09:50:02 6    A. Mark Holodniy's lab notebook, but it was not
09:50:08 7 a thorough going. It was really a pre- -- a more
09:50:13 8 focused one.
09:50:15 9    Q. What -- what do you mean by that?
09:50:17 10    MR. RODRIGUEZ: And I just want to caution
09:50:19 11 you not reveal any attorney-client communications.
09:50:22 12 You can talk about how you personally looked at the --
09:50:25 13 the lab notebooks but not reveal any attorney-client
09:50:29 14 communications.
09:50:32 15    THE WITNESS: Since it actually was done in
09:50:36 16 the presence of attorneys, I'm not sure that it isn't
09:50:39 17 completely covered by the attorney-client privilege.
09:50:43 18    MR. RODRIGUEZ: Well, I'm going to object
09:50:45 19 then on the basis of calling for attorney-client
09:50:47 20 privilege and instruct you not to answer. We can
09:50:49 21 discuss that off-line to determine if there's an
09:50:52 22 answer that you can provide.
09:50:55 23 BY MR. STONE:
09:50:55 24    Q. Well, which portions of Dr. Holodniy's lab
09:50:58 25 notebooks refreshed your recollection?

Page 35

09:51:00 1    A. You're just repeating the same question that
09:51:02 2 we can't -- chose not to answer.
09:51:04 3    Q. Well, you actually can answer that because if
09:51:07 4 it refreshed your recollection, I'm entitled to
09:51:10 5 understand that.
09:51:10 6    MR. RODRIGUEZ: You -- you can state -- if
09:51:11 7 there was a particular portion that you have a
09:51:13 8 specific recollection of, then you can state that.
09:51:18 9    THE WITNESS: Well, I was specifically
09:51:22 10 looking at the timing of the work at Stanford compared
09:51:25 11 to the timing of the work at --
09:51:26 12    MR. RODRIGUEZ: Actually, let me -- let me
09:51:27 13 stop you right there. So the question is, is there --
09:51:30 14    MR. STONE: No, no, no, no. And -- and
09:51:32 15 Counsel, I mean, he's providing an answer --
09:51:33 16    MR. RODRIGUEZ: Then I'm going to object --
09:51:34 17    MR. STONE: On what grounds?
09:51:35 18    MR. RODRIGUEZ: -- on the basis of
09:51:36 19 attorney-client privilege, and I'm going to instruct
09:51:38 20 you not to answer.
09:51:38 21    THE WITNESS: Thank you.
09:51:40 22    MR. RODRIGUEZ: Now -- why don't you just ask
09:51:41 23 your next question.
09:51:42 24    MR. STONE: No.
09:51:43 25    Could you restate the question, please.

Page 36

9 (Pages 33 to 36)

CONFIDENTIAL

| | |
|---|---|
| 10:27:16 1      MR. RODRIGUEZ: Objection. Vague. | 10:29:33 1      THE WITNESS: Certainly aspects of it. I saw |

10:27:16 1      MR. RODRIGUEZ: Objection. Vague.
10:27:20 2      THE WITNESS: I had a chance to review the
10:27:22 3  material transfer agreement.
10:27:26 4  BY MR. STONE:
10:27:26 5      Q. Did you do anything else?
10:27:29 6      MR. RODRIGUEZ: And I'll just caution you not
10:27:31 7  to reveal any attorney-client communications.
10:27:34 8      THE WITNESS: Well, I certainly thought about
10:27:36 9  all the events of those times.
10:27:36 10 BY MR. STONE:
10:27:38 11     Q. But having not seen this document prior to
10:27:44 12 today, I take it you didn't do anything else
10:27:46 13 specifically to prepare for this topic?
10:27:48 14     MR. RODRIGUEZ: Objection. Mischaracterizes
10:27:51 15 the testimony.
10:27:52 16     THE WITNESS: Well, it seems to me that this
10:27:54 17 is a pivotal document that I had to think about.
10:27:54 18 BY MR. STONE:
10:28:03 19     Q. Did you speak to anyone prior to today other
10:28:05 20 than your counsel to prepare for testifying concerning
10:28:09 21 area of inquiry No. 7?
10:28:11 22     A. No.
10:28:14 23     Q. Other than looking at the MTA, did you look at
10:28:17 24 any other documents to prepare?
10:28:21 25     A. Oh, I had to think about all the things we

Page 57

10:28:26 1  talked about several minutes ago in order to think
10:28:32 2  about the events of that time.
10:28:34 3      Q. So -- so what did you think about?
10:28:37 4      MR. RODRIGUEZ: And I'll just caution you
10:28:39 5  again not to reveal any attorney-client
10:28:41 6  communications.
10:28:41 7      THE WITNESS: As I said, papers, letters, and
10:28:50 8  so forth.
10:28:50 9  BY MR. STONE:
10:28:51 10     Q. And maybe you misunderstood my question. You
10:28:53 11 said you had to think about it, and I was wondering
10:28:55 12 what you thought about.
10:28:56 13     MR. RODRIGUEZ: Objection. Vague. Asked and
10:28:57 14 answered.
10:29:01 15     THE WITNESS: I had to --
10:29:03 16 BY MR. STONE:
10:29:04 17     Q. Please. Go ahead.
10:29:05 18     A. I had to think about the events of that time.
10:29:08 19 Place myself back in those days and read the letters
10:29:12 20 and look at the documents and consider what exactly
10:29:18 21 happened.
10:29:19 22     Q. In connection with the work that you did with
10:29:23 23 Dr. Holodniy, was it your practice, while he was
10:29:26 24 working for you, to review his lab notebook?
10:29:31 25     MR. RODRIGUEZ: Objection. Vague.

Page 58

10:29:33 1      THE WITNESS: Certainly aspects of it. I saw
10:29:37 2  tables and figures and discussed next strategies.
10:29:37 3  BY MR. STONE:
10:29:43 4      Q. You did that back in the 1989, 1990 time
10:29:49 5  frame?
10:29:50 6      A. Yes.
10:29:50 7      Q. Did you know Sohini Sengupta?
10:29:57 8      A. Sure. I do know her.
10:29:59 9      Q. And did you have a practice of reviewing her
10:30:02 10 lab notebook at the time that she was working with
10:30:06 11 Dr. Holodniy?
10:30:07 12     A. No, I didn't.
10:30:11 13     Q. Did you have a practice of reviewing
10:30:13 14 Dr. Katzenstein's lab notebook while he was working
10:30:17 15 with you back in the late '80s, early '90s?
10:30:24 16     A. I don't think he had lab notebooks. But on
10:30:27 17 the other hand, I discussed with him and Sohini the
10:30:33 18 data as it was occurring. It's that I haven't
10:30:45 19 precisely been over the day-to-day lab notes.
10:30:45 20     Q. You didn't review Dr. Sengupta's lab notebooks
10:30:50 21 in preparation for your testimony concerning topic
10:30:53 22 No. 7, did you?
10:30:54 23     A. No.
10:30:54 24     Q. And you didn't review all the volumes of
10:30:57 25 Dr. Holodniy's lab notebooks in preparing for your

Page 59

10:30:59 1  testimony concerning topic No. 7, did you?
10:31:02 2      A. No.
10:31:13 3      Q. So what work was performed in connection with
10:31:16 4  the 1988 materials transfer agreement?
10:31:19 5      MR. RODRIGUEZ: Objection. Vague.
10:31:21 6      THE WITNESS: Well, only -- only work at
10:31:31 7  Stanford where we drew blood from patients undergoing
10:31:37 8  trials in preparation for studying them at Cetus and
10:31:44 9  perhaps at Stanford as well.
10:31:44 10 BY MR. STONE:
10:31:53 11     Q. Is that the entirety of work that was
10:31:55 12 performed in connection with the 1988 MTA, to your
10:31:58 13 knowledge?
10:31:58 14     A. Yes.
10:31:58 15     Q. Was any PCR work performed in connection with
10:32:01 16 that MTA?
10:32:02 17     A. Yes. There was some work done at Cetus.
10:32:04 18     Q. What was the nature of that work?
10:32:07 19     A. It was a semiquantitative analysis of blood
10:32:12 20 virus.
10:32:16 21     Q. This 1988 MTA that is referred to here was an
10:32:23 22 '88 MTA that was signed on -- it was signed in February
10:32:37 23 of 1989.
10:32:39 24     Is that the MTA that you're referring to?
10:32:41 25     A. Yes.

Page 60

15 (Pages 57 to 60)

CONFIDENTIAL

10:32:41 1    MR. RODRIGUEZ: Objection. The document
10:32:43 2 speaks for itself.
10:32:43 3 BY MR. STONE:
10:32:58 4    Q. And what was the subject matter generally of
10:33:00 5 the 1988 MTA you're referring to?
10:33:02 6    MR. RODRIGUEZ: Objection. The document
10:33:04 7 speaks for itself. Calls for a legal conclusion.
10:33:07 8    THE WITNESS: It -- it actually is pretty
10:33:09 9 vague because it doesn't have a specific set of
10:33:14 10 experiments that it refers to. But yet all the MTAs
10:33:20 11 I've done in the past usually are documented around a
10:33:26 12 specific set of experiments.
10:33:28 13    My memory and my sense of what was going on
10:33:32 14 from my papers and the information that I had was that
10:33:39 15 this MTA was directed toward allowing us to look at
10:33:49 16 virus in the blood of patients in an IL-2 study that
10:33:54 17 was partially supported by Cetus, but also the
10:33:57 18 National Institutes of Health.
10:34:07 19 BY MR. STONE:
10:34:08 20    Q. The semiquant work that you referred to, who
10:34:10 21 was doing that work at Cetus, to your knowledge?
10:34:13 22    A. I really can't remember. There were a number
10:34:15 23 of people that were in the HIV group at Cetus, but I
10:34:24 24 believe there was a woman who was most involved with
10:34:27 25 it, but I really dealt with her primarily through

Page 61

10:34:34 1 others, particularly, I think, Eric Groves.
10:34:38 2    Q. In connection with this work, did you have a
10:34:40 3 primary contact at Cetus?
10:34:44 4    A. I think I just said through Eric Groves.
10:34:46 5    Q. And I was wondering if he was your -- was --
10:34:49 6 was Dr. Groves your primary contact at Cetus?
10:34:52 7    A. It's really hard to be sure now these many
10:34:55 8 years later.
10:34:57 9    Q. The woman that you're referring to, was that
10:34:59 10 Sharon DeGroat?
10:35:00 11    A. No. Shirley Kwok, I believe.
10:35:22 12    Q. Let me show you what previously was marked as
10:35:48 13 Exhibit 29.
10:35:48 14    (Previously marked Exhibit 29 was
10:35:48 15    presented to the witness.)
10:35:48 16 BY MR. STONE:
10:36:08 17    Q. Dr. Merigan, do you recognize Exhibit 29?
10:36:12 18    A. Yes.
10:36:12 19    Q. Is this the MTA that you've been referring to?
10:36:15 20    A. I believe so.
10:36:23 21    Q. And is it your recollection that semiquant
10:36:31 22 work was done in connection with this MTA?
10:36:35 23    A. Yes.
10:36:37 24    Q. Who -- were you involved in discussions that
10:36:40 25 led to the drafting of this MTA?

Page 62

10:36:45 1    A. No.
10:36:47 2    Q. You had no discussions with anyone at Stanford
10:36:50 3 or Cetus relating to the preparation of this MTA?
10:36:54 4    A. No. I think we had -- I had discussions with
10:36:57 5 scientists and administrative people at Cetus to
10:37:09 6 stimulate the work that was done under this MTA, and I
10:37:19 7 believe the work had actually gone on even before this
10:37:21 8 MTA. And it -- it was required by Cetus as kind of a
10:37:30 9 last minute thing because we'd shipped the samples.
10:37:35 10 The specimens maybe had been titrated or were in the
10:37:39 11 midst of titration, and we couldn't get -- they didn't
10:37:43 12 want to give the results unless we signed this MTA.
10:37:50 13    At -- at Stanford, you can see an
10:37:55 14 administrative officer signed off on the MTA as well
10:38:00 15 as myself, David Schwartz.
10:38:03 16    Q. Which scientists at Cetus did you have
10:38:06 17 discussions with concerning Exhibit 29?
10:38:12 18    A. Well, I'm -- I'm sorry, but I can't tell all
10:38:15 19 of them, but I know that Eric Groves and Shirley Kwok,
10:38:21 20 I think, for two.
10:38:27 21    Q. Can you recall any others?
10:38:36 22    A. Not really.
10:38:36 23    Q. Not at all?
10:38:37 24    A. No. There may have been because it's a large
10:38:39 25 group, and we were doing work for the National

Page 63

10:38:48 1 Institutes of Health in HIV in patients which actually
10:38:52 2 involved the FDA. And everyone was very interested in
10:38:59 3 whether, when we give patients IL-2, would we activate
10:39:07 4 the virus, not suppress the virus. And we were doing
10:39:11 5 the first experiments to give it in combination with
10:39:14 6 AZT.
10:39:15 7    So when no one really knew the outcome and
10:39:19 8 yet PCR had not been shown to be quantitative yet with
10:39:26 9 respect to measuring the virus, but it seemed logical
10:39:31 10 to send specimens to Cetus since they were involved in
10:39:35 11 this area. And we were -- felt it was in our
10:39:43 12 patients' best interests to find out whether the IL-2
10:39:47 13 was activating the virus or not.
10:39:51 14    Q. Is it your recollection that you didn't
10:39:53 15 receive any results from Cetus concerning that work
10:39:58 16 until after this was executed in February of 1989?
10:40:01 17    A. That's the way I remember it, yes.
10:40:07 18    Q. This MTA doesn't appear to reference IL-2.
10:40:12 19    Does that suggest to you that the MTA you're
10:40:16 20 recalling was a different MTA?
10:40:18 21    A. No. I think it was a generic MTA, not
10:40:22 22 really -- it was just to cover the work that they were
10:40:36 23 doing.
10:40:42 24    Q. And -- and when you say "generic," what do you
10:40:45 25 mean by that?

Page 64

16  (Pages 61 to 64)

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

CONFIDENTIAL

10:40:48 1    A. Not one that specified exactly what samples
10:40:53 2  were being sent to Cetus.
10:41:01 3    Q. And the MTA covers materials being provided
10:41:06 4  from Cetus to Stanford, right?
10:41:10 5      MR. RODRIGUEZ: Objection. Calls for a legal
10:41:12 6  conclusion.
10:41:15 7      THE WITNESS: I don't know whether it did or
10:41:17 8  not.
10:41:18 9  BY MR. STONE:
10:41:18 10    Q. Prior to this MTA, had you ever entered into
10:41:23 11  another MTA with Cetus?
10:41:25 12    A. I don't believe so.
10:41:27 13    Q. Is it your recollection that there was only
10:41:30 14  one MTA between your group and Cetus?
10:41:35 15    A. That's the way I remember it. I actually
10:41:41 16  didn't remember this MTA, either.
10:41:45 17    Q. When did you first see this MTA, to your
10:41:48 18  recollection?
10:41:49 19      MR. RODRIGUEZ: You can just give a date, but
10:41:52 20  don't give additional details to the extent they
10:41:54 21  relate to attorney-client communications.
10:42:03 22      THE WITNESS: I believe in the last year.
10:42:03 23  BY MR. STONE:
10:42:06 24    Q. And you didn't see any other MTAs in
10:42:08 25  preparation for your testimony today?

Page 65

10:42:10 1    A. No.
10:42:10 2    Q. That is your signature on the last page of
10:42:14 3  Exhibit 29?
10:42:19 4    A. Yes.
10:42:19 5    Q. Do you know if any materials were provided to
10:42:22 6  Stanford pursuant to this MTA?
10:42:26 7    A. I don't believe so.
10:42:27 8    Q. But you don't really have a recollection one
10:42:29 9  way or the other, do you?
10:42:30 10      MR. RODRIGUEZ: Objection. Mischaracterizes
10:42:32 11  the testimony.
10:42:33 12      THE WITNESS: No, since all I knew there was
10:42:35 13  work at Cetus, not work at Stanford at this point.
10:42:35 14  BY MR. STONE:
10:42:41 15    Q. And until this -- and until the last year when
10:42:44 16  you saw this again, you didn't even remember that there
10:42:46 17  had been an MTA between Stanford and Cetus, right?
10:42:49 18      MR. RODRIGUEZ: Objection. Mischaracterizes
10:42:52 19  the testimony.
10:42:53 20      THE WITNESS: I -- I -- I don't remember all
10:42:59 21  the things that happened then, but I do remember that,
10:43:07 22  after seeing this, it was relevant to the specimens
10:43:15 23  taken at Stanford.
10:43:15 24  BY MR. STONE:
10:43:18 25    Q. But sitting here today, you can't recall

Page 66

10:43:20 1  specifically one way or the other what materials were
10:43:22 2  provided to people at Stanford in connection with this
10:43:26 3  MTA?
10:43:28 4      MR. RODRIGUEZ: Objection. Mischaracterizes
10:43:30 5  the testimony.
10:43:31 6      THE WITNESS: I didn't say there were any
10:43:32 7  specimens -- anything provided to the people at
10:43:37 8  Stanford.
10:43:37 9  BY MR. STONE:
10:43:39 10    Q. Right. And -- and my question is, you don't
10:43:42 11  really recall one way or the other whether or not
10:43:44 12  materials were provided to Stanford under this MTA,
10:43:47 13  right?
10:43:47 14      MR. RODRIGUEZ: Same -- same objection and
10:43:49 15  asked and answered.
10:43:50 16      THE WITNESS: I -- I -- yes. I have already
10:43:52 17  answered that question.
10:43:52 18  BY MR. STONE:
10:43:54 19    Q. Right. And my question is, sitting here
10:43:57 20  today, though, you don't recall one way or the other
10:44:00 21  whether or not materials were provided to Stanford in
10:44:03 22  connection with this MTA?
10:44:04 23      MR. RODRIGUEZ: Objection. Asked and
10:44:05 24  answered. Mischaracterizes the testimony.
10:44:08 25      THE WITNESS: I have not -- I do not believe

Page 67

10:44:12 1  this was relevant to any materials provided at
10:44:17 2  Stanford.
10:44:17 3  BY MR. STONE:
10:44:19 4    Q. Do you know whether or not materials were
10:44:21 5  provided to Stanford under this MTA, Exhibit 29?
10:44:25 6    A. I said I do not believe there were any --
10:44:28 7  anything provided to Stanford from this.
10:44:31 8    Q. Right. Do you know?
10:44:32 9    A. Yes.
10:44:32 10      MR. RODRIGUEZ: Same objection. Asked and
10:44:34 11  answered.
10:44:34 12  BY MR. STONE:
10:44:35 13    Q. And so your testimony is there weren't
10:44:37 14  materials provided under this MTA?
10:44:39 15    A. I believe there was not, yes.
10:44:40 16    Q. Do you have any records that would reflect
10:44:42 17  that?
10:44:43 18      MR. RODRIGUEZ: Objection. Vague.
10:44:48 19      THE WITNESS: What sort of records?
10:44:50 20  BY MR. STONE:
10:44:50 21    Q. Any records.
10:44:51 22      MR. RODRIGUEZ: Same objection.
10:44:53 23      THE WITNESS: Only the knowledge of what I
10:44:55 24  said we had relevant to preparing for the deposition.
10:44:55 25  BY MR. STONE:

Page 68

17  (Pages 65 to 68)

**CONFIDENTIAL**

10:45:02 1    Q. And did those records reflect that no
10:45:04 2 materials were transferred?
10:45:06 3    A. Yes --
10:45:07 4    MR. RODRIGUEZ: Objection. Vague.
10:45:08 5    THE WITNESS: Yes, because there was no work
10:45:10 6 at Stanford from materials provided at that time.
10:45:10 7 BY MR. STONE:
10:45:17 8    Q. Dr. Holodniy didn't bring materials from Cetus
10:45:19 9 to Stanford?
10:45:20 10    MR. RODRIGUEZ: Objection. Calls for
10:45:21 11 speculation. Lacks foundation.
10:45:23 12    THE WITNESS: Dr. Holodniy is not involved in
10:45:25 13 this MTA.
10:45:25 14 BY MR. STONE:
10:45:27 15    Q. That's your testimony?
10:45:28 16    A. Yes.
10:45:28 17    Q. How do you know that?
10:45:30 18    A. Because his name -- he's not the signatory to
10:45:33 19 it.
10:45:34 20    Q. Dr. Holodniy wasn't working for you in late
10:45:36 21 1988?
10:45:38 22    A. I said he was not a signatory to it. He did
10:45:41 23 not -- it did not cover his work.
10:45:46 24    Q. Did you ever discuss your belief that this MTA
10:45:50 25 did not cover Dr. Holodniy with anyone at Cetus?

Page 69

10:45:55 1    A. Not that I remember.
10:45:56 2    Q. Did you ever discuss that with anyone at
10:45:59 3 Stanford?
10:46:00 4    A. Not that I remember.
10:46:02 5    Q. Was Dr. Holodniy working for you in December
10:46:15 6 of 1988?
10:46:16 7    MR. RODRIGUEZ: Objection. Vague as to
10:46:17 8 "working for you."
10:46:21 9    THE WITNESS: I think so. But that would be
10:46:25 10 reflected in his lab notebooks.
10:46:25 11 BY MR. STONE:
10:46:27 12    Q. What kind of work was he doing then?
10:46:30 13    MR. RODRIGUEZ: Same objection.
10:46:36 14    THE WITNESS: Again, I don't have his lab
10:46:38 15 notebooks, so I can't answer that question.
10:46:38 16 BY MR. STONE:
10:46:41 17    Q. You don't know what kind of work Dr. Holodniy
10:46:44 18 was doing then?
10:46:44 19    A. It's just you want a precise answer, and I
10:46:47 20 want to give -- give you a precise answer, but I can't
10:46:50 21 do it without looking at the specific notes to cover
10:46:53 22 the specific window of time you're interested in.
10:46:57 23    Q. What kind of work was he doing in 1988 for
10:47:00 24 you?
10:47:01 25    MR. RODRIGUEZ: Objection. As to work doing

Page 70

10:47:03 1 for you.
10:47:07 2    THE WITNESS: He was a clinical and research
10:47:09 3 trainee under me. I brought him to Stanford. I
10:47:12 4 provided him the grant support that supported him at
10:47:17 5 Stanford. And he was working both in my laboratory --
10:47:25 6 he came to be working at Cetus, and I can't give you
10:47:29 7 the exact day he worked there, but Cetus had him as a
10:47:35 8 guest in their laboratory for a period of time.
10:47:38 9    And then he stopped working at Cetus when it
10:47:42 10 became -- when, in fact, he didn't need their help.
10:47:47 11 And he was taking specimens from Stanford again to
10:47:51 12 look at the virus levels.
10:47:55 13    But again, I think it was during 1988, '89,
10:47:59 14 '90 that he was a postdoctoral fellow, but, again,
10:48:04 15 without his -- without his laboratory notebook or
10:48:07 16 specifics, I can't go further.
10:48:07 17 BY MR. STONE:
10:48:10 18    Q. You directed Dr. Holodniy to go to Cetus?
10:48:13 19    MR. RODRIGUEZ: Objection. Vague as to
10:48:16 20 "directed."
10:48:17 21    THE WITNESS: Well, he went there because I
10:48:21 22 arranged it.
10:48:23 23 BY MR. STONE:
10:48:23 24    Q. And you arranged it so that he could learn
10:48:25 25 techniques related to PCR, right?

Page 71

10:48:27 1    MR. RODRIGUEZ: Objection. Vague.
10:48:29 2    THE WITNESS: I think he'd already started
10:48:31 3 some PCR work himself. And I thought it was maybe '89
10:48:37 4 when he started it, but I could be precise about the
10:48:41 5 date when I looked at his laboratory notebook. And
10:48:53 6 he -- we thought that it would be good for him to work
10:48:58 7 with somebody else who'd done it because it might be a
10:49:03 8 faster road to getting the work going in our group.
10:49:11 9    There were people around the country in other
10:49:13 10 regions working on it, but I thought he -- I thought
10:49:18 11 it would be, in fact, to Cetus's advantage as well as
10:49:23 12 ours to have him trained. I'd seen their work, and it
10:49:29 13 was only semiquantitative response they were
10:49:34 14 documenting. And we knew we needed a very precise
10:49:39 15 quantitative assay and that we had to do that because
10:49:46 16 there wasn't really much interest at Cetus at that
10:49:52 17 time on a precise quantitative assay.
10:49:55 18 BY MR. STONE:
10:49:55 19    Q. And you couldn't do that on your own, and
10:49:57 20 that's why you sent Dr. Holodniy to Cetus?
10:49:59 21    A. No.
10:49:59 22    MR. RODRIGUEZ: Objection. Mischaracterizes
10:50:01 23 the testimony.
10:50:01 24    THE WITNESS: I think it was really a
10:50:02 25 question of -- in a situation where there was a

Page 72

**18  (Pages 69 to 72)**

CONFIDENTIAL

10:50:05 1  worldwide epidemic occurring. We had the specimens,
10:50:12 2  and we could get to a working methods fastest if we
10:50:18 3  got some help from people who'd already worked in that
10:50:22 4  area from the standpoint of basic science and not
10:50:26 5  clinical science. They had that capability developed.
10:50:39 6  And because they were close, we thought it might be --
10:50:47 7  and he could still work at home, live at home, it was
10:50:52 8  simplest to start out with him.
10:50:53 9  BY MR. STONE:
10:50:54 10  Q. Well, you also had a lengthy history with
10:50:56 11  Cetus, didn't you?
10:50:57 12      MR. RODRIGUEZ: Objection. Vague.
10:50:58 13      THE WITNESS: Oh, yes. I was on -- I was on the
10:51:01 14  original Cetus board of directors, scientific board.
10:51:01 15  BY MR. STONE:
10:51:06 16  Q. And at the time you sent Dr. Holodniy to
10:51:09 17  Cetus, you were a consultant at Cetus, were you not?
10:51:12 18      MR. RODRIGUEZ: Objection. Mischaracterizes
10:51:13 19  the testimony as to "sent."
10:51:16 20      THE WITNESS: Yes, I was, but I was working
10:51:18 21  on another area, HIV and cancer. I'm sorry. IL-2 and
10:51:26 22  cancer.
10:51:27 23  BY MR. STONE:
10:51:27 24  Q. You did also work, though, with IL-2 and HIV
10:51:31 25  in connection with your efforts at Cetus, did you not?

Page 73

10:51:34 1  A. No, I don't believe so. I think the -- I
10:51:37 2  mentioned IL-2 in clinical studies, and we were
10:51:43 3  interested in Cetus helping us determine whether there
10:51:47 4  was a chance we were activating the virus.
10:51:50 5  Q. Did Cetus provide you with IL-2 in connection
10:51:53 6  with your HIV clinical studies?
10:51:57 7  A. No. I believe they -- it went through the
10:51:59 8  National Institutes of Health.
10:52:03 9  Q. At the time Dr. Holodniy joined your group and
10:52:07 10  began working for you, what experience did he have with
10:52:10 11  PCR?
10:52:11 12      MR. RODRIGUEZ: Objection. Calls for
10:52:12 13  speculation.
10:52:15 14      THE WITNESS: He had no ex- -- no direct
10:52:17 15  experience, but he had worked in relevant molecular
10:52:21 16  biology.
10:52:21 17  BY MR. STONE:
10:52:21 18  Q. What relevant molecular biology?
10:52:24 19      MR. RODRIGUEZ: Objection. Calls for
10:52:25 20  speculation.
10:52:25 21      THE WITNESS: At this time I can't remember.
10:52:29 22  BY MR. STONE:
10:52:29 23  Q. Sitting here today, you don't know?
10:52:30 24  A. I can't remember.
10:52:31 25  Q. Sitting here today, you can't remember; is

Page 74

10:52:34 1  that correct?
10:52:34 2  A. Thank you. Yes.
10:52:36 3  Q. How did Dr. Holodniy first become exposed to
10:52:41 4  PCR?
10:52:41 5      MR. RODRIGUEZ: Objection. Calls for
10:52:42 6  speculation.
10:52:46 7      THE WITNESS: There were people at Stanford
10:52:48 8  doing PCR. It was a widespread technique. We'd, in
10:52:55 9  fact, ordered our first PCR machine, I think, before
10:52:58 10  he came.
10:52:58 11  BY MR. STONE:
10:53:02 12  Q. Do you know if it was before he came?
10:53:04 13      MR. RODRIGUEZ: Objection. Vague.
10:53:06 14      THE WITNESS: I think so. Yeah. I think I
10:53:08 15  did -- I think it was before he came.
10:53:10 16  BY MR. STONE:
10:53:10 17  Q. When was it ordered?
10:53:14 18  A. '87 or '88, right in there.
10:53:18 19  Q. Who ordered it?
10:53:20 20  A. I did.
10:53:23 21  Q. How did you do that?
10:53:26 22  A. Had my secretary prepare a purchase order.
10:53:30 23  Q. And you signed it on behalf --
10:53:32 24  A. Yeah.
10:53:32 25  Q. -- of Stanford?

Page 75

10:53:33 1      MR. RODRIGUEZ: Objection. Calls for a legal
10:53:34 2  conclusion.
10:53:37 3      THE WITNESS: I don't sign purchase orders.
10:53:39 4  The university signs purchase orders on my behalf.
10:53:39 5  BY MR. STONE:
10:53:45 6  Q. So you would have signed it, Thomas Merigan,
10:53:48 7  right?
10:53:49 8  A. I don't think I signed even -- at any time, I
10:53:53 9  didn't have to sign for everything. I could prepare
10:53:56 10  the material, and then -- prepare the specifications
10:54:00 11  and what we were wanting when, and then the university
10:54:04 12  processed my order if I had the funds to support it.
10:54:09 13  Q. So can you provide me with the month and year
10:54:13 14  when you ordered the PCR equipment?
10:54:18 15      MR. RODRIGUEZ: Objection. Vague.
10:54:24 16      THE WITNESS: It's my understanding you
10:54:26 17  already have been provided with it from my attorneys.
10:54:26 18  BY MR. STONE:
10:54:30 19  Q. I'm asking you, sir.
10:54:32 20      MR. RODRIGUEZ: Objection. Argumentative.
10:54:34 21      THE WITNESS: Yes, I don't understand what
10:54:37 22  you mean.
10:54:37 23  BY MR. STONE:
10:54:38 24  Q. Please provide me with the month and year when
10:54:40 25  you submitted the purchase order for the PCR equipment.

Page 76

19 (Pages 73 to 76)

11:10:51 1    Q. Did anyone at Stanford teach Dr. Holodniy how
11:10:55 2  to run the PCR equipment that was in the lab?
11:10:57 3    MR. RODRIGUEZ: Objection. Calls for
11:10:58 4  speculation.
11:11:04 5    THE WITNESS: I -- I can't remember that.
11:11:08 6  I -- I don't think so, no. I think it was up to him
11:11:14 7  and his understanding of the methodology. He was
11:11:18 8  really pioneering that work for us.
11:11:30 9    MR. STONE: Let's go off the record so we can
11:11:32 10 change the tape.
11:11:32 11    MR. RODRIGUEZ: Okay.
11:11:33 12    MR. STONE: We may as well take a short
11:11:35 13 break, too.
11:11:36 14    VIDEO OPERATOR: The time is 11:11. We are
11:11:38 15 going off the record. And this is the completion of
11:11:41 16 media No. 1.
11:19:37 17    (Recess.)
11:19:48 18    VIDEO OPERATOR: The time is 11:20. We are
11:20:02 19 back on the record. And this will be the beginning of
11:20:05 20 media No. 2 in the deposition of Dr. Thomas Merigan.
11:20:05 21 BY MR. STONE:
11:20:10 22    Q. Dr. Merigan, have you ever published any
11:20:13 23 papers relating to PCR?
11:20:18 24    A. Quite a few.
11:20:19 25    Q. What was the first paper you published related

Page 89

11:20:22 1  to PCR?
11:20:29 2    A. It might have been the paper in the Journal
11:20:34 3  of Infectious Disease.
11:20:34 4    Q. That's the JID paper that was coauthored with
11:20:38 5  certain Cetus personnel?
11:20:40 6    A. Yeah.
11:20:43 7    Q. Sitting here today, you don't recall having
11:20:45 8  published a paper related to PCR prior to that date; is
11:20:48 9  that correct?
11:20:49 10    A. Well, I had a paper involving PCR that was
11:20:51 11 presented at a symposium, and I don't remember whether
11:20:57 12 it was -- I think it was definitely after that paper,
11:21:02 13 but I'm not sure as to whether it was six months later
11:21:07 14 or at the time.
11:21:10 15    Q. Did that paper relate to the same work as the
11:21:13 16 JID paper?
11:21:14 17    A. It covered that among other things, yes.
11:21:18 18    Q. Was that paper a coauthored with certain Cetus
11:21:22 19 personnel?
11:21:22 20    A. No. It was just a review. So it must have
11:21:25 21 been later. I think it was of our general work
11:21:31 22 because the work with Cetus was really just an
11:21:36 23 introductory --
11:21:38 24    Q. Have you had any formal PCR training yourself?
11:21:40 25    MR. RODRIGUEZ: Objection. Vague.

Page 90

11:21:42 1    THE WITNESS: No.
11:21:42 2  BY MR. STONE:
11:21:47 3    Q. You were a consultant for Cetus in the past,
11:21:50 4  correct?
11:21:51 5    A. Yes.
11:21:51 6    Q. When did you first become involved with Cetus?
11:21:57 7    A. Maybe 1979.
11:21:59 8    Q. What was the nature of your involvement?
11:22:06 9    A. I had developed the first lymphokine or
11:22:15 10 cytokine for clinical application, and Cetus had an
11:22:28 11 interest in developing other cytokines and using other
11:22:33 12 techniques in infectious disease.
11:22:42 13    Q. Did you first contact Cetus or did they
11:22:44 14 contact you?
11:22:47 15    A. They contacted me.
11:22:49 16    Q. Who contacted you?
11:22:51 17    A. Might have been Ron Cape.
11:22:54 18    Q. Who was Ron Cape at that time in terms of his
11:22:58 19 position?
11:22:58 20    A. The co-president of Cetus.
11:23:01 21    Q. Do you recall anything about his first contact
11:23:06 22 with you?
11:23:17 23    A. No, other than he was enthusiastic that I
11:23:22 24 join their scientific board.
11:23:24 25    Q. Cetus's Scientific Advisory Board, is that

Page 91

11:23:27 1  were you're referring to?
11:23:28 2    A. Yes.
11:23:28 3    Q. Did you join Cetus's Scientific Advisory
11:23:31 4  Board?
11:23:31 5    A. Yes.
11:23:32 6    Q. Did you join the board in 1979?
11:23:33 7    A. I believe so.
11:23:34 8    Q. In connection with your position on Cetus's
11:23:40 9  Scientific Advisory Board, what type of role did you
11:23:42 10 play at Cetus?
11:23:44 11    A. Well, we set up a program in immunology and
11:23:52 12 immunologic aspects of treatment of infectious disease
11:23:56 13 and cancer eventually at Stanford -- in the area
11:24:01 14 immediately adjacent to Stanford called Cetus Immune
11:24:04 15 or Cetus Palo Alto, that functioned for a few
11:24:10 16 years. And we had projects there that involved
11:24:20 17 immunology and virology that I was a contributor to.
11:24:26 18    Q. And what was the nature of your contribution,
11:24:30 19 generally?
11:24:32 20    A. I was an advisor. Did not do laboratory work
11:24:36 21 but interacted with Cetus scientists who were doing
11:24:41 22 laboratory work and with Cetus administrative people
11:24:48 23 to determine the next directions for Cetus.
11:24:55 24    And I was personally close to Steven
11:25:02 25 Rosenberg, who had done trials of natural IL-2 in

Page 92

23 (Pages 89 to 92)

**CONFIDENTIAL**

11:25:14 1 cancer patients which were very similar to mine of
11:25:19 2 those years and proceeding with interferon, another
11:25:28 3 lymphokine.
11:25:29 4     And our trials were very attractive to the
11:25:33 5 biotech community because we had determined where
11:25:38 6 interferon might play a role in human medicine. And
11:25:45 7 IL-2 didn't have that understanding yet of where it
11:25:49 8 might fit into human medicine, and yet it was a
11:25:56 9 characterized material that might be produced by
11:25:59 10 recombinant DNA, which was a unique technique in
11:26:04 11 biotechnology programs like Cetus's.
11:26:08 12     Q. Was Cetus a producer of IL-2?
11:26:11 13     A. Not at the -- not when we started, but under
11:26:15 14 our help, Cetus Immune -- we arranged for
11:26:20 15 Dr. Rosenberg to work with Cetus in transferring
11:26:24 16 technology to Berkeley and to Palo -- and to Palo Alto
11:26:28 17 to do that, to -- to prepare IL-2 and to eventually
11:26:34 18 make it by recombinant DNA techniques.
11:26:38 19     Q. When -- when you say transferring it to
11:26:39 20 Berkeley and Palo Alto, you're referring Cetus
11:26:42 21 facilities in those locations?
11:26:43 22     A. Yes.
11:26:47 23     Q. The manufacturing or production of IL-2 using
11:26:51 24 recombinant DNA technology, is that something that you
11:26:55 25 had experience with or expertise with?

Page 93

11:26:56 1     A. No expertise, but I was a clinical person who
11:27:01 2 understood the issues in developing a recombinant DNA
11:27:06 3 product for use in clinical medicine because I was
11:27:09 4 also working with Roche at that time beginning
11:27:16 5 clinical trials of recombinant DNA, now produced
11:27:22 6 interferon. But we were -- it was a parallel path
11:27:26 7 kind of issue, and we were further along in the path
11:27:29 8 in terms of we had had natural interferon for many
11:27:34 9 years and had proven its activity in animal models and
11:27:39 10 in human medicine.
11:27:40 11     And then it became important to make this
11:27:43 12 very expensive material more cheaply using recombinant
11:27:48 13 DNA and see if you could get the same clinical
11:27:51 14 responses that you got with the more crude, natural
11:27:58 15 interferon. And Rosenberg was at a much earlier stage
11:28:05 16 wanting to again use recombinant DNA to use
11:28:11 17 large-scale studies in cancer because he'd seen some
11:28:14 18 encouragement in small-scale natural recombinant IL-2
11:28:20 19 studies.
11:28:21 20     Now, in addition, there was work at Cetus
11:28:26 21 Palo Alto on DNA virus, cytomegalo virus, and we were
11:28:33 22 working on developing monoclonal antibodies as
11:28:38 23 potential treatment for cytomegalo virus infection
11:28:42 24 where I -- because I was an expert in cytomegalo virus
11:28:47 25 infection and -- and the growth of that virus and its

Page 94

11:28:50 1 quantitation, and, in fact, its being able to
11:28:57 2 quantitate it and how it would be a method to
11:29:01 3 evaluating antivirals.
11:29:11 4     Q. Were you compensated in connection with the
11:29:13 5 work that you were doing as a member of the Cetus
11:29:16 6 Scientific Advisory Board?
11:29:17 7     A. Yes, I was.
11:29:18 8     Q. How were you compensated?
11:29:20 9     A. By monthly payments and by stock options.
11:29:27 10     Q. How much were you paid?
11:29:30 11     A. I'm really sorry. I can't tell you that
11:29:33 12 number. It was a good payment of both. I don't have
11:29:40 13 a specific record, but I think you've subpoenaed --
11:29:48 14 no. You have documents that show from the original
11:29:55 15 agreement what that was to be.
11:29:58 16     Q. But sitting here today, you don't have a
11:30:00 17 recollection of the specifics?
11:30:01 18     A. Not a precise recollection.
11:30:16 19     Q. How long did you serve on Cetus's Scientific
11:30:23 20 Advisory Board?
11:30:23 21     A. Through to about 1990 -- I mean, what am I --
11:30:34 22 yeah, 1990, maybe 1989, right in that period.
11:30:34 23     Q. What was the reason for you ceasing your
11:30:40 24 position on Cetus's Scientific Advisory Board?
11:30:43 25     A. Well, I had been the advisor to Cetus perhaps

Page 95

11:30:50 1 after about -- after Cetus Immune closed and the
11:30:55 2 technology we started was -- some transferred to -- to
11:31:00 3 Berkeley, Emeryville and some stopped, project
11:31:05 4 stopped, I became advisor to the president of Cetus
11:31:08 5 about IL-2 studies in patients in cancer. And the
11:31:16 6 work with Cetus stopped after he was deposed as
11:31:24 7 chairman. And it was right in this period and was
11:31:32 8 associated with the fact that Cetus needed to be
11:31:35 9 reorganized because the FDA had turned down the first
11:31:41 10 request for IL-2 licensing.
11:31:45 11     Q. Who was it that you were the advisor to?
11:31:47 12     A. Fildes, Robert Fildes.
11:31:52 13     Q. And what was the nature of the advice that you
11:31:56 14 provided to him in connection with your tenure as his
11:31:59 15 advisor?
11:31:59 16     MR. RODRIGUEZ: Objection. Vague.
11:32:04 17     THE WITNESS: I advised him on what sorts of
11:32:11 18 trials might be necessary in kidney cancer and to help
11:32:16 19 interpret the data coming from his group's work, and
11:32:20 20 how to interact with the FDA advisory committee
11:32:29 21 because I had been on that committee myself for four
11:32:32 22 years and understood what the goals of the committee
11:32:40 23 were in terms of expectations of a potential drug for
11:32:47 24 human medicine coming from recombinant DNA technology.
11:32:51 25 BY MR. STONE:

Page 96

**24 (Pages 93 to 96)**

CONFIDENTIAL

| | |
|---|---|
| 11:32:51 1 | Q. Do you recall when you became the advisor to |
| 11:32:55 2 | Robert Fildes? |
| 11:32:57 3 | A. I think -- |
| 11:32:58 4 | MR. RODRIGUEZ: Objection. Mischaracterizes |
| 11:33:00 5 | the testimony. |
| 11:33:02 6 | THE WITNESS: I think it was in 1984, '5 when |
| 11:33:17 7 | the -- because when Cetus Palo Alto was closed at that |
| 11:33:26 8 | time, the contracts on the Scientific Advisory Board |
| 11:33:33 9 | of my colleagues were stopped, and my contract was |
| 11:33:38 10 | continued under the original terms because I was doing |
| 11:33:42 11 | that specific advisory work for him in terms of IL-2 |
| 11:33:48 12 | studies. |
| 11:33:48 13 | BY MR. STONE: |
| 11:33:53 14 | Q. And so you did remain a member of the Cetus |
| 11:33:56 15 | Scientific Advisory Board while you were in this |
| 11:33:58 16 | advisory role to Fildes; is that correct? |
| 11:34:04 17 | A. I -- you know, I can't remember. I don't |
| 11:34:06 18 | remember going to general meetings or -- and the -- |
| 11:34:15 19 | even the general meetings yearly might not be even |
| 11:34:19 20 | taking place then. And Cetus was converting from an |
| 11:34:26 21 | early staged biotech company to one that was more lean |
| 11:34:31 22 | and mean and hoping to compete with the big pharma |
| 11:34:39 23 | programs with specific projects in mind -- specific |
| 11:34:43 24 | products in mind rather than just gathering scientists |
| 11:34:49 25 | who were expert in the recombinant DNA or monoclonal |

Page 97

| | |
|---|---|
| 11:34:55 1 | antibody area. |
| 11:34:57 2 | Q. Did you attend Scientific Advisory Board |
| 11:35:00 3 | meetings during your tenure on the board? |
| 11:35:06 4 | A. I would think only one or two that I can |
| 11:35:09 5 | remember. |
| 11:35:09 6 | Q. How many other people were there on the |
| 11:35:12 7 | Scientific Advisory Board? |
| 11:35:14 8 | A. It fluctuated, but I remember numbers like |
| 11:35:21 9 | 25, 30, 40 down to lesser numbers. |
| 11:35:33 10 | Q. At the time that you were on -- strike that. |
| 11:35:36 11 | At the time that you were in your advisory |
| 11:35:38 12 | role to Robert Fildes, were you also a consultant for |
| 11:35:41 13 | Cetus? |
| 11:35:44 14 | A. Well, I think the word "Scientific Advisory |
| 11:35:48 15 | Board member" and "consultancy" are somewhat |
| 11:35:55 16 | equivalent. So you could say I was a consultant |
| 11:36:00 17 | because I was helping the organization because of my |
| 11:36:05 18 | prior experience. |
| 11:36:08 19 | Q. So is it your testimony that you didn't have |
| 11:36:11 20 | two roles, one as consultant and one as a member of the |
| 11:36:16 21 | Scientific Advisory Board? |
| 11:36:17 22 | A. No. It was really one as consultant. By |
| 11:36:20 23 | that time, Fildes was representing big pharma's |
| 11:36:27 24 | approach, which doesn't really rely on scientific |
| 11:36:32 25 | advisory boards but tries to build internally within |

Page 98

| | |
|---|---|
| 11:36:35 1 | the company the expertise to get the job done. |
| 11:37:13 2 | Q. Let me show you what we'll mark as |
| 11:37:40 3 | Exhibit 351. |
| 11:37:40 4 | (Deposition Exhibit 351 marked by the |
| 11:37:41 5 | court reporter.) |
| 11:37:41 6 | MR. STONE: And for the record, Exhibit 351 |
| 11:37:43 7 | is a multipage document bearing production numbers |
| 11:37:47 8 | RMS 63947 through 63952. |
| 11:39:52 9 | Q. Dr. Merigan, do you recognize Exhibit 351? |
| 11:39:55 10 | A. Yes. |
| 11:39:55 11 | Q. And is this a consulting agreement that you |
| 11:39:58 12 | entered into with Cetus in May of 1980? |
| 11:40:01 13 | A. Yes. |
| 11:40:04 14 | Q. It's your signature on the last page of |
| 11:40:07 15 | Exhibit 351 -- |
| 11:40:08 16 | A. Yes. |
| 11:40:08 17 | Q. -- the page bearing production number |
| 11:40:11 18 | RMS 63952? |
| 11:40:12 19 | A. Yes. |
| 11:40:12 20 | Q. And I take it you intended to be bound by this |
| 11:40:17 21 | agreement when you executed it? |
| 11:40:18 22 | MR. RODRIGUEZ: Objection. Vague. Calls for |
| 11:40:20 23 | a legal conclusion. |
| 11:40:26 24 | THE WITNESS: Well, I signed it. Yes. |
| 11:40:26 25 | BY MR. STONE: |

Page 99

| | |
|---|---|
| 11:40:29 1 | Q. And you intended to be bound by it, correct? |
| 11:40:31 2 | MR. RODRIGUEZ: Same objections. |
| 11:40:33 3 | THE WITNESS: Yes. |
| 11:40:33 4 | BY MR. STONE: |
| 11:40:35 5 | Q. Did you have any discussions with anyone at |
| 11:40:37 6 | Cetus relating to this agreement? |
| 11:40:41 7 | A. No. |
| 11:40:45 8 | Q. That's no, you had no discussions, or no -- |
| 11:40:45 9 | A. No, I had -- |
| 11:40:48 10 | Q. -- you recall no discussions? |
| 11:40:51 11 | A. No, I had no discussions. |
| 11:40:52 12 | Q. They provided this to you? |
| 11:40:56 13 | A. Yes. |
| 11:40:56 14 | Q. Who provided it to you? |
| 11:41:01 15 | A. I -- someone probably who worked with the |
| 11:41:03 16 | chairman of the board. |
| 11:41:10 17 | Q. Do you recall specifically who provided it to |
| 11:41:12 18 | you? |
| 11:41:13 19 | A. No. |
| 11:41:13 20 | Q. And without having any discussions, you signed |
| 11:41:15 21 | it? |
| 11:41:16 22 | MR. RODRIGUEZ: Objection. Mischaracterizes |
| 11:41:18 23 | the testimony and vague. |
| 11:41:24 24 | THE WITNESS: What do you mean by |
| 11:41:25 25 | "discussions"? |

Page 100

25  (Pages 97 to 100)

CONFIDENTIAL

12:12:51 1    A. No.

12:12:51 2    Q. Can you recall anything specific that

12:12:56 3    Dr. Sninsky said?

12:12:58 4    A. Well, he reaffirmed something that came out

12:13:04 5    from the other Cetus scientists when we decided to go

12:13:10 6    our separate directions after publishing -- or

12:13:14 7    submitting the JID article and before the JC article

12:13:22 8    work was started and came out.

12:13:25 9        Cetus was primarily in the mode of thinking

12:13:32 10   of Ph.D.s who thought the most important work that

12:13:39 11   could come from diagnostics would be a monitoring of

12:13:44 12   blood banking for presence of HIV in transfused blood,

12:13:52 13   potentially for transfusion. And he thought very

12:14:01 14   strongly that our work with monitoring HIV levels in

12:14:12 15   therapy would not become clinically significant.

12:14:18 16       And that was after we published our JCI paper

12:14:22 17   and had had increasing experience with it. I can't

12:14:28 18   tell you, though, exact day of that because I haven't

12:14:31 19   any direct document on it. It just was when he'd been

12:14:35 20   a longer-term Cetus employee and after the time we had

12:14:42 21   our discussions both at Stanford and at Cetus about

12:14:47 22   the fact that they contributed to our starting the

12:14:53 23   effort, and we were going to continue to work on it

12:15:02 24   but separately from them.

12:15:05 25       Q. So you mentioned that there was a discussion

Page 117

12:15:07 1    about going in separate directions. Who did that

12:15:11 2    discussion take place with?

12:15:18 3    A. One or two or three of the people who were on

12:15:21 4    the paper. Perhaps Michael Konrad and the fellow

12:15:24 5    who's been my primary contact. He was -- they were

12:15:27 6    both there. And I remember us saying that we had had

12:15:35 7    a good collaboration when we -- when they started us

12:15:41 8    out by helping us get started and that we recognized

12:15:46 9    that by including him -- including them in the two

12:15:50 10   papers -- two early papers, but that they were going

12:15:55 11   other directions with their HIV work, and we were

12:16:00 12   continuing to work with it for our goals.

12:16:03 13   Q. What -- where did that meeting take place?

12:16:05 14   A. Well, I think both at Cetus on one occasion

12:16:08 15   and definitely in my office at Stanford.

12:16:12 16   Q. So there was more than one discussion about

12:16:14 17   going --

12:16:14 18   A. I --

12:16:15 19   Q. -- in separate directions?

12:16:16 20   A. I think so, yes.

12:16:17 21   Q. And so let's just break it down into what your

12:16:21 22   recollection is of each of the two discussions, if you

12:16:24 23   can.

12:16:25 24   A. No, I don't think I can.

12:16:25 25   Q. Okay.

Page 118

12:16:25 1    A. It --

12:16:26 2    Q. So it kind of blurs in your mind? You can't

12:16:29 3    distinguish between what was said at one of the

12:16:34 4    meetings and what was said at the other?

12:16:36 5    A. No.

12:16:36 6    Q. Can you distinguish in your mind who was

12:16:39 7    present at the meeting at Cetus as compared to who was

12:16:43 8    present at your office at Stanford?

12:16:45 9    A. Well, I remember definitely Groves being

12:16:47 10   present at my office because we were going over the

12:16:50 11   final way we were going to cast the paper in -- for

12:16:52 12   the JID. And I can't remember for the -- when this

12:17:01 13   happened at Cetus very precisely. It's just that I

12:17:05 14   have a feeling it was discussed at both places.

12:17:13 15   Q. And do you have any recollection as to anyone

12:17:16 16   else who was present at the meeting in your office

12:17:24 17   besides yourself and Michael Groves?

12:17:27 18   A. Well, I mentioned Michael Konrad. I don't

12:17:31 19   believe there were any others there.

12:17:32 20   Q. No one else from Stanford was present there?

12:17:34 21   A. Oh, very likely Mark Holodniy was present and

12:17:38 22   perhaps David Katzenstein.

12:17:39 23   Q. And you said very likely, but is it your

12:17:42 24   recollection that they were present or just based on

12:17:45 25   circumstances, you think they could have been present?

Page 119

12:17:46 1    A. No. I think that in the case of Mark

12:17:50 2    Holodniy, he really had to be present because another

12:17:54 3    issue was the specific data we were discussing of his

12:17:58 4    work.

12:18:03 5    Q. Right. But you say he had to be present.

12:18:05 6    I'm -- I'm asking if, sitting here today, in your mind

12:18:07 7    you have a specific recollection that, in fact, he was

12:18:10 8    present?

12:18:10 9    A. Yes, I do.

12:18:11 10   Q. Okay. So sitting here today, do you have a

12:18:14 11   specific recollection in your mind of anyone else who

12:18:17 12   was present?

12:18:17 13   A. Well, I mentioned two people from --

12:18:19 14   Q. Besides -- besides the people you've already

12:18:21 15   testified to, Dr. Groves, yourself, Mark Holodniy, and

12:18:25 16   perhaps Michael Konrad.

12:18:30 17   A. And perhaps David Katzenstein.

12:18:35 18   Q. And so when you say perhaps, is there a

12:18:37 19   specific recollection, or is that just conjecture on

12:18:40 20   your part sitting here today?

12:18:41 21   A. No. It was that he deserved to be there

12:18:46 22   because he was a collaborator from Stanford in the

12:18:49 23   work, and he was not vital, so I can't say I'm sure he

12:18:54 24   was there, but he -- if -- if he hadn't have been

12:19:01 25   traveling or consumed by some other responsibility, he

Page 120

30  (Pages 117 to 120)

CONFIDENTIAL

```
 1
 2          I, the undersigned, a Certified Shorthand
 3     Reporter of the State of California, do hereby certify:
 4          That the foregoing proceedings were taken
 5     before me at the time and place herein set forth; that
 6     any witnesses in the foregoing proceedings, prior to
 7     testifying, were placed under oath; that a verbatim
 8     record of the proceedings was made by me using machine
 9     shorthand which was thereafter transcribed under my
10     direction; further, that the foregoing is an accurate
11     transcription thereof.
12          I further certify that I am neither
13     financially interested in the action nor a relative or
14     employee of any attorney of any of the parties.
15          IN WITNESS WHEREOF, I have this date
16     subscribed my name.
17
18     Dated: _____
19
20
21
22     _____
           SUZANNE F. BOSCHETTI
23         CSR No. 5111
24
25
```

Page 145

37  (Page  145)

CONFIDENTIAL ATTORNEYS' EYES ONLY

### Page 146

```
            UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF CALIFORNIA
THE BOARD OF THE TRUSTEES OF
THE LELAND STANFORD JUNIOR
UNIVERSITY,
            Plaintiff,
      vs.                    No. C-05-04158 MHP
ROCHE MOLECULAR SYSTEMS, INC.;
ROCHE DIAGNOSTICS CORPORATION;
ROCHE DIAGNOSTICS OPERATIONS,
INC.; ROCHE DIAGNOSTIC SYSTEMS,
INC.,
            Defendants.
_____

AND RELATED COUNTERCLAIM.
_____
          CONFIDENTIAL - ATTORNEYS' EYES ONLY
    VIDEOTAPED DEPOSITION OF THOMAS C. MERIGAN, M.D.
                 Palo Alto, California
            Wednesday, September 13, 2006
                      Volume 2


Reported by:
SUZANNE F. BOSCHETTI
CSR No. 5111
Job No. 3-52873
```

### Page 147

```
 1        UNITED STATES DISTRICT COURT
 2      NORTHERN DISTRICT OF CALIFORNIA
 3  THE BOARD OF THE TRUSTEES OF
    THE LELAND STANFORD JUNIOR
 4  UNIVERSITY,
 5        Plaintiff,
 6      vs.           No. C-05-04158 MHP
 7  ROCHE MOLECULAR SYSTEMS, INC.;
    ROCHE DIAGNOSTICS CORPORATION;
 8  ROCHE DIAGNOSTICS OPERATIONS,
    INC.; ROCHE DIAGNOSTIC SYSTEMS,
 9  INC.,
10        Defendants.
11  _____
    AND RELATED COUNTERCLAIM.
12  _____
13
14
15       Confidential videotaped deposition of THOMAS
16  C. MERIGAN, M.D., Volume 2, taken on behalf of
17  Defendants and Counterclaimants Roche Molecular
18  Systems, Inc., et al., at 3175 Hanover Street, Palo
19  Alto, California, beginning at 9:21 a.m. and ending at
20  1:31 p.m. on Wednesday, September 13, 2006, before
21  SUZANNE F. BOSCHETTI, Certified Shorthand Reporter No.
22  5111.
23
24
25
```

### Page 148

```
 1  APPEARANCES:
 2
 3  For Plaintiff and Counterclaim Defendants The Board of
    the Trustees of the Leland Stanford Junior University,
 4  et al.:
 5     COOLEY GODWARD LLP
       BY:  RICARDO RODRIGUEZ
 6     Attorney at Law
       Five Palo Alto Square, 3000 El Camino Real
 7     Palo Alto, California 94306-2155
       (650) 843-5000
 8
    For Defendants and Counterclaimants Roche Molecular
 9  Systems, Inc., et al.:
10     QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
       BY:  ROBERT W. STONE
11     BY:  BRIAN C. CANNON
       Attorneys at Law
12     555 Twin Dolphin Drive, Suite 560
       Redwood Shores, California 94065
13     (650) 801-5001
14  Videographer:
15     RAY TYLER
       SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
16     San Francisco, California
       (415) 274-9977
17
18
19
20
21
22
23
24
25
```

### Page 149

```
 1              INDEX
 2  WITNESS:              EXAMINATION
 3  THOMAS C. MERIGAN, M.D.
    Volume 2
 4
    BY MR. STONE            151
 5
 6           EXHIBITS
 7  DEPOSITION              PAGE
 8  357 Letter to Teresa Y. Basham, Ph.D., and     223
       Thomas C. Merigan, M.D., from Jeffrey S.
 9     Price, Ph.D., March 12, 1985, Bates Nos.
       RMS 0064086 - RMS 0064087; 2 pages
10
    358 Confidentiality and Materials Transfer      230
11     Agreement, 5/14/1985, Bates Nos. RMS
       0064080 - RMS 0064085; 6 pages
12
    359 Cover letter to Dr. Merigan, from Jeffrey   233
13     S. Price, Ph.D., January 12, 1986, with
       enclosure, Bates Nos. RMS 0064078 - RMS
14     0064079; 2 pages
15  360 Letter to Dr. Thomas Merigan, from Jeffrey  251
       S. Price, Ph.D., April 27, 1988, Bates Nos.
16     RMS 0064062 - RMS 0064064; 3 pages
17  361 Grant Application entitled AIDS Research    253
       Center Core Support Grant, Bates Nos. STAN
18     021064 - STAN 021426; 363 pages
19  362 Stanford University Matched Assets List,    269
       03/02/92, with handwritten cover page, Bates
20     Nos. STAN 027062 - STAN 027078; 17 pages
21  363 Letter to Thomas C. Merigan, M.D., et al.,  270
       from Jeffrey C. Price, Ph.D., May 20, 1988,
22     with Attachment I, Bates Nos. RMS 0064056 -
       RMS 0064059; 4 pages
23
    364 Visitor's Confidentiality Agreement,        275
24     stamped received June 3, 1988, Bates No.
       RMS 05915; 1 page
25
```

1  (Pages 146 to 149)

CONFIDENTIAL ATTORNEYS' EYES ONLY

**Page 158**

```
09:28:55  1  of how we prepared for our work. And the work
09:28:59  2  relevant to the patent and the work prior to the
09:29:02  3  patent with Cetus, I think I know quite a lot about
09:29:06  4  because it has been the subject of so much discussion
09:29:09  5  and thought.
09:29:10  6      Q. How many other material transfer agreements
09:29:13  7  were there?
09:29:13  8      A. I don't think there --
09:29:15  9      MR. RODRIGUEZ: Objection. Vague.
09:29:16 10      THE WITNESS: I don't think there was another
09:29:17 11  one.
09:29:17 12  BY MR. STONE:
09:29:17 13      Q. What was transferred pursuant to material
09:29:20 14  transfer agreements that existed between the 1983
09:29:23 15  agreement that I showed you and the 1988 agreement that
09:29:26 16  I showed you on Monday; do you know?
09:29:28 17      MR. RODRIGUEZ: Objection. Calls for a legal
09:29:31 18  conclusion. Lacks foundation.
09:29:34 19      THE WITNESS: I don't think any else -- any
09:29:36 20  -- there was any material transferred or material
09:29:39 21  transfer agreement.
09:29:39 22  BY MR. STONE:
09:29:39 23      Q. Sitting here today, you're not aware of any
09:29:43 24  other material transfer agreements that existed between
09:29:45 25  1983 and December of 1988; is that correct?
```

**Page 159**

```
09:29:49  1      A. Yes.
09:29:50  2      Q. And sitting here today, you're not aware of
09:29:52  3  any materials that were transferred from Cetus to
09:29:55  4  Stanford pursuant to material transfer agreements that
09:29:59  5  existed to the extent that any did, between 1983 and
09:30:02  6  December 1988; is that correct?
09:30:04  7      A. Yes.
09:30:04  8      Q. And you're not prepared to testify concerning
09:30:06  9  that? You didn't prepare to testify concerning such
09:30:10 10  agreements prior to your deposition today; is that
09:30:12 11  correct?
09:30:12 12      A. Yes.
09:30:15 13      Q. Dr. Merigan, I've put in front of you what
09:30:18 14  previously was marked as, I believe, Exhibit 16; is
09:30:23 15  that correct? I actually handed you the copy. Now I'm
09:30:26 16  not sure which one I handed you. It's the patent right
09:30:28 17  there on your left hand.
09:30:30 18      A. Yeah.
09:30:30 19      Q. The exhibit number on the bottom is what, sir?
09:30:32 20      A. 16.
09:30:33 21      Q. 16. And I'm also going to show you what
09:30:35 22  previously has been marked as Exhibit 15.
09:30:35 23      (Previously marked Exhibit 15 was
09:30:39 24      presented to the witness.)
09:30:43 25      THE WITNESS: Yeah.
```

**Page 160**

```
09:30:43  1  BY MR. STONE:
09:30:44  2      Q. Dr. Merigan, do you recognize Exhibit 15?
09:30:51  3      MR. RODRIGUEZ: Do you have extra copies of
09:30:53  4  those?
09:30:55  5      MR. STONE: I do.
09:31:09  6      THE WITNESS: Yeah.
09:31:09  7  BY MR. STONE:
09:31:11  8      Q. You do recognize Exhibit 15?
09:31:13  9      A. Yeah.
09:31:14 10      Q. Do you recognize that as the '730 patent?
09:31:24 11      A. Yes, that's what it says on the top of it.
09:31:26 12      Q. Are you a named inventor on the '730 patent?
09:31:29 13      A. Yes.
09:31:29 14      Q. Did you contribute to the subject matter of
09:31:31 15  the '730 patent?
09:31:32 16      A. Yes.
09:31:32 17      Q. What was your contribution to the subject
09:31:34 18  matter of the '730 patent?
09:31:37 19      MR. RODRIGUEZ: Objection. Calls for a legal
09:31:40 20  conclusion.
09:31:40 21      THE WITNESS: I was the principal
09:31:47 22  investigator of the group that did the work resulting
09:31:47 23  in the patent. And I fulfilled all the functions of
09:31:53 24  principal investigator. I had the idea. I supported
09:31:58 25  other people for doing it. I put materials of mine
```

**Page 161**

```
09:32:02  1  and my thinking into it, and I worked with the patent
09:32:07  2  attorneys in drawing it up.
09:32:07  3  BY MR. STONE:
09:32:15  4      Q. Other than performing your role as the
09:32:17  5  principal investigator, did you have any other
09:32:21  6  contributions to the subject matter of the '730 patent?
09:32:23  7      MR. RODRIGUEZ: Objection. Mischaracterizes
09:32:25  8  his testimony.
09:32:31  9      THE WITNESS: I don't know what -- what
09:32:34 10  you're getting at about other functions. Principal
09:32:39 11  investigator, I've gone over some of the functions. I
09:32:42 12  can go over others. Do you want a more complete
09:32:45 13  picture of that? Because that may mean a different
09:32:48 14  thing to you than to me.
09:32:49 15  BY MR. STONE:
09:32:49 16      Q. Sure. And I would like a complete picture of
09:32:51 17  what your contributions were to the subject matter of
09:32:53 18  the '730 patent.
09:32:55 19      MR. RODRIGUEZ: Objection. Calls for a legal
09:32:56 20  conclusion.
09:32:59 21      THE WITNESS: Well as I say, I had worked in
09:33:04 22  viral diagnostics for many years. We treated
09:33:11 23  hepatitis B and CMV and used for the first time
09:33:18 24  chemical methods for characterizing the impact on
09:33:21 25  viral load. And I, as I mentioned, had the idea that
```

**4 (Pages 158 to 161)**

**CONFIDENTIAL ATTORNEYS' EYES ONLY**

09:33:32 1   the moment we had a virus that didn't grow as well as
09:33:38 2   HIV did, it would need -- we would need that kind of
09:33:41 3   technology, that is, the ability to quantitate the
09:33:43 4   virus in the blood of patients during therapy to make
09:33:48 5   good decisions on continuing therapy or choice of
09:33:52 6   drugs.
09:33:53 7       So the patent is not about just the assay, it
09:33:57 8   is about using the assay to determine whether or not
09:34:01 9   to continue with the given drug or start a new drug.
09:34:08 10   And that concept is what I had in my mind, and that --
09:34:17 11   that PCR might give us a tool for. And the people
09:34:24 12   that worked with me knew that, and we worked together
09:34:30 13   to see if it was true. We were in a unique position
09:34:34 14   because on one hand we had assay working but we also
09:34:41 15   had -- were treating some of the first patients in the
09:34:46 16   country with monotherapy and combination therapy, and
09:34:50 17   particularly with combination therapy with a rather
09:34:54 18   small number of patients you could see whether it was
09:34:58 19   viral load and resistance mutations related well to
09:35:03 20   either the failure or the action of a drug
09:35:06 21   respectively.
09:35:07 22       So I on a frequent basis would meet with my
09:35:18 23   colleagues and define where we were going and -- and
09:35:23 24   they took different aspects of the project and helped
09:35:28 25   make it happen.

Page 162

09:35:30 1       Mark Holodniy was pivotal, as you know, and
09:35:34 2   David Katzenstein had worked with HIV before at
09:35:41 3   National -- at the Center For Aids Disease Control,
09:35:47 4   and so when he came to the lab, he had also worked on
09:35:51 5   noncultured methods for quantitating virus. And our
09:35:55 6   group and he had discussed those techniques, and so he
09:36:00 7   was really aware why I thought this could result in
09:36:06 8   something useful for medicine.
09:36:14 9       And I initially worked with Cetus on it, and
09:36:19 10   we also -- but on the other hand, there we were just
09:36:23 11   working to study the stage of disease with respect to
09:36:27 12   whether we could demonstrate virus consistently in the
09:36:33 13   blood. And we took that technique and modified it
09:36:40 14   over time and applied it to these treated patients and
09:36:46 15   came up with the basis for the claims of the patent.
09:36:59 16       And the reason I patented it was on the
09:37:02 17   suggestion of a patent lawyer who offered to do it for
09:37:06 18   me because my son had HIV, and he thought that it was
09:37:12 19   very important that any advance in this field would
09:37:17 20   have the benefit of protection for some developer who
09:37:22 21   was going to develop the patent. And my university,
09:37:26 22   therefore, didn't actually have to support the funding
09:37:30 23   of that to start with.
09:37:33 24       So the patent was developed in conjunction
09:37:39 25   with Pennie & Edmonds. And it was my -- mine to do it

Page 163

09:37:45 1   because he made a good case for the fact that the idea
09:37:51 2   would be more likely to rapidly gain support in
09:37:56 3   medicine if the company had a position with --
09:38:03 4   supported by a patent rather than just the papers we
09:38:06 5   were publishing.
09:38:08 6   BY MR. STONE:
09:38:08 7     Q. The prosecution was done for free by Pennie &
09:38:12 8   Edmonds?
09:38:12 9     A. There was like a delayed payment. Only --
09:38:15 10   only if and when we develop royalties would they take
09:38:19 11   some funding for it. But it was minimal, and it was
09:38:23 12   several years later because it took time to go through
09:38:27 13   the patent granting situation, and for the field to
09:38:31 14   catch up with the idea. And many things happened to
09:38:40 15   make it an important part of human medicine.
09:38:43 16     Q. Was the lawyer at Pennie & Edmonds who gave
09:38:46 17   you the suggestion Leslie Misrock?
09:38:49 18     A. That's right.
09:38:49 19     Q. The assay that you referred to, that's the
09:38:51 20   assay for quantitating HIV RNA using PCR?
09:38:55 21      MR. RODRIGUEZ: Objection. Vague.
09:38:56 22   Mischaracterizes testimony.
09:38:58 23      THE WITNESS: It's two different assays. One
09:39:02 24   is for PCR, and the other is for -- for quantitating
09:39:06 25   virus in blood, but the other is for looking at the

Page 164

09:39:09 1   nature of virus in the blood, particularly changes in
09:39:12 2   the drug target genes, mutations that might cause
09:39:16 3   resistance.
09:39:17 4   BY MR. STONE:
09:39:17 5     Q. The assay for quantitating HIV RNA using PCR,
09:39:22 6   that was the assay that Dr. Holodniy was working on
09:39:27 7   while he was at Cetus?
09:39:28 8      MR. RODRIGUEZ: Objection. Lacks foundation.
09:39:30 9   Calls for speculation.
09:39:31 10      THE WITNESS: Actually, he started to work
09:39:33 11   there, but as I said before, Cetus's work was only
09:39:37 12   semiquantitative, and he had to do much work to make
09:39:41 13   it a quantitative assay that would reflect accurately
09:39:48 14   the blood levels, especially in early patients. So
09:39:53 15   there were tricks he had to do that were developed
09:39:55 16   only at the bench at Stanford afterwards.
09:39:57 17   BY MR. STONE:
09:39:58 18     Q. Sitting here today, are you able to
09:39:59 19   distinguish the work that Dr. Holodniy did at Stanford
09:40:03 20   with respect to the assay versus the work that he did
09:40:06 21   with input from Cetus?
09:40:10 22     A. Oh, yes.
09:40:11 23      MR. RODRIGUEZ: Objection. Vague.
09:40:11 24      THE WITNESS: Oh, yes.
09:40:11 25   BY MR. STONE:

Page 165

**5  (Pages 162 to 165)**

CONFIDENTIAL ATTORNEYS' EYES ONLY

12:19:19 1    Q. You don't recognize the form of document?

12:19:21 2    A. No, not even the form of the document. It

12:19:27 3 must be an internal document produced in the -- in the

12:19:42 4 administration of Stanford based on what we purchased.

12:19:50 5    Q. Let me show you what we'll mark as next in

12:19:53 6 order.

12:19:58 7    A. Ah, related to grants. HLA has to do with

12:20:01 8 grants.

12:20:01 9    (Deposition Exhibit 363 marked by the

12:20:17 10 court reporter.)

12:20:17 11 BY MR. STONE:

12:20:17 12    Q. Was the PCR machine in your lab purchased with

12:20:19 13 grant money?

12:20:21 14    A. Yes.

12:20:21 15    Q. So a -- an inventory of equipment purchased

12:20:26 16 with grant money should reflect when that was

12:20:30 17 purchased, correct?

12:20:31 18    A. Except it is not -- the only problem is I

12:20:38 19 don't know what inventory this was and what grants it

12:20:41 20 covers since I'm not familiar with that output of the

12:20:51 21 university's stuff.

12:20:56 22    MR. STONE: For the record, Exhibit 363 is a

12:20:58 23 multipage document bearing production numbers RMS

12:21:02 24 64056 through RMS 64059.

12:21:12 25    Q. Dr. Merigan, do you recognize Exhibit 363?

12:21:45 1    A. Yes.

12:21:45 2    Q. And is it because you recognize your

12:21:49 3 signature?

12:21:49 4    A. No, not just that.

12:21:53 5    Q. So you actually recall this Material Transfer

12:21:56 6 Agreement --

12:21:56 7    A. Yes.

12:21:56 8    Q. -- now having seen it?

12:21:58 9    A. No, having seen it earlier.

12:21:59 10    Q. Oh, you saw this previously?

12:22:01 11    A. Yes.

12:22:02 12    Q. When did you see this?

12:22:04 13    A. I would think a few weeks ago with my

12:22:08 14 counsel.

12:22:09 15    Q. So in preparing for your deposition, you

12:22:11 16 reviewed more than one MTA?

12:22:14 17    A. No, I think this might be the one. That's

12:22:16 18 what I was trying to get at and -- and in the past,

12:22:23 19 earlier in the deposition, I referred to one, and I

12:22:26 20 think this was that one.

12:22:28 21    Q. And this is the one that you were referring to

12:22:30 22 pursuant to which the semiquant work was done?

12:22:35 23    A. No.

12:22:36 24    MR. RODRIGUEZ: Objection. Mischaracterizes

12:22:37 25 testimony.

12:22:37 1    THE WITNESS: No, it doesn't have -- well,

12:22:39 2 yes, that's right, that's right. And the material, as

12:22:46 3 it says here, is not just biological materials or

12:22:55 4 recombinant DNA -- recombinant IL-2, it's know-how and

12:23:00 5 data. So this was something that was covered fairly

12:23:08 6 precisely. And as I say, I saw this in conjunction

12:23:14 7 with some letters from Cetus that showed the results

12:23:18 8 of specific titrations and convinced me that the Cetus

12:23:24 9 work was only semiquantitative and that it would take

12:23:29 10 considerable effort to improve it to be -- meet the

12:23:33 11 needs of my plans for the future.

12:23:36 12 BY MR. STONE:

12:23:37 13    Q. So did you have discussions with anyone at

12:23:39 14 Cetus at this time about your plans for the future?

12:23:52 15    A. I don't remember.

12:23:52 16    Q. But after you entered into the Material

12:23:56 17 Transfer Agreement in Exhibit 363, it was then that you

12:23:59 18 started receiving the data from Cetus relating to the

12:24:04 19 semiquant work?

12:24:04 20    A. It's not began receiving, it's one document

12:24:09 21 describing titrations in two patients or three

12:24:14 22 patients and lays out about ten observations or

12:24:19 23 something in each.

12:24:22 24    Q. And so your recollection is there was one

12:24:24 25 piece of correspondence that you received?

12:24:26 1    A. That's right.

12:24:29 2    Q. How was it arranged -- so -- strike that.

12:24:33 3    This semiquant work that was being done at

12:24:36 4 Cetus related to an ongoing study at Stanford?

12:24:39 5    A. No. We were working with material that was

12:24:43 6 supplied by National Institutes of Health and had come

12:24:47 7 from Cetus and giving it to patients. So we had a

12:24:52 8 formal protocol, and it was registered with the FDA by

12:24:58 9 the National Institutes of Allergy and Infectious

12:25:04 10 Disease. And Cetus was agreeable to my idea of

12:25:09 11 looking at the virus because we thought the virus

12:25:16 12 might be -- being activated by IL-2, and it was

12:25:20 13 important for the safety of the patients to know about

12:25:22 14 the quantitation of the virus.

12:25:23 15    And you keep speaking about viral RNA. But

12:25:28 16 that's really our discovery. People didn't know

12:25:31 17 whether it was going to be RNA or DNA or XYZ or what

12:25:38 18 fraction of RNA or DNA it would be. And at this time

12:25:41 19 we thought that it -- Cetus might be interested in

12:25:48 20 doing the techniques they had available, and that's

12:25:51 21 what they did. But it was uninterpretable data, and

12:25:54 22 therefore we knew we had much more work because not only

12:25:57 23 to find the kind of RNA as well as the method --

12:26:03 24 details of the method itself. The kind of -- the kind

12:26:08 25 of nucleic acid that was going to be studied and the

12:26:12 1 methods itself to get --
12:26:14 2    Q. Does -- the semiquant work that Cetus was
12:26:17 3 doing on samples that were provided to it by Stanford,
12:26:21 4 those samples were generated as part of the study you
12:26:26 5 described?
12:26:26 6    A. That's right.
12:26:26 7    Q. And then those samples were given to Cetus and
12:26:32 8 a team of people there engaged in semiquant work using
12:26:35 9 PCR, to your recollection?
12:26:37 10    A. Yeah, using PCR, but I actually don't know
12:26:40 11 whether they were using RNA or DNA PCR.
12:26:44 12    Q. And in connection with any of that work, did
12:26:48 13 you ever send Dr. Schwartz to Cetus?
12:26:52 14    A. Oh, I could have, but I don't remember it.
12:26:55 15 And his going there would be fundamentally different
12:27:04 16 in the way Mark went there, in the sense that Schwartz
12:27:09 17 might have gone there to talk about some samples he
12:27:12 18 brought. But on the other hand, in the case of Mark,
12:27:17 19 it was with the prior agreement with Cetus that Mark
12:27:22 20 was going to be able to work there for a short period
12:27:28 21 of time to get started in the PCR technique as he was
12:27:33 22 doing it.
12:27:34 23    Q. Who authorized that prior agreement?
12:27:36 24    MR. RODRIGUEZ: Objection. Calls for a legal
12:27:37 25 conclusion.

Page 274

12:27:38 1    THE WITNESS: Which one are you talking
12:27:40 2 about?
12:27:40 3 BY MR. STONE:
12:27:40 4    Q. The one that permitted Mark to go to Cetus.
12:27:43 5    MR. RODRIGUEZ: Same objection. Calls for
12:27:44 6 speculation.
12:27:46 7    THE WITNESS: Probably myself and Jeffrey
12:27:50 8 Price, and -- who was it -- some of the people who
12:28:00 9 were on the paper, because they thought it would -- it
12:28:09 10 would be reasonable.
12:28:09 11 BY MR. STONE:
12:28:11 12    Q. Michael Konrad, was he one?
12:28:13 13    A. Yes, he might have been one.
12:28:15 14    Q. And that stemmed from the initial semiquant
12:28:19 15 work; is that right?
12:28:21 16    MR. RODRIGUEZ: Objection. Vague.
12:28:22 17    THE WITNESS: I don't know. For me it was
12:28:27 18 driven by the fact that I thought it was an important
12:28:30 19 thing, and I don't know what was in their mind.
12:28:30 20 BY MR. STONE:
12:28:33 21    Q. Let me show you what we'll have marked as next
12:28:35 22 in order.
12:29:00 23    (Deposition Exhibit 364 marked by the
12:29:04 24    court reporter.)
12:29:04 25    MR. STONE: For the record, Exhibit 364 is a

Page 275

12:29:07 1 single page document bearing production number RMS
12:29:11 2 5915.
12:29:13 3    Q. Dr. Merigan, do you recognize RMS 5915?
12:29:19 4    A. No, I don't, but I see David Schwartz's name
12:29:23 5 on it. And I wouldn't think that it was not a
12:29:25 6 document he signed, but I believe it is a document
12:29:28 7 that he must have signed.
12:29:29 8    Q. And you wouldn't have been surprised that he'd
12:29:32 9 have to sign this kind of a visitor agreement when he
12:29:34 10 went to Cetus?
12:29:34 11    A. Well, I want to read this. I have to --
12:29:37 12 since I haven't seen it. Granting the access to
12:29:40 13 facilities and information. And I don't know whether
12:29:42 14 physically he went there that -- it's a blanket thing
12:29:49 15 that was signed, but I don't know that physically he
12:29:52 16 went there. I'm sure that there must have been
12:29:55 17 discussions, but I don't know about him going there
12:29:58 18 physically. But maybe he did.
12:30:01 19    Q. And that would have been something that you
12:30:02 20 would have arranged, right?
12:30:03 21    MR. RODRIGUEZ: Objection. Vague.
12:30:11 22    THE WITNESS: Yes, I would have.
12:30:11 23 BY MR. STONE:
12:30:12 24    Q. Dr. Schwartz didn't have an independent
12:30:15 25 relationship with Cetus that you're aware of, correct?

Page 276

12:30:17 1    A. Well, I don't know that. He could have
12:30:21 2 developed the relationship with Cetus and -- and I
12:30:25 3 don't know that he did -- he was not also a prime
12:30:29 4 mover in having this happen. But it was certainly a
12:30:34 5 goal for me when we got the machine to want to follow
12:30:40 6 through on an idea that I said was long preexisting in
12:30:44 7 my mind.
12:30:45 8    Q. But Dr. Schwartz wasn't the person who ended
12:30:49 9 up ultimately doing that; that was Dr. Holodniy?
12:30:51 10    MR. RODRIGUEZ: Objection. Vague.
12:30:53 11    THE WITNESS: Yes.
12:30:53 12    (Deposition Exhibit 365 marked by the
12:31:13 13    court reporter.)
12:31:13 14    THE WITNESS: Two pages.
12:31:19 15    MR. STONE: For the record, Exhibit 365 is a
12:31:22 16 two-page document bearing production numbers CH 996
12:31:26 17 and CH 997.
12:31:28 18    Q. Dr. Merigan, do you recognize Exhibit 365?
12:31:33 19    A. Yes.
12:31:33 20    Q. Is this some of the semiquant work that you
12:31:36 21 were referring to previously?
12:31:37 22    A. Yes.
12:31:37 23    Q. And this appears to reflect two batches of
12:31:41 24 samples that were provided to Cetus by Dr. Schwartz?
12:31:45 25    A. No. Oh, provided to Cetus from Dr. Schwartz,

Page 277

33  (Pages 274 to 277)

CONFIDENTIAL ATTORNEYS' EYES ONLY

```
12:31:52  1   yes.
12:31:52  2      Q. And there's a number of different patients
12:31:56  3   listed in each batch; is that correct?
12:31:58  4      A. Two -- yeah.
12:32:00  5      Q. So, for instance, where it says patient 1,
12:32:03  6   that's one patient, patient 8 is a different patient,
12:32:06  7   patient 9 -- in the left-hand column on the first page?
12:32:09  8      A. Yeah.
12:32:12  9      Q. Do you recall any discussions with anyone at
12:32:15 10   Cetus relating to Exhibit 365?
12:32:24 11      A. No. I must have had them, though.
12:32:26 12      Q. Do you recall any discussions with anyone at
12:32:28 13   Stanford relating to Exhibit 365?
12:32:31 14      A. Well, surely Dr. Schwartz and I discussed
12:32:35 15   them.
12:32:35 16      Q. But sitting here today, you don't have a
12:32:38 17   present recollection of that?
12:32:38 18      A. No.
12:32:39 19      Q. Let me show you what we'll mark as next in
12:32:41 20   order.
12:32:41 21         (Deposition Exhibit 366 marked by the
12:33:01 22         court reporter.)
12:33:01 23      MR. STONE: For the record, Exhibit 366 is a
12:33:03 24   two-page document bearing production numbers CH 740
12:33:07 25   and 741.
                                                   Page 278
```

```
12:34:51  1   you can recall about how you expressed what your goal
12:34:55  2   was to Cetus from Mr. -- for Dr. Holodniy?
12:35:04  3      A. Well, clearly with these two documents, Cetus
12:35:12  4   knew it was good to look at the blood of patients for
12:35:18  5   virus with PCR, and they could see the same
12:35:24  6   limitations as I could in the way the data looked.
12:35:29  7   And I think that's why they went ahead and had Mark as
12:35:35  8   a guest for a few months in their lab, and it did give
12:35:40  9   us a good start on it, as you and I have discussed.
12:35:56 10         (Discussion off the record.)
12:35:56 11   BY MR. STONE:
12:35:56 12      Q. Let me show you two documents that --
12:35:56 13         (Deposition Exhibits 367 and 368 marked
12:36:36 14         by the court reporter.)
12:36:36 15      MR. STONE: For the record, Exhibit 367 is a
12:36:39 16   multipage document bearing production number CH 1064
12:36:43 17   through CH 1067, and Exhibit 368 is a multipage
12:36:49 18   document bearing production numbers CH 1079 through
12:36:54 19   1082.
12:36:55 20      Q. Dr. Merigan, do you recognize Exhibits 367 and
12:37:00 21   368?
12:37:00 22      A. No.
12:37:03 23      Q. Any reason to believe you didn't receive them
12:37:06 24   in October of 1988?
12:37:12 25      A. I just don't remember them.
                                                   Page 280
```

```
12:33:12  1      Q. Dr. Merigan, do you recognize this exhibit?
12:33:14  2      A. I haven't seen -- I haven't seen it since it
12:33:18  3   was originally sent to David, and I'm sure I saw it
12:33:22  4   then.
12:33:23  5      Q. Because you were involved in this work with
12:33:27  6   your coworker Dr. Schwartz, right?
12:33:30  7      A. Mm-hmm.
12:33:30  8      Q. And do you have any specific recollection of
12:33:35  9   discussions with anyone at Cetus or at Stanford
12:33:38 10   relating to this?
12:33:40 11      A. No, but I am sure that I did with most likely
12:33:48 12   Groves and -- and maybe Kwok or Sninsky, yeah.
12:33:55 13      Q. Does this document refresh your recollection
12:33:58 14   any further about discussions with Cetus about this
12:34:02 15   quantitation work?
12:34:11 16      A. Yes.
12:34:12 17      Q. How so?
12:34:15 18      A. I'd concluded from both these documents at
12:34:19 19   that time when I was -- when they were fresh in my
12:34:23 20   hands back in July of 1988 that there would be need
12:34:33 21   for a better technique.
12:34:38 22      Q. Did you express that to Cetus at the time?
12:34:40 23      A. Yes, yes. And that I was going to work on
12:34:43 24   that. And that was a goal for Mark Holodniy.
12:34:47 25      Q. Can you -- can you tell me anything else that
                                                   Page 279
```

```
12:37:15  1      Q. Do you -- I know this is a tough question, but
12:37:20  2   do you have any recollection what your fax number was
12:37:22  3   back then? Maybe it's something that hasn't changed
12:37:25  4   over time.
12:37:25  5      A. No, I'm sorry, I don't.
12:37:32  6         Well, that might have been. Yeah, I think
12:37:34  7   that was -- looking at the outside of this, I think
12:37:37  8   those -- might have been the fax machine that's still
12:37:40  9   there today -- not machine, number.
12:37:44 10      Q. Okay. The number (415) 725-2395?
12:37:49 11      A. Yeah, I think that still may be that lab's
12:37:52 12   fax number.
12:37:54 13      Q. Did there come a time, Dr. Merigan, when you
12:37:57 14   requested protocols from Cetus in writing relating to
12:38:01 15   quantitation of HIV?
12:38:03 16      A. Yes.
12:38:03 17      Q. From whom did you seek such protocols?
12:38:07 18      A. One of the staff, it could have been Eric
12:38:10 19   Groves, it could have been Sninsky, it could have been
12:38:13 20   Kwok. I asked that that might make Mark's starting
12:38:19 21   the work more easy.
12:38:19 22      Q. And do you recall what the response was of
12:38:24 23   Dr. Groves?
12:38:24 24      A. No, I don't know that. I don't know that. I
12:38:27 25   don't have those -- I don't have a memory or papers
                                                   Page 281
```

34  (Pages 278 to 281)

**CONFIDENTIAL ATTORNEYS' EYES ONLY**

12:38:32 1 that tell me what the response was.

12:38:34 2    Q. But presumably the response was favorable

12:38:37 3 because Dr. Holodniy did go to Cetus?

12:38:39 4    A. No, I don't think that's necessarily true.

12:38:42 5 The scientists may not have their methods written up

12:38:47 6 in a way that they can share with another individual,

12:38:51 7 and that was a request of some specific work that

12:38:56 8 might have not been to -- in people's agenda. And I

12:39:05 9 can't -- all I've seen is my letter requesting it.

12:39:08 10    Q. You saw that letter in preparation for your

12:39:10 11 deposition?

12:39:10 12    A. That's right.

12:39:11 13    Q. Let me show you what previously was marked as

12:39:13 14 Exhibit 28.

12:39:13 15       (Previously marked Exhibit 28 was

12:39:21 16       presented to the witness.)

12:39:21 17 BY MR. STONE:

12:39:22 18    Q. Dr. Merigan, is this the letter that you were

12:39:24 19 referring to?

12:39:25 20    A. Yes.

12:39:25 21    Q. And this is a letter that you and Dr. Schwartz

12:39:29 22 sent to Dr. Groves on or about November 7, 1988?

12:39:34 23    A. Yes.

12:39:34 24    Q. And in this letter you were seeking Cetus

12:39:38 25 protocols for extraction, amplification and

Page 282

12:39:40 1 quantitation of HIV?

12:39:42 2    A. DNA. That's very, very important.

12:39:45 3    Q. Why is that important, sir?

12:39:47 4    A. Because it tells me that the original work,

12:39:53 5 which is not reported in any detail, is with DNA, and

12:39:59 6 DNA doesn't work to follow day-to-day changes in the

12:40:03 7 virus. It's only RNA which Mark discovered that

12:40:06 8 allows you to follow day-to-day changes in the virus.

12:40:11 9    Q. Did Cetus provide Dr. Holodniy with protocols

12:40:14 10 for extraction of HIV RNA?

12:40:17 11       MR. RODRIGUEZ: Objection. Calls for

12:40:19 12 speculation.

12:40:19 13       THE WITNESS: I can't answer that question.

12:40:19 14 BY MR. STONE:

12:40:21 15    Q. Well, you reviewed his lab notebooks, didn't

12:40:23 16 you?

12:40:24 17    A. Yes.

12:40:24 18       MR. RODRIGUEZ: Objection. Mischaracterizes

12:40:26 19 the testimony.

12:40:27 20       THE WITNESS: But the notebook doesn't say

12:40:29 21 that -- doesn't -- didn't necessarily have all the

12:40:34 22 materials Cetus gave or didn't give. That there was

12:40:39 23 methods developed during that time to look at RNA, but

12:40:43 24 I don't know what Cetus's role was in that versus the

12:40:49 25 DNA and the quantitation -- the semiquantitation that

Page 283

12:40:54 1 is reflected in these documents you sent me.

12:40:57 2 BY MR. STONE:

12:40:57 3    Q. In fact, Dr. Merigan, didn't Dr. Holodniy

12:41:00 4 paste into his lab notebook a protocol for extraction

12:41:03 5 of RNA that he received from Cetus?

12:41:05 6    A. Well, you're asking the question as though it

12:41:08 7 must be there, so -- but again, I don't remember

12:41:13 8 everything in the lab notebook.

12:41:15 9    Q. Didn't Dr. Holodniy receive protocols for

12:41:18 10 amplification of HIV RNA?

12:41:20 11    A. Yes.

12:41:21 12       MR. RODRIGUEZ: Objection. Calls for

12:41:22 13 speculation.

12:41:22 14       THE WITNESS: I would think that he did, but

12:41:24 15 I don't -- I haven't -- right now I guess I'm getting

12:41:28 16 tired, too. I don't have it all right in my

12:41:33 17 fingertips.

12:41:34 18 BY MR. STONE:

12:41:35 19    Q. Didn't Dr. Holodniy receive protocols from

12:41:38 20 Cetus for reverse transcription of HIV RNA?

12:41:42 21    A. Oh, I --

12:41:42 22       MR. RODRIGUEZ: Objection. Calls for

12:41:44 23 speculation.

12:41:45 24       THE WITNESS: Yes, I think he did, and that's

12:41:46 25 the kind of thing that, without a doubt, Mark was

Page 284

12:41:50 1 helped by Cetus. And I imagine there was help with

12:41:55 2 RNA as well, but exactly what form it came in, I don't

12:42:00 3 know.

12:42:00 4 BY MR. STONE:

12:42:01 5    Q. Didn't Dr. Holodniy receive protocols for

12:42:04 6 nonisotopic detection methods of HIV PCR product from

12:42:10 7 Cetus?

12:42:10 8       MR. RODRIGUEZ: Objection. Calls for

12:42:11 9 speculation.

12:42:16 10       THE WITNESS: Perhaps, yes.

12:42:16 11 BY MR. STONE:

12:42:21 12    Q. Didn't Dr. Holodniy receive a standard for use

12:42:25 13 in quantitating HIV RNA using PCR from Cetus?

12:42:30 14       MR. RODRIGUEZ: Objection. Calls for

12:42:31 15 speculation.

12:42:33 16       THE WITNESS: I think he did, yeah.

12:42:33 17 BY MR. STONE:

12:42:35 18    Q. Did you ever have any interaction with a

12:42:39 19 Dr. Alice Wang at Cetus?

12:42:42 20    A. No. I don't think so. Was she -- I'm sorry.

12:42:47 21 Yeah. No, I don't think so.

12:42:50 22    Q. She was on the serum paper?

12:42:50 23    A. Yeah, I thought so.

12:42:51 24    Q. But you don't recall any interaction with her?

12:42:53 25    A. I just didn't -- yeah, right.

Page 285

35 (Pages 282 to 285)

**CONFIDENTIAL ATTORNEYS' EYES ONLY**

12:42:55 1    Q. Did you have any interaction with Clayton
12:42:58 2  Casipit of Cetus?
12:42:59 3    A. No, although I know he contributed.
12:43:01 4    Q. He contributed to the JID paper?
12:43:05 5    A. That's right.
12:43:06 6    Q. Do you know what the subject matter of his
12:43:06 7  contribution was?
12:43:06 8    MR. RODRIGUEZ: Objection. Calls for
12:43:08 9  speculation.
12:43:09 10    THE WITNESS: He might have run some samples.
12:43:09 11
12:43:11 12  BY MR. STONE:
12:43:11 13    Q. Wasn't he the one who prepared the standards
12:43:13 14  that Dr. Holodniy used?
12:43:14 15    MR. RODRIGUEZ: Same objection and lacks
12:43:15 16  foundation.
12:43:19 17    THE WITNESS: I can believe that possibility,
12:43:23 18  I just don't know.
12:43:23 19  BY MR. STONE:
12:43:26 20    Q. After your November 7, 1988 letter to
12:43:31 21  Dr. Groves reflected in Exhibit 28, was it then when
12:43:33 22  you arranged for Dr. Holodniy to go to Cetus?
12:43:36 23    A. It was after it, but now I'm -- yes, it was
12:43:40 24  after it.
12:43:41 25    Q. And can you recall anything more specific
**Page 286**

12:43:48 1  about the discussions you had with Cetus personnel
12:43:50 2  concerning arranging for Dr. Holodniy to go there?
12:43:52 3    MR. RODRIGUEZ: Objection. Vague.
12:43:56 4    THE WITNESS: Yeah, I don't know what you
12:43:57 5  mean by that.
12:43:57 6  BY MR. STONE:
12:43:59 7    Q. I'm just wondering, sir, sitting here today,
12:44:03 8  do you have a present recollection of any specific
12:44:04 9  discussions that you had with Cetus personnel
12:44:07 10  concerning arranging for Dr. Holodniy to go to Cetus?
12:44:10 11    A. I think that I remember at least reassuring
12:44:12 12  him that he was an honest and able person who would
12:44:17 13  follow through on -- and do good work. And that was
12:44:23 14  important in Cetus's accepting him, my verification
12:44:27 15  that I had worked with him clinically, and I had
12:44:30 16  looked at his qualifications and had talked to his
12:44:33 17  mentors at other institutions. And putting all that
12:44:36 18  together, I felt he was a person who could move this
12:44:41 19  project good -- in a good way for both us and Cetus.
12:44:48 20    Q. And on that basis Cetus agreed to have --
12:44:50 21    A. That's right.
12:44:50 22    Q. -- to have Dr. Holodniy in their lab?
12:44:52 23    A. That's right.
12:44:59 24    MR. STONE: Why don't we go off the record
12:45:01 25  and take a short break.
**Page 287**

12:45:02 1    VIDEO OPERATOR: The time is 12:45. We're
12:45:06 2  going off the record.
12:51:42 3    (Recess.)
12:51:42 4    VIDEO OPERATOR: The time is 12:51. We're
12:51:46 5  back on the record.
12:51:46 6  BY MR. STONE:
12:51:47 7    Q. Dr. Merigan, so after -- after you sent your
12:51:53 8  request for a written protocol concerning quantitation
12:51:57 9  from Cetus, at some point thereafter you arranged with
12:52:01 10  Cetus for Dr. Holodniy to go to Cetus, correct?
12:52:04 11    A. Yes.
12:52:05 12    Q. And you also entered into a Material Transfer
12:52:12 13  Agreement with Cetus in or around that same time frame,
12:52:18 14  correct?
12:52:18 15    A. Well, you have to tell me because I don't
12:52:23 16  know the timeline.
12:52:24 17    Q. Sure. Well, so you requested the written
12:52:27 18  protocol from Cetus in November of 1988, correct? That
12:52:37 19  request was contained in Exhibit 28?
12:52:39 20    A. Yes, okay. That's November.
12:52:41 21    Q. And then --
12:52:41 22    A. And this is December.
12:52:43 23    Q. And then thereafter there was an MTA dated
12:52:46 24  December 19, 1988 that wasn't signed, it appears, until
12:52:50 25  February of 1989, if you look at the last page of
**Page 288**

12:52:52 1  Exhibit 29.
12:53:29 2    A. Yeah.
12:53:31 3    Q. And that MTA was negotiated in connection with
12:53:38 4  the collaboration that you engaged in with Cetus and
12:53:42 5  Dr. Holodniy, correct?
12:53:43 6    A. Mm-hmm. No. No. I'm wrong. As I said,
12:53:50 7  this -- I mean, you spoke to me -- I couldn't hear you
12:53:54 8  because you were facing away. Can you repeat the
12:53:57 9  question?
12:53:57 10    Q. Sure. This MTA, the one found in Exhibit 29,
12:54:00 11  was negotiated with Cetus in connection with the
12:54:02 12  collaboration that you engaged in with Cetus pursuant
12:54:06 13  to which Dr. Holodniy went to Cetus, right?
12:54:09 14    A. No, I don't know that. I don't see Dr.
12:54:13 15  Holodniy here listed.
12:54:14 16    Q. Well, pursuant to this MTA, wasn't Cetus going
12:54:18 17  to provide your lab with materials, including primers
12:54:24 18  and probes, for detecting HIV using PCR?
12:54:29 19    MR. RODRIGUEZ: Objection. Calls for a legal
12:54:30 20  conclusion. The document speaks for itself.
12:54:34 21    THE WITNESS: I don't -- I really don't know
12:54:36 22  what happened here, whether anything came from this or
12:54:39 23  not. I don't know. But it appears to be that it was
12:54:43 24  between myself and David Schwartz and not Mark
12:54:49 25  Holodniy. That's really an important issue to me, is
**Page 289**

**36 (Pages 286 to 289)**

CONFIDENTIAL ATTORNEYS' EYES ONLY

12:54:51 1 that I see no signature of Mark Holodniy here and I
12:54:56 2 don't see him listed in the agreement. So you're --
12:55:01 3 you're adding that out and I think you're wrong.
12:55:04 4 BY MR. STONE:
12:55:05 5    Q. Well, you don't really know one way or the
12:55:07 6 other?
12:55:08 7    A. No, I do know that it -- that this concerns
12:55:12 8 Schwartz and that the work that Cetus was interested
12:55:17 9 in most of all was the IL-2 work. And Schwartz was
12:55:23 10 involved in the IL-2 work, and we saw some reports
12:55:26 11 there. But this might have been an attempt to get
12:55:32 12 David Schwartz to start working on the work, and this
12:55:36 13 might be equipping him with material. But I don't
12:55:39 14 know whether any material ever came because I never
12:55:42 15 saw any results from it. And -- but that's -- that's
12:55:45 16 what this document's about. Not about Mark Holodniy,
12:55:49 17 even though you've tried to bring it in several times.
12:55:52 18    Q. Well, Dr. Merigan, in the -- in paragraph 2 on
12:55:58 19 the first page of Exhibit 29, it talks about certain
12:56:03 20 materials in section 2(a), including appropriate
12:56:07 21 primers and probes for the detection of HIV.
12:56:11 22    Do you see that?
12:56:11 23    A. Yeah.
12:56:12 24    Q. What PCR work did Dr. Schwartz do?
12:56:15 25    MR. RODRIGUEZ: Objection. Vague.

Page 290

12:56:17 1    THE WITNESS: I've got to say that I'm a
12:56:20 2 little suspicious that this -- this Material Transfer
12:56:25 3 Agreement was never fulfilled, that it -- it was
12:56:29 4 written to cover work that Schwartz would do, but
12:56:32 5 I'm -- since I've never seen -- I never saw a positive
12:56:38 6 work with Schwartz and it -- and there was nothing for
12:56:43 7 Mark to build on from Schwartz that it never took
12:56:43 8 place.
12:56:43 9
12:56:48 10 BY MR. STONE:
12:56:48 11    Q. What PCR work did Dr. Schwartz do in your lab?
12:56:53 12    A. As I say, I don't know that there was any.
12:56:56 13 But on the other hand, this document is cast to cover
12:57:02 14 work by Schwartz, not Holodniy.
12:57:04 15    Q. Isn't it cast to cover work by coworkers in
12:57:08 16 your lab?
12:57:08 17    A. No, it covers -- it covers me and Schwartz.
12:57:10 18 That's what it says and that's who signed it.
12:57:13 19    Q. If you look at paragraph 3, the second
12:57:15 20 sentence, it says:
12:57:16 21    "During the course of this scientific
12:57:18 22    collaboration, Cetus contemplates providing
12:57:21 23    the scientist and his or her coworkers with
12:57:24 24    certain proprietary information relating to
12:57:27 25    PCR technology."

Page 291

12:57:27 1    Do you see that?
12:57:31 2    A. Yes.
12:57:31 3    Q. Does that change your testimony?
12:57:37 4    A. Well, I really don't know how
12:57:40 5 it can apply to Mark Holodniy if he isn't involved in
12:57:43 6 it.
12:57:43 7 BY MR. STONE:
12:57:43 8    Q. Well, he was your coworker, right?
12:57:45 9    MR. RODRIGUEZ: Objection. Calls for legal
12:57:47 10 conclusion.
12:57:48 11    THE WITNESS: There was lots of people who
12:57:49 12 were my coworkers, but I just -- that is not a good,
12:57:53 13 clear term to me.
12:57:53 14
12:57:53 15 BY MR. STONE:
12:57:53 16    Q. Well, Holodniy was one of your coworkers,
12:57:56 17 right?
12:57:56 18    MR. RODRIGUEZ: Same objection. Calls for a
12:57:59 19 legal conclusion.
12:58:03 20    THE WITNESS: I don't know. I mean, he
12:58:08 21 worked in my laboratory, yes, if that's what you mean
12:58:13 22 by a coworker.
12:58:14 23 BY MR. STONE:
12:58:15 24    Q. Did Holodniy bring primers and probes from
12:58:18 25 Cetus to Stanford's lab?

Page 292

12:58:19 1    MR. RODRIGUEZ: Objection. Lacks foundation.
12:58:21 2 Calls for speculation.
12:58:23 3    THE WITNESS: I don't think so.
12:58:25 4 BY MR. STONE:
12:58:25 5    Q. Did Holodniy bring protocols from Cetus to
12:58:29 6 Stanford's lab?
12:58:30 7    MR. RODRIGUEZ: Objection. Calls for
12:58:31 8 speculation.
12:58:32 9    THE WITNESS: I think that since --
12:58:36 10    MR. RODRIGUEZ: Vague.
12:58:37 11    THE WITNESS: Since the -- since some of the
12:58:40 12 original work was up at Cetus, that if we continued
12:58:45 13 along that vein, you can say he brought protocols.
12:58:48 14 But -- and you've already suggested that there's a
12:58:51 15 protocol in his notebook, so I guess he did bring
12:58:55 16 protocols to Stanford.
12:58:56 17 BY MR. STONE:
12:58:56 18    Q. Did Holodniy bring information that he learned
12:58:59 19 from Cetus relating to HIV RNA quantitation to
12:59:03 20 Stanford?
12:59:04 21    MR. RODRIGUEZ: Objection. Calls for
12:59:05 22 speculation.
12:59:11 23    THE WITNESS: I don't know. I think so. I'm
12:59:12 24 sure there was some help without a doubt from Cetus.
12:59:16 25 BY MR. STONE:

Page 293

37 (Pages 290 to 293)

CONFIDENTIAL ATTORNEYS' EYES ONLY

01:30:37 1   BY MR. STONE:
01:30:39 2       Q. So, when you're saying that you had completed
01:30:43 3   the work, are you referring to box C in -- box 6C in
01:30:51 4   Exhibit 81 that we were discussing earlier?
01:30:54 5           MR. RODRIGUEZ: Objection. Calls for a legal
01:30:56 6   conclusion.
01:30:58 7           THE WITNESS: Yes, that's what I meant.
01:30:58 8   BY MR. STONE:
01:31:00 9       Q. And so your testimony is that you had
01:31:01 10  satisfied that in your mind before April of 1991?
01:31:05 11      A. That's right.
01:31:05 12          MR. RODRIGUEZ: Objection. Calls for a legal
01:31:07 13  conclusion.
01:31:12 14          MR. STONE: Okay. I reserve my right to
01:31:16 15  continue this deposition, and I guess we can go off
01:31:19 16  the record.
01:31:19 17          MR. RODRIGUEZ: We believe the deposition is
01:31:21 18  concluded, so there's just a disagreement on that.
01:31:24 19          MR. STONE: Very well.
01:31:26 20          VIDEO OPERATOR: This concludes today's
01:31:28 21  deposition of Dr. Thomas Merigan. The number of media
01:31:32 22  used was two, volume 2. We're off the record at 1:31
01:31:37 23  p.m.
01:31:40 24      (Discussion off the record.)
01:31:40 25          MR. RODRIGUEZ: Yes, we'll designate it

Page 310

01:31:42 1   attorneys' eyes only, and we would like the witness to
01:31:49 2   have an opportunity to review the transcript.
3   //
4   //
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 311

1
2
3
4
5
6
7
8           I, THOMAS C. MERIGAN, M.D., do hereby
9   declare under penalty of perjury that I have read the
10  foregoing transcript of my deposition; that I have
11  made such corrections as noted herein, in ink,
12  initialed by me, or attached hereto; that my testimony
13  as contained herein, as corrected, is true and
14  correct.
15          EXECUTED this _____ day of
16  _____, 20_____, at
17  _____, _____.
18  (City)          (State)
19
20          _____
            THOMAS C. MERIGAN, M.D.
21          Volume 2
22
23
24
25

Page 312

1
2           I, the undersigned, a Certified Shorthand
3   Reporter of the State of California, do hereby
4   certify:
5           That the foregoing proceedings were taken
6   before me at the time and place herein set forth; that
7   any witnesses in the foregoing proceedings, prior to
8   testifying, were placed under oath; that a verbatim
9   record of the proceedings was made by me using machine
10  shorthand which was thereafter transcribed under my
11  direction; further, that the foregoing is an accurate
12  transcription thereof.
13          I further certify that I am neither
14  financially interested in the action nor a relative or
15  employee of any attorney of any of the parties.
16          IN WITNESS WHEREOF, I have this date
17  subscribed my name.
18
19          Dated: _____
20
21
22
23          _____
            SUZANNE F. BOSCHETTI
24          CSR No. 5111
25

Page 313

42  (Pages 310 to 313)