HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

THE BOARD OF THE TRUSTEES OF
THE LELAND STANFORD JUNIOR
UNIVERSITY,

    Plaintiff,

vs.                  No. C-05-04158 MHP

ROCHE MOLECULAR SYSTEMS, INC.;
ROCHE DIAGNOSTICS CORPORATION;
ROCHE DIAGNOSTICS OPERATIONS,
INC.; ROCHE DIAGNOSTIC SYSTEMS,
INC.,

    Defendant.

AND RELATED COUNTERCLAIM.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF THOMAS J. WHITE, Ph.D.

Redwood Shores, California

October 9, 2006

Reported by:
SUZANNE F. BOSCHETTI
CSR No. 5111

Job No. 3-53999

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

5c32c821-d654-4901-8e94-8148bc440213

Dockets.Justia.com

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 50

```
10:36:05  1   developed a diagnostic test for anything. He didn't
10:36:08  2   have that expertise. But people in his department could
10:36:10  3   easily have used tests developed by Kwok, Sninsky or
10:36:14  4   others for whatever purpose they had in mind. And the
10:36:17  5   same would apply to Konrad and people -- people in this
10:36:20  6   department. Or they could have tried to develop one
10:36:22  7   independently since some people in that department did
10:36:26  8   have the requisite expertise.
10:36:31  9   BY MS. RHYU:
10:36:32 10       Q. But are you aware specifically of anyone
10:36:34 11   outside of the labs of John Sninsky and Shirley Kwok who
10:36:40 12   had developed any tests for detection of HIV
10:36:45 13   sequences --
10:36:48 14       MR. BOOZELL: Vague and ambiguous.
10:36:48 15   BY MS. RHYU:
10:36:49 16       Q. -- using PCR?
10:36:50 17       MR. BOOZELL: Calls for speculation. Lacks
10:36:52 18   foundation.
10:36:52 19       THE WITNESS: I'm aware that the reason I'm
10:36:54 20   here deposing -- being deposed today has something to do
10:36:58 21   with that question, but beyond that, I have no specific
10:37:00 22   recollection of it.
10:37:02 23       MS. RHYU: Okay. Let's take a break.
10:37:03 24       VIDEO OPERATOR: The time is 10:37. We are
10:37:07 25   going off the record.
```

Page 51

```
10:52:12  1       (Recess.)
10:52:21  2       VIDEO OPERATOR: The time is 10:52. We are
10:52:36  3   back on the record.
10:52:36  4   BY MS. RHYU:
10:52:39  5       Q. As vice president of research at Cetus, did you
10:52:45  6   endeavor to keep informed of the research projects that
10:52:48  7   were going on at Cetus?
10:52:49  8       MR. BOOZELL: Vague and ambiguous.
10:52:51  9       THE WITNESS: Yes, to the extent that was
10:52:53 10   possible, I took some -- more interest in some and less
10:52:56 11   interest in others, but in general I kept apprised of
10:52:59 12   the status.
10:52:59 13   BY MS. RHYU:
10:53:00 14       Q. And through what mechanisms? How did you keep
10:53:04 15   informed of the various research projects that were
10:53:07 16   going on at Cetus?
10:53:08 17       A. Through informal conversations with the
10:53:12 18   individual scientists, through occasional meetings with
10:53:15 19   scientists, through occasionally attending their
10:53:18 20   laboratory meetings, scientific retreats and occasional
10:53:23 21   reports from some of the scientists.
10:53:27 22       Q. Were there structures or systems in place for
10:53:30 23   you to have regular reports from the scientists?
10:53:36 24       MR. BOOZELL: Vague and ambiguous.
10:53:37 25       THE WITNESS: As I mentioned earlier, some
```

Page 52

```
10:53:40  1   scientists wrote regular reports and some never wrote
10:53:43  2   reports. So there wasn't a formal system of report
10:53:48  3   writing in the research group. In the development group
10:53:52  4   people were usually more responsible about writing
10:53:56  5   reports. So --
10:53:58  6   BY MS. RHYU:
10:54:00  7       Q. So your distinction between -- I just want to
10:54:04  8   understand your distinction between the research group
10:54:06  9   and the development group. What group would John
10:54:08 10   Sninsky and Shirley Kwok fall into?
10:54:11 11       A. John Sninsky and Shirley Kwok were members of
10:54:14 12   the research group.
10:54:16 13       Q. And Eric Groves, what group was he in?
10:54:20 14       A. As I mentioned earlier, Eric Groves was in the
10:54:24 15   clinical group, which was either clinical or
10:54:27 16   pharmacology or toxicology. I can't remember
10:54:30 17   specifically about him. But that was a third segment of
10:54:35 18   the research and development group, and I believe they
10:54:39 19   reported to someone else who reported to Price, but --
10:54:42 20   and indirectly to me as my associate director of
10:54:45 21   activities. But they were not under -- Groves was not
10:54:49 22   in the research group.
10:54:50 23       Q. As to Groves' work, how did you keep updated on
10:54:55 24   his work?
10:54:56 25       MR. BOOZELL: Vague and ambiguous. Assumes
```

Page 53

```
10:54:57  1   facts not in evidence. Calls for speculation.
10:55:07  2       THE WITNESS: As part of my responsibility as
10:55:10  3   associate director of research and development, I tried
10:55:12  4   to keep track of the things that were not under my
10:55:14  5   direct responsibility. I could do that through
10:55:16  6   attending occasional meetings where they were presenting
10:55:20  7   the activities going on in their areas. Since they were
10:55:23  8   usually running the clinical trials of potential drugs
10:55:27  9   that had been developed in research or discovered and
10:55:31 10   made in research, I had a personal interest in finding
10:55:34 11   out what was happening with the drugs, and so sometimes
10:55:37 12   I paid attention to the clinical trials.
10:55:40 13       Some of the people who worked for me
10:55:42 14   occasionally did experimental work as part of the
10:55:46 15   activities of the pharmacology, toxicology or clinical
10:55:51 16   group, but I can't recall specifically whether Groves
10:55:56 17   wrote reports or not or even what area of that whole
10:56:00 18   division wrote reports. My guess is they probably wrote
10:56:04 19   reports from time to time but not necessarily on a
10:56:06 20   formal basis.
10:56:15 21   BY MS. RHYU:
10:56:15 22       Q. Did you have any knowledge of a collaboration
10:56:18 23   between Dr. Groves and Dr. Tom Merigan?
10:56:22 24       A. Yes.
10:56:22 25       Q. And what did you know about that collaboration?
```

5c32c821-d654-4901-8e94-8148bc440213

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

### Page 54

```
10:56:25  1        A. Well, I believe Merigan in his consulting role
10:56:29  2    for Cetus -- he's a physician, so he advised Cetus on
10:56:34  3    some of the clinical trials that Cetus was conducting.
10:56:38  4    And I believe Stanford, through Merigan or Stanford
10:56:44  5    Medical Center, was one of the clinical trial sites for
10:56:47  6    Interleukin 2 testing with the hypothesis that it would
10:56:53  7    benefit -- benefit people infected with the AIDS virus,
10:56:56  8    as I mentioned earlier in the deposition.
10:56:58  9        Q. And do you know what Merigan's role was as a
10:57:01 10    consultant in that capacity?
10:57:03 11        MR. BOOZELL: Vague and ambiguous.
10:57:07 12        THE WITNESS: Could you be more specific about
10:57:09 13    the capacity you're referring to?
10:57:10 14    BY MS. RHYU:
10:57:11 15        Q. What did he consult on in the context of the
10:57:14 16    IL-2 clinical studies?
10:57:16 17        A. Well, he was a consultant to that division, and
10:57:22 18    I presume it had to do with the clinical trials of the
10:57:26 19    Interleukin 2. He might have also consulted on the
10:57:30 20    interferon trial as well earlier, but I don't have a
10:57:33 21    specific knowledge of his role there.
10:57:34 22        Q. Do you have any specific knowledge as to any
10:57:37 23    collaborations between Dr. Merigan and Dr. Groves that
10:57:40 24    related to detection of HIV sequences using PCR?
10:57:46 25        MR. BOOZELL: Vague and ambiguous. Calls for
```

### Page 55

```
10:57:48  1    speculation.
10:57:51  2        THE WITNESS: I know that that's the reason for
10:57:53  3    this deposition, but aside from that, Merigan consulted
10:57:59  4    with Cetus on any or all of Cetus's projects. He was
10:58:04  5    the general consultant, and he had been a member of
10:58:08  6    Cetus Immune Corporation, so --
10:58:10  7    BY MS. RHYU:
10:58:10  8        Q. But are you specifically aware of any
10:58:12  9    collaboration that Merigan had with Groves involving the
10:58:21 10    use of PCR to detect HIV sequences?
10:58:25 11        MR. BOOZELL: Vague and ambiguous. Asked and
10:58:27 12    answered. Calls for speculation. Lacks foundation.
10:58:31 13        THE WITNESS: I'm aware that a collaboration
10:58:34 14    between Merigan and Cetus is the subject of this lawsuit
10:58:37 15    and deposition. Beyond that, no.
10:58:37 16    BY MS. RHYU:
10:58:40 17        Q. So as the senior -- I'm sorry, as the vice
10:58:44 18    president of research, you don't recall knowing about
10:58:49 19    any collaboration that specifically related to PCR and
10:58:55 20    HIV that Dr. Merigan was involved in while you were at
10:58:59 21    Cetus?
10:58:59 22        MR. BOOZELL: Vague and ambiguous. Misleading.
10:59:01 23    Misstates his testimony. It's argumentative. It calls
10:59:04 24    for speculation.
10:59:05 25        THE WITNESS: I was vice president of research
```

### Page 56

```
10:59:07  1    through February of 1989, so my knowledge of Cetus's
10:59:10  2    activities as vice president of research are limited to
10:59:14  3    that time frame. And in 1988 I was on a sabbatical from
10:59:19  4    that position, and so I had less involvement in managing
10:59:23  5    the research in 1988.
10:59:23  6    BY MS. RHYU:
10:59:31  7        Q. With those qualifications, you don't have any
10:59:34  8    specific knowledge of Dr. Merigan's involvement in -- in
10:59:39  9    consulting relating to PCR and HIV?
10:59:42 10        MR. BOOZELL: Same objections.
10:59:42 11    BY MS. RHYU:
10:59:43 12        Q. Is that correct?
10:59:44 13        MR. BOOZELL: Same objections.
10:59:48 14        THE WITNESS: As I mentioned earlier, I know
10:59:51 15    that Merigan was interested in testing Interleukin 2 in
10:59:56 16    the AIDS patients, and PCR would have been used as part
11:00:03 17    of that clinical trial.
11:00:03 18    BY MS. RHYU:
11:00:10 19        Q. Why do you say "PCR would have been used as
11:00:12 20    part of that clinical trial"?
11:00:14 21        A. Because PCR was one of the methods of
11:00:17 22    diagnosing people who were infected with the AIDS virus,
11:00:21 23    and we were also interested in the question of whether
11:00:24 24    effective therapies would reduce the amount of virus.
11:00:29 25        Q. Do you have any memory today of Dr. Merigan
```

### Page 57

```
11:00:34  1    working in collaboration with Dr. Groves on using PCR to
11:00:41  2    detect HIV sequences?
11:00:42  3        MR. BOOZELL: Asked and answered. Vague and
11:00:44  4    ambiguous. Calls for speculation. Lacks foundation.
11:00:47  5    Misleading.
11:00:49  6        THE WITNESS: Could you repeat the question?
11:00:50  7        MS. RHYU: Can you read it back, please.
11:01:03  8        (Record read as follows:
11:01:03  9        "QUESTION: Do you have any memory
11:01:03 10        today of Dr. Merigan working in collaboration
11:01:03 11        with Dr. Groves on using PCR to detect HIV
11:01:05 12        sequences?")
11:01:05 13        THE WITNESS: In what period?
11:01:07 14    BY MS. RHYU:
11:01:08 15        Q. While you were working at Cetus.
11:01:09 16        MR. BOOZELL: Same objections.
11:01:14 17        THE WITNESS: No.
11:01:14 18    BY MS. RHYU:
11:01:32 19        Q. I'm handing you what was previously marked as
11:01:35 20    Exhibit 601.
11:01:35 21        (Previously marked Exhibit 601 was
11:01:46 22        presented to the witness.)
11:01:46 23    BY MS. RHYU:
11:01:46 24        Q. This is a consulting agreement made between
11:01:48 25    Cetus and Tom Merigan, and the date is April 13th, 1984.
```

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

5c32c821-d654-4901-8e94-8148bc440213

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

### Page 58

```
11:01:57  1        Do you recognize Exhibit 601?
11:02:02  2        A. Yes.
11:02:03  3        Q. And when did you last look at Exhibit 601?
11:02:08  4        MR. BOOZELL: I'm going to object to the extent
11:02:10  5    it might call for attorney-client privileged
11:02:12  6    communications and instruct the witness not to answer
11:02:14  7    with respect to any documents I may have shown him in
11:02:18  8    his prep.
11:02:18  9    BY MS. RHYU:
11:02:27 10        Q. I'll help you out.
11:02:28 11        A. Sorry. I don't know how to answer that
11:02:30 12    question.
11:02:30 13        Q. Okay. Aside from your preparation for today's
11:02:32 14    deposition, have you seen this document before?
11:02:34 15        A. Not to my knowledge.
11:02:36 16        Q. Were you involved in preparing or negotiating
11:02:44 17    or executing any consulting agreements with consultants
11:02:48 18    while you were working at Cetus?
11:02:49 19        MR. BOOZELL: Vague and ambiguous. Overbroad,
11:02:51 20    compound.
11:02:53 21        THE WITNESS: Yes.
11:02:54 22    BY MS. RHYU:
11:02:54 23        Q. Were you involved in preparing, negotiating or
11:03:02 24    executing any consulting agreements with Dr. Merigan?
11:03:06 25        MR. BOOZELL: Same objections.
```

### Page 59

```
11:03:09  1        THE WITNESS: I don't recall specifically, but
11:03:11  2    it would have been my -- one of my roles to have an
11:03:17  3    opinion and/or recommend that we have consulting
11:03:20  4    agreements with certain scientists or physicians, and
11:03:26  5    Dr. Merigan would have been one of them.
11:03:26  6    BY MS. RHYU:
11:03:29  7        Q. So I just want to make clear, then, you don't
11:03:33  8    specifically recall working on this consulting
11:03:35  9    agreement, but you think that it was likely that you
11:03:39 10    were involved in putting this agreement in place?
11:03:42 11        A. No --
11:03:42 12        MR. BOOZELL: Vague and ambiguous.
11:03:43 13    Mischaracterizes his testimony.
11:03:44 14        THE WITNESS: -- that mischaracterizes my
11:03:45 15    testimony. What I said was that in general I would make
11:03:48 16    my opinion known. If the consulting was specifically
11:03:53 17    for activities in the research area, then I would have
11:03:57 18    more involvement in the nature of the topics to be
11:04:01 19    consulted on. In Merigan's case, since he was a
11:04:05 20    consultant to all of R&D, I would have given my opinion
11:04:10 21    to Price as to whether or not I thought it would be
11:04:12 22    useful to the research organization and potentially to
11:04:15 23    R&D.
11:04:15 24    BY MS. RHYU:
11:04:17 25        Q. And do you recall giving your opinion to
```

### Page 60

```
11:04:19  1    Dr. Price regarding Merigan -- regarding Merigan's
11:04:25  2    consultancy?
11:04:27  3        MR. BOOZELL: Vague and ambiguous.
11:04:29  4        THE WITNESS: No, I don't recall giving my
11:04:31  5    opinion to Dr. Price specifically with regard to Dr.
11:04:34  6    Merigan.
11:04:34  7    BY MS. RHYU:
11:04:34  8        Q. Do you recall giving your advice to anyone
11:04:37  9    relating to Dr. Merigan being a consultant for Cetus?
11:04:42 10        MR. BOOZELL: Same objections.
11:04:43 11        THE WITNESS: Yes.
11:04:44 12    BY MS. RHYU:
11:04:44 13        Q. And what was your advice regarding Merigan
11:04:49 14    being a consultant for Cetus?
11:04:50 15        A. It was the same as the other former academic
11:04:56 16    members of Cetus Immune of Palo Alto, which was they
11:05:00 17    should be made consultants.
11:05:02 18        Q. And why did you think that Dr. Merigan should
11:05:04 19    be made a consultant?
11:05:06 20        MR. BOOZELL: Vague and ambiguous.
11:05:09 21        THE WITNESS: Because it was continuing their
11:05:13 22    roles and funds as consultants, it was one of the ways
11:05:18 23    of eliminating the subsidiary for Cetus Palo Alto or
11:05:22 24    Cetus Immune.
11:05:25 25    BY MS. RHYU:
```

### Page 61

```
11:05:25  1        Q. Did you also appreciate that Dr. Merigan had
11:05:28  2    expertise that would be helpful for Cetus?
11:05:32  3        MR. BOOZELL: Vague and ambiguous. Misleading.
11:05:39  4        THE WITNESS: I believe that Dr. Merigan had
11:05:41  5    certain expertise that would be useful to Cetus.
11:05:41  6    BY MS. RHYU:
11:05:51  7        Q. You said you gave some advice regarding
11:05:53  8    consultants. Did you actually read consulting
11:05:58  9    agreements for Cetus consultants in the course of
11:06:03 10    getting these consulting agreements in place?
11:06:06 11        MR. BOOZELL: Vague and ambiguous.
11:06:07 12        THE WITNESS: I'm not sure what you mean by
11:06:09 13    "these consulting agreements." You mean a specific one
11:06:11 14    or consulting agreements in general?
11:06:13 15    BY MS. RHYU:
11:06:13 16        Q. I'm just asking you generally to start. Was
11:06:15 17    that a role of yours? Were you familiar with Cetus
11:06:18 18    consulting agreements?
11:06:20 19        A. I was familiar with the Cetus consulting
11:06:23 20    agreements that specifically would be for consultants
11:06:26 21    that I wanted to have as -- for the research division.
11:06:28 22    Those I would usually read carefully. Other ones from
11:06:32 23    other divisions or even for R&D in general, sometimes
11:06:36 24    other people, like apparently in this case, Price had
11:06:39 25    more involvement with or exclusive involvement with.
```

16 (Pages 58 to 61)

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 62

```
11:06:43  1      Q. Okay. If you could look at Exhibit 601. On
11:06:49  2   the first page there's a paragraph 2 that refers to
11:06:54  3   duties. Do you see that paragraph?
11:06:55  4      A. Yes.
11:06:56  5      Q. Does that paragraph look familiar to you?
11:07:01  6         MR. BOOZELL: Vague and ambiguous.
11:07:01  7         THE WITNESS: No.
11:07:01  8   BY MS. RHYU:
11:07:05  9      Q. Do the terms recited in the paragraph for the
11:07:07 10   consultant look familiar to you?
11:07:09 11         MR. BOOZELL: Same objections.
11:07:11 12         THE WITNESS: I'm not sure what you're
11:07:13 13   referring to. Is it a different section in 2 or is
11:07:15 14   it --
11:07:15 15   BY MS. RHYU:
11:07:16 16      Q. In section 2, the terms for the duties.
11:07:19 17         MR. BOOZELL: Vague and ambiguous.
11:07:41 18         THE WITNESS: Could you read back the question?
11:07:41 19         (Record read as follows:
11:07:41 20            "Do the terms recited in the
11:07:41 21         paragraph for the consultant look familiar to
11:07:53 22         you?")
11:07:53 23   BY MS. RHYU:
11:07:54 24      Q. Actually, let me be more specific. Let me
11:07:56 25   refer to the sentence, the second sentence of paragraph
```

Page 63

```
11:07:59  1   2.
11:07:59  2            "During the Consulting Period, consultant
11:08:02  3         agrees to perform to the best of his ability
11:08:04  4         the scientific consulting duties assigned to
11:08:06  5         him by Cetus, which may include the functions
11:08:09  6         of inventing, discovering and developing new
11:08:11  7         and novel devices, methods and principles
11:08:15  8         relating to the work of Cetus."
11:08:18  9         Is that a term that was generally in Cetus
11:08:22 10   consulting agreements?
11:08:23 11         MR. BOOZELL: Vague and ambiguous.
11:08:24 12         THE WITNESS: Not to my -- not to my knowledge.
11:08:24 13   BY MS. RHYU:
11:08:29 14      Q. Do you know if Dr. Merigan was assigned any
11:08:32 15   duties by Cetus pursuant to this consulting agreement,
11:08:38 16   Exhibit 601?
11:08:39 17         MR. BOOZELL: Vague and ambiguous. Calls for a
11:08:40 18   legal conclusion. Lacks foundation. Calls for
11:08:42 19   speculation.
11:08:44 20         THE WITNESS: I don't know specifically, but I
11:08:46 21   believe he was involved in the clinical trials of
11:08:48 22   Interleukin 2, which certainly would have come under the
11:08:52 23   consulting agreement.
11:09:08 24   BY MS. RHYU:
11:09:08 25      Q. And on the next page under paragraph, "3.1
```

Page 64

```
11:09:15  1   Institutional Affiliations," do you see where it says in
11:09:29  2   the second paragraph -- I mean in the second sentence of
11:09:33  3   paragraph 3.1:
11:09:36  4            "Consultant represents that he's not a
11:09:39  5         party to any existing agreement which would
11:09:41  6         prevent him from entering into this
11:09:43  7         Agreement, and that the only agreements with
11:09:46  8         third parties which may restrict his
11:09:49  9         consulting activities on behalf of Cetus are
11:09:52 10         consultant's existing employment agreement
11:09:54 11         with the Institution, the Institution's
11:09:56 12         policy statement with respect to outside
11:09:59 13         consulting, and the Institution's standard
11:10:01 14         Patent Agreement, which are attached hereto
11:10:03 15         as Exhibits A, B, and C, respectively"?
11:10:09 16         Do you see that?
11:10:10 17      A. Yes, I do. Except for Exhibits A, B and C, I
11:10:13 18   don't see those, but --
11:10:14 19      Q. Do you recognize that as a limitation that was
11:10:20 20   commonly seen in consulting agreements of Cetus?
11:10:24 21         MR. BOOZELL: Objection. Vague and ambiguous.
11:10:25 22   Misstates the document. Calls for a legal conclusion.
11:10:29 23   Calls for speculation.
11:10:29 24         THE WITNESS: Yeah, these agreements were
11:10:33 25   prepared by the legal department. I don't recognize
```

Page 65

```
11:10:35  1   that specifically as being a -- a routine statement for
11:10:42  2   such documents. But this is one consulting agreement
11:10:45  3   among many, so I can't comment whether it's usual or
11:10:50  4   unusual.
11:10:50  5   BY MS. RHYU:
11:10:50  6      Q. Do you remember seeing that limitation before
11:10:52  7   in other agreements?
11:10:53  8         MR. BOOZELL: Same objection. Also
11:10:55  9   mischaracterizes the document.
11:10:57 10         THE WITNESS: I don't recall any other
11:10:58 11   consulting agreements from 15 years ago or, in this
11:11:03 12   case, 20 years ago.
11:11:03 13   BY MS. RHYU:
11:11:21 14      Q. You said these agreements were prepared by the
11:11:23 15   legal department. What was the procedure that Cetus
11:11:28 16   undertook to get these agreements in place?
11:11:32 17         MR. BOOZELL: Vague --
11:11:32 18   BY MS. RHYU:
11:11:33 19      Q. I just want to have a sense of who was involved
11:11:36 20   in preparing these agreements.
11:11:38 21         MR. BOOZELL: It's vague and ambiguous, and I
11:11:39 22   caution the witness not to reveal any attorney-client
11:11:41 23   privileged communications between you and anybody at
11:11:44 24   Cetus related to any of these agreements.
11:11:45 25         THE WITNESS: What time frame are you referring
```

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

5c32c821-d654-4901-8e94-8148bc440213

### Page 82

```
11:35:16  1   BY MS. RHYU:
11:35:17  2       Q. I'm handing you what's been marked as
11:35:20  3   Exhibit 688. It's a letter dated September 14th, 1983,
11:35:24  4   from you, Tom -- Thomas J. White to Dr. Thomas Merigan
11:35:31  5   bearing the production number RMS 64033.
11:35:31  6           (Deposition Exhibit 688 marked by the
11:35:48  7           court reporter.)
11:35:48  8   BY MS. RHYU:
11:35:48  9       Q. Do you recognize Exhibit 688?
11:35:50 10           MR. BOOZELL: Again instruct you not to answer
11:35:53 11   to the extent it would reveal attorney-client privileged
11:35:56 12   communications.
11:35:57 13           THE WITNESS: Yes, I do.
11:35:57 14   BY MS. RHYU:
11:35:59 15       Q. And what is it?
11:36:00 16       A. It's a letter in support of a grant application
11:36:03 17   that Tom Merigan wanted to send to the National
11:36:07 18   Institutes of Health.
11:36:23 19       Q. Are you finished?
11:36:24 20       A. Mm-hmm.
11:36:26 21       Q. How was Cetus supporting the grant application
11:36:30 22   that Tom Merigan wanted to send to the National
11:36:33 23   Institutes of health?
11:36:33 24           MR. BOOZELL: Vague and ambiguous. The
11:36:34 25   document speaks for itself.
```

### Page 83

```
11:36:36  1           THE WITNESS: Well, I don't know all ways in
11:36:39  2   which they were supporting it, but one of the ways was
11:36:42  3   to provide him with this letter that would show the
11:36:45  4   reviewers at the National Institutes of Health that he
11:36:50  5   had a company willing to provide him with Interleukin 2
11:36:54  6   for whatever the subject matter of his grant was.
11:36:54  7   BY MS. RHYU:
11:36:58  8       Q. Did this also serve as a -- as documentation of
11:37:06  9   the transfer of IL-2 under the Material Transfer
11:37:17 10   Agreement, Exhibit 355?
11:37:19 11           MR. BOOZELL: Vague and ambiguous. Calls for
11:37:20 12   speculation. Lacks foundation. Calls for a legal
11:37:22 13   conclusion.
11:37:23 14           THE WITNESS: No. This is a letter to
11:37:26 15   Dr. Merigan for him to include with his grant
11:37:30 16   application, indicating we would be willing to provide
11:37:33 17   him with such Interleukin 2 for his studies on herpes
11:37:38 18   simplex viruses.
11:37:38 19   BY MS. RHYU:
11:37:43 20       Q. You're saying Exhibit 688 is unrelated to
11:37:46 21   Exhibit 355?
11:37:47 22           MR. BOOZELL: Vague and ambiguous. Misstates
11:37:49 23   his testimony. Calls for a legal conclusion. Calls for
11:37:51 24   speculation.
11:37:59 25           THE WITNESS: Well, I can't speak to that
```

### Page 84

```
11:38:01  1   point. It says in the letter on September 14th that I'm
11:38:06  2   enclosing two copies of our standard transfer materials
11:38:10  3   form. So for that purpose, if you have the material
11:38:15  4   transfer form that was attached to this letter, as it
11:38:18  5   says enclosure, I would know whether or not the Material
11:38:23  6   Transfer Agreement you previously asked me about,
11:38:24  7   Exhibit 355 dated September 7th, is the Material
11:38:30  8   Transfer Agreement that we sent with the letter of
11:38:31  9   September 14th, or whether there was one that was
11:38:34 10   specific and had to do with testing Interleukin 2 in
11:38:42 11   invitro studies on herpes simplex viruses. There's
11:38:45 12   nothing you've given me that connects the two, so I
11:38:48 13   can't answer that question.
11:39:06 14   BY MS. RHYU:
11:39:06 15       Q. And do you have any understanding as to why you
11:39:11 16   would have enclosed another material transfer form with
11:39:21 17   the transfer of IL-2 on September 14th, 1983, when there
11:39:32 18   was already a Material Transfer Agreement that you had
11:39:42 19   signed on September 9th, 1983, in the form of
11:39:47 20   Exhibit 355?
11:39:47 21           MR. BOOZELL: It's vague and ambiguous.
11:39:50 22   Caution that it potentially misstates the document that
11:39:53 23   was attached -- part of the document. Calls for
11:39:55 24   speculation. Lacks foundation.
11:40:00 25           THE WITNESS: I don't know what the Materials
```

### Page 85

```
11:40:03  1   Transfer Agreement that were enclosed with the letter
11:40:05  2   pertain to, but in some occasions reagents were used for
11:40:10  3   different purposes, and it could be felt that an
11:40:13  4   additional materials transfer agreement was needed in
11:40:16  5   some occasions. Whether that was relevant here or not,
11:40:19  6   I don't know, because there's nothing that connects the
11:40:21  7   two documents that you've given me.
11:40:28  8   BY MS. RHYU:
11:40:29  9       Q. You say in some occasions reagents that were --
11:40:39 10   I just want to clarify your -- I just want to understand
11:40:43 11   the answer you just provided. You said that in some
11:40:45 12   occasions where reagents were used for different
11:40:48 13   purposes, additional material transfer agreements were
11:40:53 14   needed. And under what circumstances would you need
11:40:56 15   additional material transfer agreements for the same
11:41:01 16   reagents?
11:41:01 17           MR. BOOZELL: It's vague and ambiguous. It's
11:41:03 18   overbroad. Incomplete hypothetical. Calls for
11:41:08 19   speculation.
11:41:08 20           THE WITNESS: Well, a material transfer
11:41:12 21   agreement could have been written narrowly and the
11:41:15 22   request for additional material could be intended to be
11:41:18 23   used for a different purpose, so you wouldn't want an
11:41:20 24   additional materials transfer agreement to cover a
11:41:23 25   different purpose. On the other hand, an agreement
```

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 86

| Time | Line | Text |
|---|---|---|
| 11:41:25 | 1 | could be written very broadly, and one might want to |
| 11:41:31 | 2 | have additional explicit protection by providing another |
| 11:41:34 | 3 | one. |
| 11:41:34 | 4 | But the probable answer to your question is |
| 11:41:37 | 5 | that the letter is dated the 14th, and since it was sent |
| 11:41:42 | 6 | by mail, it's unlikely that it would have been signed on |
| 11:41:46 | 7 | the 15th, but I'm guessing. Without the enclosures for |
| 11:41:53 | 8 | this thing, it's difficult to know if there's any |
| 11:41:55 | 9 | connection between the two except they both went to Tom |
| 11:41:58 | 10 | Merigan. |
| 11:42:07 | 11 | BY MS. RHYU: |
| 11:42:07 | 12 | Q. Do you see the stamps -- I'm almost finished |
| 11:42:11 | 13 | with this line of questioning, and I know we want to |
| 11:42:13 | 14 | take a lunch break. But our videotape is running out, |
| 11:42:15 | 15 | so I want to propose that we just take a brief break to |
| 11:42:19 | 16 | change the video, have a few more minutes of |
| 11:42:21 | 17 | questioning, and then take a lunch break. Is that all |
| 11:42:24 | 18 | right? |
| 11:42:24 | 19 | MR. BOOZELL: Yes. |
| 11:42:25 | 20 | VIDEO OPERATOR: The time is 11:42. We're |
| 11:42:27 | 21 | going off the record, and this will be the completion of |
| 11:42:30 | 22 | media No. 1. |
| 11:46:25 | 23 | (Recess.) |
| 11:46:26 | 24 | VIDEO OPERATOR: The time is 11:46. We are |
| 11:46:43 | 25 | back on the record, and this will be the beginning of |

Page 87

| Time | Line | Text |
|---|---|---|
| 11:46:44 | 1 | media No. 2 in the deposition of Dr. Thomas White. |
| 11:46:44 | 2 | BY MS. RHYU: |
| 11:46:53 | 3 | Q. Dr. White, you just pointed out with respect to |
| 11:46:57 | 4 | Exhibits 355 and 688 that Exhibit 688 is dated September |
| 11:47:06 | 5 | 14th and it was sent by mail, and Exhibit 355 was |
| 11:47:16 | 6 | dated -- was signed September 15th. You said "it's |
| 11:47:23 | 7 | unlikely that it would have been signed on the 15th, but |
| 11:47:26 | 8 | I'm guessing." And I just want to understand what you |
| 11:47:28 | 9 | meant by that. |
| 11:47:31 | 10 | Was it -- by pointing that out, are you |
| 11:47:36 | 11 | suggesting that the Material Transfer Agreement, |
| 11:47:39 | 12 | Exhibit 355, was not the agreement that was attached to |
| 11:47:43 | 13 | Exhibit 688? |
| 11:47:45 | 14 | MR. BOOZELL: Vague and ambiguous. Misstates |
| 11:47:46 | 15 | his testimony. Calls for speculation. |
| 11:47:55 | 16 | THE WITNESS: I think the beginning part of |
| 11:47:57 | 17 | your question stated that -- actually, read the |
| 11:48:03 | 18 | beginning -- maybe you could read that question over |
| 11:48:05 | 19 | again. It had to do with this thing about was it mailed |
| 11:48:08 | 20 | on the 14th or not. That's what I'm -- |
| 11:48:08 | 21 | Q. Actually, I'm just asking -- |
| 11:48:10 | 22 | A. I don't know if it was mailed or not, so -- but |
| 11:48:14 | 23 | aside from that, this was sent on the 14th. It had to |
| 11:48:17 | 24 | get to Stanford and been signed on the 15th. Whereas it |
| 11:48:21 | 25 | was prepared on the 9th, my guess is it was probably |

Page 88

| Time | Line | Text |
|---|---|---|
| 11:48:24 | 1 | sent shortly after the 9th and been signed on the 15th. |
| 11:48:27 | 2 | So -- but I'm guessing. I don't know. It looks like |
| 11:48:29 | 3 | maybe there's another one attached to this thing. |
| 11:48:31 | 4 | Q. And just to make the record straight, you're |
| 11:48:34 | 5 | saying it looks to you that there was a different |
| 11:48:36 | 6 | Material Transfer Agreement attached to Exhibit 688 |
| 11:48:38 | 7 | which is dated September 14th, 1983? |
| 11:48:41 | 8 | MR. BOOZELL: Vague and ambiguous. Misstates |
| 11:48:42 | 9 | his testimony. Calls for speculation. |
| 11:48:45 | 10 | THE WITNESS: I can't tell. There is no |
| 11:48:47 | 11 | enclosure with the letter. And you haven't shown me any |
| 11:48:54 | 12 | other material transfer agreements signed by Dr. Merigan |
| 11:48:57 | 13 | to cover Interleukin 2. There is this one, Exhibit 355, |
| 11:49:03 | 14 | signed on the 15th. I don't know if they were |
| 11:49:05 | 15 | associated with each other or not, but it looks to me a |
| 11:49:09 | 16 | little close in date if he was receiving the letter, the |
| 11:49:12 | 17 | 14th by mail. |
| 11:49:13 | 18 | BY MS. RHYU: |
| 11:49:13 | 19 | Q. And it wouldn't be unusual practice for you to |
| 11:49:18 | 20 | send different material transfer agreements for transfer |
| 11:49:24 | 21 | of the same reagent if the reagent is to be used for |
| 11:49:27 | 22 | different purposes? |
| 11:49:28 | 23 | MR. BOOZELL: Vague and ambiguous. Misstates |
| 11:49:29 | 24 | his testimony. It's an incomplete hypothetical. |
| 11:49:31 | 25 | THE WITNESS: That misstates my testimony. As |

Page 89

| Time | Line | Text |
|---|---|---|
| 11:49:34 | 1 | I stated earlier, it depends on the breadth of the |
| 11:49:39 | 2 | initial material transfer agreement and whether or not |
| 11:49:42 | 3 | one wanted to obtain more protection from the use of the |
| 11:49:45 | 4 | material, one might add an additional one, either |
| 11:49:50 | 5 | because the first one was narrow and you wanted to cover |
| 11:49:52 | 6 | a new use, or even if the first one was broad, you |
| 11:49:56 | 7 | wanted to cover something more specifically. There are |
| 11:49:58 | 8 | a variety of reasons one might add additional MTAs or |
| 11:50:03 | 9 | not. |
| 11:50:17 | 10 | BY MS. RHYU: |
| 11:50:17 | 11 | Q. Do you have an understanding of the distinction |
| 11:50:20 | 12 | between detection of HIV sequences and quantitation of |
| 11:50:25 | 13 | HIV sequences? |
| 11:50:27 | 14 | MR. BOOZELL: Vague and ambiguous. Misleading. |
| 11:50:29 | 15 | THE WITNESS: Well, detection is oftentimes |
| 11:50:31 | 16 | used to mean both things, but can also refer to a |
| 11:50:37 | 17 | qualitative assay or an assay for doing sequence |
| 11:50:42 | 18 | determination. Quantitation, while it is a form of |
| 11:50:47 | 19 | detection, usually refers to measuring the amount of |
| 11:50:51 | 20 | something. |
| 11:50:55 | 21 | BY MS. RHYU: |
| 11:50:55 | 22 | Q. So detection -- you said detection is |
| 11:51:03 | 23 | oftentimes used to mean both things. What does it mean |
| 11:51:07 | 24 | to you? |
| 11:51:09 | 25 | MR. BOOZELL: Vague and ambiguous. |

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

5c32c821-d654-4901-8e94-8148bc440213

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 90

11:51:09  1   THE WITNESS: Detection to me means the ability
11:51:12  2   to detect the subject or the target of detection -- I'm
11:51:19  3   assuming you mean by PCR now -- as well as to
11:51:24  4   characterize and/or classify it, and to measure how much
11:51:28  5   of it is present. Detection is used very broadly in a
11:51:32  6   diagnostics sense.
11:51:32  7   BY MS. RHYU:
11:51:37  8       Q. Was Cetus initially focused on detection of HIV
11:51:40  9   DNA?
11:51:41 10       MR. BOOZELL: Vague and ambiguous. Calls for
11:51:42 11   speculation.
11:51:45 12       THE WITNESS: Cetus was initially interested in
11:51:49 13   finding out whether or not the AIDS virus could be
11:51:53 14   detected in blood samples, and they were interested in
11:51:57 15   characterizing variants of the AIDS virus and doing
11:52:01 16   epidemiology on it and seeing whether or not a series of
11:52:05 17   diagnostic tests could be developed to detect, diagnose,
11:52:10 18   characterize and measure the amount of the virus.
11:52:10 19   BY MS. RHYU:
11:52:19 20       Q. As its initial focus, Cetus focused on
11:52:24 21   diagnostic tests for detecting HIV DNA, correct?
11:52:29 22       MR. BOOZELL: Vague and ambiguous. Asked and
11:52:31 23   answered. Calls for speculation. Assumes facts not in
11:52:33 24   evidence.
11:52:33 25       THE WITNESS: The first of Cetus's work on the

Page 91

11:52:37  1   AIDS virus had to do with detecting the DNA or proviral
11:52:42  2   form of the virus in white blood cells. Then they began
11:52:46  3   to look to see if they could detect it in serum or
11:52:49  4   plasma. And then they began to look at the possibility
11:52:52  5   of detecting the RNA form of the virus.
11:52:52  6   BY MS. RHYU:
11:53:04  7       Q. Handing you what was previously marked as
11:53:06  8   Exhibit 29.
11:53:06  9       (Previously marked Exhibit 29 was
11:53:22 10        presented to the witness.)
11:53:22 11   BY MS. RHYU:
11:53:23 12       Q. Do you recognize Exhibit 29?
11:53:24 13       MR. BOOZELL: I instruct you not to answer to
11:53:26 14   the extent that it would reveal attorney-client
11:53:28 15   privileged communications.
11:53:40 16       THE WITNESS: Well, it's a Material Transfer
11:53:42 17   Agreement between Cetus Corporation and Stanford
11:53:48 18   University specifically directed towards the proposed
11:53:52 19   scientific collaboration between Tom Merigan and David
11:53:56 20   Schwartz.
11:53:56 21   BY MS. RHYU:
11:53:56 22       Q. Did you have any involvement in creating
11:54:07 23   Exhibit 29?
11:54:12 24       MR. BOOZELL: Vague and ambiguous, and to the
11:54:19 25   extent that it would involve legal advice, instruct you

Page 92

11:54:22  1   not to answer.
11:54:25  2       THE WITNESS: Not to my knowledge.
11:54:25  3   BY MS. RHYU:
11:54:30  4       Q. Do you recall a collaboration involving Cetus,
11:54:34  5   Thomas Merigan and David Schwartz?
11:54:42  6       MR. BOOZELL: Vague and ambiguous.
11:54:47  7       THE WITNESS: Could you specify the time frame
11:54:49  8   you're speaking about here?
11:54:51  9   BY MS. RHYU:
11:54:51 10       Q. In the December 1988 time frame, which is the
11:54:54 11   date of Exhibit 29 --
11:54:58 12       A. No.
11:54:58 13       Q. -- on the face of the document.
11:55:04 14       At the time that you were at Cetus, you were
11:55:07 15   unaware of any collaboration involving Dr. Merigan and
11:55:11 16   Dr. Schwartz and Cetus relating to Exhibit 29?
11:55:23 17       MR. BOOZELL: Vague and ambiguous. Asked and
11:55:24 18   answered. Calls for a legal conclusion. Calls for
11:55:28 19   speculation.
11:55:29 20       THE WITNESS: I'll have to look at the subject
11:55:31 21   matter of Exhibit 29 in order to see whether I can
11:55:35 22   answer that question or not.
11:56:16 23       Could you reread the question now, please?
11:56:34 24       (Record read as follows:
11:56:34 25        "QUESTION: At the time that you were

Page 93

11:56:34  1        at Cetus, you were unaware of any
11:56:34  2        collaboration involving Dr. Merigan and
11:56:34  3        Dr. Schwartz and Cetus relating to Exhibit
11:56:35  4        29?")
11:56:35  5       THE WITNESS: Well, I knew that Tom Merigan was
11:56:37  6   a member of the Aids Cooperative Trial Group and that he
11:56:41  7   was a consultant of Cetus's. And that Sninsky was in
11:56:49  8   contact with him. But other than that, I have no
11:56:54  9   knowledge or recollection of the material in Exhibit 29.
11:56:54 10   BY MS. RHYU:
11:56:59 11       Q. Are you aware generally of collaborations that
11:57:03 12   Cetus had with scientists who were members of the Aids
11:57:09 13   Cooperative Trial Group?
11:57:09 14       MR. BOOZELL: Vague and ambiguous. Overbroad.
11:57:12 15       THE WITNESS: I know that Cetus thought the
11:57:14 16   AIDS Cooperative Clinical Trial Group was a useful
11:57:23 17   organization that represented an opportunity for several
11:57:26 18   different kinds of collaborations. But generally, very
11:57:29 19   generally I would say yes. Specifically I don't recall.
11:57:29 20   BY MS. RHYU:
11:57:34 21       Q. And we're both using the term Aids Cooperative
11:57:40 22   Trial Group fairly loosely. In the agreement there's a
11:57:43 23   reference to the AIDS Treatment Cooperative Group. Do
11:57:46 24   you know -- and it's referred to as ATCG. Do you know
11:57:50 25   if that refers to a group of scientists who were working

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

5c32c821-d654-4901-8e94-8148bc440213

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 110

```
12:59:54  1   everything was considered to be confidential unless
12:59:57  2   otherwise designated, would have been covered by a
12:59:59  3   consulting or another type of agreement such as a
01:00:08  4   materials transfer agreement.
01:00:08  5       BY MS. RHYU:
01:00:08  6       Q. So it was your understanding that Dr. Merigan
01:00:10  7   had access to Cetus confidential information about PCR
01:00:13  8   and HIV, correct?
01:00:16  9       A. Yes.
01:00:16 10       MR. BOOZELL: Vague and ambiguous.
01:00:17 11       THE WITNESS: That I'm certain of.
01:00:17 12   BY MS. RHYU:
01:00:21 13       Q. So it was further your understanding that any
01:00:23 14   work that Dr. Merigan did using PCR and HIV would fall
01:00:27 15   under his consulting agreement with Cetus?
01:00:30 16       MR. BOOZELL: It's asked and answered. Vague
01:00:31 17   and ambiguous. Overbroad. Calls for a legal
01:00:33 18   conclusion. Calls for speculation. Lacks foundation.
01:00:35 19   It's an incomplete hypothetical. It's asked and
01:00:37 20   answered.
01:00:39 21       THE WITNESS: Dr. Merigan was privy to
01:00:41 22   confidential information at Cetus's work on PCR and HIV
01:00:48 23   from early on as a member of the scientific advisory
01:00:51 24   group, as a consultant, as an attendee at Cetus
01:00:55 25   scientific conferences and specific meetings. So all of
```

Page 111

```
01:00:59  1   that information would have been covered at least under
01:01:01  2   this 1984 confidentiality agreement and potentially
01:01:05  3   other ones that he may have arranged with Cetus after I
01:01:08  4   left Cetus's employment.
01:01:08  5       BY MS. RHYU:
01:01:14  6       Q. That still doesn't answer my question. I want
01:01:16  7   to know if you have an understanding as to work that Dr.
01:01:28  8   Merigan does relating to PCR and HIV, based on what you
01:01:39  9   knew about Dr. Merigan's relationship with Cetus in the
01:01:44 10   late 1980s and early 1990s, was it your conclusion that
01:01:50 11   Dr. Merigan's HIV-related PCR work was subject to or
01:01:59 12   fell under the Cetus consulting agreement?
01:02:03 13       MR. BOOZELL: It's asked and answered. It's
01:02:05 14   vague and ambiguous. It's overbroad. Calls for
01:02:07 15   speculation. Lacks foundation. Calls for a legal
01:02:10 16   conclusion. It's an incomplete hypothetical.
01:02:13 17       THE WITNESS: I can't answer that question
01:02:15 18   because you haven't described to me how you define HIV
01:02:19 19   work using PCR done by Dr. Merigan.
01:02:19 20   BY MS. RHYU:
01:02:23 21       Q. Okay. I'll define it for you. If Dr. Merigan
01:02:27 22   used PCR and showed that one could monitor the efficacy
01:02:37 23   of HIV therapy by quantitating HIV nucleic acids using
01:02:48 24   PCR, is that work that you would understand belonged to
01:02:54 25   Cetus?
```

Page 112

```
01:02:54  1       MR. BOOZELL: It's vague and ambiguous. It's
01:02:55  2   overbroad. Calls for speculation. Lacks foundation.
01:02:58  3   Calls for a legal conclusion. It's an incomplete
01:03:02  4   hypothetical.
01:03:02  5       THE WITNESS: I believe that work of that type
01:03:06  6   was Cetus confidential information and if Merigan used
01:03:09  7   that work and information of Cetus's and/or the
01:03:13  8   reagents, he would have been using Cetus confidential
01:03:16  9   information covered by one or more agreements as a
01:03:19 10   consultant or a collaborator or as the recipient of
01:03:23 11   material from Cetus and information from Cetus and as an
01:03:26 12   attendee at the scientific conferences.
01:03:26 13   BY MS. RHYU:
01:03:30 14       Q. And that was your belief in 1991?
01:03:34 15       MR. BOOZELL: Same objections.
01:03:37 16       THE WITNESS: As I stated, I left Roche -- I
01:03:40 17   left Cetus for Roche in February or March of 1989. If
01:03:44 18   agreements in effect with Merigan were still valid
01:03:47 19   through that period, they would have covered such Cetus
01:03:50 20   confidential information. And in any event, the
01:03:53 21   agreements invariably covered for years after the term
01:03:58 22   of the agreement. So my answer to your question is if
01:04:01 23   Merigan used Cetus confidential information, it would
01:04:04 24   have been covered by one of the agreements that Cetus
01:04:07 25   had with them, including through the early 1990s.
```

Page 113

```
01:04:20  1   BY MS. RHYU:
01:04:20  2       Q. And you have no reservation arriving at that
01:04:23  3   conclusion?
01:04:23  4       MR. BOOZELL: Argumentative. Vague and
01:04:25  5   ambiguous. Calls for speculation. Lacks foundation.
01:04:27  6   Calls for a legal conclusion.
01:04:42  7       THE WITNESS: I believe that Tom Merigan was
01:04:44  8   privy to Cetus confidential information both on the PCR
01:04:48  9   method and on its use and the diagnosis, detection,
01:04:51 10   classification, quantification of the AIDS virus during
01:04:54 11   that period of time that you've described. And if he
01:04:58 12   did work on that, he was using Cetus confidential
01:05:02 13   information to do such work under an obligation to Cetus
01:05:09 14   via his consulting or other agreements that he had with
01:05:13 15   Cetus Corporation.
01:05:13 16   BY MS. RHYU:
01:05:16 17       Q. So you have no reservation?
01:05:17 18       MR. BOOZELL: Asked and answered. Same
01:05:19 19   objections.
01:05:20 20       THE WITNESS: I believe I've answered that
01:05:22 21   question.
01:05:22 22   BY MS. RHYU:
01:05:23 23       Q. What was your answer? Was it "yes" or "no"?
01:05:25 24       MR. BOOZELL: It doesn't have to be a yes or
01:05:27 25   No. It's misleading. Same objections as before.
```

### Page 118

```
01:11:25  1   another institution who didn't visit Cetus. Visitors
01:11:28  2   had more access to other scientists and to confidential
01:11:32  3   information than people who didn't visit Cetus.
01:11:32  4   BY MS. RHYU:
01:11:37  5     Q. In the 1989 time frame, did you have an
01:11:40  6   understanding of what Cetus's visitor's confidentiality
01:11:52  7   agreement required?
01:11:53  8     MR. BOOZELL: Vague and ambiguous. Assumes
01:11:54  9   facts not in evidence. Calls for speculation. Lacks
01:11:56 10   foundation. Calls for a legal conclusion.
01:11:59 11     THE WITNESS: As I've described earlier, I left
01:12:02 12   Cetus in February or March of 1989, so their policies
01:12:05 13   after I left I'm not familiar with. But they had a
01:12:08 14   visitor confidentiality agreement or agreements that
01:12:11 15   they used prior to the time that I left.
01:12:11 16   BY MS. RHYU:
01:12:14 17     Q. And based on what you knew at the time that you
01:12:17 18   left of Cetus's visitor's confidentiality agreements, do
01:12:23 19   you know if there was a form, visitor's confidentiality
01:12:26 20   agreement, at Cetus at that time?
01:12:28 21     MR. BOOZELL: Vague and ambiguous. Compound.
01:12:30 22     THE WITNESS: As I've mentioned earlier, Cetus
01:12:32 23   had forms. Sometimes the forms could be modified.
01:12:38 24   There was a visitor's confidentiality agreement used for
01:12:41 25   short-term visitors. Sometimes people who were there
```

### Page 119

```
01:12:44  1   longer periods had other agreements. But there was a
01:12:46  2   standard visitor's confidentiality agreement.
01:12:46  3   BY MS. RHYU:
01:12:49  4     Q. And do you know what that standard
01:12:51  5   confidentiality agreement required of the visitors?
01:12:57  6     MR. BOOZELL: Vague and ambiguous.
01:12:59  7     THE WITNESS: Well, I can't recall the language
01:13:01  8   specifically, but the general nature of it is that
01:13:06  9   during their visit to the Cetus laboratory, the
01:13:09 10   scientist may be exposed to Cetus confidential
01:13:12 11   information, data, results, business strategy, economic
01:13:18 12   information, a very, very broad description of the types
01:13:21 13   of information that they might be exposed to or access
01:13:26 14   to materials. And that that information was to be held
01:13:30 15   in strict confidence and not used for any other purpose.
01:13:35 16   And also any invention or invention concept that might
01:13:42 17   come to such a visitor as a result of that access to
01:13:47 18   Cetus information belonged to Cetus, if I recall
01:13:52 19   correctly.
01:13:55 20   BY MS. RHYU:
01:13:56 21     Q. You said as a result of access to Cetus
01:13:58 22   information belonged to Cetus. So is that as a result
01:14:02 23   of access to Cetus's confidential information as you
01:14:06 24   described it?
01:14:06 25     MR. BOOZELL: Vague and ambiguous. Calls for a
```

### Page 120

```
01:14:08  1   legal conclusion. Calls for speculation. Lacks
01:14:10  2   foundation.
01:14:12  3     THE WITNESS: It was not up to the visiting
01:14:14  4   scientist to determine what was confidential or not.
01:14:17  5   The default condition under those agreements was that
01:14:20  6   everything that they learned during their visit to Cetus
01:14:24  7   was Cetus confidential information. If there was any
01:14:29  8   question about that whatsoever, their obligation was to
01:14:31  9   provide that -- to not use it and also to provide any --
01:14:38 10   if they thought they made an invention, it would be
01:14:41 11   owned by Cetus.
01:14:41 12   BY MS. RHYU:
01:14:42 13     Q. I understand what you're saying about the
01:14:44 14   default presumption of confidentiality. My question is
01:14:47 15   if Cetus itself said that some information was not
01:14:52 16   confidential, did the visitor's confidentiality
01:14:59 17   agreement cover that undisputedly nonconfidential
01:15:06 18   information?
01:15:06 19     MR. BOOZELL: It's vague and ambiguous. Calls
01:15:08 20   for a legal conclusion. Lacks foundation. Calls for
01:15:10 21   speculation. It's an incomplete hypothetical.
01:15:12 22     THE WITNESS: I don't have the visitor's
01:15:16 23   confidentiality agreement in front of me. I can't
01:15:18 24   remember.
01:15:18 25   BY MS. RHYU:
```

### Page 121

```
01:15:18  1     Q. You just can't remember?
01:15:19  2     A. No.
01:15:27  3     Q. I'm handing you what was previously marked as
01:15:29  4   Exhibit 30.
01:15:29  5     (Previously marked Exhibit 30 was
01:15:40  6     presented to the witness.)
01:15:40  7   BY MS. RHYU:
01:15:41  8     Q. This exhibit bears the date February 14th,
01:15:46  9   1989. Were you still at Cetus February 14th, 1989?
01:15:51 10     A. I think I left on that date or the next day.
01:15:55 11   But as I'm -- as I mentioned, it could have been March
01:15:58 12   14th or 15th. But I think actually it was February, but
01:16:01 13   I'm not positive. It was either that day or the day
01:16:04 14   after or a month later.
01:16:05 15     Q. So Exhibit 30 is a confidential -- Visitor's
01:16:09 16   Confidentiality Agreement with Dr. Mark Holodniy. Do
01:16:13 17   you recognize this agreement aside from any preparation
01:16:16 18   that you did for today's deposition?
01:16:19 19     A. No.
01:16:24 20     Q. Do you think you might have reviewed it prior
01:16:26 21   to its execution?
01:16:28 22     MR. BOOZELL: Calls for speculation. Lacks
01:16:30 23   foundation.
01:16:34 24     THE WITNESS: No.
01:16:34 25   BY MS. RHYU:
```

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 206

```
04:04:49  1    Q. So merely from knowing the subject matter of a
04:04:52  2  patent and -- strike that.
04:04:56  3        Merely from knowing that the patent relates to
04:04:59  4  the use of PCR on HIV sequences and knowing that that
04:05:11  5  patent was issued to Tom Merigan, based on that
04:05:16  6  information, it wouldn't have been enough for you to
04:05:20  7  think to yourself this patent should fall under a
04:05:26  8  consulting agreement that Tom Merigan had with Cetus?
04:05:29  9        MR. BOOZELL: Vague and ambiguous. Misstates
04:05:31 10  his testimony. Calls for a legal conclusion.
04:05:34 11  Incomplete hypothetical.
04:05:36 12        THE WITNESS: As I'm sure you know, everything
04:05:38 13  about how to answer that question would depend on the
04:05:41 14  timing of the supposed discovery or invention of Tom
04:05:46 15  Merigan and its relationship to his consulting
04:05:50 16  arrangement with Cetus and/or Roche. Without your being
04:05:54 17  more specific, I can't tell you how I would form an
04:05:57 18  opinion. But I would certainly have to know the content
04:06:00 19  of such a putative invention or the content of the
04:06:04 20  patent application and the filing date and the claims of
04:06:09 21  the application relative to work I knew was under --
04:06:14 22  being undergone at Cetus during the relevant time period
04:06:17 23  or before.
04:06:17 24  BY MS. RHYU:
04:06:20 25    Q. You understood that these patents were owned by
```

Page 207

```
04:06:22  1  Stanford, correct?
04:06:22  2        MR. BOOZELL: Vague and ambiguous. Calls for a
04:06:25  3  legal conclusion. Assumes facts not in evidence.
04:06:27  4        THE WITNESS: I didn't understand that and --
04:06:31  5  when you handed them to me, but if it says on here who
04:06:35  6  owns them or to whom they're assigned, which I don't see
04:06:40  7  here anywhere, but I'm assuming they were assigned to
04:06:43  8  Stanford, but I don't see that in here anywhere. Are
04:06:47  9  you --
04:06:49 10  BY MS. RHYU:
04:06:49 11    Q. On the first page? Which patent are you
04:06:51 12  looking at?
04:06:52 13    A. I'm looking at the '128. Oh, assignee, Leland
04:07:00 14  Stanford Junior. So looking at this, I see that all
04:07:03 15  four of them have been assigned to Stanford University.
04:07:07 16  So if your question is do I assume that Stanford owns
04:07:11 17  these patents, I would say yes, unless someone else has
04:07:14 18  bought them from Stanford.
04:07:16 19    Q. You didn't understand that Roche owned these
04:07:18 20  patents?
04:07:19 21        MR. BOOZELL: It's vague and ambiguous and
04:07:21 22  calls for a legal conclusion. Calls for speculation.
04:07:24 23  Lacks foundation. It's an incomplete hypothetical.
04:07:24 24  BY MS. RHYU:
04:07:32 25    Q. I mean at the time that you became aware of one
```

Page 208

```
04:07:35  1  of these patents, at that time you wouldn't have
04:07:37  2  understood that Roche owned the patents?
04:07:39  3        MR. BOOZELL: Same objections.
04:07:39  4        THE WITNESS: That question cannot be answered
04:07:42  5  the way you phrased it. I've told you I cannot remember
04:07:46  6  reading the application at the time I became aware of
04:07:48  7  it. And without that information, I would be able to
04:07:52  8  form no opinion on whether or not Roche or Cetus
04:07:58  9  deserved ownership of it or owned it. I'd have to look
04:08:02 10  at the list of inventors and the assignees, and I'd have
04:08:06 11  to know something about Roche's discussions with
04:08:08 12  Stanford. So I don't know the answer to your question.
04:08:08 13  BY MS. RHYU:
04:08:25 14    Q. Did you -- well, you did say that it was likely
04:08:33 15  that you were aware of at least one of these patents,
04:08:37 16  the '128, the '268 or the '086 prior to -- even prior to
04:08:43 17  working at Celera, correct?
04:08:46 18    A. I don't know if I said likely or possible.
04:08:47 19    Q. You said likely.
04:08:48 20        MR. BOOZELL: Let him finish his answer,
04:08:51 21  please, and misstates his testimony.
04:08:51 22  BY MS. RHYU:
04:08:54 23    Q. If you want to change that now, go ahead.
04:08:56 24        MR. BOOZELL: It's argumentative and
04:08:58 25  mischaracterizes his testimony. Let him finish his
```

Page 209

```
04:09:00  1  answer.
04:09:01  2        THE WITNESS: I cannot remember reading either
04:09:02  3  of these applications. I said it was a common practice
04:09:06  4  of mine to try to stay in touch with applications filed
04:09:12  5  by other parties on projects on which Roche was working.
04:09:12  6  I do not remember reading either of the applications,
04:09:15  7  and your line of questioning is to ask me what I thought
04:09:17  8  of applications that I have told you I cannot remember
04:09:19  9  reading. So it's extremely difficult to answer a
04:09:23 10  question about something I've already told you I cannot
04:09:25 11  remember.
04:09:25 12  BY MS. RHYU:
04:09:28 13    Q. I'm handing you an exhibit that was previously
04:09:31 14  marked 554.
04:09:31 15        (Previously marked Exhibit 554 was
04:09:44 16         presented to the witness.)
04:09:44 17  BY MS. RHYU:
04:09:44 18    Q. Do you recognize Exhibit 554?
04:09:46 19        MR. BOOZELL: I instruct you not to answer to
04:09:48 20  the extent it would reveal attorney-client privileged
04:09:51 21  communications or work product.
04:09:53 22        THE WITNESS: I do.
04:09:53 23  BY MS. RHYU:
04:10:06 24    Q. What is it?
04:10:13 25    A. It's a letter from a senior licensing associate
```

Page 210

```
04:10:16  1   at Stanford University to Tom MacMahon, the president of
04:10:19  2   LabCorp.
04:10:20  3       Q. And how do you recognize it? When did you see
04:10:26  4   it before?
04:10:27  5       MR. BOOZELL: I instruct you not to answer to
04:10:28  6   the extent it calls for attorney-client privilege and
04:10:31  7   work product. Otherwise you can answer.
04:10:33  8       THE WITNESS: Well, I don't recall it today,
04:10:36  9   but I can see that the handwritten notes in the upper
04:10:39 10   right-hand corner are my writing.
04:10:48 11   BY MS. RHYU:
04:10:48 12       Q. And are you referring to the handwritten notes
04:10:51 13   that -- actually, maybe I could ask you to read them
04:10:56 14   since it's your handwriting.
04:11:00 15       A. Well, the date is cut off, but I'm assuming
04:11:03 16   it's 10/8/98. That's an assumption. And then it says
04:11:11 17   "cc: Sias, Petry, Meyers, Finckh, Sninsky." And then
04:11:16 18   below that it says "FYI" with a colon and then my name.
04:11:20 19   And below that it says "I'll let you know what LabCorp
04:11:23 20   does."
04:11:29 21       Q. Does the cc list there indicate that you
04:11:34 22   forwarded Exhibit 554, the letter, to the people listed
04:11:40 23   on the cc list somewhere around October 8 of 1998?
04:11:48 24       A. No, it doesn't. It indicates an intention to
04:11:51 25   do that but ordinarily when it's been done, I draw a
```

Page 211

```
04:11:55  1   line through the cc list to indicate that it's actually
04:11:57  2   been done. It doesn't mean that it hadn't been done,
04:12:01  3   but my practice is to draw a line through it when it has
04:12:04  4   been done.
04:12:08  5       Q. Can you think of any reason why you would not
04:12:11  6   have forwarded it after -- forwarded the letter after
04:12:15  7   writing the cc list on there?
04:12:16  8       MR. BOOZELL: Vague and ambiguous. Calls for
04:12:18  9   speculation.
04:12:28 10       THE WITNESS: I don't know whether I gave them
04:12:31 11   copies or not. I might have or I might have forgotten
04:12:37 12   to.
04:12:37 13   BY MS. RHYU:
04:12:40 14       Q. Do you know how you obtained this letter?
04:12:48 15       A. Well, I'm not one of the copies on it, so I
04:12:52 16   might have received it from Mr. MacMahon.
04:13:02 17       Q. Can you think of any other way that you would
04:13:04 18   have received the letter, Exhibit 554?
04:13:08 19       MR. BOOZELL: Vague and ambiguous. Calls for
04:13:10 20   speculation. Lacks foundation.
04:13:11 21       THE WITNESS: I would just be speculating. If
04:13:14 22   I got a letter to Mr. MacMahon, it was probably from
04:13:17 23   Mr. MacMahon.
04:13:17 24   BY MS. RHYU:
04:13:20 25       Q. Do you know what the date stamp October 8th
```

Page 212

```
04:13:22  1   that's right next to the note FYI, do you know where
04:13:29  2   that date stamp would have come from?
04:13:31  3       A. No.
04:13:40  4       Q. Is it your practice to date stamp documents on
04:13:45  5   sending them to other parties, to other individuals?
04:13:50  6       MR. BOOZELL: Vague and ambiguous.
04:13:55  7       THE WITNESS: No.
04:13:55  8   BY MS. RHYU:
04:13:56  9       Q. Was that your practice back in 1998?
04:13:59 10       A. No.
04:13:59 11       MR. BOOZELL: Same.
04:14:00 12       THE WITNESS: I wrote 10-8 something at the
04:14:03 13   top. That was the date at which I believe I read this
04:14:06 14   and made the note at the top. But the date stamp is not
04:14:15 15   mine. I don't use a date stamp.
04:14:15 16   BY MS. RHYU:
04:14:17 17       Q. The people listed on the cc list, are all of
04:14:20 18   these people employees, or were they all employees of
04:14:24 19   Roche Molecular Systems on or about October 1st, 1998?
04:14:34 20       A. I believe Sias, Petry, Myers and Sninsky were
04:14:39 21   employees of Roche Molecular Systems. Finckh might have
04:14:43 22   been or he could have been a member of Roche Biochemical
04:14:52 23   Sciences. I can't remember.
04:14:53 24       Q. And who was Finckh?
04:14:56 25       A. He was a scientist who worked for Roche at
```

Page 213

```
04:15:02  1   their laboratory site in Germany who had come to the
04:15:06  2   U.S. to work with Tom Myers.
04:15:12  3       Q. Were any of these people working on PCR assays
04:15:16  4   for monitoring antiviral therapy?
04:15:23  5       MR. BOOZELL: Vague and ambiguous.
04:15:23  6       THE WITNESS: Yes.
04:15:23  7   BY MS. RHYU:
04:15:32  8       Q. Who was working on that subject matter among
04:15:37  9   the cc list?
04:15:38 10       MR. BOOZELL: Same objections.
04:15:40 11       THE WITNESS: Well, Myers and Finckh and
04:15:45 12   Sninsky as the head of research, and myself as head of
04:15:49 13   research and development.
04:15:51 14       MS. RHYU: We need to take a quick break to
04:15:53 15   change the video.
04:15:58 16       THE WITNESS: Okay.
04:15:58 17       VIDEO OPERATOR: The time is 4:15 p.m. We're
04:16:01 18   going off the record and this is the completion of media
04:16:03 19   No. 3.
04:19:42 20       (Recess.)
04:19:54 21       VIDEO OPERATOR: The time is 4:19 p.m. We're
04:20:00 22   back on the record and this will be the beginning of
04:20:02 23   media No. 4 in the deposition of Dr. Thomas White.
04:20:02 24   BY MS. RHYU:
04:20:07 25       Q. Did anyone at Roche Molecular Systems work on
```

Page 214

```
04:20:18  1   PCR assays for monitoring antiviral therapy and making
04:20:22  2   therapeutic decisions in the treatment of AIDS
04:20:28  3   specifically relating to detection of mutations in
04:20:33  4   reverse transcriptase in the October 1998 time frame?
04:20:39  5       MR. BOOZELL: Vague and ambiguous. Compound.
04:20:40  6   Calls for speculation.
04:20:45  7       THE WITNESS: I'm not so sure about the Codons
04:20:50  8   mentioned in this letter here, but otherwise the answer
04:20:53  9   to your question is yes.
04:20:53 10   BY MS. RHYU:
04:21:00 11      Q. Upon receipt of this letter, is it likely that
04:21:04 12   you read it?
04:21:06 13      A. Yes.
04:21:08 14      Q. Were you concerned that the patents might be --
04:21:24 15   might have related -- strike that.
04:21:31 16      Why did you consider sending copies of this
04:21:35 17   letter to the people listed on that cc list?
04:21:39 18      MR. BOOZELL: Vague and ambiguous. Calls for
04:21:40 19   speculation.
04:21:45 20      THE WITNESS: Well, Tom MacMahon was an
04:21:47 21   important customer of Roche's, and he'd received this
04:21:52 22   letter from Stanford informing him of the existence of
04:21:57 23   these two patents, which probably had a bearing on the
04:22:01 24   kinds of home brew resistance test sequencing that
04:22:08 25   LabCorp was offering. And since he was kind enough to
```

Page 215

```
04:22:13  1   give me a copy of the letter, for information purposes I
04:22:18  2   copied it to Dr. Sias, who was a director of licensing
04:22:22  3   at Roche, to Doug Petry, who was in the law department,
04:22:27  4   since I thought they should be aware that MacMahon had
04:22:30  5   received this letter. And to Myers, Finckh and Sninsky
04:22:34  6   because they were working on a DNA chip base method that
04:22:41  7   could potentially be used to type the virus and make
04:22:44  8   treatment decisions. And then as I say here, I'll let
04:22:48  9   you know what LabCorp does, assuming MacMahon saw fit to
04:22:52 10   let me know what he did.
04:22:59 11   BY MS. RHYU:
04:22:59 12      Q. So you mentioned that you don't have a line
04:23:02 13   through this cc list here. Given the concerns that you
04:23:09 14   just articulated, do you think you would have tried to
04:23:14 15   ensure that this letter was indeed forwarded to people
04:23:21 16   at RMS?
04:23:23 17      MR. BOOZELL: Vague and ambiguous. Misstates
04:23:24 18   his testimony and calls for speculation. Lacks
04:23:27 19   foundation.
04:23:28 20      THE WITNESS: Well, it's clearly my intention
04:23:30 21   that a copy should go to the five people that are named
04:23:33 22   there. I would say it's probable that they got a copy
04:23:36 23   of it. But the fact that it's not crossed out departs
04:23:42 24   from my usual practice of indicating when the copies
04:23:46 25   actually had been sent.
```

Page 216

```
04:23:46  1   BY MS. RHYU:
04:23:50  2      Q. Did you cross names out when you were just
04:23:52  3   forwarding notes to people also? So if you received a
04:23:56  4   letter and you wanted to forward it to someone else and
04:23:59  5   wrote on that a note to the person that you were
04:24:03  6   forwarding the letter to, would you have crossed that
04:24:06  7   out also, or does that practice only apply to cc's?
04:24:10  8      MR. BOOZELL: Vague and ambiguous, and
04:24:11  9   compound.
04:24:12 10      THE WITNESS: If you're referring to forwarding
04:24:14 11   the original of a document like a letter to other people
04:24:18 12   to read?
04:24:19 13   BY MS. RHYU:
04:24:20 14      Q. Yes.
04:24:20 15      A. Is that your question?
04:24:22 16      Q. Yes.
04:24:23 17      A. In that instance I would not have written the
04:24:27 18   letters "cc," I would have written in my customary
04:24:30 19   practice "circulate," and then the names of the people.
04:24:32 20   And if I wanted to get a copy of it back at the -- if I
04:24:36 21   wanted it back at the end, I'd put my own name at the
04:24:39 22   bottom of the list. If I didn't care, I wouldn't, and I
04:24:41 23   would have no further information about whether they got
04:24:44 24   it or read it.
04:24:45 25      Q. And if it was a letter that you didn't draft,
```

Page 217

```
04:24:48  1   but a letter that you received and you wanted to forward
04:24:51  2   that to just one other person --
04:24:55  3      A. That's what I was referring to in the previous
04:24:57  4   answer.
04:24:57  5      Q. That is what you're referring to. Okay.
04:24:59  6      A. My own letters I would send directly to someone
04:25:02  7   and/or copy them on it. You talked about forwarding. I
04:25:06  8   thought you meant forwarding a letter I received rather
04:25:11  9   than one that originated with me.
04:25:13 10      Q. Upon receiving and reading the letter in
04:25:17 11   Exhibit 554, is it likely that you would have read the
04:25:22 12   patents referred to in the letter?
04:25:24 13      MR. BOOZELL: Misstates his testimony. It's
04:25:26 14   vague and ambiguous.
04:25:29 15      THE WITNESS: As I said earlier when you asked
04:25:31 16   me about the patent specifically in these four, which
04:25:34 17   two of them are listed here, it's possible that I read
04:25:37 18   them, but I don't recall reading them. And in any
04:25:46 19   event, the letter was not to Roche, it was to Tom
04:25:49 20   MacMahon, so the action that I indicated I would take is
04:25:52 21   to let those five people know what LabCorp had decided
04:25:56 22   to do. And by copying it to Petry, who was in the law
04:26:01 23   department, I assumed he would read them. So it was
04:26:06 24   part of my role as head of R&D, you know, to provide
04:26:11 25   advice to the legal department at Roche in terms of
```

55 (Pages 214 to 217)

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 218

```
04:26:14  1   making assessments of third party intellectual property
04:26:20  2   and/or licensing decisions.
04:26:22  3       BY MS. RHYU:
04:26:22  4       Q. Do you recall whether you followed up with Tom
04:26:27  5   MacMahon as to what LabCorp decided to do about these
04:26:31  6   patents?
04:26:31  7       A. No.
04:26:34  8       Q. Do you know that LabCorp has a license to these
04:26:39  9   patents today?
04:26:40 10       A. No.
04:26:41 11       Q. In 1998, did Roche have any relationship with
04:26:49 12   LabCorp in the -- in the sense of a business
04:26:58 13   relationship aside from the licensing relationship?
04:27:04 14       MR. BOOZELL: Vague.
04:27:04 15       MS. RHYU: Let me try that again. Let me try
04:27:06 16   that again.
04:27:08 17       Q. Did Roche have -- did Roche appoint members to
04:27:16 18   the LabCorp board in the 1998 time frame?
04:27:20 19       MR. BOOZELL: Vague and ambiguous. Calls for
04:27:22 20   speculation.
04:27:25 21       THE WITNESS: I don't know how to answer that
04:27:27 22   question. Are you referring to LabCorp's board of
04:27:29 23   directors?
04:27:30 24       BY MS. RHYU:
04:27:30 25       Q. Yes.
```

Page 219

```
04:27:32  1       MR. BOOZELL: Same objections.
04:27:35  2       THE WITNESS: I think Jean-Luc Belingard, who
04:27:40  3   replaced MacMahon as the head of the diagnostics
04:27:44  4   division, I think he's on the board of directors of
04:27:51  5   LabCorp, but I don't know when he was appointed. It
04:27:55  6   could have been well before that.
04:27:57  7       BY MS. RHYU:
04:27:59  8       Q. Was there a point at which LabCorp and Roche --
04:28:07  9   was there a point at which Roche had an ownership
04:28:11 10   interest in LabCorp?
04:28:13 11       MR. BOOZELL: Vague and ambiguous. Calls for a
04:28:14 12   legal conclusion. Calls for speculation.
04:28:19 13       THE WITNESS: Roche owned the predecessor of
04:28:22 14   LabCorp, and I believe at some point they owned -- had
04:28:28 15   an ownership interest in the successor -- sorry. Roche
04:28:35 16   owned Roche Biomedical Laboratories. That grew, as I
04:28:41 17   mentioned earlier. Roche had a subsequent ownership
04:28:44 18   interest in whatever RBL grew into, and I think that
04:28:49 19   might have extended to the point of having partial
04:28:53 20   ownership of LabCorp. But the acquisition and merger
04:29:00 21   activities of LabCorp are not something that I'm
04:29:02 22   familiar with in any detail. But I think the short
04:29:06 23   answer to your question is at some point Roche had an
04:29:09 24   ownership interest in LabCorp.
04:29:11 25       BY MS. RHYU:
```

Page 220

```
04:29:11  1       Q. Did you understand in the October '98 time
04:29:14  2   frame that Roche had an obligation to LabCorp to assist
04:29:21  3   them in determining whether assays that LabCorp was
04:29:29  4   developing potentially infringed existing patents?
04:29:41  5       MR. BOOZELL: Vague and ambiguous.
04:29:42  6       THE WITNESS: I don't think Roche had any such
04:29:44  7   obligation to LabCorp about LabCorp's commercial
04:29:48  8   business. If Roche was selling LabCorp a product and it
04:29:58  9   carried certain rights with it, those rights would be
04:30:01 10   carried as part of the label license to LabCorp or any
04:30:05 11   other customer.
04:30:05 12       BY MS. RHYU:
04:30:13 13       Q. Do you remember discussing these Stanford
04:30:22 14   patents listed in Exhibit 554 with Tom MacMahon?
04:30:38 15       A. I don't, but it's possible that MacMahon handed
04:30:42 16   me a copy of this thing. I can't remember how I got it.
04:30:50 17       Q. And you're referring to the letter when you say
04:30:52 18   "this thing"?
04:30:53 19       A. I'm referring to Exhibit 554, yes.
04:30:55 20       Q. Is it possible that he also handed you the
04:30:58 21   attached copies of the '268 and the '128 patents as
04:31:04 22   referred to in the letter?
04:31:06 23       MR. BOOZELL: Vague and ambiguous. Calls for
04:31:07 24   speculation.
04:31:08 25       THE WITNESS: I don't recall, but I think
```

Page 221

```
04:31:11  1   that's unlikely.
04:31:11  2       BY MS. RHYU:
04:31:22  3       Q. Do you recall having any discussions with any
04:31:23  4   of the people on the cc list relating to the patents
04:31:32  5   listed on this -- in this letter?
04:31:35  6       MR. BOOZELL: If the answer is yes to either of
04:31:37  7   the first two people, I instruct you not to answer other
04:31:40  8   than saying yes. Don't reveal any of the communications
04:31:44  9   you had with Dr. Sias or Doug Petry in response to
04:31:47 10   counsel's question.
04:31:53 11       THE WITNESS: Your question is subsequent to
04:31:54 12   this letter, do I recall having any conversations with
04:31:57 13   any of those five people about it?
04:32:00 14       BY MS. RHYU:
04:32:00 15       Q. Yes.
04:32:00 16       A. No.
04:32:32 17       Q. I'm handing you what was previously marked as
04:32:35 18   Exhibit 683.
04:32:35 19       (Previously marked Exhibit 683 was
04:32:35 20       presented to the witness.)
04:32:35 21       BY MS. RHYU:
04:32:47 22       Q. So Exhibit 683 is a privilege log that was
04:32:53 23   produced to Stanford by Roche, by Roche's attorneys.
04:32:58 24   And a privilege log, in case you're not aware, is a log
04:33:06 25   that parties produce that lists documents which the
```

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

5c32c821-d654-4901-8e94-8148bc440213

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 222

```
04:33:12  1  producing party claims are subject to certain
04:33:17  2  privileges, so that the party's claiming that they don't
04:33:22  3  have to turn over the document because the substance of
04:33:24  4  the document contains privileged information. But
04:33:27  5  because of the rules that we conduct litigation by, the
04:33:33  6  party is obligated to identify the information that's
04:33:38  7  listed here to describe what that document is.
04:33:46  8        Do you follow me?
04:33:48  9     A. So far.
04:33:48 10     Q. Okay. So I'd like you to turn to page -- I
04:33:53 11  believe it's page 7. And I'm wrong, it's page 9 of
04:34:09 12  Exhibit 683. And look at the entries dated 12/15/1999.
04:34:23 13  There are two such entries.
04:34:25 14        The first entry identifies a document dated
04:34:30 15  12/15/1999 that is from a D. Petry. The recipients
04:34:37 16  named are T. White, J. Sninsky, S. Sias, K. Ordonez, V.
04:34:43 17  Lee and M. Griffith. The privilege -- the privileges
04:34:48 18  asserted are AC, attorney-client privilege, and WP, work
04:34:53 19  product privilege. And the description of the document
04:34:55 20  is "Memorandum reflecting attorney-client communication
04:34:58 21  and attorney work product regarding U.S. Patent No's,"
04:35:02 22  and then it lists the '730, the '086, the '128 and the
04:35:08 23  '268 patents.
04:35:10 24        Do you see that line?
04:35:12 25     A. Yes.
```

Page 223

```
04:35:15  1     Q. Do you recall a memorandum circulated around
04:35:22  2  December 1999 relating to these listed patents?
04:35:31  3     A. No.
04:35:31  4        MR. BOOZELL: You can answer that yes or no.
04:35:41  5  BY MS. RHYU:
04:35:41  6     Q. You have no recollection at all of receiving
04:35:45  7  any memorandum in the 1999 time frame relating to the
04:35:54  8  '730, the '086, the '128 and '268 patents?
04:35:59  9        MR. BOOZELL: Asked and answered, and it's
04:36:01 10  vague and ambiguous. And you can answer that yes or no.
04:36:08 11        THE WITNESS: You started -- I have no
04:36:09 12  recollection. Is that the way you're -- yeah, it's
04:36:12 13  correct, I have no recollection of receiving a
04:36:15 14  memorandum of that description on page 9.
04:36:15 15  BY MS. RHYU:
04:36:22 16     Q. Do you recall any meetings taking place that
04:36:39 17  discuss the subject matter of the patents, the '730,
04:36:47 18  '086, '128 and/or the '268 patents?
04:36:50 19        MR. BOOZELL: It's compound. It's vague and
04:36:53 20  ambiguous, and you can answer yes or no.
04:37:02 21        THE WITNESS: No.
04:37:02 22  BY MS. RHYU:
04:37:02 23     Q. Do you recall discussing any of these patents
04:37:05 24  with Doug Petry or any of the other individuals listed
04:37:10 25  on the recipient's list?
```

Page 224

```
04:37:12  1        MR. BOOZELL: Vague and ambiguous. Compound.
04:37:14  2  You can answer yes or no.
04:37:17  3        THE WITNESS: No.
04:37:17  4  BY MS. RHYU:
04:37:32  5     Q. Was Doug Petry a patent agent at Roche?
04:37:37  6     A. I believe he was a patent agent in the law
04:37:40  7  department at Roche Molecular Systems.
04:37:47  8     Q. Do you know if he undertook analyses of patents
04:37:55  9  in his role as a Roche patent agent?
04:38:02 10        MR. BOOZELL: You can answer that yes or no.
04:38:07 11        THE WITNESS: Well, that would have been
04:38:10 12  consistent with his responsibilities. I don't recall
04:38:11 13  specifically if he did or didn't.
04:38:14 14  BY MS. RHYU:
04:38:15 15     Q. Do you recall receiving any memoranda, not just
04:38:21 16  this one, but any memoranda about any patents drafted by
04:38:26 17  Doug Petry?
04:38:27 18        MR. BOOZELL: Vague and ambiguous. You can
04:38:31 19  answer yes or no.
04:38:38 20        THE WITNESS: Could you read the question back
04:38:40 21  again?
04:38:52 22        (Record read as follows:
04:38:52 23        "QUESTION: Do you recall receiving
04:38:52 24     any memoranda, not just this one, but any
04:38:52 25     memoranda about any patents drafted by Doug
```

Page 225

```
04:38:54  1     Petry?")
04:38:54  2        THE WITNESS: I have no specific recollection
04:38:55  3  of receiving any memoranda from Doug Petry about patents
04:39:03  4  that he assessed. Is that your question?
04:39:06  5  BY MS. RHYU:
04:39:07  6     Q. Yes. In the 1999 time frame, what was your
04:39:11  7  title at Roche Molecular Systems?
04:39:15  8     A. I think it was senior vice president of
04:39:16  9  research and development.
04:39:21 10     Q. At that time, were you involved generally in
04:39:25 11  assessing or evaluating patents which may potentially be
04:39:41 12  asserted against Roche?
04:39:44 13        MR. BOOZELL: It's vague and ambiguous.
04:39:48 14        THE WITNESS: As part of my responsibility as
04:39:51 15  head of R&D, at the request of the law department I
04:39:55 16  would sometimes provide them with my opinion on various
04:40:03 17  matters in order for them to make a legal assessment and
04:40:08 18  advise management of their assessment. I only provided
04:40:12 19  scientific assessment.
04:40:12 20  BY MS. RHYU:
04:40:17 21     Q. And you say you would sometimes -- sometimes
04:40:19 22  provide them with your opinion. Under what
04:40:24 23  circumstances were you requested to provide an opinion
04:40:30 24  on assessments of patents?
04:40:35 25        MR. BOOZELL: It's vague and ambiguous. It
```

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

5c32c821-d654-4901-8e94-8148bc440213

Page 246

```
05:14:22  1  BY MS. RHYU:
05:14:22  2     Q. Yes.
05:14:24  3        MR. BOOZELL: Same objections.
05:14:27  4        THE WITNESS: I didn't understand that, but I
05:14:29  5  could surmise it from the fact that he's a coauthor on
05:14:32  6  the paper with four scientists from Cetus.
05:14:32  7  BY MS. RHYU:
05:14:39  8     Q. And does looking at Exhibit 1 refresh your
05:14:42  9  recollection at all as to whether you had the
05:14:46 10  understanding that Dr. Holodniy was a visiting scientist
05:14:57 11  at Cetus?
05:15:10 12     A. Exhibit 1 does not refresh my memory on that
05:15:15 13  subject.
05:15:19 14     Q. Were you a member of the patent committee at
05:15:25 15  Cetus?
05:15:26 16        MR. BOOZELL: It's vague and ambiguous.
05:15:30 17        THE WITNESS: You asked me that question
05:15:32 18  before. What I said was that there was a group of
05:15:34 19  people who met at Cetus to discuss patents and invention
05:15:39 20  disclosures, etcetera, and that I would have
05:15:42 21  participated in some of those discussions.
05:15:42 22  BY MS. RHYU:
05:15:47 23     Q. I'm sorry, I thought that the prior questioning
05:15:48 24  was related to a patent committee at Roche.
05:15:51 25     A. Oh, I thought it was at Cetus, but maybe you
```

Page 247

```
05:15:54  1  could check.
05:15:55  2     Q. All right. Sorry. I'll check that later. But
05:15:57  3  at Cetus you did participate --
05:16:02  4     A. While I was employed there, yes, mostly up
05:16:07  5  through 1987. And I don't believe that was the case in
05:16:12  6  1988 and would not have been the case from '89 to '91.
05:16:18  7     Q. When you did participate, was there a system in
05:16:30  8  place of ranking invention disclosures that were
05:16:34  9  submitted by Cetus scientists?
05:16:43 10        MR. BOOZELL: It's vague and ambiguous.
05:16:45 11        THE WITNESS: I think there was a rough system
05:16:46 12  of ranking things in terms of whether something should
05:16:50 13  be filed on right away or held for more information or
05:16:56 14  potentially published because it was already covered, or
05:17:03 15  held as know-how and never published, or held as
05:17:12 16  confidential information because it was too early to
05:17:15 17  determine that and might be revisited later.
05:17:15 18  BY MS. RHYU:
05:17:20 19     Q. And do you recall that the ranking system
05:17:22 20  ranked invention disclosures with a number between 1 and
05:17:27 21  5?
05:17:27 22     A. That sounds right, but I can't remember if it
05:17:29 23  was from 1 to 10 or 1 to 3 or whatever. But there was
05:17:33 24  some -- some such number. I know 1 was the most
05:17:37 25  important.
```

Page 248

```
05:17:37  1     Q. And an invention disclosure that attained the
05:17:40  2  rank of 1 was a disclosure that Cetus would file a
05:17:44  3  patent on?
05:17:47  4        MR. BOOZELL: Vague and ambiguous. Misstates
05:17:48  5  his testimony.
05:17:50  6        THE WITNESS: Well, any invention disclosure
05:17:55  7  that -- or any other subject that came up for
05:17:58  8  consideration in the meeting, which could also include
05:18:03  9  foreign filings or continuations in part, other things,
05:18:06 10  if it was ranked 1, it was simply given the highest
05:18:10 11  priority for action by the law department. That could
05:18:14 12  include filing a patent application, but it could
05:18:16 13  include, as I said, a continuation in part or any of
05:18:23 14  several other things that had to do with patent
05:18:25 15  prosecutions and filings. So I think that answered your
05:18:29 16  question.
05:18:29 17  BY MS. RHYU:
05:18:29 18     Q. What did the lowest rank indicate?
05:18:33 19        MR. BOOZELL: Vague and ambiguous. Calls for
05:18:35 20  speculation. It's overbroad. It's an incomplete
05:18:42 21  hypothetical.
05:18:42 22        THE WITNESS: There were several different
05:18:43 23  rankings, as I replied earlier, and the lower of the
05:18:48 24  ranks could indicate that the committee thought the
05:18:52 25  material had already been covered, there was not enough
```

Page 249

```
05:18:56  1  information to make a decision at that meeting or
05:18:58  2  something to be revisited, or something to be published
05:19:02  3  because it had already been published and it was time to
05:19:05  4  publish it, or to publish it in order to get it into the
05:19:09  5  public domain or to be retained as know-how and/or
05:19:12  6  confidential material. So the 5 -- sometimes people
05:19:17  7  interpret that as meaning it was freedom to publish, but
05:19:21  8  that wasn't the only meaning of the designation.
05:19:24  9  BY MS. RHYU:
05:19:25 10     Q. But if something that's designated at the
05:19:27 11  lowest rank, say 5, and it was published, is it fair to
05:19:32 12  say that that ranking -- is it fair to say that that
05:19:38 13  disclosure was one that the patent committee felt was
05:19:48 14  okay to make public without -- without having any
05:19:55 15  further action with respect to filing the patent?
05:19:58 16        MR. BOOZELL: It's vague and ambiguous. Calls
05:20:00 17  for speculation. Lacks foundation. It's an incomplete
05:20:03 18  hypothetical.
05:20:03 19        THE WITNESS: No.
05:20:03 20  BY MS. RHYU:
05:20:06 21     Q. Why not?
05:20:07 22        MR. BOOZELL: Same objections.
05:20:08 23        THE WITNESS: Well, as I mentioned earlier, it
05:20:11 24  could mean any of four or five different things
05:20:13 25  including retaining the information as confidential;
```

Page 270

1
2      I, the undersigned, a Certified Shorthand
3   Reporter of the State of California, do hereby certify:
4      That the foregoing proceedings were taken
5   before me at the time and place herein set forth; that
6   any witnesses in the foregoing proceedings, prior to
7   testifying, were placed under oath; that a verbatim
8   record of the proceedings was made by me using machine
9   shorthand which was thereafter transcribed under my
10  direction; further, that the foregoing is an accurate
11  transcription thereof.
12     I further certify that I am neither
13  financially interested in the action nor a relative or
14  employee of any attorney of any of the parties.
15     IN WITNESS WHEREOF, I have this date
16  subscribed my name.
17
18     Dated: _____
19
20
21
22  _____
     SUZANNE F. BOSCHETTI
23   CSR No. 5111
24
25