**HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

THE BOARD OF TRUSTEES OF THE
LELAND STANFORD JUNIOR
UNIVERSITY,
            Plaintiff,
        vs.                    No. C-05-04158-MHP
ROCHE MOLECULAR SYSTEMS, INC.,
et al.,

            Defendants.

AND RELATED COUNTERCLAIM.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
VIDEOTAPED DEPOSITION OF JOHN J. SNINSKY, Ph.D.
Redwood Shores, California
Thursday, July 27, 2006

Reported by:
GINA GLANTZ
CSR No. 9795, RPR, RMR
JOB No. 3-50827

**Page 2**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

THE BOARD OF TRUSTEES OF THE
LELAND STANFORD JUNIOR
UNIVERSITY,
            Plaintiff,
        vs.                    No. C-05-04158-MHP
ROCHE MOLECULAR SYSTEMS, INC.,
ROCHE DIAGNOSTICS CORPORATION;
ROCHE DIAGNOSTICS OPERATIONS,
INC.; ROCHE DIAGNOSTICS SYSTEMS, INC.,

            Defendants.

AND RELATED COUNTERCLAIM.

Videotaped Deposition of JOHN J. SNINSKY, Ph.D., taken on behalf of Plaintiff and Counterclaim Defendants, at 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California, beginning at 9:37 a.m. and ending at 6:01 p.m., on Thursday, July 27, 2006, before GINA GLANTZ, Certified Shorthand Reporter No. 9795.

**Page 2**

APPEARANCES:

For Plaintiff The Board of Trustees of The Leland Stanford Junior University and Counterclaim Defendants
Thomas Merigan and Mark Holodniy:

COOLEY GODWARD LLP
BY: MICHELLE S. RHYU, Ph.D.
Attorney at Law
Five Palo Alto Square, 3000 El Camino Real
Palo Alto, California 94306-2155
(650) 843-5000

For Defendants and Counterclaimants Roche Molecular Systems, Inc., et al., and the Witness:

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
BY: JEFFREY N. BOOZELL
Attorney at Law
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
(213) 624-7707

Also Present:

RHEA NERESIAN

Videographer:
RAY TYLER
SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
450 Sansome Street, Suite 1550
San Francisco, California 94111
(415) 274-9977

**Page 3**

INDEX

WITNESS                         EXAMINATION
JOHN J. SNINSKY, Ph.D.

    BY MS. RHYU                    10

EXHIBITS

DEPOSITION                          PAGE

532  Two-page document titled "Notice of        9
     Deposition of John Sninsky"

532A  Eight-page subpoena                        9

533  Eight-page curriculum vitae for John J.    23
     Sninsky, Ph.D. (JS 00001 - 8)

534  One-page letter dated April 10, 1991, to   62
     Jim Mullins from John J. Sninsky, Ph.D.
     (RMS 00776)

535  Fifteen-page document titled "PCR          72
     Diagnostics Collaborative Agreements
     Since 01 Jan 88" (RMS 00055 - 69)

536  Five-page article from Journal of          109
     Virology May 1987, titled "Identification
     of Human Immunodeficiency Virus Sequences
     by Using In Vitro Enzymatic Amplification
     and Oligomer Cleavage Detection" (RMS
     0064511 - 4515)

**Page 4**

**1 (Pages 1 to 4)**

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

1    Q   And did you work on particular projects during
2    your postdoc?
3    A   I worked with Dr. Stanley N. Cohen, and worked
4    on cloning and molecular virology.
5    Q   Dr. Cohen is a Nobel Laureate?
6    A   No, he's not, unfortunately.
7    Q   Dr. Cohen is a pioneer in molecular biology?
8    A   He is.
9    Q   And was he involved in the discovery of
10   restriction enzymes?
11   A   No, he was involved in the very first cloning
12   experiments with Dr. Herbert Boyer.
13   Q   And when you say "cloning experiments," what do
14   you mean by that?
15   A   The stitching together and propagation of DNA
16   from one organism into another.
17   Q   And does that term "cloning experiments"
18   encompass making plasmid DNAs?
19   A   Yes.
20   Q   Does it encompass inserting DNA sequences from
21   one organism into a plasmid vector DNA sequence?
22   A   Yes, it does.
23   Q   And did you do that, that kind of work, in the
24   19 -- during your postdoctoral fellowship between 1976
25   and 1980?

Page 25

1    A   Yes, I did.
2    Q   Was cloning into plasmid vectors a technique
3    that was widely known in 1980?
4        MR. BOOZELL:  Objection.  Vague and ambiguous,
5    calls for speculation, lacks foundation.
6        You can answer.
7        THE WITNESS:  When I was with Dr. Cohen, it was
8    relatively shortly after it was first described in the
9    literature, so it was becoming well known.
10   BY MS. RHYU:
11   Q   Did you work at Cetus while you were a
12   postdoctoral fellow?
13   A   There was a subsidiary of Cetus called Cetus
14   Palo Alto that I -- in some capacity, consultant,
15   advisor, before I accepted my position at the Albert
16   Einstein College of Medicine, but I can't now recall
17   exactly what that position was.
18   Q   Do you remember your first interaction with the
19   subsidiary of Cetus, Cetus Palo Alto?
20   A   It was with Dr. Cohen.
21   Q   What else do you remember about that first
22   interaction?
23   A   I've described to you everything I recall about
24   it.
25   Q   Do you remember if you met with someone from

Page 26

1    Cetus?
2    A   At that time, I only recall talking to
3    Dr. Cohen.
4    Q   And you recall being a consultant for Cetus
5    Palo Alto?
6    A   I'm not sure what capacity I was associated
7    with Cetus Palo Alto; it was a very brief period.  But
8    as soon as I took my academic position, I didn't have a
9    relationship with Cetus Palo Alto.
10   Q   When you say you were a consultant or acted in
11   some other capacity, were you giving information to
12   Cetus?
13       MR. BOOZELL:  Objection.  Vague and ambiguous,
14   misstates his testimony.
15       THE WITNESS:  I don't recall the capacity in
16   which I was with Cetus Palo Alto.  I provided them with
17   general information about cloning and molecular
18   virology.
19   BY MS. RHYU:
20   Q   Do you recall if they provided you any
21   information --
22       MR. BOOZELL:  Objection.  Vague, ambiguous.
23   BY MS. RHYU:
24   Q   -- during that time frame?
25   A   Nothing that I recall.

Page 27

1    Q   Did you meet anyone from Cetus in that time
2    frame, in the 1976 through 1980 time frame, prior to
3    becoming assistant professor at the Albert Einstein
4    College of Medicine?
5        MR. BOOZELL:  Objection.  Vague and ambiguous.
6        THE WITNESS:  I recall being introduced to Ron
7    Cape and Pete Farley and David Gelfand.
8    BY MS. RHYU:
9    Q   Were they Cetus employees at that time?
10   A   They were.
11   Q   So prior to going to Cetus, you were an
12   assistant professor at the Albert Einstein College of
13   Medicine; correct?
14       MR. BOOZELL:  Objection.  Vague and ambiguous.
15       THE WITNESS:  That's correct.
16   BY MS. RHYU:
17   Q   And what was your research area as assistant
18   professor at Albert Einstein?
19   A   The study of hepatitis B.
20   Q   And what did your study of hepatitis B entail?
21   A   It included the analysis of the genes and their
22   involvement in the pathogenesis of the virus, and its
23   role in the development of liver cancer.
24   Q   Did that work involve molecular cloning?
25   A   Yes, it did.

Page 28

7  (Pages 25 to 28)

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

1    Q  Did it involve the expression of RNA from
2  transcription vectors?
3    A  Yes, it did.
4    Q  Can you explain that to me?
5       MR. BOOZELL:  Objection.  Vague and ambiguous.
6       THE WITNESS:  What would you like me to
7  explain?
8  BY MS. RHYU:
9    Q  When -- when you say it -- your work with
10  hepatitis B involved the expression of RNA from
11  transcription vectors, can you just explain to me
12  what -- what RNA was expressed, from what transcription
13  vectors?
14       MR. BOOZELL:  Objection.  Vague and ambiguous,
15  complex, calls for a narrative.
16       Go ahead.
17       THE WITNESS:  In brief, we tried to express the
18  hepatitis B genes or proteins in bacteria, Escherichia
19  coli.
20  BY MS. RHYU:
21    Q  And did you do that by cloning DNA sequences
22  from the hepatitis B virus into a plasmid vector?
23    A  Yes, that's correct.
24    Q  And was the RNA transcript expressed from a
25  promoter that was in the plasmid vector?
Page 29

1    A  That's correct.
2    Q  And do you recall what promoters you used?
3    A  There were a combination of promoters that were
4  used, that included the chloramphenicol and tetracycline
5  promoters, as well as the promoter for the lactose gene.
6    Q  Did you ever use the T7 promoter at that stage,
7  prior to 1984 -- prior to 1985, I should say?
8    A  No.
9    Q  How about the SP6 promoter?
10    A  No.
11    Q  Were you successful in expressing hepatitis RNA
12  from a transcription vector?
13    A  Yes, I was.
14    Q  Was your lab the first lab to express foreign
15  RNA in a transcription -- from a transcription vector?
16    A  No.
17    Q  Was the technique of expressing RNA sequence
18  from a transcription vector a widely known technique as
19  of the mid-1980s?
20       MR. BOOZELL:  Vague and ambiguous, calls for
21  speculation, lacks foundation.
22       THE WITNESS:  I'm not sure I know what you mean
23  by "widely known."  It was familiar in the scientific
24  community.
25  BY MS. RHYU:
Page 30

1    Q  Meaning that scientists were generally using
2  those techniques?
3       MR. BOOZELL:  Same objections.
4       THE WITNESS:  Those techniques were really
5  immature at that time, so not all genes could be
6  expressed.
7  BY MS. RHYU:
8    Q  But a variety of genes had been expressed from
9  plasmid expression vectors?
10       MR. BOOZELL:  Same objections.
11       THE WITNESS:  Yes.
12  BY MS. RHYU:
13    Q  Their RNA transcripts were expressed from
14  plasmid vectors?
15    A  Yes.
16    Q  And that was in the mid-1980s?
17       MR. BOOZELL:  Objection.  Vague and ambiguous.
18       THE WITNESS:  The late '70s and early '80s.
19  BY MS. RHYU:
20    Q  So your CV states that you started working at
21  Cetus Corporation in 1984.  What were the circumstances
22  of your transition from Albert Einstein College of
23  Medicine to Cetus Corporation?
24       MR. BOOZELL:  Objection.  Vague and ambiguous.
25       THE WITNESS:  I'm not sure I know what you mean
Page 31

1  by the circumstances around.
2  BY MS. RHYU:
3    Q  Why did you go to Cetus?
4       MR. BOOZELL:  Objection.  Vague and ambiguous.
5       THE WITNESS:  There were a combination of
6  reasons, but the prime one was that it seemed like a
7  wise decision for my career development.
8  BY MS. RHYU:
9    Q  Did Cetus recruit you?
10    A  They offered me a job.
11    Q  Were you aware of the PCR technique when you
12  decided to join Cetus?
13    A  No.
14    Q  And I see, while you were at Cetus, you had
15  several different -- you had two different job titles;
16  is that correct?
17    A  Yes.
18    Q  Were there other job titles that you had that
19  are not on this CV, while you were at Cetus?
20    A  There were multiple titles.  As indicated in
21  the resume, senior scientist, director of the
22  diagnostics program, senior director of the diagnostics
23  program.
24    Q  I see.  But other than the titles reflected on
25  your CV, did you have any other positions while you were
Page 32

8  (Pages 29 to 32)

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

1  at Cetus?
2      A  Not that I can recall.
3      Q  So I'm interested in the period from 1988 to
4  1991, when you were senior director of the diagnostics
5  program, PCR division, and director of the department of
6  infectious diseases at Cetus Corporation, so I'd like to
7  ask you some questions about that.
8      A  Sure.
9      Q  What was the PCR division?
10     A  It was a subset, a group of individuals who
11  had, as their prime area of interest, research on and
12  commercialization of PCR-based activities.
13     Q  And who were the individuals in the PCR
14  division at that time, that you can recall?
15     A  I couldn't recollect all of them, but I
16  remember there being approximately 70 people in the
17  organization.
18     Q  Of those 70 people, how many were scientists?
19     MR. BOOZELL:  Objection.  Vague and ambiguous.
20  BY MS. RHYU:
21     Q  This is just in the PCR division.
22     MR. BOOZELL:  Same objections.
23     THE WITNESS:  I'm not sure I know what you're
24  asking.
25  BY MS. RHYU:

Page 33

1      Q  I'm just trying to get a sense of who were the
2  scientists that you were working with in the PCR
3  division?
4      MR. BOOZELL:  Vague and ambiguous.
5      THE WITNESS:  I remember everyone being trained
6  in either medicine or science.
7  BY MS. RHYU:
8      Q  And you recall there were about 70 such people?
9      A  That's correct.
10     Q  As senior director of the diagnostics program,
11  what were your job responsibilities?
12     A  I oversaw the relationship between Eastman
13  Kodak and Cetus, as it entailed both immunodiagnostics
14  and nucleic acid diagnostics.
15     Q  Did you have any other responsibilities as
16  senior director of the diagnostics program?
17     A  I also oversaw PCR technology development.
18     Q  And what does that mean?
19     A  At that time, there was significant effort to
20  continue to optimize the procedure, investigate
21  automation, and to look into alternative enzymes for the
22  polymerase chain reaction.
23     Q  And you said you oversaw the Kodak-Cetus
24  relationship.  Who at Cetus was involved in the
25  collaboration between Kodak and Cetus?  I'm asking

Page 34

1  scientists.
2      MR. BOOZELL:  Objection.  Vague and ambiguous.
3      THE WITNESS:  Tom White was the primary person.
4  BY MS. RHYU:
5      Q  Was there anyone else supporting Tom White?
6      MR. BOOZELL:  Same objections.
7      THE WITNESS:  The Cetus-Kodak relationship
8  include -- included a large number of scientists in both
9  immunodiagnostics and nucleic acid diagnostics, and I
10  can't remember all of the people involved.
11  BY MS. RHYU:
12     Q  What was Tom White's role?
13     A  He was vice president for research, and I,
14  either indirectly, in a dotted-line relationship, or
15  directly, reported to him concerning those activities.
16     Q  Who reported to you concerning that Kodak-Cetus
17  collaboration?
18     A  Among the key people were Drs. Henry Erlich,
19  David Gelfand and Shirley Kwok.
20     Q  Can you think of anyone else?
21     A  Shelley Williams was a project coordinator.
22     Q  So you oversaw the Kodak-Cetus collaboration,
23  and you oversaw PCR development.  Did you have any other
24  job responsibilities as senior director of the
25  diagnostics program between 1988 and 1991?

Page 35

1      MR. BOOZELL:  Objection.  Vague and ambiguous,
2  misstates his testimony.
3      THE WITNESS:  That encompasses the
4  responsibilities as I recall them.
5  BY MS. RHYU:
6      Q  Did you have an office at Cetus?
7      A  Yes, I did.
8      Q  And where was that located?
9      A  It was in multiple places.  It started off in
10  The Horton Street Building, but most of the time it was
11  on the -- in the so-called main or Shell Building.
12     Q  Did you say "Shell Building"?
13     A  Yes.
14     Q  S-h-e-l-l?
15     A  That's correct.
16     Q  Is that the building that housed Dr. Eric
17  Groves' lab?
18     A  That's correct.
19     Q  And between 1988 and 1991, did you have an
20  office in the Shell Building?
21     A  Yes.
22     Q  And where in the building was your office?
23     A  The third floor.
24     Q  Did you have a lab in the Shell Building
25  between 1988 and 1991?

Page 36

9  (Pages 33 to 36)

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

1  project with Dr. Bill Robinson. Bill worked in the
2  division of, and down the hall from, Tom Merigan.
3    Q  Did Dr. Merigan supervise any of your work
4  while you were at Stanford?
5    A  No.
6    Q  Did you interact with him while he was a
7  consultant at Cetus?
8    A  Yes.
9    Q  And in what context did you interact with him
10 while he was a consultant at Cetus?
11   A  Whenever consultants were at Cetus, at
12 meetings, we would have an opportunity to talk about our
13 mutual interests, such as viruses.
14   Q  Do you have any specific recollection of
15 interactions you had with Dr. Merigan at Cetus?
16   A  Nothing specific, but it would have entailed
17 primarily cytomegalovirus, CMV.
18   Q  Did Cetus have ongoing research related to CMV?
19   A  I'm sorry, are we talking about the period of
20 time when I was a postdoctoral fellow at Stanford or --
21   Q  Cetus.
22   A  -- at Cetus? I don't remember us working on
23 CMV.
24   Q  But you did remember talking with Dr. Merigan
25 about CMV at Cetus?

Page 57

1    A  At Stanford and at Cetus. Tom was interested
2  in CMV, and, frequently, consultants, like Tom, inquire
3  whether or not we should be developing or doing research
4  in those areas.
5    Q  Do you recall any other suggestions that
6  Dr. Merigan made at Cetus?
7    A  No.
8    Q  Do you have any understanding as to what
9  specific projects Tom Merigan was consulting on at
10 Cetus?
11     MR. BOOZELL: Objection. Vague and ambiguous.
12     THE WITNESS: My recollection is the treatment
13 of viral diseases.
14 BY MS. RHYU:
15   Q  And you said you didn't remember anything
16 specific about Dr. Merigan's -- about interactions with
17 Dr. Merigan at Cetus, so I'd just like to know, what is
18 the basis of your memory that he consulted regarding the
19 treatment of viral diseases?
20     MR. BOOZELL: Objection. Vague and ambiguous,
21 misstates his testimony, it's argumentative.
22     THE WITNESS: I remember telling Tom how
23 important PCR was going to be for viral detection in
24 general and HIV specifically.
25 BY MS. RHYU:

Page 58

1    Q  Was that at Cetus?
2    A  Yes.
3      MR. BOOZELL: Objection. Vague.
4  BY MS. RHYU:
5    Q  And do you remember when you told him that?
6    A  I don't remember a specific date.
7    Q  Do you remember if anyone else heard you?
8    A  I can't remember whether it was in a phone
9  conversation without someone or whether or not it was in
10 a group of people.
11   Q  Do you remember anything else about that
12 conversation?
13   A  Only what I just indicated.
14   Q  Do you remember having any specific discussions
15 with Dr. Merigan about HIV?
16     MR. BOOZELL: Objection. Vague and ambiguous.
17     THE WITNESS: Other than the one I just
18 mentioned?
19 BY MS. RHYU:
20   Q  Yes. Well -- yes.
21     MR. BOOZELL: Same objections.
22     THE WITNESS: In the context of meetings that
23 included consultants, I would have had discussions that
24 encompassed HIV, so -- but I don't remember anything
25 specific.

Page 59

1  BY MS. RHYU:
2    Q  And would those discussions have been relating
3  to the work that you or the people that you supervised
4  were conducting related to HIV?
5    A  Yes, that's correct.
6    Q  So outside -- well, first let's talk about the
7  meetings that you just mentioned. What were these
8  meetings that included consultants?
9    A  Sometimes consultants visited Cetus. Other
10 examples of meetings were the Cetus scientific meetings,
11 which were held about once every 18 months.
12   Q  Was it your understanding that the consultants
13 consulted on specific projects at Cetus?
14     MR. BOOZELL: Objection. Vague and ambiguous.
15     THE WITNESS: I never saw their agreement, so I
16 couldn't say.
17 BY MS. RHYU:
18   Q  But just from your interaction with
19 Dr. Merigan, did you have any understanding as to
20 whether he was consulting as to specific projects?
21     MR. BOOZELL: Same objections.
22     THE WITNESS: There's nothing that I recall
23 about those discussions with Tom that would have
24 indicated one way or the other.
25 BY MS. RHYU:

Page 60

**HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY**

1  BY MS. RHYU:
2    Q  I'm asking generally, did you design any
3  experiments for Dr. Merigan to carry out?
4      MR. BOOZELL:  Same objections.
5      THE WITNESS:  It's a very, very general -- very
6  general question.  I certainly remember indicating,
7  saying to Tom that PCR would be a powerful tool with HIV
8  and viruses in general.  I remember relaying, generally,
9  information about how to carry out PCR in the best
10  possible way, but I don't have a specific recollection
11  of a specifically designed experiment.
12  BY MS. RHYU:
13    Q  How about David Schwartz --
14      MR. BOOZELL:  Same objections.
15  BY MS. RHYU:
16    Q  -- did you design any experiments for David
17  Schwartz?
18      MR. BOOZELL:  Sorry.  Same objections.
19      THE WITNESS:  In the context of materials
20  transfer agreement, we trained -- trained people in PCR.
21  But I wasn't working in the laboratory myself, so I
22  wouldn't have specifically designed an experiment myself
23  in terms of, you know, a bench-type experiment.
24  BY MS. RHYU:
25    Q  Do you recall training Dr. Schwartz to carry

Page 101

1  out PCR at Cetus?
2      MR. BOOZELL:  Objection.  Vague and ambiguous.
3      THE WITNESS:  I personally wouldn't have
4  trained anyone except for my brother, but the people in
5  the organization would have trained people.
6  BY MS. RHYU:
7    Q  Do you recall that Dr. Schwartz came to Cetus
8  to be trained to use PCR?
9      MR. BOOZELL:  Same objections.
10      THE WITNESS:  I have a general recollection of
11  that.
12  BY MS. RHYU:
13    Q  Do you know who at Cetus would have trained
14  him?
15    A  It's likely that it would have been Gail
16  Rodgers and Roberta Mattich and people that worked in
17  their organization.
18    Q  But you didn't participate in actually showing
19  Dr. Schwartz how to conduct PCR?
20    A  No.  Unfortunately, I wasn't working at the
21  bench at the time.
22    Q  What else do you remember about the MTAs listed
23  under "Stanford University" on RMS 00062 in Exhibit 535?
24      MR. BOOZELL:  Objection.  Vague and ambiguous,
25  calls for a narrative, lacks foundation.

Page 102

1      THE WITNESS:  I just have a general
2  recollection.
3  BY MS. RHYU:
4    Q  Have you told me everything that is your
5  recollection?
6    A  To the best of my knowledge.
7    Q  After the initial transfer of materials, do you
8  recall -- let me strike that.
9      So is it your testimony today that you
10  generally recall transferring materials to Dr. Merigan
11  around the February 1989 time frame?
12      MR. BOOZELL:  Objection.  Vague and ambiguous,
13  misstates his testimony.
14      THE WITNESS:  I generally recall providing
15  materials.  I don't specifically remember when that was.
16  BY MS. RHYU:
17    Q  Do you recall whether you provided materials to
18  Tom Merigan on any other occasions?
19      MR. BOOZELL:  Objection.  Vague and ambiguous.
20      THE WITNESS:  My recollection is there would
21  have been multiple occasions.
22  BY MS. RHYU:
23    Q  You have a specific recollection that there
24  were multiple occasions that you transferred materials
25  to Tom Merigan?

Page 103

1    A  I didn't say that, I said I had a general
2  recollection that we would have done it multiple times.
3    Q  And why is that?
4    A  Because we trained them in how to do PCR and
5  HIV.
6    Q  What materials are you referring to?
7    A  Information, reagents, oligonucleotides,
8  enzymes.
9    Q  So are you testifying that you would have given
10  reagents or that you remember giving reagents?
11      MR. BOOZELL:  Objection.  Vague and ambiguous,
12  compound, asked and answered.
13      THE WITNESS:  I'm saying I have a general
14  recollection of providing information and reagents to
15  Tom Merigan and the people in his group.
16  BY MS. RHYU:
17    Q  Do you remember handing them over?
18      MR. BOOZELL:  Vague and ambiguous.
19      THE WITNESS:  I have a general recollection,
20  but I don't have a specific recollection.
21  BY MS. RHYU:
22    Q  So you don't remember handing reagents over to
23  any individual?
24      MR. BOOZELL:  Vague and ambiguous, asked and
25  answered, argumentative.

Page 104

26 (Pages 101 to 104)

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

1    THE WITNESS: Yeah, I don't have a specific
2  recollection. It's unlikely that I would have relayed
3  those reagents. Somebody in my organization would have
4  relayed them.
5  BY MS. RHYU:
6    Q  Is there any documentation of any of the
7  transfers that you remember?
8    MR. BOOZELL: Objection. Vague and ambiguous.
9    THE WITNESS: I don't know.
10 BY MS. RHYU:
11   Q  Do you remember writing anything up, stating
12 that you were transferring reagents to Dr. Merigan?
13   A  We were helping so many people in so many ways,
14 I don't have a specific recollection.
15   Q  You don't have a specific recollection of
16 writing anything up; is that what you're saying?
17   MR. BOOZELL: Vague and ambiguous, misstates
18 his testimony, asked and answered.
19   THE WITNESS: As you can tell from this
20 document, we helped a large number of people. I simply
21 don't have a specific recollection.
22 BY MS. RHYU:
23   Q  Are you aware of the existence of any documents
24 today that document the transfer of any reagents to
25 Dr. Merigan under the MTA?

Page 105

1    MR. BOOZELL: Objection. Vague and ambiguous
2  and calls for a legal conclusion.
3    THE WITNESS: I don't have any documents, and I
4  haven't looked at any documents from that time period.
5  I don't know.
6  BY MS. RHYU:
7    Q  So you're referring to having helped lots of
8  different researchers to learn the PCR technique?
9    A  Yes.
10   Q  Was Cetus trying to disseminate the PCR
11 techniques to the greater research population?
12   MR. BOOZELL: Objection. Vague and ambiguous,
13 calls for speculation and foundation as to Cetus's
14 intent.
15   THE WITNESS: Yeah, I'm not quite sure I know
16 what you mean by that question.
17 BY MS. RHYU:
18   Q  Is it your understanding that Cetus wanted
19 scientists to learn to use PCR techniques?
20   MR. BOOZELL: Same objections.
21   THE WITNESS: Cetus was a commercial entity
22 that was interested in capturing value from the things
23 that they were investing in, and among the ways to do
24 that was to commercialize reagents and establish
25 materials transfer agreements, and that encompasses what

Page 106

1  Cetus was interested in.
2  BY MS. RHYU:
3    Q  Cetus had patented PCR techniques?
4    A  That's correct.
5    Q  And Cetus had patented PCR reagents?
6    A  That's correct.
7    Q  And Cetus -- it was in Cetus's interest -- it's
8  your understanding that Cetus wanted scientists to learn
9  and use these PCR techniques and reagents?
10   MR. BOOZELL: Objection. Vague and ambiguous,
11 compound, calls for speculation, lacks foundation.
12   THE WITNESS: Your question is more complex
13 than it appears on the surface, because Cetus is a
14 commercial entity. So the -- it's not clear business --
15 clear -- a productive business model would be to simply
16 disseminate information. So they were responsible for
17 capturing value out of the things that they discovered,
18 and the way they did that was to work with individuals
19 to create value, or to sell reagents that would bring
20 value to the company. So saying that Cetus was
21 interested in disseminating information is -- is not a
22 very good way to think about it. They were a commercial
23 entity.
24 BY MS. RHYU:
25   Q  In the context of MTAs, what do you mean by

Page 107

1  capturing value out of the things Cetus discovered?
2    MR. BOOZELL: Objection. Vague and ambiguous,
3  calls for speculation, lacks foundation, calls for a
4  legal conclusion.
5    THE WITNESS: I think the -- a pointed answer
6  to that question is probably best answered by a lawyer
7  rather than a scientist.
8  BY MS. RHYU:
9    Q  You have no understanding of what -- what you
10 meant by capturing value?
11   MR. BOOZELL: Same objections, argumentative.
12   THE WITNESS: I mean, I obviously have a
13 scientist -- scientist's perception of what that means,
14 but not a legal one.
15 BY MS. RHYU:
16   Q  Okay. What's your scientist's perception of
17 what that means, capturing value out of Cetus's
18 inventions in the context of an MTA?
19   MR. BOOZELL: Same objections.
20   THE WITNESS: In the context of materials
21 transfer agreements, there are terms that are associated
22 with ownership of intellectual property, so it is in
23 that context that I made that statement.
24 BY MS. RHYU:
25   Q  Can you elaborate on what you mean by that?

Page 108

27  (Pages 105 to 108)

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

1    MR. BOOZELL: Same objections.
2    THE WITNESS: I can't make it any clearer than
3  that from a scientist's perspective.
4    MS. RHYU: I'm ready for a break, are you?
5    MR. BOOZELL: Yes.
6    THE VIDEOGRAPHER: The time is 12:17. We're
7  going off the record.
8    (Lunch recess.)
9    (Deposition Exhibit 536 marked.)
10    THE VIDEOGRAPHER: Good afternoon. The time is
11  1:07 p.m. We are back on the record.
12  BY MS. RHYU:
13    Q  Dr. Sninsky, I've given you a document labeled
14  Exhibit 536. It, for the record, bears the production
15  numbers RMS 0064511 through 0064515. It appears to be
16  a -- an article from the Journal of Virology, the first
17  author is Shirley Kwok, and the title is "Identification
18  of Human Immunodeficiency Virus Sequences by Using In
19  Vitro Enzymatic Amplification and Oligomer Cleavage
20  Detection." Do you recognize this document?
21    A  Yes, I do.
22    Q  Is this the first article that you published
23  that was related to HIV?
24    A  I believe it is.
25    Q  And this involved the identification of HIV

Page 109

1  sequences?
2    A  That's correct.
3    Q  If you could turn to 64512, and Table 1 that's
4  on that page. Do you understand Table 1 to list a
5  series of primers and probes?
6    A  That's correct.
7    Q  And do you see where it designates SK19 and has
8  a sequence that follows the designation SK19?
9    A  Yes.
10    Q  And is that SK19 the same as the SK19 we
11  discussed earlier today?
12    A  Yes.
13    Q  That's a probe that is complimentary to the gag
14  DNA sequence of HIV?
15    A  Yes.
16    Q  So this article published the sequence of SK19?
17    A  Yes.
18    Q  And by publishing this, the SK19 sequence was
19  no longer confidential to Cetus; correct?
20    MR. BOOZELL: Objection. Vague and ambiguous,
21  calls for a legal conclusion, lacks foundation and calls
22  for speculation.
23    THE WITNESS: Sometimes there's a
24  misunderstanding that when something is disclosed, that
25  it's in the public domain. This indicates that it was

Page 110

1  disclosed, but it doesn't indicate anything about
2  ownership.
3  BY MS. RHYU:
4    Q  Right. I'm not asking about whether it was
5  proprietary. I'm asking whether it was confidential.
6    MR. BOOZELL: Same objections.
7  BY MS. RHYU:
8    Q  Was the SK19 sequence confidential as of 1987?
9    MR. BOOZELL: Same objections.
10    THE WITNESS: SK19 is disclosed in this
11  document.
12  BY MS. RHYU:
13    Q  The sequence of SK19 is disclosed in this
14  document?
15    A  Yes, that's correct.
16    Q  So a person reading this document would be able
17  to make the SK19 primer -- I'm sorry, the SK19 probe, if
18  they're able to synthesize an oligonucleotide?
19    MR. BOOZELL: Objection. Vague and ambiguous
20  and calls for speculation.
21    THE WITNESS: Not necessarily. The
22  oligonucleotides, just like any other reagent, can be
23  produced at different levels of purity in performance,
24  so that would be one thing that one would have to
25  consider.

Page 111

1  BY MS. RHYU:
2    Q  So a manufacturing -- or purity considerations
3  aside, a person who is skilled in making
4  oligonucleotides would be able to synthesize an
5  oligonucleotide having the sequence of SK19 after the
6  disclosure in Exhibit 536?
7    MR. BOOZELL: Vague and ambiguous, calls for
8  speculation, lacks foundation.
9    THE WITNESS: I think it's -- that's a critical
10  aside. I mean, it all depends on how that
11  oligonucleotide would perform, so just because you have
12  the sequence, doesn't necessarily mean you would have an
13  oligonucleotide that performed in the same way.
14  BY MS. RHYU:
15    Q  One could make the oligonucleotide, though --
16    MR. BOOZELL: Same objections.
17  BY MS. RHYU:
18    Q  -- knowing the sequence?
19    MR. BOOZELL: Same objections.
20    THE WITNESS: Knowing the sequence, you could
21  make the oligonucleotide.
22  BY MS. RHYU:
23    Q  Exhibit 536 does not involve the quantitation
24  of HIV nucleic acid in patient samples; correct?
25    A  I'd have to reread the document. Would you

Page 112

28  (Pages 109 to 112)

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

1  in the "Methods" section under "Subjects."
2      Q  Okay. We've talked about 539. You want to
3  move on to 540?
4      A  The "Materials and Methods" section of document
5  540 doesn't mention antiviral therapy in the context of
6  the clinical specimens.
7      Q  541?
8      A  The "Methods" section of document 541 that's
9  listed as "Study Participants" doesn't mention whether
10  antiviral therapy was used.
11      Q  And how about 542?
12      A  There's a sentence in document 542, under
13  "Materials and Methods," that says, "At the time of
14  venipuncture, none of the patients were known to be
15  taking drugs that had anti-HIV activity."
16      Q  Thank you, Dr. Sninsky.
17      Prior to 1991, you and your colleagues at Cetus
18  were looking at the level of HIV nucleic acids in PBMCs;
19  right?
20      MR. BOOZELL: Objection. Vague and ambiguous,
21  calls for speculation, lacks foundation.
22      THE WITNESS: My recollection, we were looking
23  at HIV nucleic acid.
24  BY MS. RHYU:
25      Q  In PBMCs?

Page 133

1  ask: Prior to 1991, were you aware of anyone at Cetus
2  doing work specifically with quantitation of HIV RNA in
3  patient samples that were in plasma or serum?
4      A  I don't remember whether we were or we weren't.
5  But it's really not --
6      Q  So sitting here today --
7      A  -- fundament- -- really not fundamentally
8  different, because the virus blebs out of the cell, so
9  you can think of a virus particle as being a small cell.
10      Q  Sitting here today, you don't remember whether
11  you were or were not looking at patient samples from
12  plasma or serum?
13      A  That's correct.
14      Q  And did you just say that you see no
15  distinction between looking at samples from plasma
16  versus PBMCs?
17      MR. BOOZELL: Objection. Vague and ambiguous.
18      THE WITNESS: What I said is when the virus
19  leaves the cell, it brings along with it the cell
20  membrane that is characteristic of the cell.
21  BY MS. RHYU:
22      Q  Why were your experiments, the ones described
23  in the articles we've just reviewed, why were those
24  focused on samples taken from PBMCs as opposed to plasma
25  or serum?

Page 135

1      MR. BOOZELL: Same objections.
2      THE WITNESS: My recollection was we did some
3  whole blood experiments as well, so I don't remember the
4  specifics in terms of pre-'91, post-'91. We clearly, as
5  one of these papers indicates, were doing RNA
6  experiments as well as DNA experiments, and determining
7  the amounts of RNA that were present.
8  BY MS. RHYU:
9      Q  But those were all in PBMCs, right, as far as
10  the published articles that we looked at?
11      MR. BOOZELL: Same objections.
12      THE WITNESS: As far as these publications,
13  that's correct.
14  BY MS. RHYU:
15      Q  Prior to 1991, were you doing any work
16  specifically with quantitation of HIV RNA in plasma or
17  serum samples?
18      MR. BOOZELL: Objection. Vague and ambiguous
19  as to "you."
20      THE WITNESS: I certainly personally didn't do
21  the experiments, because I oversaw the laboratory.
22  There were other people who were doing -- doing the
23  studies.
24  BY MS. RHYU:
25      Q  I understand. So let's change the question to

Page 134

1      MR. BOOZELL: Objection. Vague and ambiguous,
2  compound.
3      THE WITNESS: Retroviruses are known, as we
4  said earlier, to go through a proviral intermediate, and
5  the expectation was that, looking at both DNA and RNA
6  was going to be important, and because of the -- the
7  the greater stability of DNA, we chose to focus our
8  initial experiments on DNA, as described in these
9  publications.
10  BY MS. RHYU:
11      Q  And is that the reason you also chose to focus
12  on PBMCs as opposed to plasma?
13      A  The comparisons that were being done were
14  primarily through, as indicated by one of these
15  publications, reverse transcriptase activity, the
16  ability to culture HIV cells, and those culturing
17  techniques were cultured from peripheral blood
18  mononuclear cells, so it was thought to be advantageous
19  to determine the amounts of RNA in the same materials
20  that culturing was being done from.
21      Q  And it was difficult to culture from plasma or
22  serum?
23      MR. BOOZELL: Objection. Vague and ambiguous,
24  and misstates his testimony.
25      THE WITNESS: HIV was difficult to culture

Page 136

34  (Pages 133 to 136)

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

1  until people found the appropriate conditions in cells
2  to do that with.  Eventually people were able to culture
3  HIV routinely.
4  BY MS. RHYU:
5      Q  I just want to make sure we're saying the
6  same -- we're understanding the same thing when you say
7  "culture."  What do you mean when you say culturing from
8  cells or from plasma?
9      A  Initially it wasn't possible to culture the
10  virus, as other viruses are -- other viruses were
11  cultured.  It was then determined how one can do that,
12  in terms of activation, et cetera.
13     Q  And when was that determined?
14     A  I don't remember the specifics.
15     Q  Sometime late in the 1980s?
16     A  Yes.  Mid end, mid-1980s.  The -- and you could
17  both culture the virus from infected cells, and then,
18  eventually, culture the virus from free virus in the
19  sera or the plasma, so the initial experiments involved
20  activating infected cells.  So we were interested in --
21  my recollection is we were interested in looking at the
22  same materials that people were using to start from.
23     Q  Why did you need to culture the virus?  Why
24  couldn't you just obtain the nucleic acid from the
25  plasma?

Page 137

1      MR. BOOZELL:  Objection.  Vague and ambiguous,
2  compound, misstates his testimony.
3      THE WITNESS:  You could, but the -- we just
4  decided to start with the cells.
5  BY MS. RHYU:
6      Q  And aside from what you just explained, were
7  there any other advantages to starting with the cells?
8      MR. BOOZELL:  Objection.  Vague and ambiguous,
9  misstates his testimony.
10     THE WITNESS:  DNA doesn't require a reverse
11  transcription step to convert it to DNA before
12  amplification.  So just a logical place to start.
13  BY MS. RHYU:
14     Q  And aside from the circumstances that you
15  described, were there any other anticipated pitfalls in
16  working with plasma or serum?
17     MR. BOOZELL:  Same objections.
18     THE WITNESS:  I don't remember any of the
19  specifics.  I just remember a feeling of urgency to
20  accomplish the detection of HIV to provide valuable
21  diagnostics for the epidemic.  It was right -- I was in
22  New York when the epidemic struck.  I was in
23  San Francisco when the epidemic was moving through the
24  city like wildfire.  So I was feeling, quite urgently,
25  the need to apply these new tools to detection of this

Page 138

1  deadly virus.
2  BY MS. RHYU:
3      Q  And in that urgency, you thought the best way
4  to develop an assay for detecting HIV would be to look
5  at DNA and PBMCs?
6      A  From these papers that you've just given me,
7  between 538 and 542, it's a clear indication of both DNA
8  and RNA.
9      Q  But you were looking to develop an assay for
10  detecting HIV in PBMCs as opposed to plasma or serum?
11     MR. BOOZELL:  Objection.  Vague and ambiguous,
12  asked and answered.
13     THE WITNESS:  The important thing is there was
14  DNA or RNA.  The source wasn't as important, the
15  reservoirs of the virus placed themselves in the brain,
16  placed themselves in the lymph nodes.  So I don't think
17  the source was as important as simply was DNA or RNA.
18  BY MS. RHYU:
19     Q  But you focused first on PBMCs?
20     MR. BOOZELL:  Same objections.
21     THE WITNESS:  As these paper indicated, the
22  first publications described peripheral blood
23  mononuclear cells.
24  BY MS. RHYU:
25     Q  Prior to 1991, you were not using RNA

Page 139

1  quantitation to monitor the efficacy of any HIV
2  treatment; correct?
3      A  I don't remember.
4      Q  You don't remember one way or another?
5      A  No.
6      Q  Prior to the end of 1991, do you know of any
7  Cetus scientist who was monitoring the efficacy of an
8  HIV treatment by RNA quantitation?
9      A  I --
10     MR. BOOZELL:  Objection.  Vague and ambiguous,
11  calls for a legal conclusion, calls for speculation,
12  lacks foundation.
13     THE WITNESS:  I can't recall now, in 2006, what
14  was done before 1991 and what was done after 1991.
15  BY MS. RHYU:
16     Q  I'm handing you what I'm marking as Exhibit
17  543, bearing production numbers RMS 01149 through 01155,
18  a publication from Analytical Biochemistry in 1990
19  entitled "Quantitation of HIV-1 Proviral DNA Relative to
20  Cellular DNA By the Polymerase Chain Reaction."
21     (Deposition Exhibit 543 marked.)
22  BY MS. RHYU:
23     Q  Do you recognize this article?
24     A  Yes, I do.
25     Q  And what is it?

Page 140

35  (Pages 137 to 140)

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

1  kit to measure the amounts of virus. It's the whole
2  issue of diagnostic claims versus therapeutic claims.
3  BY MS. RHYU:
4      Q  Do you know who at Roche or which group at
5  Roche was responsible for the clinical trials related to
6  approval of this kit for monitoring therapy?
7      A  Joanne Spadoro was the person who oversaw the
8  development of the work. I can't remember now who was
9  responsible for the regulatory submission.
10     Q  And where is Joanne Spadoro?
11     A  She works in New Jersey, at Roche.
12     Q  Do you know if anyone else is -- oversees
13  clinical trials related to this kit?
14     A  I can't remember the names of the people in the
15  regulatory group. I'm drawing a blank on the names of
16  the people in the regulatory group.
17     Q  I believe you testified a little while ago
18  that, sitting here today, you cannot -- you cannot say
19  whether you can accurately measure viral load using HIV
20  DNA from PBMCs. Am I -- is that correct, that you said
21  that?
22     MR. BOOZELL:  Misstates his testimony.
23     THE WITNESS:  No, that's not what I said. What
24  I said was what I didn't know was the value of
25  quantitating DNA for therapeutic monitoring.

Page 205

1  BY MS. RHYU:
2      Q  And what's the basis for your not being certain
3  of that?
4      A  Because the extent of studies with DNA aren't
5  as substantive as the studies that have been done with
6  RNA to date.
7      Q  Are they -- are there -- do you know the
8  existence of some data from DNA studies related to
9  monitoring effectiveness of treatment that suggests that
10  the monitoring of the DNA is not an accurate measure of
11  viral load?
12     MR. BOOZELL:  Objection. Vague and ambiguous,
13  complex.
14     THE WITNESS:  I don't recall any experiments
15  that indicate that it's not sufficient for efficacy,
16  only that the data is not available.
17  BY MS. RHYU:
18     Q  Do you know if anyone is working on that now?
19     MR. BOOZELL:  Same objections.
20     THE WITNESS:  I don't know. I mean, among the
21  reasons of the movement to nearly exclusively look at
22  RNA was the early use of p24 antigen to determine
23  efficacy of therapeutic intervention, and p24 antigen is
24  a protein bound in the virus particle, so that in order
25  to do comparison experiments with the p24 antigen, it

Page 206

1  would have -- it's most logical to compare it to the RNA
2  in the virus particle.
3  BY MS. RHYU:
4      Q  Did you know that when you were doing your
5  quantitation studies with proviral DNA?
6      MR. BOOZELL:  Objection. Vague and ambiguous.
7      THE WITNESS:  No, p24 was after the fact.
8  BY MS. RHYU:
9      Q  Do you know approximately what time that came
10  up?
11     A  I don't remember.
12     Q  Do you have a general idea of when you became
13  aware of that problem?
14     MR. BOOZELL:  Same objections.
15     THE WITNESS:  I don't remember when -- I don't
16  remember when they started using p24 in sera.
17  BY MS. RHYU:
18     Q  Not even generally, you don't remember?
19     MR. BOOZELL:  Asked and answered.
20     THE WITNESS:  No, I don't.
21  BY MS. RHYU:
22     Q  Do you know Dr. Mark Holodniy?
23     A  I do.
24     Q  And when did you first meet Mark Holodniy?
25     A  I don't remember the date when I first met him.

Page 207

1      Q  Under what circumstances did you first meet
2  Dr. Holodniy?
3      A  In the context of talking to Tom Merigan and
4  getting to know the people that either worked in his
5  laboratory or were working with him at Stanford.
6      Q  Did you ever talk with Tom Merigan at Stanford
7  as to -- once you became an employee of Cetus?
8      MR. BOOZELL:  Objection. Vague and ambiguous.
9      THE WITNESS:  I don't remember a specific
10  event. It wouldn't surprise me if I did, because I went
11  to Stanford a couple times.
12  BY MS. RHYU:
13     Q  What was the reason for your going to Stanford
14  a couple of times as an employee of Cetus?
15     A  One was we had a collaboration with Tom, so
16  that if I was in the area and I thought it was
17  productive to stop by and talk -- plus I had friends at
18  Stanford, so if I was going to be there anyways, I might
19  stop by.
20     Q  And the collaboration you had with Tom, was
21  that the IL-2 collaboration?
22     A  I didn't collaborate with Tom on IL-2.
23     Q  What collaboration are you speaking of?
24     A  The use of PCR to detect HIV.
25     Q  What's your understanding of your collaboration

Page 208

52  (Pages 205 to 208)

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

1  with Tom --
2      MR. BOOZELL: Objection.
3  BY MS. RHYU:
4      Q  -- Merigan --
5      MR. BOOZELL: Objection. Vague.
6  BY MS. RHYU:
7      Q  -- regarding the use of PCR to detect HIV?
8      A  My recollection is we trained him how to do PCR
9  and how to detect HIV in the -- in the optimal way.
10     Q  Do you have a recollection of the time period
11  when you were at Stanford to discuss that with Tom
12  Merigan?
13     A  No, I don't.
14     Q  Are you aware of the existence of any
15  collaboration agreement that describes a collaboration
16  with Tom relating to detecting PCR -- detecting HIV
17  using PCR?
18     A  Other than, like, a materials transfer
19  agreement?
20     Q  Yes.
21     A  Don't recall.
22     Q  Did you meet Mark Holodniy at Stanford?
23     MR. BOOZELL: Vague and ambiguous.
24     THE WITNESS: I don't remember whether I met
25  him first in Emeryville at Cetus or at Stanford or at a
                                          Page 209

1  scientific meeting.
2  BY MS. RHYU:
3      Q  How many times have you spoken with Mark
4  Holodniy generally, just an estimate?
5      A  Ten or more times.
6      Q  20 times?
7      A  I wouldn't want to put a number on it. I mean,
8  we met at scientific meetings. When he was at -- in
9  Emeryville, we touched base then, multiple times per
10  year.
11     Q  Do you have any specific recollection of any
12  discussions you've had with Mark Holodniy relating to
13  HIV?
14     A  Not a specific recollection, but, you know,
15  because of our mutual interest in HIV, and because of us
16  doing PCR on HIV, we had multiple discussions.
17     Q  Did Mark Holodniy tell you that he was
18  interested in quantifying RNA levels in plasma?
19     A  Yes.
20     Q  At the time that Mark Holodniy told you that,
21  had you been conducting -- had you or anyone in your lab
22  been conducting experiments to quantify RNA levels in
23  plasma?
24     A  I don't remember. What would have been
25  important is not where the nucleic acid came from, but
                                          Page 210

1  whether it was DNA or RNA, and we had been doing RNA
2  experiments.
3      Q  So you specifically remember a conversation
4  with Mark Holodniy regarding quantitation of RNA levels
5  in plasma -- strike that.
6      You specifically remember that the conversation
7  that you had with Mark Holodniy regarding RNA levels in
8  plasma took place after you had been looking at RNA
9  levels in PBMCs?
10     MR. BOOZELL: Objection. Vague and ambiguous,
11  misstates his testimony.
12     THE WITNESS: I don't remember -- I have a
13  general recollection of talking to Mark, I don't
14  specifically remember when I spoke with him, and I don't
15  remember the specific dates.
16  BY MS. RHYU:
17     Q  Do you remember if you ever gave him any
18  reagents?
19     MR. BOOZELL: Objection. Vague and ambiguous,
20  especially as to "you."
21     THE WITNESS: It's unlikely that I personally
22  would have given him reagents. There were people in the
23  organization that were responsible for providing enzymes
24  and oligonucleotide primers and protocols, et cetera.
25  But I don't remember handing him reagents.
                                          Page 211

1  BY MS. RHYU:
2      Q  Are you specifically aware of any -- any
3  instances where you or any of the members of your
4  laboratory gave Mark Holodniy any reagents?
5      A  No. I mean, I oversaw the laboratory. I
6  wasn't involved in the reagents, so I don't specifically
7  recall.
8      Q  What was your understanding of why Dr. Holodniy
9  was at Cetus?
10     A  To learn how to do PCR for HIV and use it in
11  the context of the IL-2 trials.
12     Q  And how did you gain that understanding?
13     A  Discussions with Eric Groves and from Mark.
14     Q  Anyone else?
15     A  Can't remember.
16     Q  We talked about the Kodak litigation earlier.
17  Am I remembering correctly that you testified that you
18  submitted a declaration in connection with the Kodak
19  litigation?
20     A  Yes, that's true.
21     Q  Did you submit that declaration in about
22  November of 1991?
23     A  I don't remember when it was.
24     Q  Is that consistent with your recollection of
25  the events relating to your involvement with the Kodak
                                          Page 212

                        53  (Pages 209 to 212)

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

1   Q  Did you monitor The Journal of Infectious
2 Diseases?
3     MR. BOOZELL: Objection. Vague and ambiguous.
4     THE WITNESS: I was aware of the HIV work being
5 done, and I was aware of what was being done downstairs.
6 BY MS. RHYU:
7   Q  Did you -- what did you do to stay abreast of
8 developments that were happening in relation to
9 quantitation of HIV?
10   A  In general or in the clinical group?
11   Q  In general, as of the early 1990s.
12   A  I went to scientific meetings, reviewed
13 scientific manuscripts, talked to people in meetings and
14 touched base with Mark Holodniy, David Katzenstein and
15 Eric Groves about what they were doing downstairs.
16   Q  Did you believe that you should be an author on
17 this publication when you first saw it, Exhibit 1?
18     MR. BOOZELL: Objection. Vague and ambiguous.
19     THE WITNESS: I don't remember requesting
20 authorship on this paper.
21 BY MS. RHYU:
22   Q  Do you remember ever discussing this article,
23 Exhibit 1, with your colleagues at Cetus?
24   A  I remember general discussions with my
25 colleagues at Cetus about these experiments, but I
                    Page 225

1 don't -- I can't recollect, you know, a specific
2 discussion right now.
3   Q  Do you remember having any discussions with
4 Mark Holodniy regarding this Exhibit 1?
5   A  I generally recall talking to Mark about how
6 things were going.
7   Q  Did you design any of the experiments reported
8 in Exhibit 1?
9     MR. BOOZELL: Objection. Vague and ambiguous.
10     And go ahead and spend as much time as you need
11 reviewing it to determine the answer to the question.
12     THE WITNESS: I don't remember designing any of
13 the specific experiments. They show up as figures in
14 Exhibit 1.
15 BY MS. RHYU:
16   Q  I'm handing you what was previously marked
17 Exhibit 46, it's a publication in the Journal of
18 Clinical Investigation, published in November 1991. And
19 Mark Holodniy is the first author. Do you recognize
20 Exhibit 46?
21   A  I generally recollect it.
22   Q  When did you first see Exhibit 46, generally?
23     MR. BOOZELL: Objection. Vague and ambiguous.
24     THE WITNESS: I don't remember a specific time.
25 BY MS. RHYU:
                    Page 226

1   Q  Would you have seen it while you were at Cetus?
2   A  Yes.
3   Q  Would you have seen it as part of your review
4 of publications to keep abreast of developments in your
5 field?
6     MR. BOOZELL: Objection. Vague and ambiguous,
7 misstates her testimony.
8     THE WITNESS: I generally read papers on HIV.
9 BY MS. RHYU:
10   Q  Did you ever discuss this publication or the
11 experiments in the publication with Mark Holodniy?
12   A  I don't remember.
13   Q  Did you ever discuss Exhibit 46 or the
14 experiments described within it with Dr. Merigan?
15     MR. BOOZELL: And go ahead and take as much
16 time as you need to look at it to answer the question.
17     THE WITNESS: I remember talking to Tom in
18 general terms about this, but I didn't design any of the
19 experiments that are in figures -- in Figure 3.
20 BY MS. RHYU:
21   Q  Why are you limiting that to Figure 3? Why are
22 you limiting your response to Figure 3? Did you design
23 any of the experiments in this article?
24   A  Well, I don't have time to read the entire
25 article, so I'm just trying to look at the figures,
                    Page 227

1 which is where the data is and look at the materials and
2 methods and --
3   Q  I see.
4   A  -- to try to give you, within reason, as
5 complete an answer as I can.
6   Q  I see. But based on -- well, let me ask you
7 this. Did you ever tell Dr. Merigan that you believed
8 you should have been an author on this publication,
9 Exhibit 46?
10   A  I don't remember saying to Tom that I should be
11 an author on this.
12   Q  Did you have that belief, that you should be an
13 author on Exhibit 46?
14   A  Not that I recall.
15   Q  Was it your understanding that Cetus had a
16 proprietary interest in any of the work described in
17 Exhibit 46 when you first saw this article back in the
18 1990 time frame?
19     MR. BOOZELL: Objection. Vague and ambiguous,
20 calls for a legal conclusion, calls for speculation,
21 lacks foundation.
22     THE WITNESS: So the question again is?
23     (Record read.)
24     MS. RHYU: And I correct that with '91.
25     MR. BOOZELL: And it also misstates his
                    Page 228

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

1  testimony.
2      THE WITNESS: I don't know what the specific
3  relationship was in terms of Mark working at Cetus on
4  the -- on the assay, so I would be the wrong person to
5  ask.
6  BY MS. RHYU:
7      Q  Based on your interactions with Tom Merigan,
8  did you think that Cetus had some proprietary interest
9  in the experiments described in Exhibit 46?
10     MR. BOOZELL: Again, vague and ambiguous, lacks
11 foundation, calls for speculation, calls for a legal
12 conclusion.
13     THE WITNESS: Virtually all of the technology
14 refers to Cetus technology, so, I mean, what I don't
15 know is to what extent the -- I don't recall the
16 agreement with Tom Merigan's lab as he worked -- he and
17 his colleagues worked in the therapeutics group, so I
18 can't answer that question.
19 BY MS. RHYU:
20     Q  But you never said to Tom Merigan, "The
21 experiments you describe in the JCI article are
22 proprietary to Cetus" --
23     MR. BOOZELL: Same --
24 BY MS. RHYU:
25     Q  -- you never said that?

Page 229

1      MR. BOOZELL: Sorry. Same objections.
2      THE WITNESS: I don't remember saying that to
3  Tom.
4  BY MS. RHYU:
5      Q  Do you remember submitting the article to the
6  internal patent committee -- and when -- I'm referring
7  to article Exhibit 46. Do you remember submitting that
8  to the internal patent committee to assess Cetus's
9  rights?
10     MR. BOOZELL: Objection. Vague and ambiguous.
11     THE WITNESS: This is a paper that was in the
12 therapeutics group, so it wouldn't have come through me.
13 BY MS. RHYU:
14     Q  You mean an invention disclosure wouldn't have
15 come through you? I don't understand what you're saying
16 when you say it wouldn't have come through you.
17     A  An invention disclosure in a publication review
18 would not have gone through my office.
19     Q  I'm asking you, after seeing it published, did
20 it occur to you that Cetus might have proprietary
21 interest in the work described in this publication?
22     MR. BOOZELL: Objection. Vague and ambiguous,
23 lacks foundation, calls for a legal conclusion.
24     THE WITNESS: Yeah, I didn't think of it one
25 way or the other.

Page 230

1  BY MS. RHYU:
2      Q  Is it your understanding that after a paper is
3  published, an inventor still has a year to file for a
4  patent on the information that's disclosed in that
5  publication?
6      MR. BOOZELL: Same objections.
7      THE WITNESS: The policy has changed. There
8  was a time when you had a year in Europe, but you lost
9  your ability to file in the U.S., so the -- in the -- in
10 this time period, my recollection was that you had a
11 year to file for Europe, but you had to file immediately
12 for the U.S., but I may have be remembering that
13 incorrectly.
14 BY MS. RHYU:
15     Q  Do you have a place where you store
16 publications that are relevant to your field of
17 research?
18     MR. BOOZELL: Objection. Vague and ambiguous
19 as to time.
20     THE WITNESS: Now or then or --
21 BY MS. RHYU:
22     Q  Now.
23     A  Now mostly I keep things stored as PDFs.
24     Q  And then, in the 1990 time frame?
25     A  I kept hard copies in file folders.

Page 231

1      Q  Did you take those hard copies with you to
2  Roche when you left Cetus?
3      A  No, I --
4      MR. BOOZELL: Objection. Vague and ambiguous,
5  and asked and answered.
6      THE WITNESS: No, I left everything at Roche.
7  BY MS. RHYU:
8      Q  No, the question was whether you took those
9  hard copies to Roche when you left Cetus.
10     MR. BOOZELL: Same objections.
11     THE WITNESS: To the best of my recollection,
12 yes.
13 BY MS. RHYU:
14     Q  Do you remember discussing this publication
15 with anyone at Roche, Exhibit 46?
16     A  No.
17     (Deposition Exhibit 552 marked.)
18     MS. RHYU: I'll hand you what's been marked
19 Exhibit 552, and I apologize, I only have one copy.
20 Perhaps you can look on it together.
21     Q  Now that I've handed it to you, I realize I
22 haven't looked at the Bates -- I haven't read the Bates
23 range into the record. Could you do that for me?
24     A  552, and the RMS 0014307, RMS -- to RMS
25 0014654.

Page 232

58  (Pages 229 to 232)

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

1 regulatory group.
2     (Deposition Exhibit 553 marked.)
3 BY MS. RHYU:
4   Q  I'm handing you what's been marked as Exhibit
5 553, and it doesn't have a production number, but it
6 is -- it has a notation "PCR Protocols.  A Guide to
7 Methods and Applications."
8     MR. BOOZELL:  Can I ask what the source of this
9 document is, Counsel?
10    MS. RHYU:  I believe the source of this
11 document is the publisher of this document, of the -- of
12 the "PCR Protocols" book.
13    MR. BOOZELL:  It's a book called "PCR
14 Protocols"?
15    MS. RHYU:  Yes.
16   Q  Are you familiar with a book called "PCR
17 Protocols.  A Guide to Methods and Applications"?
18   A  I am.
19   Q  Are you an editor of that book, "PCR
20 Protocols"?
21   A  I am.  I was.
22   Q  And the other editors are Michael Innis, David
23 Gelfand and Thomas white?
24   A  That's correct.
25   Q  And the second page of this document has a

1 section that says "Bibliographic & Ordering
2 Information."  Do you see that?
3   A  Yes.
4   Q  And do you see where it says "publication date:
5 1989 December 28th"?
6   A  Yes.
7   Q  "Imprint:  ACADEMIC PRESS"?
8   A  Yes.
9   Q  Is that consistent with your recollection -- is
10 that publication date consistent with your recollection
11 of the date that the "PCR Protocols" book was published?
12   A  Yes.
13   Q  I'm handing you what was previously marked as
14 Exhibit 34.  Do you recognize this document?  It's
15 entitled "Invention Disclosure," and it's dated
16 1/9/1990.
17   A  Yes, I generally do.
18   Q  You do?  When do you recall first seeing it?
19   A  I don't remember when I saw it, I just
20 generally remember seeing it.
21   Q  Do you recall seeing it while you were still at
22 Cetus?
23   A  I don't remember.
24    MR. BOOZELL:  I'm going to object that the
25 questions are vague and ambiguous and potentially

1 misleading, as it seems that there are actually two
2 documents in this exhibit.  That being said --
3 BY MS. RHYU:
4   Q  Do you know if you were involved in assessing
5 whether or not to file a patent application related to
6 this invention disclosure, Exhibit 34?
7     MR. BOOZELL:  Same objections.
8     THE WITNESS:  I don't recall.
9 BY MS. RHYU:
10   Q  You don't recall at all?
11   A  Correct.
12   Q  Do you understand that this is an invention
13 disclosure that was submitted by Mark -- Mike Konrad for
14 Mark Holodniy?
15    MR. BOOZELL:  Objection.  Misstates the
16 document, and add on my previous objections.
17    THE WITNESS:  I do see writing at the top
18 indicating that it's from Mike Konrad and indicating
19 that it's for Mark Holodniy.
20 BY MS. RHYU:
21   Q  Do you recall ever considering an invention
22 disclosure that was submitted or that was filled out by
23 Mark Holodniy?
24   A  No.
25    MR. BOOZELL:  Objection.  Vague and ambiguous.

1     THE WITNESS:  No, I don't.
2 BY MS. RHYU:
3   Q  If you'll turn to the last page of the
4 document, Exhibit 34, I just wanted to ask you to look
5 at that "copy to" list.  You're the first name on the
6 "copy to" list.  Can you tell me who Raymond is?
7   A  John Raymond.
8   Q  And what was John Raymond's position?
9   A  He was responsible for development for the
10 research products.  I'm not -- I can't remember
11 specifically for this time period, 1990, but John
12 oversaw the development of the research products.
13   Q  How about JSF?
14   A  Probably JSP, for Jeff Price.
15   Q  I see.  And the last name there, do you
16 recognize that?
17   A  I don't.
18   Q  Do you believe that you received this
19 publication pursuant to Cetus's publication review
20 policy?
21    MR. BOOZELL:  Objection.  Vague and ambiguous.
22    MS. RHYU:  Let me start over.
23   Q  Do you see that page RMS 00544 has an abstract
24 on it?
25   A  I notice there's an abstract on 00544.

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

1    Q  Who is Tom MacMahon?
2    A  Tom MacMahon is presently the president or CEO
3  of Laboratory Corporation of America.
4    Q  Did he ever hold a title at Roche?
5    A  Yes, he was responsible for U.S. in vitro human
6  diagnostics.
7    Q  Where was he based when he was working at
8  Roche?
9    A  New Jersey.
10    Q  Did you interact with Mr. MacMahon?
11    A  Yes.
12    Q  What was the extent of your interaction with
13  Mr. MacMahon?
14    A  He was overall responsible for the program, so
15  I didn't have daily or weekly discussions with him, but
16  every once in a while, we would touch base when I was in
17  the area or he was in the area.
18    Q  So when you say the program, are you saying he
19  was overall responsible for the research program related
20  to the Amplicor kit?
21    A  Yes.
22    Q  Have you had a chance to read this exhibit?
23    A  No.  Would you like me to?
24    Q  Yes, I would like you to.
25    A  I've read this document.

Page 245

1    Q  Does it refresh your recollection as to whether
2  you've ever seen this document before?
3    A  No, it doesn't.
4    Q  Do you think you've ever seen this document
5  before?
6    MR. BOOZELL:  Asked and answered.
7    THE WITNESS:  I don't remember seeing it.
8  BY MS. RHYU:
9    Q  Do you see the references in the second
10  paragraph to U.S. Patent Nos. 5,650,268 and 5,631,128?
11    A  I see that.
12    Q  Do you have any idea what those patents relate
13  to?
14    A  I don't.  But they indicate that they're in the
15  area of AZT drug resistance.
16    MS. RHYU:  Marking, as Exhibit 555, U.S. Patent
17  No. 5,631,128, the patent is entitled "Polymerase Chain
18  Reaction Assays for Monitoring Antiviral Therapy and
19  Making Therapeutics Decisions in the Treatment of
20  Acquired Immunodeficiency Syndrome," and the inventors
21  are Michael Kozal and Thomas Merigan.
22    (Deposition Exhibit 555 marked.)
23  BY MS. RHYU:
24    Q  Have you ever seen this patent before?
25    A  No, I haven't.

Page 246

1    Q  Are you aware of its existence?
2    A  No.
3    Q  Were you aware of its existence before I showed
4  it to you just now?
5    A  I don't remember ever seeing it.
6    Q  Okay.
7    (Deposition Exhibit 556 marked.)
8    MS. RHYU:  And I'm marking, as Exhibit No. 556,
9  U.S. Patent No. 5,650,268.  It's a second patent issued
10  to Kozal and Merigan.
11    Q  Does this look familiar?
12    MR. BOOZELL:  Objection.  Vague and ambiguous.
13    THE WITNESS:  I don't remember seeing this.
14  BY MS. RHYU:
15    Q  Do you know who Michael Kozal is?
16    A  He was somebody that worked with Tom.
17    Q  Did you ever meet him?
18    A  Yes.
19    Q  Did you know what his work was about, what he
20  was working on in Tom Merigan's lab?
21    MR. BOOZELL:  Objection.  Vague and ambiguous,
22  especially as to time.
23    THE WITNESS:  I don't remember the specifics.
24  BY MS. RHYU:
25    Q  Do you remember reading any publications by

Page 247

1  Mike Kozal and Tom Merigan?
2    A  Right now, I don't.
3    Q  Who took over Tom MacMahon's position at Roche
4  after Tom MacMahon left?
5    A  Kathy Ordonez.
6    Q  Could you spell that, please.
7    A  O-r-d-o-n-e-z.
8    Q  What was Tom White's position in 1998?
9    MR. BOOZELL:  Objection.  Vague and ambiguous.
10  BY MS. RHYU:
11    Q  His position at Roche?
12    A  Vice president of research and development.
13    Q  Do you recall any discussions at Roche relating
14  to this letter that was forwarded by Tom MacMahon to
15  various people at Roche?
16    A  No, I don't.
17    Q  I'm speaking about Exhibit 554.
18    A  I don't recall any discussions at Roche
19  involving 554.
20    Q  I'm handing you what's been marked previously
21  as Exhibit 16, it's U.S. Patent 6,503,705.  Do you
22  recognize Exhibit 16?
23    A  No, I don't.
24    MR. BOOZELL:  Just want to note for the record,
25  for whatever it's worth, that the first page has an RMS

Page 248

62  (Pages 245 to 248)

**HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY**

1    prior to it being considered final.
2         THE VIDEOGRAPHER: Any further questions?
3         MR. BOOZELL: That is all.
4         THE VIDEOGRAPHER: This concludes today's
5    deposition of Dr. John Sninsky. The number of media
6    used was four. We are going off the record at 6:01 p.m.
7    //
8    //
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 257

---

1
2
3         I, the undersigned, a Certified Shorthand
4    Reporter of the State of California, do hereby certify:
5         That the foregoing proceedings were taken
6    before me at the time and place herein set forth; that
7    any witnesses in the foregoing proceedings, prior to
8    testifying, were placed under oath; that a verbatim
9    record of the proceedings was made by me using machine
10    shorthand which was thereafter transcribed under my
11    direction; further, that the foregoing is an accurate
12    transcription thereof.
13         I further certify that I am neither
14    financially interested in the action nor a relative or
15    employee of any attorney of any of the parties.
16         IN WITNESS WHEREOF, I have this date
17    subscribed my name.
18
19    DATED: _____
20
21
22
                _____
23    GINA GLANTZ
      CSR No. 9795
24
25

Page 259

---

1
2
3
4
5
6
7
8
9
10    I, JOHN J. SNINSKY, Ph.D., do hereby declare
11    under penalty of perjury that I have read the foregoing
12    transcript; that I have made any corrections as appear
13    noted, in ink, initialed by me, or attached hereto; that
14    my testimony as contained herein, as corrected,
15    is true and correct.
16         EXECUTED this _____ day of _____,
17    20___, at _____, _____.
              (City)        (State)
18
19
20
21
22    _____
      JOHN J. SNINSKY, Ph.D.
23
24
25

Page 258

---

65  (Pages 257 to 259)