**CONFIDENTIAL - ATTORNEYS' EYES ONLY**

## Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

THE BOARD OF TRUSTEES OF THE LELAND
STANFORD JUNIOR UNIVERSITY,

    Plaintiff
vs.
    CASE NUMBER:
    C-05-04158 MHP

ROCHE MOLECULAR SYSTEMS, INC.,
ROCHE DIAGNOSTICS CORPORATION;
ROCHE DIAGNOSTICS OPERATIONS, INC.
    Defendants

ROCHE MOLECULAR SYSTEMS, INC.
ROCHE DIAGNOSTICS CORPORATION;
ROCHE DIAGNOSTICS OPERATIONS, INC.,

    Counter-Claimants
vs.
THE BOARD OF TRUSTEES OF THE
LELAND STANFORD JUNIOR UNIVERSITY;
AND THOMAS MERIGAN.
    Counter-claim Defendants

CONFIDENTIAL - ATTORNEYS' EYES ONLY

The video deposition of DAVID H. SCHWARTZ, M.D. was held on Monday, October 16th, 2006, commencing at 9:15 a.m. at the Law Offices of Bowie & Jensen, LLC, 29 West Susquehanna Avenue, Suite 600, Towson, Maryland, 21204, Baltimore, Maryland, before R. Dwayne Harrison, Notary Public.
JOB NO. 54638

## Page 2

APPEARANCES:

JOSHUA A. GLIKIN, ESQUIRE
VINCENT M. GUIDA, JR., ESQUIRE
Bowie & Jensen, LLC
29 Susquehanna Avenue, Suite 600
Towson, Maryland, 21204
Tel: 410.583.2400 Fax: 410.583.2437
E-mail: guida@bowie-jensen.com
E-mail: glikin@bowie-jensen.com
    On behalf of Plaintiff

JEFFREY N. BOOZELL, ESQUIRE
Quinn, Emanuel, Urquhart, Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California, 90017
Tel: 213.624.7707 Fax: 213.624.0643
E-mail: jeffboozell@quinnemanuel.com
    On behalf of Roche Molecular Systems, Inc., Roche Diagnostics Corporation; Roche Diagnostics Operations, Inc.

MICHELLE S. RHYU, ESQUIRE
Cooley, Godward, Kronish, LLP
Five Palo Alto Square, 4th Floor
3000 El Camino Real
Palo Alto, California, 94306-2155
Tel: 650.843.5505 Fax: 650.857.0663
E-mail: mrhyu@cooley.com
    On behalf of Board of Trustees of the Leland Stanford Junior University; and Thomas Merigan

ALSO PRESENT:
SUJATHA IYENGAR, Ph.D.
JANET THOMAS, VIDEOGRAPHER

## Page 3

1     STIPULATION
2     It is stipulated and agreed by and between
3 counsel for the respective parties that the filing of
4 this deposition with the Clerk of Court be and the same
5 are hereby waived.
6     - - - - - - -
7 follows:
8     VIDEOGRAPHER: Here begins media number one
9 of the deposition of Dr. David Schwartz in the matter
10 of the Board of Trustees of Leland Stanford Junior
11 University vs. Roche Molecular Systems, et al. and
12 Roche Molecular Systems, et al. vs. the Board of
13 Trustees of Leland Stanford Junior University. This
14 case is in the court of the United States District
15 Court Northern District of California and the case
16 number is C-05-04158 MHP. Today's date is
17 October 16th, 2006 and the time is 9:18. The
18 deposition is taking place at 29 West Susquehanna
19 Avenue, Suite 600, Towson, Maryland 21204 and it's
20 being taken on behalf of the -- is it the Plaintiffs?
21     MR. BOOZELL: Both.
22     VIDEOGRAPHER: Plaintiffs and defendants.
23 The videographer is Janet Thomas appearing on behalf of
24 Sarnoff Court Reporters & Legal Technologies located in
25 Irvine, Los Angeles, San Francisco, California.

## Page 4

1     Would counsel please identify yourselves
2 and state who you represent?
3     MR. BOOZELL: Jeff Boozell from Quinn,
4 Emanuel, Urquhart, Oliver & Hedges representing the
5 Roche defendants.
6     MS. RHYU: Michelle Rhyu from Cooley,
7 Godward, Kronish representing Stanford University and
8 the counter-defendants.
9     MR. GLIKIN: Joshua Glikin from Bowie &
10 Jensen in Towson, Maryland representing Dr. Schwartz.
11 Whereupon,
12     DAVID H. SCHWARTZ, M.D.,
13 called as a witness, having been first duly sworn
14 to tell the truth, the whole truth, and nothing
15 but the truth, was examined and testified as
16 follows:
17     EXAMINATION BY MR. BOOZELL:
18 Q   Good morning, Dr. Schwartz. Thank you for
19 being here. As we said, I am Jeff Boozell. I
20 represent Roche in this patent litigation where
21 Stanford has sued Roche. We appreciate you taking time
22 out of your busy schedule. I know that time is short
23 and we will get right into it.
24     Can you please state your name for the
25 record?

**Page 97**

1  Q   Is there anything in this letter of
2  November 7th, 1988 that suggests that you were
3  collaborating to develop a quantitative assay at all?
4       MR. BOOZELL: Misleading, vague and
5  ambiguous, leading.
6  A   If I understand your question correctly,
7  you are asking me is there anything in this letter that
8  refers to quantitation of HIV DNA.
9  Q   I'm asking you, based on this November 7th,
10 1988 letter, you are simply requesting a copy of the
11 protocol that Cetus is using, correct?
12      MR. BOOZELL: Vague and ambiguous,
13 misstates the document, it's misleading, it's leading.
14 A   That's what it appears to say, yes.
15 Q   So at least in this letter of
16 November 1988, you are not working together to come up
17 with new methods of quantifying DNA?
18      MR. BOOZELL: It's vague and ambiguous,
19 misstates the document, it's misleading, misstates his
20 prior testimony, it's leading.
21 A   This letter refers to existing methods and
22 then it just says that we're going to look at
23 individuals longitudinally.
24 Q   It was your understanding that the existing
25 methods were being used on samples from a clinical

**Page 98**

1  trial of HIV patients who were being given AZT and
2  IL-2, correct?
3       MR. BOOZELL: Vague and ambiguous,
4  misstates his testimony. It's misleading and it's
5  leading.
6  A   Yes, that's my understanding.
7  Q   And what did you know about the Cetus
8  protocol that was being used on those samples?
9       MR. BOOZELL: Vague and ambiguous.
10 A   Can you clarify or elaborate?
11 Q   Did you know anything about the details of
12 the protocol that was being used by Cetus on the
13 samples that you were sending to Cetus?
14      MR. BOOZELL: Vague and ambiguous.
15 A   I knew that they were using polymerase
16 chain reaction to amplify certain regions and I believe
17 at that time I knew that they were developing it with
18 radioactive probes.
19 Q   And this was an assay that quantified HIV
20 DNA, correct?
21      MR. BOOZELL: Vague and ambiguous, leading.
22 A   My feeling at that time was that it
23 probably wasn't quantifying the DNA very well but that
24 that was the goal.
25 Q   You are saying that the Cetus protocol that

**Page 99**

1  was being used at the time on the samples that you were
2  sending to Cetus was not quantifying DNA very well. Is
3  that what you just said?
4       MR. BOOZELL: Vague and ambiguous,
5  misstates his testimony.
6  A   I'm saying from my understanding of the
7  state of the science at that time, I had difficulty
8  seeing how the assay was going to be sufficiently
9  quantitative and it was necessary to look at what was
10 being done and improve it in order to have sufficient
11 quantitative resolution to be useful.
12 Q   But by this time, November 7th, 1988, you
13 hadn't yet looked at the assay, the protocol that was
14 being used by Cetus?
15      MR. BOOZELL: Vague and ambiguous,
16 misstates his testimony, it's leading.
17 A   It would appear that I hadn't obtained a
18 hard copy of it. I don't recall whether I ever looked
19 at it in full detail. I would have been aware of the
20 general principles of it.
21 Q   So let's turn to the next page that shows
22 the PCR results, still on Exhibit 28. What does probe
23 number one indicate, the column under probe number one?
24      MR. BOOZELL: Vague and ambiguous.
25 A   That would have been one of the probes they

**Page 100**

1  used to hibernize with the amplified compound.
2  Q   Do you know what probe they were using?
3  A   I wouldn't know which one was probe number
4  one.
5  Q   Do you how probe number one was distinct
6  from probe number two?
7       MR. BOOZELL: Vague and ambiguous.
8  A   My understanding at the time was that it
9  saw a somewhat different nucleotide sequence.
10 Q   Did you know at that time what the two
11 probes were?
12 A   I may have known at that time. I don't
13 recall now.
14 Q   And can you explain what the columns, the
15 first three columns indicate?
16      MR. BOOZELL: It's vague and ambiguous.
17 It's compound.
18 A   The first column didn't -- well, I can see
19 it's weak. So these -- the first come column is weeks
20 of trial. The second column gives the patient's name
21 and I believe the start -- I believe the start and stop
22 dates of when IL-2 would have been administered,
23 although I'm not sure if that's the case. And I
24 actually don't know what this third column refers to.
25 Q   Do you know what the numbers under the

Page 101

1  columns for probe number one and probe number two
2  indicate?
3     A   I believe looking at these, to the best of
4  my recollection, these are relative intensity scores of
5  the hybridization after being developed
6  radiographically. So a quantitation of the band
7  intensity, I believe, of each probe with the amplified
8  template.
9     Q   And are these the results that you alluded
10 to earlier which were inadequate quantitations?
11        MR. BOOZELL: Vague and ambiguous.
12 Misstates his testimony. Misleading.
13    A   These results would be among those that I
14 would have found inadequate for quantitation in this
15 trial.
16    Q   Upon reviewing these results, did you do
17 anything to improve the quantitative method?
18        MR. BOOZELL: Vague and ambiguous.
19    A   One thing I discussed with Dr. Merigan at
20 one point, I believe with one of the Cetus scientists,
21 would have been that using a radioactive probe was
22 fraught with problems.
23    Q   So these were results from using a
24 radioactive probe?
25        MR. BOOZELL: Vague and ambiguous. Calls

Page 102

1  for speculation. Let him finish his answer.
2     A   I cannot be absolutely sure. I know at one
3  time early on that's what was being used. These kinds
4  of scores would be consistent with that but I can't be
5  absolutely sure that's what was used here. Other
6  things I would have discussed is that this kind of a
7  scoring system of basically one to four as well as the
8  obvious inconsistencies between the two probes would
9  have made it extremely difficult to quantitate drug
10 effects that were less than a log.
11    Q   And you appreciated that in November of
12 1988?
13        MR. BOOZELL: Vague and ambiguous and
14 leading.
15    A   That was my impression at that time.
16    Q   Was Cetus conducting blind tests meaning
17 that they didn't know what the samples were that they
18 were testing?
19        MR. BOOZELL: Asked and answered.
20    A   My recollection is that they did not have
21 the codes indicating what the therapy was that each of
22 these individual was on or not on. That's my
23 recollection and obviously that would have been the
24 correct design for the study.
25    Q   Do you know if anyone from Cetus designed

Page 103

1  the study or assisted in designing the study?
2         MR. BOOZELL: Calls for speculation, lacks
3  foundation, leading.
4     A   My recollection is that we discussed with
5  John Sninsky and his staff when they were going to
6  receive these, what they would receive and how they
7  would send them back to us.
8     Q   Were there any statistical analyses done to
9  evaluate whether one could monitor the efficacy of the
10 treatment using -- by following the levels of DNA
11 obtained in these assays?
12        MR. BOOZELL: Vague and ambiguous and
13 leading.
14    A   These data don't really warrant statistical
15 analysis. Any experienced scientist can look at these
16 and say this is not going to give statistically
17 significant data and certainly that there's no
18 statistically significant effect indicated by these
19 data. These kinds of considerations were taken by me
20 to a very senior biostatistician, Lincoln Moses, at
21 some point in the development, with the idea that -- of
22 getting an idea how many repetitions would be needed or
23 how many parallel amplifications would have to be done
24 to get statistically meaningful data if the interassay
25 variability was what we had been seeing which was

Page 104

1  roughly four-fold between samples, as I recall. And he
2  did some calculations and told us that it would be more
3  than 20 replications that would be required to get data
4  that would detect half log variations.
5         So in answer to your question, what was
6  done to analyze this, these data were not -- did not
7  require analysis but I asked a very sophisticated
8  senior statistician to project what would be needed if
9  you had lots of data of this type in order to get an
10 idea of how many replications would have to be
11 performed and it was a high number.
12    Q   Do you mean to suggest that obtaining high
13 quantities of data like the data reflected in
14 Exhibit 28 would ultimately have proven that this assay
15 works for monitoring efficacy of treatment?
16        MR. BOOZELL: Vague and ambiguous, calls
17 for speculation, misstates his testimony, leading.
18    A   From these data, I cannot say nor do I
19 believe anyone can say anything about the quantitative
20 nature of this assay. What I'm saying is that if you
21 were to posit or assume that you had an assay that was
22 variable such that repeat samples varied by four-fold
23 most of the time so they had a certain coefficient of
24 variation, certain standard deviation, if you can do
25 them enough times, there is some number of times at

26 (Pages 101 to 104)

**Page 105**

1  which you would be able to detect true changes of a
2  certain magnitude.
3       At the time this work was being done, the
4  magnitude of changes induced by AZT or AZT and IL-2 was
5  generally less than a log. So that is a very tight
6  window to try to hit with an assay. And my
7  understanding, after consulting with Lincoln Moses and
8  looking at things myself, was that it would require
9  many, many, many runs of this particular technology to
10 be able to pick up a four to ten-fold difference. So,
11 I presented that to Merigan and Dr. Holodniy, who was
12 actually with me in these things, as a problem with
13 that particular line of pursuit.
14    Q   So you recognized that a different type of
15 assay was necessary in this November 1988 time frame?
16        MR. BOOZELL: Vague and ambiguous and
17 leading.
18    A   We recognized one of two things or both was
19 necessary. One, either looking for more dramatic viral
20 changes, so drugs -- either drugs would have to have a
21 bigger impact than a one-log reduction in load or you
22 would have to have another strategy.
23    Q   IL-2 was never shown to have an effective
24 treatment for HIV, correct?
25        MR. BOOZELL: Leading, vague and ambiguous,

**Page 106**

1  calls for speculation, lacks foundation.
2     A   In my opinion, the field would consider the
3  jury to be out on that bearing in mind that there are
4  two aspects, essentially, of treatment. One is
5  improvement of the immune response, the other being
6  reduction in viral load. So, to the best of my
7  knowledge, IL-2 has never been shown to be helpful in
8  reducing viral load. But there are -- there's a large
9  body of work on both sides of whether or not IL-2 is
10 helpful for immune system.
11    Q   So the jury is still out on that question?
12        MR. BOOZELL: Vague and ambiguous,
13 misstates his testimony, leading.
14    A   The last time I checked with people
15 conducting a trial, the jury was still out on the
16 long-term benefit of IL-2 therapy in HIV.
17    Q   I want to go back to Exhibit 29 and ask
18 you, do you recall ever specifically receiving
19 materials or information that were identified to be
20 exchanged pursuant to this agreement?
21        MR. BOOZELL: Vague and ambiguous, calls
22 for speculation, lacks foundation, calls for a legal
23 conclusion, misleading.
24    A   To the best of my knowledge, such materials
25 did end up in our lab. I personally cannot recall

**Page 107**

1  opening the package that contained them or being handed
2  the package.
3     Q   You don't recall any reference to this
4  material transfer agreement?
5         MR. BOOZELL: Same objections.
6     A   Can you clarify the question?
7     Q   Do you recall whether any materials that
8  appeared in the Stanford laboratory had any notation
9  that they were received pursuant to Exhibit 29, the
10 material transfer?
11    A   I don't recall.
12        MR. BOOZELL: Same objections.
13    Q   Do you see the asterisk? There's an
14 asterisk in the middle of paragraph three of following
15 the sentence: "As used in this agreement, confidential
16 information shall mean all data, protocols, technical
17 and economic information, commercialization, clinical
18 and research strategies, trade secrets and know-how
19 disclosed or provided by Cetus to scientists." And
20 then there's an asterisk. At the bottom of the page it
21 says, "and designated in writing as confidential at the
22 time of disclosure."
23        Do you see that?
24    A   Yes.
25    Q   Do you recall ever being given any

**Page 108**

1  information that was designated in writing as
2  confidential at the time that it was transferred from
3  Cetus?
4         MR. BOOZELL: Vague and ambiguous, calls
5  for speculation, lacks foundation, it's leading.
6     A   The only other confidentiality or materials
7  transfer type of agreement I can recall, I believe
8  related to interleukin-2 standards and perhaps some
9  information on interleukin-2 assay. I cannot recall
10 any other specific material transfer agreements other
11 than this visitor's consent relating to PCR.
12        MR. BOOZELL: Let me just add an objection.
13 Calls for a legal conclusion.
14    Q   If you'd focus your attention to paragraph
15 three, the first sentence: "The material shall be used
16 in research studies on the detection of human HIV in
17 samples accumulated by ATCG. Do you know what ATCG is
18 referring to there?
19    A   Well, let's define elsewhere as the AIDS
20 therapy cooperative group.
21    Q   Do you mean the AIDS treatment cooperative
22 group's --
23    A   Treatment cooperative group. I have to be
24 honest with you, that in recent usage I've remembered
25 it as being ACTG standing for aids clinical trials

1  you mean by proprietary technology? What is the
2  proprietary technology?
3      MR. BOOZELL: Vague and ambiguous, calls
4  for speculation, lacks foundation and it is a legal
5  question.
6   A  My assumption was that this exciting PCR
7  technology that had been so much in the news and was so
8  promising, that was the technology I was thinking
9  about. I believed or I was under the impression that
10 the company owned that technology and, again, perhaps
11 naively, I don't know, but that things accomplished
12 with that technology in our lab would be part of that.
13  Q  So you're referring to the CPR technology
14 invented by Kary Mullis?
15  A  Yes.
16  Q  Do you have any opinion of Dr. Mark
17 Holodniy?
18     MR. BOOZELL: Vague, ambiguous, calls for
19 speculation.
20  A  In what respect?
21  Q  You interacted with him regularly?
22  A  Yes, I liked him. I liked him very much.
23  Q  Was he a competent scientist?
24     MR. BOOZELL: Vague, ambiguous.
25  A  I thought he was a very competent

Page 153

1  scientist. I have the highest regard for Dr. Holodniy,
2  his competence and professionalism. I thought he was
3  excellent.
4   Q  Is it fair to say that he took the lead in
5  the project relating to developing an assay for
6  quantitating HIV RNA using PCR?
7      MR. BOOZELL: It's vague, ambiguous and
8  calls for speculation.
9   A  It's fair to say he took the lead from me
10 in the development of the quantitative assay. I have
11 no knowledge, for example, on whether David Katzenstein
12 was more influential in pushing the switch over to RNA,
13 nor do I have any knowledge about the specific role or
14 the magnitude of the role played by Cetus employees.
15 But certainly I passed the baton to Dr. Holodniy at the
16 stage when we were still looking at DNA.
17     MS. RHYU: I have no further questions.
18     MR. BOOZELL: And it's 3:00. So given the
19 testimony that we've elicited and the documents
20 reviewed, I'd like to designate the transcript as
21 confidential "attorneys eyes only."
22     VIDEOGRAPHER: This concludes the third
23 media used. We are off the record at 3:01.
24     (Deposition was concluded at 3:01 p.m.)
25

Page 154

9   I, DAVID H. SCHWARTZ, M.D., do hereby declare under
10 penalty of perjury that I have read the foregoing
11 transcript; that I have made any corrections as appear
12 noted, in ink, initialed by me, or attached hereto; that
13 my testimony as contained herein, as corrected, is true
14 and correct.
15     EXECUTED this _____ day of _____,
16 20____, at _____, _____.
           (City)        (State)

_____
DAVID H. SCHWARTZ, M.D.

Page 155

1  State of Maryland
2  County of Baltimore, to wit:
3      I, R. DWAYNE HARRISON, a Notary Public of
4  the State of Maryland, City of Baltimore, do hereby
5  certify that the within-named witness personally
6  appeared before me at the time and place herein set
7  out, and after having been duly sworn by me, according
8  to law, was examined by counsel.
9      I further certify that the examination was
10 recorded stenographically by me and this transcript is
11 a true record of the proceedings.
12     I further certify that I am not of counsel
13 to any of the parties, nor in any way interested in the
14 outcome of this action.
15     As witness my hand and notarial seal this
16 19th day of October 2006.

_____
R. DWAYNE HARRISON
Notary Public

My Commission Expires:
September 15th, 2009

Page 156

39 (Pages 153 to 156)