CONFIDENTIAL

## Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

THE BOARD OF TRUSTEES OF THE LELAND
STANFORD JUNIOR UNIVERSITY,

    Plaintiff,

vs.   Case No.: C 05 04158 MHP

ROCHE MOLECULAR SYSTEMS, ET AL.,

    Defendants.

ROCHE MOLECULAR SYSTEMS, ET AL.,

    Counterclaimants,

vs.

THE BOARD OF TRUSTEES OF THE LELAND
STANFORD JUNIOR UNIVERSITY; AND THOMAS
MERIGAN,

    Counterclaim Defendants.

C O N F I D E N T I A L
(THIS MATERIAL IS CONFIDENTIAL PURSUANT TO COURT ORDER)

DEPOSITION OF ERIC GROVES

San Diego, California

Friday, August 11, 2006

Reported by:
BROOKE SILVAS, RPR
CSR No. 10988
Job No. 51122

## Page 2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

THE BOARD OF TRUSTEES OF THE LELAND
STANFORD JUNIOR UNIVERSITY,

    Plaintiff,

vs.   Case No.: C 05 04158 MHP

ROCHE MOLECULAR SYSTEMS, ET AL.,

    Defendants.

ROCHE MOLECULAR SYSTEMS, ET AL.,

    Counterclaimants,

vs.

THE BOARD OF TRUSTEES OF THE LELAND
STANFORD JUNIOR UNIVERSITY; AND THOMAS
MERIGAN,

    Counterclaim Defendants.

Deposition of ERIC GROVES, taken on behalf of Plaintiff and Counterclaim Defendant, at 4445 Eastgate Mall, Suite 200, San Diego, California, beginning at 9:02 a.m., Friday, August 11, 2006, before BROOKE SILVAS, CSR No. 10988, RPR.

## Page 3

APPEARANCES OF COUNSEL:

For the Plaintiff and Counterclaim Defendant, The Board of Trustees of the Leleand Standford Junior University and Counterclaim Defendants Thomas Merigan and Mark Holodniy:

  COOLEY GODWARD, LLP
  BY: RICARDO RODRIGUEZ, ESQ.
  Five Palo Alto Square
  3000 El Camino Real
  Palo Alto, California 94306-2155
  (650) 843-5000
  rr@cooley.com

For the Defendants and Counterclaimant Roche Systems:

  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  BY: JEFFREY N. BOOZELL, ESQ.
  865 South Figueroa Street
  10th Floor
  Los Angeles, California 90017
  (213) 624-7707
  jeffboozell@quinnemanuel.com

Also Present:
  CATALINA AMPARANO, Videographer

## Page 4

I N D E X

| WITNESS | EXAMINATION |
|---|---|
| ERIC GROVES | |
|   BY MR. RODRIGUEZ | 6 |

E X H I B I T S

| PLAINTIFF'S | | PAGE: |
|---|---|---|
| 600 | Curriculum Vitae | 83 |
| 601 | Consulting Agreement, Bates stamped RMS 06272-6288 | 128 |
| 602 | Non-Exclusive Consulting Agreement between Cetus Corporation and Thomas Merigan, Bates stamped 00048-50 | 128 |
| 603 | Publication Clearance Request, Bates stamped RMS 00588-590 | 138 |
| 604 | Letter to Mark Holodniy, Thomas Merigan, and David Schwartz from Eric Groves, January 29, 1990 | 140 |
| 605 | Publication Clearance Request, Bates stamped RMS 00921-942 | 141 |

1 (Pages 1 to 4)

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

### Page 21

```
09:19   1   came to work in the laboratory. She reported to
        2   Mike Conrad, who then reported to me.
09:19   3   Q  So she was indirectly a supervisee of you?
09:19   4   A  Yes.
09:19   5   Q  What do you recall about Ms. Kim's work?
09:19   6      MR. BOOZELL: Objection. Calls for a narrative.
        7   Vague.
09:19   8      THE WITNESS: What sort of information would you
        9   like?
09:20  10   BY MR. RODRIGUEZ:
09:20  11   Q  What was the work -- did she have
       12   particular job duties?
09:20  13   A  She came to work as a technician. She was
       14   relatively inexperienced, and she gained experience
       15   on the job and performed various technician
       16   activities in the laboratory supporting its
       17   function.
09:20  18   Q  Do you recall which technician activities?
09:20  19   A  She worked in several areas, but then
       20   worked on some of the PCR efforts in the laboratory.
09:20  21   Q  Do you remember which PCR efforts?
09:20  22   A  She worked in support of the analysis of
       23   the effects of -- of -- of sample collection
       24   techniques for PCR samples as to whether a sample
       25   was collected in the right media, whether that would
```

### Page 22

```
        1   lead to stability of a sample, joining -- before it
        2   was actually analyzed.
09:20   3   Q  Do you know what kind of media she was
        4   testing?
09:21   5   A  These were standard tubes that come -- onto
        6   which blood is drawn at clinical sites that come in
        7   a variety of different forms. They're sites --
        8   tubes designed for plasmas, for -- tubes with
        9   different anticoagulants in them, tubes that are
       10   designed to collect serum. It is standard to see
       11   that your sample would be preserved by establishing
       12   proper collection techniques. And she worked at
       13   least in part to confirm that the choice that we
       14   recommended for sites to collect the samples was an
       15   appropriate one.
09:21  16   Q  Do you recall any other PCR work that she
       17   did?
09:21  18   A  She worked in support of some of the work
       19   that Mark Holodniy was doing in collaboration with
       20   the laboratory.
09:21  21   Q  What was the work that she did in
       22   connection with Dr. Holodniy?
09:21  23   A  She did -- she did some of the day-to-day
       24   assays.
09:22  25   Q  To determine what?
```

### Page 23

```
09:22   1   A  We were interested in assaying for
        2   circulating HIV, viral RNA and DNA in the blood
        3   samples obtained from the Stanford draw.
09:22   4   Q  How was it that she became assigned to the
        5   task of doing some of the assaying in connection
        6   with Dr. Holodniy?
09:22   7   A  She was interested in gaining the
        8   experience. And we needed some help. So she took
        9   the task on.
09:22  10   Q  Is this assaying actually the
       11   quantification?
09:22  12   A  It was an attempt to quantify. But I think
       13   by present standards, it would be viewed as -- as
       14   qualitative at best.
09:22  15   Q  Why is that?
09:22  16   A  It's not easy to do that well. And we were
       17   trying to learn how to do it.
09:23  18   Q  Did you have discussions with Ms. Kim on a
       19   regular basis?
09:23  20      MR. BOOZELL: Objection. Vague.
09:23  21      THE WITNESS: Episodic also. She was under the
       22   supervision of Dr. Conrad. And so I would -- I
       23   organized -- the laboratory was organized with he --
       24   with Dr. Conrad in charge of the day-to-day affairs.
       25   My responsibilities were strategic and directive and
```

### Page 24

```
        1   budgetary and supervisory in the sense of -- of
        2   worrying about whether people were there or not,
        3   employee problems. But as part of the leadership
        4   strategy role, I was responsible for refining the
        5   direction of -- in which the laboratory was
        6   evolving. So her day-to-day responsibilities would
        7   have been reporting through Mike Conrad to me. But
        8   the laboratory was a small place, and so I was
        9   interested in this particular project. So people
       10   talked and I talked. But I don't remember any of
       11   the explicit circumstances under which we talked.
       12   But we talked about progress.
09:24  13   Q  Did -- in terms of her doing some of this
       14   assaying work in connection with Dr. Holodniy, is
       15   that something that she had to clear with you or did
       16   she clear that with Mr. Conrad? How did that end up
       17   on her plate?
09:24  18      MR. BOOZELL: Objection. Vague. Compound.
09:24  19      THE WITNESS: Dr. Conrad and I discussed the
       20   allocation of technician resources within the
       21   laboratory. And she was, therefore, under -- in the
       22   course of that class of supervisor/supervisee
       23   discussion, we decided she was an appropriate person
       24   to support this work.
       25
```

**Page 45**

```
09:52
09:53



09:54



09:54
```

 1  we were just starting out. So the goal was to
 2  achieve some better measure of circulating viral
 3  content than was available at the time. As we got
 4  more and more experienced, we became more and more
 5  refined in our approach to doing that.
 6      Q  And I guess what I'm trying to get at is
 7  the actual -- and whether or not there was actual --
 8  any actual support that was provided to the clinical
 9  trial by Cetus that specifically dealt with the
10  quantitation of HIV/RNA.
11      And let me just give you some context so
12  you understand where I'm going. So you had
13  mentioned these four areas that Cetus was generally
14  involved with in connection with the IL-2/AZT study.
15  The supply of IL-2 and advice on how to use the
16  IL-2. The lab support with this viral titer and PK,
17  pharmacokinetics. And so what I'm wondering is
18  whether the quantitation work relating to HIV RNA
19  was done just internally to try and figure out if
20  that's something that would help the study or
21  whether that was a formal part of the study and
22  something that -- that Cetus was routinely providing
23  to Stanford.
24      So with that kind of just background, my
25  question is, did Cetus provide actual quantitation

**Page 46**

 1  of HIV RNA to Stanford in connection with the
 2  IL-2/AZT study?
 3      A  Yes.
 4      MR. BOOZELL: Objection. Vague and ambiguous.
 5      THE WITNESS: We --
 6  BY MR. RODRIGUEZ:
 7      Q  Can --
 8      A  So -- so it was an explicit -- and I don't
 9  remember how the language in the protocol would have
10  been written. There's a protocol that describes the
11  study. There was a contract between Stanford and
12  Cetus as to how this relationship ran. I don't have
13  a copy of that nor do I remember the details. So as
14  part of that protocol, samples were likely stated in
15  the protocol that they would be collected for
16  laboratory study purposes. And we explicitly worked
17  with Stanford to provide our best effort to
18  quantitate what we saw in those samples with regard
19  to HIV. And we -- they would send us samples. We
20  would send them results. They may have sent us
21  false samples. They may have sent us duplicates.
22  So the effort was to provide them with this
23  information.
24      Q  Now, with respect to actually obtaining the
25  samples in the first place, was Cetus involved at

**Page 47**

 1  all in obtaining the blood samples for use in the
 2  AZT IL-2 study?
 3      MR. BOOZELL: Objection. Vague and ambiguous.
 4      THE WITNESS: No Cetus employee was a direct
 5  participant in the day-to-day conduct of the trial.
 6  That was all Stanford people. Stanford
 7  phlebotomists, Stanford researchers are responsible
 8  for the day-to-day conduct of the trial. So the
 9  samples obtained were then transported to Cetus
10  where the assays were done.
11      Q  Was there a particular reason why no Cetus
12  people were involved? Was it some regulation --
13      A  Yeah.
14      Q  -- or protocol?
15      A  Yeah. It's -- there's some practical
16  reasons. The patients come into the clinic. Cetus
17  employees work full-time. The clinic visits are
18  only sometimes. But the most important this is the
19  conduct of the trial is the responsibility of
20  Stanford personnel. When you bring in outsiders,
21  then you -- Stanford would have to take full
22  responsibility for their conduct and everything
23  about them. And so the custom has evolved in the
24  conduct of clinical trials that pharmaceutical
25  personnel rarely would participate directly in the

**Page 48**

 1  obtaining of anything from a patient. Even talking
 2  to patients.
 3      Q  Did Cetus employees provide any input in
 4  analyzing results of the IL-2/AZT clinical trial to
 5  determine whether there was enhancement of
 6  immunologic function?
 7      MR. BOOZELL: Objection. Vague. Ambiguous.
 8  Calls for speculation.
 9      THE WITNESS: So they sent us results that they
10  had obtained to compare with the results that we had
11  obtained after we supplied them with the results.
12  So there was a sharing of -- the agreement was that
13  we would share the information obtained from the
14  clinical trial. So the appropriate way to do that
15  is not to affect the assay results by the assayers
16  by sending them the results -- other results in
17  advance. Because there's always a question about
18  whether somebody can somehow -- okay. So we would
19  do the results. We would send them there. They
20  would send us the results on the same patients. We
21  would do comparisons. We would have some
22  discussions about whether this was all working as we
23  had hoped and talk about whether it could be
24  improved. But the nature of these things is you
25  have to get enough samples before you can draw any

```
12:38   1    Q   If I could -- start that one again. I have
        2    handed you what has previously been marked as
        3    Exhibit 46.
12:38   4        Would you please take look at Exhibit 46
        5    and tell me if you recognize it?
12:38   6    A   I do. I reviewed it with counsel
        7    yesterday. But --
12:38   8    Q   Do you --
12:38   9    A   -- only in that sense.
12:38  10    Q   Do you recall seeing Exhibit 46 prior to
       11    your review yesterday?
12:38  12    A   No. Excuse me. I review not having seen
       13    it before yesterday.
12:38  14    Q   And so let me just see if I'm clear then.
       15    It's not that you recall one way or the other. You
       16    don't believe that you saw it before yesterday?
12:39  17    A   That's correct.
12:39  18    Q   Are there any other documents that you
       19    reviewed in connection with counsel that refreshed
       20    your recollection that you can remember?
12:39  21    A   I think we basically covered them.
12:39  22    Q   Are there any others that you can remember?
12:39  23    A   No.
12:39  24        MR. RODRIGUEZ: Subject to continuing document
       25    issues, I have no further questions. Thank you for
```
Page 145

```
        1    your time.
12:39   2        MR. BOOZELL: Okay. And given the documents
        3    that have been entered into the record in the
        4    deposition and Dr. Groves's testimony, Roche would
        5    like to designate the transcript as attorney's eyes
        6    only, restricted -- highly restricted. And
        7    Dr. Groves requests the opportunity to review his
        8    transcript and make any changes before it becomes
        9    final.
12:39  10        MR. RODRIGUEZ: Thank you for your time.
12:39  11        MR. BOOZELL: Thank you.
12:39  12        THE VIDEOGRAPHER: This concludes today's
       13    deposition of Eric Groves. The number of media used
       14    was two. We're going off the record. The time is
       15    12:40 p.m.
12:40  16        (Deposition session concluded at 12:40
       17    p.m.)
       18        -oOo-
```
Page 146

```
 9   I, ERIC GROVES, do hereby declare under
10   penalty of perjury that I have read the foregoing
11   transcript; that I have made any corrections as appear
12   noted, in ink, initialed by me, or attached hereto; that
13   my testimony as contained herein, as corrected, is true
14   and correct.
15       EXECUTED this _____ day of _____,
16   20____, at _____, _____.
                    (City)         (State)

                    _____
                         ERIC GROVES
```
Page 147

```
 1   STATE OF CALIFORNIA  )
                         ) ss.
 2   COUNTY OF RIVERSIDE )

 4       I, Brooke Silvas, Certified Shorthand Reporter,
 5   Certificate No. 10988, for the State of California, hereby
 6   certify:
 7       I am the deposition officer that stenographically
 8   recorded the testimony in the foregoing deposition;
 9       Prior to being examined the deponent was first
10   duly sworn by me;
11       The foregoing transcript is a true record of the
12   testimony given;
13       Before completion of the deposition, review of the
14   transcript {X} was { } was not requested. If requested, any
15   changes made by the deponent (and provided to the reporter)
16   during the period allowed are appended hereto.

18   Dated _____.
```
Page 148