Board of Trustees of the Leland Stanford Junior University v. Roche Molecular Systems, Inc. et al

Doc. 95 Att. 10

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

### Page 1

```
              UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF CALIFORNIA
THE BOARD OF TRUSTEES OF THE
LELAND STANFORD JUNIOR
UNIVERSITY,
              Plaintiff,
      vs.                        No. C 05 04158 MHP
ROCHE MOLECULAR SYSTEMS, ET AL.,
              Defendants.
_____
ROCHE MOLECULAR SYSTEMS, ET AL.,
LELAND STANFORD JUNIOR
UNIVERSITY,
              Counterclaimants,
      vs.                        No. C 05 04158 MHP
ROCHE MOLECULAR SYSTEMS, ET AL.,
              Counterclaim Defendants.

         HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY
          VIDEOTAPED DEPOSITION OF CLAYTON CASIPIT
                  Redwood Shores, California
                     Friday, July 21, 2006

Reported by:
TRACY L. PERRY
CSR No. 9577
JOB No. 3-50389
```

### Page 2

```
1          UNITED STATES DISTRICT COURT
2         NORTHERN DISTRICT OF CALIFORNIA
3   THE BOARD OF TRUSTEES OF THE
    LELAND STANFORD JUNIOR
4   UNIVERSITY,
5        Plaintiff,
6        vs.      No. C 05 04158 MHP
7   ROCHE MOLECULAR SYSTEMS, ET AL.,
8        Defendants.
    _____
9   ROCHE MOLECULAR SYSTEMS, ET AL.,
    LELAND STANFORD JUNIOR
10  UNIVERSITY,
11       Counterclaimants,
12       vs.      No. C 05 04158 MHP
13  ROCHE MOLECULAR SYSTEMS, ET AL.,
14       Counterclaim Defendants.
    _____
15
16       Confidential Videotaped Deposition of
17  CLAYTON CASIPIT, taken on behalf of Plaintiff and
18  Counterclaim Defendants, at 555 Twin Dolphin Drive,
19  Suite 560, Redwood Shores, California, beginning at
20  9:05 a.m. and ending at 2:02 p.m., on Friday, July 21,
21  2006, before TRACY L. PERRY, Certified Shorthand Reporter
22  No. 9577.
23
24
25
```

### Page 3

```
1   APPEARANCES:
2
    For Plaintiff and Counterclaim Defendants:
3
         COOLEY GODWARD LLP
4        BY: MAGDALENA STROJWAS WILKINSON
             MICHELLE S. RHYU
5        Attorneys at Law
         5 Palo Alto Square
6        3000 El Camino Real
         Palo Alto, California 94306-2155
7        650-843-5155
         mwilkinson@cooley.com
8        mrhyu@cooley.com
9   For Defendants and Counterclaimants and the witness:
10       QUINN, EMANUEL, URQUHART, OLIVER & HEDGES LLP
         BY: BRIAN C. CANNON
11       Attorney at Law
         555 Twin Dolphin Drive, Suite 560
12       Redwood Shores, California 94065
         650-801-5000
13       briancannon@quinnemanuel.com
14  There also being present:
15       Rhea Neresian
         Ray Tyler, Videographer
16
17
...
25
```

### Page 4

```
1                    INDEX
2   WITNESS:                         EXAMINATION
3   CLAYTON CASIPIT
4
5   BY MS. WILKINSON                      7
6
7                   EXHIBITS
8   DEPOSITION                              PAGE
9   508  Plaintiff's Notice of Deposition of   22
         Defendants Pursuant to Fed. R. Civ. P.
10       30(b)(6); 11 pages
11  509  Curriculum Vitae of Clayton L. Casipit;  27
         9 pages
12
    510  U.S. Patent #5,644,035; 27 pages       58
13
    511A Notebook #3702 of Clayton Casipit Bates 85
14       Stamped CH0000388-CH0000583; multi-paged
15  511B Notebook #3702 of Clayton Casipit Bates 85
         Stamped RMS05692-RMS05887; multi-paged
16
    512A Notebook #3951 of Clayton Casipit Bates 113
17       Stamped CH0000584-CH0000679; multi-paged
18  512B Notebook #3951 of Clayton Casipit Bates 113
         Stamped RMS05582-RMS05691; multi-paged
19
    513  Document titled "Reference, Transcription  90
20       Systems"; 1 page
21  514  Document titled "Vector Maps"; 1 page  93
22
    515  Document containing the handwritten notation 116
23       "Original Data for CC2 Work, Books 3702
         & 3951"; multi-paged
24
    516  Article titled "Competitive Polymerase Chain 134
25       Reaction Assay for Quantitation of HIV-1 DNA
```

1 (Pages 1 to 4)

### Page 73

```
11:29:52   1  question as to the accuracy, but at the same time,
           2  assuming that they did -- they -- they kept proper lab
           3  techniques, I would imagine that it's accurate. But I
           4  can't be sure. I wasn't there, you know, seeing how they
           5  did the experiments. It's simply trust.
11:29:52   6      Q  What questions do you have as to accuracy of the
           7  results in the JID article?
11:29:59   8      MR. CANNON: Objection as to form.
11:30:02   9      THE WITNESS: Questions that I have personally?
          10  In -- in general, I think in the -- in the realm of PCR
          11  amplification and quantitation of mRNA, the -- the
          12  questions of accuracy would be mainly that these were --
          13  it returns back to the same situation. When they're
          14  not -- when two templates are put in different tubes,
          15  they may not necessarily amplify at the same rate or
          16  time. So therefore, it may not be accurate. Now, these
          17  are all a lot of maybes. I can't tell you for sure,
          18  so...
11:30:45  19  BY MS. WILKINSON:
11:30:46  20      Q  So just so I understand your testimony, your
          21  concern stems from the fact that the JID article did not
          22  use an internal standard; is that correct?
11:31:01  23      A  That is one of my concerns, yes.
11:31:05  24      Q  Do you have any other concerns?
11:31:11  25      A  Again, it -- it -- like I said, it was a matter
```

### Page 74

```
           1  of trust that they set up the tubes properly, that they
           2  tried to keep everything the same as much as possible,
           3  even though they didn't put them in the same tubes.
           4  Again, it's mainly that they did their experiments
           5  properly.
11:31:25   6      Q  Do you have any reason to believe that they
           7  didn't?
11:31:28   8      A  I don't have any reason, but I don't know.
11:31:32   9      Q  So is -- is your concern typical scientific
          10  skepticism about an experiment that you didn't conduct
          11  yourself?
11:31:45  12      A  Yes. Yes. Absolutely.
11:31:55  13      MS. WILKINSON: Would you like to take a break now?
          14  We've been going for about an hour.
11:31:59  15      MR. CANNON: That would be great.
11:32:00  16      THE VIDEOGRAPHER: The time is 11:31 a.m. We're
          17  going off the record, and this is the completion of
          18  Media Number 1.
11:32:07  19      (Recess taken: 11:32 until 11:43 a.m.)
11:43:19  20      THE VIDEOGRAPHER: The time is 11:43, we are back on
          21  record, and this is the beginning of Media Number 2 in
          22  the deposition of Clayton Casipit.
11:43:42  23  BY MS. WILKINSON:
11:43:42  24      Q  Mr. Casipit, the second topic that counsel
          25  identified you would be testifying as a 30(b)(6) witness
```

### Page 75

```
           1  about is a transfer of material to Dr. Holodniy. Is that
           2  correct?
11:43:56   3      A  Correct.
11:43:57   4      MR. CANNON: Transfer of certain material.
11:43:59   5      THE WITNESS: Certain.
11:44:00   6  BY MS. WILKINSON:
11:44:00   7      Q  What material was transferred to Dr. Holodniy?
11:44:05   8      A  The RNA standard itself.
11:44:15   9      Q  The plasmids were not transferred to
          10  Dr. Holodniy; isn't that correct?
11:44:19  11      A  Correct.
11:44:34  12      Q  When you mention -- when you say that the RNA
          13  standard itself --
11:44:38  14      A  Mm-hmm.
11:44:39  15      Q  -- was transferred, what do you mean by that?
11:44:44  16      A  The RNA. It was the final quantitated RNA
          17  standard.
11:44:53  18      Q  How much of the RNA standard was provided?
11:44:58  19      A  I think I wrote in my notebook 25 micrograms, I
          20  think.
11:45:14  21      Q  And how many ex- -- just so I understand how
          22  much 25 micrograms of standard is, how many experiments
          23  could you do with 25 micrograms?
11:45:25  24      MR. CANNON: Objection as the form.
11:45:32  25      THE WITNESS: Depending how you used it and that you
```

### Page 76

```
           1  didn't use it very careful -- carelessly, you could --
           2  you can do quite a few. I can tell you, more than a
           3  hundred.
11:45:42   4  BY MS. WILKINSON:
11:45:42   5      Q  More than 200?
11:45:45   6      A  If you -- if you handled it properly, yes.
11:45:56   7      Q  Would you be able to do a hundred -- a hundred
           8  tubes' worth?
11:46:08   9      A  Yes.
11:46:08  10      MR. CANNON: Objection as to form.
11:46:12  11      You can answer the question.
11:46:13  12      THE WITNESS: Yes.
11:46:22  13  BY MS. WILKINSON:
11:46:22  14      Q  How -- how did you transfer the material to
          15  Dr. Holodniy?
11:46:31  16      A  He came to the lab and I got it out of the
          17  minus 80 and gave it to him; he put it into a cold box
          18  with -- with dry ice, I believe, and took it away.
11:46:44  19      Q  What was it in?
11:46:45  20      A  An Eppendorf tube.
11:46:48  21      Q  Was the tube labeled in any way?
11:46:53  22      A  I -- I usually labeled my tubes and it probably
          23  had the name of the construct and how much was in it.
11:47:00  24      Q  Other than the name of the construct and your
          25  name, do you recall anything else that was on the label?
```

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

```
11:47:12  1       A  I don't recall anything else that was on the
          2    label.
11:47:15  3       Q  Was the tube labeled "Confidential"?
11:47:20  4       A  No, it was not.
11:47:21  5       Q  Was the tube labeled "Proprietary"?
11:47:26  6       A  No, it did not have a label of "Proprietary."
11:47:29  7       Q  Did you regard the standard as confidential?
11:47:36  8       A  Yes, I did.
11:47:37  9       Q  Did you tell Mark Holodniy he was restricted in
         10    any way in his use of that standard?
11:47:48 11       A  No, I did not, but I assumed that because he had
         12    signed confidentiality agreements with Cetus, I assumed
         13    that he knew this.
11:48:00 14       Q  Did you know at the time that you gave
         15    Mark Holodniy the standard that he had signed a
         16    confidentiality agreement with Cetus?
11:48:13 17       A  Again, I was assuming, because he interacted
         18    quite freely with other scientists within Cetus.
11:48:24 19       Q  Was there any policy at Cetus that constrained
         20    your interactions with non-Cetus employees?
11:48:30 21       A  Yes, there was.
11:48:31 22       Q  And what was that policy?
11:48:33 23       A  The policy was that we could not share them --
         24    share with anyone who had not signed a confidentiality
         25    agreement. We could not share materials or -- or
                                                            Page 77
```

```
          1    information, notebooks, or anything. We could not
          2    photocopy notebooks or give -- and give those photocopies
          3    to them.
11:48:54  4       Q  But you didn't know at the time that you gave
          5    Dr. Holodniy this standard whether he had executed a
          6    confidentiality agreement; isn't that your testimony?
11:49:08  7       MR. CANNON: Objection as to form, misstates prior
          8    testimony.
11:49:15  9       THE WITNESS: I -- could you ask that question
         10    again, please. I'm sorry.
11:49:19 11       MS. WILKINSON: Can you read the -- back the
         12    question, please.
11:48:54 13          (The record was read as follows:
11:48:54 14           "QUESTION: But you didn't know at the time
         15           that you gave Dr. Holodniy this standard
         16           whether he had executed a confidentiality
         17           agreement; isn't that your testimony?")
11:49:32 18       MR. CANNON: Same objections.
11:49:34 19       THE WITNESS: I guess I could say I didn't know for
         20    a fact. I did not see him sign the agreement and I did
         21    not see a signed copy of his agreement. But again, I was
         22    assuming that because he had interacted quite freely with
         23    other scientists in Cetus that he -- he understood the
         24    confidentiality at Cetus.
11:49:59 25    BY MS. WILKINSON:
                                                            Page 78
```

```
11:49:59  1       Q  Have you seen a confidentiality agreement signed
          2    by Dr. Holodniy at -- for Cetus since you gave him --
11:50:13  3       A  No, I haven't.
11:50:14  4       Q  -- the transfer?
11:50:15  5       A  No.
11:50:15  6       Q  So sitting here today, you don't know whether
          7    Mark Holodniy executed a confidentiality agreement with
          8    Cetus; is that correct?
11:50:25  9       MR. CANNON: Objection as to form.
11:50:27 10       THE WITNESS: I have not seen, physically seen it in
         11    front of me, no. I have not seen, so therefore I do not
         12    know, yeah.
11:50:34 13    BY MS. WILKINSON:
11:50:34 14       Q  Has anyone told you whether Dr. Holodniy signed
         15    a confidentiality agreement with Cetus?
11:50:41 16       MR. CANNON: I would caution the witness not to
         17    reveal attorney-client communications in answer to the
         18    question. Other than that, you can answer the question.
         19    If you can't answer without revealing the attorney-client
         20    privilege, then say so.
11:51:01 21       THE WITNESS: Yeah, I cannot answer.
11:51:02 22       MS. WILKINSON: Are you instructing the witness not
         23    to answer?
11:51:04 24       THE WITNESS: I can't answer. I don't know.
11:51:06 25       MR. CANNON: If he cannot -- if he's just testified
                                                            Page 79
```

```
          1    he can't answer without revealing so, based upon that
          2    testimony, I instruct the witness not to reveal the
          3    testimony by answering.
11:51:11  4    BY MS. WILKINSON:
11:51:14  5       Q  Mr. Casipit, you knew that Dr. Holodniy was
          6    going to use the standard for patient samples at
          7    Stanford; is that correct?
11:51:25  8       A  Yes, I was told by Alice that that's what he
          9    would use it for, yes.
11:51:29 10       Q  Were there any restrictions on Mark Holodniy
         11    using the standard for his patient studies at Stanford?
11:51:37 12       A  Not that I'm aware of or I was aware of.
11:51:51 13       Q  Was anything else transferred to Dr. Holodniy by
         14    you?
11:51:55 15       A  By me? No.
11:51:59 16       Q  Was there any documentation of your transfer of
         17    standard to Dr. Holodniy?
11:52:10 18       A  I did make an entry in my notebook.
11:52:14 19       Q  Other than an entry in your notebook, was there
         20    any documentation that -- of your transfer to
         21    Dr. Holodniy?
11:52:26 22       A  Not by me and not to my knowledge. Alice may
         23    have, I'm not sure, but not -- I haven't -- I did not.
11:52:36 24       Q  Are you aware of any material transfer
         25    agreements between Cetus and anyone at Stanford?
                                                            Page 80
```

20 (Pages 77 to 80)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

### Page 81

11:52:47  1   A  No. There could be dozens. I don't know. I
2   don't know of that one.
11:52:53  3   Q  Are there any that you're aware of that would
4   apply to the transfer of material from you to
5   Dr. Holodniy?
11:53:06  6   A  The -- the R -- the RNA standard? That
7   particular one?
11:53:11  8   Q  Yes.
11:53:12  9   A  No, I do not know of any MTA.
11:53:14 10   Q  And you are designated by Roche today as a
11   person most knowledgeable about the transfer of the
12   standard to the extent that it falls under our topics; is
13   that correct?
11:53:36 14   A  Correct.
11:53:37 15   Q  And do you recall whether one of our topics was
16   in regards to a material transfer agreement?
11:53:47 17   MR. CANNON: Objection; the topic says what it says,
18   and we've already articulated the subject matter that
19   Clayton Casipit is going to be the Roche corporate
20   representative for.
11:54:00 21   BY MS. WILKINSON:
11:54:00 22   Q  Are there any documents that accompanied the
23   tube that you transferred?
11:54:14 24   A  I -- I can't recall. I really can't recall.
25   The only thing I can recall now is my -- I looked over my

### Page 82

1   notebook and I had an entry that I transferred it on that
2   day.
11:54:29  3   Q  Were there any letters that you recall?
11:54:32  4   A  I don't recall any letters.
11:54:33  5   Q  Any written instructions?
11:54:36  6   A  Not written instructions. I got verbal
7   instructions from Alice.
11:54:40  8   Q  What were those instructions?
11:54:43  9   A  The instructions was -- were that Mark had --
10   had wanted to come over to get the -- to get the sample
11   or to get the mRNA standard and that he was going to go
12   ahead and proceed with his experiments and that he would
13   be coming by later that afternoon and that I was to have
14   it ready for him.
11:55:08 15   Q  And who knew that Mark would be coming by?
11:55:13 16   A  I'm assuming Alice did, yeah.
11:55:16 17   Q  Did anyone else know about the material that you
18   gave?
11:55:20 19   A  Anyone else know, other than Alice? I don't
20   know. I don't know if anybody else knew.
11:55:29 21   Q  Did anyone else give anything to Dr. Holodniy of
22   which you are aware?
11:55:36 23   A  Of what I'm aware? I knew he was down in
24   clinical or pre-clinical, but I don't know what they gave
25   him.

### Page 83

11:55:46  1   Q  So other than the RNA standard, you're not aware
2   of anything that anybody at Cetus gave to Dr. Holodniy;
3   is that correct?
11:56:02  4   A  Correct.
11:56:29  5   Q  Did Alice give you any instructions about the
6   tube that you were going to give to Dr. Holodniy?
11:56:42  7   MR. CANNON: Objection; asked and answered.
11:56:46  8   THE WITNESS: Instructions. Just to get a tube
9   ready and give it to him. That's about all I can recall.
11:56:56 10   BY MS. WILKINSON:
11:56:56 11   Q  She did not tell you -- let me start again.
11:57:01 12   She did not instruct you to communicate to
13   Dr. Holodniy that the material was confidential; is that
14   correct?
11:57:13 15   A  Yeah, she did not instruct me, yes.
11:57:15 16   Q  And she did not instruct you to tell him that
17   the material was proprietary; is that correct?
11:57:21 18   A  Correct.
11:57:29 19   Q  Mr. Casipit, did you keep laboratory notebooks
20   at Cetus?
11:57:33 21   A  Yes, I did.
11:57:34 22   Q  And when did that practice begin?
11:57:35 23   A  When I started work there.
11:57:37 24   Q  Did you write down all important steps in your
25   research in those notebooks?

### Page 84

11:57:42  1   A  As much as I could.
11:57:44  2   Q  It was your practice to record important steps
3   in your experiments; is that correct?
11:57:48  4   A  Yes, it was.
11:57:50  5   Q  Did you write down all interactions you had with
6   other scientists?
11:57:58  7   A  Yes, I did denote it several times in my
8   introduction or in my discussion and that I would put in
9   and say that, you know, such-and-such a scientist had --
10   had said this might work or whatever. And so I would
11   make little notations within the text.
11:58:16 12   Q  And it was your practice to do so on a regular
13   basis?
11:58:20 14   A  As regular as possible, yes.
11:58:22 15   Q  Would you have any entries before June of 1989
16   that pertained to your work on the RNA standard we've
17   been talking about?
11:58:32 18   MR. CANNON: Objection as to form. You can show him
19   the notebook if you want.
11:58:38 20   THE WITNESS: Not that I can recall.
11:58:43 21   MS. WILKINSON: I'd like to mark several exhibits
22   for the record at this time. As in previous depositions,
23   we have two copies of notebooks that have been provided
24   to us. They're of varying copy qualities, so I'm going
25   to introduce both into the record.

### Page 149

```
 1  any further questions, but I want to designate the
 2  transcript as highly confidential, attorney's eyes only.
 3  And per agreement with the other side, the witness will
 4  have the opportunity to review the transcript before it
 5  is finalized.
14:42:23  6     MS. WILKINSON: Thank you. Thank you very much for
 7  your time.
14:42:27  8     THE VIDEOGRAPHER: This concludes today's deposition
 9  of Clayton Casipit. The number of media used was two.
10  We are off the record at 2:42 p.m.
14:42:47 11     THE REPORTER: For the written record,
12  Ms. Wilkinson, would you like a copy of the transcript?
14:42:53 13     MS. WILKINSON: Yes.
14:42:54 14     MS. RHYU: Yes.
14:42:55 15     THE REPORTER: Counsel, for you?
14:42:55 16     MR. CANNON: Yes. I'd like a rough ASCII e-mailed
17  to me, and I'd like the regular -- the transcript as soon
18  as you get it done, and then we've agreed that the party
19  taking the depo is going to keep the originals and my
20  copies.
14:43:17 21     MS. WILKINSON: We would also request a copy of the
22  rough ASCII transcript, please.
14:43:21 23     THE REPORTER: Thank you.
14:43:22 24     MR. CANNON: And if you could send the actual
25  manuscript to me, I will get it to the witness for
```

### Page 150

```
 1  viewing and signing.
14:43:45  2     THE REPORTER: Are there any time constraints on
 3  this transcript?
14:43:53  4     MR. CANNON: I'd like it in one week, please.
14:43:53  5     MS. RHYU: We'll take the same.
14:43:53  6     //
14:45:47  7     //
```

### Page 151

```
 9  I, CLAYTON CASIPIT, do hereby declare under
10  penalty of perjury that I have read the foregoing
11  transcript of my deposition; that I have made such
12  corrections as noted herein, in ink, initialed by me, or
13  attached hereto; that my testimony as contained herein,
14  as corrected, is true and correct.
15      EXECUTED this _____ day of _____,
16  20___, at _____,
                _____.
17     (City)          (State)

20     CLAYTON CASIPIT
```

### Page 152

```
 1  STATE OF CALIFORNIA )
                       : ss
 2  COUNTY OF CONTRA COSTA)

 4     I, the undersigned, a Certified Shorthand
 5  Reporter of the State of California, do hereby
 6  certify:
 7     That the foregoing proceedings were taken
 8  before me at the time and place herein set forth; that
 9  any witnesses in the foregoing proceedings, prior to
10  testifying, were placed under oath; that a verbatim
11  record of the proceedings was made by me using machine
12  shorthand which was thereafter transcribed under my
13  direction; further, that the foregoing is an accurate
14  transcription thereof.
15     I further certify that I am neither
16  financially interested in the action nor a relative or
17  employee of any attorney of any of the parties.
18     IN WITNESS WHEREOF, I have this date
19  subscribed my name.

21     Dated: _____

24     TRACY L. PERRY
        CSR No. 9577
```