Board of Trustees of the Leland Stanford Junior University v. Roche Molecular Systems, Inc. et al    Doc. 95 Att. 22

REVISION NOTICE 2—1980
November 15, 1980

Stanford University

# Administrative Guide
(Guide to Administrative Organization, Policies, and Procedures)

*Please put the attached pages in your copy of the Guide and remove the pages that have been replaced. This notice may be discarded when you are through.*

## Summary of Additions and Changes

**35.3, Payroll Deadlines—1981**

Replace the one-page Memo dated December 15, 1978. The Payroll Deadlines Memo has been revised to include mention of new forms introduced a year ago with the combined payroll/personnel system. The actual deadlines in addition to being published here were printed in the January 7, 1981, *Campus Report*.

**75., Inventions, Patents, and Licensing**

Replace the five-page Memo entitled Patents, dated October 1, 1974, and December 15, 1970. University patent policy, adopted by the Board of Trustees in 1970, is not changed. The Guide Memo has been revised, however, to include background information (section 3) on inventions, patents, patentability, and the value of nonpatentable inventions. The revised royalty-income sharing distribution plan is explained in section 2.a.(2). Paragraph 1.b. clarifies the responsibilities of Sponsored Project's Patent and Copyright Affairs group and the Office of Technology Licensing. Text formerly in the Personnel Patent Agreement, SU-18, has become paragraph 1.d.(6) of the revised Memo.

**76., Copyrightable Materials and Other Intellectual Property**

Replace the one-page Guide Memo 76., Copyright Policy, dated May 1, 1975, and the three-page Memo 76.1, Copyright Administration, dated August 15, 1975, with this new four-page Memo. The statement of policy and objectives is not substantively changed. The definition of "work for hire" (3.b.) has been broadened to conform with the 1978 Copyright Act. Provisions have been added for University ownership of trade and service marks to make explicit what is implied by law (3.c.(1) and 5.a.). Guidelines relating to books and articles have been rewritten; the intent, however, is to continue the existing policy for works where ownership generally vests in the creator rather than the University (4.a.). The policy on University ownership of commissioned works is continued, but written agreement is now required by the 1978 Copyright Act. Use of University facilities is clarified, but not intended to change existing policy (4.d.). Computer software and databases produced as works for hire are now explicitly University-owned (4.e.), and protected as trade secrets consistent with the rights of scholarly publication (4.e.(1)). Existing policy on videotaping and related technology is now included as paragraph 4.1.

Editor's Note: Call Jane Arnold at News and Publications Service, ext. 7-2558, if you would like to receive a page check (a list of all Guide Memos and their dates) to confirm the accuracy of your Administrative Guide. Also, if you have one of the 20-year-old cloth binders and it's falling apart, Jane can send you a new vinyl replacement.—*Karen Bartholomew*

*January 30, 1981*



STAN 015486

Dockets.Justia.com

November 15, 1980          Page 1 of 4                          Guide Memo: 75.

# Inventions, Patents, and Licensing

1. **STANFORD POLICY AND PROCEDURE**
   a. **Invention rights policy**—Unlike industry and many other universities, Stanford's invention rights policy allows all rights to remain with the inventor if possible.
      (1) **Retention of patent rights by inventor**—The Board of Trustees on April 14, 1970, adopted the following resolution: "Except in cases where other arrangements are required by contracts and grants for sponsored research or where other arrangements have been specifically agreed upon in writing, it shall be the policy of the University to permit employees of the University, both faculty and staff, and students to retain all rights to inventions made by them."
      (2) **Invention rights with external sponsors**—In practice, the great majority of inventions arise from externally funded research covered by agreements containing patent provisions. Some agreements permit the University to retain title and grant license rights to the sponsor; some provide for the reverse or defer allocation of rights.
         (a) **Retention of rights by University**—If the University wishes to obtain title it must petition the sponsor for a waiver and must demonstrate that the best method quickly and effectively to develop a particular discovery is to permit the University to patent and license the invention.
         (b) **Retention of rights by inventor**—Some sponsors allow title to be retained by the inventor when the University declines development. In such cases the inventor must petition the sponsoring agency directly. The Sponsored Projects Office's Patent and Copyright Affairs staff can assist in determining the provisions of a particular sponsored research agreement.
   b. **Patent administration responsibility**—Patent administration at Stanford is divided into two main functional areas: the Patent and Copyright Affairs group as part of the Sponsored Projects Office, and the Office of Technology Licensing.
      (1) **Patent and Copyright Affairs group**
         (a) The goals of the Patent and Copyright Affairs group are:
            - To assist in administering intellectual property right terms and conditions of the University's grants and contracts;
            - To facilitate compliance with applicable patent and copyright laws;
            - To assist in achieving compliance with University policies regarding intellectual property rights and secrecy in research;
            - To negotiate the most favorable intellectual property right terms available for the University and for individual researchers;
            - To provide adequate information to the Office of Technology Licensing to serve as the basis for appropriate marketing and licensing decisions.
         (b) **Responsibilities of Patent and Copyright Affairs manager**—The Patent and Copyright Affairs manager is responsible for the formal patent review of sponsored research, initial reports of inventions, contract and grant patent terms and conditions, patent certification, and the administration of personnel patent agreements in conformance with the University's policies and contractual obligations.
         (c) **Other patent management**—Assistance in monitoring major research activities at Hansen Laboratories and the Stanford Linear Accelerator Center is provided on a part-time basis by professional staff or outside patent attorneys.
      (2) **Office of Technology Licensing**
         (a) The goals of the Office of Technology Licensing are:
            - To provide a mechanism for bringing inventions developed as a result of University research forward to public use and benefit;
            - To provide, consistent with the first goal, an additional source of income to the University for research and education.
         (b) **Responsibilities of Technology Licensing director**—The Technology Licensing director is responsible for the administration of the University's licensing program, including the commercial evaluation of inventions from both sponsored and independent research, patent filing decisions, petitions to agencies for greater rights in inventions, and negotiation of licensing agreements with industry.

STAN 015487

November 15, 1980     Page 2 of 4     Guide Memo: 75.

## Inventions, Patents, and Licensing

c. **Personnel patent agreements**

  (1) **Individuals bound by patent agreements**—In order for Stanford to comply with its obligations to sponsors, all individuals who may be in a capacity to make, conceive, or first actually reduce to practice inventions, improvements, or discoveries under externally sponsored projects with patent terms must sign the *Stanford University Patent Agreement* (form SU-18, available from Stores Department). This includes faculty, staff, students, and others who either now or in the future expect to use equipment and facilities, or to receive salary or other types of support, from externally sponsored projects. It also includes visiting faculty, industrial personnel, fellows, etc., who are not employees and receive salary or other support elsewhere but who participate or intend to participate in externally sponsored research projects at Stanford. In addition, as new faculty and staff are employed or as new individuals participate in sponsored projects, the same eligibility tests are to be applied and *Patent Agreements* signed as required.

  (2) **Signing of Patent Agreements**—Each department is responsible for getting the *Patent Agreement* signed at the time of initial employment. The white copy of the signed *Patent Agreement* should be attached to and forwarded with the *Personnel Action Form* or *Student Action Form*, whichever is appropriate; the yellow copy should be retained in departmental files; the pink copy should be retained by the signee.

  (3) **Exceptions to Patent Agreements**—The *Patent Agreement* does not apply to an invention which qualifies fully under California Labor Code Section 2780 (i.e., an invention for which no Stanford University equipment, supplies, facility, or trade secret information was used and which was developed entirely in the employee's own time and (a) does not relate to Stanford research and (b) does not result from any work performed by the employee for Stanford).

d. **Invention disclosures**

  (1) **Definition of invention disclosures**—An invention disclosure is a document which provides information about what was invented, inventor(s), circumstances leading to the invention, and facts concerning subsequent activities. It provides the basis for a determination of patentability and the technical information for drafting a patent application. (Forms are available from Sponsored Projects.)

  (2) **When invention disclosure is required**—An invention disclosure must be prepared and submitted for each invention conceived or first actually reduced to practice under a University contract or grant with patent terms.

  (3) **Identification of inventions**—Inventions are usually identified by formal reviews of research activities and technical reports, or by the individual inventor and his/her associates.

  (4) **Procedure for invention disclosure**—When a discovery has been made which might be patentable, an invention disclosure describing the invention and including other related facts should be prepared by the inventor and forwarded to the manager, Patent and Copyright Affairs, or to the SLAC inventions administrator, as appropriate. Forms may be requested from their offices.

  (5) **Invention disclosure review criteria**—Disclosures of inventions derived from sponsored research are reviewed for technical content, rights, and equities, and consideration of the grant or contract terms before being submitted to the Office of Technology Licensing for commercial evaluation and appropriate action. Disclosures are then submitted to the sponsor, together with notification of the decision of the Office of Technology Licensing regarding further development.

  (6) **Request for transfer of rights from sponsor to inventor**

  (a) Under some circumstances the inventor may request and be granted rights by a sponsor to an invention made under a contract, provided that a well-conceived and detailed plan for commercial development accompanies the request and the request has the authorization of the University.

  (b) Written notice of intention to request rights from a sponsor should be made at the time the invention disclosure is submitted. Authorization for the request should be obtained from the Office of Technology Licensing.

e. **Patent licensing policy**—The University encourages the development by industry for public use and benefit of inventions which occur in the course of University research. It recognizes that protection of proprietary rights in the form of a patent license are often necessary—particularly with inventions derived from basic research—to encourage a company to risk the investment of its personnel and financial resources to develop the invention. Where possible, the University endeavors to make inventions to which it holds title available to the public on a nonexclusive basis. However, in most cases an initial limited term exclusive license is necessary to make it feasible for a company to undertake commercial development and production. Nonexclusive licenses are made available after this initial limited term.

The basic purposes of the University always take precedence over patent considerations. While the

★ Revised

STAN 015488

November 15, 1980            Page 3 of 4            Guide Memo: 75.

## Inventions, Patents, and Licensing

University recognizes the benefits of patent development, it is most important that the direction of University research should not be established or unduly influenced by patent considerations.

2. **PATENT DEVELOPMENT OPTIONS**

   Consistent with patent terms of a particular research sponsor, the inventor usually has the following options for development of his/her invention.

   a. **Stanford licensing program**—The University maintains a licensing program administered by the Office of Technology Licensing, which is available to all University inventors.
      (1) **Evaluation for licensing**—Inventions submitted to the program are evaluated for their licensing potential. If accepted, the Office of Technology Licensing in cooperation with the inventor seeks to license the invention to a company for development and marketing.
      (2) **Distribution of royalties**—The following procedures are followed for the distribution of royalties received under its licensing program:
         (a) **Office of Technology Licensing deductions**—A deduction of 15% to cover the budgeted expenses of the Office of Technology Licensing is taken from gross royalty income, followed by a deduction for any direct assignable expenses—typically patent filing fees.
         (b) **Division of royalties**—After deductions, royalty income is divided one-third to the inventor, one-third to the inventor's department, and one-third to the University royalty income fund.
         (c) **Division of royalties after payment of limited inventor's share**—In cases where the sponsor may limit an inventor's share to less than one-third of net royalty income (for example the Department of Health and Human Services), the remainder after deducting the allowable inventor's share will be divided one-half to the department and one-half to royalty income fund.
         (d) **Royalty income fund**—Income to the royalty fund will be paid out to the schools (the dean of research for the independent laboratories) at each fiscal year end, after an additional allocation is made as necessary to the OTL budget in the event the 15% charge against gross royalty income is insufficient to cover OTL's budget expenses in a given year. Allocations are made to the schools and the dean of research in proportion to the total annual royalty income generated by school inventions.

   b. **Development by the Inventor**—When a sponsor's policy permits, an inventor who wishes to develop at his/her own expense inventions made in the course of sponsored research may petition the sponsor for the appropriate rights, subject to the sponsor's terms and conditions, and a royalty-free nontransferable license to the University.
      (1) **Normal conditions of sponsorship**—U.S. Government sponsors normally require that:
         (a) The sponsor be advised of all patent actions including application serial number and filing date, granting of patent and patent number;
         (b) The U.S. Government be provided a royalty-free license to the invention;
         (c) An annual progress report on the development of the invention be provided the sponsor;
         (d) The sponsor can reacquire title in the event of certain conditions including lack of diligence on the part of the inventor in obtaining development.

   c. **Patent management organizations**—There are organizations (e.g., Research Corporation, University Patents, Inc., Battelle Development Corporation) which are also available to provide development services. The Office of Technology Licensing can furnish information and assistance regarding these organizations.

   The inventor is cautioned to work with reputable, established organizations such as those listed above rather than with unknown or unestablished commercial firms.

3. **BACKGROUND**

   a. **What is a patent?**—A patent is a grant issued by the U.S. Government giving an inventor the right to exclude all others from making, using, or selling the invention within the United States, its territories and possessions for a period of 17 years. When a patent application is filed, the U.S. Patent Office reviews to ascertain if the invention is new, useful, and nonobvious and, if appropriate, grants a patent—usually two to five years later. Not all patents are necessarily valuable or insusceptible to challenge.

   b. **What is an Invention?**—An invention is a novel and useful idea relating to processes, machines, manufactures, and compositions of matter. It may cover such things as new or improved devices, systems, circuits, chemical compounds, mixtures, etc.

   It is probable that an invention has been made when something new and useful has been conceived or developed, or when unusual, unexpected, or nonobvious results have been obtained and can be exploited.

\* Revised

STAN 015489

November 15, 1980        Page 4 of 4        Guide Memo: 75.

## Inventions, Patents, and Licensing

An invention can be made solely or jointly with others as coinventors. To be recognized legally, a coinventor must have conceived of an essential element of an invention or contributed substantially to the general concept. (See section 1.d. for information and procedure regarding the formal disclosure of an invention.)

c. Patentability—Not all inventions are patentable. Questions relating to patentability are often complex and usually require professional assistance.
   (1) General criteria for patentability—An important criterion of patentability is that an invention must not be obvious to a worker with ordinary skill in that particular field. It also must not have been publicly known or used by others in this country or patented or described in a printed publication anywhere prior to the date of invention.
   (2) Loss of patentability—Inventions that are patentable initially may become unpatentable for a variety of reasons. An invention becomes unpatentable in the United States unless a formal application is filed with the U.S. Patent Office within 12 months of disclosure in a publication or of any other action which results in the details of the invention becoming generally available.
   (3) Circumstantial impairment of patentability—Many other circumstances may impair patentability, such as lack of "diligence." For example, unless there is a record of continuous activity in attempting to complete and perfect an invention, it may be determined that the invention has been abandoned by the initial inventor, and priority given to a later inventor who showed "due diligence."
   (4) International variation of patentability regulations—Regulations covering the patentability of inventions and application filing procedures vary considerably from country to country and are subject to change. It is important to note that an invention is unpatentable in most foreign countries unless a patent application is filed *before* publication.

d. Value of nonpatentable inventions

An invention, although unpatentable for various reasons, may still be valuable and important—for example, trade secrets and technical "know-how" encompassing proprietary information of a valuable and confidential nature.

Agencies sponsoring research at Stanford usually require reports of all inventions, whether or not they are considered patentable.

STAN 015490