COOLEY GODWARD KRONISH LLP
STEPHEN C. NEAL (No. 170085) (nealsc@cooley.com)
RICARDO RODRIGUEZ (No. 173003) (rr@cooley.com)
MICHELLE S. RHYU (No. 212922) (mrhyu@cooley.com)
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306-2155
Tel:   (650) 843-5000
Fax:  (650) 857-0663

Attorneys for Plaintiff and Counterclaim Defendant,
THE BOARD OF TRUSTEES OF THE LELAND STANFORD
JUNIOR UNIVERSITY and Counterclaim Defendants THOMAS
MERIGAN and MARK HOLODNIY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY,<br><br>Plaintiff,<br><br>v.<br><br>ROCHE MOLECULAR SYSTEMS, ET AL.,<br><br>Defendants. | Case No. C 05 04158 MHP<br><br>**COUNTERCLAIM DEFENDANTS STANFORD UNIVERSITY, DR. MERIGAN AND DR. HOLODNIY'S MOTION FOR SUMMARY JUDGMENT**<br><br>[Public Version] |
| ROCHE MOLECULAR SYSTEMS, ET AL.,<br><br>Counterclaimants,<br><br>v.<br><br>THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY; THOMAS MERIGAN AND MARK HOLODNIY<br><br>Counterclaim Defendants. | |

740289 v1/PA

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

**COUNTERCLAIM DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
CASE NO. C 05 04158 MHP**

# TABLE OF CONTENTS

PAGE

I. INTRODUCTION ........................................................................................................... 1
II. STATEMENT OF FACTS ............................................................................................. 2
   A. Procedural Background ........................................................................................ 2
   B. The Inventions of the Merigan Patents ................................................................. 2
   C. Factual Background .............................................................................................. 3
      1. Background on Dr. Merigan and Cetus ..................................................... 3
      2. The Quantitation of HIV Sequences Using PCR ...................................... 4
      3. Development of the Patented Invention .................................................... 6
      4. Cetus's Awareness of the Inventors' Work ............................................... 7
   D. The Agreements at Issue and the Asset Purchase Agreement ............................. 7
   E. RMS's Knowledge of the Merigan Patents and Stanford's Licensing Efforts ................................................................................................................... 8
      1. RMS Knew of the Merigan Patent Family No Later Than December 1999 ............................................................................................ 8
      2. RMS Knew of Stanford's Licensing Efforts with the Merigan Patents No Later than October 1998 ......................................................... 9
III. STANDARD FOR SUMMARY JUDGMENT .......................................................... 10
IV. ARGUMENT ................................................................................................................ 11
   A. RMS's Ownership and License Claims are Barred by Its Excessive Delay in Bringing Suit .................................................................................................. 11
      1. The Statute of Limitations Bars RMS's Claims as a Matter of Law ........ 11
          a. The Four-Year Statute of Limitations ........................................... 11
          b. RMS's Causes of Action Accrued at Least as of May 1992 ......... 12
          c. RMS's Causes of Action Accrued No Later than December 15, 1999, the Date of Actual Notice ................................................ 13
          d. RMS also had Actual Notice of its Ownership and License Claims No Later than April, 2000 ................................................... 14
          e. Alleged Ignorance of the Contracts Does Not Toll the Statute .......................................................................................... 15
      2. The Doctrine of Laches Bars Any Equitable Claims to Ownership ........ 16
      3. Roche's Claims are Barred by Equitable Estoppel .................................. 17
   B. There is Insufficient Evidence as a Matter of Law for RMS to Meet its Burden on Its Claims through the Merigan 1984 and 1991 Consulting Agreements. .......................................................................................................... 19
      1. RMS Lacks Standing to Obtain Ownership or License Rights Through the Merigan Consulting Agreements ......................................... 19
          a. The 1991 Asset Purchase Agreement Makes No Mention of the Merigan Consulting Agreements ............................................ 20

**TABLE OF CONTENTS**
(CONTINUED)

PAGE

    b. No Facts Manifest an Intent to Assign the Merigan Consulting Agreements to Hoffman-La Roche............................ 21

   2. Merigan's Work, Funded by the U.S. Government, was Expressly Excluded from the 1984 Agreement ........................................................ 22

   3. No Merigan Work Related to the Patents was Done Under the April 1991 Merigan Consulting Agreement ........................................................ 23

 C. RMS Cannot Meet Its Burden on Its Claims Through the 1988 MTA ................. 23

 D. RMS Cannot Meet its Burden on Its Claims Through Holodniy's 1989 Visitor's Confidentiality Agreement ................................................................ 25

   1. The Visitor's Confidentiality Agreement is Unenforceable If Interpreted to Include Public Information ............................................... 25

   2. RMS Cannot Show that Dr. Holodniy Used Cetus Trade Secrets to Invent ............................................................................................... 27

 E. RMS has no Cognizable Claim to Ownership Via "Shop Rights." ....................... 28

   1. The Inventions were Not "Conceived and Perfected" at Cetus ................ 28

   2. The Equities Confirm the Inapplicability of the Shop Rights Doctrine .................................................................................................. 29

V. CONCLUSION ................................................................................................................ 30

# TABLE OF AUTHORITIES

PAGE

**CASES**

A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,
  960 F.2d 1020 (Fed. Cir. 1992) .................................................................. 19

Advanced Bionics Corp. v. Medtronic, Inc.,
  29 Cal. 4th 697 (2002) .............................................................................. 26

Alamar Biosciences, Inc. v. Difco Lab., Inc.,
  No. Civ-S-941856 DFL PAN., 1995 WL 912345 (E.D. Cal. Oct. 13, 1995) .............. 11, 15

Am. Credit Indem. Co. v. Sacks,
  213 Cal. App. 3d 622 (1989) ..................................................................... 27

Anderson v. Liberty Lobby, Inc.,
  477 U.S. 242 (1986) ................................................................................. 11

April Enterprises, Inc. v. KTTV,
  147 Cal. App. 3d 805 (1983) ..................................................................... 13

Arachnid, Inc. v. Merit Indus., Inc.,
  939 F.2d 1574 (Fed. Cir. 1991) .................................................................. 10

Asnon v. Foley,
  105 Cal. App. 624 (1930) .......................................................................... 10

Bass v. Hueter,
  205 Cal. 284 (1928) ................................................................................. 13

Brower v. Evans,
  257 F.3d 1058 (9th Cir. 2001) ................................................................... 11

Campbell v. Bd. of Trs. of Leland Stanford Junior Univ.,
  817 F.2d 499 (9th Cir. 1987) ..................................................................... 26

Celotex Corp. v. Catrett,
  477 U.S. 317 (1986) ................................................................................. 10

Compare Metro Traffic Control, Inc. v. Shadow Traffic Network,
  22 Cal. App. 4th 853 (1994) ...................................................................... 27

Crom v. Cement Gun Co.,
  46 F. Supp. 403 (D. Del. 1942) .................................................................. 29

Danjaq LLC v. Sony Corp.,
  263 F.3d 942 (9th Cir. 2001) ................................................................. 16, 17

Dillon v. Bd. of Pension Comm'rs,
  18 Cal. 2d 427 (1941) ............................................................................... 13

Everex Sys., Inc. v. Cadtrak Corp. (In re CFLC, Inc.),
  89 F.3d 673 (9th Cir. 1996) ....................................................................... 24

Francklyn v. Guilford Packing Co.,
  695 F.2d 1158 (9th Cir. 1983) ................................................................... 30

Ginther v. Tilton,
  206 Cal. App. 2d 284 (1962) ..................................................................... 13

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

740289 v1/PA

iii.

# TABLE OF AUTHORITIES
### (CONTINUED)

PAGE

*Granite State Ins. Co. v. Smart Modular Techs., Inc.*,
    76 F.3d 1023 (9th Cir. 1996) .......................................................................................... 18

*Gutierrez v. Mofid*,
    39 Cal. 3d 8929 (1985) .................................................................................................. 14

*High Sierra Hikers Ass'n v. Blackwell*,
    390 F.3d 630 (9th Cir. 2004) .......................................................................................... 11

*Hunter v. Superior Court*,
    36 Cal. App. 2d 100 (1939) ............................................................................................ 26

*In re CFLC, Inc.*,
    89 F.3d at 679 (citing *Gilson v. Republic of Ireland*, 787 F.2d 655 (D.C. Cir. 1986)) ........................................................................................................... 24, 25

*In re Hernandez*,
    285 B.R. 435 (Bankr. D. Ariz. 2002) .............................................................................. 24

*In re Patient Educ. Media, Inc.*,
    210 B.R. 237 (Bankr. S.D.N.Y. 1997) ............................................................................ 25

*In re Providian Credit Card Cases*,
    96 Cal. App. 4th 292 (2002) ..................................................................................... 27, 28

*Kimberly Corp. v. Hartley Pen Co.*,
    237 F.2d 294 (9th Cir. 1956) .......................................................................................... 14

*Leahey v. Dep't of Water & Power*,
    76 Cal. App. 2d 281 (1946) ............................................................................................ 12

*Maguire v. Hibernia Sav. & Loan Soc'y*,
    23 Cal. 2d 719 (1994) .................................................................................................... 12

*Mechmetals Corp. v. Telex Computer Prods., Inc.*,
    709 F.2d 1287 (9th Cir. 1983) ........................................................................................ 30

*Miller v. Glen Miller Prods., Inc.*,
    454 F.3d 975 (9th Cir. 2006) .......................................................................................... 11

*Mogul v. Jenkins Bros.*,
    120 N.Y.S.2d 585 (1953) ............................................................................................... 20

*Monolith Portland Midwest Co. v. Kaiser Aluminum & Chem. Corp.*,
    407 F.2d 288 (9th Cir. 1969) .......................................................................................... 12

*Pearl-Wick Corp. v. John Hancock Mut. Life Ins. Co.*
    26 B.R. 604 (S.D.N.Y. 1982) ......................................................................................... 21

*Perlman v. Catapult Entm't, Inc. (In re Catapult Entm't, Inc.)*,
    165 F.3d 747 (9th Cir. 1999) .......................................................................................... 24

*PPG Indus., Inc. v. Guardian Indus. Corp.*,
    597 F.2d 1090 (6th Cir. 1979) ........................................................................................ 24

*Property Asset Mgmt., Inc. v. Chicago Title Ins. Co.*,
    173 F.3d 84 (2nd Cir. 1999) ........................................................................................... 21

*Rhythm & Hues, Inc. v. Terminal Mktg. Co.*,
    4697, 2004 WL 941908, (S.D.N.Y. May 4, 2004) ......................................................... 20

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

740289 v1/PA

iv.

# TABLE OF AUTHORITIES
## (CONTINUED)

| | PAGE |
|---|---|
| *Rigging Int'l Maint. Co. v. Gwin*, 128 Cal. App. 3d 594 (1982) | 27 |
| *Sardanis v. Sumitomo Corp.*, 723 N.Y.S.2d 466 (2001) | 20 |
| *Stenograph Corp. v. Fulkerson*, 972 F.2d 726 (7th Cir. 1992) | 24 |
| *Summerhays v. Scheu*, 10 Cal. App. 2d 574 (1936) | 26 |
| *Thompson v. Impaxx, Inc.*, 113 Cal. App. 4th 1425 (2003) | 26 |
| *TM Patents, L.P. v. Int'l Bus. Machs. Corp.*, 121 F. Supp. 2d 349 (S.D.N.Y. 2000) | 10 |
| *Tostevin v. Douglas*, 160 Cal. App. 2d 321 (1958) | 12 |
| *Trindade v. Superior Court*, 29 Cal. App. 3d 857 (1973) | 12 |
| *Trustees of the Cal. State Univs. v. Nat'l Collegiate Athletic Ass'n*, 82 Cal. App. 3d 461 (1978) | 18 |
| *Unarco Indus., Inc. v. Kelley Co.*, 465 F.2d 1303 (7th Cir. 1972) | 24 |
| *United States v. Garan*, 12 F.3d 858 (9th Cir. 1993) | 18, 29 |
| *Vacco Indus., Inc. v. Van Den Berg*, 5 Cal. App. 4th 34 (1992) | 28 |
| *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157 (1990) | 20 |
| *Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443 (2002) | 27 |
| *Wilshire Westwood Assocs. v. Atl. Richfield Co.*, 20 Cal. App. 4th 732 (1993) | 14, 15, 17 |
| *Winston Research Corp. v. Minn. Mining & Mfg. Co.*, 350 F.2d 134 (9th Cir 1965) | 26 |

**OTHER AUTHORITIES**

| | |
|---|---|
| 35 U.S.C. § 200 | 23 |
| 35 U.S.C. § 202 | 23 |
| Cal. Code Civ. Proc. § 337 | 11 |
| Cal. Code Civ. Proc. § 343 | 12, 16 |
| Cal. Evid. Code § 500 | 10 |
| California Business and Professions Code section 16600 | 26 |

**TABLE OF AUTHORITIES**
(CONTINUED)

**PAGE**

Fed. R. Civ. P. 56(c) .................................................................................................................... 10

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

740289 v1/PA

vi.

## I. INTRODUCTION

After fourteen years of silence and acquiescence, Roche Molecular Systems et al. ("RMS"), a partial successor-in-interest to Cetus Corporation ("Cetus"), seeks to strip Dr. Tom Merigan, Dr. Mark Holodniy and Stanford University of patents they acquired through hard work and dedication to improving HIV-AIDS therapy. RMS asserts broad rights to **any use** of polymerase chain reaction ("PCR") technology that was *ever* learned from Cetus, regardless of whether that technology is or ever was confidential to Cetus. It now asserts these claims through strained readings of four contracts and the shop rights doctrine. But the evidence shows that no one believed the inventions were the property of Cetus, even after the patents issued.

RMS admits it has been aware of Stanford's sole claim to the inventions since December 1999. As this action was filed in October 2005, all of RMS's claims are time barred by the four-year statute of limitations and the doctrine of laches. Estoppel also bars RMS's claims, because Stanford, Dr. Merigan, and Dr. Holodniy reasonably relied, to their detriment, on Cetus's and RMS's actions, which included declining to file a patent, consenting to publication of early work done in part at Cetus, and failing to identify its interest.

Summary judgment is also proper on several additional grounds. RMS does not have rights to the 1984 and 1991 Merigan consulting agreements. These agreements were evaluated in connection with the purchase of PCR assets from Cetus, but were excluded from the several hundred agreements that were transferred from Cetus to Hoffmann La-Roche. Even if they had been transferred, the agreements do not cover research where government funds were used to develop the inventions. Claims based on the Materials Transfer Agreement (MTA) fail, because the option to a nonexclusive license is simply not an assignable right. As to the 1989 Confidentiality Agreement, it cannot reach work subsequently performed at Stanford, because such an interpretation would render the contract unenforceable. Finally, the shop rights doctrine does not apply, foremost because the invention was not made at Cetus as required by the doctrine.

COOLEY GODWARD KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

740289 v1/PA                                1                      COUNTERCLAIM DEFENDANTS'
                                                                   MOTION FOR SUMMARY JUDGMENT
                                                                   CASE NO. C 05 04158 MHP

II. STATEMENT OF FACTS

A. Procedural Background.

The Board of Trustees of the Leland Stanford Junior University ("Stanford") filed suit against Roche Molecular Systems, Inc. and its affiliates (collectively, "RMS") on October 14, 2005, for infringement of two U.S. patents, 5,968,730 (the "'730 patent") and 6,503,705 (the "'705 patent"). (Rhyu Decl.[1], Exs. 15 & 16.) The inventors on both patents are Drs. Thomas Merigan, David Katzenstein, and Mark Holodniy.[2] RMS filed counterclaims seeking declaratory judgment of its ownership and license to the '730 and '705 patents, as well as to four additional patents and patent applications that are in the same patent family (collectively, "the Merigan Patents").[3] (Rhyu Decl., Ex. 700 at 10-25.) RMS also asserted counterclaims against Drs. Merigan and Holodniy for breach of contract, and seeks specific performance to assign the Merigan patents to RMS. (Id. at 25-29.) REDACTED (Rhyu Decl., Ex. 681 at Resp. to Interrog. No. 2.) The Court bifurcated the ownership issues. Stanford now seeks summary judgment on RMS's ownership, license and breach of contract claims.

B. The Inventions of the Merigan Patents.

The Merigan patents involve methods for evaluating the effectiveness of anti-HIV therapy to make therapeutic decisions for treating patients with Acquired Immunodeficiency Syndrome (AIDS). (Rhyu Decl., Ex. A at 162:7-9, 161:16-163:5.) For example, the '705 and '730 patents involve correlating measurements of HIV nucleic acids with determining whether or not a therapy is effective. (See, e.g., Rhyu Decl., Ex. 16, col. 23-24 at claim 1 and Ex. 15, col. 21-22 at claim 1.) The methods of the Merigan patents involve using polymerase chain reaction ("PCR") to test

---

[1] Declaration of Michelle S. Rhyu in Support of Counterclaim Defendants Stanford University, Dr. Merigan and Dr. Holodniy's Motion for Summary Judgment ("Rhyu Decl.").
[2] Due to a patent office error, Michael J. Kozal is also listed as an inventor on the '705 patent. This error has been corrected through a certificate of correction. (Rhyu Decl., Ex. 16.)
[3] The additional patents are U.S. Patent Nos. 5,631,128 ("'128 patent", Rhyu Decl., Ex. 555); 5,856,086 ("'086 patent", Rhyu Decl., Ex. 684); 5,650,268 ("'268 patent", Rhyu Decl., Ex. 556), and Reissue Patent No. RE38,352 E ("'352 patent", Rhyu Decl., Ex. 701). The application corresponds to publication US2003/0118986 A1. (Mejia Decl. ¶ 4.)

COOLEY GODWARD KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

740289 v1/PA                      2                      COUNTERCLAIM DEFENDANTS'
                                                         MOTION FOR SUMMARY JUDGMENT
                                                         CASE NO. C 05 04158 MHP

1  for the presence of HIV nucleic acid. *The PCR assay itself is not the claimed invention* in the
2  Merigan patents. (Rhyu Decl., Ex. A at 161:16-163:5, 163:9-16; Holodniy Decl. ¶ 26.)
3       The first Merigan patent application, No. 07/883,327 ("'327 application"), was filed on
4  May 14, 1992. (Rhyu Decl. Ex. 15 at 1.) The first Merigan patent issued on July 22, 1997, and
5  the "parent" application to all of the Merigan patents became publicly available in 1997. (Mejia
6  Decl., ¶ 6.) That application includes claims to methods for monitoring the effectiveness of anti-
7  HIV treatment by detecting HIV nucleic acids using PCR. (Rhyu Decl., Ex. 692 at STAN
8  014837-843.)

### C. Factual Background

#### 1. Background on Dr. Merigan and Cetus.

Around 1980, Cetus asked Dr. Merigan to be a member of its Scientific Advisory Board. (Rhyu Decl., Ex. A at 91:6-92:7.) At the time, Dr. Merigan was a Professor of Medicine at Stanford and a prominent researcher in virology. Cetus's main research focus was the development of Interleukin-2 ("IL-2") as a therapeutic agent. Cetus sought Dr. Merigan's clinical expertise and hoped his advice would help Cetus to obtain regulatory approval for IL-2. (Rhyu Decl., Ex. B at 53:22-54:8, 61:1-5, 63:14-24; Ex. A at 95:19-98:5.) Dr. Merigan attended occasional meetings at Cetus and was generally available as an expert when needed. (Rhyu Decl., Ex. A at 92:8-93:11, 95:19-98:5.) This advisory relationship was formalized in consulting agreements signed in 1980, 1984, and 1991. (Rhyu Decl., Exs. 351, 356 & 369). From the beginning, these agreements recognized that Dr. Merigan had obligations to his employer, Stanford, and that the consulting agreements did not interfere with those obligations. (*Id.* at Ex. 351, ¶3(a); Ex. 352, ¶3(a); Ex. 356, ¶3; Ex. 369, ¶4.)

In the mid 1980s, Dr. Merigan was focused on the treatment of AIDS. He was instrumental in establishing the Center for AIDS Research (CFAR) at Stanford, through a grant from the National Institutes of Health. (Rhyu Decl., Ex. A at 25:20-27:10.) In approximately 1989, he became Director of the Center. In parallel, he obtained a U.S. government grant to conduct clinical trials as part of the AIDS Clinical Trials Group ("ACTG"). (Rhyu Decl., Ex. A at 24:3-10, 33:4-22.) Under these grants, he worked with Dr. David Schwartz to administer a

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

740289 v1/PA      3      COUNTERCLAIM DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
CASE NO. C 05 04158 MHP

1  clinical trial that tested IL-2 (provided by Cetus) as a potential treatment for AIDS. (Rhyu Decl.,
2  Ex. A at 61:4-18.) Meanwhile, at Cetus, Kary Mullis, a Cetus employee, had invented the PCR
3  technology in 1983 and had obtained "a fundamental patent" that was published in 1987. (Rhyu
4  Decl., Ex. 686; Ex. C at 128:6-133:7.)

5  Drs. Merigan and Schwartz agreed to send patient samples from their ACTG trial to
6  Cetus so that Cetus could perform tests, *i.e.*, "assays," using PCR to detect HIV. (Rhyu Decl.,
7  Ex. A at 62:17-64:13; Ex. G at 45:24-47:10.) At that time, the Cetus PCR test involved testing
8  DNA sequences isolated from so-called peripheral blood mononuclear cells ("PBMCs") of the
9  infected patients. (Rhyu Decl., Ex. B at 90:12-91:5; Ex. D at 135:22-138:12, 139:19-23; Ex. E at
10 49:3-10, 87:12-89:6.) Drs. Schwartz and Merigan asked Cetus for a written copy of the Cetus
11 protocol for detecting HIV DNA in November 1988. (Rhyu Decl., Ex. 28; Ex. A at 281:13-
12 283:8.) This request appears to have triggered the preparation of a Materials Transfer
13 Agreement, dated December 19, 1988 ("the MTA"). (Rhyu Decl., Ex. 29; Ex. A at 288:17-
14 291:8.) There is no evidence that any materials were actually transferred to Dr. Schwartz or Dr.
15 Merigan under this agreement. (Rhyu Decl., Ex. A at 66:5-7, 68:4-69:6, 290:24-291:8.)
16 Furthermore, the Cetus PCR tests on Stanford samples, conducted in the fall of 1988, were
17 inconclusive, because the assay that Cetus was using was too blunt an instrument to provide
18 reproducible, clinically useful information. (Rhyu Decl., Ex. A at 271:21-273:25; Ex. F at
19 99:21-105:22.)

### 2. The Quantitation of HIV Sequences Using PCR.

21 In late 1988, Dr. Merigan recognized that existing PCR assays, and particularly the assay
22 then used by Cetus, were only semi-quantitative. (Rhyu Decl., Ex. A at 60:15-20, 71:18-72:17;
23 Ex. G at 23:10-14, 45:24-47:10.) Dr. Merigan encouraged Dr. Mark Holodniy, an M.D. and
24 post-doctoral fellow, to undertake to design a better assay for quantitating the level of nucleic
25 acids. While Dr. Holodniy already knew about PCR, through a wide array of publications
26 (Holodniy Decl. ¶¶ 7, 8), Drs. Merigan and Holodniy concluded that Dr. Holodniy should visit
27 Cetus to facilitate the development of the assay. (Holodniy Decl. ¶ 9.) Dr. Holodniy spent

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

740289 v1/PA

4

COUNTERCLAIM DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
CASE NO. C 05 04158 MHP

several days a week working at Cetus between February and October or November 1989.[4] (Holodniy Decl. ¶¶ 12, 24.) Dr. Holodniy was never paid by Cetus. (Holodniy Decl. ¶ 13.) The improved assay was ultimately published in April 1991 in the *Journal of Infectious Diseases*. (Rhyu Decl., Ex. 1 ("JID article"); Holodniy Decl. ¶ 22.) Dr. Holodniy is the lead author, and several Cetus co-authors are included. (*Id*.) This improved assay is **not** the invention of the Merigan patents, and is cited and described in the patents as pre-existing technology. (Rhyu Decl., Ex. 15 at 13:64-66; Holodniy Decl. ¶ 26.)

In 1989, Cetus had an aggressive intellectual property review and rapid publication policy, as described at length by John Sninsky, Cetus's then Senior Director of Diagnostics of the PCR division, in a declaration he prepared in 1991. (Rhyu Decl., Ex. 550 at 13-14.) Cetus approved the publication of the PCR assay that Dr. Holodniy developed several times. (Holodniy Decl. ¶¶ 19, 21, 22.) For example, in early 1990, Drs. Merigan and Holodniy prepared two abstracts describing the PCR assay and listing several Cetus scientists as co-authors. (*Id.*; Rhyu Decl., Ex. 35 at RMS00102.) Upon submitting a publication clearance request and receiving consent from Cetus, Dr. Holodniy presented the abstracts at the UCLA Keystone Symposium and the Sixth International AIDS conference in San Francisco in spring of 1990. (Holodniy Decl. ¶¶ 19, 21; Rhyu Decl., Ex. 41.) Moreover, Cetus approved the JID manuscript prior to publication. (Rhyu Decl., Ex. 39; Holodniy Decl. ¶ 22.)

Dr. Holodniy also submitted an invention disclosure form to Cetus, disclosing the "Quantitation of HIV-1 viral RNA in human serum utilizing an in vitro generated internal standard for co-amplification and an enzyme-linked affinity assay for detection." (Rhyu Decl., Ex. 34; Holodniy Decl. ¶ 20.) The Cetus patent committee gave the invention disclosure the lowest possible ranking, a "5." (*See* Rhyu Decl., Ex. 518 at RMS 6456, 6460 (Disclosure 90-003); Ex. B at 247:19-248:16.) Consistent with the general policy that Cetus did not take action

---

[4] During the time he visited Cetus, no one ever told Dr. Holodniy that any information he learned or any reagent he used was confidential or a trade secret. (Holodniy Decl. ¶ 14.) Indeed, the techniques, protocols and information he used at Cetus were published, either before Holodniy arrived at Cetus, or sometime later in 1989. (Holodniy Decl. ¶¶ 17(a)-(i).)

COOLEY GODWARD KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

740289 v1/PA

5

COUNTERCLAIM DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. C 05 04158 MHP

to file patents on invention disclosures it ranked "5," Cetus never filed a patent application based on that disclosure, as it never asked Dr. Holodniy to cooperate in the filing of a patent. (Holodniy Decl. ¶ 20) Cetus also consented to the publication of a second article, submitted in July 1990, that described the assay and the inhibition of the PCR reactions by heparin. (Rhyu Decl., Ex. 13.) Thus, the work involving Cetus, Holodniy and Merigan culminated in the publication of two articles relating to assays for quantitation of HIV RNA. (Rhyu Decl., Ex. 1 & Ex. 13.) Both articles had been submitted for publication by July 1990. (*Id.*)

### 3. Development of the Patented Invention.

In July 1990, Holodniy began experiments to ascertain whether detection of HIV nucleic acid levels in patient plasma samples would correlate with the effectiveness of the HIV treatment and would inform decisions regarding patient treatment. (Holodniy Decl. ¶ 25.) Despite the public availability of his improved assay for detecting HIV viral RNA sequences using PCR, the question of whether detected levels of HIV RNA would correlate with effectiveness of treatment was still unknown. (Holodniy Decl. ¶ 27.) That is, the use of a PCR assay was just one step of the multi-step method. For example, uncertainty remained as to (1) whether the assay would be sufficiently sensitive and reproducible to measure HIV RNA changes over time in a clinical setting; (2) whether the variability of virus levels and changes in virus levels for different individuals would be beyond the utility of the assay; (3) whether nucleic acid levels in plasma could be used to predict the effectiveness of the therapy against the entire infection; and (4) whether the available treatments would be effective enough to produce changes that could be measured. (Holodniy Decl. ¶ 27.) Furthermore, appropriate patient samples needed to be identified and obtained. (Holodniy Decl. ¶ 28.) Also, the assay disclosed in the JID article needed more improvement before use in a monitoring study. (*Id.*) The assay had to be performed in parallel with tests that could verify efficacy of treatment. (*Id.*) Statistical analyses had to be performed on the results obtained from the patient samples, to determine whether there was in fact a correlation between efficacy of treatment and HIV levels. (*Id.*)

Drs. Merigan, Holodniy, and Katzenstein ("the inventors") designed and carried out these experiments, with some assistance from Dr. Dennis Israelski, who provided patient samples.

COOLEY GODWARD KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

740289 v1/PA

6

COUNTERCLAIM DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. C 05 04158 MHP

1   Cetus was not involved in any stage of the effort to design, carry out or analyze these clinical
2   experiments. (Holodniy Decl. ¶ 29.) The inventors designed the original experiments to test
3   samples from patients who had been treated with a drug called dideoxyinosine ("ddI"), both by
4   itself and in combination with the drug AZT. (*Id.*) These experiments were funded by two
5   different U.S. government grants provided by the National Institutes of Health. (Mejia Decl. ¶
6   98.) The inventors worked diligently on this project to monitor efficacy of anti-HIV treatment
7   through the summer and winter of 1990. Eventually, prior to April 1991, they demonstrated a
8   correlation between HIV levels and effectiveness of treatment. (Holodniy Decl. ¶¶ 29, 30.)

    **4.    Cetus's Awareness of the Inventors' Work.**

10  The work of the Stanford physician-scientists culminated in submission of a manuscript
11  to the Journal of Clinical Investigation (JCI) in May 1991. (Rhyu Decl., Ex. 46.) The article
12  was published in November 1991 and reported the inventors' findings that a correlation indeed
13  could be made between the effectiveness of anti-HIV therapy and the detected HIV nucleic acid
14  level, enabling the use of the correlation to make therapeutic decisions for treating AIDS
15  patients. The work in the JCI article forms the foundation of the Merigan patents. (Holodniy
16  Decl. ¶ 30.) Submission of a patent application on the work followed in May 1992.

17  Dr. Sninsky, head of the PCR division at Cetus, read the JCI article around the time it
18  was published. (Rhyu Decl., Ex. D at 226:16-227:9.) Although Dr. Sninsky testified that he was
19  collaborating with Drs. Merigan and Holodniy on using PCR to detect HIV (Rhyu Decl., Ex. D
20  at 208:13-209:9; 210:11-19), he never claimed co-authorship of the JCI article. (*Id.* at 228:6-14.)

    **D.    The Agreements at Issue and the Asset Purchase Agreement.**

22  RMS asserts ownership rights based on the following four contracts: (1) a 1984
23  consulting agreement between Dr. Merigan and Cetus Corp. (the "1984 Merigan Consulting
24  Agreement," Ex. 601), (2) a 1991 consulting agreement between Dr. Merigan and Cetus Corp.
25  (the "1991 Merigan Consulting Agreement," Ex. 602), (3) a Materials Transfer Agreement
26  between Cetus, on the one hand, and Stanford and Drs. Merigan and David Schwartz on the
27  other (the "1988 MTA," Ex. 29) and (4) a Visitor's Confidentiality Agreement between Dr.
28  Holodniy and Cetus Corp. ("1989 Confidentiality Agreement," Ex. 30).  **REDACTED**

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

740289 v1/PA     7     COUNTERCLAIM DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
CASE NO. C 05 04158 MHP

REDACTED

(Ex. 681 at Resp. to Interrog. No. 2.).

The 1984 and 1991 Merigan Agreements are not listed in the APA.[5] Section 2.1 of the APA contains the "Agreement to Sell and to Purchase." (Rhyu Decl., Ex. 518 at RMS 06333.) Schedules 2.1(a)-(e) and (g) to the APA list specific assets transferred under the agreement. (*Id.* at RMS 06403.) The 1984 and the 1991 Merigan Consulting Agreements are not listed anywhere in any of these Schedules, or in any other part of the APA. (*See, e.g.*, Schedules at *id.* at RMS 6403-53.) In particular, the Merigan Consulting Agreements are not listed among the "Transferred Contract" in schedule 2.1(d) or the exhaustive "Attachment A to Schedule 2.1(d)." (*Id.* at RMS 6466-547.) The schedule lists over five hundred separate contracts, including consulting agreements between other Stanford scientists and Cetus. (*Id.* at RMS 06496.)

### E.  RMS's Knowledge of the Merigan Patents and Stanford's Licensing Efforts.

#### 1.  RMS Knew of the Merigan Patent Family No Later Than December 1999.

REDACTED

(Rhyu Decl., Ex. 681 at Resp. to Interrog. No. 10.) RMS's privilege log confirms that on this date, an RMS patent agent named Doug Petry distributed a memorandum discussing these Merigan patents. (Rhyu Decl., Ex. 702 at 5.) The RMS privilege log shows that the memorandum discussing these Merigan patents was distributed to Tom White (Sr. V.P., Research and Development), John Sninsky (V.P., Roche Genetics (U.S.) and V.P., Discovery Research), Stacey Sias (Director of Licensing), Kathy Ordonez (President), Victor Lee (patent counsel), and Melinda Griffith (in-house counsel). At least four of these RMS employees (White, Sninsky, Sias and Griffith) had been Cetus employees who moved to Roche after Roche purchased Cetus assets. Dr. White had been Senior Vice President of Research and Development at Cetus and testified that he was aware that Dr. Merigan had access to Cetus

---

[5] Stanford strongly disputes RMS's contention that the inventions at issue in this case substantively fall under any of the contracts. However, the facts supporting Stanford's position will not be set forth here, where the focus on summary judgment is the undisputed facts.

COOLEY GODWARD  
KRONISH LLP  
ATTORNEYS AT LAW  
PALO ALTO

740289 v1/PA

8

COUNTERCLAIM DEFENDANTS'  
MOTION FOR SUMMARY JUDGMENT  
CASE NO. C 05 04158 MHP

confidential information about PCR and HIV. (Rhyu Decl., Ex. B at 110:6-111:4.) He further testified that he understood that Dr. Merigan's use of PCR to monitor HIV therapy would have been covered by a Cetus consulting agreement. (Rhyu Decl., Ex. B at 111:21-112:12; 113:7-15.)

### 2. RMS Knew of Stanford's Licensing Efforts with the Merigan Patents No Later than October 1998.

Dr. Tom White, Senior Vice President of Research and Development at RMS, learned of Stanford's efforts to license the '268 and '128 patents in October 1998. (Rhyu Decl, Ex. B at 209:13-210:20, 214:16-215:10; Ex. 554.) At that time, he received a letter that Luis Mejia of Stanford had sent to Tom MacMahon at the Laboratory Corporation of America (LabCorp), seeking to license these patents to LabCorp. (Rhyu Decl, Ex. B at 209:13-210:20; Ex. 554; Mejia Decl. ¶ 9.) Mejia's letter identifies the '268 and '128 patents, their title and general subject matter, and the fact that "[t]wo other patent applications for this invention have been allowed and will issue shortly." (Rhyu Decl., Ex. 554.) Although Dr. White could not specifically recall forwarding the letter to others at RMS in 1998, he testified that he wrote in the corner of this letter a list of individuals to whom he intended to send the letter. (Rhyu Decl, Ex. B at 214:16-215:25.) Included on the "cc:" list are Stacey Sias, who was director of Licensing at that time, Doug Petry, and John Sninsky. Thus at a minimum, the Senior Vice President of Research and Development, its Vice President of Roche Genetics (U.S.) and of Discovery Research, its licensing director and its patent agent knew of Stanford's licensing efforts relating to the '268 and '128 patents by October of 1998.

Stanford specifically sought an exclusive license from Roche on April 6, 2000. On that date, Luis Mejia, Senior Licensing Associate in Stanford's Office of Technology Licensing, made a presentation to Claude Montandon and Andreas Maurer, Roche's Director of Licensing in Basel, Switzerland. (Mejia Decl. ¶ 10.) The presentation included slides, which document the information he conveyed at that meeting. (Rhyu Decl., Ex. 693.) Mr. Mejia provided background for the technology, referring to the "Stanford/Cetus article" published in JID in April 1991. (Id. at STAN 029329.) He also referred Roche's Director of Licensing specifically to the JCI article. (Id. at STAN 029330.) He then described Stanford's view that "[t]he value of

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

740289 v1/PA

9

COUNTERCLAIM DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
CASE NO. C 05 04158 MHP

quantification of HIV RNA in plasma serum was not evident to Cetus at that time or through June 1992." (*Id.* at 029331.) Noting that "Dr. Holodniy, Dr. Katzenstein and Dr. Merigan had conceived that measurement of HIV RNA from plasma could be used for assessing efficacy of antiviral therapy" (*id.* at 029332), Mr. Mejia continued with a discussion of the claims of the '730 patent and "[c]ontinuations based on the same application 'family.'" (*Id.* at 029334.) Mr. Mejia concluded by offering Roche an exclusive license to the "subject Stanford IP." (*Id.* at 029340.) Following the presentation, neither Mr. Montandon nor Mr. Maurer mentioned any existing right by Roche to the "subject Stanford IP." (Mejia Decl. ¶ 12.)

### III. STANDARD FOR SUMMARY JUDGMENT

In this phase of the case, RMS is the claimant and bears the burden of proof at trial on its claims to ownership and license. Cal. Evid. Code § 500; *see also Asnon v. Foley*, 105 Cal. App. 624, 631 (1930) (counterclaimant bears burden of proof on counterclaims). Under federal law, Stanford is the holder of legal title to its issued patents and has a presumption of ownership. *See Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1578 n.2 (Fed. Cir. 1991); *see also TM Patents, L.P. v. Int'l Bus. Machs. Corp.*, 121 F. Supp. 2d 349, 368 (S.D.N.Y. 2000) (patentee holds presumptive title to a patent). Summary judgment in favor of Stanford is appropriate if Stanford establishes that RMS has failed to raise sufficient evidence to establish the existence of an element essential to its case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Summary judgment is further appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact . . . ." Fed. R. Civ. P. 56(c) To defeat summary judgment on Stanford's affirmative defenses, RMS must establish a genuine dispute regarding material facts which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[6]

---

[6] *See also Miller v. Glen Miller Prods., Inc.*, 454 F.3d 975, 987-88 (9th Cir. 2006) (summary judgment of laches); *Alamar Biosciences, Inc. v. Difco Lab., Inc.*, No. Civ-S-941856 DFL PAN., 1995 WL 912345, at * 3 (E.D. Cal. Oct. 13, 1995) (summary judgment appropriate where party did not carry burden of proving facts necessary to show statute of limitations period was tolled). To raise a genuine dispute, RMS must show sufficient evidence for a reasonable jury to return a verdict in its favor. *Anderson*, 477 U.S. at 242; *see also High Sierra Hikers Ass'n v. Blackwell*,

## IV. ARGUMENT

### A. RMS's Ownership and License Claims are Barred by Its Excessive Delay in Bringing Suit.

Despite being fully aware for six years of Dr. Merigan and Dr. Holodniy's interactions with Cetus, the Merigan patents, and the publication describing the invention claimed in the Merigan patents, RMS made no ownership, license, or even co-authorship claims until it crafted its counterclaims in this lawsuit. RMS took no action upon learning of the assignment of the Merigan patents to Stanford University and was silent even as it learned of Stanford's attempts to license those patents to third parties. As a factual matter, such silence evinces RMS's pre-litigation view that it had no rights to the Merigan patents. As a matter of law, such inaction prevents RMS from pursuing its claims.

#### 1. The Statute of Limitations Bars RMS's Claims as a Matter of Law.

##### a. The Four-Year Statute of Limitations.

RMS's counterclaims for declaratory judgment of ownership and license to the Merigan patents are subject to California's statute of limitations, which require these claims to have been brought within four years after the cause of action accrued.[7] See Cal. Code Civ. Proc. §§ 337(1), 343. RMS bases its counterclaims on four contracts: the 1984 and 1991 Merigan consulting agreements, the 1989 MTA, and the 1989 Holodniy Visitor's Confidentiality Agreement ("the four contracts"). (Rhyu Decl., Exs. 601, 602, 29 & 30.) Where RMS's claims are premised on these agreements, they are subject to the four-year statute of limitations period applicable to written contracts. Cal. Code Civ. Proc. §§ 337(1), 343; see 3 Witkin, Cal. Proc., Chapter IV Actions, § 625, pp. 805-06 (4th ed. 1997); *Maguire v. Hibernia Sav. & Loan Soc'y*, 23 Cal. 2d 719, 733-34 (1994); *Tostevin v. Douglas*, 160 Cal. App. 2d 321, 330 (1958) ("[A]fter the 'coercive' remedy is barred by the statute of limitations, a declaratory relief action may not be utilized to circumvent the purpose of the statute."); *Leahey v. Dep't of Water & Power*, 76 Cal. App. 2d 281, 286 (1946).

---

390 F.3d 630, 640-41 (9th Cir. 2004); *Brower v. Evans*, 257 F.3d 1058, 1064-70 (9th Cir. 2001).
[7] Although RMS also asserts joint invention by Cetus employees as a basis for ownership, inventorship issues were not included in this first phase of the case.

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

740289 v1/PA

11

COUNTERCLAIM DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
CASE NO. C 05 04158 MHP

To the extent that RMS asserts that its declaratory judgment claims are not based in contract, the applicable statute is also four years. Cal. Code Civ. Proc. § 343; *see* 3 Witkin, Cal. Proc., Chapter IV Actions, § 617, p. 793 (4th ed. 1997) ("The effect of [CCP § 343] is to eliminate the contention that an action without a specific limitation provision may be brought at any time . . . ."). Thus, RMS's claims are barred by the statute of limitations if the cause of action accrued more than four years before October 14, 2005, that is, before October 14, 2001.[8]

### b. RMS's Causes of Action Accrued at Least as of May 1992.

Undisputed facts establish that RMS's causes of action accrued long before October 14, 2001. The limitations period begins to run when the last element required for the plaintiff to assert his claim occurs.[9] *See Monolith Portland Midwest Co. v. Kaiser Aluminum & Chem. Corp.*, 407 F.2d 288, 292-93 (9th Cir. 1969) (trade secret claim matured at first adverse use or disclosure, not upon knowledge of confidentiality breach by plaintiff). For RMS's ownership claims, the limitations period commenced when events occurred that indicated that Stanford, Dr. Merigan and Dr. Holodniy denied or repudiated any ownership interest of RMS in the patents in suit. *Id.* RMS's own Amended Answer and Counterclaims aver to the occurrence of these events as early as 1991. For example, RMS averred that as early as May 1991, Stanford, Merigan and Holodniy "took sole credit for work conducted jointly with Cetus" by submitting a paper to the Journal of Clinical Investigation that failed to identify Cetus authors and failed to seek approval from Cetus for publication. (Rhyu Decl., Ex. 700 at 14, ¶ 26.) RMS averred that Stanford, Merigan and Holodniy claimed independent invention and deleted reference to Cetus employees in "published paper after published paper" that followed the May 1991 submission.

---

[8] Under California law, a counterclaim relates back to the filing of the original complaint. *See Trindade v. Superior Court*, 29 Cal. App. 3d 857, 859-60 (1973).

[9] The "discovery rule" articulated in *April Enterprises, Inc. v. KTTV*, 147 Cal. App. 3d 805, 832 (1983), which states that the limitations period runs only after the plaintiff discovered or should have discovered the breach, does not apply in this case. That rule applies only to "breaches which can be, and are, committed in secret and, moreover, where the harm flowing from those breaches will not be reasonably discoverable by plaintiffs until a future time." *Id.* at 832. The work to which RMS now claims rights was published in November 1991 (Rhyu Decl., Ex. 700 at 14, ¶¶ 26-27) and the Senior Director of the PCR division at Cetus, John Snisky, was aware of that publication around 1991. (*Id.*, Ex. D at 226:16-227:19.)