1  (*Id.*, ¶ 28.) And RMS averred that "the methods claimed in [U.S. Patent No. 5,968,730, which

2  was filed on May 14, 1992 and issued on October 19, 1999] were the subject of the joint

3  collaboration between Cetus and Stanford researchers and were covered by, among other things,

4  the MTA, and the 1984 and 1991 consulting/confidentiality agreements between

5  Counterclaimant RMS's predecessor, Cetus, and Counterclaim Defendant Merigan, and the 1989

6  consulting/confidentiality agreement between Counterclaim Defendant Holodniy and Cetus."

7  (Rhyu Decl., Ex. 700 at 14-15, ¶ 29.) Merigan and Holodniy's use of information which RMS

8  alleges was learned at Cetus, their claims of independent invention, their failure to attribute the

9  work underlying the invention to Cetus and RMS, and their filing of the patent without Cetus in

10 May 1992 constituted denunciations of any rights owned by Cetus or RMS. This triggered the

11 limitations period, which expired at least by May 1996.[10]

12
   **c.**  **RMS's Causes of Action Accrued No Later than December 15, 1999, the Date of Actual Notice.**

13

14
   Even if the Court finds that the limitations period did not run from the time that Merigan

15 and Holodniy repudiated RMS's ownership interest, RMS's claims are still barred by the statute.

16 Under the common law discovery rule, RMS had constructive and actual notice of the causes of

17 action at least by December 15, 1999. *Wilshire Westwood Assocs. v. Atl. Richfield Co.*, 20 Cal.

18 App. 4th 732, 740 (1993) (limitations period begins when the plaintiff has actual or constructive

19 notice of the facts giving rise to the claim); *Gutierrez v. Mofid*, 39 Cal. 3d 892, 898-99 (1985).

20 ███████████████  **REDACTED**  ███████████████

---

21 [10] RMS may argue that breach of the contracts did not occur until Merigan and Holodniy refused

22 RMS's requests for assignment. This argument fails, because no such requests were made prior

23 to the initiation of this suit. When demand for an assignment is necessary to enable a party to

24 discharge his contractual obligations, and no time is specified in the contract, the demand must be

25 made within a reasonable time. *Bass v. Hueter*, 205 Cal. 284, 287 (1928) ("Where, under the

26 contract of the parties, a notice is required to be given or a demand required to be made, a party

27 cannot prevent the statute from running by failing to give the notice or make the demand."); *see

28 also Ginther v. Tilton*, 206 Cal. App. 2d 284, 286 (1962); *Ilse v. Burgess*, 28 Cal. App. 2d 654,

657 (1938). Furthermore, once a party has the power to make a demand, he or she cannot

suspend indefinitely the running of the statute of limitations by postponing the time of demand.

*Dillon v. Bd. of Pension Comm'rs*, 18 Cal. 2d 427, 430 (1941); *Ginther*, 206 Cal. App. 2d at 286.

Absent "peculiar circumstances," the reasonable time to make a demand is limited to the time

provided in the statute of limitations. *Bass*, 205 Cal. at 287.

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

740289 v1/PA     13

DocketsJustia.com

**REDACTED**

(Rhyu Decl., Ex. 681 at Resp. to Interrog. No. 10.)  By December 1999, an RMS patent agent had actually prepared a memorandum discussing these Merigan patents. [11]  (Rhyu Decl., Ex. 702 at 5.)  The first page of each patent states that it is assigned to Stanford (*see, e.g.*, Rhyu Decl., Ex. 15 at RMS00001; Ex. C at 116:2-10; Ex. B at 207:11-18), and thus provides notice that the inventors believed they had no other obligation to others in regard to the inventions disclosed or claimed in the patents.  *See Kimberly Corp. v. Hartley Pen Co.*, 237 F.2d 294, 301 (9th Cir. 1956) (barring equitable ownership claim where issuance of patent constituted constructive notice of assignment to another).   The December 15, 1999 memorandum demonstrates knowledge by RMS employees at the highest level, including the President (Ordonez), patent counsel (Lee), the V.P. of Research and Development (White) and V.P., Roche Genetics (U.S.) and V.P., Discovery Research (Sninsky), that the inventors did not recognize Cetus or RMS as having any rights to the patents.  (Rhyu Decl., Ex. 702 at 5.)  RMS has averred that all of these patents and pending patent applications in the same patent family are covered by the four contracts, "among other things."  (Rhyu Decl., Ex. 700 at 14-16, ¶¶ 29-31.)  Thus, by December 1999, RMS employees at the highest levels had actual notice of the facts underlying its current declaratory relief claims, and the limitations period commenced no later than December 15, 1999.

d.      **RMS also had Actual Notice of its Ownership and License Claims No Later than April, 2000.**

In addition to notice of Stanford's assertion of ownership by 1999, RMS had actual, direct notice that Stanford, Merigan and Holodniy did not recognize RMS's putative right to a nonexclusive license by April 2000.  Mr. Mejia's April 2000 presentation makes clear that the Stanford inventors considered themselves exclusive inventors of the '730 patent and related

---

[11] Although the '705 patent issued after 1999, the '705 (and pending patent applications to which RMS claims ownership) has the identical specification, or disclosure, as the '730 patent.  RMS avers that the "'705 Patent contains claims that are substantially the same as those found in the '730 Patent."  (Rhyu Decl., Ex. 700 at 15, ¶ 30.)  Likewise, the '352 patent is a Reissue of the '086 patent and has the identical specification as the '086 patent, which issued in January 1999. (Rhyu Decl., Exs. 684 & 701.)

Cooley Godward
Kronish LLP
Attorneys At Law
Palo Alto

740289 v1/PA                        14                    **Counterclaim Defendants'
Motion for Summary Judgment
Case No. C 05 04158 MHP**

1    applications. (Rhyu Decl., Ex. 693 at STAN 029332 ("Dr. Holodniy, Dr. Katzenstein and Dr.

2    Merigan *had conceived* . . . .").) The presentation derided Cetus's appreciation of the usefulness

3    of a quantitative assay, stating "the value of quantification of HIV RNA in plasma serum was not

4    evident to Cetus . . . through June 1992." Mejia's presentation put Roche on clear notice that

5    Stanford did not believe Cetus made any contribution to the patent or had any license interest.

6    (Mejia Decl. ¶ 11.) RMS was thus on notice of both its ownership and license claims no later

7    than April 2000.

8                        **e.    Alleged Ignorance of the Contracts Does Not Toll the Statute.**

9          RMS cannot escape the statute of limitations by arguing that it was unaware of its own

10    rights in the four contracts as of December 15, 1999. "If a person becomes aware of facts which

11    would make a reasonably prudent person suspicious, he or she has a duty to investigate further

12    and is charged with knowledge of matters which would have been revealed by such an

13    investigation." *Wilshire*, 20 Cal. App. 4th at 740 (citations and quotations omitted); *Alamar

14    Biosciences, Inc.*, 1995 WL 912345, at *3 ("There is constructive notice when a reasonably

15    diligent plaintiff would have discovered the facts."). In this case, reasonable diligence would

16    have unearthed Merigan and Holodniy's prior relationship with Cetus. Indeed, four of the

17    recipients of the December 15, 1999 memorandum were former Cetus employees. White and

18    Sninsky testified that they had extensive interactions with Dr. Merigan at Cetus, and that they

19    were aware of Merigan's contractual obligations to Cetus. (Rhyu Decl., Ex. B at 110:6-111:4,

20    111:21-112:12, 113:7-15; Ex. D at 208:13-24; 210:11-19.) Sninsky further testified that he was

21    aware that Holodniy was at Cetus to "learn how to do PCR for HIV and use it in the context of

22    IL-2 trials." (Rhyu Decl., Ex. D at 212:8-11.) Moreover, the four contracts and other

23    information required to ascertain the relationship between RMS and Stanford, Merigan and

24    Holodniy were uniquely in RMS's possession or control. Under these circumstances, RMS's

25    failure to investigate its potential claims cannot excuse its late claim.

26          The statute of limitations thus prohibits RMS from pursuing its claims to ownership and

27    license based on the four contracts, or any other equitable claims captured by Cal. Code Civ.

28    Proc. § 343. Accordingly, RMS's fourth and sixth through tenth counterclaims should be

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

740289 v1/PA                          15                    COUNTERCLAIM DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
CASE NO. C 05 04158 MHP

1    dismissed as a matter of law, except to the extent they rely on claims of joint inventorship.[12]

2    **2.    The Doctrine of Laches Bars Any Equitable Claims to Ownership.**

3    RMS's claims are also barred by the doctrine of laches. "Laches is an equitable defense

4    that prevents a [party], who with full knowledge of the facts, acquiesces in a transaction and

5    sleeps upon his rights."  *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 950-51 (9th Cir. 2001)

6    (citations and internal quotations omitted).   Undisputed facts establish the two elements of

7    laches: (1) for more than ten years, Cetus and RMS slept on its alleged ownership and license

8    rights, despite its full awareness of Stanford, Merigan, and Holodniy's claims to ownership; and

9    (2) the Counterdefendants are prejudiced by RMS's late assertion of its rights.

10    Cetus and RMS acquiesced and stayed silent when Stanford, Merigan and Holodniy

11    repeatedly took "sole credit" for the work that RMS claims was jointly done with Cetus.  (Rhyu

12    Decl., Ex. 700 at 14, ¶ 26.)  Cetus/RMS knew or should have known of the Counterdefendants'

13    claims to ownership at least as of November 1991, when Drs. Merigan and Holodniy published

14    the JCI article without attribution to Cetus. (Rhyu Decl., Ex. 700 at 14, ¶¶ 26-30.)  *See Danjaq*

15    *LLC*, 263 F.3d at 952 (delay is to be measured from the time that claimant knew or should have

16    known about the potential claim at issue).   RMS also knew or should have known of their

17    potential ownership claim when Drs. Merigan and Holodniy claimed independent invention in

18    "published paper after published paper." (Rhyu Decl., Ex. 700 at 14, ¶ 28.)   RMS certainly

19    should have known of its potential claims when it evaluated the Merigan patent family, which

20    was assigned to Stanford, in December 1999.  (*See* Section IV.A.1.c. *supra*.)   It knew of its

21    potential ownership and license claims in April 2000, when Mr. Mejia sought to license the '730

22    patents to it.   (*See* Section IV.A.1.d. *supra*.)   At a minimum, RMS was under a duty to

23    investigate its claims by that point.  *Wilshire Westwood*, 20 Cal. App. 4th at 740.   These

24    undisputed facts show that RMS has been sleeping on its rights since 1991, and at the very latest,

25    since April 2000.

26

---

27    [12] In the interests of judicial economy, if the Court finds in favor of Stanford on Statute of
Limitations, laches or estoppel, the breach of contract and specific performance counterclaims
28    (eleven through fourteen) should also be dismissed on summary judgment.

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

740289 v1/PA                          16                    COUNTERCLAIM DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
CASE NO. C 05 04158 MHP

1    RMS's failure to timely pursue its claims has prejudiced Counterdefendants in two

2    significant ways.  First, Stanford has undertaken substantial efforts to license several of the

3    Merigan patents to third parties and has participated in two expensive patent litigations relating

4    to the patents.  (Mejia Decl. ¶ 14.)  Indeed RMS was silent despite knowing that Stanford was

5    seeking licensees of these patents as early as 1998, and certainly by 2000.  (Rhyu Decl., Ex. 554;

6    Ex. B at 221:17-23; Mejia Decl. ¶ 9.)  Counterdefendants are further prejudiced by the loss of

7    evidence and stale memories associated with RMS's delay.  *Danjaq LLC*, 263 F.3d at 955

8    (evidentiary prejudice supports laches).  For example, the recipients of the December 15, 1999

9    RMS memorandum relating to the Merigan patents could not recall any discoverable details

10   about the memorandum.  (Rhyu Decl, Ex. B at 222:10-225:4; Ex. C at 113:1-114:24.)  Dr.

11   Sninsky could not remember the existence of the Merigan patents, even though he was a

12   recipient of the December 15, 1999 memorandum.  (Rhyu Decl, Ex. D at 246:16-247:13, 248:20-

13   23.)  Dr. Mike Konrad, another Cetus employee, could not recall the Invention Disclosure that he

14   had apparently submitted on behalf of Dr. Holodniy.  (Rhyu Decl., Ex. N at 36:2-18.)

15   RMS knew or should have known of its claims fourteen years before this suit was filed.

16   Even after the November 1991 JCI publication, RMS was repeatedly notified that the

17   Counterdefendants did not recognize RMS's putative ownership or license rights.

18   Counterdefendants were prejudiced by RMS's inaction.  By failing to bring its claims until 2005,

19   RMS is barred under the laches doctrine.

20               **3.       Roche's Claims are Barred by Equitable Estoppel.**

21   The estoppel defense promotes "equity and justice of the individual case by preventing a

22   party from asserting his rights under a general technical rule of law, when he has so conducted

23   himself that it would be contrary to equity and good conscience . . . ."  *Granite State Ins. Co. v.*

24   *Smart Modular Techs., Inc.*, 76 F.3d 1023, 1027 (9th Cir. 1996) (citation omitted).  Here, RMS is

25   estopped from claiming any rights in the Merigan patents, because Stanford, Dr. Merigan and Dr.

26   Holodniy justifiably relied on the conduct of Cetus and RMS to conclude that RMS had

27   abandoned any rights to the Merigan patents.  The elements of equitable estoppel are:

28   (1) the party to be estopped must be apprised of the facts; (2) he must intend that

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

740289 v1/PA                                    17                        COUNTERCLAIM DEFENDANTS'
                                                                          MOTION FOR SUMMARY JUDGMENT
                                                                          CASE NO. C 05 04158 MHP

1   his conduct shall be acted upon, or must so act that the party asserting the estoppel
    had a right to believe it was so intended; (3) the party must be ignorant of the true
2   state of facts; and (4) he must rely upon the conduct to his injury.

3   *Id.* at 1028 (citations omitted).  Estoppel may be applied as a defense to equitable as well as

4   contract claims.  *Trustees of the Cal. State Univs. v. Nat'l Collegiate Athletic Ass'n,* 82 Cal. App.

5   3d 461, 472-73 (1978).  Misleading conduct triggering estoppel precludes not only the an original

6   party to the contract, but also any successors to the contractual rights.  *United States v. Garan*, 12

7   F.3d 858, 960 at n.2 (9th Cir. 1993) (estoppel binds not only guilty party but also those in privity

8   with him).

9          The Counterdefendants detrimentally relied on various Cetus and Roche conduct:  First,

10  Dr. Holodniy reasonably concluded that Cetus did not consider him to be using Cetus confidential

11  or trade secret information, because he was never told that anything he used or learned was

12  confidential to Cetus or a trade secret.  (Holodniy Decl. ¶ 14.)  To the contrary, he was given free

13  access to information without any restriction or admonition, and was even given materials that

14  lacked any confidentiality designation.  (Rhyu Decl, Ex. K at 75:7-77:6.)  Indeed, he understood

15  that the information he was using had been published or was soon to be published.  (Holodniy

16  Decl. ¶ 17.)  Second, the Counterdefendants reasonably concluded that Cetus was not interested

17  in any rights relating to the development of the RNA quantitative assay when Cetus declined to

18  pursue a patent on the invention disclosure submitted by Dr. Holodniy in January 1990.  (*Supra*

19  Section II.C.2; Holodniy Decl. ¶ 20.)   Nobody ever followed up with Dr. Holodniy about

20  pursuing a patent on the information disclosure.    (Holodniy Decl. ¶ 20.)    Third, the

21  Counterdefendants concluded that the RNA quantitative assay itself was not considered by Cetus

22  to be confidential or a trade secret.  This conclusion was bolstered by Cetus's consent to publish

23  the UCLA Keystone abstract in March/April 1990, the AIDS Conference abstract in June 1990,

24  and the JID publication in 1991.  (*Supra* Section II.C.2., Holodniy Decl. ¶¶ 19, 21, 22; *see* Rhyu

25  Decl., Ex. 31 at RMS 00096; Ex. 35 at RMS 00101; Ex. 39 at RMS 00076.)   Fourth,

26  Counterdefendants concluded that Cetus was abandoning any potential rights to examine methods

27  of monitoring HIV levels in therapy, through a discussion that Dr. Merigan had with Dr. Sninsky

28  shortly after the JID article was submitted in spring of 1991.  Dr. Merigan understood from his

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

740289 v1/PA                    18                    COUNTERCLAIM DEFENDANTS'
                                                      MOTION FOR SUMMARY JUDGMENT
                                                      CASE NO. C 05 04158 MHP

1    conversation with Dr. Sninsky that Cetus and Stanford would pursue different research

2    objectives, wherein Cetus was primarily interested in diagnostics for monitoring blood banks and

3    Dr. Merigan wanted to focus on monitoring HIV levels in therapy.  (Rhyu Decl, Ex. A at 117:2-

4    24.)  Dr. Merigan understood through this conversation that he would "go in a separate direction"

5    from Cetus, and that Cetus sought no further interest in the monitoring realm.  This understanding

6    was confirmed by the silence of Cetus and RMS during the many years that Dr. Merigan and his

7    colleagues published numerous articles reporting success in correlating HIV nucleic acid levels

8    with efficacious treatment.  *See A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020,

9    1042 (Fed. Cir. 1992) ("[E]quitable estoppel may arise where, coupled with other factors, a

10    patentee's 'misleading conduct' is essentially misleading inaction.").

11            Based on Cetus's knowing and intentional actions, Stanford, Dr. Merigan and Dr.

12    Holodniy freely disclosed the quantitative RNA assay found in the JID article and proceeded to

13    develop the invention of the Merigan patents.  They prosecuted and obtained those patents,

14    believing they had sole ownership rights.  Stanford further actively sought to license and is in

15    contract with several licensees relating to those patents.  Moreover, two lawsuits were filed to

16    protect Stanford's rights under the patents.  (Mejia Decl. ¶ 14.)  Stanford has invested

17    substantially in the Merigan patents with the understanding that no one else had ownership

18    claims to them.  Having acted as though it disclaimed any right, RMS is now estopped.

19    **B.    There is Insufficient Evidence as a Matter of Law for RMS to Meet its
              Burden on Its Claims through the Merigan 1984 and 1991 Consulting
20            Agreements.**

21            **1.    RMS Lacks Standing to Obtain Ownership or License Rights
                      Through the Merigan Consulting Agreements.**
22

23            RMS lacks standing under the Merigan Agreements, because these Agreements were

24    never assigned to Roche.  *See Sardanis v. Sumitomo Corp.*, 723 N.Y.S.2d 466, 469 (2001) ("To

25    be a real party in interest, an assignee 'must have some title, legal or equitable, to the thing

26    assigned.'") (citation omitted).[13]  In this case, the record shows that RMS did not obtain title.

27    _____

28    [13] The question of the validity of assignment is governed by law of place where assignment is
       made.  *See Mogul v. Jenkins Bros.*, 120 N.Y.S.2d 585, 586 (1953).  As the parties to the APA

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

740289 v1/PA                    19                    COUNTERCLAIM DEFENDANTS'
                                                      MOTION FOR SUMMARY JUDGMENT
                                                      CASE NO. C 05 04158 MHP

1    *See Rhythm & Hues, Inc. v. Terminal Mktg. Co.*, No. 01 Civ. 4697 (DAB) GWG, 2004 WL

2    941908, at *10 (S.D.N.Y. May 4, 2004) (the party seeking to enforce the assignment has the

3    burden to prove its validity).

             a.    **The 1991 Asset Purchase Agreement Makes No Mention of the**
                   **Merigan Consulting Agreements.**

6         Under New York law, "when parties set down their agreement in a clear, complete

7    document, their writing should as a rule be enforced according to its terms."[14]  According to the

8    unambiguous terms of the 1991 APA, the Merigan Consulting Agreements were not

9    transferred.[15]  By their plain language, only three sections of the APA, 2.1(c), 2.1(d), and 2.1(g),

10   pertain to the transfer of intellectual property or contracts. (Rhyu Decl., Ex. 518 at RMS 06333-

11   35.)  The Merigan consulting agreements were not transferred through 2.1(c) (pertaining to

12   "PCR Intellectual Property") as the agreements are not listed among the transferred assets in

13   Schedule 2.1(c).  (*Id.*, Ex. 518 at RMS06444-64.)  RMS's 30(b)(6) designee agreed that 2.1(c)

14   does not effect transfer.  (Rhyu Decl., Ex. I at 144:5-18.)  Nor were the agreements transferred

15   through 2.1(d) (pertaining to "Transferred Contracts), as evidenced by the fact that the Merigan

16   Agreements are not listed in the corresponding Schedule or the attachment to that Schedule.  (*Id.*,

17   Ex. 518 at RMS06466-6547; *see* Ex. I at 144:22-145:10.)  RMS's representative also conceded it

18   was reasonable to conclude that ownership interest also was not transferred through 2.1(g), as

19   that clause plainly pertains only to "confidentiality agreements or confidentiality provisions of

20   other agreements."  (*See id.* at 147:13-25.)  That is, even if the rights under the confidentiality

21   provisions of the Merigan Agreements were transferred, no ownership right was transferred

22   under section 2.1(g).  Finally, RMS's 30(b)(6) witness testified that he could not conclude one

23   way or the other whether or not the Merigan consulting agreements were transferred pursuant to

24   2.1(h).  (Rhyu Decl., Ex. I at 153:19-154:1.)  However, the plain terms of that clause compel the

---

25   selected the law of New York as the governing law of the APA, this analysis refers to New York
26   law.  (Rhyu Decl., Ex. 518 at § 13.3, RMS06395.)

     [14] *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990).

27   [15] The APA also contains an integration clause, Section 13.1.  Parol evidence is excluded from
     consideration if the contract has an integration clause and the terms of the contract are
28   unambiguous.  *W.W.W. Assocs., Inc.*, 77 N.Y.2d at 163.

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

740289 v1/PA                        20                    COUNTERCLAIM DEFENDANTS'
                                                         MOTION FOR SUMMARY JUDGMENT
                                                         CASE NO. C 05 04158 MHP

1    conclusion that "nonprivileged books, documents and records of Seller" do not include

2    consulting agreements.    Moreover, that the agreements are not listed is significant given that

3    over five hundred contracts *are* listed.    Among those are contracts between Cetus and other

4    Stanford consultants.    (*Id.*, Ex. 518 at RMS06496.)    The Merigan consulting agreements are not

5    in the APA and were never assigned to Hoffman La-Roche.    Thus, RMS never acquired rights

6    under the Merigan agreements.[16]

7

8

**b.    No Facts Manifest an Intent to Assign the Merigan Consulting Agreements to Hoffman-La Roche.**

9        Even if the Court were to go beyond the four corners of the APA to ascertain whether the

10    Merigan consulting agreements were assigned to Roche, there is insufficient evidence to support

11    assignment.    Assignment of rights generally requires language manifesting an intention by the

12    owner of the right to make the transfer.    *See Pearl-Wick Corp. v. John Hancock Mut. Life Ins.*

13    *Co.* (*In re Pearl-Wick Corp.*), 26 B.R. 604, 608 (S.D.N.Y. 1982).    RMS has failed to identify any

14    contemporaneous evidence manifesting an intention to transfer the Merigan agreements.    *See*

15    *Property Asset Mgmt., Inc. v. Chicago Title Ins. Co.*, 173 F.3d 84, 87 (2nd Cir. 1999)

16    (uncommunicated subjective intent to assign alone cannot create an issue of fact where otherwise

17    there is none).    Indeed, the exhaustive list of consulting agreements in Schedule 2.1(d) suggests

18    that the Merigan consulting agreements were intentionally omitted from the list.

19        Furthermore, an early draft of the APA shows that the parties opted to exclude a "catch-

20    all" provision that would have transferred contracts not explicitly listed in Schedule 2.1(d).    (*See*

21    Rhyu Decl., Ex. 525 at RMS 0062420.)    The intentional omission of the "catch-all" provision

22    from the final draft supports the conclusion that the parties did not intend to transfer the unlisted

23    Merigan Agreements.    Absent sufficient evidence of assignment to Roche, RMS has no standing

24    to assert ownership through the Merigan consulting agreements.

25

26

---

27    [16] Nor does Roche have an effective license from Cetus or Chiron under the APA.    Cetus and Chiron do not have, nor have they ever asserted, any ownership interest in the patents, and section

28    2.8 applies only to rights obtained prior to the closing date of the APA.

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

740289 v1/PA                    21                    COUNTERCLAIM DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
CASE NO. C 05 04158 MHP

1

## 2.    Merigan's Work, Funded by the U.S. Government, was Expressly Excluded from the 1984 Agreement.

2

3    Both Stanford and the U.S. government had rights to the Merigan Patents. The Merigan

4    1984 consulting agreement expressly recognizes that those rights supersede Cetus's rights. The

5    1984 agreement contained the following clause recognizing the rights of the U.S. government

6    and Stanford, and limiting Cetus's rights:

7        It is understood that nothing contained herein shall affect the rights or obligations
         of CONSULTANT, the Institution [Stanford] or the United States Government
8        with respect to . . . any Inventions which are the products of CONSULTANT's
         research undertaken in connection with his employment by the Institution, to the
9        extent that such Institution shall have any rights in any such Invention in
         accordance with CONSULTANT's existing agreement with such Institution[]"

10

11    (Rhyu Decl., Ex. 601, § 6.1 at 8.) This provision, in the context of Stanford's policy regarding

12    government funded research, placed the inventions outside the reach of the 1984 agreement.

13    (*See* Mejia Decl. ¶¶ 15-18.)

14    Stanford had ownership rights to the inventions at issue in this suit, and Dr. Merigan was

15    obligated to assign his rights to Stanford in the first instance. According to Stanford's policy, set

16    forth in Stanford's Copyright and Patent Agreement with employees, all employees were

17    required in 1984 to assign to Stanford their interests in inventions that had been supported by

18    U.S. government grants. (Rhyu Decl., Ex. 123 at STAN 010209; Mejia Decl. ¶¶ 15-18.) The

19    Copyright and Patent Agreement states:

20        2. I agree to assign or confirm in writing to Stanford and/or Sponsors [e.g., the
         U.S. government] that right, title and interest in and to . . . such inventions as
21        required by Contracts or Grants, and to execute and to deliver all documents and
         to do any and all things necessary or proper on my part to enable Stanford to
22        comply with any Contracts or Grants relating to such . . . inventions.

23    (*Id.* at 010209.) Moreover, it is undisputed that the inventions at issue in this suit were supported

24    by U.S. government grants. Specifically, the work was supported by grants AI27762-03 and

25    AI27766-07 from the National Institutes of Health. (Rhyu Decl, Ex. A at 26:16-27:10; Mejia

26    Decl. ¶ 8.) Dr. Merigan understood that he had an obligation to assign his invention to Stanford,

27    as evidenced by the declaration he submitted to the patent office in 1992. (Rhyu Decl., Ex. 87 at

28    STAN 00633 ("As an employee of Stanford University, I am required to assign my rights in the

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

740289 v1/PA                    22                    COUNTERCLAIM DEFENDANTS'
                                                     MOTION FOR SUMMARY JUDGMENT
                                                     CASE NO. C 05 04158 MHP

1  above referenced application to the University.  Therefore I will have no ownership interest in

2  the application.").)[17]  Stanford's ownership rights were expressly preserved in the 1984 Merigan

3  consulting agreement.  Accordingly, RMS cannot establish any ownership rights through that

4  agreement as a matter of law.

        **3.**     **No Merigan Work Related to the Patents was Done Under the April 1991 Merigan Consulting Agreement.**

7       There is insufficient evidence in the record to support RMS's claim that the invention

8  falls under Merigan's 1991 agreement.  That agreement was effective as of April 19, 1991.

9  (Rhyu Decl., Ex. 369.)  However, Dr. Holodniy attests that the completed work supporting the

10  inventions was conceived and reduced to practice prior to April 19, 1991.  (Holodniy Decl. ¶ 31.)

11  Dr. Holodniy's testimony is supported by the fact that the 1991 JCI publication describing the

12  inventive work was submitted for publication prior to May 14, 1991.  Thus, even if RMS could

13  overcome the statutory and equitable bars to its claims, it cannot establish any ownership rights

14  through the 1991 agreement, as a matter of law.

15      **C.**    **RMS Cannot Meet Its Burden on Its Claims Through the 1988 MTA.**

16       The MTA does not grant an ownership right.  (Rhyu Decl., Ex. 29, ¶ 8.)  By its express

17  terms, the MTA grants two options to two types of licenses.  Specifically, the MTA grants

18  "CETUS the first ***option to an exclusive license*** . . . or ***at CETUS' option, a nonexclusive***

19  ***license***."  (Rhyu Decl., Ex. 29, ¶ 8 (emphasis added).)  No ownership right is involved.

20  Moreover, the options clause contemplates subsequent action by Cetus to exercise the options

21  (*id.*, Ex. L 159:24-160:1); Cetus never exercised the options.  (Mejia Decl. ¶ 13.)  No actual

---

[17] Stanford's policy was consistent with the Bayh-Dole Act, as codified in 35 U.S.C. §§ 200-202.  The statute provides that if the University does not elect to retain title to an invention that was supported by government grants, "the Federal Government may receive title to any subject invention in which the contractor does not elect to retain rights or fails to elect rights within such times."  35 U.S.C. § 202(c)(2).  The statute further requires funding agreements with nonprofit organizations such as Stanford to contain provisions to effectuate "a prohibition upon the assignment of rights to a subject invention in the United States without the approval of the Federal agency [except in cases inapplicable here] . . . ."  *Id.*, § 202(c)(7)(A).  The statute contemplates that the inventor may retain rights only if "the Federal agency [] consider[s] and after consultation with the contractor grant[s] requests for retention of rights by the inventor . . . ."  *Id.* § 202(d).

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

740289 v1/PA          23          COUNTERCLAIM DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
CASE NO. C 05 04158 MHP

1  license attaches to the MTA.

2      The MTA was not assignable and thus not assigned.

3  **REDACTED**

4                                              (*See* Rhyu Decl.,

5  Ex. 681 at Resp. to Interrog. No. 2.)  Cetus had no authority to transfer a non-exclusive patent

6  license or an option to a non-exclusive patent license to any third party.

7      The power to assign the patent rights in the MTA is governed by federal law.  *Everex*

8  *Sys., Inc. v. Cadtrak Corp. (In re CFLC, Inc.)*, 89 F.3d 673, 679 (9th Cir. 1996) ("federal law

9  governs the assignability of patent licenses . . . .").  It is well established that nonexclusive patent

10 licenses can be assigned to a third party only with the consent of the licensor.  *Perlman v.*

11 *Catapult Entm't, Inc. (In re Catapult Entm't, Inc.)*, 165 F.3d 747, 750 (9th Cir. 1999);

12 *Stenograph Corp. v. Fulkerson*, 972 F.2d 726, 729 n.2 (7th Cir. 1992); *In re Hernandez*, 285

13 B.R. 435, 440 (Bankr. D. Ariz. 2002) (finding that patent license, whether exclusive or

14 nonexclusive, is assignable only with consent of the licensor).  The assignment of a nonexclusive

15 patent license is void unless the patent owner expressly consents, or the patent license itself

16 permits assignment.  *In re CFLC, Inc.,* 89 F.3d at 679 (citing *Gilson v. Republic of Ireland,* 787

17 F.2d 655, 658 (D.C. Cir. 1986)); *PPG Indus., Inc. v. Guardian Indus. Corp.*, 597 F.2d 1090,

18 1093 (6th Cir. 1979); *Unarco Indus., Inc. v. Kelley Co.,* 465 F.2d 1303, 1306 (7th Cir. 1972).

19 The Ninth Circuit in *In re CFLC* reasoned that permitting free assignability of patent licenses

20 "would be fraught with the danger that the licensee would assign it to the patent holder's most

21 serious competitor . . . ."  *In re CFLC*, 89 F.3d at 679.   The same rationale justifies restricting

22 assignment of an option to a nonexclusive license.  That is, if transferring an option to a

23 nonexclusive license were freely permitted, the patent holder would have no control over the

24 identity of the licensee who exercises the option.  Hence, an option to a license must be subject

25 to the same prohibition on assignment as a nonexclusive patent license: both require consent of

26 the patent holder.  *Cf. In re Patient Educ. Media, Inc.*, 210 B.R. 237, 243 (Bankr. S.D.N.Y.

27 1997) (recognizing that licensee's exercise of an option to a nonexclusive license would result in

28 a non-assignable license).  In the current case, consent to assignment was not provided in the

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

740289 v1/PA                    24                    COUNTERCLAIM DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
CASE NO. C 05 04158 MHP

1    MTA, or at any other time.[18]  (Rhyu Decl., Ex. 29.)  Thus, the option to the nonexclusive license

2    was not transferred to Hoffman-LaRoche or to RMS as a matter of law.[19]

3        **D.    RMS Cannot Meet its Burden on Its Claims Through Holodniy's 1989
             Visitor's Confidentiality Agreement.**

4

5        The 1989 Visitor's Confidentiality Agreement between Cetus and Dr. Holodniy is

6    expressly limited to "January 15, 1989 through July 1, 1989."  (Rhyu Decl., Ex. 30.)  The most

     pertinent provision of this agreement is paragraph 3, which contains the following assignment
7
     clause:
8

9        If, as a consequence of my access to Cetus' facilities or information, I conceive of
         or make, alone or with others, ideas, inventions and improvements thereof or
10       know-how related thereto that relate in any manner to the actual or anticipated
         business of CETUS, I will assign and do hereby assign to Cetus my right, title,
11       and interest in each of the ideas, inventions, and improvements thereof described
         in this paragraph.
12   (Rhyu Decl., Ex. 30, ¶ 3.)

13       The Visitor's Confidentiality Agreement cannot establish an ownership interest as a

14   matter of law for two reasons.  First, if "information" is interpreted so as not to be limited to

15   inventions using trade secrets, the Confidentiality Agreement is unenforceable under California

16   Business and Professions Code section 16600 as an unreasonable restraint of trade.

17   Alternatively, if the Court interprets the Confidentiality Agreement to avoid unenforceability, the

18   Merigan patents fall outside of its scope.

19           **1.    The Visitor's Confidentiality Agreement is Unenforceable If
                 Interpreted to Include Public Information.**
20

21       RMS's interpretation of the assignment provision in paragraph 3 of Holodniy's 1989

22   Visitor's Confidentiality Agreement renders the paragraph hopelessly broad, and thus void and

23   _____

24   [18] Furthermore, the MTA expressly states that it is "not assignable, whether by operation of law
     or otherwise, without the prior written consent of the Senior Vice President of Research and
25   Development at CETUS."  (Rhyu Decl., Ex. 29, ¶ 12.)  This clause imposes a second prerequisite
     to proper assignment.  No written evidence of consent by the Sr. V.P. of R&D has been produced
26   by RMS to date.
     [19] The MTA requires confidential information to be designated in writing as confidential at the
27   time of disclosure (Rhyu Decl, Exh. 29).  The undisputed fact that no writings exist
     memorializing the transfer of confidential information supports Stanford's claim that no
28   information was transferred.

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

740289 v1/PA                    25                    COUNTERCLAIM DEFENDANTS'
                                                      MOTION FOR SUMMARY JUDGMENT
                                                      CASE NO. C 05 04158 MHP

1   unenforceable.  California Business and Professions Code section 16600, states: "[e]xcept as

2   provided in this chapter, every contract by which anyone is restrained from engaging in a lawful

3   profession,[20] trade, or business of any kind is to that extent void."  This section reflects a strong

4   policy in California "that every citizen shall retain the right to pursue any lawful employment

5   and enterprise of their choice." *Advanced Bionics Corp. v. Medtronic, Inc.*, 29 Cal. 4th 697, 706

6   (2002) (citations omitted).  Under section 16600, assignment agreements are enforceable only to

7   the extent necessary to protect trade secrets and prevent unfair competition.  *Thompson v.*

8   *Impaxx, Inc.*, 113 Cal. App. 4th 1425, 1430 (2003); *see also Armorlite Lens Co. v. Campbell*,

9   340 F. Supp. 273, 275 (employee assignment agreements enforceable only to extent that

10  employee's later inventions are based upon confidential information); *Winston Research Corp. v.*

11  *Minn. Mining & Mfg. Co.*, 350 F.2d 134, 144-46 (9th Cir 1965) (Noncompete agreements cannot

12  be used to prevent an employee's use of "general skill, knowledge, and experience," even though

13  acquired in part during past employment.).

14      However, RMS interprets the assignments clause without limitation to trade secrets,

15  confidential information, or unfair competition.  Indeed, RMS's 30(b)(6) witness Mike Ostrach

16  testified that Dr. Holodniy had a continuing obligation to assign inventions made as a

17  consequence of his access to ***any*** Cetus information, whether that information was confidential

18  or not.  (Rhyu Decl., Ex. I at 83:7-20.)  Ostrach, who was general counsel at Cetus, further

19  interprets this expansive provision to apply to inventions Holodniy makes even today with non-

20  confidential information.  (*Id.* at 86:10-18.)  RMS's interpretation would unfairly obligate

21  Holodniy to sign over work he created using quantitative PCR techniques that have been publicly

22  known for fifteen years.  (Holodniy Decl. ¶ 17.)  Given his profession as a physician specializing

23  in AIDS clinical research, such a restraint is in direct conflict with Holodniy's obligations to his

24  current employer.  (Holodniy Decl. ¶ 6.)  Accepting Ostrach and RMS's interpretation, the

[20] Section 16600's protection extends to specialization within a profession (e.g., tax lawyer, AIDS researcher).  *See Campbell v. Bd. of Trs. of Leland Stanford Junior Univ.*, 817 F.2d 499, 503 (9th Cir. 1987) ("One may, by devoting all of his energy to a specialty within a traditional profession, limit his 'profession, trade, or business' under section 16600 to that specialty."); *see also Summerhays v. Scheu*, 10 Cal. App. 2d 574, 577 (1936); *Hunter v. Superior Court*, 36 Cal. App. 2d 100, 114 (1939).

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

740289 v1/PA                26                COUNTERCLAIM DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
CASE NO. C 05 04158 MHP

assignment provision of the 1989 Visitor's Confidentiality Agreement violates the Business and Professions Code, and is void and unenforceable as a matter of law.

### 2.    RMS Cannot Show that Dr. Holodniy Used Cetus Trade Secrets to Invent.

If the Visitor's Confidentiality Agreement is not deemed unenforceable, it may only be construed to require assignment of inventions that are based upon Cetus's trade secrets. *See Rigging Int'l Maint. Co. v. Gwin*, 128 Cal. App. 3d 594, 614 (1982) (16600 precludes enforcement of a non-compete agreement "beyond the protection of confidential information"). But Cetus never took the necessary steps to preserve its information as a trade secret.

Just as California law limits non-compete agreements to the protection of trade secrets, it likewise limits them to protection of information that is the subject of reasonable efforts to maintain confidentiality. *Compare Metro Traffic Control, Inc. v. Shadow Traffic Network*, 22 Cal. App. 4th 853, 861 (1994) (holding employee noncompetition agreement inapplicable where asserted trade secrets had been released without reasonable efforts to protect confidentiality); *Am. Credit Indem. Co. v. Sacks*, 213 Cal. App. 3d 622, 634 (1989) (holding confidentiality agreement violated where trade secret holder had measures to protect confidentiality in place). Under California law, reasonable efforts to maintain trade secrecy include informing employees of trade secret status, limiting access to information on a "need to know basis," controlling physical access to the information, and physically labeling information as confidential. *See Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1454 (2002); *In re Providian Credit Card Cases*, 96 Cal. App. 4th 292, 307 (2002).

Cetus took no steps to protect the confidentiality of information to which Dr. Holodniy had access.[21] Every Cetus employee with whom Dr. Holodniy interacted testified in deposition that they never told Dr. Holodniy that any information or materials were confidential. (*See, e.g.*, Rhyu Decl., Ex. K at 83:5-17; Ex. M at 80:1-81:1; Ex. E at 56:14-57:10; Holodniy Decl. ¶ 14.) Nor were any materials marked confidential. Cetus undertook no efforts to maintain trade secret or confidential status, even when employees knew that Dr. Holodniy was taking the material

---

[21] Nor did Roche, following its acquisition of certain Cetus assets.

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

740289 v1/PA                                27                    COUNTERCLAIM DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
CASE NO. C 05 04158 MHP

back to Stanford.  (Rhyu Decl., Ex. K at 80:5-12; Holodniy Decl. ¶ 14.)  Cetus did not require Holodniy to keep a separate Cetus lab notebook, and did not require Holodniy to leave his lab notebook at Cetus when he stopped visiting.  Nor did it require him to label the data he generated as confidential or as information that should not be copied or disclosed.  *See Providian Credit Card Cases*, 96 Cal. App. 4th at 307.  To the contrary, Cetus repeatedly approved publication of work describing the quantitation assay that Dr. Holodniy had developed in his collaboration with Cetus employees.   Specifically, Cetus approved publication of an abstract for the UCLA-Keystone meeting in March/April 1990, and abstract for the AIDS conference in San Francisco in June 1990, and the JID article itself in April 1991.  (Holodniy Decl. ¶¶ 19, 21, 22.)

Moreover, Cetus's public disclosure of the information to which Dr. Holodniy had access by itself destroys any claim of trade secrecy.  *See Vacco Indus., Inc. v. Van Den Berg*, 5 Cal. App. 4th 34, 50 (1992) (The definition of a trade secret "necessarily compel[s] the conclusion that a trade secret is protectible [sic] only so long as it is kept secret by the party creating it.").  Under both trade secret law and the express terms of the Confidentiality Agreement, any information that "enters the public domain" through publication is not protected as a trade secret.  *See Id.*; Cal. Civil Code § 3426.1(d); (Rhyu Decl., Ex. 30 ¶ 2.)

Dr. Sninsky has described Cetus's "aggressive" intellectual property review and rapid publication policy.  (Rhyu Decl., Ex. 550 at 13-14.)  Indeed, 7,000 PCR related publications existed as of 1991.  (*Id.* at 14, ¶ 18.)  Here, the technology learned by Holodniy at Cetus was made public at least by the end of 1989 and therefore could not be characterized as a trade secret when Holodniy started work on the inventions in July 1990.  (Holodniy Decl. ¶ 17(a)-(i).)

**E.    RMS has no Cognizable Claim to Ownership Via "Shop Rights."**

RMS cannot acquire rights to the Merigan patents through the shop rights doctrine, because (1) the invention was not "conceived and perfected" at Cetus; and (2) equitable consideration do not invoke the shop rights doctrine.

**1.    The Inventions were Not "Conceived and Perfected" at Cetus.**

The equitable shop rights doctrine applies "where a servant, during his hours of employment, working with his master's materials and appliances, *conceives and perfects* an

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

COUNTERCLAIM DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
CASE NO. C 05 04158 MHP

1   invention for which he obtains a patent . . . ." *United States v. Dubilier Condenser Corp.*, 289

2   U.S. 178, 188 (1933) (emphasis added).  The doctrine does not apply to ensnare later inventions

3   made without the wages, materials, tools, or workplace of the employer.  *See Crom v. Cement*

4   *Gun Co.*, 46 F. Supp. 403 (D. Del. 1942) (no shop right where inventions made after employee

5   left employment to form his own partnership).  There is no evidence to suggest that the invention

6   of the Merigan patents was conceived and perfected at Cetus.  Instead, only an assay for

7   quantitation of HIV RNA in serum was developed during the term of Holodniy's visitor's

8   agreement at Cetus.  (*See supra,* Section II.C.2.)  As of the time Dr. Holodniy stopped visiting

9   Cetus, significant uncertainties remained as to how to utilize the assay to inform patient therapy.

10  (*See supra*, Section II.C.3.a.)  It cannot reasonably be disputed that experiments confirming the

11  workability of the Merigan invention were carried out at Stanford, not Cetus.  (Holodniy Decl., ¶

12  25.)  The patients tested were from clinical trials using ddI, not IL-2.  These experiments are

13  described, for example, in Dr. Holodniy's laboratory notebook in July 1990, well after Dr.

14  Holodniy had stopped visiting Cetus.  (Rhyu Decl., Ex. 7 at STAN 016255-56.) [22]

15          **2.      The Equities Confirm the Inapplicability of the Shop Rights Doctrine.**

16          The shop right doctrine arose "as a form of equitable compensation for situations where

17  the employer has financed an employee's invention by providing wages, materials, tools, and a

18  workplace."  *See Mechmetals Corp. v. Telex Computer Prods., Inc.*, 709 F.2d 1287, 1291 (9th

19  Cir. 1983).  In *Mechmetals*, the Ninth Circuit cautioned that "the doctrine should be carefully

20  confined to the type of situation for which it was created: where the inventor is an employee

21  working at the employer's direction . . . ."  *Id.* at 1293.  There is no dispute that Drs. Merigan and

22  Holodniy were never employed by Cetus.  Both were employed by Stanford, and their wages

23  were at all times paid by Stanford from U.S. government grants.  (Rhyu Decl., Ex. A at 24:3-13,

24  70:5-71:4; Holodniy Decl. ¶ 13.)

25          In order to establish shop rights outside of any employee/employer relationship, RMS

26  must show that other equitable factors compel application of the doctrine.  *See Francklyn v.*

27

28  [22] There is also no evidence to support the claim that Dr. Merigan or Katzenstein used the wages, materials, tools, and workplace of Cetus to conceive and perfect the invention.

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

740289 v1/PA                              29                        COUNTERCLAIM DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
CASE NO. C 05 04158 MHP

1   *Guilford Packing Co.*, 695 F.2d 1158, 1160-61 (9th Cir. 1983) (holding strict employer-

2   employee relationship not necessary where inventor worked over a two-year period at the

3   company, perfected and completed the invention using company tools, and knowingly

4   acquiesced to the company's manufacture and use of the invention.).  There is no evidence here

5   that Dr. Merigan or Dr. Holodniy, after exploiting wages, tools and workplace of Cetus, also

6   induced Cetus or Roche to use the invention.  Rather than inducing or consenting to Roche's use

7   of the invention, Drs. Merigan and Holodniy rightly took sole credit for the work and published

8   article after article without attribution to alleged Cetus contributors.   They diligently filed

9   patents, and promptly upon issuance of the '730 patent, Stanford sought to negotiate a license

10  with Roche.  (Mejia Decl. ¶¶ 4-6, 9, 10.)

11       Shop rights cannot apply, because the multi-step, clinically valuable, monitoring

12  invention of the Merigan patents was not conceived and perfected at Cetus.  Secondarily, the

13  doctrine cannot be invoked where there is no employee/employer relationship and no evidence of

14  inducement or consent.

15  **V.    CONCLUSION**

16       For the foregoing reasons, Stanford University moves for Summary Judgment as follows:

17  (1) RMS's ownership, license, and breach of contract claims are barred by the statute of

18  limitations, laches and/or estoppel; (2) RMS has no ownership or license rights to the inventions

19  at issue under the 1984 and 1991 Merigan Consulting Agreements; (3) RMS has no ownership or

20  license rights to the inventions at issues under the 1988 MTA; and (4) RMS has no ownership or

21  license rights to the inventions at issue under the 1989 Visitor's Confidentiality Agreement.

22  Dated: October 27, 2006                    COOLEY GODWARD KRONISH LLP

23

24                                            by: /s/

25                                                Michelle S. Rhyu

26                                            Attorneys for Counter Defendants The Board of
                                             Trustees of the Leland Stanford Junior University,
27                                            Thomas Merigan and Mark Holodniy

28

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

740289 v1/PA                    30                    COUNTERCLAIM DEFENDANTS'
                                                     MOTION FOR SUMMARY JUDGMENT
                                                     CASE NO. C 05 04158 MHP