

1  COOLEY GODWARD KRONISH LLP
2  STEPHEN C. NEAL (No. 170085) (nealsc@cooley.com)
   RICARDO RODRIGUEZ (No. 173003) (rr@cooley.com)
3  MICHELLE S. RHYU (No. 212922) (mrhyu@cooley.com)
   Five Palo Alto Square
4  3000 El Camino Real
   Palo Alto, CA  94306-2155
5  Tel:    (650) 843-5000
   Fax:    (650) 857-0663
6
   Attorneys for Plaintiff and Counterclaim Defendant,
7  THE BOARD OF TRUSTEES OF THE LELAND STANFORD
   JUNIOR UNIVERSITY and Counterclaim Defendants THOMAS
8  MERIGAN and MARK HOLODNIY
9
10                    UNITED STATES DISTRICT COURT
11                  NORTHERN DISTRICT OF CALIFORNIA
12
13  THE BOARD OF TRUSTEES OF THE          Case No.  C 05 04158 MHP
    LELAND STANFORD JUNIOR
14  UNIVERSITY,                           **STANFORD UNIVERSITY, DR. MERIGAN
                                          AND DR. HOLODNIY'S OPPOSITION TO
15                  Plaintiff,            COUNTERCLAIMANT RMS'S MOTION
                                          FOR SUMMARY JUDGMENT**
16           v.
17
    ROCHE MOLECULAR SYSTEMS, ET AL.,
18
                    Defendants.
19
20  ROCHE MOLECULAR SYSTEMS, ET AL.,      Hearing Date:  December 4, 2006
                                          Time: 2:00 p.m.
21                  Counterclaimants,     Dept: 15, 18th Floor
22           v.                           Hon. Marilyn Hall Patel
23
    THE BOARD OF TRUSTEES OF THE
24  LELAND STANFORD JUNIOR
    UNIVERSITY; THOMAS MERIGAN AND
25  MARK HOLODNIY
26                  Counterclaim Defendants.
27
28

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

TABLE OF CONTENTS

PAGE

I.      INTRODUCTION ................................................................................ 1

II.     STATEMENT OF FACTS ................................................................. 2

III.    ROCHE'S SUMMARY JUDGMENT MOTION SHOULD BE DENIED ...................... 2

        A.    RMS Has No "Shop Rights" to the Patented Inventions ............................ 3

              1.    Cetus did not obtain shop rights to the patented inventions ................... 3

              2.    Cetus could not transfer shop rights to RMS ................................ 5

              3.    Shop rights do not cover sales of the patented inventions ...................... 5

        B.    RMS Has No Ownership Rights Through Holodniy's Visitor's
              Confidentiality Agreement ................................................................ 6

              1.    The visitor's confidentiality agreement did not transfer ownership,
                    because under federal law, Dr. Holodniy could not assign to Cetus ........ 7

                    a.    Legislation governing U.S. government-funded inventions
                          divested Dr. Holodniy of title to his inventions. ........................ 7

                    b.    Under the Bayh-Dole Act, title to the patents in suit vested
                          in Stanford University first ............................................... 8

                    c.    Under the Bayh-Dole Act, title never vested in Dr. Holodniy ........ 9

              2.    As a matter of law, RMS's interpretation of the Confidentiality
                    Agreement renders it unenforceable under California Business &
                    Profession Code § 16600 .................................................... 10

              3.    At a minimum, there is a genuine dispute as to whether the
                    inventions were a "consequence" of Dr. Holodiny's access to Cetus ...... 11

                    a.    The quantitative HIV RNA assay was not developed as "a
                          consequence of" Dr. Holodiny's access to Cetus ..................... 12

                    b.    The multi-step method of the patented invention was not
                          developed "as a consequence of" Dr. Holodiny's access to
                          Cetus ........................................................................ 14

        C.    Even if Cetus Had Acquired Dr. Holodniy's Patent Rights, Stanford Was a
              Subsequent Bona Fide Purchaser That Extinguished Cetus's Rights ................ 15

        D.    RMS Does Not Have a Royalty-Free License Under the MTA ..................... 16

              1.    As a matter of law, RMS has no claim to any licenses or options to
                    license under the MTA, because such rights are not transferable
                    without Stanford's consent and Stanford did not consent ..................... 17

              2.    The MTA requires a reasonable royalty for a nonexclusive license ......... 18

              3.    No relevant "materials" were transferred under the MTA .................... 19

                    a.    As a matter of law, the MTA is limited to materials received
                          by Dr. Merigan or Dr. Schwartz, and there is no record
                          evidence of any such materials .......................................... 19

                    b.    Alternatively, a number of genuine issues of fact require the
                          denial of RMS's motion for summary judgment ..................... 21

1

**TABLE OF CONTENTS**

(CONTINUED)

2

                                                                                                    **PAGE**

3      E.      Stanford, Holodniy and Merigan Are Entitled to Summary Judgment
               Dismissing RMS's Counterclaims and Affirmative Defenses..............................22

4      F.      Stanford Has Established Standing to Assert Infringement of the '705 and
               '730 Patents.................................................................................................24

5

IV.    CONCLUSION .........................................................................................................25

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

PAGE

3

**CASES**

4    *65 Butterfield v. Chicago Title Ins. Co.*
         70 Cal. App. 4th 1047 (1999)....................................................................................... 24
5
     *Arachnid, Inc. v. Merit Indus., Inc.*
6         939 F.2d 1574 (Fed. Cir. 1991)..................................................................................... 24

7    *Armorlite Lens Co. v. Campbell*
         340 F. Supp. 273 (S.D. Cal. 1972)................................................................................. 11
8
     *ASAT Holdings, Ltd. v. Motorola, Inc.*
         No. 5:03-CV-01514-RS, 2004 WL 2646657 (N.D. Cal. Nov. 17, 2004) ..................... 17
9
     *Branco v. Norwest Bank Minn., N.A.*
10        381 F. Supp. 2d 1274 (D. Haw. 2005) .......................................................................... 23

11   *California Eastern Labs., Inc. v. Gould*
         896 F.2d 400 (9th Cir. 1990) .......................................................................................... 5
12
     *Cf. Holly D v. Cal. Inst. of Tech.*
         339 F.3d 1158 (9th Cir. 2003) ....................................................................................... 23
13
     *Chou v Univ. of Chicago*
14        254 F.3d 1347 (Fed. Cir. 2001) ...................................................................................... 9

15   *City of St. Paul v. Evans*
         344 F.3d 1029 (9th Cir. 2003)................................................................................... 23, 24
16
     *Cool Fuel, Inc. v. Connett*
         685 F.2d 309 (9th Cir. 1982).......................................................................................... 23
17
     *Cooper v. Goldfarb*
18        154 F.3d 1321 (Fed. Cir. 1998) ....................................................................................... 4

19   *Crom v. Cement Gun Co.*
         46 F. Supp. 403 (D. Del. 1942) ....................................................................................... 3
20
     *Eaton v. Evans*
         204 F.3d 1094 (Fed. Cir. 2000) ....................................................................................... 3
21
     *FilmTec Corp. v. Allied Signal Inc.*
22        939 F.2d 1568 (Fed. Cir. 1991) ........................................................................ 7, 15, 16, 25

23   *FilmTec Corp. v. Hydranautics*
         982 F.2d 1546 (Fed. Cir. 1993) .................................................................................... 7, 8
24
     *Flannery Bolt Co. v. Flannery*
         86 F.2d 43 (3d Cir. 1936)............................................................................................. 5, 6
25
     *Francklyn v. Guilford Packing Co.*
26        695 F.2d 1158 (9th Cir. 1983) ...................................................................................... 5, 6

27   *Kunstman v. Mirizzi*
         234 Cal. App. 2d 753 (1965).......................................................................................... 24

     *Phillips v. AWH Corp.*
         415 F.3d 1303 (Fed. Cir. 2005)....................................................................................... 3

28

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

# TABLE OF AUTHORITIES
### (CONTINUED)

PAGE

*Ralph J. Gonocci Revocable Living Trust v. Three M Tool & Mach., Inc.*
No. 02-74796, 2006 WL 1676898 (E.D. Mich. June 13, 2006) ............................ 6

*Regents of Univ. of N.M. v. Knight*
321 F.3d 1111 (Fed. Cir. 2003) .................................................................... 9

*Rhone Poulenc Agro, S.A. v. DeKalb Genetics Corp.*
284 F.3d 1323 (Fed. Cir. 2002) ............................................................ 15, 17

*Sicom Sys. Ltd. v. Agilent Techs., Inc.*
427 F.3d 971 (Fed. Cir. 2005) ..................................................................... 25

*Speedplay, Inc. v. Bebop, Inc.*
211 F.3d 1245 (Fed. Cir. 2000) .................................................................... 8

*Styne v. Stevens*
26 Cal. 4th 42 (2001) ............................................................................... 23

*Thompson v. Impaxx, Inc.*
113 Cal. App. 4th 1425 (2003) ................................................................ 10

*TIG Ins. Co. of Mich. v. Homestore, Inc.*
137 Cal. App. 4th 749 (2006) .................................................................. 18

*TM Patents, L.P. v. Int'l Bus. Machs. Corp.*
121 F. Supp. 2d 349 (S.D.N.Y. 2000) .............................................. 8, 9, 24, 25

*U.S. Cellular Inv. Co. v. GTE Mobilnet, Inc.*
281 F.3d 929 (9th Cir. 2002) ..................................................................... 19

*Ulead Sys., Inc. v. Lex Computer & Mgmt. Corp.*
351 F.3d 1139 (Fed. Cir. 2003) ................................................................. 17

*United States v. Dubilier Condenser Corp.*
289 U.S. 178 (1933) .................................................................................. 3

*Univ. of Bd. of Trs. of W. Va. v. VanVoorhies*
278 F.3d 1288 (Fed. Cir. 2002) ................................................................... 9

*Winston Research Corp. v. Minn. Mining & Mfg. Co.*
350 F.2d 134 (9th Cir 1965) ..................................................................... 11

*Withington-Cooley Mfg. Co. v. Kinney*
68 F. 500 (6th Cir. 1895) ........................................................................... 6

*Wommack v. Durham Pecan Co.*
715 F.2d 962 (5th Cir. 1983) ...................................................................... 6

## CODES

35 U.S.C. §§ 200-210 ................................................................................ 8

35 U.S.C. § 201(e) and (i) ......................................................................... 8

35 U.S.C. § 202 ..................................................................................... 8, 9

35 U.S.C. § 261 ....................................................................................... 15

48 C.F.R. § 52.227-11(f)(1)-11(f)(4) ........................................................... 9

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

**TABLE OF AUTHORITIES**
(CONTINUED)

PAGE

**OTHER AUTHORITIES**

Robert A. Matthews, Annotated Patent Digest § 35:35 (2006). ................................................. 17

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

**TABLE OF CITATION CONVENTIONS**

| Citation Format | Source Material |
| --- | --- |
| Rhyu Supp. Decl. | Exhibits attached to the Supplemental Declaration of Michelle S. Rhyu in Support of Counterclaim Defendants Stanford University, Dr. Merigan and Dr. Holodniy's Opposition to Counterclaimant RMS's Motion for Summary Judgment |
| Merigan Decl. | Paragraphs in the Declaration of Thomas C. Merigan, M.D., in Support of Counterclaim Defendants Stanford University, Dr. Merigan and Dr. Holodniy's Opposition to Roche Molecular Systems' Motion for Summary Judgment |
| Stanford's MSJ | Pages in the Counterclaim Defendants Stanford University, Dr. Merigan and Dr. Holodniy's Motion for Summary Judgment |
| Rhyu Decl. | Exhibits attached to the Declaration of Michelle S. Rhyu in support of Counterclaim Defendants Stanford University, Dr. Merigan and Dr. Holodniy's Motion for Summary Judgment |
| Holodniy Decl. | Paragraphs in the Declaration of mark Holodniy, M.D., in Support of Counterclaim Defendants Stanford University, Dr. Merigan and Dr. Holodniy's Motion for Summary Judgment |
| Mejia Decl. | Paragraphs in the Declaration of Luis R. Mejia in Support of Counterclaim Defendants Stanford University, Dr. Merigan and Dr. Holodniy's Motion for Summary Judgment |
| RMS's MSJ | Pages in the Defendants' Notice of Motion and Motion for Summary Judgment of Ownership of and License to the '730 and '705 Patents; and Memorandum of Points and Authorities in Support Thereof |
| Chiang Decl. | Exhibits attached to the Declaration of T.J. Chiang in Support of Defendants' Motion for Summary Judgment |
| Groves Decl. | Paragraphs in the Declaration of Dr. Eric S. Groves in Support of Roche's Motion for Summary Judgment |
| Nersesian Decl. | Exhibits attached to the Declaration of Rhea Nersesian in Support of Roche's Motion for Summary Judgment |
| SUF | Joint Statement of Undisputed Facts |

# I.    INTRODUCTION

Contrary to RMS's assertions, the invention in this case is not PCR technology.  Nor is it a quantitative assay for determining the level of HIV RNA.  PCR and the quantitative assay were published and dedicated to the public well before the filing date of the patents in suit.  As the patent claims state, the invention involves methods of evaluating the effectiveness of anti-HIV therapy, which necessarily includes the step of correlating HIV nucleic acid levels with the effectiveness of therapy.  RMS's failure to tie the invention to its assertions is fatal to its motion.

Similarly, RMS cannot have shop rights when it has provided no evidence to establish that the patented invention was reduced to practice at Cetus.  To the contrary, the JID Article co-authored by Stanford and Cetus scientists recognizes that "further studies will be necessary to validate" whether the quantitative assay will work for monitoring therapy.  The evidence shows that the patented method was first used and shown to work at Stanford, long after Dr. Holodniy stopped visiting Cetus.  This work tested samples from a clinical trial in which Cetus had no part. RMS also has not established ownership of the Stanford invention through Dr. Holodniy's Visitor's Confidentiality Agreement.  To the extent that Dr. Holodniy had learned any PCR techniques at Cetus, they were non-confidential and available for public use.  Cetus itself did not contemporaneously believe it had any rights to Stanford's invention.  At the time the invention was published, no one from Cetus claimed that the work was Cetus' property.  Even upon evaluating Stanford's patents in 1999, no one, including John Sninsky, the former director of Cetus's PCR Division, thought Cetus had ownership or license rights.  As to the MTA, despite the MTA's requirement that confidential information be designated as such *in writing* upon disclosure, no writing exists that documents any transfer under the MTA.

Full analysis of RMS's claims compels grant of Stanford's summary judgment motion. RMS cannot not, as a matter of law, obtain rights from Dr. Holodniy.  Federal law divested Dr. Holodniy of his rights in the federally-funded inventions.  He simply had no rights to give to Cetus.  Moreover, RMS's failure to record any assignment with the Patent & Trademark Office rendered Stanford a *bona fide* purchaser of the inventions.  As to the MTA, Cetus could not have transferred a non-exclusive license without Stanford's consent, which was never sought or given.

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

1

STANFORD'S OPPOSITION TO
RMS'S MOTION FOR SUMMARY JUDGMENT
CASE NO. C 05 04158 MHP

1   Absent any colorable basis for ownership, license or fair use, summary judgment dismissing

2   RMS's counterclaims and related affirmative defenses is in order.

3        Almost a year ago, RMS sought and obtained bifurcation of the ownership issues on the

4   promise that it could decidedly end this case on those issues.  However, RMS has not shown any

5   connection to the inventions beyond the published JID article that the PTO considered as prior art

6   before granting the patents.  RMS's claims overreach, and in any case are barred by the statute of

7   limitations, waiver and estoppel as discussed in Stanford's opening brief.  Stanford, Dr. Merigan,

8   and Dr. Holodniy respectfully request that their motion be granted, RMS's motion be denied, and

9   the full patent infringement case filed by Stanford be allowed to proceed expeditiously.

10  **II.    STATEMENT OF FACTS**

11       The facts set forth in the Counterclaim Defendants' Motion for Summary Judgment

12  (Stanford's MSJ at 2-10) and the parties' Joint Statement of Undisputed Facts ("SUF") support

13  this memorandum.

14  **III.   ROCHE'S SUMMARY JUDGMENT MOTION SHOULD BE DENIED**

15       RMS seeks summary judgment on three  theories: the shop rights doctrine, ownership

16  through Dr. Holodniy's 1989 Visitor's Confidentiality Agreement, and license under the 1988

17  Materials Transfer Agreement.  Based on these theories, it further seeks summary judgment on its

18  affirmative defenses and the issue of Stanford's standing to sue.  Not only has RMS failed to meet

19  its burden, its arguments highlight the purely legal issues that compel summary judgment in favor

20  of Stanford.  RMS cannot demonstrate rights to the Merigan patents, because (A) shop rights do

21  not apply when the patented invention was not reduced to practice at Cetus; (B) by the legislative

22  command of the Bayh-Dole Act, Dr. Holodniy did not have title to assign to Cetus; (C) Cetus and

23  RMS never recorded title to the patents, thus Stanford was a bona fide purchaser of the patented

24  invention; and (D) the option to a nonexclusive license under the MTA was not transferable to

25  RMS.  RMS's ownership and license claims are thus unsupported, and its related counterclaims

26  and affirmative defenses should be dismissed.

27  **A.    RMS Has No "Shop Rights" to the Patented Inventions.**

28  RMS cannot establish a defense to infringement of the Merigan patents via shop rights

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

2

STANFORD'S OPPOSITION TO
RMS'S MOTION FOR SUMMARY JUDGMENT
CASE NO. C 05 04158 MHP

1    for at least three independent reasons. First, Cetus could not acquire shop rights when the

2    patented invention was not reduced to practice at Cetus. Second, even if it had acquired the

3    rights, Cetus could not sell shop rights to the purchaser of only a subset of its assets. Third, shop

4    rights do not allow infringing sales of patented product with no compensation to the inventor.

5    These factors, in addition to Stanford's arguments in its opening brief (Stanford's MSJ at 28-30),

6    compel a finding of no shop rights in the patented invention as a matter of law.

7          1.    **Cetus did not obtain shop rights to the patented inventions.**

8          As set forth in Stanford's opening brief (Stanford's MSJ at 28-30), shop rights are

9    precluded unless RMS can show that the **_invention_** at issue was conceived **_and_** reduced to

10   practice while Dr. Holodniy was actively using Cetus resources and facilities.[1]   Reduction to

11   practice of a method requires performing a process that meets every element of the invention and

12   demonstrating that the process works for its intended purpose. *See Eaton v. Evans*, 204 F.3d

13   1094, 1097 (Fed. Cir. 2000) (no reduction to practice where element was missing).   Because

14   RMS has not even alleged that the patented method was performed at Cetus (RMS's MSJ at 26-

15   27), it has not met its initial burden to show that the invention was reduced to practice at Cetus.

16        RMS erroneously equates the HIV RNA Quantitation Assay published in the JID Article

17   with the patented method for monitoring the efficacy of anti-HIV therapy.   The patented

18   invention is not the assay that was published in the JID Article. (Holodniy Decl. ¶¶ 22, 26.) The

19   patented invention, as defined in the claims of the '730 and '705 patents, requires a correlation or

20   relationship between measured HIV nucleic acid levels and effectiveness of the anti-retroviral

21   therapy. (Rhyu Decl., Ex. 15 at col. 21-24 & Ex. 16 at col. 23-24.) *See Phillips v. AWH Corp.*,

22   415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*), *cert denied*, ("It is a bedrock principle of patent

23   law that the claims of a patent define the invention.") (internal quotations and citation omitted).

24   Because D r. Holodniy had not established any correlation between nucleic acid levels and

---

[1] *See United States v. Dubilier Condenser Corp.*, 289 U.S. 178, 188 (1933) (shop rights doctrine applies only "where a servant, during his hours of employment, working with his master's materials and appliances, conceives **_and perfects_** an invention for which he obtains a patent . . . .") (emphasis added); *Crom v. Cement Gun Co.*, 46 F. Supp. 403, 404 (D. Del. 1942) ("Under no circumstances can a shop right come into existence unless the inventor was an employee at the time when the invention was made **_and reduced to practice_**.") (emphasis added).

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

STANFORD'S OPPOSITION TO
RMS'S MOTION FOR SUMMARY JUDGMENT
CASE NO. C 05 04158 MHP

1  effectiveness of treatment at the time he visited Cetus (Holodniy Decl. ¶¶ 25-27), the invention

2  was not reduced to practice there.  (Holodniy Decl. ¶ 27.)  *See also Cooper v. Goldfarb*, 154 F.3d

3  1321, 1327-28 (Fed. Cir. 1998).  Moreover, the JID Article acknowledged that the quantitation

4  assay was not understood to work to monitor efficacy of treatment, stating "[f]urther studies will

5  be necessary to validate this approach."  (Rhyu Decl., Ex. 1 at 862 & 865 (emphasis added).)

6        Validation of a method of monitoring the effectiveness of anti-HIV treatment occurred at

7  Stanford.  Dr. Holodniy began experiments in July 1990 to ascertain whether any relationship

8  could be found between nucleic acid levels and therapeutic effectiveness.  (Holodniy Decl. ¶ 25;

9  Rhyu Decl., Ex. 7 at STAN 016255-56.)  Between July 1990 and April 19, 1991, Dr. Holodniy

10  designed and conducted experiments with the other inventors that demonstrated a correlation.

11  (Holodniy Decl. ¶¶ 25-31.)  These experiments tested patient samples from AIDS clinical trials

12  administering dideoxyinosine ("ddI") and AZT.  (*Id.* ¶ 29; Merigan Decl. ¶¶ 16 -17.)  Dr.

13  Holodniy performed all of this work at Stanford facilities, funded by Stanford through U.S.

14  government grants.[2]  Cetus took no part in the ddI/AZT trials or the experiments using the

15  samples from these trials.  (Merigan Decl. ¶¶ 16-17.)

16        The Stanford inventors' successful demonstration of a statistically significant relationship

17  between HIV RNA levels and effectiveness of anti-HIV treatment was published in the *Journal*

18  *of Clinical Investigation* in November 1991 ("JCI Article").  (Holodniy Decl. ¶ 30; Rhyu Decl.,

19  Ex. 46.)  The JCI Article concluded "that plasma HIV RNA copy number can be quantitated by

20  PCR and does decrease with dideoxynucleoside therapy."  (Rhyu Decl., Ex. 46 at 1759.)  The

21  work reported in the JCI Article, ***not*** the JID Article, is the basis of the patents in suit.  (Holodniy

22  Decl. ¶ 30; Merigan Decl. ¶ 20.)  For example, Table 1 and Figures 1-3 of the patents in suit

23  correspond to Table 1 and Figures 1-3 of the JCI Article.  (SUF 89.)  The Methods, Results and

24  Discussion sections of the JCI Article are reproduced essentially verbatim in Section 6 of the

25  patents in suit.  (*Compare* Rhyu Decl. Ex. 15, col. 9:25-15:5, *with* Ex. 46.)  Further, notebook

26

---

27  [2] (Holodniy Decl. ¶ 25; Merigan Decl. ¶¶ 13, 15; Rhyu Decl., Ex. A at 25:24-28:4 (NIH grant for
CFAR infrastructure; Rhyu Supp. Decl., Ex. O at 254:3-257:15 (NIH grant money for PCR

28  equipment); *id* at 304:20-305:20 (Stanford CFAR paid Holodniy and sponsored his work).)

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

4

STANFORD'S OPPOSITION TO
RMS'S MOTION FOR SUMMARY JUDGMENT
CASE NO. C 05 04158 MHP

1  entries in Dr. Holodniy's notebook after January 1991 confirm that the experiments reported in

2  the JCI Article and claimed in the patents were done at Stanford. (Holodniy Decl. ¶ 25; Rhyu

3  Supp. Decl. Ex. 8 at STAN 016389 & STAN 016399 (corresponding with Figures 1 & 2,

4  respectively, of the patents).) Thus, it cannot reasonably be disputed that the patented invention

5  was *not* reduced to practice at Cetus. Accordingly, the equitable shop rights doctrine cannot give

6  Cetus rights to the patented invention.

7        **2.**      **Cetus could not transfer shop rights to RMS.**

8        "It is a well established principle that a shop right is personal to the employer; it cannot be

9  assigned or transferred by contract to a third person." *Francklyn v. Guilford Packing Co.,* 695

10  F.2d 1158, 1162-63 (9th Cir. 1983). Deviation from the general prohibition on transfers of shop

11  rights is allowed only where a successor firm acquires the entire business and assets of the

12  company holding the shop right. *See California Eastern Labs., Inc. v. Gould,* 896 F.2d 400, 402

13  (9th Cir. 1990) (shop rights passed to successor only because patentee "presented no evidence in

14  the record to show that [the successor firm] did not purchase ***all of*** [the firm holding the shop

15  right]") (emphasis added). Hoffmann-LaRoche did not purchase all of the business and assets of

16  Cetus. Through the Asset Purchase Agreement, Hoffmann-LaRoche purchased only a portion of

17  Cetus's assets, with the remainder of the Cetus business merging with Chiron. (Chiang Decl., Ex.

18  50 at 18:25-20:9; Rhyu Supp. Decl., Ex. Q at 98:10-99:9.) RMS cites no authority to support its

19  plea for an exception to the rule against transfer. Moreover, to allow such free transfer of the

20  equitable right would unfairly expand the right to benefit purchasers who never invested in the

21  original invention. Thus, even if Cetus had held a shop right (which it did not), Hoffmann-

22  LaRoche, and consequently RMS, could not have purchased that right from Cetus.

23        **3.**      **Shop rights do not cover sales of the patented inventions.**

24        Shop rights do not sanction unlimited infringing sales of the patented invention, where no

25  benefit flows back to the inventor. The equitable right is to be determined "from the nature of the

26  employer's business, the character of the invention involved, the circumstances which created it

27  and the relation, conduct, and intention of the parties." *Flannery Bolt Co. v. Flannery,* 86 F.2d

28  43, 44 (3d Cir. 1936). Consistent with equities, cases tend to place limits on the employer's

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

5

STANFORD'S OPPOSITION TO
RMS'S MOTION FOR SUMMARY JUDGMENT
CASE NO. C 05 04158 MHP

1   exploitation of the invention beyond its own use. *Wommack v. Durham Pecan Co.*, 715 F.2d 962,

2   965 (5th Cir. 1983) ("A shop right permits the employer to use the subject of the patent for his

3   own purposes, but not to sell or prohibit others from using it. The inventor retains a valid

4   patent."); *Francklyn*, 695 F.2d at 1162-63 (shop right did not include the right to lease the

5   patented invention). Where sales of a patented invention have been permitted under the shop

6   rights doctrine, the employee-inventors were either paid royalties for each sale of the invention or

7   had acquiesced to sales made by their employer while employed. *See Flannery Bolt*, 86 F.2d at

8   44 (president of company paid royalty for each sale of his patented product); *Withington-Cooley*

9   *Mfg. Co. v. Kinney*, 68 F. 500, 505 (6th Cir. 1895) (inventor was specifically hired to develop

10  products for employer to sell); *Ralph J. Gonocci Revocable Living Trust v. Three M Tool &*

11  *Mach., Inc.*, No. 02-74796, 2006 WL 1676898, at *3-4 (E.D. Mich. June 13, 2006) (employee

12  knew employer was manufacturing and selling invention but never objected to such activity).

13  Here, by contrast, Dr. Holodniy was never employed or paid by Cetus. (Holodniy Decl. ¶ 13;

14  Merigan Decl. ¶¶ 12-14.) He never consented to Cetus or RMS using the patented inventions, but

15  rather, Stanford sought a license from RMS soon after the patents issued. (Mejia Decl. ¶¶ 10-11.)

16  No evidence exists of Dr. Holodniy inducing Cetus or RMS to sell the accused infringing kits.

17  RMS's attempt to justify its unlimited sales of infringing kits, without returning any benefit to the

18  inventors, cannot prevail under these circumstances. The equities do not protect free exploitation

19  of inventions where there was never an employer relationship. Summary judgment of ***no*** shop

20  rights is appropriate, and RMS's motion should be denied.

21        **B.    RMS Has No Ownership Rights Through Holodniy's Visitor's**
22              **Confidentiality Agreement.**

23        Dr. Holodniy's 1989 Visitor's Confidentiality Agreement did not give ownership to RMS

24  for several reasons. First, the inventions could not have been assigned through the Visitor's

25  Confidentiality Agreement, because the Bayh-Dole Act divested Dr. Holodniy of any title to

26  transfer. Second, RMS's attempts to interpret Dr. Holodniy's 1989 Visitor's ***Confidentiality***

27  Agreement to ensnare later-developed inventions using non-confidential, published techniques is

28  legally forbidden as an unreasonable restraint of trade under California Business and Professions

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

6

STANFORD'S OPPOSITION TO
RMS'S MOTION FOR SUMMARY JUDGMENT
CASE NO. C 05 04158 MHP

1    Code §16600.  (Stanford's MSJ at 25.)  Finally, even if the Court declines to grant Stanford's

2    motion regarding Holodniy's Visitor's Confidentiality Agreement, RMS's motion must be

3    denied, because there are genuine disputes of material fact regarding whether the claimed

4    invention was made "as a consequence of" Dr. Holodniy's access to Cetus.

5                        **1.       The Visitor's Confidentiality Agreement did not transfer ownership,**

6                        **because under federal law, Dr. Holodniy could not assign to Cetus.**

7                        **a.       Legislation governing U.S. government-funded inventions**
                         **divested Dr. Holodniy of title to his inventions.**

8            Dr. Holodniy had no rights in the inventions of the patents in suit to transfer to Cetus.

9    Thus, as a matter of law, the Visitor's Confidentiality Agreement did not assign the inventions to

10   Cetus.      *FilmTec Corp. v. Hydranautics*, 982 F.2d 1546, 1553-54 (Fed. Cir. 1993)

11   ("*Hydranautics*") (statute governing title to inventions made under government contract divested

12   inventor of "all of his interest" to the invention by operation of law).[3]  The *Hydranautics* case

13   expands on the earlier Federal Circuit case, *FilmTec Corp. v. Allied Signal Inc.*, 939 F.2d 1568

14   (Fed. Cir. 1991) ("*FilmTec*"), which RMS cites in its opening brief.  Both *Hydranautics* and

15   *FilmTec* discuss the question of whether the common plaintiff, FilmTec, had properly obtained

16   assignment to the '344 patent.  While the Court in *FilmTec* held that the plaintiff had failed to

17   meet the preliminary injunction standard of establishing a reasonable likelihood of success on the

18   merits of whether it had rightful title, *id.* at 1573, the Court finally reached the question of

19   whether the inventor had properly conveyed title to FilmTec in the *Hydranautics* case.

20   *Hydranautics*, 982 F.2d at 1553-54.  Like RMS does here, FilmTec argued that it had acquired

21   assignment of the patent from the inventor.  *Id.* at 1549.  However, the Court found that the

22   invention was made under a contract between the U.S. Government and the inventor's employer.

23   *Id.* at 1548, 1553.  The Court further found that the contract was governed by legislation that

24   clearly intended for the government to retain title to all inventions made under the contract.  *Id.*

---

25   [3]Cetus knew that the government had rights in government-funded inventions made by Dr.
     Holodniy and other Stanford employees.  For example, Michael Ostrach, Cetus' general counsel,
26   testified that he was aware of the Bayh-Dole Act's provisions and that Stanford employees may
     be required to assign their inventions to the University if federal funding was involved.  (Rhyu
27   Supp. Decl., Ex. Q at 57:18-58:8.)  Furthermore, Dr. Merigan's consulting agreements with Cetus
28   expressly referred to such government rights.  (*See* Stanford's MSJ at 22-23.)

STANFORD'S OPPOSITION TO
RMS'S MOTION FOR SUMMARY JUDGMENT
CASE NO. C 05 04158 MHP

1  at 1553. Rejecting FilmTec's argument that the inventor had assigned to it title to the patent, the

2  Court held that the inventor "had no right to assign [the invention] to FilmTec," because, "when

3  the invention was conceived by [the inventor] title to that invention immediately vested in the

4  United States by operation of law." *Id.*; *see also TM Patents, L.P. v. Int'l Bus. Machs. Corp.*,

5  121 F. Supp. 2d 349, 365-66 (S.D.N.Y. 2000) (discussing *FilmTec* and *Hydranautics*).[4]

6              **b.    Under the Bayh-Dole Act, title to the patents in suit vested in**
               **Stanford University first.**
7

8      As in *Hydranautics*, here Dr. Holodniy had no rights to convey to Cetus. The Bayh-Dole

9  Act vests title to government-funded inventions in the university or the U.S. government, but not

10 with the inventor, absent express consent. The Bayh-Dole Act, 35 U.S.C. §§ 200-210, governs

11 patent rights to "subject inventions" that are "conceived or first actually reduced to practice"

12 under a funding agreement between a non-profit research organization such as a university and

13 the U.S. government. *See* 35 U.S.C. § 201(e) (defining "subject invention") and 201(i) (defining

14 "nonprofit organization"); *see also TM Patents*, 121 F. Supp. 2d at 365-68. The inventions at

15 issue in this case were made at Stanford University, in Dr. Merigan's laboratory, under U.S.

16 government grants. (SUF 93; Mejia Decl. ¶ 8; Merigan Decl. ¶ 14; Rhyu Decl., Ex. A at 25:24-

17 28:4; Rhyu Supp. Decl., Ex. O at 254:3-257:15, 304:20-305:20.)

18     According to the Bayh-Dole Act, Stanford had the first right to elect to retain title to the

19 inventions in the Merigan patents. *See* 35 U.S.C. § 202; *TM Patents*, 121 F. Supp. 2d at 368

20 ("Non-profits conducting research under these government funding agreements can . . . elect to

21 obtain title to any inventions developed under or derived from those agreements.") Stanford

22 expressly elected to retain title to these inventions after filing the patents. (Rhyu Supp. Decl., Ex.

23 710 at STAN 003945-49.) In November 1994, Stanford granted the United States government a

24 license to the invention under the Bayh-Dole Act. (Rhyu Supp. Decl., Ex. 711 at STAN 003952.)

25 Stanford also recorded the license in the PTO. (SUF 92; Rhyu Supp. Decl., Ex. 712 at STAN

26 015520-24.) In addition, the inventors executed a formal assignment, which was recorded in the

27
28  [4] The other case cited by RMS, *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1253 (Fed. Cir. 2000) is irrelevant, as it does not involve government-funded research.

1   PTO.[5]   (Rhyu Supp. Decl., Ex. 711 at STAN 003952; *id.*, Ex. 705 at PENNIE 000125

2   (Assignment of parent application); *id.*, Ex. 706 at PENNIE 000315-16  (assignment recorded by

3   PTO).)  Because title to the government-funded inventions vested in Stanford, which took all

4   required steps to retain title, Dr. Holodniy never had title to assign to Cetus.[6]

5                        **c.      Under the Bayh-Dole Act, title never vested in Dr. Holodniy.**

6          Even if Stanford had not elected to retain title to the inventions, federal law dictates that

7   Dr. Holodniy still would not have had rights to assign to Cetus.  An individual inventor can only

8   retain title provided that he satisfies certain explicit conditions set forth in 35 U.S.C. § 202(d).

9   *TM Patents*, 121 F. Supp. 2d at 368.  That is, if the university does not elect to retain title, the

10  federal government, upon the inventor's request to retain rights, "may consider and after

11  consultation with the contractor" grant the inventor's request for retention of rights subject to

12  certain regulations.  35 U.S.C. § 202(d).  Indeed, the statute requires government funding

13  agreements with universities to contain "a prohibition upon the assignment of rights to a subject

14  invention in the United States without the approval of the Federal agency," except under

15  circumstances that are not relevant here.  35 U.S.C. § 202(c)(7).  Even with Federal agency

16  approval, the inventor cannot obtain title unless he or she affirmatively executes confirmatory

17  instruments under the Federal Acquisitions Act and place an appropriate statement in the patent.

18  *See* 35 U.S.C. § 202(d); 48 C.F.R. § 52.227-11(f)(1)-11(f)(4); *TM Patents*, 121 F. Supp. 2d at

19  365, 368-69 (patent assignment to plaintiff TM Patents by the sole named inventor was invalid,

20  because inventor never executed required forms to obtain title in the government-funded

21  invention).  Thus, even if RMS argues that Stanford did not retain title, Dr. Holodniy had no title

22  

---

23  [5] Consistent with the Bayh-Dole Act and Stanford's patent policy regarding government-funded
    inventions, Dr. Holodniy agreed to assign to Stanford his rights to inventions as required by
24  Contracts or Grants.  (Rhyu Decl., Ex. 23 ¶ 2; Mejia Decl. ¶¶ 15-18.)

    [6] *See also Univ. of Bd. of Trs. of W. Va. v. VanVoorhies*, 278 F.3d 1288, 1296-99 (Fed. Cir. 2002)
25  (former graduate student could not assign invention to subsequent employer after agreeing to
    assign it to university where he made the invention); *Regents of Univ. of N.M. v. Knight*, 321 F.3d
26  1111, 1121-22 (Fed. Cir. 2003) (university employment policy asserting ownership of inventions
    made with university funds gave university ownership of patent); *Chou v Univ. of Chicago*, 254
27  F.3d 1347, 1356-57 (Fed. Cir. 2001) (university employment policy creates duty to assign
    inventions even when there is no separate agreement to assign).
28  

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

9

STANFORD'S OPPOSITION TO
RMS'S MOTION FOR SUMMARY JUDGMENT
CASE NO. C 05 04158 MHP

1  to assign to Cetus, as there is no evidence that he ever sought to retain rights from the

2  government, received Federal agency approval to retain title, executed any documents to obtain

3  title, or received any Federal agency approval to assign the invention to Cetus.

4         **2.    As a matter of law, RMS's interpretation of the Confidentiality
              Agreement renders it unenforceable under California Business &
5             Profession Code § 16600.**

6         RMS's ownership claim also fails because of its faulty premise that Cetus owned any

7  inventions where Dr. Holodniy used the method published in the JID Article. (RMS's MSJ at

8  22:4-9 & n.22.)    Contrary to RMS's representations, Dr. Holodniy's contributions to the

9  inventions of the patents in suit went well beyond the development of a quantitative assay.[7]  But

10 even if Dr. Holodniy used the JID method to develop the patents in suit, RMS cannot establish

11 ownership from such use, because the publication of that method in two separate abstracts and the

12 JID Article, and Cetus's failure to preserve the confidentiality of that method, excluded the

13 method from the Visitor's Confidentiality Agreement. (*See* Stanford's MSJ at 27; SUF 73-85.)

14        RMS's interpretation of the assignment provision in paragraph 3 of Dr. Holodniy's 1989

15 Visitor's Confidentiality Agreement to cover ***non-confidential*** information that was published in

16 the JID Article, among other places, renders the paragraph void and unenforceable as a matter of

17 law. (*See* Stanford's MSJ at 25-26.)  *Thompson v. Impaxx, Inc.*, 113 Cal. App. 4th 1425, 1430

18 (2003) (assignment agreements can only be used to protect trade secrets and confidential

19 information).  To prevent Dr. Holodniy from using the information that was published in the JID

20 Article, as well as in abstracts published in spring of 1990, would be impermissibly anti-

21 competitive.[8]  Indeed, the Science Citation Index reports that greater than 140 publications have

22 cited the JID Article. (Rhyu Supp. Decl., Ex. 713.)  Restraining Dr. Holodniy from using the

23

---

24 [7] In the letter from Dr. Holodniy to his attorney cited by RMS, Dr. Holodniy expressly states his
   contributions beyond development of the assay, referring to "work which demonstrates a
25 reduction in plasma HIV RNA after dideoxynucleoside therapy is determined by the polymerase
   chain reaction.  This is the work published in the [JCI Article and] is crucial to the invention
26 because it demonstrates the utility of using plasma HIV RNA as a marker for antiretroviral
27 therapy." (Chiang Decl., Ex. 26 at STAN 028512.)
   [8] Ms. Wang was not aware of any restrictions about how Dr. Holodniy could use the information
28 that she discussed with him. (Rhyu Supp. Decl., Ex. V at 36:23-37:14, 50:8-25.)

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO                                          10                    STANFORD'S OPPOSITION TO
                                                                        RMS'S MOTION FOR SUMMARY JUDGMENT
                                                                        CASE NO. C 05 04158 MHP

1   published assay while others are free to use it would unfairly deprive him of use of "general skill,

2   knowledge, and experience." *Winston Research Corp. v. Minn. Mining & Mfg. Co.*, 350 F.2d

3   134, 141-42, 144-46 (9th Cir 1965) (rejecting employer's attempt to prevent former employee

4   from using published information about design and engineering decisions relating to employer's

5   precision tape recorders); *see also, Armorlite Lens Co. v. Campbell*, 340 F. Supp. 273, 275 (S.D.

6   Cal. 1972) (agreement invalid as too broad when it required former employee to turn over "*all*

7   new ideas and concepts concerning the field of work or the products of the employer which

8   occur to him within one year after the termination of his employment").[9]

9        RMS cannot prevail on its claims under the Visitor's Confidentiality Agreement without

10   imposing a broad interpretation of that agreement that is impermissibly anticompetitive.   The

11   assignment provision of the Confidentiality Agreement is thus void and cannot convey ownership

12   interest in the patents at issue to Cetus or RMS as a matter of law.

       **3.**     **At a minimum, there is a genuine dispute as to whether the inventions**
13
               **were a "consequence" of Dr. Holodiny's access to Cetus.**
14

15        Based on undisputed facts, the Visitor's Confidentiality Agreement did not confer rights

16   in the invention to Cetus as a matter of law for the reasons stated in Sections III.B.1-2.  But even

17   if the Court denies Stanford's motion for summary judgment, genuine disputed facts preclude

18   summary judgment in favor of RMS.  To prevail on summary judgment, RMS must establish

19   that no genuine dispute exists as to whether the patented inventions were made "as a

20   consequence" of Dr. Holodniy's access to Cetus materials and information.   The Merriam-

21   Webster's Ninth New Collegiate Dictionary defines "consequence" as "something produced by a

22   cause or necessarily following from a set of conditions."  (Rhyu Supp. Decl., Ex. 707.)  Applied

23   here, the agreement fails to reach the patents because (a) Dr. Holodniy's development of the

24   quantitative RNA assay published in the JID Article was *not*  made as a consequence of his

25   access to Cetus, and (b) Dr. Holodniy's contributions to the patented invention were *not* made as

26   a consequence of his access to Cetus.

27   [9] Indeed, several Cetus witnesses admitted that they use the skills they learned at Cetus with their
28   post-Cetus employers.  (Rhyu Supp. Decl., Ex. R at 126:5-127:12 (admitting his use of PCR used
    post-Cetus); *id.*, Ex. S at 153:22-158:2 (admitting her use of ELISA after Cetus).)

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

11

STANFORD'S OPPOSITION TO
RMS'S MOTION FOR SUMMARY JUDGMENT
CASE NO. C 05 04158 MHP

a.    **The quantitative HIV RNA assay was not developed as "a consequence of" Dr. Holodniy's access to Cetus.**

Although Cetus scientists helped Dr. Holodniy to learn PCR, all of the information he acquired at Cetus while developing the quantitative HIV RNA assay published in the JID Article was public and accessible.  (Holodniy Decl. ¶¶ 17(a)-(i) (summarizing publications that disclosed the technology).)  Specifically, the five steps that RMS asserts "made HIV RNA quantification possible" (RMS's MSJ at 15:17-18) were published by 1989.  As to step (1), methods for HIV RNA extraction had been published by 1989. (*See, e.g.*, Rhyu Supp. Decl., Ex. T at 72:10-74:4, 86:1-87:1; *id.*, Ex. 708 at 37; Rhyu Decl., Ex. 15 at col. 4:12-14 (referring to 1987 RNA extraction protocol).)  As to step (2), reverse transcription PCR ("RT-PCR") methods were published by 1989. (Holodniy Decl. ¶ 17(a); Rhyu Supp. Decl., Ex. T at 72:10-74:4, 86:1-87:1.)  As to step (3), Stacey Sias testified that methods and materials for PCR had been published December 1985. (*Id.*, Ex. U at 77:24-78:21.)  The sequences of all four DNA primers used to perform PCR in the quantitative RNA assay were published by 1989.  (Holodniy Decl. ¶¶ 17(b)-(e).)  As to step (4), methods of detection of targeted DNA using an HRP probe had been published by 1989.  For instance, Cetus's protocols for biotinylation of SK 38 and HRP labeling of SK19 were published in 1989. (*Id.* ¶ 17(f).)  HRP labeling of DNA probes could be performed for a scientist by an outside company and was "easy to do" by 1989. (Rhyu Supp. Decl., Ex. S at 137:25-138:10.)  Colorimetric assays and ELISA assays for detecting PCR product were "fairly well-known" by 1989. (*Id.*, Ex. R at 30:5-11; *id.*, Ex. S at 23:7-24.)  As to step (5), the method for construction and use of a cRNA internal standard for quantitative RT-PCR was published in 1989. (Holodniy Decl. ¶¶ 17(h)-(i).)  By mid 1989, the CC2 standard could be made using commercially available reagents and "known," "common" molecular biology techniques.[10] (Rhyu Supp. Decl., Ex. R at 12:11-13:17.)  Alice Wang, a co-author on the

---

[10] RMS overinflates the importance of the CC2 "internal standard" RNA. (RMS MSJ at 10-11, n.14.)  Wang's expertise related to quantitation and use of an *internal* standard that contains a mutation which permits it to be distinguished from the product generated from the HIV sample in the same tube. (Rhyu Supp. Decl., Ex. V at 116:2-21.)  However, that feature of CC2 was irrelevant to the Dr. Holodniy's quantitation assay, as the JID Article and JCI article did not use CC2 as an internal standard. (*Id.*, Ex. R at 72:4-9 (standard and sample were not in the same tube); Rhyu Decl., Ex. K at 73:20-23 (JID did not use internal standard).)  Wang acknowledged

1    JID Article, testified that her practice was to share freely with third parties the quantitative PCR

2    work at Cetus. (*Id.*, Ex. V at 36:23-37:14.)

3         Moreover, RMS's description of the "collaboration" exaggerates Cetus's contribution to

4    the development of a quantitative PCR assay for quantification of HIV RNA in patient serum. Of

5    the four Cetus co-authors of the JID Article, only Clayton Casipit did any laboratory work related

6    to the project, and he testified that he completed his work, which was limited to constructing the

7    CC2 standard, in "weeks," "not months." (*Id.*, Ex. R at 49:25-50:16.) Alice Wang testified that

8    she did not direct any of Holodniy's work and did not know that Holodniy intended to quantitate

9    HIV RNA in serum. (*Id.*, Ex. V at 21:13-23:10, 72:23-73:23, 74:13-75:3, 87:13-88:5, 89:19-

10   89:23.) When shown a copy of the patent, she could not remember if it was related to anything

11   she had worked on. (*Id.* at 95:11-96:24.) Michael Konrad, the third Cetus co-author, testified

12   that he only spoke to Holodniy "very occasionally" and had only a "vague" memory of how often

13   Holodniy was at Cetus. (*Id.*, Ex. W at 24:10-19, 27:18-24.) Konrad also admitted that he had no

14   memory of the JID Article, could not identify any contribution he had made to it, and had no

15   memory of the associated invention disclosure or the technology described in it. (*Id.* at 52:12-18,

16   54:11-19, 28:17-30:8.) Likewise, Eric Groves, the fourth Cetus co-author, admitted that he had

17   no substantive role in the work described in the JID Article, and had been added as a co-author

18   because he was the supervisor with responsibility over Cetus' relationship to Merigan and

19   Holodniy. (Rhyu Supp. Decl., Ex. X at 132:14-133:5.) In fact, Groves could not remember

20   whether *anyone* at Cetus had ever quantitated HIV RNA from serum by PCR, and admitted that

21   he had no memory that "Cetus per se was attempting to develop a commercial assay which would

22   be appropriate for [the task of quantifying HIV using PCR]." (*Id.* at 124:19-125:4, 95:12-22.)

23         The testimony and publications suggest that the quantitative HIV RNA assay published in

24   the JID Article could have been made with reference to existing publications and without access

25

26   that, when used in separate tubes, a gag gene RNA with no mutation could be used as a standard.
     (Rhyu Supp. Decl., Ex. V at 118:8-17.) Cetus's Dr. Sninsky also conceded that in the mid 1980s,

27   the "technique of expressing RNA sequence from a transcription vector" "was familiar in the
     scientific community." (Rhyu Decl., Ex. D at 30:17-24.) Thus, Dr. Holodniy could have used

28   published techniques to make the HIV gag RNA external standard that he needed.

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

13

1    to Cetus or its scientists. Although Cetus scientists provided helpful assistance, their contact with

2    Holodniy was minimal. They did not have significant roles in developing the assay. The facts

3    give rise to a reasonable inference that not even the quantitative assay was developed "as a

4    consequence" of Dr. Holodniy's access to Cetus.

5               **b.    The multi-step method of the patented invention was not
6                       developed "as a consequence of" Dr. Holodniy's access to
                        Cetus.**

7         Additional disputed facts exist as to whether Dr. Holodniy's contributions to the ***patented***

8    ***inventions*** were made "as a consequence" of his access to Cetus. RMS repeatedly attempts to

9    blur the very real distinction between the quantitative HIV RNA assay published in the JID

10   Article and the multi-step method of the patented invention, which was reported in the later

11   published JCI Article. (*See* Section III.A.1 *supra*; RMS's MSJ at 16, n.16.) But the PTO agreed

12   with Stanford that the patented invention was not obvious from the assay published in the JID

13   Article; it granted the patents after considering the JID Article as prior art. This fact by itself

14   creates a reasonable inference that the patented invention did not "necessarily follow" from Dr.

15   Holodniy's work with Cetus scientists, as reflected in the JID Article.

16        Considering the facts in the light most favorable to Stanford, a jury could reasonably infer

17   that Dr. Holodniy was the driving force behind the development of the quantitative HIV RNA

18   assay, and that he could have developed that assay based on publicly available articles and

19   information. A reasonable jury could further infer that Dr. Holodniy's clinical experiments

20   demonstrating reduced plasma HIV RNA after dideoxynucleoside therapy were not a

21   consequence of his access to Cetus. Indeed, there is no evidence that Cetus had any involvement

22   in designing or implementing the ddI trial. (Merigan Decl. ¶ 17) Cetus was uninvolved and

23   uninterested in determining whether there was a correlation between RNA levels and efficacy of

24   treatment, perhaps because it assessed therapy monitoring as a low profit endeavor compared to

25   diagnostics. (Rhyu Decl. Ex. A at 117:2-24; Rhyu Supp. Decl., Ex. Q at 134:22-138:19; *id.*, Exs.

26   632 and 633.) That Cetus was not a factor in the patented inventions is illustrated by the fact that

27   Cetus scientist Shirley Kwok only proposed developing "quantitative assays to evaluate drug

28   efficacy" for the first time in July 1991, more than a year after Dr. Holodniy began his correlation

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO                                      14                    STANFORD'S OPPOSITION TO
                                                                     RMS'S MOTION FOR SUMMARY JUDGMENT
                                                                     CASE NO. C 05 04158 MHP

1    experiments on patient samples pre and post therapy at Stanford.  (Rhyu Supp. Decl., Ex. 593 at

2    RMS 069922-31;  Rhyu Decl., Ex. E at 85-87, 89:13-92:22; *see also* Rhyu Supp. Decl., Ex. R at

3    144:6-145:15; Rhyu Decl., Ex. 7 at STAN 016255.)  Further, Cetus's lack of any legitimate claim

4    to the work published in the JCI Article is shown by its contemporaneous failure to assert any

5    ownership right (Stanford's MSJ at 11), as well as its failure to recognize any potential ownership

6    right when reviewing the Merigan patents.  (Rhyu Supp. Decl., Ex. U at 114:25-115:20.)

7    **C.    Even if Cetus Had Acquired Dr. Holodniy's Patent Rights, Stanford Was a
         Subsequent Bona Fide Purchaser That Extinguished Cetus's Rights.**

8

9         For the several reasons discussed above, Cetus did not acquire Dr. Holodniy's rights in

10   the patents through the 1989 Visitor's Confidentiality Agreement.  But assuming *arguendo* that

11   statutory restrictions did not divest Dr. Holodniy of his rights to the assignment and Cetus

12   acquired rights through the Visitor's Confidentiality Agreement, Stanford's subsequent

13   assignment from Dr. Holodniy makes Stanford a *superior* bona fide purchaser.  Generally, 35

14
     U.S.C. § 261 governs ownership and assignment of patents.  Section 261 states:
15

16        An assignment, grant or conveyance shall be void as against any subsequent purchaser or
          mortgagee for a valuable consideration, without notice, unless it is recorded in the Patent
17        and Trademark Office within three months from its date or prior to the date of such
          subsequent purchase or mortgage.
18
     *i.d.*, 35 U.S.C. § 261.  The Federal Circuit recognized in *FilmTec* that a party taking legal title of
19
     property without notice of a prior sale takes the title free and clear of any encumbrances – *even if*
20
     *the prior purchaser had legal title.  See FilmTec*, 939 F.2d at 1573-74 (noting that § 261 was
21
     intended to cut off both equitable and legal encumbrances); *see also, Rhone Poulenc Agro, S.A.*
22
     *v. DeKalb Genetics Corp.*, 284 F.3d 1323, 1327 (Fed. Cir. 2002) (*en banc*) (bona fide purchaser
23
     rule applied to patents under 35 U.S.C. § 261 is a question of federal law informed by state law).
24
          Even assuming, as RMS argues, that Dr. Holodniy assigned an expectant interest in the
25
     patented inventions to Cetus through the Visitor's Confidentiality Agreement, RMS has produced
26
     no evidence that either it or Cetus ever recorded their interest in the patents at the PTO.  Section
27
     261 requires recordation "within three months from its date or prior to the date of such
28

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO
                                        15              STANFORD'S OPPOSITION TO
                                                        RMS'S MOTION FOR SUMMARY JUDGMENT
                                                        CASE NO. C 05 04158 MHP

1  subsequent purchase or mortgage." 35 U.S.C. § 261. Thus, when Dr. Holodniy executed a

2  formal assignment of his invention to Stanford in 1995, and Stanford recorded that assignment,

3  Stanford took title free and clear of any encumbrance that the Visitor's Confidentiality Agreement

4  might have created. (Rhyu Supp. Decl., Ex. 705 at PENNIE 000125.) *See also FilmTec*, 939

5  F.2d at 1573-74. Stanford also paid valuable consideration for the inventions as set forth in his

6  Copyright and Patent Agreement with Stanford.[11] (Rhyu Decl., Ex. 23.) According to Stanford's

7  policy regarding inventions, patents and licensing, the consideration includes royalties. (*See id.*,

8  Ex. 24 at STAN 015489.) Finally, Stanford had no notice of Cetus' or Roche's putative rights in

9  the invention. Stanford was unaware of Dr. Holodniy's Visitor's Confidentiality Agreement.

10  (Rhyu Supp. Decl., Ex. P at 220:15-224:1, 282:13-285:3, 355:10-358:20.) And neither Cetus nor

11  RMS notified Stanford of their interests in the patent prior to the assignment.[12] (Mejia Decl. ¶

12  12.) Thus Stanford's assignment from Holodniy in 1995 was a bona fide purchase, and any rights

13  created through the Visitor's Confidentiality Agreement were extinguished.

14  **D.    RMS Does Not Have a Royalty-Free License Under the MTA.**

15  Stanford's motion for summary judgment on the Materials Transfer Agreement ("MTA")

16  should be granted, and RMS's motion should be denied, because (1) the options to license under

17  the MTA, if any, were not transferable as a matter of law; (2) the MTA requires the payment of a

18  reasonable royalty for a nonexclusive license as a matter of law; and (3) the MTA, as a matter of

19  law, is limited to materials transferred to Dr. Merigan or Dr. Schwartz and there is no evidence of

20  any such transfer. At a minimum, material issues of disputed fact require RMS's motion for

21  summary judgment on the MTA to be denied.

22  **1.    As a matter of law, RMS has no claim to any licenses or options to
23  license under the MTA, because such rights are not transferable
       without Stanford's consent and Stanford did not consent.**

24  Whatever license rights Cetus may have had under the MTA, those rights were not

[11] The Copyright and Patent Agreement identifies the consideration for assignment as follows: "in consideration of my employment or continued employment by Stanford, the receipt of remuneration from Stanford, participation in projects administered by Stanford, access to or use of facilities provided by Stanford, and/or other valuable consideration . . . ." (Rhyu Decl., Ex. 23.)
[12] RMS failed to notify Stanford of its alleged rights, despite knowledge of the inventors' publications, the patents, and Stanford's licensing efforts. (Stanford's MSJ at 7-10 & 12-15.)

1   transferable without Stanford's consent. RMS's only claim based on the MTA is that it acquired

2   a nonexclusive license to the '730 and '705 patents from Cetus through the Asset Purchase

3   Agreement. (RMS's MSJ at 27 & n.24.) RMS's opening brief, however, ignores the settled legal

4   precedent detailed in Stanford's opening brief that patent licenses and options to license cannot be

5   transferred without the licensor's consent. (Stanford's MSJ at 23-25 (collecting cases)); *see also*

6   *Ulead Sys., Inc. v. Lex Computer & Mgmt. Corp.*, 351 F.3d 1139, 1147 (Fed. Cir. 2003) ("'It is

7   well settled that a non-exclusive licensee of a patent has only a personal and not a property

8   interest in the patent.'" (quoting *In re CFLC, Inc.*, 89 F.3d 673, 679 (9th Cir. 1996))); *Rhone-*

9   *Poulenc Agro*, 284 F.3d at 1328-29 (Fed. Cir. 2002) (*en banc*); *ASAT Holdings, Ltd. v. Motorola,*

10  *Inc.*, No. 5:03-CV-01514-RS, 2004 WL 2646657, at *7 (N.D. Cal. Nov. 17, 2004) ("Patent law

11  holds that a putative assignment of a patent license is void unless it is made pursuant to the

12  express terms of the license."); Robert A. Matthews, Annotated Patent Digest § 35:35 (2006).

13          Here, it is undisputed that Stanford never consented to the transfer of any options or

14  licenses from Cetus. (Mejia Decl. ¶¶ 11, 13.) Indeed, there is no evidence that Stanford was even

15  apprised that Cetus transferred its interests to Hoffmann-La Roche. The MTA itself does not

16  evince Stanford's consent, but rather restricts assignability by preventing a transfer of the MTA

17  "without the prior written consent of the Senior Vice President of Research and Development at

18  CETUS." (Rhyu Decl., Ex. 29 ¶ 12.) No evidence exists that the Senior Vice President of

19  Research and Development evaluated the MTA and consented to its transfer. Nor is there any

20  evidence that Stanford ever subsequently gave consent to the transfer of any options or licenses

21  under the MTA from Cetus to RMS.[13] To permit Cetus, a start-up biotechnology company, to

22  freely transfer a non-exclusive license to Hoffman-La Roche, a multinational corporation that

23  operates in 150 countries and touts itself as "number one in diagnostics" globally (Rhyu Supp.

24  Decl. Ex. 714 (http://www.roche.com/home/divisions.htm)), would directly contravene the

25  principle underlying the doctrine of non-transferability of nonexclusive licenses.

26

27

28

[13] RMS has not provided any evidence that it has ever exercised an option to a nonexclusive license under the MTA. (*See* Mejia Decl. ¶ 13.)

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO                                        17                    STANFORD'S OPPOSITION TO
                                                                       RMS'S MOTION FOR SUMMARY JUDGMENT
                                                                       CASE NO. C 05 04158 MHP

1

      **2.**      **The MTA requires a reasonable royalty for a nonexclusive license.**

2

      Even if the MTA were to provide RMS with options to a nonexclusive license for the '730

3

and '705 patents, RMS's motion for summary judgment should still be denied because the MTA

4

requires the payment of a reasonable royalty for nonexclusive licenses.  RMS asserts that it

5

already has a "non-exclusive royalty-free license to the '730 and '705 Patents under the MTA,"

6

but that assertion contradicts the plain language of the contract, which nowhere uses the term

7

"royalty-free."  (*See* RMS's MSJ at 27.)  To the contrary, if the parties had intended to reward

8

Cetus with a free nonexclusive license, they would have used those words as they did in prior

9

agreements. (*See* Chiang Decl., Ex. 4 at RMS 64083 (using the words "nonexclusive, worldwide,

10

irrevocable, royalty-free license"); *see also* Rhyu Supp. Decl., Ex. P at 293:20-295:10.)

11

      Moreover, RMS's construction would render the term "option" meaningless. *See TIG Ins.*

12

*Co. of Mich. v. Homestore, Inc.*, 137 Cal. App. 4th 749, 757 (2006).  Under the MTA, if the

13

conditions precedent are met, Cetus had "the first ***option*** to an exclusive license . . . or at CETUS'

14

***option***, a nonexclusive license."  (Rhyu Decl., Ex. 29 ¶ 8 (emphasis added).)  Construing the

15

"option" to a nonexclusive license as royalty-free, as RMS does, would make no sense because a

16

rational decisionmaker would always accept an option if it were free.  Instead, the language of the

17

MTA shows that the parties intended for Cetus to be able to choose to pay a higher amount for an

18

exclusive license (an option for an exclusive license), a lesser amount for a nonexclusive license

19

(an option for a nonexclusive license), or nothing if it did not want either license.  (*See* Rhyu

20

Supp. Decl., Ex. P at 280:13-281:3.)  Accordingly, the parties providing for an "option" to the

21

nonexclusive license shows that they did not intend the nonexclusive license to be royalty-free.

22

      None of the arguments raised by RMS in its summary judgment brief compels a contrary

23

construction.  RMS's argument as to the distinction between exclusive and nonexclusive licenses

24

fails because both types of licenses may be royalty-bearing.  RMS's claim as to the intent of the

25

MTA is irrelevant even if true because a royalty-bearing license would provide Cetus access just

26

like a royalty-free license would.  Finally, RMS's contention as to the word order of the various

27

clauses provides no reason to draw a negative inference depriving Stanford of its right to a

28

reasonable royalty.  On the extrinsic evidence, RMS's citation to Mr. Ostrach's testimony is

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

18

STANFORD'S OPPOSITION TO
RMS'S MOTION FOR SUMMARY JUDGMENT
CASE NO. C 05 04158 MHP

irrelevant, because he testified that he "do[es] not have any specific recollection of this particular signed agreement" and was not involved in the drafting, signing, or negotiation of the agreement. (*E.g.*, Chiang Decl., Ex. 50 at 91:21-94:16.) To the contrary, Dr. Merigan, who participated in the negotiation and signing of the MTA, testified that the intent was to provide Cetus with an option to a royalty-bearing nonexclusive license, not a royalty-free license. (Merigan Decl. ¶ 8; *see also* Rhyu Supp. Decl., Ex. P at 293:20-295:10.) Thus, even if the MTA conferred a transferable right (which it did not), the right in question requires negotiation of a reasonable royalty. RMS's motion for summary judgment as to the MTA should thus be denied.

### 3.    No relevant "materials" were transferred under the MTA.

#### a.    As a matter of law, the MTA is limited to materials received by Dr. Merigan or Dr. Schwartz, and there is no record evidence of any such materials.

As a matter of law, the unambiguous language of the MTA limits its scope to materials received by Dr. Merigan or Dr. Schwartz. *E.g.*, *U.S. Cellular Inv. Co. v. GTE Mobilnet, Inc.*, 281 F.3d 929, 934-37 (9th Cir. 2002) (affirming grant of summary judgment on unambiguous contract language). The MTA begins, "Dear Drs. Merigan and Schwartz: Cetus Corporation agrees to provide *you* with certain research substances and know-how . . . ." (Rhyu Decl., Ex. 29 at 1 (emphasis added).) Paragraph 1 expressly defines the term "SCIENTIST" as limited to "Thomas C. Merigan, M.D., and David Schwartz, M.D., Ph.D.," and subparagraph 2(b) is explicitly limited to items "received by SCIENTIST from CETUS."[14]  (*Id.*, ¶¶ 1, 2(b).)

That the MTA was limited to items received by Dr. Merigan or Dr. Schwartz is consistent with the context in which it was signed. In 1988, Dr. Merigan and Dr. Schwartz were working with Dr. Eric Groves from Cetus on a specific NIH-sponsored study involving interleukin-2.

---

[14] Subparagraph 2(a) does not specifically mention the parties involved in the transfer of materials and, therefore, must be read in the context of the entire agreement, which is limited to items received from Cetus by Dr. Merigan or Dr. Schwartz. (*E.g.*, Rhyu Decl., Ex. 29 at 1 ("Dear Drs. Merigan and Schwartz: Cetus Corporation agrees to provide you with certain research substances and know-how . . . .").) Similarly, subparagraph 2(c)'s use of the term "replicated" refers back to subparagraphs 2(a) and (b) because the items necessarily must have been replicated from something. Subparagraph 2(a) and 2(c), therefore, are likewise limited to items initially received from Cetus by Dr. Merigan or Dr. Schwartz.

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

19

STANFORD'S OPPOSITION TO
RMS'S MOTION FOR SUMMARY JUDGMENT
CASE NO. C 05 04158 MHP

1    (*See, e.g.*, Groves Decl. ¶ 4; Merigan Decl. ¶¶ 3-5; SUF 71.)  As part of that study, Dr. Merigan

2    and Dr. Schwartz sent a handful of patient samples to Cetus for analysis using PCR.  (Merigan

3    Decl. ¶ 4; *e.g.*, SUF 71.)  Due to the disappointing results from Cetus's analysis, Dr. Merigan and

4    Dr. Schwartz requested Cetus's protocol in order to "do a step-by-step comparison of our results"

5    from these limited experiments.  (Rhyu Decl., Ex. 28 at CH0000743; Merigan Decl. ¶ 5; SUF

6    104.)  In response to this request, Cetus sent the Materials Transfer Agreement to Dr. Merigan

7    and Dr. Schwartz.  (RMS's MSJ; SUF 6.)

8         RMS has failed to identify any materials or information given to Dr. Merigan or Dr.

9    Schwartz under the MTA.  Dr. Groves did not declare that he gave anything to Dr. Merigan or Dr.

10   Schwartz.  (*See generally* Groves Decl.)  Dr. Merigan and Dr. Schwartz also did not testify that

11   they received any materials under the MTA after it was signed, not even the early Cetus protocol

12   they requested.  (Rhyu Decl., Ex. A at 68:4-15, 272:16-23, 290:24-291:8; Merigan Decl. at ¶ 11;

13   Rhyu Supp. Decl., Ex. Y at 31:18-32:3, 74:18-76:18; Rhyu Decl., Ex. F at 98:19-101:15.)  It is

14   further undisputed that no documents evidence a transfer of confidential materials, as required by

15   the MTA.  (Merigan Decl. ¶¶ 10-11.)  Instead, soon after the MTA was signed, these experiments

16   were abandoned because Dr. Merigan, Dr. Schwartz, and the Cetus scientists involved did not

17   have the time or interest to pursue them.  (Merigan Decl. ¶ 10; Rhyu Supp. Decl., Ex. 568 (Cetus

18   email stating "[a]s a side note, I recollect that the PCR folks [at Cetus] didn't want to collaborate

19   with 'a D. Schwartz' from Stanford."); Rhyu Supp. Decl., Ex. Y at 81:6-22, 83:25-84:15.)

20        Indeed, RMS does not even allege in its argument that any materials were given to

21   Dr. Merigan or Dr. Schwartz, but instead alleges only that "***Holodniy*** was provided" certain items

22   and that "***Holodniy*** received the cRNA standard."  (RMS's MSJ at 28 (emphasis added).)  Those

23   allegations are legally irrelevant, because materials provided to Dr. Holodniy are outside the

24   scope of the unambiguous terms of the MTA.  Because the MTA is limited, as a matter of law, to

25   materials received by Dr. Merigan or Dr. Schwartz, and there is no evidence of such receipt,

26

27

28

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

20

STANFORD'S OPPOSITION TO
RMS'S MOTION FOR SUMMARY JUDGMENT
CASE NO. C 05 04158 MHP

1  Stanford's motion for summary judgment should be granted and RMS's motion denied.[15]

2  **b.    Alternatively, a number of genuine issues of fact require the denial of RMS's motion for summary judgment.**

3

4  Even if the Court declines to grant summary judgment in favor of Stanford, a number of

5  material disputes prevent RMS's motion from being granted. Importantly, the parties dispute

   what, if any, physical materials were given to Dr. Holodniy by Cetus scientists under the MTA.

6  (Holodniy Decl. ¶¶ 7-15.)    Even Cetus scientists who RMS alleges gave Dr. Holodniy

7  information under the MTA all testified that they knew nothing about the MTA. (Rhyu Decl., Ex.

8  K at 81:3-9 ("I do not know of any MTA."); *id.*, Ex. M at 79:15-80:13; Rhyu Supp. Decl., Ex. W

9  at 89:19-21; *id.*, Ex. T at 61:8-21; *see also id.*, Ex. X at 116:24-119:15 (Dr. Groves testifying that

10 it would have been a "problem" if Dr. Merigan had even attempted to use any materials provided

11 under the MTA for purposes other than the IL-2 study). The CC2 RNA in particular could not

12 have been transferred under the MTA, as Clayton Casipit, the technician who gave the CC2 RNA

13 to Dr. Holodniy, admitted that the material was not labeled confidential or proprietary, even

14 though the MTA requires confidential information transferred under the MTA to be labeled as

15 such upon transfer.[16] (Rhyu Decl., Ex. 29; *id.*, Ex. K at 76:14-77:6.)

16

17 RMS's assertions about the scope of the MTA (RMS's MSJ at 4-5) also are not supported

18 by the evidence it cites. For example, Dr. Groves does not state that he transferred the requested

19 protocol, and he does not identify any materials actually transferred. (Groves Decl. ¶ 10.)

---

20 [15] Under the MTA, "Materials" are defined to include items that are "replicated" from other

21 "Materials," but the parties rejected language that would have included items "derived" from other materials. (*See* Rhyu Decl., Ex. 29 ¶ 2(c).) Because the quantitative assay developed by

22 Dr. Holodniy and the clinical trials undertaken at Stanford after Dr. Holodniy left Cetus were not

23 mere "replicat[ions]" of work previously done by Cetus, neither the assay nor the information from the clinical trials are "Materials" under the MTA.

   [16] RMS's claim that the CC2 plasmid was transferred to Hoffmann-La Roche as part of the asset

24 purchase agreement is contradicted by the record. Neither pCC2 nor CMCC 3799 (its associated

25 internal access number) is listed as a transferred plasmid under the relevant portion of the APA. (Rhyu Decl., Ex. 518 at RMS 06428-43.) Thus, Chiron acquired the rights to pCC2. Although

26 Hoffmann-LaRoche requested and received the pCC2 plasmid from Chiron in 1993 (Nersessian

   Decl., Exs. 3-4), the plasmid transfer did not convey intellectual property ownership rights to

27 RMS. (*See id.*, Ex. 4.) Chiron's ownership of the CC2 plasmid comports with the fact that both

28 to Casipit and Wang moved to Chiron, not Roche, after the Chiron/Cetus merger and execution of the APA. (Rhyu Supp. Decl., Ex. R at 124:23-126:13.)

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

21

STANFORD'S OPPOSITION TO
RMS'S MOTION FOR SUMMARY JUDGMENT
CASE NO. C 05 04158 MHP

1   Further, Mr. Ostrach admitted he had no personal knowledge of the negotiation or signing of the

2   1988 MTA in question.  (Chiang Decl., Ex. 50 at 90:16-94:16.)  Dr. Schwartz disclaimed having

3   any understanding as to whether the MTA covered materials given to Dr. Holodniy, conceding

4   that he had "assume[ed] that the relationships had been worked out" before he arrived at Stanford.

5   (Rhyu Supp. Decl., Ex. Y at 44:15-46:22, 48:4-11, 143:13-144:25.)

6          When reasonable inferences are drawn in favor of Stanford, a factfinder could conclude

7   that the MTA only covered the discrete project that Drs. Merigan and Schwartz conducted

8   relating to measuring IL-2 samples using Cetus's old method.  A factfinder could further

9   conclude that the requested protocol was never sent to Merigan, Schwartz, or anyone else at

10  Stanford, since no one, including Dr. Groves, testified that a protocol had been transferred.  And a

11  fact finder could conclude that Dr. Holodniy, who never knew about the MTA or anyone's

12  obligations under the MTA, was not bound by the MTA.  Indeed, he signed his own Visitor's

13  Confidentiality Agreement, which covered his relationship with Cetus.  (Rhyu Decl., Ex. 30.)

14  These genuine disputes preclude summary judgment in favor of RMS.

15          **E.     Stanford, Holodniy and Merigan Are Entitled to Summary Judgment
16                  Dismissing RMS's Counterclaims and Affirmative Defenses.**

17          RMS's request for summary judgment on its affirmative defenses is unsupportable, as

18  Counterdefendants have shown that RMS's ***counterclaims and affirmative defenses*** are without

19  merit as a matter of law.  In its opening brief, Stanford moved for summary judgment that: (1) all

20  of RMS's counterclaims were barred by the statute of limitations, laches and/or estoppel

21  (Stanford's MSJ at 11-19); (2) RMS has no ownership or license rights to the patented inventions

22  through the 1984 and 1991 Merigan Consulting Agreements (*id.* at 19-23); (3) RMS has no

23  ownership or license rights through the 1988 MTA (*id.* at 23-25); (4) RMS has ownership or

24  license rights through Holodniy's 1989 Visitor's Confidentiality Agreement (*id.* at 25-28); and (5)

25  RMS has no ownership or license rights through the shop rights doctrine (*id.* at 28-30).

26          For the reasons explained in this memorandum and in Stanford's motion, RMS has failed

27  to establish that it is entitled to summary judgment on its affirmative defenses related to the 1989

28  Holodniy Visitor's Confidentiality Agreement, the 1988 MTA, and shop rights.  To the contrary,

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

22

STANFORD'S OPPOSITION TO
RMS'S MOTION FOR SUMMARY JUDGMENT
CASE NO. C 05 04158 MHP

1    Counterdefendants have demonstrated that RMS's claims based on all four contracts and shop

2    rights are without merit as a matter of law and should be dismissed. (Stanford's MSJ at 19-30.)

3    If the Court grants Stanford's motion regarding RMS's counterclaims, the Court may, and should

4    in the interest of judicial economy, dismiss RMS's Fourth (ownership), Sixth (license) and

5    Seventh (standing) Affirmative Defenses, which involve identical issues and the same facts as

6    discussed in the parties' motions for summary judgment. *Cf. Holly D v. Cal. Inst. of Tech.*, 339

7    F.3d 1158, 1162 (9th Cir. 2003) (granting summary judgment on an affirmative defense); *Cool*

8    *Fuel, Inc. v. Connett*, 685 F.2d 309, 311-12 (9th Cir. 1982) (seminal case in Ninth Circuit holding

9    that summary judgment may be granted to a nonmoving party where the parties have had a "full

10   and fair opportunity to ventilate the issues involved in the motion").

11       All of the arguments articulated herein and in Stanford's motion may be considered in

12   defeating RMS's affirmative defenses.  RMS relies on *Styne v. Stevens*, 26 Cal. 4th 42, 51-52

13   (2001), for the proposition that the statute of limitations analysis does not apply to its affirmative

14   defenses. (RMS's MSJ at 20 n.21.)  However, the rule articulated in *Styne* does not apply here,

15   because RMS is simultaneously seeking affirmative relief through its counterclaims.  "Courts

16   allow defenses that would be time-barred if raised as claims, *so long as the party asserting the*

17   *defense is not seeking affirmative recovery on an identical claim*." *Branco v. Norwest Bank*

18   *Minn., N.A.*, 381 F. Supp. 2d 1274, 1285 (D. Haw. 2005) (emphasis added); *City of St. Paul v.*

19   *Evans*, 344 F.3d 1029, 1035 (9th Cir. 2003) ("It is important that the party asserting the defense is

20   not, simultaneously or in parallel litigation, seeking affirmative recovery on an identical claim.

21   Thus, whether affirmative defenses are exempt from statutes of limitations largely hinges on a

22   realistic assessment of the parties' litigation posture.").  In *City of St. Paul*, the Ninth Circuit

23   deemed the defenses raised by the *City of St. Paul* to be time-barred, after finding that the City of

24   St. Paul was the aggressor in the litigation and that the defenses were "mirror images" of its time-

25   barred claims. *City of St. Paul*, 344 F.3d at 1035.

26       RMS is undeniably an aggressor in this case, having brought counterclaims asserting

27   ownership, license, breach of contract, and specific performance. (Stanford's MSJ at 2.)  RMS

28   sought and obtained bifurcation of the lawsuit to act as plaintiff in this phase of the case on its

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

23

STANFORD'S OPPOSITION TO
RMS'S MOTION FOR SUMMARY JUDGMENT
CASE NO. C 05 04158 MHP

1   claims for declaratory judgment of ownership and license to Stanford's inventions. RMS not only

2   seeks title to the two patents that Stanford asserted in its complaint, but it also seeks title to four

3   additional patents which name a different Stanford inventor who has no ties to Cetus or RMS.

4   (Stanford's MSJ at 2; Merigan Decl. ¶¶ 21-23.)  RMS even seeks ownership and license to a

5   pending Stanford patent application. (Stanford's MSJ at 2.)  RMS's Amended Answer shows that

6   RMS's affirmative defenses are a mirror image of its counterclaims.  (Am. Ans. *Compare* Fourth,

7   Sixth and Seventh Affirmative Defenses, *with* Fourth and Sixth Counterclaims.)  RMS's Fourth,

8   Sixth  and  Seventh  Affirmative  Defenses   are  "simply  time-barred  claims  masquerading  as

9   defenses and are likewise subject to the statute of limitations bar." *City of St. Paul*, 344 F.3d at

10  1035-36.  Accordingly, even without reaching the analysis of the separate agreements and shop

11  rights, these affirmative defenses are time-barred according to the statute of limitations and laches

12  analysis in Stanford's motion.  (Stanford's MSJ at 11-17.)  RMS's late claim also cannot be

13  excused on equitable grounds. *65 Butterfield v. Chicago Title Ins. Co.*, 70 Cal. App. 4th 1047,

14  1062-63 (1999) (settlement negotiations do not equitably toll statute of limitations).[17]

15      F.      **Stanford Has Established Standing to Assert Infringement of the '705 and**

16              **'730 Patents.**

17          Stanford, Dr. Merigan and Dr. Holodniy have satisfied the burden on their own motion

18  for  summary  judgment  to  establish  that  RMS's  ownership  counterclaims  and  affirmative

19  defenses should be dismissed. (*See* Stanford's MSJ at 19-30.)  In demonstrating the deficiencies

20  of RMS's ownership claims, Stanford has made the showing necessary to establish its standing

21  to sue for infringement of the '730 and '705 patents.  First, Stanford has recorded a notarized

22  assignment with the PTO, creating a presumption that it holds legal title and has standing to sue

23  for infringement of the patents. (Rhyu Supp. Decl., Ex. 706 (recording notarized assignments).)

24  *See* 35 U.S.C. section 261 (notarized assignment is prima facie evidence of conveyance of a

25  patent); *Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1578 n.2 (Fed. Cir. 1991) ("The

---

26  [17]The counterclaim defendants are also not equitably estopped from asserting the statute of

27  limitations, because there is no evidence that the counterclaim defendants ever made any
    misrepresentations or promises inducing RMS to delay the filing of its claims in reliance thereon.

28  *See Kunstman v. Mirizzi*, 234 Cal. App. 2d 753, 756-58 (1965).

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

24

STANFORD'S OPPOSITION TO
RMS'S MOTION FOR SUMMARY JUDGMENT
CASE NO. C 05 04158 MHP

1  entity to whom the grant of a patent is made by the PTO . . . holds the 'legal title' to the

2  patent."); *TM Patents*, 121 F. Supp. 2d at 368 (patentee holds presumptive title to a patent).

3  Second, Stanford has identified undisputed facts establishing that RMS's claim of ownership

4  under the Visitor's Confidentiality Agreement is barred by California Business & Professions

5  Code § 16600 and the Bayh-Dole Act. *Supra* Sections III.B.1 and III.B.2. Third, Stanford has

6  provided specific evidence demonstrating that Holodniy's development of the patented

7  inventions is not subject to the Visitor's Confidentiality Agreement. *Supra* Section III.B.3.

8  Fourth, Stanford has established that, even if Cetus had a valid assignment via the

9  Confidentiality Agreement, Stanford nonetheless qualifies as a bona fide purchaser, eradicating

10  RMS's putative ownership rights. *Supra* Section III.C.[18] RMS has failed to raise any abiding

11  issue challenging Stanford's presumptive title and standing.

12  **IV.    CONCLUSION**

13      For the foregoing reasons, RMS's motion should be denied in its entirety. Stanford, Dr.

14  Merigan, and Dr. Holodniy respectfully request that the Court grant summary judgment

15  dismissing RMS's counterclaims and affirmative defenses related to ownership, license, shop

16  rights, breach of contract and specific performance. This corresponds to RMS's Fourth, Sixth

17  and Seventh Affirmative Defenses and Fourth and Sixth through Fourteenth Counterclaims.

18  Dated: November 15, 2006          COOLEY GODWARD KRONISH LLP

19

20           by: /s/ _____

21                   Michelle S. Rhyu

22           Attorneys for Counter Defendants The Board of
         Trustees of the Leland Stanford Junior University,
         Thomas Merigan and Mark Holodniy

23

---

24  [18] The cases RMS cites are inapposite. *Sicom Sys. Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 976 (Fed. Cir. 2005), addresses a patent licensee's standing to sue for infringement under an exclusive license. Here, Stanford is no licensee – it undisputedly holds recorded title to the patents (*supra*, Section III.B.1.b), giving it a presumption of legal title and standing. RMS's other cited case, *Filmtec*, is an appeal of a grant of a preliminary injunction, and accordingly applies the "reasonable likelihood on the merits" standard. 939 F.2d at 1570, 1572-73 ("[T]he issue here is not whether title lies with the Government . . . it is rather whether FilmTec has made a . . . showing of . . . reasonable likelihood of success on the merits."). *But see supra* Section III.B.1 (discussing FilmTec's standing in context of prevailing government rights to the invention).

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

25

STANFORD'S OPPOSITION TO
RMS'S MOTION FOR SUMMARY JUDGMENT
CASE NO. C 05 04158 MHP