HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

---

**Page 1**

```
              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA

THE BOARD OF TRUSTEES OF THE
LELAND STANFORD JUNIOR
UNIVERSITY,
            Plaintiff,
       vs.                    No. C-05-04158-MHP
ROCHE MOLECULAR SYSTEMS, INC.,
et al.,
            Defendants.

AND RELATED COUNTERCLAIM.


      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
   (30)(b)(6) DEPOSITION OF THE BOARD OF TRUSTEES OF THE
       LELAND STANFORD JUNIOR UNIVERSITY
              Through MARY ALBERTSON
                Palo Alto, California
              Friday, August 25, 2006

Reported by:
GINA GLANTZ
CSR No. 9795, RPR, RMR
JOB No. 3-52398
```

---

**Page 2**

```
 1            UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
 3
 4    THE BOARD OF TRUSTEES OF THE
      LELAND STANFORD JUNIOR
 5    UNIVERSITY,
 6          Plaintiff,
 7       vs.            No. C-05-04158-MHP
 8    ROCHE MOLECULAR SYSTEMS, INC.;
      ROCHE DIAGNOSTICS CORPORATION;
 9    ROCHE DIAGNOSTICS OPERATIONS, INC.,
10          Defendants.
11    _____
      AND RELATED COUNTERCLAIM.
12    _____
13
14
15      30(b)(6) Deposition of The Board of Trustees of the
16  Leland Stanford Junior University through MARY
17  ALBERTSON, taken on behalf of the Defendants and
18  Counterclaimants Roche Molecular Systems, Inc.; Roche
19  Diagnostics Corporation; and Roche Diagnostics
20  Operations, Inc., at Five Palo Alto Square, 3000 El
21  Camino Real, Palo Alto, California, beginning at 9:07
22  a.m. and ending at 5:28 p.m., on Friday, August 25,
23  2006, before GINA GLANTZ, Certified Shorthand Reporter
24  No. 9795.
25
```

---

**Page 3**

```
 1  APPEARANCES:
 2
 3  For Plaintiff The Board of Trustees of The Leland
    Stanford Junior University and Counterclaim Defendants:
 4
       COOLEY GODWARD LLP
 5     BY: RICARDO RODRIGUEZ
          Attorney at Law
 6     Five Palo Alto Square, 3000 El Camino Real
       Palo Alto, California 94306-2155
 7     (650) 843-5000
 8
    For Defendants and Counterclaimants Roche Molecular
 9  Systems, Inc., et al.:
10     QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
       BY: JEFFREY N. BOOZELL
11         Attorneys at Law
       865 S. Figueroa Street, 10th Floor
12     Los Angeles, California 90017
       (213) 624-7707
13
14  Videographer:
15     RAY TYLER
       SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
16     450 Sansome Street, Suite 1550
       San Francisco, California 94111
17     (415) 274-9977
18
19
20
21
22
23
24
25
```

---

**Page 4**

```
 1                      INDEX
 2  WITNESS                        EXAMINATION
 3  MARY ALBERTSON
 4
 5    BY MR. BOOZELL                   12
 6
 7
 8                     EXHIBITS
 9  DEPOSITION                           PAGE
10
    110  Two-page document, the first page is a    77
11       letter dated August 24, 2006, to Jeffrey
         Boozell from Ricardo Rodriguez; attached
12       is a fax confirmation
13  111  Multipage document, the first two pages   88
         are a letter to S. Leslie Misrock from
14       Mark Holodniy, M.D.; attached is a
         document titled "Polymerase Chain Reaction
15       Assays for Monitoring Antiviral Therapy
         and Making Therapeutic Decisions in the
16       Treatment of Acquired Immunodeficiency
         Syndrome" (STAN 028511 - 028570)
17
    112  One-page document titled "Stanford         94
18       University Office of Technology Licensing
         Invention and Technology Disclosure" (STAN
19       028660)
20  113  Three-page document titled "Petition to   106
         Correct Inventorship" (STAN 014084 -
21       014086)
22  114  Two-page document titled "Declaration of  109
         Thomas C. Merigan, Jr., M.D." (STAN 006332
23       - 006333)
24  115  Two-page document titled "Declaration of  126
         Barry W. Elledge, Ph.D." (STAN 006335 -
25       006336)
```

1 (Pages 1 to 4)

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

### Page 217

```
14:01:56  1   That's listed under the category for 2.
14:02:02  2       MR. BOOZELL: Okay, I'm just not -- explain to
14:02:04  3   me what it -- what the -- what you're saying the
14:02:07  4   limitation is. She's only going to testify to what?
14:02:10  5       MR. RODRIGUEZ: So -- it says here, "We
14:02:12  6   specifically object to topics 2 to 4, 8, 9 and 10
14:02:15  7   because Stanford is not a party, does not have any
14:02:18  8   direct knowledge of the agreements. Stanford will
14:02:20  9   answer questions regarding its policy with respect to
14:02:25 10   consulting agreements."
14:02:25 11   BY MR. BOOZELL:
14:02:25 12       Q So Ms. Albertson, you don't have any
14:02:28 13   information regarding collaborations, cooperations or
14:02:31 14   joint work between Cetus and Stanford related to PCR?
14:02:37 15       A We don't -- we don't know what the work done
14:02:39 16   was.
14:02:41 17       Q What do you know?
14:02:42 18       A Well, if there were collaborations or anything,
14:02:46 19   you know, the actual agreements that were entered into,
14:02:48 20   we've produced a list of what those were, but we don't
14:02:52 21   know what the work done was. I mean, we don't -- the
14:02:55 22   university doesn't track the actual work.
14:02:57 23       Q The university makes no effort to track any
14:03:01 24   work done during the collaboration between, in this
14:03:05 25   case, Stanford and Cetus?
```

### Page 218

```
14:03:07  1       A Correct. The university -- the university, per
14:03:11  2   se, doesn't -- doesn't track that. The individual
14:03:14  3   scientists are the only ones who know the actual work.
14:03:17  4       Q Now, what's the distinction you're drawing
14:03:21  5   between the individual scientists and the university?
14:03:23  6   Doesn't the university have an understanding of the work
14:03:26  7   that's conducted based on the scientists' understanding
14:03:29  8   of the work they're doing at Stanford University or in
14:03:32  9   conjunction with Stanford University?
14:03:34 10       MR. RODRIGUEZ: Objection. Vague.
14:03:36 11       THE WITNESS: Who would you -- no. I mean,
14:03:39 12   the -- who is the university? I mean, the individual
14:03:42 13   scientists are the only ones who are going to know the
14:03:44 14   actual work that they -- that they do.
14:03:47 15   BY MR. BOOZELL:
14:03:48 16       Q So if Merigan collaborates with Cetus, for
14:03:52 17   instance, in the late '80s or early '90s --
14:03:54 18       A Um-hmm, yes.
14:03:55 19       Q -- the university -- it's the university's
14:03:59 20   position they have no idea what he's doing?
14:04:01 21       MR. RODRIGUEZ: Objection. Mischaracterizes
14:04:03 22   the testimony.
14:04:04 23       THE WITNESS: When the collaboration is set up
14:04:06 24   through Sponsored Projects Office back then or through
14:04:12 25   Industrial Contracts Office now, in the original
```

### Page 219

```
14:04:15  1   contract or collaboration agreement, in that case, if
14:04:18  2   it's a collaboration agreement, a work statement is
14:04:22  3   created that outlines what work will be done, but after
14:04:26  4   that's created, when the work is actually done, there
14:04:29  5   isn't follow-up done. This is a research institution.
14:04:33  6   The faculty do, the PIs do whatever they're going to do
14:04:39  7   and they publish. So in the -- in the context of
14:04:41  8   knowing what the scientists do or the students or the
14:04:44  9   graduate students or the postdocs, the university knows
14:04:48 10   when things are published or -- or something like that,
14:04:51 11   but it's not a corporate environment. It's a research
14:04:55 12   institution.
14:04:56 13   BY MR. BOOZELL:
14:04:56 14       Q So your position here today is that the -- the
14:05:00 15   employee's knowledge is not coextensive with the
14:05:06 16   university's knowledge?
14:05:07 17       MR. RODRIGUEZ: Objection. Calls for a legal
14:05:09 18   conclusion.
14:05:10 19       THE WITNESS: The researchers are always going
14:05:14 20   to have the most extensive knowledge of what they're
14:05:18 21   doing in their research.
14:05:21 22   BY MR. BOOZELL:
14:05:22 23       Q You didn't answer my question.
14:05:23 24       Can you read my question back?
14:05:33 25       (Record read as follows:
```

### Page 220

```
14:05:33  1       "Q So your position here today is that
14:05:33  2       the employee's knowledge is not
14:05:33  3       coexistive (sic) with the university's
14:05:33  4       knowledge?")
14:05:33  5       MR. RODRIGUEZ: Same objections, and asked and
14:05:35  6   answered.
14:05:37  7       MR. BOOZELL: And I meant to say "coextensive"
14:05:41  8   if I meant "coexistive." Coextensive.
14:05:45  9       MR. RODRIGUEZ: Same objections.
14:05:46 10   BY MR. BOOZELL:
14:05:46 11       Q Is that your position?
14:05:46 12       MR. RODRIGUEZ: Same objections.
14:05:48 13       THE WITNESS: Correct.
14:05:48 14   BY MR. BOOZELL:
14:06:03 15       Q So is it your understanding -- strike that.
14:06:06 16       Do you understand that Dr. Holodniy was a
14:06:10 17   visitor at Cetus between February of '89 and October of
14:06:14 18   '89?
14:06:16 19       MR. RODRIGUEZ: Objection. Calls for
14:06:17 20   speculation, lacks foundation.
14:06:22 21       THE WITNESS: I understand that he was a
14:06:23 22   visitor at --
14:06:25 23       MR. RODRIGUEZ: Wait, wait. Hold on. Hold on
14:06:25 24   a second.
14:06:26 25       So we're getting into an area where -- where
```

55 (Pages 217 to 220)

**Page 221**

| Time | # | Text |
|---|---|---|
| 14:06:30 | 1 | Ms. Albertson I don't think was designated. |
| 14:06:35 | 2 | So I just want to make sure that the |
| 14:06:37 | 3 | information you're providing is not attorney-client |
| 14:06:39 | 4 | information, because what we've told them is that with |
| 14:06:42 | 5 | respect to topics 2 to 4, 8, 9 and 10, that Stanford |
| 14:06:48 | 6 | will answer questions regarding its policy with respect |
| 14:06:52 | 7 | to consulting agreements. |
| 14:06:52 | 8 | THE WITNESS: Okay. |
| 14:06:55 | 9 | MR. RODRIGUEZ: So if you're -- if what you're |
| 14:06:55 | 10 | about to discuss is information learned in the context |
| 14:06:57 | 11 | of an attorney-client communication, then you should not |
| 14:07:01 | 12 | provide any additional information. |
| 14:07:02 | 13 | THE WITNESS: Okay. I understand, from |
| 14:07:08 | 14 | reviewing an agreement, that he signed a visitor's |
| 14:07:12 | 15 | agreement. |
| 14:07:13 | 16 | MR. BOOZELL: And just for clarification, |
| 14:07:15 | 17 | Ricardo, are you saying that Stanford is not designating |
| 14:07:19 | 18 | anybody to talk about collaboration, cooperation or |
| 14:07:21 | 19 | joint work undertaken between Cetus and Stanford other |
| 14:07:24 | 20 | than to talk about consulting policies? |
| 14:07:26 | 21 | MR. RODRIGUEZ: Wait. Which topic is that? |
| 14:07:27 | 22 | MR. BOOZELL: No. 2. |
| 14:07:28 | 23 | MR. RODRIGUEZ: No. 2. And the -- right. So |
| 14:07:42 | 24 | we are -- we are designating, subject to the objections |
| 14:07:46 | 25 | that we had back on June 20th, with respect to |

**Page 222**

| Time | # | Text |
|---|---|---|
| 14:07:50 | 1 | Stanford's knowledge. So the issue that I have here is |
| 14:07:53 | 2 | that Ms. Albertson learned information from us for |
| 14:07:58 | 3 | purposes of this litigation that was not information |
| 14:08:02 | 4 | that was contemporaneously known by Stanford at the |
| 14:08:06 | 5 | time. So you can ask generally questions about what |
| 14:08:08 | 6 | Stanford knew at that time with respect to Dr. Holodniy. |
| 14:08:11 | 7 | If you want to know what actually occurred and the |
| 14:08:14 | 8 | factual circumstances relating to the visitor's |
| 14:08:17 | 9 | agreement and Dr. Holodniy's dealings with that, then |
| 14:08:20 | 10 | you have the opportunity to question Dr. Holodniy on |
| 14:08:23 | 11 | that. |
| 14:08:29 | 12 | BY MR. BOOZELL: |
| 14:08:29 | 13 | Q  So Ms. Albertson, do you have any information |
| 14:08:33 | 14 | that you're prepared to testify to here today regarding |
| 14:08:37 | 15 | Dr. Holodniy's visiting Cetus or any of the work done at |
| 14:08:45 | 16 | Cetus in the 1989 time frame? |
| 14:08:49 | 17 | A  No. |
| 14:08:50 | 18 | Q  And it's your position that you have no such |
| 14:08:57 | 19 | information because Stanford has no such information? |
| 14:09:03 | 20 | MR. RODRIGUEZ: I'm just going to object as |
| 14:09:05 | 21 | calling for a legal conclusion. |
| 14:09:06 | 22 | If you understand the question, you can answer. |
| 14:09:08 | 23 | THE WITNESS: Can you repeat your question? |
| 14:09:16 | 24 | BY MR. BOOZELL: |
| 14:09:16 | 25 | Q  Yes. So you're just -- you're -- you are -- |

**Page 223**

| Time | # | Text |
|---|---|---|
| 14:09:18 | 1 | you have no information to disclose related to any |
| 14:09:23 | 2 | collaboration, cooperation or joint work between |
| 14:09:26 | 3 | Stanford and Cetus because you simply believe that |
| 14:09:31 | 4 | Stanford was not aware of any such information; is that |
| 14:09:34 | 5 | correct? |
| 14:09:34 | 6 | A  That's correct. |
| 14:09:35 | 7 | Q  Do you think Dr. Merigan knew that Dr. Holodniy |
| 14:09:41 | 8 | was at Cetus? |
| 14:09:42 | 9 | MR. RODRIGUEZ: Objection. Calls for |
| 14:09:45 | 10 | speculation. |
| 14:09:45 | 11 | THE WITNESS: I have no idea. |
| 14:09:46 | 12 | BY MR. BOOZELL: |
| 14:09:46 | 13 | Q  Did you talk to Dr. Merigan in preparation for |
| 14:09:49 | 14 | this topic -- |
| 14:09:51 | 15 | A  No, I did not. |
| 14:09:52 | 16 | Q  -- to testify on this topic? |
| 14:09:53 | 17 | Do you know whether Dr. Holodniy had an |
| 14:09:56 | 18 | understanding of what he was doing at Stanford -- at |
| 14:09:59 | 19 | Cetus? |
| 14:09:59 | 20 | MR. RODRIGUEZ: Objection. Calls for |
| 14:10:00 | 21 | speculation. |
| 14:10:00 | 22 | THE WITNESS: I don't know. I hope so. |
| 14:10:07 | 23 | BY MR. BOOZELL: |
| 14:10:09 | 24 | Q  And you didn't talk to Dr. Holodniy in |
| 14:10:11 | 25 | preparation for your deposition today? |

**Page 224**

| Time | # | Text |
|---|---|---|
| 14:10:12 | 1 | A  No. |
| 14:10:13 | 2 | Q  Do you know whether Dr. Merigan knew what |
| 14:10:17 | 3 | Dr. Holodniy was actually doing at Cetus? |
| 14:10:19 | 4 | A  I don't know. |
| 14:10:19 | 5 | Q  And you didn't talk to Dr. Holodniy in |
| 14:10:22 | 6 | preparation for your deposition -- I mean, Dr. Merigan |
| 14:10:24 | 7 | in preparation for your deposition today? |
| 14:10:26 | 8 | A  No. |
| 14:10:26 | 9 | Q  Did Stanford know, in 1989, that Holodniy was |
| 14:10:38 | 10 | visiting Cetus? |
| 14:10:39 | 11 | A  I don't know. |
| 14:10:40 | 12 | Q  You don't know whether Stanford knew in 1989? |
| 14:10:44 | 13 | A  I don't know. |
| 14:10:45 | 14 | Q  One way or the other? |
| 14:10:47 | 15 | A  I don't know one way or the other. |
| 14:10:48 | 16 | Q  Holodniy was an employee of Stanford in 1989; |
| 14:10:55 | 17 | correct? |
| 14:10:56 | 18 | A  I don't know. |
| 14:11:01 | 19 | Q  You don't know whether he was an employee in |
| 14:11:04 | 20 | '89? |
| 14:11:04 | 21 | A  I don't know. |
| 14:11:04 | 22 | Q  Assuming that he was an employee in 1989 -- |
| 14:11:12 | 23 | strike that. |
| 14:11:13 | 24 | Are you familiar with the term "fellow"? |
| 14:11:15 | 25 | A  Yes. |

**Page 277**

15:22:33  1    or the other?
15:22:34  2        A   I don't know one way or another.
15:22:45  3        Q   Now, you said earlier that the material
15:22:49  4    transfer agreement that we're looking at, Exhibit 29,
15:22:52  5    you don't know whether that was tied to a -- the
15:22:55  6    clinical trial we were talking about earlier; is that
15:22:58  7    correct?
15:22:58  8        A   I don't know if it is or not.
15:22:59  9        Q   But you said that you thought it was based on
15:23:03 10    some sort of Stanford form; is that right?
15:23:04 11        A   The language in here is based on standard
15:23:10 12    Stanford language for a material transfer agreement.
15:23:12 13        Q   How about paragraph 8, is that based on
15:23:15 14    Stanford -- Stanford's standard language?
15:23:20 15        A   This is based on standard Stanford language.
15:23:24 16        Q   Do you know who wrote the original language?
15:23:26 17        A   No, I don't.
15:23:27 18        Q   Do you know when it was written?
15:23:29 19        A   No. The beginning of time.
15:23:32 20        Q   Do you know whether it was actually Stanford's
15:23:35 21    standard language or whether it was Cetus's standard
15:23:39 22    language?
15:23:39 23        A   No, I don't.
15:23:40 24        Q   You don't know one way or the other?
15:23:42 25        A   No, I don't.

**Page 278**

15:23:43  1        Q   Is it your understanding under this -- under
15:23:52  2    this agreement that Cetus was entitled to a license if
15:23:59  3    materials it provided under this agreement were used to
15:24:04  4    invent something?
15:24:05  5            MR. RODRIGUEZ: Objection. Vague, calls for a
15:24:08  6    legal conclusion, and again, I'm going to ask whether
15:24:10  7    you're going to allow questioning on this topic with
15:24:16  8    respect to your 30(b)(6) witness.
15:24:19  9            MR. BOOZELL: She's been designated on this --
15:24:20 10    on this agreement. I'm going to ask her the questions.
15:24:23 11    I don't -- I don't recall off the top of my head what
15:24:24 12    our witness has been designated on, but she -- I know
15:24:27 13    she's been designated on this, so I'm going to ask those
15:24:30 14    questions. We can deal with what our witness is going
15:24:33 15    to answer in response to what questions and what topics
15:24:35 16    when we get there.
15:24:36 17            MR. RODRIGUEZ: I'm going to object as to
15:24:38 18    outside the scope, then, and lodge my other objections
15:24:41 19    as well.
15:24:41 20            So to the extent that you have an understanding
15:24:44 21    and you understand the question, you can provide the
15:24:46 22    information.
15:24:47 23            THE WITNESS: Could you please repeat your
15:24:49 24    question?
15:24:50 25            MR. BOOZELL: Can you read back my question.

**Page 279**

15:25:08  1            (Record read.)
15:25:09  2            MR. RODRIGUEZ: Same objections.
15:25:13  3            THE WITNESS: Cetus was entitled to negotiate a
15:25:25  4    license, it didn't automatically get a license.
15:25:29  5    BY MR. BOOZELL:
15:25:32  6        Q   And what do you base that on?
15:25:33  7            MR. RODRIGUEZ: Same objections.
15:25:34  8            THE WITNESS: The fact that the language says
15:25:40  9    first option to an exclusive license at a reasonable
15:25:43 10    royalty to be negotiated in good faith, et cetera.
15:25:47 11    BY MR. BOOZELL:
15:25:47 12        Q   It con- -- the agreement continues on "or
15:25:49 13    Cetus's option or non-exclusive license"; correct?
15:25:52 14        A   Correct.
15:25:53 15        Q   It's your understanding that Cetus would have
15:26:08 16    to negotiate a license --
15:26:08 17        A   Correct.
15:26:08 18        Q   -- if it arose under this agreement?
15:26:08 19            MR. RODRIGUEZ: Same objections.
15:26:08 20            THE WITNESS: Correct.
15:26:08 21    BY MR. BOOZELL:
15:26:14 22        Q   And that's based on just your reading of this
15:26:16 23    language today; correct?
15:26:17 24            MR. RODRIGUEZ: Same objections.
15:26:18 25            THE WITNESS: No, it's based on my

**Page 280**

15:26:20  1    understanding of how a material transfer agreement is
15:26:23  2    drafted and what the rights are that we grant in a
15:26:26  3    material transfer agreement.
15:26:27  4    BY MR. BOOZELL:
15:26:28  5        Q   And what is that understanding?
15:26:29  6            MR. RODRIGUEZ: Same objections.
15:26:29  7            THE WITNESS: In exchange for using materials
15:26:34  8    from a company, there are certain rights that we grant
15:26:38  9    in exchange, and those -- except in the -- those are
15:26:47 10    typically that we will negotiate with that company a
15:26:53 11    license.
15:26:57 12    BY MR. BOOZELL:
15:26:57 13        Q   What if Cetus wanted a nonexclusive license,
15:27:01 14    would that require negotiation?
15:27:02 15        A   We would negotiate a license.
15:27:03 16        Q   Even if it was nonexclusive?
15:27:05 17        A   Correct.
15:27:06 18        Q   If it was a nonexclusive license, what would
15:27:10 19    you be negotiating?
15:27:11 20        A   The royalties for a nonexclusive license.
15:27:14 21        Q   So it's your position under this agreement that
15:27:16 22    a nonexclusive license would be for a fee?
15:27:19 23            MR. RODRIGUEZ: Objection. Calls for
15:27:20 24    speculation, calls for a legal conclusion and outside
15:27:22 25    the scope.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## Page 281

15:27:25  1  You can answer to the extent you have your own
15:27:28  2  knowledge.
15:27:28  3  THE WITNESS: Yes.
15:27:29  4  BY MR. BOOZELL:
15:27:29  5  Q  Based on what?
15:27:30  6  MR. RODRIGUEZ: Same objections.
15:27:31  7  THE WITNESS: Based on the fact that it would
15:27:34  8  be a license for a reasonable royalty, whether it's
15:27:38  9  exclusive or nonexclusive.
15:27:39 10  BY MR. BOOZELL:
15:27:51 11  Q  Do you know whether that was the subject of any
15:27:53 12  negotiation with Stanford and Cetus at the time that
15:27:56 13  this was signed in '89?
15:27:58 14  A  I don't know.
15:28:00 15  Q  You don't know if they discussed it one way or
15:28:06 16  the other?
15:28:06 17  A  I don't know.
15:28:06 18  Q  And you said earlier that you're not sure
15:28:08 19  whether this is a standard Cetus form or a standard
15:28:12 20  Stanford form; is that correct?
15:28:13 21  A  That's correct.
15:28:13 22  Q  So you don't know whether that was negotiated,
15:28:16 23  that provision was negotiated with respect to the
15:28:22 24  standard form back whenever that was created?
15:28:25 25  MR. RODRIGUEZ: Objection. Vague.

## Page 282

15:28:26  1  THE WITNESS: That's correct, I don't know if
15:28:28  2  it was negotiated.
15:28:29  3  BY MR. BOOZELL:
15:28:31  4  Q  So you don't know whether there were any
15:28:32  5  discussions about that at all?
15:28:34  6  A  That's correct, I don't know.
15:28:35  7  Q  So you don't really know what the intent of
15:28:39  8  that paragraph is; correct?
15:28:40  9  MR. RODRIGUEZ: Objection. Calls for a legal
15:28:42 10  conclusion.
15:28:42 11  THE WITNESS: I don't know.
15:28:44 12  BY MR. BOOZELL:
15:28:58 13  Q  When Holodniy visited Stanford -- Cetus in --
15:29:03 14  starting in February of '89, do you know if anybody at
15:29:07 15  Stanford was aware that he would have to sign a -- some
15:29:09 16  sort of visitor's confidentiality agreement?
15:29:11 17  MR. RODRIGUEZ: Objection. Lacks foundation.
15:29:14 18  THE WITNESS: I don't know if anybody knew.
15:29:16 19  BY MR. BOOZELL:
15:29:17 20  Q  You don't know if anybody knew?
15:29:18 21  A  No, don't know.
15:29:19 22  Q  Do you know whether Merigan had been required
15:29:27 23  to sign a confidentiality agreement by Cetus at some
15:29:30 24  point prior to Dr. Holodniy's visit to Cetus?
15:29:32 25  A  I don't know.

## Page 283

15:29:33  1  Q  And you don't know whether Dr. Merigan knew
15:29:37  2  that Holodniy would have to sign some sort of agreement?
15:29:39  3  A  No, I don't know.
15:29:40  4  Q  Did you talk to Dr. Merigan about that subject
15:29:45  5  in preparation for your deposition?
15:29:47  6  A  No, I didn't.
15:29:49  7  Q  Incidentally, Stanford signed the MTA, Exhibit
15:30:02  8  29; correct?
15:30:03  9  A  Yes.
15:30:09 10  Q  So it knew at the time that it signed it that
15:30:13 11  this agreement existed; correct?
15:30:14 12  A  Correct.
15:30:15 13  Q  Do you know whether Dr. Schwartz had ever had
15:30:19 14  to sign a visitor's confidentiality agreement or some
15:30:23 15  sort of confidentiality agreement by Cetus?
15:30:27 16  A  Not to my knowledge.
15:30:29 17  Q  You don't know one way or the other?
15:30:30 18  A  Correct.
15:30:31 19  Q  Do you know whether Dr. Schwartz knew that
15:30:34 20  Dr. Holodniy would have to sign a visitor's
15:30:40 21  confidentiality agreement upon visiting Cetus?
15:30:42 22  MR. RODRIGUEZ: Objection. Calls for
15:30:44 23  speculation.
15:30:44 24  THE WITNESS: Could you repeat that?
15:30:45 25  BY MR. BOOZELL:

## Page 284

15:30:45  1  Q  Do you know whether Dr. Schwartz knew that
15:30:49  2  Dr. Holodniy would have to sign a visitor's
15:30:50  3  confidentiality agreement at Cetus --
15:30:52  4  A  I don't know if he knew that.
15:30:53  5  MR. RODRIGUEZ: Objection. Calls for
15:30:54  6  speculation.
15:30:54  7  THE WITNESS: I don't know if he knew that.
15:30:55  8  BY MR. BOOZELL:
15:30:56  9  Q  You don't know one way or the other?
15:30:57 10  A  No.
15:30:58 11  Q  Do you know whether he had to sign one in the
15:31:01 12  past with respect to visiting Cetus --
15:31:04 13  MR. RODRIGUEZ: Objection. Vague.
15:31:05 14  BY MR. BOOZELL:
15:31:06 15  Q  -- Dr. Schwartz?
15:31:07 16  A  I don't know if Dr. Schwartz had to sign one in
15:31:09 17  the past.
15:31:10 18  Q  Do you have any understanding as to how many
15:31:18 19  Stanford researchers visited Cetus throughout the late
15:31:23 20  '80s and early '90s?
15:31:25 21  A  I have no idea how many Stanford researchers
15:31:31 22  visited Cetus then, during that time period.
15:31:34 23  Q  Couldn't even guess?
15:31:35 24  A  Couldn't even guess.
15:31:37 25  Q  Do you know whether those researchers, if there

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

```
15:31:41  1    were some, that visited, had to sign a confidentiality
15:31:44  2    agreement when they walked in the door?
15:31:46  3        A   I would have no way of knowing that.
15:31:48  4        Q   The signatory of the MTA that we looked at,
15:32:08  5    Exhibit 29, is a Robert Baum; is that correct?
15:32:12  6        A   Yes.
15:32:13  7        Q   He's a contract officer in the Sponsored
15:32:17  8    Projects Office?
15:32:17  9        A   Yes.
15:32:18 10        Q   Did you talk to Dr. Baum in preparation for
15:32:20 11    your deposition today?
15:32:20 12        A   No.
15:32:21 13        Q   Do you know whether Stanford signed other MTAs
15:32:31 14    other than Exhibit 29 with Cetus?
15:32:37 15        A   They would have been in the list we produced.
15:32:42 16        Q   Do you know, sitting here today, whether they
15:32:44 17    did that?
15:32:44 18        A   I don't remember. No, I don't know.
15:32:46 19        Q   Do you know what the relationship between the
15:32:50 20    Stanford Sponsored Projects Office was and Stanford? I
15:32:55 21    mean -- let me start that completely over.
15:32:57 22            Do you know what the relationship, the nature
15:32:58 23    of the relationship, was between Cetus and the Stanford
15:33:02 24    Sponsored Projects Office?
15:33:05 25        A   What the relationship is?
                                                           Page 285

15:33:06  1        Q   In the late '80s and '90s, do you know?
15:33:09  2        A   You mean as in good or bad or --
15:33:10  3        Q   I mean, do you know what the nature of the
15:33:12  4    relationship was?
15:33:13  5        A   No, I don't know.
15:33:14  6        Q   Do you know how many times someone from Cetus
15:33:18  7    interacted with someone from the Sponsored Projects
15:33:20  8    Office?
15:33:20  9        A   No, I don't know.
15:33:21 10        Q   So you have no idea whether anybody in the
15:33:26 11    Sponsored Projects Offices -- Office was familiar with
15:33:29 12    Cetus' policies regarding visitors' confidentiality
15:33:34 13    agreements?
15:33:34 14        A   No, I don't know.
15:33:35 15        Q   One way or the other?
15:33:36 16        A   No, I don't know.
15:33:37 17        Q   Did the Stanford Projects -- did the Stanford
15:33:50 18    Sponsored Projects Office deal with a lot of biotech
15:33:52 19    companies, do you know?
15:33:53 20        A   I guess I'm not sure what you mean by "a lot."
15:33:59 21        Q   More than 10?
15:34:02 22        A   Yes.
15:34:03 23        Q   More than 20?
15:34:04 24        A   Yes.
15:34:05 25        Q   About how many biotech companies do you believe
                                                           Page 286

15:34:09  1    the Sponsored Projects Office would have dealt with over
15:34:14  2    the years?
15:34:14  3        A   Since when?
15:34:16  4        Q   Since its inception.
15:34:18  5        A   Hundreds.
15:34:19  6        Q   Hundreds. So you would say the Sponsored
15:34:24  7    Projects Office probably had a pretty good understanding
15:34:26  8    of the practices of biotech companies with respect to
15:34:29  9    confidentiality of their information; is that correct?
15:34:32 10            MR. RODRIGUEZ: Objection. Calls for
15:34:36 11    speculation.
15:34:36 12            THE WITNESS: I agree. I mean, that was in the
15:34:39 13    early stages, but they were certainly qualified to
15:34:41 14    understand confidentiality.
15:34:44 15    BY MR. BOOZELL
15:34:44 16        Q   Do you think they understood the industry
15:34:46 17    practice related to confidentiality agreements for
15:34:51 18    visitors?
15:34:51 19            MR. RODRIGUEZ: Objection. Calls for
15:34:54 20    speculation, lacks foundation.
15:34:55 21            THE WITNESS: Sponsored Projects Office didn't
15:34:57 22    review confidentiality agreements.
15:34:59 23    BY MR. BOOZELL:
15:35:03 24        Q   Who would have reviewed those?
15:35:04 25        A   Usually nobody.
                                                           Page 287

15:35:06  1        Q   And why is that?
15:35:11  2        A   If it's an agreement between an individual and
15:35:15  3    a company. There isn't a need to review, like a
15:35:18  4    consulting agreement or a confidentiality agreement, the
15:35:21  5    university isn't a signator (sic).
15:35:23  6        Q   What if the university -- what if the
15:35:27  7    individual signed the confidentiality in the scope of
15:35:30  8    his employment at Stanford?
15:35:34  9            MR. RODRIGUEZ: Objection. Vague.
15:35:35 10            THE WITNESS: Yeah.
15:35:36 11    BY MR. BOOZELL:
15:35:37 12        Q   Would anybody at Stanford have reviewed that
15:35:39 13    document?
15:35:39 14        A   I'm not sure what you mean by within the scope
15:35:41 15    of his employment at the university.
15:35:43 16        Q   If he was an employee of the university and he
15:35:48 17    went to a biotech company, in that capacity, to learn
15:35:51 18    techniques and had to sign a confidentiality agreement,
15:35:54 19    would Stanford have known that?
15:35:56 20        A   Stanford still does not need to review it if
15:36:01 21    the individual is signing on his own behalf and the
15:36:04 22    university is not a signator. For example, I sign
15:36:10 23    confidentiality agreements in my capacity at OTL when I
15:36:13 24    read a business plan. I'm signing on my own behalf, I'm
15:36:16 25    not signing on behalf of the university. Nobody reviews
                                                           Page 2
```

```
15:40:52  1   guys want to take a quick break?
15:40:53  2       MR. RODRIGUEZ: It's up to you.
15:40:54  3       MR. BOOZELL: Yeah, let's take a quick break.
15:40:56  4       THE VIDEOGRAPHER: The time is 3:40. We're
15:40:58  5   going off the record.
15:41:29  6       (Discussion off the record.)
15:41:33  7       THE VIDEOGRAPHER: The time is 3:42. We are
15:42:14  8   back on the record to announce that this will be the
15:42:18  9   completion of Media No. 3. The time continues to be
15:42:21 10   3:42. We are going off the record.
15:42:33 11       (Recess.)
15:49:24 12       THE VIDEOGRAPHER: The time is 3:49 p.m. We're
15:49:32 13   back on the record, and this is the beginning of Media
15:49:35 14   No. 4 in the deposition of Mary Albertson.
15:49:39 15   BY MR. BOOZELL:
15:49:39 16   Q   I may have asked you this before, maybe even
15:49:42 17   multiple times, but with respect to the MTA, did you --
15:49:47 18   have you ever talked to Robert Baum?
15:49:49 19   A   No, I have not.
15:49:50 20   Q   Did you talk to anybody from the Sponsored
15:49:54 21   Projects Office or who was in the Sponsored Projects
15:49:56 22   Office at the time of the signing of the MTA about the
15:49:58 23   MTA?
15:49:58 24   A   I haven't talked to anybody who was in the
15:50:01 25   office at the time. I have talked to somebody who has
                                                       Page 293
```

```
15:50:07  1   worked in the Sponsored Projects Office about the MTA.
15:50:09  2   Q   And who was that?
15:50:10  3   A   Kathy Ku.
15:50:12  4   Q   What did she tell you?
15:50:13  5   A   That this is pretty standard language for a
15:50:19  6   material transfer agreement.
15:50:25  7   Q   Anything else?
15:50:26  8   A   Nothing in particular. I mean, if you have
15:50:32  9   questions, I could respond to them.
15:50:34 10   Q   Well, just can you recall anything else she
15:50:36 11   said to you about the MTA?
15:50:37 12   A   Yes. I asked her in particular about clause 8
15:50:45 13   and what was customary at the time about issuing
15:50:49 14   licenses, and -- under MTAs, and she said at the time
15:50:54 15   issuing a royalty-bearing exclusive and nonexclusive --
15:50:58 16   royalty-bearing nonexclusive license was customary at
15:51:01 17   the time.
15:51:02 18   Q   And how does she know that?
15:51:03 19   A   Because she was in the office of -- Sponsored
15:51:11 20   Projects Office.
15:51:11 21   Q   In '88-'89?
15:51:14 22   A   I believe it was '88-'89 or right before then.
15:51:18 23   Q   Do you know whether she was personally involved
15:51:20 24   in the negotiation of any Stanford-Cetus MTAs?
15:51:24 25   A   She was not.
                                                       Page 294
```

```
15:51:25  1   Q   Have you talked to anybody in preparation for
15:51:26  2   your deposition that was?
15:51:28  3   A   No. And when we negotiate a royalty-free
15:51:39  4   nonexclusive license, we put in "royalty-free
15:51:43  5   nonexclusive license."
15:51:45  6   Q   And that was the practice in '88?
15:51:47  7   A   That was the practice in '88 and still is the
15:51:50  8   practice.
15:51:50  9   Q   How do you know that was the practice in '88?
15:51:52 10   A   Because I talked to Kathy Ku about it.
15:51:55 11   Q   But she never negotiated anything with
15:51:58 12   Stanford, correct, any MTA with Stanford?
15:52:01 13   A   With Cetus.
15:52:02 14   Q   With Cetus and Stanford?
15:52:04 15   A   She did not.
15:52:05 16   Q   Do you recall anything else that Kathy Ku told
15:52:07 17   you related to the MTA?
15:53:49 18   A   Yes. She said that the material -- it was
         19   unusual in number 2, the definition of the material was
         20   overly broad compared to what we usually had so that it
         21   was unusual that there was no attachment describing what
         22   the material exactly was. Usually we have something
         23   that says, you know, primer names, 573, or whatever the
         24   designation is. Other than that, nothing that I recall
         25   that was specific.
                                                       Page 295
```

```
          1   Q   You don't recall anything else she said to you
          2   about the MTA?
          3   A   I don't recall anything else. She was actually
          4   at OTL in '88, so it was prior to '88 that she was in
          5   Sponsored Projects Office. I forget the exact date, so
          6   she had already gone to OTL by '88.
          7   Q   So she wasn't in the O- -- the Sponsored
          8   Projects Office at this time?
          9   A   No, she wasn't.
         10   Q   And when I say "this time," I mean 1988.
         11   A   1988.
         12   Q   Did you talk to anybody else about the MTA to
15:53:51 13   prepare for your deposition, other than Ricardo or
15:53:52 14   somebody from his office?
15:53:54 15   A   No, I just talked to Kathy about it.
15:54:01 16   Q   Okay.
15:54:05 17   A   Both in the context of Sponsored Projects
15:54:08 18   Office and in the context of both of our experience in
15:54:13 19   negotiating. For a period of time, material transfer
15:54:14 20   agreements were negotiated by OTL, and that's where I
15:54:18 21   got my experience negotiating, my primary experience in
15:54:21 22   negotiating material transfer agreements. For a period
15:54:23 23   of time, we negotiated them in our office.
15:54:24 24   Q   And when was that?
15:54:26 25   A   That was probably in the first few years that I
                                                       Page 296
```

```
17:12:16  1    A  No.
17:12:16  2    Q  Don't know one way or the other?
17:12:18  3    A  Don't know.
17:12:19  4    Q  I'm going to mark the next in order. This
17:12:38  5  document is Bates-numbered RMS 00048 through 50.
17:12:56  6        (Deposition Exhibit 131 marked.)
17:12:57  7  BY MR. BOOZELL:
17:12:57  8    Q  Do you recognize this document?
17:13:03  9    A  Yes.
17:13:03 10    Q  Have you seen this document before?
17:13:04 11    A  Yes, I have.
17:13:05 12    Q  In what capacity?
17:13:07 13    A  Preparation for this deposition.
17:13:09 14    Q  Do you have any information to testify here to
17:13:13 15  today related to the negotiation, intent, execution of
17:13:17 16  this agreement?
17:13:18 17    A  Since we don't review or negotiate the
17:13:24 18  consulting agreements, I don't really have much
17:13:27 19  information on this.
17:13:28 20    Q  Do you have any information related to those
17:13:31 21  topics?
17:13:32 22    A  Nothing beyond what's on the paper.
17:13:34 23    Q  Do you have any idea when Stanford first became
17:13:38 24  aware of this agreement?
17:13:40 25    A  No, I don't.
                                                  Page 353

17:13:40  1    Q  One way or the other, you don't know?
17:13:43  2    A  No, I don't know.
17:13:53  3    Q  I believe you were also designated to be
17:13:57  4  Stanford's person most knowledgeable with respect to
17:13:59  5  that agreement; is that correct?
17:14:00  6    A  Yes.
17:14:01  7        MR. RODRIGUEZ: Well, if that's category --
17:14:03  8        MR. BOOZELL: 5.
17:14:04  9        MR. RODRIGUEZ: That's category number 5?
17:14:06 10        MR. BOOZELL: As far as I understand, yes. I
17:14:14 11  may be wrong. She can -- she's --
17:14:16 12        MR. RODRIGUEZ: I think it's probably not.
17:14:18 13        MR. BOOZELL: That's probably wrong. But if
17:14:19 14  it's within those you specified earlier, you have a
17:14:23 15  continuing objection; right?
17:14:24 16        MR. RODRIGUEZ: Yes.
17:14:24 17  BY MR. BOOZELL:
17:14:24 18    Q  Okay. Subject to counsel's objections, do you
17:14:26 19  have any information to impart as Stanford's person most
17:14:36 20  knowledgeable related to that agreement other than what
17:14:39 21  we just talked about?
17:14:40 22    A  I'm happy to answer questions, but I can't
17:14:42 23  think of anything off the top of my head.
17:14:44 24    Q  But again, you don't have any information
17:14:47 25  related to the facts surrounding the creation or
                                                  Page 354

17:14:52  1  execution or intent of this agreement?
17:14:53  2    A  No.
17:14:54  3    Q  What did you do to prepare to testify regarding
17:14:59  4  this agreement?
17:15:00  5    A  I reviewed the document.
17:15:03  6    Q  Did you do anything other than that?
17:15:05  7    A  No.
17:15:06  8    Q  Didn't talk to Dr. Merigan?
17:15:08  9    A  Did not talk to Dr. Merigan.
17:15:10 10    Q  I'd like to show you what's been previously
17:15:26 11  marked as Exhibit 30. Do you recognize this document?
17:15:31 12    A  Is this the same one? Yes, I do.
17:15:42 13    Q  What is this document?
17:15:44 14    A  It's a visitor's confidentiality agreement
17:15:46 15  signed by Dr. Holodniy.
17:15:47 16    Q  And when's the first time you saw this
17:15:49 17  document?
17:15:49 18    A  In preparation for this deposition.
17:15:51 19    Q  Do you have any understanding as to when
17:15:53 20  Stanford first became aware of this agreement?
17:15:55 21    A  No, I don't.
17:15:57 22    Q  Do you know whether Dr. Merigan knew of this
17:16:02 23  agreement back when it was signed in 1989?
17:16:05 24    A  No, I don't.
17:16:06 25    Q  One way or the other, you don't know?
                                                  Page 355

17:16:08  1    A  No, I don't.
17:16:09  2    Q  Do you have any information whether -- as to
17:16:11  3  whether anybody at Stanford knew about this agreement
17:16:16  4  around when it was signed in 1989 or thereafter?
17:16:19  5    A  I don't have any information on whether anybody
17:16:23  6  knew about it.
17:16:24  7    Q  One way or the other?
17:16:25  8    A  No.
17:16:25  9    Q  Do you see the signature block on page 2?
17:16:32 10    A  Yes, I do.
17:16:33 11    Q  Do you see that Mark Holodniy listed his
17:16:36 12  address as Stanford University Medical Center, Division
17:16:39 13  of Infectious Diseases?
17:16:39 14    A  Yes.
17:16:41 15    Q  Does that indicate to you that Dr. Holodniy
17:16:43 16  believed he was visiting Cetus as an employee of
17:16:46 17  Stanford?
17:16:46 18        MR. RODRIGUEZ: Objection. Vague, calls for
17:16:48 19  speculation.
17:16:48 20        THE WITNESS: I don't know what his intent was
17:16:53 21  by signing that that way.
17:16:55 22  BY MR. BOOZELL:
17:16:56 23    Q  And I think you testified earlier you don't
17:16:58 24  know anything about any conversations that either
17:17:01 25  Dr. Merigan or Schwartz may have had with Holodniy about
                                                  Page 356
```

89 (Pages 353 to 356)

### Page 357

```
17:17:04  1  visiting Cetus; is that correct?
17:17:07  2      A  I don't know what I testified to earlier, but I
17:17:10  3  don't know what conversations he may have had with any
17:17:14  4  of them.
17:17:14  5      Q  Do you have any understanding as to whether
17:17:16  6  Dr. Holodniy believes that he was at Cetus as an
17:17:19  7  employee of Stanford University?
17:17:20  8      MR. RODRIGUEZ:  Objection.  Vague, calls for
17:17:21  9  speculation.
17:17:21 10      THE WITNESS:  I don't know whether he thought
17:17:23 11  he was visiting there as an employee of Stanford or not.
17:17:23 12  BY MR. BOOZELL:
17:17:27 13      Q  You don't know one way or the other?
17:17:29 14      A  I don't know one way or the other.
17:17:31 15      Q  Have you talked to Dr. Holodniy about that?
17:17:33 16      A  No, I haven't.
17:17:33 17      Q  Have you done anything else to educate yourself
17:17:35 18  on that topic?
17:17:36 19      A  No, I haven't.
17:17:37 20      Q  Do you have any information -- you've been
17:17:39 21  designated with respect to this agreement as Stanford's
17:17:43 22  person most knowledgeable; is that correct?
17:17:44 23      MR. RODRIGUEZ:  Actually, that's not correct.
17:17:46 24  Again, that's subject to the metes and bounds that we
17:17:50 25  identified in prior correspondence.
```

### Page 358

```
17:17:52  1  BY MR. BOOZELL:
17:17:52  2      Q  Subject to those metes and bounds, is that your
17:17:55  3  understanding?
17:17:56  4      A  That's my understanding.
17:17:58  5      Q  Other than what's in the document, do you have
17:18:00  6  any information concerning this document?
17:18:08  7      A  No, I don't.
17:18:11  8      Q  So you don't have any understanding of the
17:18:15  9  intent as expressed at the time of its creation, whether
17:18:19 10  Dr. Holodniy reviewed it with anybody prior to its
17:18:23 11  execution, the execution, any of those topics?
17:18:27 12      A  No, I don't.
17:18:28 13      Q  Do you know whether Dr. Holodniy -- excuse me,
17:18:33 14  strike that.
17:18:34 15      Do you have any understanding whether anybody
17:18:36 16  from Cetus spoke with Dr. Holodniy about this agreement
17:18:40 17  before he signed it?
17:18:41 18      A  I don't have that information.
17:18:42 19      Q  You don't know one way or the other?
17:18:44 20      A  I don't know one way or the other.
17:18:49 21      Q  Do you know whether anybody from Cetus spoke
17:18:52 22  with Dr. Merigan regarding this agreement prior to
17:18:55 23  Dr. Holodniy signing it?
17:18:56 24      A  I don't have that information.
17:18:59 25      Q  Would Dr. Holodniy have been permitted to sign
```

### Page 359

```
17:19:03  1  this agreement as an employee of Stanford?
17:19:04  2      MR. RODRIGUEZ:  Objection.  Vague.
17:19:06  3      THE WITNESS:  It wouldn't have been against
17:19:15  4  Stanford policy for Dr. Holodniy to sign this agreement.
17:19:18  5  BY MR. BOOZELL:
17:19:18  6      Q  As an employee of Stanford?
17:19:20  7      A  Correct.
17:19:20  8      MR. RODRIGUEZ:  Objection.  Vague.
17:19:23  9  BY MR. BOOZELL:
17:19:28 10      Q  But you don't have any information -- again, I
17:19:30 11  know I've asked this question a couple times, but you
17:19:33 12  don't have any information regarding what knowledge was
17:19:36 13  imparted to Dr. Holodniy during his visits that followed
17:19:40 14  this agreement at Cetus?
17:19:42 15      A  No, I don't have any information on what
17:19:44 16  knowledge was imparted to Dr. Holodniy while he was at
17:19:47 17  Cetus.
17:19:48 18      Q  I believe you've also been designated as --
17:20:04 19  30(b)(6) topic related to collaboration, cooperation or
17:20:08 20  joint work between Roche and Stanford related to the
17:20:14 21  PCR, the subject of the patents; is that right?
17:20:16 22      MR. RODRIGUEZ:  Do you have a topic number for
17:20:18 23  that?
17:20:18 24      MR. BOOZELL:  I don't.  We can look in the --
17:20:19 25      MR. RODRIGUEZ:  I'll just say again that's
```

### Page 360

```
17:20:21  1  subject to the correspondence that we provided you a
17:20:24  2  while back with respect to the metes and bounds of the
17:20:27  3  designation.
17:20:29  4      MR. BOOZELL:  Okay.
17:20:33  5      THE WITNESS:  Yo. Yes.
17:20:35  6  BY MR. BOOZELL:
17:20:35  7      Q  Were you designated on that topic subject to
17:20:39  8  those metes and bounds?
17:20:40  9      A  Sure, yes.
17:20:41 10      Q  Are you aware of any collaboration, cooperation
17:20:44 11  or joint work between Roche and Stanford related to PCR
17:20:46 12  or the subject matter of the patents?
17:20:49 13      A  I'm not, but if there was any, it was produced
17:20:51 14  on that list that was produced by Sponsored Projects
17:20:57 15  Office.
17:20:57 16      Q  But you're not aware of any collaboration
17:20:59 17  today?
17:20:59 18      A  No, I'm not.
17:21:00 19      Q  What did you do to prepare to give testimony on
17:21:02 20  this topic?
17:21:03 21      A  I requested from Sponsored Projects Office that
17:21:08 22  they look in Spiders and produce a list of any
17:21:12 23  collaborations, sponsored projects, between Stanford and
17:21:17 24  Roche.
17:21:18 25      Q  What's Spiders?
```

```
 1
 2
 3        I, the undersigned, a Certified Shorthand
 4   Reporter of the State of California, do hereby certify:
 5        That the foregoing proceedings were taken
 6   before me at the time and place herein set forth; that
 7   any witnesses in the foregoing proceedings, prior to
 8   testifying, were placed under oath; that a verbatim
 9   record of the proceedings was made by me using machine
10   shorthand which was thereafter transcribed under my
11   direction; further, that the foregoing is an accurate
12   transcription thereof.
13        I further certify that I am neither
14   financially interested in the action nor a relative or
15   employee of any attorney of any of the parties.
16        IN WITNESS WHEREOF, I have this date
17   subscribed my name.
18
19   DATED: _____
20
21
22        _____
          GINA GLANTZ
23        CSR No. 9795
24
25
```

Page 365