Board of Trustees of the Leland Stanford Junior University v. Roche Molecular Systems, Inc. et al  Doc. 113 Att. 19

**HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY- RESTRICTED**

---

### Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

THE BOARD OF THE TRUSTEES OF
THE LELAND STANFORD JUNIOR
UNIVERSITY,
    Plaintiff,
vs.    No. C-05-04158 MHP
ROCHE MOLECULAR SYSTEMS, INC.;
ROCHE DIAGNOSTICS CORPORATION;
ROCHE DIAGNOSTICS OPERATIONS,
INC.; ROCHE DIAGNOSTIC SYSTEMS,
INC.,
    Defendant.

AND RELATED COUNTERCLAIM.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY - RESTRICTED
VIDEOTAPED DEPOSITION OF MICHAEL S. OSTRACH
San Francisco, California
Monday, August 21, 2006

Reported by:
SUZANNE F. BOSCHETTI
CSR No. 5111
Job No. 3-51840

---

### Page 2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

THE BOARD OF THE TRUSTEES OF
THE LELAND STANFORD JUNIOR
UNIVERSITY,
    Plaintiff,
vs.    No. C-05-04158 MHP
ROCHE MOLECULAR SYSTEMS, INC.;
ROCHE DIAGNOSTICS CORPORATION;
ROCHE DIAGNOSTICS OPERATIONS,
INC.; ROCHE DIAGNOSTIC SYSTEMS,
INC.,
    Defendant.

AND RELATED COUNTERCLAIM.

Confidential videotaped deposition of MICHAEL OSTRACH, taken on behalf of Plaintiff and Counterclaim Defendants The Board of the Trustees of the Leland Stanford Junior University, at 50 California, 22nd Floor, San Francisco, California, beginning at 9:04 a.m. and ending at 2:30 p.m. on Monday, August 21, 2006, before SUZANNE F. BOSCHETTI, Certified Shorthand Reporter No. 5111.

---

### Page 3

APPEARANCES:

For Plaintiff and Counterclaim Defendants The Board of the Trustees of the Leland Stanford Junior University, et al.:

    COOLEY GODWARD LLP
    BY: RICARDO RODRIGUEZ
    Attorney at Law
    Five Palo Alto Square, 3000 El Camino Real
    Palo Alto, California 94306-2155
    (650) 857-0663

For Defendants and Counterclaimants Roche Molecular Systems, Inc., et al.:

    QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
    BY: JEFFREY N. BOOZELL
    Attorney at Law
    865 S. Figueroa Street, 10th Floor
    Los Angeles, California 90017
    (213) 624-7707

Videographer:

    RAY TYLER
    SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
    San Francisco, California
    (415) 274-9977

---

### Page 4

INDEX

| WITNESS: | EXAMINATION |
|---|---|
| MICHAEL OSTRACH | |
|   BY MR. RODRIGUEZ | 6 |

EXHIBITS

| DEPOSITION | | PAGE |
|---|---|---|
| 626 | Cetus, Cowen & Co. West Coast Tour, Agenda, Bates No. RMS 0521; 1 page | 106 |
| 627 | Assets Purchase Agreement, July 19, 1991, cover sheet, Bates No. RMS 05923; Opinion of Michael S. Ostrach, General Counsel to seller, Bates Nos. RMS 06264 - RMS 06267; 5 pages | 113 |
| 628 | Handwritten notes beginning "12/3 Cetus Conf Call," Bates Nos. RMS 78168 - RMS 78170; 3 pages | 117 |
| 629 | Handwritten notes beginning "5/26 Cetus," Bates Nos. RMS 78175 - RMS 78185; 11 pages | 119 |
| 630 | Handwritten notes beginning "9/13/90 Cetus," Bates Nos. RMS 78157 - RMS 78162; 6 pages | 123 |
| 631 | Handwritten notes beginning "12/4 Cetus," Bates nos. RMS 78146 - RMS 78154; 9 pages | 129 |
| 632 | Handwritten notes entitled "Test Case (Gen. Probe)," Bates Nos. RMS 78280 - RMS 78298; 19 pages | 134 |
| 633 | Handwritten notes entitled "Primary Applications," Bates Nos. RMS 78299 - RMS 78301; 3 pages | 138 |

---

1 (Pages 1 to 4)

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

Dockets.Justia.com

**HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY- RESTRICTED**

### Page 57

```
10:30:44  1   A. Well, the UC policy seemed to be quite more
10:30:47  2   difficult than the Stanford policy in that
10:30:50  3   it effec- -- my recollection or my take, my sort of
10:30:54  4   emotional reaction to the document was that it would
10:30:56  5   be very difficult to obtain rights to inventions made
10:31:01  6   by professors during the time they were employed by
10:31:04  7   the university, whether or not they were at that
10:31:07  8   moment working as a consultant on behalf of another
10:31:13  9   party. And -- and so that's what I recall.
10:31:19 10   Q. The Stanford policy that you were shown on
10:31:23 11   last Friday, do you recall having actually seen
10:31:26 12   that policy at some point back around the time that
10:31:33 13   Exhibit 601 was executed?
10:31:36 14   A. It was -- the one I saw on Friday was
10:31:39 15   consistent with my recollection that Stanford was
10:31:42 16   fairly liberal in providing the rights to the
10:31:44 17   professors.
10:31:45 18   Q. Do you recall any exceptions to the
10:31:50 19   general policy of providing rights to professors --
10:31:50 20   A. I don't recall --
10:31:55 21   Q. -- in the Stanford policy?
10:31:56 22   A. -- a specific exception. I would be --
10:32:01 23   expect that government-funded inventions might be
10:32:04 24   dealt with specifically and possibly differently.
10:32:07 25   Q. Why would you have that expectation?
```

### Page 58

```
10:32:10  1   A. Because I think until before 1984, the
10:32:13  2   government claimed an interest in inventions made on
10:32:20  3   its grants and in '84 the law was changed to provide a
10:32:26  4   grant to the institution of those rights, which I
10:32:30  5   would expect, therefore, would then be provided to the
10:32:35  6   professor consistent with other patent rights. But
10:32:39  7   before '84, and since this is right around '84, as I
10:32:43  8   recall, don't know.
10:32:46  9   Q. Now, why do you say that you -- let me
10:32:50 10   back up a little bit.
10:32:51 11      So in 1984, what was your understanding of
10:32:56 12   way in which the law was changed with respect to
10:32:59 13   intellectual property arising from grants?
10:33:01 14   MR. BOOZELL: Calls for a legal conclusion.
10:33:03 15   Calls for speculation. Lacks foundation. Incomplete
10:33:05 16   hypothetical. Calls for an expert opinion.
10:33:07 17   THE WITNESS: I thought it was '84 that the
10:33:09 18   Bayh-Dole Act was passed, where Congress provided that
10:33:15 19   inventions made on federal grants could be given to
10:33:17 20   the university rather than kept by the government.
10:33:20 21   I -- I believe before that the university sort of had
10:33:22 22   to ask the government to give it the patents.
10:33:22 23   BY MR. RODRIGUEZ:
10:33:28 24   Q. And then you also said that therefore,
10:33:31 25   after 1984, you would expect that -- that it would
```

### Page 59

```
10:33:35  1   be provided to the professor consistent with other
10:33:37  2   patents rights.
10:33:38  3      What did you mean by that?
10:33:40  4   A. Well, I --
10:33:40  5   MR. BOOZELL: Same objections.
10:33:41  6   THE WITNESS: Because I recall that the
10:33:42  7   policy said that if professors made inventions while
10:33:45  8   working for Stanford, the professor could keep it. So
10:33:47  9   I assume that after the government said to the
10:33:51 10   universities, you guys can keep the IP rights, that
10:33:56 11   Stanford's policy said in addition to any IP that you
10:33:58 12   invent for us while working for us, you can keep that,
10:34:04 13   plus you can keep any inventions you make while
10:34:06 14   working on a government grant while you're working for
10:34:09 15   us. That's speculation.
10:34:09 16   BY MR. RODRIGUEZ:
10:34:13 17   Q. Do you recall being aware of the
10:34:15 18   particular patent policy of Stanford at the time
10:34:20 19   that Exhibit 601 was executed?
10:34:25 20   A. Yes.
10:34:25 21   MR. BOOZELL: Vague and ambiguous. Asked and
10:34:31 22   answered.
10:35:00 23      (Previously marked Exhibit 602 was
10:35:01 24      presented to the witness.)
10:35:01 25   BY MR. RODRIGUEZ:
```

### Page 60

```
10:35:01  1   Q. I've handed you a copy of what has been
10:35:03  2   previously marked as Exhibit 602. This is a
10:35:07  3   document having Bates No. RMS 00048 through 00050.
10:35:15  4      Would you please take a look at
10:35:17  5   Exhibit 602 and tell me if you recognize it.
10:35:20  6   A. Yes.
10:35:20  7   Q. How do you recognize Exhibit 602?
10:35:24  8   A. It appears to be based on a Cetus non- --
10:35:30  9   nonexclusive confidential -- I'm sorry -- nonexclusive
10:35:33 10   consulting agreement.
10:35:37 11   Q. So is it the case that Exhibit 602, like
10:35:41 12   Exhibit 601, is that sort of form agreement?
10:35:45 13   MR. BOOZELL: Vague and ambiguous.
10:35:48 14   THE WITNESS: Yes.
10:35:48 15   BY MR. RODRIGUEZ:
10:35:53 16   Q. And there were then a number of different
10:35:56 17   consultants who executed consulting agreements such
10:36:01 18   as Exhibit 602?
10:36:03 19   A. Probably.
10:36:05 20   Q. Who drafted Exhibit 602?
10:36:11 21   A. I don't recall.
10:36:12 22   Q. Who likely drafted Exhibit 602?
10:36:14 23   MR. BOOZELL: Vague and ambiguous. Calls for
10:36:17 24   speculation.
10:36:20 25   THE WITNESS: Well, since it calls for
```

15 (Pages 57 to 60)

**HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY- RESTRICTED**

### Page 97

```
11:38:24  1   agreements where it was provided for payment for a
11:38:29  2   nonexclusive license?
11:38:31  3          MR. BOOZELL: Vague and ambiguous.
11:38:32  4          THE WITNESS: I don't recall any time that we
11:38:34  5   at Cetus agreed to such a provision in an MTA.
11:38:34  6   BY MR. RODRIGUEZ:
11:38:43  7      Q. If I could direct your attention to the
11:38:45  8   next page of Exhibit 29, STAN 003863.
11:38:54  9          Do you see paragraph 12 that's on 003863?
11:39:04 10      A. Yes.
11:39:04 11      Q. Would you please read paragraph 12 to
11:39:06 12   yourself and tell me when you're done.
11:39:09 13      A. Okay.
11:39:10 14      Q. What was your understanding of
11:39:15 15   paragraph 12 of Exhibit 29 with respect to the form
11:39:24 16   agreements for materials transfer?
11:39:26 17      A. I --
11:39:26 18          MR. BOOZELL: Vague and ambiguous. Calls for
11:39:27 19   speculation. Calls for a legal conclusion.
11:39:30 20          THE WITNESS: I don't recall.
11:39:30 21   BY MR. RODRIGUEZ:
11:39:35 22      Q. Do you recall having any understanding
11:39:37 23   around the 1989 time frame with respect to the
11:39:40 24   assignability of materials transfer agreements?
11:39:43 25          MR. BOOZELL: Same objections.
```

### Page 98

```
11:39:45  1          THE WITNESS: No specific recollection.
11:39:59  2   BY MR. RODRIGUEZ:
11:39:59  3      Q. Do you recall any concerns or discussions
11:40:01  4   within Cetus with respect to the assignability of
11:40:04  5   materials transfer agreements?
11:40:05  6          MR. BOOZELL: You can answer that question
11:40:06  7   "yes" or "no."
11:40:07  8          THE WITNESS: Yes.
11:40:07  9   BY MR. RODRIGUEZ:
11:40:10 10      Q. What were those concerns or discussions?
11:40:13 11          MR. BOOZELL: I'm going to advise you not to
11:40:15 12   answer the question to the extent it calls for
11:40:17 13   attorney-client privileged communications.
11:40:18 14          THE WITNESS: It was our policy at all times
11:40:20 15   to ensure that our technology rights were transferable
11:40:26 16   in connection, at a minimum, with the sale of the
11:40:30 17   company, but always -- I don't even recall ever losing
11:40:40 18   the -- the discu- -- the negotiation with respect to a
11:40:41 19   sale of a portion of the business to which the
11:40:44 20   property related. So it was -- I would say I do not
11:40:50 21   recall any exceptions to the policy where we sought to
11:40:53 22   ensure that anything we owned or obtained would go in
11:40:58 23   a merger or sale of assets. It's very important to
11:41:03 24   me.
11:41:03 25   BY MR. RODRIGUEZ:
```

### Page 99

```
11:41:04  1      Q. But are you setting up a distinction
11:41:06  2   between merger or sale of assets of the entire
11:41:09  3   company versus entire portions of it?
11:41:11  4      A. I'm trying to be specific to say that my
11:41:13  5   objective, which I believe I achieved in all cases,
11:41:16  6   was that either in the case of a sale of a portion of
11:41:20  7   the company or the entire company that the -- that the
11:41:24  8   rights would go with the -- to the transferee without
11:41:29  9   permission of another party.
11:41:37 10      Q. I want to turn back now to the asset
11:41:43 11   purchase between Roche and Cetus.
11:41:48 12      A. Which Roche?
11:41:58 13          MR. BOOZELL: Is there another one for me?
11:42:11 14          (Previously marked Exhibit 525 was
11:42:11 15          presented to the witness.)
11:42:11 16   BY MR. RODRIGUEZ:
11:42:11 17      Q. I've handed you what has been previously
11:42:13 18   marked as Exhibit 525. It's a document that starts
11:42:21 19   with Bates No. RMS 0062304 and ends with
11:42:32 20   RMS 0062599.
11:42:33 21          Would you just take a quick flip through
11:42:36 22   Exhibit 525 and tell me if you generally recognize
11:42:40 23   the subject matter of it?
11:43:10 24      A. It appears to be schedules that were prepared
11:43:14 25   leading up to the asset purchase agreement, final
```

### Page 100

```
11:43:19  1   schedules.
11:43:23  2      Q. Is it likely that at some point you
11:43:25  3   reviewed Exhibit 525 in connection with the
11:43:29  4   purchase of assets of Cetus by Roche?
11:43:33  5      A. I, from time to time, saw versions of the
11:43:38  6   drafts and the final schedules. I -- I just can't say
11:43:46  7   that I saw this particular set, but I was generally
11:43:51  8   aware, as the schedules were being prepared by us,
11:43:56  9   what they said, what decisions were being made about
11:44:03 10   how to provide the information called for by the
11:44:06 11   schedule.
11:44:08 12      Q. If I could direct your attention to page
11:44:11 13   RMS 0062420.
11:44:20 14      A. Got it.
11:44:24 15      Q. If you could please read to yourself the
11:44:26 16   last paragraph on that page and tell me when you're
11:44:30 17   done.
11:45:00 18      A. Okay. I've read it.
11:45:02 19      Q. Would you -- based on your experience,
11:45:06 20   would you generally characterize that paragraph as
11:45:09 21   a catchall provision?
11:45:11 22          MR. BOOZELL: Calls for a legal conclusion.
11:45:13 23   Calls for expert opinion.
11:45:15 24          THE WITNESS: I don't know what you mean by
11:45:17 25   "catchall provision." It -- it -- it says what it
```

25 (Pages 97 to 100)

## Page 133

```
01:17:50  1       MR. BOOZELL: Vague and ambiguous. Misstates
01:17:52  2  his testimony.
01:17:54  3       THE WITNESS: Yes. Basically that Roche took
01:17:58  4  subject to whatever Roche -- Kodak's rights were or
01:18:02  5  might be determined to be.
01:18:02  6  BY MR. RODRIGUEZ:
01:18:04  7    Q. You mentioned previously that there was an
01:18:07  8  issue relating to multifaceted consulting
01:18:11  9  agreements and how they would be dealt with.
01:18:12 10       Was that issue specifically discussed with
01:18:16 11  Roche?
01:18:18 12    A. Not at this level, at this 12/4 meeting.
01:18:22 13    Q. In general, was it discussed with Roche?
01:18:24 14    A. It was discussed, as I mentioned, in the
01:18:27 15  course of the negotiation and working on the rep
01:18:32 16  presentations and what the schedules contained and
01:18:34 17  what the agreement said about the schedules and the
01:18:38 18  recognition that we had agreements that flowed rights
01:18:43 19  to Cetus that related to PCR and that didn't relate to
01:18:47 20  PCR and that related to both applications -- that is,
01:18:52 21  therapeutic applications and practicing PCR -- that
01:18:56 22  those would be dealt with through some sort of a
01:18:59 23  license, two-way license, as I recall, that we got --
01:19:03 24  in case we transferred too much to them, we got a
01:19:06 25  license back, and in case we didn't transfer enough to
```

## Page 134

```
01:19:10  1  them, they got a license to whatever we retained.
01:19:16  2       Now, that's my recollection. I suppose we
01:19:19  3  could go through the agreement and see where that
01:19:21  4  might pop up, but --
01:19:25  5    Q. Well, let's finish up with the handwritten
01:19:27  6  notes, and then we'll to get that box.
01:19:27  7       (Discussion off the record.)
01:19:27  8       (Deposition Exhibit 632 marked by the
01:19:27  9       court reporter.)
01:19:27 10  BY MR. RODRIGUEZ:
01:19:47 11    Q. The reporter has handed you what has been
01:19:49 12  marked as Exhibit 632. This is a document having a
01:19:52 13  number of handwritten notes, bearing Bates
01:19:54 14  Nos. RMS 78280 through 78298.
01:20:00 15       Would you please take a look at
01:20:03 16  Exhibit 632 and tell me if you recognize it.
01:20:09 17       MR. BOOZELL: Go ahead and look at the whole
01:20:12 18  thing. It seems to change partway through, the
01:20:16 19  formats.
01:21:39 20       THE WITNESS: Okay.
01:21:39 21  BY MR. RODRIGUEZ:
01:21:43 22    Q. Do you recognize Exhibit 632?
01:21:46 23    A. No.
01:21:46 24    Q. Do you recognize the content of it at all?
01:21:49 25    A. Yeah.
```

## Page 135

```
01:21:50  1    Q. What do you recognize about the content?
01:21:53  2    A. Looks like it's Hollings Renton's analysis of
01:21:58  3  various financial outcomes of various assumed
01:22:05  4  diagnostics, commercialization scenarios.
01:22:10  5    Q. Why was the analysis prepared?
01:22:12  6       MR. BOOZELL: Calls for speculation. Lacks
01:22:14  7  foundation.
01:22:15  8       THE WITNESS: I have no idea.
01:22:15  9  BY MR. RODRIGUEZ:
01:22:16 10    Q. Do you know if it was prepared in
01:22:18 11  connection with the asset purchase agreement?
01:22:19 12       MR. BOOZELL: Same objections.
01:22:21 13       THE WITNESS: I -- I do not know that. I
01:22:23 14  seriously doubt that it was.
01:22:23 15  BY MR. RODRIGUEZ:
01:22:27 16    Q. Do you have any sense of when this was
01:22:29 17  prepared?
01:22:31 18       MR. BOOZELL: Same objections.
01:22:34 19       THE WITNESS: I have a sense from one page,
01:22:35 20  which at the very top says 4/6/89. It's the -- oh,
01:22:43 21  it's 78284, RMS.
01:22:43 22  BY MR. RODRIGUEZ:
01:22:51 23    Q. If I could direct your attention to
01:22:54 24  RMS 78293.
01:23:08 25       Do you see there where it refers to
```

## Page 136

```
01:23:09  1  various different applications under retrovirus,
01:23:13  2  namely blood screening, therapy monitoring, and
01:23:15  3  diagnosis?
01:23:16  4    A. Mm-hmm.
01:23:17  5    Q. Do you recall discussion of the
01:23:18  6  application of PCR with respect to those three
01:23:21  7  applications?
01:23:22  8    A. Sure.
01:23:23  9    Q. Do you recall generally whether the
01:23:27 10  relative value that's associated with those
01:23:31 11  applications that's on RMS 78293 reflects the
01:23:38 12  general conception of the value for those
01:23:42 13  applications within Cetus?
01:23:44 14       MR. BOOZELL: Vague and ambiguous. Lacks
01:23:46 15  foundation. Calls for speculation.
01:23:50 16       THE WITNESS: These are what they say they
01:23:52 17  are. They're estimates of markets, annual markets for
01:23:56 18  these specific applications based on these
01:24:01 19  assumptions.
01:24:01 20  BY MR. RODRIGUEZ:
01:24:01 21    Q. Are these estimates consistent with your
01:24:03 22  recollection of what folks at Cetus believed the
01:24:06 23  market for these applications to be?
01:24:08 24       MR. BOOZELL: Same objections.
01:24:09 25       THE WITNESS: They seem to be in the range.
```

```
01:24:11  1   They actually seem a little low to me, but they're in
01:24:14  2   the range.
01:24:14  3       BY MR. RODRIGUEZ:
01:24:15  4       Q. What about in a relative sense? In a
01:24:17  5   relative sense, was blood screening typically
01:24:20  6   viewed as far and away the most potentially
01:24:23  7   profitable application for PCR in connection with
01:24:25  8   HIV?
01:24:26  9       MR. BOOZELL: Same objection.
01:24:27 10   Mischaracterizes the document and the evidence.
01:24:31 11       THE WITNESS: Of course. Initially, that was
01:24:34 12   the expectation based on the assumption that there are
01:24:37 13   many more tests done in blood screening than there are
01:24:47 14   in -- would be done in therapy monitoring. So, for
01:24:56 15   example, on this very page, there's 29 million tests
01:24:59 16   for blood screening and 1 million tests for therapy.
01:24:59 17       BY MR. RODRIGUEZ:
01:25:04 18       Q. During the course of your time at Cetus,
01:25:09 19   was there ever a moment when the relative amount of
01:25:15 20   value that was projected for therapy monitoring
01:25:21 21   changed substantially relative to blood screening?
01:25:24 22       MR. BOOZELL: Vague and ambiguous. Calls for
01:25:26 23   speculation. Lacks foundation.
01:25:30 24       THE WITNESS: Over time the perceived market
01:25:33 25   for therapeutic monitoring has increased steadily,
                                                        Page 137

01:25:38  1   and, therefore, as a percentage compared to blood
01:25:44  2   screening would also increase.
01:25:44  3       BY MR. RODRIGUEZ:
01:25:47  4       Q. I'm just talking about while you were at
01:25:50  5   Cetus.
01:25:51  6       A. While I was at Cetus, it was the prevailing
01:25:54  7   view that blood screening would always be a larger
01:25:59  8   market in dollar size than monitoring of therapy --
01:26:07  9       MR. BOOZELL: Same objections --
01:26:08 10       THE WITNESS: -- in the application of AIDS.
01:26:09 11       MR. BOOZELL: Same objection and instruction.
01:26:09 12       BY MR. RODRIGUEZ:
01:26:12 13       Q. A substantial market?
01:26:16 14       A. Yes.
01:26:16 15       MR. BOOZELL: Vague and ambiguous.
01:26:17 16       THE WITNESS: Yes. Based on the assumptions
01:26:21 17   that were made about what one could imagine in terms
01:26:26 18   of the number of tests performed annually and the
01:26:31 19   price one could charge for those tests.
01:26:31 20       (Deposition Exhibit 633 marked by the
01:26:31 21        court reporter.)
01:26:31 22       BY MR. RODRIGUEZ:
01:26:55 23       Q. The reporter has handed you what has been
01:26:56 24   marked as Exhibit 633. This is a series of
01:27:00 25   handwritten notes having Bates No. RMS 78299
                                                        Page 138

01:27:05  1   through 78301.
01:27:07  2       Would you please take a look at
01:27:09  3   Exhibit 633 and tell me if you recognize it.
01:27:13  4       A. No.
01:27:14  5       Q. Do you recognize anything about the
01:27:17  6   content of Exhibit 633?
01:27:29  7       A. Seems to be a slightly more refined analysis
01:27:33  8   of the type that we were just looking at.
01:27:37  9       Q. Why do you characterize it as more
01:27:39 10   refined?
01:27:40 11       A. Well, I see the recognition that you'd
01:27:43 12   probably combine in the blood screening several
01:27:46 13   different viruses, at least grouped according to
01:27:52 14   retrovirus versus hepatitis. So it seems to be a bit
01:27:59 15   more sophisticated in the concept of how the products
01:28:02 16   would be positioned. And it also seems to be a bit
01:28:08 17   more comprehensive in terms of the targets.
01:28:13 18       Q. Any sense of the approximate time frame
01:28:19 19   for what is shown in Exhibit 633?
01:28:21 20       MR. BOOZELL: Calls for speculation.
01:28:23 21       THE WITNESS: You mean when these assumptions
01:28:25 22   or analyses were done?
01:28:25 23       BY MR. RODRIGUEZ:
01:28:28 24       Q. Sure.
01:28:28 25       A. I don't know, no.
                                                        Page 139

01:28:30  1       Oh, wait. It is likely -- well, there are
01:28:35  2   two reasons why I speculate this was done fairly early
01:28:43  3   in -- let's call it the mid '80s. In particular, I
01:28:52  4   note that on page 2, which is RMS 78300, that the
01:29:02  5   heading is "Assumptions for DNA Probe Analysis" and
01:29:06  6   that Cetus was doing DNA probes in connection with
01:29:13  7   Kodak and prior to the Kodak relationship and stopped
01:29:19  8   working on DNA probes when the Kodak relationship
01:29:24  9   ended and focused its entire diagnostic activities on
01:29:29 10   PCR, and we didn't do any DNA probe work.
01:29:33 11       So I don't think we would have been doing
01:29:36 12   analysis of markets for DNA probes after we stopped
01:29:41 13   working with Kodak.
01:29:43 14       Q. So it is likely that Exhibit 633 was
01:29:46 15   prepared well prior to Exhibit 632?
01:29:54 16       A. Well, no. Only because -- that was my
01:29:57 17   speculation. I mean, what this Exhibit 632 appears to
01:30:03 18   be is comparing what would happen if the Gen-Probe
01:30:11 19   technology, which was not our technology but a company
01:30:15 20   named Gen-Probe, which did DNA probes, was added to
01:30:20 21   the PCR business versus Kodak did it. So this looks
01:30:25 22   to me like it was some sort of analysis of whether the
01:30:31 23   Roche/Cetus diagnostics collaboration should get
01:30:37 24   involved in gene probes or not.
01:30:41 25       MR. RODRIGUEZ: Why don't we take a short
                                                        Page 140
```

```
02:30:15  1         MR. BOOZELL: Okay.
02:30:17  2         MR. RODRIGUEZ: I have no further questions
02:30:18  3     at this time.
02:30:20  4         Thank you for your time.
02:30:22  5         THE WITNESS: Okay.
02:30:23  6         MR. BOOZELL: Given the documents that have
02:30:25  7     been entered into the deposition and the testimony
02:30:28  8     given by Mr. Ostrach, Roche would like to designate
02:30:32  9     the transcript as highly restricted, attorneys' eyes
02:30:35 10     only, and would also like to request -- Mr. Ostrach
02:30:37 11     would like to request that he be given the opportunity
02:30:40 12     to review and sign and correct his transcript if that
02:30:43 13     be necessary prior to it becoming final.
02:30:47 14         VIDEO OPERATOR: This concludes today's
02:30:52 15     deposition of Michael Ostrach. The number of media
02:30:55 16     used was three. We're going off the record at
02:30:59 17     2:31 p.m.
         18     //
         19     //
         20
         21
         22
         23
         24
         25
                                                      Page 169
```

```
 1
 2
 3
 4
 5
 6
 7         I, MICHAEL S. OSTRACH, do hereby declare
 8     under penalty of perjury that I have read the
 9     foregoing transcript of my deposition; that I have
10     made such corrections as noted herein, in ink,
11     initialed by me, or attached hereto; that my testimony
12     as contained herein, as corrected, is true and
13     correct.
14         EXECUTED this _____ day of _____,
15     200___, at _____, _____.
                (City)           (State)
16
17         _____
                MICHAEL S. OSTRACH
18
19
20
21
22
23
24
25
                                              Page 170
```

```
 1    STATE OF CALIFORNIA )
                          :ss
 2    COUNTY OF SAN MATEO )
 3         I, the undersigned, a Certified Shorthand
 4    Reporter of the State of California, do hereby
 5    certify:
 6         That the foregoing proceedings were taken
 7    before me at the time and place herein set forth; that
 8    any witnesses in the foregoing proceedings, prior to
 9    testifying, were placed under oath; that a verbatim
10    record of the proceedings was made by me using machine
11    shorthand which was thereafter transcribed under my
12    direction; further, that the foregoing is an accurate
13    transcription thereof.
14         I further certify that I am neither
15    financially interested in the action nor a relative
16    or employee of any attorney of any of the parties.
17         IN WITNESS WHEREOF, I have this date
18    subscribed my name.
19
20
21    Dated: _____
22
23
             _____
24           SUZANNE F. BOSCHETTI
             CSR No. 5111
25
                                        Page 171
```

43 (Pages 169 to 171)