A005D3C
SUNNY DeWITT - July 13, 2006

```
 1        IN THE UNITED STATES DISTRICT COURT
 2          NORTHERN DISTRICT OF CALIFORNIA
 3
 4   THE BOARD OF TRUSTEES OF THE   )
     LELAND STANFORD JUNIOR         )
 5   UNIVERSITY,                    )
                                    )
 6            Plaintiff,            )
                                    )
 7      vs.                         ) No. C-05-14158 MHP
                                    )
 8   ROCHE MOLECULAR SYSTEMS, INC.; )
     ROCHE DIAGNOSTICS CORPORATION; )
 9   ROCHE DIAGNOSTICS OPERATIONS,  )
     INC.; ROCHE DIAGNOSTIC SYSTEMS,)
10   INC.,                          )
                                    )
11            Defendants.           )
     _____)
12                                  )
     AND RELATED CROSS-ACTIONS.     )
13   _____)
14
15         VIDEOTAPED DEPOSITION OF
16              SUSANNE DEWITT
17         SAN FRANCISCO, CALIFORNIA
18              July 13, 2006
19
20
     ATKINSON-BAKER, INC.
21   COURT REPORTERS
     180 Montgomery Street, Suite 800
22   San Francisco, California 94104-4266
     1-800-288-3376
23
24   REPORTED BY: RICHARD M. RAKER, CSR NO. 3445
25   FILE NO.: A005D3C
```

Page 1

Atkinson-Baker, Inc., Court Reporters    800-288-3376

A005D3C
SUNNY DeWITT - July 13, 2006

**Page 2**

```
 1       IN THE UNITED STATES DISTRICT COURT
 2          NORTHERN DISTRICT OF CALIFORNIA
 3
 4   THE BOARD OF TRUSTEES OF THE  )
     LELAND STANFORD JUNIOR        )
 5   UNIVERSITY,                   )
                                   )
 6          Plaintiff,             )
                                   )
 7   vs.            ) No. C-05-14158 MHP
                                   )
 8   ROCHE MOLECULAR SYSTEMS, INC.;)
     ROCHE DIAGNOSTICS CORPORATION;)
 9   ROCHE DIAGNOSTICS OPERATIONS, )
     INC.; ROCHE DIAGNOSTIC SYSTEMS,)
10   INC.,                         )
                                   )
11          Defendants.            )
                                   )
12                                 )
     AND RELATED CROSS-ACTIONS.    )
13                                 )
14
15
16      Deposition of SUSANNE DEWITT, taken on
17   behalf of Plaintiff, at 555 Twin Dolphin Drive,
18   Redwood Shores, California, commencing at
19   9:12 a.m., July 13, 2006, before Richard M. Raker,
20   CSR No. 3445.
21
22
23
24
25
```

**Page 3**

```
 1            APPEARANCES
 2
 3   FOR THE PLAINTIFF:
 4      COOLEY GODWARD LLP
        BY: MICHELLE S. RHYU, Ph.D., ESQ.
 5      Five Palo Alto Square
        3000 El Camino Real
 6      Palo Alto, California 94306
        (650) 843-5505
 7
     FOR THE DEPONENT:
 8
        QUINN EMANUEL URQUHART OLIVER & HEDGES
 9      BY: JEFFREY N. BOOZELL, ESQ.
        865 S. Figueroa Street
10      10th Floor
        Los Angeles, California 90017
11      (213) 624-7707
12   ALSO PRESENT: PETER MATTESON, VIDEOGRAPHER
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1              I N D E X
 2   WITNESS:    SUSANNE DEWITT
 3   EXAMINATION                PAGE
 4   BY MS. RHYU                 6
 5
 6
 7   EXHIBITS:
 8        PLAINTIFF'S
 9   NUMBER     DESCRIPTION          PAGE
10   500- Subpoena (retained by counsel)   59
11   501- Document dated 6-6-06            70
12        (retained by counsel)
13   502-A- Notebook                       113
14   502-B- Notebook                       113
15   503-A- Notebook 3221                  114
16   503-B- Document Bates stamped CH 271  114
17   504-A- Document Bates stamped CH 212  116
18   504-B- Document Bates stamped RMS 5473 116
19   505-A- Document Bates stamped RMS 5430 117
20   505-B- Document Bates stamped CH 165  117
21   506- Document Bates stamped RMS 5427  118
22   507- Document Bates stamped RMS 5419  118
23
24
25
```

**Page 5**

```
 1              MORNING SESSION
 2
 3        THE VIDEO OPERATOR:  I'm Peter
 4   Matteson, your videographer, and I represent
 5   Atkinson-Baker, Inc., in Glendale, California. I'm
 6   a notary public.  I'm not financially interested in
 7   this action, nor am I a relative or employee of any
 8   attorney or any of the parties.
 9        The date is January [sic] 13, 2006,
10   and the time is 9:13 a.m.  This deposition is
11   taking place at 555 Twin Dolphin Drive, Suite 560,
12   Redwood Shores, California.
13        This is Case No. C-05-04158 MHP,
14   entitled "The Board of Trustees of the Leland
15   Stanford Junior University vs. Roche Molecular
16   Systems, Inc., et al."
17        The deponent is Susanne DeWitt.  This
18   deposition is being taken on behalf of the
19   plaintiff.  Your court reporter is Richard Raker
20   from Atkinson-Baker.
21        Counsel will now please introduce
22   themselves.
23        MS. RHYU:  Michelle Rhyu of Cooley
24   Godward on behalf of Stanford University.
25        MR. BOOZELL:  Jeff Boozell, from Quinn
```

Atkinson-Baker, Inc., Court Reporters          800-288-3376

A005D3C
SUNNY DeWITT - July 13, 2006

Page 22

1  using peroxidases of which I obtained from marine
2  organisms, hail peroxidases.
3      Q.  And after that?
4      A.  I joined the diagnostics group, cancer
5  diagnostics.
6      Q.  And what's approximately the time
7  frame that you joined the cancer diagnostics group?
8          MR. BOOZELL: Objection; vague and
9  ambiguous.
10         THE WITNESS: I think it was around
11 1981, but I cannot be precise. I don't recall.
12 BY MS. RHYU:
13     Q.  How long were you a part of the cancer
14 diagnostics group?
15     A.  At least three years, possibly four.
16     Q.  Can you recall projects that you
17 worked on while you were a part of the cancer
18 diagnostics group?
19     A.  I was working on a project which
20 simultaneously detected PSA -- that's
21 prostate-specific antibody -- I mean antigen --
22 excuse me -- prostate-specific antigen and
23 prostatic acid phosphatase.
24     Q.  And what methods were you using to
25 detect these two compounds?

Page 23

1      A.  We were using ELISA methods.
2      Q.  And that was in the 1981 to 1985 time
3  frame?
4      A.  I can't be precise about the dates.
5      Q.  But it was at least before 1985?
6      A.  Yes, I believe so.
7      Q.  Would you say that by 1985 ELISA
8  methods were well known to people practicing in
9  molecular biology?
10         MR. BOOZELL: Objection; vague,
11 ambiguous, may call for speculation, lacks
12 foundation, and you've established no personal
13 knowledge.
14         You can answer the question about
15 whether or not it's generally known in the
16 community. You can answer, but otherwise --
17         MS. RHYU: Can you just read back the
18 question after that long objection.
19         (The record was read back as follows:
20         "Q.  Would you say that by 1985 ELISA
21         methods were well known to people
22         practicing in molecular biology?")
23         THE WITNESS: I don't know about well
24 known. They were in the literature.
25 BY MS. RHYU:

Page 24

1      Q.  And after the cancer diagnostics
2  group, did you change groups again?
3      A.  Yes, I did.
4      Q.  And where did you go?
5      A.  I went to the clinical biology
6  division at Cetus.
7      Q.  And can you give me a general estimate
8  of the time frame that you did that?
9      A.  It was in the second half of the '80s.
10     Q.  And who did you work with in the
11 clinical biology division?
12         MR. BOOZELL: Objection; vague.
13 BY MS. RHYU:
14     Q.  Who was your supervisor?
15     A.  Dr. Michael Konrad.
16     Q.  Did you have any other supervisors?
17         MR. BOOZELL: Objection; vague. In
18 that department during this time?
19         MS. RHYU: Yes.
20         THE WITNESS: Not directly.
21 Indirectly Dr. Edward Bradley and Dr. Eric Groves
22 and Dr. Carolyn Paradise.
23 BY MS. RHYU:
24     Q.  And what's your distinction between
25 directly and indirectly?

Page 25

1      A.  Well, Mike Konrad reported to Ed
2  Bradley, but because of the high level of my
3  independent work there, I could also report
4  directly to -- that is, I could report to
5  Dr. Konrad who would report to Dr. Bradley, or
6  directly to Dr. Bradley and Dr. Groves.
7      Q.  So Dr. Groves was a supervisor of
8  Dr. Konrad also?
9      A.  I don't know what their relationship
10 was.
11     Q.  Did you understand --
12     A.  They were colleagues.
13     Q.  Did you understand them to have
14 equivalent positions?
15         MR. BOOZELL: Objection. May call for
16 speculation.
17         THE WITNESS: Yes. I think that
18 Dr. Bradley was a -- was the director of the
19 clinical biology group.
20 BY MS. RHYU:
21     Q.  And how about Eric Groves? What was
22 Eric Groves' --
23     A.  He wasn't the director, but I don't
24 remember exactly what his title was.
25     Q.  So you said that you started working

7 (Pages 22 to 25)

Atkinson-Baker, Inc., Court Reporters                    800-288-3376

A005D3C
SUNNY DeWITT - July 13, 2006

### Page 134

1  outside company to make a biotinylated probe from
2  that known sequence?
3      MR. BOOZELL: Objection; vague and
4  ambiguous, calls for speculation, and asked and
5  answered.
6      THE WITNESS: It's possible that the
7  probe was sent out and it was biotinylated outside.
8  BY MS. RHYU:
9    Q. Are you --
10   A. But the probe itself was made
11 in-house.
12   Q. And what makes you say that?
13   A. Because it has an SK38 number.
14   Q. But if you knew the sequence of that
15 probe --
16   A. Yes.
17   Q. -- would it be possible for you to ask
18 an outside company to synthesize that probe and
19 link it to biotin?
20     MR. BOOZELL: Vague and ambiguous and
21 asked and answered.
22     THE WITNESS: They would give it their
23 own catalog number. If we had a known sequence and
24 had the probe, why would we even bother to ask an
25 outside company to make that same probe for us?

### Page 135

1  BY MS. RHYU:
2    Q. Oh, okay. I understand.
3    A. But if we did for some reason, which
4  is unlikely, they wouldn't call it SK, whatever it
5  is, 38. They would call it -- if it's Abbott Labs,
6  they would call it Abbott something or another.
7    Q. If I didn't work at Cetus and I wanted
8  to make SK38 that was biotinylated and I knew the
9  sequence of SK38 that was biotinylated, in August
10 of 1989 I could go to an outside company and ask
11 them to make an oligonucleotide having the sequence
12 of SK38 with a biotin label on it.
13     MR. BOOZELL: Objection.
14 BY MS. RHYU:
15   Q. Do you agree with that statement?
16     MR. BOOZELL: Objection; vague and
17 ambiguous and calls for speculation, lacks
18 foundation. No personal knowledge.
19     THE WITNESS: Unless the probe
20 sequence was published, no one else would have it.
21 BY MS. RHYU:
22   Q. But if it was published.
23     MR. BOOZELL: Same objections.
24 BY MS. RHYU:
25   Q. If it was published, then I could have

### Page 136

1  gone to a commercial source to obtain a
2  biotin-labeled SK38 oligonucleotide.
3    A. I don't know.
4      MR. BOOZELL: Same objections.
5  BY MS. RHYU:
6    Q. And why don't you know? What is the
7  missing information there?
8    A. I simply don't know if any company
9  made biotinylated probes using Cetus sequence --
10 sequencing. I don't know. I mean it's possible,
11 but extraordinarily.
12   Q. But if you had the probe in-house,
13 you're saying you could send that probe out and
14 have it biotinylated.
15   A. Well, that's what I'm suggesting. But
16 this was only a speculation there. I didn't say
17 that it came from outside. I just asked myself a
18 question, was this in-house or not, this
19 biotinylated probe. I didn't say that it was from
20 outside. I just didn't know at the time.
21   Q. I'm just asking if your understanding
22 was that it was possible to have obtained the
23 biotin-labeled primer from a commercial prep --
24   A. I don't know the answer.
25   Q. -- since you raised the question here.

### Page 137

1    A. I simply don't know.
2    Q. Do you know what -- I'm sorry. Please
3  finish.
4    A. It says up there -- I don't know why
5  the asterisk, but it says, "Prepared in-house by
6  Corey Levinson?"
7    Q. But you agree that's a question mark
8  outside --
9    A. I wrote a question mark. Yes.
10   Q. -- of that?
11     Do you see sort of on the -- on the
12 left side written sideways where it says, ^ "Three
13 AIDS-specific probes with five-prime HRP conjugated
14 were prepared." Do you see that?
15   A. Yes.
16   Q. What's your understanding of what a
17 five-prime HRP conjugated is?
18   A. Well, the probes have two ends, you
19 know, the three-prime end and the five-prime end.
20 So this one was labeled on the five-prime end.
21   Q. And it was labeled with HRP?
22   A. Yes.
23   Q. And do you know what HRP is?
24   A. Horseradish peroxidase.
25   Q. In August of 1989, was it possible to

35 (Pages 134 to 137)

A005D3C
SUNNY DeWITT - July 13, 2006

**Page 138**

1  go to an outside company to obtain an HPR
2  conjugated to a probe?
3      MR. BOOZELL: Objection; calls for
4  speculation, lacks foundation.
5      THE WITNESS: If we sent them a probe,
6  I suppose they could label it. But I have no
7  reason to think that -- I mean, it is speculation.
8  I have no reason to think that they would send out
9  a probe to be conjugated to HRP when we could do it
10 in-house. It's not that hard to do.
11 BY MS. RHYU:
12     Q.  It's not hard to conjugate HRP with a
13 probe?
14     MR. BOOZELL: Objection; misstates her
15 testimony.
16 BY MS. RHYU:
17     Q.  I'm just asking.
18     A.  I really no longer recall how hard it
19 was, but I think there are protocols to that.
20     Q.  And when you say "it's not that hard
21 to do," what were you referring to?
22     A.  I have conjugated enzymes to probes.
23     Q.  And that was in the late 1980s time
24 frame?
25     A.  Yes.

**Page 139**

1      Q.  Was it before 1988?
2      A.  This particular probe?
3      Q.  No, your conjugation of enzymes to
4  probes.
5      A.  Oh, this is a method that was used
6  commonly.
7      Q.  Commonly?
8      A.  Commonly.
9      Q.  And publicly known.
10     MR. BOOZELL: Objection; calls for
11 speculation.
12     THE WITNESS: In-house it was known.
13 We were the first biotech company.
14 BY MS. RHYU:
15     Q.  I understand that.
16     Did you interact with scientists
17 outside of Cetus?
18     A.  Occasionally.
19     Q.  Is it your understanding that
20 scientists outside of Cetus also understood how to
21 conjugate HRP to probes by the late 1980s?
22     MR. BOOZELL: Objection; calls for
23 speculation, lacks foundation.
24     THE WITNESS: It's possible.
25 BY MS. RHYU:

**Page 140**

1      Q.  Is it likely based on your
2  interactions with scientists at that time?
3      MR. BOOZELL: Same objections.
4      THE WITNESS: I have no opinion on
5  that. It depends on the motivation.
6  BY MS. RHYU:
7      Q.  What do you mean it depends on their
8  motivation?
9      A.  If somebody wanted to do it, I suppose
10 they could have, but --
11     Q.  Had you ever heard of a company called
12 Operon Technologies in San Pablo?
13     MR. BOOZELL: Objection; vague as to
14 time.
15     THE WITNESS: No.
16 BY MS. RHYU:
17     Q.  You've never been aware of a company
18 called Operon Technologies in San Pablo?
19     MR. BOOZELL: Asked and answered.
20     THE WITNESS: All these companies
21 sound alike.
22 BY MS. RHYU:
23     Q.  On the very next page, can you
24 describe to me what's on that page, CH 337?
25     A.  Are you talking about page 172?

**Page 141**

1      Q.  Yes. Corresponding to CH 337.
2  Thanks.
3      A.  All right. Yes.
4      Q.  What is on this page?
5      MR. BOOZELL: Objection; document
6  speaks for itself. Vague and ambiguous.
7      THE WITNESS: This is a commercial
8  plate -- 96-well plate -- which evidently has a
9  coating, and it has a membrane at the bottom of the
10 well. So most probably -- in other words, it's a
11 filter. So beads would not go through it. So you
12 can wash a plate and it would retain the beads.
13 BY MS. RHYU:
14     Q.  And those would be avidin biotin -- or
15 avidin-coated beads. So one could use this plate
16 if one were using an assay involving avidin-coated
17 beads?
18     A.  You could presumably use it depending
19 on the diameter of the bead, because it gives a
20 pore diameter, I believe.
21     Q.  Is this the kind of plate that was
22 used for nonisotopic detection of PCR products in
23 the late 1980s at Cetus?
24     A.  It was one of the many that we tested.
25     Q.  This plate was available commercially?

36 (Pages 138 to 141)

A005D3C
SUNNY DeWITT - July 13, 2006

**Page 150**

1  ahead. So is that everything that was in this
2  solution, the master mix?
3       MR. BOOZELL: I'm going to object;
4  vague and ambiguous.
5  BY MS. RHYU:
6       Q. I see that just under protocols for
7  nonisotopic PCR there is a -- in caps it says
8  "master mix," underlined?
9       A. Yes.
10      Q. Does that mean that the solution
11  listed under that is the master mix?
12      A. Yes, I believe so.
13      Q. And then placental DNA --
14      A. Yes.
15      Q. -- was that publicly available in
16  January of '89?
17      A. Yes.
18      Q. And we'll skip the thermocycler
19  program for now, but below that it says
20  "bead-blocking solution," and it lists 50X
21  Denhardt's. Do you know if that was publicly
22  available in January --
23      A. Yes.
24      Q. -- of '89?
25      A. Yes.

**Page 151**

1       Q. It was?
2       A. Yes.
3       Q. And 5 percent gelatin. Was that
4  publicly available?
5       A. Yes. Well, gelatin was. You can make
6  it up to any percent you want.
7       Q. How about sheared herring sperm DNA?
8  Was that publicly available --
9       A. Yes.
10      Q. -- as of January 1, 1989?
11      A. Yes.
12      Q. And what's that DI H20?
13          (Interruption)
14      THE WITNESS: Oh, maybe it's
15  deionized. Excuse me. Deionized water.
16  BY MS. RHYU:
17      Q. And would you agree that deionized and
18  distilled water were publicly available as of
19  January 1989?
20      A. They're made in-house.
21      Q. And were they also publicly available?
22      A. I'm sure they are, but not to extent
23  of purity. That would be used in a laboratory of
24  this type.
25      Q. Do you know if other laboratories had

**Page 152**

1  access to deionized and distilled water as of
2  January of 1989?
3       A. I don't know.
4       MR. BOOZELL: Objection; calls for
5  speculation.
6  BY MS. RHYU:
7       Q. On the next page, there is a reference
8  to 20X SSPE buffer.
9       A. Um-hmm.
10      Q. Do you know what that is used for?
11      MR. BOOZELL: It's at the top of the
12  page.
13      THE WITNESS: Yeah, I know, but I'm
14  trying to remember what it was used for. I think
15  it was used for the ELISA plates.
16  BY MS. RHYU:
17      Q. And were the ingredients for that
18  buffer also publicly available as of January 1989?
19      A. The dry ingredients would have been.
20      Q. You say everything except for the
21  water would have been available?
22      A. What I mean is you have to make them
23  up. You buy them as dry ingredients, and then you
24  have to dissolve them, weigh them, dissolve them,
25  and use them. Yes, the dry ingredients.

**Page 153**

1       Q. And would one of skill in the art
2  typically know how to make that buffer given the
3  dry ingredients?
4       MR. BOOZELL: Objection; calls for
5  speculation, lacks foundation, calls for expert
6  testimony.
7       THE WITNESS: Any technician would
8  have been able to make them up.
9       MR. BOOZELL: Michelle, whenever it's
10  convenient to you, I personally need a two-minute
11  break --
12      MS. RHYU: Okay.
13      MR. BOOZELL: -- after lunch.
14      MS. RHYU: Sure. Let's have a break
15  now.
16      THE VIDEO OPERATOR: Going off the
17  record at 1:52 p.m.
18      (Break taken.)
19      THE VIDEO OPERATOR: We're back on the
20  record at 1:59 p.m.
21  BY MS. RHYU:
22      Q. You worked at Cetus for about eight
23  years?
24      A. No.
25      Q. I'm sorry. Eighteen years? That's my

39 (Pages 150 to 153)

Atkinson-Baker, Inc., Court Reporters                    800-288-3376

A005D3C
SUNNY DeWITT - July 13, 2006

Page 154

1  math.
2      A.  More like eighteen. Yes.
3      Q.  And then you went to Zoma?
4      A.  Yes.
5      Q.  Did you use PCR techniques at Zoma?
6      A.  No.
7      Q.  Did you use ELISA techniques at Zoma?
8      A.  Yes.
9      Q.  Was it your understanding that
10 anything you invented based on techniques you
11 learned at Cetus was the intellectual property of
12 Cetus?
13         MR. BOOZELL: Objection; calls for a
14 legal conclusion and it's vague and ambiguous.
15 BY MS. RHYU:
16     Q.  Just asking for your understanding.
17         MR. BOOZELL: Same objections.
18         THE WITNESS: Did I understand that
19 what?
20         MS. RHYU: Would you read it back?
21         (The record was read back as follows:
22         "Q. Was it your understanding that
23             anything you invented based on
24             techniques you learned at Cetus was
25             the intellectual property of

Page 155

1             Cetus?")
2         THE WITNESS: Yes.
3  BY MS. RHYU:
4      Q.  Even after you left Cetus?
5      A.  Yes.
6         MR. BOOZELL: Same objections. Sorry.
7  Go ahead.
8  BY MS. RHYU:
9      Q.  So anything you did at Zoma using
10 ELISA techniques, if that led to an invention, you
11 understood that to be the intellectual property of
12 Cetus?
13         MR. BOOZELL: Same objections.
14         THE WITNESS: No.
15 BY MS. RHYU:
16     Q.  Why not?
17     A.  ELISAs are a general technique.
18     Q.  When you say it's "a general
19 technique," what do you mean by that?
20     A.  Everybody uses ELISAs. So if I used
21 ELISAs at Zoma, that certainly wasn't the
22 intellectual property of Cetus.
23     Q.  Even if you learned that while you
24 were an employee at Cetus using Cetus's facilities?
25         MR. BOOZELL: Calls for a legal

Page 156

1  conclusion, assumes facts not in evidence, and it's
2  argumentative.
3  BY MS. RHYU:
4      Q.  Just asking for your understanding.
5      A.  Certainly not. I mean, I don't know
6  if you're asking it in the negative or the
7  positive. If I learned something at Cetus, that I
8  could apply it elsewhere?
9      Q.  Yes.
10     A.  Well, of course.
11     Q.  But the question was, if you learn a
12 technique at Cetus and you applied it elsewhere,
13 was it your understanding that the inventions that
14 came out of applying those techniques while you
15 were not at Cetus -- were those inventions the
16 property of Cetus?
17         MR. BOOZELL: It's vague and
18 ambiguous, assumes facts not in evidence. It's an
19 incomplete hypothetical, and it calls for a legal
20 conclusion.
21         THE WITNESS: I simply don't follow
22 you.
23 BY MS. RHYU:
24     Q.  Which part do you not follow? It's a
25 pretty simple question. I'm just asking, what was

Page 157

1  your understanding as to your obligations to Cetus
2  or Roche after you left Cetus?
3      A.  I had no obligation to them.
4      Q.  So even though you learned techniques
5  at Cetus, even proprietary techniques at Cetus --
6      A.  Oh, proprietary. That's different.
7      Q.  Well, PCR is a proprietary technique
8  to Cetus.
9      A.  But I didn't use PCR at Zoma.
10     Q.  If you had used PCR at Zoma to come up
11 with an invention, do you think that would belong
12 to Cetus?
13         MR. BOOZELL: Vague and ambiguous,
14 calls for a legal conclusion, incomplete
15 hypothetical.
16         THE WITNESS: I can't -- I really -- I
17 don't know.
18 BY MS. RHYU:
19     Q.  Did you have any understanding -- did
20 you have any understanding that if you used PCR
21 after you left Cetus anything that you created
22 belonged to Cetus?
23         MR. BOOZELL: Same objections.
24 BY MS. RHYU:
25     Q.  Was that your understanding is my

40 (Pages 154 to 157)

A005D3C
SUNNY DeWITT - July 13, 2006

Page 158

1  question.
2      A. No.
3      Q. Was it your understanding that you
4  could use techniques that you learned at Cetus and
5  apply them to other projects once you left Cetus?
6         MR. BOOZELL: Vague and ambiguous,
7  incomplete hypothetical, calls for a legal
8  conclusion.
9         THE WITNESS: I can't answer that
10 question.
11 BY MS. RHYU:
12     Q. Why can't you answer it?
13     A. For the reasons that Jeff just
14 articulated.
15     Q. I'm just asking for your
16 understanding. What was your understanding of your
17 obligation to Cetus?
18        MR. BOOZELL: Same objections.
19 BY MS. RHYU:
20     Q. Did you understand that if you used
21 PCR anything you created following from that use
22 would belong to Cetus?
23        MR. BOOZELL: Vague and ambiguous,
24 misstates her testimony and is an incomplete
25 hypothetical, and it calls for a legal conclusion.

Page 159

1  BY MS. RHYU:
2      Q. Was that your understanding?
3      A. I fail to understand the distinction
4  between proprietary techniques and just general
5  increase in knowledge.
6      Q. Okay. I don't want to use broad terms
7  like that. I'm just asking --
8      A. You were the ones who used them.
9      Q. Okay. So let's just use a term that
10 you understand. PCR. And I'm asking you, was it
11 your understanding when you left Cetus that
12 anything you created using PCR if you were to
13 create something would belong to Cetus?
14        MR. BOOZELL: Vague and ambiguous,
15 calls for a legal conclusion, incomplete
16 hypothetical.
17        THE WITNESS: I don't know.
18 BY MS. RHYU:
19     Q. You don't know one way or the other?
20     A. That's true. I don't know one way or
21 another. It would have to be a specific
22 application, I suppose.
23     Q. What do you mean by that, "it would
24 have to be a specific application"?
25     A. In science a technique is simply a

Page 160

1  technique.
2      Q. So you should be free to use that
3  technique once you leave the company?
4         MR. BOOZELL: Objection; misstates her
5  testimony. Again, calls for a legal conclusion.
6  It's vague and ambiguous, incomplete hypothetical.
7         THE WITNESS: I simply can't answer
8  that question.
9  BY MS. RHYU:
10     Q. I don't mean to be confusing you or
11 tricking you or anything like that, but this case
12 is about obligations that individuals have to Cetus
13 once they leave. And I'm asking you because you
14 worked at Cetus for such a long time and then you
15 left.
16     A. I didn't leave. I was laid off.
17     Q. Right. Right. But then you stopped
18 working at Cetus, and you learned how to use the
19 PCR technique while at Cetus.
20     A. Yes. And I never used it since.
21     Q. And irrespective of that fact, did you
22 have an understanding as to whether -- if you used
23 the PCR technique after you left Cetus, whether
24 anything that flowed from that -- any invention
25 that flowed from that would belong to Cetus?

Page 161

1         MR. BOOZELL: Vague and ambiguous,
2  compound.
3  BY MS. RHYU:
4      Q. I'm just asking for your understanding
5  of that.
6         MR. BOOZELL: Calls for legal
7  conclusions and incomplete hypothetical, and it's
8  asked and answered.
9         THE WITNESS: I'm going to have to ask
10 in a -- answer in a way that -- Cetus commercially
11 produced in conjunction with another company
12 thermocyclers. Most obviously people use them to
13 do PCR. That was the purpose of manufacturing this
14 instrument.
15        MS. RHYU: Right.
16        THE WITNESS: So naturally people
17 would use PCR technology at other companies.
18        MS. RHYU: Right.
19        THE WITNESS: They laid people off.
20 Surely they didn't expect that these people are
21 going to forget everything they ever knew and erase
22 their minds.
23 BY MS. RHYU:
24     Q. So it wouldn't be reasonable for Cetus
25 to expect that its former employees would stop

41 (Pages 158 to 161)

A005D3C
SUNNY DeWITT - July 13, 2006

Page 170

1  Patent 6,503,705. Have you ever seen this patent
2  before?
3       MR. BOOZELL: Do I get one, Counsel?
4       MS. RHYU: Sorry.
5       MR. BOOZELL: Thank you.
6       THE WITNESS: I've not seen this
7  patent before.
8       MS. RHYU: Thank you very much. Thank
9  you for your time today. I really appreciate it.
10 I do ask you and your counsel that we be able to
11 see the documents that you have that are responsive
12 to the subpoenas that I showed you before.
13      MR. BOOZELL: Like I say, we will look
14 to see if she has any documents that are responsive
15 to those subpoenas, and if there are, then we will
16 produce them.
17      MS. RHYU: Then I have no further
18 questions at this time.
19      MR. BOOZELL: And for the record,
20 given that we've gone through a number of lab
21 notebooks of Ms. DeWitt's/Roche entities, we will
22 designate the transcript of this deposition, and in
23 particular the portions of the transcript which
24 discuss Ms. DeWitt's work at Cetus and the lab
25 notebooks and the lab notebooks themselves, as

Page 171

1  highly confidential, attorneys' eyes only, under
2  paragraphs 4 and 9 of the protective order.
3       And Ms. DeWitt would like time to
4  review her transcript before it's finalized and
5  signed.
6       MS. RHYU: So do you want to
7  provisionally make the entire transcript highly
8  confidential and then identify specific portions
9  later if you want to retain that designation?
10      MR. BOOZELL: Yes.
11      MS. RHYU: Sounds good. Thank you
12 very much.
13      THE VIDEO OPERATOR: This is the end
14 of Tape No. 2 and the end of this deposition of
15 Susanne DeWitt on July 13, 2006. We are off the
16 record at 2:31 p.m. Thank you.
17      THE REPORTER: Counsel, do you want a
18 copy and a rough disk?
19      MR. BOOZELL: Yes.
20      MS. RHYU: Yes.
21      (Deposition concluded at 2:32 p.m.)
22
23
24
25

Page 172

1  STATE OF CALIFORNIA   )
2                        ) ss.
3  COUNTY OF SAN FRANCISCO )
4
5
6
7       I, the undersigned, declare under penalty of
8  perjury that I have read the foregoing transcript,
9  and I have made any corrections, additions, or
10 deletions that I was desirous of making; that the
11 foregoing is a true and correct transcript of my
12 testimony contained therein.
13      EXECUTED this _____ day of _____,
14 2006, at _____, _____.
15      (City)      (State)
16
17
18
19
20
21      _____
22      SUSANNE DEWITT
23
24
25

Page 173

1       REPORTER'S CERTIFICATE
2
3       I, RICHARD M. RAKER, CSR #3445, Certified
4  Shorthand Reporter, certify:
5       That the foregoing proceedings were taken
6  before me at the time and place therein set forth,
7  at which time the witness was put under oath by me;
8       That the testimony of the witness and all
9  objections made at the time of the examination were
10 recorded stenographically by me and were thereafter
11 transcribed;
12      That the foregoing is a true and correct
13 transcript of my shorthand notes so taken.
14      I further certify that I am not a relative
15 or employee of any attorney or of any of the
16 parties, nor financially interested in the action.
17      I declare under penalty of perjury under the
18 laws of the State of California that the foregoing
19 is true and correct.
20      Dated this 20th day of July, 2006.
21
22
23      _____
       RICHARD M. RAKER, C.S.R. No. 3445
24
25

44 (Pages 170 to 173)

Atkinson-Baker, Inc., Court Reporters                       800-288-3376