Board of Trustees of the Leland Stanford Junior University v. Roche Molecular Systems, Inc. et al    Doc. 113 Att. 24
Case 3:05-cv-04158-MHP    Document 113-25    Filed 11/15/2006    Page 1 of 13

CONFIDENTIAL ATTORNEYS EYES ONLY - RESTRICTED

---

**Page 1**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

THE BOARD OF THE TRUSTEES OF
THE LELAND STANFORD JUNIOR UNIVERSITY,

    Plaintiff,

vs.    No. C-05-04158 MHP

ROCHE MOLECULAR SYSTEMS, INC.;
ROCHE DIAGNOSTICS CORPORATION;
ROCHE DIAGNOSTICS OPERATIONS,
INC.; ROCHE DIAGNOSTIC SYSTEMS,
INC.,

    Defendant.

AND RELATED COUNTERCLAIM.

CONFIDENTIAL - ATTORNEYS' EYES ONLY - RESTRICTED
VIDEOTAPED DEPOSITION OF ALICE WANG, Ph.D.
Redwood Shores, California
Tuesday, August 8 2006

Reported by:
SUZANNE F. BOSCHETTI
CSR No. 5111
Job No. 3-50828

---

**Page 2**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

THE BOARD OF THE TRUSTEES OF
THE LELAND STANFORD JUNIOR
UNIVERSITY,

    Plaintiff,

vs.    No. C-05-04158 MHP

ROCHE MOLECULAR SYSTEMS, INC.;
ROCHE DIAGNOSTICS CORPORATION;
ROCHE DIAGNOSTICS OPERATIONS,
INC.; ROCHE DIAGNOSTIC SYSTEMS,
INC.,

    Defendant.

AND RELATED COUNTERCLAIM.

Confidential videotaped deposition of ALICE WANG, Ph.D., taken on behalf of Plaintiff and Counterclaim Defendants The Board of the Trustees of the Leland Stanford Junior University, at 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California, beginning at 10:02 a.m. and ending at 2:07 p.m. on Tuesday, August 8, 2006, before SUZANNE F. BOSCHETTI, Certified Shorthand Reporter No. 5111.

---

**Page 3**

1  APPEARANCES:
2
3  For Plaintiff and Counterclaim Defendants The Board of
   the Trustees of the Leland Stanford Junior University,
4  et al.:
5    COOLEY GODWARD LLP
     BY: MAGDALENA STROJWAS WILKINSON
6    Attorney at Law
     Five Palo Alto Square, 3000 El Camino Real
7    Palo Alto, California 94306-2155
     (650) 857-0663
8
   For Defendants and Counterclaimants Roche Molecular
9  Systems, Inc., et al.:
10   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
     BY: ROBERT W. STONE
11   Attorney at Law
     555 Twin Dolphin Drive, Suite 560
12   Redwood Shores, California 94065
     (650) 801-5001
13
   Videographer:
14
     RAY TYLER
15   SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
     San Francisco, California
16   (415) 274-9977

---

**Page 4**

    INDEX
WITNESS:    EXAMINATION
ALICE WANG, Ph.D.

    BY MS. WILKINSON    6

    EXHIBITS
DEPOSITION    PAGE
579  Article: Detection and Quantification of    21
     Human Immunodeficiency Virus RNA in Patient
     Serum by Use of the Polymerase Chain
     Reaction, Bates Nos. WAN00001 - WAN00005;
     5 pages

580  Invention Disclosure, 2/3/89, Bates Nos.    25
     RMS 0064456 - RMS 0064459; 4 pages

581  Curriculum Vitae for Alice M. Wang, Bates    33
     Nos. WAN00045 - WAN00048; 4 pages

582  Article: Reduction in Plasma Human    82
     Immunodeficiency Virus Ribonucleic Acid
     after Dideoxynucleoside Therapy as
     determined by the Polymerase Chain Reaction,
     Bates Nos. WAN00022 - WAN00026; 5 pages

583  Proviral DNA HIV Sequence, Bates No.    110
     WAN00036; 1 page

584  HIV Sequence document, Bates No. WAN00040;    111
     1 page

585  HIV Sequence from difference isolates, Tues,    124
     July 5, 1988, Bates Nos. WAN00041 -
     WAN00042; 2 pages

---

1 (Pages 1 to 4)

**Page 21**

10:20:55  1  team, so he did all the work, and I help him to
10:21:03  2  interpret data inside that. So when come to the
10:21:07  3  writing the sections, I think, you know, both us put
10:21:11  4  some effort on it.
10:21:11  5  BY MS. WILKINSON:
10:21:16  6     Q. And did you write or do you know if
10:21:20  7  Mr. Casipit wrote anything other than the cRNA
10:21:26  8  section?
10:21:28  9     A. I don't know.
10:21:29 10     Q. How long yesterday did you look at the JID
10:21:36 11  article?
10:21:38 12     A. Couple minutes.
10:21:43 13     MS. WILKINSON: I'd like to mark as
10:21:47 14  Exhibit 579 a paper entitled "Detection and
10:21:51 15  Quantification of Human Immunodeficiency Virus RNA in
10:21:56 16  Patient Serum By Use of the Polymerase Chain
10:21:59 17  Reaction." It's been Bates labeled WAN0001 through
10:22:29 18  05.
10:22:29 19     (Deposition Exhibit 579 marked by the
10:22:29 20     court reporter.)
10:22:29 21  BY MS. WILKINSON:
10:22:40 22     Q. Ms. Wang, do you recognize this document?
10:22:43 23     A. Yes.
10:22:43 24     Q. Is this the paper that you reviewed
10:22:45 25  yesterday?

**Page 22**

10:22:47  1     A. Yes.
10:22:50  2     Q. You're a coauthor on this publication; is
10:22:53  3  that correct?
10:22:53  4     A. Yes.
10:22:53  5     Q. Can you please point me to the portion of
10:22:57  6  this article that you or Mr. Casipit authored?
10:23:06  7     A. So the first page at the right side at the
10:23:11  8  bottom section, "Construction of gag cRNA standard."
10:23:17  9     Q. So at the bottom of page WAN0001, you're
10:23:24 10  talking about the last paragraph, "Construction of
10:23:28 11  gag cRNA standard"; is that correct?
10:23:29 12     A. Yes.
10:23:30 13     Q. Is there anything else?
10:23:35 14     A. That's it.
10:23:43 15     Q. Did you contribute to the section as it
10:23:46 16  continues on page WAN0002?
10:23:52 17     MR. STONE: And what are you referring to
10:23:54 18  exactly?
10:23:55 19     MS. WILKINSON: I'm referring to Exhibit 579,
10:23:58 20  the -- in the left column, the top one, two, three,
10:24:03 21  four, five -- six lines up until the section title
10:24:07 22  "Enzyme-linked affinity assay."
10:24:12 23     THE WITNESS: No.
10:24:12 24  BY MS. WILKINSON:
10:24:13 25     Q. Okay. So the portion --

**Page 23**

10:24:15  1     MR. STONE: So she's referring to this part.
10:24:19  2     THE WITNESS: Oh. So okay. We wrote the
10:24:23  3  entire construction of gag cRNA standard and to
10:24:30  4  continue to the next page before the enzyme-linked
10:24:34  5  affinity assay.
10:24:34  6  BY MS. WILKINSON:
10:24:36  7     Q. Okay. And that one section of this paper,
10:24:40  8  that is the extent of your contribution to this
10:24:47  9  article; is that correct?
10:24:48 10     A. Yes.
10:25:09 11     Q. When did you join Cetus Corporation?
10:25:14 12     A. 1980.
10:25:17 13     Q. Your curriculum vitae indicated that you
10:25:20 14  did PCR work while you were at Cetus; is that
10:25:24 15  correct?
10:25:24 16     A. Yes.
10:25:24 17     Q. And when did you begin working in the area
10:25:26 18  of PCR?
10:25:37 19     A. '80 -- mid '80s. Don't -- don't recall
10:25:45 20  exactly.
10:25:46 21     Q. And can you tell me generally about the
10:25:49 22  PCR projects that you did in the -- starting in the
10:25:53 23  mid '80s at Cetus?
10:25:55 24     MR. STONE: Objection. Overbroad.
10:26:02 25     THE WITNESS: At that time we started

**Page 24**

10:26:04  1  atherosclerosis project, and so we like to use PCR
10:26:08  2  method to quantify the gene expression.
10:26:08  3  BY MS. WILKINSON:
10:26:16  4     Q. What do you mean by quantify?
10:26:18  5     A. Determine the expression levels of the genes.
10:26:23  6     Q. What do you mean by "determine the
10:26:25  7  expression levels"?
10:26:29  8     A. So we like to measure the messenger RNA
10:26:33  9  level.
10:26:35 10     Q. Are you referring to measuring the number
10:26:37 11  of copies of --
10:26:41 12     A. Of the --
10:26:42 13     Q. -- mRNA?
10:26:44 14     A. Yes.
10:26:44 15     Q. So when you use the term quantitate or
10:26:48 16  quantify, you're referring to determining the
10:26:52 17  absolute number of copies of particular nucleotide
10:26:59 18  sequence; is that correct?
10:27:00 19     MR. STONE: Objection. Overbroad.
10:27:03 20     THE WITNESS: So while quantify can be
10:27:06 21  absolute quantitation or relative quantitation.
10:27:06 22  BY MS. WILKINSON:
10:27:14 23     Q. And when you're talking now about doing
10:27:17 24  quantitation, were you talking about absolute or
10:27:21 25  relative?

6 (Pages 21 to 24)

### Page 33

```
10:37:00  1   BY MS. WILKINSON:
10:37:02  2       Q. Do you know when that was published?
10:37:06  3       A. Don't recall. Too long ago.
10:37:09  4       Q. Would looking at your resume help refresh
10:37:13  5   your recollection about when this work was
10:37:15  6   published?
10:37:16  7       A. Sure.
10:37:31  8       MS. WILKINSON: I'd like to mark as
10:37:34  9   Exhibit 581 the resume of Ms. Alice Wang.
10:37:34 10       (Deposition Exhibit 581 marked by the
10:37:58 11       court reporter.)
10:37:58 12       MS. WILKINSON: The record to reflect that
10:38:01 13   Exhibit 581 has been Bates labeled WAN00045 through
10:38:11 14   48.
10:38:20 15       Q. Ms. Wang, if I could call your attention
10:38:22 16   to publication No. 13. Does that refresh your
10:38:31 17   recollection about when this work was published?
10:38:35 18       A. Yes.
10:38:36 19       Q. And when was that?
10:38:37 20       A. 1989.
10:38:39 21       Q. Okay. Going back to the previous
10:38:44 22   Exhibit 580, at section VII, do you see where it
10:38:54 23   states "Please keep IPLD informed of potential
10:38:59 24   disclosures after filing this form"?
10:39:02 25       A. Excuse me.
```

### Page 34

```
10:39:04  1       (Telephonic interruption.)
10:39:23  2       THE WITNESS: Sorry about that.
10:39:23  3   BY MS. WILKINSON:
10:39:24  4       Q. Is it off now?
10:39:25  5       A. Yes. Could you repeat the question?
10:39:28  6       Q. Looking at section 7 of Exhibit 580, page
10:39:34  7   RMS 0064459, section entitled "Disclosure to Third
10:39:40  8   Parties," do you see where I'm at?
10:39:41  9       A. Yes.
10:39:42 10       Q. Do you see where it says, "Please keep
10:39:44 11   IPLD informed of potential disclosures after filing
10:39:48 12   this form"?
10:39:52 13       A. Yes.
10:39:54 14       Q. What is IPLD, if you know?
10:40:02 15       A. I don't know at this time.
10:40:03 16       Q. Do you recall if that stands for
10:40:06 17   intellectual property licensing department?
10:40:09 18       MR. STONE: Objection. Lacks foundation.
10:40:11 19   Calls for speculation.
10:40:17 20       THE WITNESS: I would think so.
10:40:17 21   BY MS. WILKINSON:
10:40:19 22       Q. Did you understand that you had an
10:40:20 23   obligation to update the IPLD?
10:40:23 24       MR. STONE: Objection. Vague and ambiguous.
10:40:25 25   Overbroad.
```

### Page 35

```
10:40:31  1       THE WITNESS: I suppose so.
10:40:31  2   BY MS. WILKINSON:
10:40:32  3       Q. Did you?
10:40:34  4       A. I don't remember. It's a long time ago.
10:40:38  5       Q. So you have no memory of submitting any
10:40:43  6   documents updating disclosures of this work?
10:40:51  7       MR. STONE: Objection. Lacks foundation.
10:40:52  8   Calls for speculation.
10:40:54  9       THE WITNESS: I don't recall.
10:40:54 10   BY MS. WILKINSON:
10:40:55 11       Q. Did you disclose this work to any third
10:40:58 12   parties after filing this form?
10:41:00 13       MR. STONE: Objection. Vague and ambiguous,
10:41:02 14   overbroad.
10:41:09 15       THE WITNESS: You mean to discuss with other
10:41:12 16   people about our work?
10:41:14 17   BY MS. WILKINSON:
10:41:15 18       Q. Yes.
10:41:18 19       A. Yeah, this is -- this is, you know, the work,
10:41:21 20   you know, we think will help the quantitation, so,
10:41:27 21   yeah, we discuss it with our colleagues about.
10:41:30 22       Q. And which colleagues did you discuss it
10:41:33 23   with?
10:41:35 24       A. That's -- don't recall. There's so many
10:41:38 25   people there, so --
```

### Page 36

```
10:41:39  1       Q. Third parties?
10:41:40  2       MR. STONE: Objection. Vague and ambiguous.
10:41:42  3       THE WITNESS: Don't remember.
10:41:42  4   BY MS. WILKINSON:
10:41:45  5       Q. You don't remember any third parties with
10:41:47  6   whom you've discussed this work since you submitted
10:41:50  7   this form?
10:41:53  8       A. See, we have very open laboratory structure,
10:41:58  9   so we have a lot of people, you know, in there. So
10:42:02 10   the day-to-day conversation, just don't recall
10:42:05 11   specifically.
10:42:06 12       Q. So in your open laboratory structure, was
10:42:10 13   it your practice to discuss the work that you were
10:42:15 14   doing with -- with people that were -- that were
10:42:18 15   there?
10:42:20 16       MR. STONE: Objection. Vague and ambiguous,
10:42:22 17   overbroad.
10:42:23 18       THE WITNESS: Since we developed this, you
10:42:25 19   know, quantitation method, so if people interested in
10:42:29 20   doing similar thing, and they will come to us and we
10:42:33 21   will discuss that.
10:42:37 22   BY MS. WILKINSON:
10:42:38 23       Q. So is it your practice to share with third
10:42:40 24   parties the work that you were doing on
10:42:43 25   quantitative PCR?
```

## Page 37

```
10:42:46  1         MR. STONE: Objection. Vague and ambiguous,
10:42:47  2  overbroad.
10:42:49  3         THE WITNESS: As I said, okay, if people
10:42:58  4  interested in this, we will discuss it.
10:43:01  5  BY MS. WILKINSON:
10:43:01  6    Q. So you shared the work that you were doing
10:43:03  7  on quantitative PCR with other people in this
10:43:06  8  scientific community freely; is that correct?
10:43:10  9         MR. STONE: Objection. Vague and ambiguous.
10:43:11 10  Overbroad. Misstates her testimony.
10:43:14 11         THE WITNESS: Yeah, at that time, also, you
10:43:16 12  know, since we had this method, and we have some
10:43:21 13  outside people, collaborators come to us to learn
10:43:30 14  this.
10:43:30 15  BY MS. WILKINSON:
10:43:31 16    Q. And the outside collaborators that came to
10:43:34 17  learn this method, were there any restrictions
10:43:39 18  about what they could do with the information that
10:43:42 19  you were giving them that you're aware of?
10:43:44 20         MR. STONE: Object to the extent it calls for
10:43:46 21  a legal conclusion. Object to the extent it lacks
10:43:48 22  foundation and calls for speculation.
10:43:51 23         THE WITNESS: I don't know what you mean by
10:43:53 24  that.
10:43:53 25  BY MS. WILKINSON:
```

## Page 38

```
10:43:53  1    Q. What is your understanding of why people
10:43:56  2  would come to you and ask about quantitative PCR in
10:44:04  3  the work that you had been doing?
10:44:05  4         MR. STONE: Same objections.
10:44:06  5         THE WITNESS: At that time, okay, this is
10:44:08  6  very new approach and a new method. And Cetus is the
10:44:15  7  center of the PCR, so the outside people definitely
10:44:19  8  like to come to Cetus to learn the PCR. And also the
10:44:24  9  quantitative PCR is another level of that.
10:44:24 10  BY MS. WILKINSON:
10:44:28 11    Q. And is it your understanding that people
10:44:30 12  would come to learn this technique and then they
10:44:36 13  would go to their regular place of business and use
10:44:41 14  this technique that -- that they learned?
10:44:45 15         MR. STONE: Objection. Calls for
10:44:46 16  speculation.
10:44:48 17         THE WITNESS: Normally we have a collaborator
10:44:51 18  come to work with us, and, you know, we -- we work
10:44:57 19  together to get a project done. And also, my boss at
10:45:03 20  that time, Dr. David Mark, he's kind of start to talk
10:45:11 21  to collaborator first.
10:45:11 22  BY MS. WILKINSON:
10:45:14 23    Q. But it's your understanding that the
10:45:16 24  scientists who came to learn techniques at Cetus
10:45:20 25  would then use those techniques that they learned
```

## Page 39

```
10:45:24  1  in their scientific practice; is that correct?
10:45:27  2         MR. STONE: Objection. Calls for
10:45:29  3  speculation. Overbroad.
10:45:30  4         THE WITNESS: I don't know what they would
10:45:32  5  do, so we just work together for the specific project,
10:45:37  6  you know, we both interested in.
10:45:37  7  BY MS. WILKINSON:
10:45:39  8    Q. So you had no understanding of what they
10:45:42  9  were going to do with that knowledge once they left
10:45:46 10  Cetus; is that correct?
10:45:47 11         MR. STONE: So you're referring to some vague
10:45:49 12  they? Objection, overbroad. Calls for speculation.
10:45:57 13         THE WITNESS: I don't want to guess.
10:45:57 14  BY MS. WILKINSON:
10:46:00 15    Q. So you have no understanding of why any
10:46:04 16  scientist came to Cetus to learn PCR techniques?
10:46:09 17         MR. STONE: Objection. Misstates her
10:46:10 18  testimony. Argumentative. Overbroad and asked and
10:46:16 19  answered.
10:46:20 20         THE WITNESS: As I said, okay, at that time
10:46:22 21  people just like to come to Cetus to learn the PCR.
10:46:27 22  PCR has just started, and people had no equipment, no
10:46:31 23  knowledge about the PCR.
10:46:31 24  BY MS. WILKINSON:
10:46:34 25    Q. Is your testimony that as of February
```

## Page 40

```
10:46:37  1  1989, there was no knowledge in the scientific
10:46:41  2  community about PCR or equipment to do so?
10:46:44  3    A. I don't mean that.
10:46:45  4         MR. STONE: Objection. Vague and ambiguous,
10:46:47  5  overbroad, argumentative.
10:46:53  6         THE WITNESS: PCR is, you know, keeping
10:46:57  7  evolving. A lot of application came generally from
10:47:01  8  the PCR technology. So even PCR invented '84, '85, by
10:47:09  9  '89, still a lot of work need to be done to improve
10:47:13 10  the PCR technology.
10:47:16 11         MS. WILKINSON: I'd like to introduce as
10:47:18 12  Exhibit 582 a paper titled "Quantitation of mRNA by
10:47:27 13  the polymerase chain reaction" labeled RMS 0061685
10:47:35 14  through 89. And actually, I'm sorry, I think I said
10:47:40 15  this would be Exhibit 582. This was actually
10:47:43 16  previously marked as Exhibit 12.
10:47:43 17         (Deposition Exhibit 12 previously marked
10:47:43 18          was presented to the witness.)
10:47:43 19  BY MS. WILKINSON:
10:47:59 20    Q. Ms. Wang, do you recognize this document?
10:48:01 21    A. Yes.
10:48:01 22    Q. You are the first author; is that right?
10:48:04 23    A. Yes.
10:48:04 24    Q. What is this article about?
10:48:06 25         MR. STONE: Objection. Overbroad.
```

10 (Pages 37 to 40)

## Page 49

```
11:16:05  1      Q. Before this work, you testified that you
11:16:06  2   had not been involved in a project to insert HIV
11:16:13  3   DNA into a plasmid; is that correct?
11:16:16  4      A. Yes.
11:16:17  5      Q. At the time of this work, were you aware
11:16:24  6   of any quantitative PCR work in the area of HIV
11:16:29  7   that was being done at Cetus?
11:16:35  8      A. I don't recall.
11:16:42  9      Q. Did you assign Mr. Casipit to make a
11:16:47 10   plasmid for expressing sequence that Mark Holodniy
11:16:51 11   was interested in?
11:16:52 12          MR. STONE: Objection. Vague and ambiguous.
11:16:54 13   Overbroad. Lacks foundation.
11:16:57 14          THE WITNESS: I just instruct, you know,
11:17:03 15   Clayton to construct this plasmid to generate a cRNA
11:17:09 16   for HIV, you know, quantitation.
11:17:09 17   BY MS. WILKINSON:
11:17:12 18      Q. And why did you do that?
11:17:14 19      A. Why did I do that?
11:17:17 20      Q. Yeah.
11:17:23 21      A. I was, you know, given this by my supervisor,
11:17:27 22   the project.
11:17:29 23      Q. Who was your supervisor?
11:17:31 24      A. Dr. David Mark.
11:17:34 25      Q. And what was your understanding of why
```

## Page 50

```
11:17:37  1   Dr. Mark asked you to work on this project?
11:17:43  2      A. I don't know. At that time we had a lot of
11:17:48  3   collaborators from outside, and so this is one of
11:17:53  4   them.
11:17:55  5      Q. And was this project related to any
11:17:59  6   particular collaborator?
11:18:02  7      A. Yeah. Mark Holodniy.
11:18:07  8      Q. And what was your understanding of
11:18:12  9   Mr. Holodniy's interest in this project?
11:18:16 10          MR. STONE: Objection. Vague and ambiguous.
11:18:21 11          THE WITNESS: Because we just developed
11:18:23 12   quantitative method to measure the messenger RNA
11:18:29 13   level, so a lot of people, you know, like to learn
11:18:33 14   this technique. And so I guess Mark interested to
11:18:44 15   quantify.
11:18:44 16   BY MS. WILKINSON:
11:18:46 17      Q. And this technique that you're referring
11:18:49 18   to for quantification of mRNA, is that the
11:18:53 19   technique that you published in Exhibit 12, the
11:19:00 20   PNAS paper that we discussed earlier?
11:19:02 21      A. Yes.
11:19:02 22      Q. And that was published in 1989; is that
11:19:06 23   correct?
11:19:06 24      A. Yes. But before we publish it, we work for,
11:19:10 25   you know, a few years before that.
```

## Page 51

```
11:19:15  1      Q. On the quantification of mRNA for
11:19:20  2   lymphokines and related genes; is that correct?
11:19:25  3      A. Yes.
11:19:32  4      Q. And the plasmid that you instructed
11:19:37  5   Mr. Casipit to make, did that use the techniques
11:19:44  6   that you had developed and described in Exhibit 12
11:19:52  7   as we had discussed before?
11:19:54  8          MR. STONE: Objection. Vague and ambiguous,
11:19:55  9   overbroad.
11:19:58 10          THE WITNESS: Not exact the same, because
11:20:02 11   this -- this HIV project only insert, you know, one
11:20:09 12   piece of HIV gene. Only try to, you know, amplify the
11:20:19 13   HIV gene, not the other genes.
11:20:21 14   BY MS. WILKINSON:
11:20:21 15      Q. So it was simpler with respect to the DNA
11:20:28 16   that you were trying to amplify; is that correct?
11:20:31 17          MR. STONE: Objection. Vague and ambiguous.
11:20:32 18   Argumentative.
11:20:35 19          THE WITNESS: In the sense of multiple genes
11:20:37 20   or single gene, yes, right. But in terms of construct
11:20:44 21   the plasmid, it just as, you know, complicated as the
11:20:48 22   other one.
11:20:48 23   BY MS. WILKINSON:
11:20:50 24      Q. The construction of plasmids with
11:20:56 25   synthetic DNA inserts, that's not something that
```

## Page 52

```
11:21:01  1   you developed, correct?
11:21:04  2          MR. STONE: Objection. Vague and ambiguous.
11:21:06  3   Overbroad.
11:21:08  4          THE WITNESS: Could you rephrase that?
11:21:10  5   BY MS. WILKINSON:
11:21:10  6      Q. The construction -- the insertion of DNA
11:21:14  7   sequence into a plasmid, you're not the first
11:21:18  8   person in molecular biology to have done that; is
11:21:23  9   that correct?
11:21:23 10          MR. STONE: Same objection.
11:21:25 11          THE WITNESS: Cloning is very broad area. So
11:21:31 12   -- but, you know, in order to get the specific piece
11:21:35 13   put in the right vector, you need to have some
11:21:40 14   knowledge.
11:21:41 15   BY MS. WILKINSON:
11:21:41 16      Q. Right. And I'm just trying to
11:21:44 17   understand --
11:21:44 18      A. Yes.
11:21:44 19      Q. -- understand the knowledge and what
11:21:48 20   you -- and what you did, so I appreciate you --
11:21:52 21      A. Okay.
11:21:52 22      Q. -- you explaining that to me.
11:21:54 23          The plasmid that Clayton made for
11:21:59 24   expressing the DNA insert for HIV, that used
11:22:08 25   techniques that were well known in molecular
```

CONFIDENTIAL ATTORNEYS EYES ONLY - RESTRICTED

### Page 69

| Time | Line | Text |
|---|---|---|
| 11:43:01 | 1 | Q. You testified that either you or |
| 11:43:02 | 2 | Mr. Casipit gave Mark cRNA standard; is that |
| 11:43:08 | 3 | correct? |
| 11:43:08 | 4 | A. Yes. |
| 11:43:08 | 5 | Q. Did you give -- are you -- sitting here |
| 11:43:14 | 6 | today, do you recall giving Mark anything else? |
| 11:43:19 | 7 | MR. STONE: Objection. Vague and ambiguous, |
| 11:43:21 | 8 | overbroad. Are you referring to something physical? |
| 11:43:25 | 9 | THE WITNESS: Yeah, I don't quite understand |
| 11:43:28 | 10 | what you're trying to ask. |
| 11:43:28 | 11 | BY MS. WILKINSON: |
| 11:43:30 | 12 | Q. Do you recall handing Mark Holodniy |
| 11:43:33 | 13 | anything else at any point? |
| 11:43:35 | 14 | MR. STONE: Objection. Vague and ambiguous. |
| 11:43:37 | 15 | Overbroad. |
| 11:43:38 | 16 | THE WITNESS: That just too long ago. I |
| 11:43:41 | 17 | don't recall. |
| 11:43:41 | 18 | BY MS. WILKINSON: |
| 11:43:42 | 19 | Q. You don't recall giving Mark Holodniy any |
| 11:43:44 | 20 | reagents? |
| 11:43:46 | 21 | MR. STONE: Objection. Misstates her |
| 11:43:49 | 22 | testimony. |
| 11:43:50 | 23 | THE WITNESS: If you can mention some, maybe |
| 11:43:54 | 24 | refresh my memory. I don't recall anything. |
| 11:43:54 | 25 | BY MS. WILKINSON: |

### Page 70

| Time | Line | Text |
|---|---|---|
| 11:43:57 | 1 | Q. But sitting here today, you can't identify |
| 11:43:59 | 2 | for me anything else that you gave to Mark |
| 11:44:03 | 3 | Holodniy; is that right? |
| 11:44:03 | 4 | MR. STONE: Objection. Vague and ambiguous, |
| 11:44:05 | 5 | overbroad. |
| 11:44:06 | 6 | THE WITNESS: Are you talking about papers, |
| 11:44:09 | 7 | reagents? What are you talking about? |
| 11:44:11 | 8 | BY MS. WILKINSON: |
| 11:44:12 | 9 | Q. Let's talk about -- let's talk about |
| 11:44:14 | 10 | reagents first. Sitting here today, can you list |
| 11:44:18 | 11 | for me all the -- all or any reagents that you |
| 11:44:25 | 12 | recall giving to Mark Holodniy? |
| 11:44:30 | 13 | A. I don't recall. |
| 11:44:30 | 14 | Q. You don't recall any reagents that you |
| 11:44:32 | 15 | gave to Mark Holodniy, correct? |
| 11:44:38 | 16 | MR. STONE: Objection. Misstates her |
| 11:44:40 | 17 | testimony. |
| 11:44:40 | 18 | THE WITNESS: Just too -- just been too long. |
| 11:44:43 | 19 | Don't recall. |
| 11:44:43 | 20 | BY MS. WILKINSON: |
| 11:44:46 | 21 | Q. Do you recall whether Mr. Casipit gave |
| 11:44:48 | 22 | Mark Holodniy any reagents? |
| 11:44:53 | 23 | A. No, I don't recall that, either. |
| 11:44:55 | 24 | Q. Do you recall whether anybody else gave |
| 11:44:58 | 25 | Mark any reagents? |

### Page 71

| Time | Line | Text |
|---|---|---|
| 11:45:02 | 1 | A. No. I don't recall that, either. |
| 11:45:04 | 2 | Q. Do you recall giving any documents to Mark |
| 11:45:24 | 3 | Holodniy? |
| 11:45:24 | 4 | A. This is a collaborative work, so we must have |
| 11:45:28 | 5 | discussed the quantitative method, so I might have |
| 11:45:33 | 6 | give him our -- a paper or some approaches we're |
| 11:45:39 | 7 | trying to do. |
| 11:45:42 | 8 | Q. The paper that you're referring to, is |
| 11:45:44 | 9 | that Exhibit 12? |
| 11:45:50 | 10 | MR. STONE: I just caution the witness not to |
| 11:45:52 | 11 | speculate. |
| 11:45:52 | 12 | THE WITNESS: I don't recall. |
| 11:45:52 | 13 | BY MS. WILKINSON: |
| 11:45:54 | 14 | Q. So sitting here today, you can't identify |
| 11:45:58 | 15 | for me any specific documents that you gave to Mark |
| 11:46:07 | 16 | Holodniy; is that right? |
| 11:46:08 | 17 | A. Yes. |
| 11:46:08 | 18 | Q. Generally, do you remember giving Mark any |
| 11:46:13 | 19 | documents? |
| 11:46:16 | 20 | MR. STONE: Objection. Asked and answered. |
| 11:46:18 | 21 | THE WITNESS: I don't recall. |
| 11:46:22 | 22 | BY MS. WILKINSON: |
| 11:46:22 | 23 | Q. Okay. Do you recall -- do you know |
| 11:46:24 | 24 | whether Mr. Casipit gave Mark Holodniy any |
| 11:46:29 | 25 | documents? |

### Page 72

| Time | Line | Text |
|---|---|---|
| 11:46:30 | 1 | A. I don't know. |
| 11:46:32 | 2 | Q. Do you know whether anybody else gave Mark |
| 11:46:38 | 3 | Holodniy any documents? |
| 11:46:39 | 4 | A. I don't know. |
| 11:46:44 | 5 | Q. Did you interact with Mr. Holodniy while |
| 11:46:49 | 6 | he was at Cetus? |
| 11:46:50 | 7 | A. Yes. |
| 11:46:51 | 8 | Q. How frequently? |
| 11:47:01 | 9 | A. I don't recall how frequently, but -- yeah, I |
| 11:47:04 | 10 | don't recall that. |
| 11:47:06 | 11 | Q. Do you recall any specific interactions |
| 11:47:11 | 12 | that you had with Mr. Holodniy at Cetus? |
| 11:47:21 | 13 | A. Yes, he came to our lab to ask help for |
| 11:47:23 | 14 | cloning the plasma to generate the cRNA for the HIV. |
| 11:47:28 | 15 | Q. So Mr. Holodniy came to your lab because |
| 11:47:37 | 16 | he was interested in making a standard for |
| 11:47:41 | 17 | quantifying HIV; is that your testimony? |
| 11:47:44 | 18 | MR. STONE: Objection. Misstates her |
| 11:47:46 | 19 | testimony. |
| 11:47:48 | 20 | THE WITNESS: What I said is he came to our |
| 11:47:50 | 21 | lab to ask help for this. |
| 11:47:50 | 22 | BY MS. WILKINSON: |
| 11:48:05 | 23 | Q. Is it your understanding that he came to |
| 11:48:07 | 24 | Cetus because he wanted to learn PCR techniques? |
| 11:48:19 | 25 | A. I don't know exactly why he, you know, came |

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

## Page 73

```
11:48:21  1   to Cetus to learn, but I knew he came to our lab to
11:48:27  2   get our help.
11:48:28  3        Q. So at the time that you met Mr. Holodniy,
11:48:34  4   he was interested in quantitating RNA from HIV
11:48:46  5   samples; is that right?
11:48:49  6        MR. STONE: Objection. Lacks foundation,
11:48:51  7   calls for speculation.
11:48:56  8        THE WITNESS: I don't know. So I just know
11:48:58  9   David Mark introduced him to me.
11:49:01 10   BY MS. WILKINSON:
11:49:01 11        Q. At the time that you met Mr. Holodniy,
11:49:08 12   your understanding was that he was interested in
11:49:13 13   HIV quantitation at that time?
11:49:25 14        A. I don't know exactly, okay. I just know that
11:49:29 15   he came to our lab, introduced by Dave -- you know, my
11:49:33 16   boss, and was -- we were asked to help him doing this.
11:49:40 17        Q. But his interest in quantitating HIV did
11:49:46 18   not develop after he met you. You knew that about
11:49:52 19   him at the time that you were introduced to him; is
11:49:56 20   that right?
11:49:56 21        MR. STONE: Objection. Lacks foundation.
11:49:57 22   Calls for speculation.
11:50:00 23        THE WITNESS: I don't know.
11:50:00 24   BY MS. WILKINSON:
11:50:01 25        Q. You testified that your supervisor
```

## Page 74

```
11:50:07  1   introduced you to Mark Holodniy; is that right?
11:50:11  2        A. Yes.
11:50:11  3        Q. What did he tell you about Mark Holodniy
11:50:14  4   at the time of that introduction?
11:50:21  5        A. I don't recall. The conversation is too long
11:50:25  6   ago.
11:50:25  7        Q. Generally?
11:50:30  8        A. Since, you know, where in our lab we're
11:50:35  9   expertise in doing the quantitative PCR, and we been
11:50:41 10   collaborate with other -- collaborate too, so he was
11:50:44 11   introduced to our lab to help him to clone this HIV
11:50:51 12   DNA.
11:50:52 13        Q. So it's your understanding that he came to
11:50:55 14   your lab to work on an HIV project?
11:51:00 15        A. Yes.
11:51:02 16        Q. And you were not Mark Holodniy's
11:51:04 17   supervisor; is that right?
11:51:06 18        A. No.
11:51:06 19        Q. And you didn't direct experiments that he
11:51:10 20   was doing; is that right?
11:51:10 21        MR. STONE: Objection. Misstates testimony.
11:51:17 22        THE WITNESS: What kind of work are you
11:51:19 23   referring to?
11:51:20 24   BY MS. WILKINSON:
11:51:20 25        Q. Any work.
```

## Page 75

```
11:51:23  1        A. He -- we -- we -- because PCR works with
11:51:34  2   another piece work there. So he came to our lab. You
11:51:38  3   know, we could have instructed him how to do PCR.
11:51:41  4        Q. So you stated that you recalled your
11:51:48  5   initial interaction with Mark Holodniy, the
11:51:53  6   introduction by your boss. Do you recall anything
11:51:57  7   else that was discussed at that time?
11:52:00  8        A. No.
11:52:00  9        Q. Do you recall any other interactions that
11:52:05 10   you had with Mark Holodniy?
11:52:09 11        MR. STONE: And so beyond the introduction?
11:52:13 12        MS. WILKINSON: Correct.
11:52:18 13        THE WITNESS: Yeah, he came to our lab -- I
11:52:23 14   remember I kind of interacted with him to discuss PCR.
11:52:34 15   Since we have so many collaborator at that time, so I
11:52:39 16   don't remember specifically what kind of, you know,
11:52:42 17   discussion I had with him.
11:52:42 18   BY MS. WILKINSON:
11:52:46 19        Q. So other than what we've discussed about
11:52:49 20   your first meeting -- introduction to Mark
11:52:55 21   Holodniy, you have no recollection of any specific
11:53:00 22   interaction you had with Mark?
11:53:01 23        MR. STONE: Objection. Misstates her
11:53:03 24   testimony. Vague and ambiguous.
11:53:07 25        THE WITNESS: In order to do the cloning, and
```

## Page 76

```
11:53:12  1   we would like to know the sequence of the HIV DNA, so
11:53:20  2   we discuss some of the, you know, design of the
11:53:24  3   primer with him.
11:53:24  4   BY MS. WILKINSON:
11:53:28  5        Q. And what can you tell me about those
11:53:31  6   discussions?
11:53:31  7        A. I don't recall. It's too long ago.
11:53:34  8        Q. So other than generally discussing primers
11:53:41  9   with Mark Holodniy, you can't tell me anything more
11:53:45 10   specific about -- about those conversations?
11:53:48 11        A. No.
11:53:48 12        MR. STONE: Objection. Misstates her
11:53:50 13   testimony.
11:53:50 14   BY MS. WILKINSON:
11:53:53 15        Q. Did I accurately -- did I accurately
11:53:55 16   characterize your position on this?
11:53:58 17        MR. STONE: Objection. Misstates her
11:53:59 18   testimony. Vague and ambiguous.
11:54:03 19        THE WITNESS: I don't recall, okay, the
11:54:05 20   specific, you know, discussions, yeah.
11:54:05 21   BY MS. WILKINSON:
11:54:07 22        Q. Okay. So we've discussed the fact that
11:54:17 23   you gave Mr. -- you or Mr. Casipit gave
11:54:22 24   Mr. Holodniy cRNA standard. Beyond that it was
11:54:28 25   your testimony that you have no specific
```

**Page 85**

12:59:01 1    Q. Is that correct?
12:59:02 2    A. Yes.
12:59:03 3    Q. And what can you tell me about the
12:59:05 4  abstract that you looked at?
12:59:08 5    A. The abstract was -- described the work which
12:59:16 6  subsequently published in that paper.
12:59:21 7    Q. Was that subsequently published in the
12:59:26 8  JID?
12:59:27 9    A. The JID, yeah.
12:59:28 10   Q. And how did the description of the work
12:59:30 11 and the abstract compare to the JID paper, if you
12:59:34 12 recall?
12:59:34 13   A. I don't recall because I didn't read
12:59:37 14 carefully.
12:59:38 15   Q. Did you read -- did you write any portion
12:59:40 16 of that abstract?
12:59:41 17   A. No, I did not.
12:59:46 18   Q. Back to this document, do you have any
12:59:49 19 recollection of whether this document was in your
12:59:55 20 old files at home?
12:59:58 21      MR. STONE: And just for the record, when we
01:00:01 22 produce documents that were provided to us by
01:00:04 23 Ms. Wang, we designated them WAN and then numbered
01:00:07 24 them, so --
01:00:08 25      MS. WILKINSON: I'm asking for the witness's

**Page 86**

01:00:11 1  testimony --
01:00:11 2       MR. STONE: I understand.
01:00:12 3       MS. WILKINSON: -- Counsel.
01:00:15 4       THE WITNESS: I don't recall. When I search
01:00:18 5  that, I just, you know -- if I saw some paper, you
01:00:21 6  know, I just send it to the attorney, yeah. I didn't
01:00:26 7  pay attention to what documents there.
01:00:26 8  BY MS. WILKINSON:
01:00:30 9    Q. Do you have any recollection of ever
01:00:34 10 reading this document before?
01:00:42 11   A. I don't recall in so many papers, so no.
01:00:48 12   Q. Do you remember discussing this
01:00:50 13 publication with anybody?
01:00:52 14      MR. STONE: And exclude from counsel --
01:00:56 15 exclude discussions with counsel in your response.
01:01:00 16      MS. WILKINSON: So far the witness has
01:01:02 17 testified --
01:01:02 18      THE WITNESS: No, no.
01:01:02 19 BY MS. WILKINSON:
01:01:04 20   Q. Okay. So it's your testimony that you do
01:01:17 21 not recall ever seeing this document?
01:01:23 22      MR. STONE: Objection. Asked and answered.
01:01:32 23      THE WITNESS: I don't recall, okay, because
01:01:33 24 it's been long time ago. I -- I don't recall.
01:01:33 25 BY MS. WILKINSON:

**Page 87**

01:01:41 1    Q. You didn't write any portion of this
01:01:43 2  article; is that right?
01:01:44 3    A. No.
01:01:44 4    Q. And you didn't review any drafts of this
01:01:47 5  article; is that right?
01:01:48 6    A. That's right.
01:01:50 7    Q. And you didn't design any of the clinical
01:01:53 8  protocols associated with this article?
01:01:57 9    A. No.
01:01:57 10      MR. STONE: Objection. Vague and ambiguous.
01:01:58 11 Overbroad. The document speaks for itself.
01:01:58 12 BY MS. WILKINSON:
01:02:00 13   Q. And you did not design any specific
01:02:03 14 protocols for monitoring efficacy of HIV treatment;
01:02:09 15 is that right?
01:02:10 16      MR. STONE: Same objections. Do you want her
01:02:12 17 to spend the time reading this article?
01:02:14 18      MS. WILKINSON: No, I'm asking her if she --
01:02:17 19   Q. Have you ever designed specific protocols
01:02:19 20 for monitoring the efficacy of HIV treatment?
01:02:24 21      MR. STONE: I'll object. The question is
01:02:25 22 vague and ambiguous and overbroad.
01:02:29 23      THE WITNESS: No.
01:02:29 24 BY MS. WILKINSON:
01:02:34 25   Q. Were you involved in selecting any

**Page 88**

01:02:38 1  patients for -- for any studies relating to PCR of
01:02:46 2  HIV patient samples?
01:02:47 3       MR. STONE: Objection. Vague and ambiguous,
01:02:49 4  overbroad.
01:02:50 5       THE WITNESS: No.
01:02:50 6  BY MS. WILKINSON:
01:02:53 7    Q. You don't have any clinical experience
01:02:56 8  with patients; is that right?
01:02:57 9       MR. STONE: Objection. Vague and ambiguous,
01:02:59 10 overbroad.
01:03:01 11      THE WITNESS: You mean back then?
01:03:04 12 BY MS. WILKINSON:
01:03:05 13   Q. At any time.
01:03:07 14   A. I do have, you know, experience right now.
01:03:09 15   Q. With HIV patients?
01:03:11 16   A. Not HIV patients.
01:03:13 17   Q. Do you have any clinical experience with
01:03:15 18 HIV patients?
01:03:17 19      MR. STONE: Same objection.
01:03:18 20      THE WITNESS: No.
01:03:18 21 BY MS. WILKINSON:
01:03:21 22   Q. And you've never treated any HIV patients
01:03:27 23 whose samples were collected for PCR studies; is
01:03:31 24 that right?
01:03:31 25      MR. STONE: Objection. Vague, ambiguous,

### Page 89

```
01:03:33  1   overbroad.
01:03:35  2        THE WITNESS: No.
01:03:35  3   BY MS. WILKINSON:
01:03:36  4      Q. I'm sorry, is it --
01:03:37  5      A. No.
01:03:37  6      Q. You've never --
01:03:39  7      A. No.
01:03:39  8      Q. You've never treated HIV patients,
01:03:42  9   correct?
01:03:44 10      A. Correct.
01:03:44 11      Q. And you've never collected samples from
01:03:47 12   HIV patients?
01:03:47 13        MR. STONE: Objection.
01:03:48 14   BY MS. WILKINSON:
01:03:48 15      Q. Is that correct?
01:03:49 16        MR. STONE: Vague and ambiguous. Overbroad.
01:03:50 17        THE WITNESS: Yes.
01:03:50 18   BY MS. WILKINSON:
01:03:55 19      Q. And you have never done quantitative PCR
01:03:59 20   on any samples from HIV patients; is that right?
01:04:04 21        MR. STONE: Objection. Vague and ambiguous,
01:04:06 22   overbroad.
01:04:07 23        THE WITNESS: Yes.
01:04:07 24   BY MS. WILKINSON:
01:04:10 25      Q. If you could just take a quick look
```

### Page 90

```
01:04:14  1   through this publication and tell me whether you
01:04:21  2   made any of the figures that appear in this
01:04:24  3   document.
01:04:25  4        MR. STONE: So you want her only to look at
01:04:27  5   the figures?
01:04:28  6        MS. WILKINSON: Yes.
01:04:44  7        THE WITNESS: No.
01:04:44  8   BY MS. WILKINSON:
01:04:45  9      Q. And if I could refer your attention to
01:04:48 10   Table 1 of Exhibit 582. You didn't analyze any of
01:04:59 11   the data that's reported in that table; is that
01:05:07 12   correct?
01:05:07 13      A. Yes.
01:05:07 14      Q. You didn't do any analysis for any of the
01:05:11 15   data that's reported in this article; is that
01:05:15 16   correct?
01:05:15 17        MR. STONE: Objection. Vague and ambiguous.
01:05:16 18   Overbroad.
01:05:17 19        THE WITNESS: Yes.
01:05:17 20   BY MS. WILKINSON:
01:05:21 21      Q. Have you ever performed any statistical
01:05:24 22   analyses on PCR data?
01:05:32 23      A. You mean that time or up to now?
01:05:37 24      Q. Through 1992.
01:05:41 25      A. No.
```

### Page 91

```
01:05:45  1        MR. STONE: I'll object. The question was
01:05:47  2   vague and ambiguous and overbroad.
01:05:47  3   BY MS. WILKINSON:
01:05:53  4      Q. Do you know whether anyone else at Cetus
01:05:59  5   was in any way involved with this publication?
01:06:02  6        MR. STONE: Objection. Vague and ambiguous,
01:06:04  7   overbroad.
01:06:07  8        THE WITNESS: No, I don't know.
01:06:07  9   BY MS. WILKINSON:
01:06:10 10      Q. Do you know of anybody at Cetus that had
01:06:12 11   any experience treating patients with HIV?
01:06:17 12      A. No, I don't know.
01:06:20 13      Q. Do you know of anyone at Cetus who had
01:06:25 14   experience collecting samples from patients that
01:06:29 15   are being treated for HIV?
01:06:31 16      A. No, I don't know.
01:06:33 17      Q. Do you know of anybody at Cetus
01:06:40 18   Corporation who had done quantitative PCR of HIV
01:06:46 19   patients at the time that you began working with
01:06:49 20   Mark Holodniy?
01:06:54 21      A. No, I don't know.
01:06:57 22      Q. Have you ever discussed with anyone
01:07:01 23   whether you should have been included as an author
01:07:04 24   on this paper?
01:07:08 25      A. This paper?
```

### Page 92

```
01:07:10  1      Q. Yes.
01:07:11  2        MR. STONE: And again, I would leave out
01:07:12  3   discussions with counsel in responding to that
01:07:14  4   question.
01:07:14  5        THE WITNESS: Okay. I'll follow my --
01:07:17  6        MS. WILKINSON: Can you please repeat my
01:07:19  7   question.
01:07:32  8        (Record read as follows:
01:07:32  9        "QUESTION: Have you ever discussed
01:07:32 10        with anyone whether you should have been
01:07:33 11        included as an author on this paper?")
01:07:33 12        MR. STONE: And all I'm saying is I'm
01:07:35 13   cautioning you to the extent you discussed that with
01:07:37 14   counsel, don't provide that in your response to the
01:07:41 15   question.
01:07:42 16        THE WITNESS: Oh, okay. No.
01:07:43 17   BY MS. WILKINSON:
01:07:43 18      Q. Before you became involved in this
01:07:44 19   lawsuit, you never discussed with anyone whether
01:07:46 20   you should be included as an author on this
01:07:49 21   article; is that right?
01:07:50 22      A. Yes.
01:08:16 23        MS. WILKINSON: I'm going to give the witness
01:08:18 24   Exhibit 15, previously marked. It's a United States
01:08:23 25   patent No. 5,968,730.
```

## Page 93

```
01:08:23  1        (Deposition Exhibit 15 previously marked
01:08:23  2        was presented to the witness.)
01:08:23  3   BY MS. WILKINSON:
01:08:41  4        Q. Ms. Wang, have you ever seen this document
01:08:43  5   before? Have you ever seen this document before?
01:09:11  6        MR. STONE: And you can answer it yes or no.
01:09:36  7        THE WITNESS: Yes.
01:09:36  8   BY MS. WILKINSON:
01:09:37  9        Q. When did you see this document?
01:09:41 10        A. Provided by my counsel.
01:09:43 11        Q. Prior to your counsel giving you this
01:09:49 12   document, had you ever seen it before?
01:09:51 13        A. No.
01:09:51 14        Q. When did counsel provide you with this
01:09:55 15   document?
01:09:56 16        MR. STONE: If you recall.
01:09:58 17        THE WITNESS: I don't recall.
01:09:58 18   BY MS. WILKINSON:
01:10:02 19        Q. Have you read it?
01:10:08 20        A. I read just -- you know, glanced through.
01:10:14 21        Q. When was the last time you glanced through
01:10:16 22   it?
01:10:17 23        A. The time my counsel provide me the document.
01:10:20 24        Q. Was that yesterday?
01:10:22 25        A. No.
```

## Page 94

```
01:10:23  1        Q. Was it a couple of years ago?
01:10:31  2        A. I don't recall.
01:10:33  3        Q. Do you recall if it was in the past six
01:10:41  4   months?
01:10:41  5        A. Could be.
01:10:42  6        Q. What do you recall about this patent?
01:10:44  7        MR. STONE: She's not going to provide expert
01:10:46  8   testimony. If what you're seeking is expert
01:10:48  9   testimony --
01:10:48 10        MS. WILKINSON: I'm asking her --
01:10:49 11        MR. STONE: No, no, no. If what you're
01:10:51 12   seeking is expert testimony, I will instruct her not
01:10:54 13   to answer. That's not appropriate --
01:10:54 14        MS. WILKINSON: I'm asking her --
01:10:55 15        MR. STONE: -- for your investigation today.
01:10:56 16   And you know that, Counsel. This is a fact witness.
01:10:56 17   If you want to ask questions about facts, you can do
01:11:00 18   that.
01:11:00 19        MS. WILKINSON: Yes.
01:11:00 20        MR. STONE: She's not providing --
01:11:01 21        MS. WILKINSON: I'm asking her about the
01:11:01 22   facts from this article.
01:11:02 23        MR. STONE: No, you're asking about expert
01:11:05 24   witness testimony. That's utterly inappropriate.
01:11:08 25   Utterly.
```

## Page 95

```
01:11:09  1        MS. WILKINSON: I've asked her what her
01:11:10  2   recollection is about this patent. If she has no
01:11:13  3   recollection other than as a potential expert witness;
01:11:16  4   is that what you're saying? As a fact witness, she's
01:11:20  5   not entitled to have any recollection about a document
01:11:22  6   that she has reviewed?
01:11:23  7        MR. STONE: Counsel, is she named as an
01:11:25  8   inventor on this patent? You can ask her if she has a
01:11:32  9   recollection.
01:11:32 10   BY MS. WILKINSON:
01:11:33 11        Q. What was your impression when you first
01:11:35 12   reviewed this document?
01:11:36 13        MR. STONE: Objection. Lacks foundation.
01:11:38 14   Calls for speculation.
01:11:45 15        THE WITNESS: I just realized there is a
01:11:48 16   patent and they're talking about using the PCR to
01:11:51 17   monitor the HIV particles.
01:11:54 18        MR. STONE: And also object to this line of
01:11:56 19   questioning as inappropriate and calls for expert
01:11:58 20   testimony.
01:11:58 21   BY MS. WILKINSON:
01:11:59 22        Q. Did you see in this patent anything that
01:12:03 23   described work that you had done at Cetus
01:12:09 24   Corporation?
01:12:09 25        A. As I mentioned --
```

## Page 96

```
01:12:10  1        MR. STONE: Same objections.
01:12:11  2        THE WITNESS: As I mentioned before, I didn't
01:12:13  3   read this patent through carefully, so --
01:12:18  4   BY MS. WILKINSON:
01:12:18  5        Q. Right. To the extent that you reviewed
01:12:22  6   it, was there anything that struck you as
01:12:27  7   discussing work that you had done while you were at
01:12:30  8   Cetus Corporation?
01:12:30  9        MR. STONE: So you're asking about her
01:12:32 10   recollection?
01:12:32 11        MS. WILKINSON: Yes.
01:12:33 12        MR. STONE: Okay. Lacks foundation. Calls
01:12:35 13   for speculation.
01:12:38 14        THE WITNESS: As I said, you know, again,
01:12:40 15   okay, I don't recall and -- because I didn't read it
01:12:43 16   carefully.
01:12:43 17   BY MS. WILKINSON:
01:12:46 18        Q. So sitting here today, you don't recall
01:12:50 19   anything in this patent that was related to the
01:13:00 20   work that you did at Cetus Corporation?
01:13:03 21        MR. STONE: Objection. Lacks foundation.
01:13:05 22   Calls for speculation. Object to the extent it calls
01:13:07 23   for expert testimony.
01:13:08 24        THE WITNESS: I don't recall.
01:13:10 25        MS. WILKINSON: Okay.
```

| | |
|---|---|
| 01:33:58  1 could refer to the line number in the left-most | 01:37:05  1 Overbroad. Incomplete hypothetical. Lacks |
| 01:34:02  2 column so that I can be sure I'm following along | 01:37:08  2 foundation. Calls for speculation. |
| 01:34:05  3 with you. | 01:37:12  3 THE WITNESS: I don't quite understand your |
| 01:34:13  4 A. 1351, SK145. And those are the -- okay. I | 01:37:13  4 question. |
| 01:34:41  5 don't quite see this. It's not quite clear here. | 01:37:13  5 BY MS. WILKINSON: |
| 01:34:44  6 1401 -- | 01:37:15  6 Q. I'm trying to understand how you selected |
| 01:34:45  7 Q. Mm-hmm. | 01:37:22  7 the portion of the sequence to focus on. |
| 01:34:46  8 A. -- there was SK something written there. | 01:37:27  8 A. Oh. I don't recall. I don't recall. |
| 01:34:48  9 Q. And 1451, above 1451 or is that below -- | 01:37:38  9 Q. Do you recall whether you looked at |
| 01:34:53 10 A. 1401. | 01:37:41 10 publications that pointed you to sequences to look |
| 01:34:54 11 Q. Okay. I see that. | 01:37:47 11 at for HIV? |
| 01:34:55 12 A. Yeah. And then 1501 is a Rsa. And then also | 01:37:52 12 A. I was told by my supervisor that the project, |
| 01:35:02 13 there's, you know, T to A mutation. | 01:37:58 13 you know, it's for HIV, yeah. So I don't recall |
| 01:35:05 14 Q. Mm-hmm. | 01:38:04 14 because my supervisor gave me the sequence. I don't |
| 01:35:08 15 A. And then line 1601, SK39. | 01:38:07 15 recall that, yeah. |
| 01:35:15 16 Q. And when did you select these sequences? | 01:38:07 16 Q. Is it your testimony that the sequence |
| 01:35:18 17 A. When did I select these sequences? | 01:38:09 17 came from David Mark? |
| 01:35:21 18 Q. Mm-hmm. You testified that you selected | 01:38:10 18 A. I don't recall. |
| 01:35:24 19 this sequence; is that right? | 01:38:11 19 MR. STONE: Objection. Asked and answered. |
| 01:35:26 20 A. Yes. | 01:38:11 20 BY MS. WILKINSON: |
| 01:35:26 21 Q. When? | 01:38:19 21 Q. Is there anybody else you could have |
| 01:35:27 22 A. When we start to do the cloning work. | 01:38:21 22 talked with that pointed you to those sequences? |
| 01:35:33 23 Q. The cloning work -- | 01:38:25 23 MR. STONE: Objection. Overbroad. Calls for |
| 01:35:36 24 A. To -- to -- to amplify this portion to put | 01:38:27 24 speculation. |
| 01:35:40 25 into the vector. | 01:38:29 25 THE WITNESS: I don't recall. |
| Page 113 | Page 115 |
| 01:35:41  1 Q. Before you began work with Mr. Casipit on | 01:38:29  1 BY MS. WILKINSON: |
| 01:35:46  2 the cRNA standard, you had not worked with these | 01:38:33  2 Q. You mentioned mutation -- |
| 01:35:50  3 HIV sequences; is that correct? | 01:38:36  3 A. Yes. |
| 01:35:53  4 A. Could you say that again? | 01:38:37  4 Q. -- in this sequence. Was this -- is there |
| 01:35:55  5 Q. Before you began work on this cRNA | 01:38:42  5 any significance to that mutation? |
| 01:36:00  6 standard and the plasmid, you had not worked | 01:38:43  6 MR. STONE: Objection. Vague and ambiguous. |
| 01:36:04  7 with -- | 01:38:45  7 THE WITNESS: Yes. |
| 01:36:04  8 A. Worked with -- | 01:38:45  8 BY MS. WILKINSON: |
| 01:36:05  9 Q. -- these sequences? | 01:38:46  9 Q. And what was that? |
| 01:36:07 10 A. That's right. | 01:38:48 10 A. So creating this mutation, we can generate |
| 01:36:07 11 Q. So how did you know which sequences to | 01:38:54 11 Rsa site. So once the product produced, we can use |
| 01:36:10 12 select? | 01:38:59 12 the Rsa site to cut the fragment to smaller -- to two |
| 01:36:11 13 MR. STONE: Objection. Vague and ambiguous. | 01:39:04 13 smaller pieces, and you can separate on the gel. |
| 01:36:13 14 Overbroad. | 01:39:10 14 Q. And why would you want to do that? |
| 01:36:15 15 THE WITNESS: This is the HIV sequence. | 01:39:11 15 A. So this way the standard -- the product |
| 01:36:15 16 BY MS. WILKINSON: | 01:39:16 16 generated from the cRNA was different from the product |
| 01:36:29 17 Q. Mm-hmm. | 01:39:19 17 generated from the HIV. |
| 01:36:32 18 A. So -- so if you want -- you know, I -- I | 01:39:21 18 Q. And that would be useful if you amplified |
| 01:36:37 19 mean, generally the standard curve for HIV, you have | 01:39:28 19 your sample and the standard in the same tube; is |
| 01:36:41 20 to use HIV sequence. | 01:39:36 20 that right? |
| 01:36:43 21 Q. Right. So somebody -- another scientist | 01:39:36 21 A. Yes. |
| 01:36:49 22 like yourself who had never worked with HIV before | 01:39:36 22 MR. STONE: Objection. Vague and ambiguous, |
| 01:36:55 23 would have the same possible set of sequences to | 01:39:37 23 overbroad. |
| 01:37:02 24 select as primers; is that right? | 01:39:37 24 BY MS. WILKINSON: |
| 01:37:04 25 MR. STONE: Objection. Vague. Ambiguous. | 01:39:38 25 Q. Did you understand my question? |
| Page 114 | Page 116 |

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

```
01:39:39  1       A. Yes.
01:39:39  2       Q. Okay?
01:39:40  3       A. But I mention to you before, the quantitation
01:39:44  4   has two approaches --
01:39:45  5       Q. Mm-hmm.
01:39:46  6       A. -- either internal standard or external
01:39:50  7   standard. So --
01:39:50  8       Q. And this aspect of the sequence was useful
01:39:56  9   to using the standard as an internal control --
01:40:02 10       MR. STONE: Objection. Misstates --
01:40:02 11   BY MS. WILKINSON:
01:40:03 12       Q. Is that right?
01:40:04 13       MR. STONE: Objection. Misstates her
01:40:05 14   testimony.
01:40:05 15       THE WITNESS: Could be used for both.
01:40:05 16   BY MS. WILKINSON:
01:40:10 17       Q. How is the mutation aspect used for both?
01:40:16 18       A. You don't -- okay. You have this -- you have
01:40:19 19   a choice. If you want it internally, you can do it.
01:40:23 20   If you want to do it externally, you can also use
01:40:25 21   this. You don't have to, you know, cut with Rsa
01:40:29 22   website.
01:40:29 23       Q. Okay. So the mutation site is not a
01:40:36 24   feature of the standard that you have to use to do
01:40:42 25   quantitative PCR; is that your testimony?
```
Page 117

```
01:40:46  1       A. When we design experiment, we usually try to
01:40:51  2   design -- try to cover all bases, so that's why, you
01:40:55  3   know, we -- we put this here. You know, in the future
01:40:59  4   you can have a choice.
01:41:00  5       Q. But you could do quantitative PCR without
01:41:05  6   using this mutation; is that right?
01:41:09  7       A. Yes.
01:41:10  8       Q. And you could do -- you could design a
01:41:16  9   standard that does not have this mutation, right?
01:41:20 10       MR. STONE: Objection. Vague and ambiguous.
01:41:21 11   Overbroad.
01:41:21 12       THE WITNESS: Yes.
01:41:23 13   BY MS. WILKINSON:
01:41:23 14       Q. You could have designed the sequence to be
01:41:28 15   identical to the gag gene RNA; is that right?
01:41:32 16       MR. STONE: Same objections.
01:41:33 17       THE WITNESS: Yes.
01:41:33 18   BY MS. WILKINSON:
01:41:35 19       Q. And that sequence could have been inserted
01:41:37 20   into a plasmid for use as a standard?
01:41:40 21       MR. STONE: Same objections. I'll object to
01:41:42 22   this whole line of testimony as seeking improper
01:41:44 23   expert testimony.
01:41:49 24       THE WITNESS: As I said before, okay, so this
01:41:51 25   just extra effort, try to cover all the bases.
```
Page 118

```
01:41:51  1   BY MS. WILKINSON:
01:41:58  2       Q. Right. But you didn't have to go through
01:42:01  3   that extra effort. You could have done the cloning
01:42:04  4   with the HIV gag gene sequence?
01:42:08  5       MR. STONE: Objection. Vague and ambiguous.
01:42:09  6   Misstates testimony.
01:42:12  7       THE WITNESS: Yes.
01:42:12  8   BY MS. WILKINSON:
01:42:15  9       Q. And that sequence could have been
01:42:16 10   expressed in the commercially available vector; is
01:42:24 11   that right?
01:42:24 12       A. Yes.
01:42:24 13       MR. STONE: Objection. Vague and ambiguous.
01:42:25 14   Overbroad. Calls for speculation.
01:42:28 15       MS. WILKINSON: Can you please --
01:42:29 16       THE WITNESS: Yes.
01:42:30 17       MS. WILKINSON: -- repeat my question?
01:42:39 18       (Record read as follows:
01:42:39 19       "QUESTION: And that sequence could
01:42:39 20       have been expressed in the commercially
01:42:40 21       available vector; is that right?")
01:42:40 22   BY MS. WILKINSON:
01:42:40 23       Q. So the --
01:42:41 24       MR. STONE: Same objections.
01:42:41 25   BY MS. WILKINSON:
```
Page 119

```
01:42:42  1       Q. So the gag gene sequence without a point
01:42:45  2   mutation could have been inserted into a
01:42:48  3   commercially available vector at the time that you
01:42:51  4   did the cRNA work and expressed cRNA to be used as
01:42:57  5   a standard; is that correct?
01:42:59  6       MR. STONE: Objection. Vague and ambiguous.
01:43:00  7   Overbroad. Incomplete hypothetical. Calls for expert
01:43:03  8   testimony. Misstates previous testimony.
01:43:11  9       THE WITNESS: To me, to design a good
01:43:17 10   standard, you do need to have that knowledge to design
01:43:20 11   that.
01:43:20 12   BY MS. WILKINSON:
01:43:21 13       Q. That wasn't my question. My question was
01:43:25 14   you said -- you testified that it was extra effort
01:43:29 15   to put in this mutation. And my question is:
01:43:32 16   Could you have expressed the exact sequence of the
01:43:37 17   gag DNA gene in a commercially available plasmid,
01:43:46 18   transcribed that into RNA and used that as an
01:43:50 19   internal standard?
01:43:51 20       MR. STONE: Objection. Vague and ambiguous.
01:43:53 21   Overbroad. Incomplete hypothetical. Calls for
01:43:56 22   speculation.
01:44:00 23       THE WITNESS: It depends on how do you want
01:44:01 24   to detect that product.
01:44:01 25   BY MS. WILKINSON:
```
Page 120

| | |
|---|---|
| 02:06:30 1    Q. And it was your testimony that you don't<br>02:06:32 2 know David Schwartz?<br>02:06:34 3    A. Right.<br>02:06:34 4    Q. And you didn't give David Schwartz<br>02:06:36 5 anything?<br>02:06:36 6    A. That's right.<br>02:06:38 7    Q. Did you review your notebooks in<br>02:06:40 8 preparation for today's deposition?<br>02:06:43 9    A. My notebooks?<br>02:06:44 10   Q. Yes.<br>02:06:45 11   A. No.<br>02:06:45 12   Q. Your Cetus notebooks.<br>02:06:48 13      Sitting here today, do you know of any<br>02:06:50 14 references to Mark Holodniy in any of your Cetus<br>02:06:53 15 laboratory notebooks?<br>02:06:55 16   A. No.<br>02:06:56 17   Q. Sitting here today, do you know of any<br>02:06:58 18 references to quantitative PCR of HIV in any of<br>02:07:03 19 your Cetus laboratory notebooks?<br>02:07:05 20   A. No.<br>02:07:23 21      MS. WILKINSON: That's all I have.<br>02:07:24 22      MR. STONE: No further questions.<br>02:07:26 23      MS. WILKINSON: Thank you very much for your<br>02:07:27 24 time this afternoon. Appreciate it.<br>02:07:28 25      THE WITNESS: You're welcome.<br>Page 129 | 1<br>2<br>3<br>4<br>5<br>6<br>7<br>8    I, ALICE WANG, Ph.D., do hereby declare<br>9 under penalty of perjury that I have read the<br>10 foregoing transcript of my deposition; that I have<br>11 made such corrections as noted herein, in ink,<br>12 initialed by me, or attached hereto; that my testimony<br>13 as contained herein, as corrected, is true and<br>14 correct.<br>15    EXECUTED this ____ day of<br>16 _____, 20____, at<br>17 _____, _____.<br>18    (City)        (State)<br>19<br>20    _____<br>        ALICE WANG, Ph.D.<br>21<br>22<br>23<br>24<br>25<br>Page 131 |
| 02:07:30 1    MR. STONE: Let's go off the record.<br>02:07:31 2    VIDEO OPERATOR: Okay. Stand by. This<br>02:07:33 3 concludes today's deposition of Dr. Alice Wang. The<br>02:07:37 4 number of media used was two. We are off the record<br>02:07:40 5 at 2:07 p.m.<br>6 //<br>7 //<br>8<br>9<br>10<br>11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25<br>Page 130 | 1<br>2    I, the undersigned, a Certified Shorthand<br>3 Reporter of the State of California, do hereby<br>4 certify:<br>5    That the foregoing proceedings were taken<br>6 before me at the time and place herein set forth; that<br>7 any witnesses in the foregoing proceedings, prior to<br>8 testifying, were placed under oath; that a verbatim<br>9 record of the proceedings was made by me using machine<br>10 shorthand which was thereafter transcribed under my<br>11 direction; further, that the foregoing is an accurate<br>12 transcription thereof.<br>13    I further certify that I am neither<br>14 financially interested in the action nor a relative or<br>15 employee of any attorney of any of the parties.<br>16    IN WITNESS WHEREOF, I have this date<br>17 subscribed my name.<br>18<br>19    Dated: _____<br>20<br>21<br>22<br>23    _____<br>24    SUZANNE F. BOSCHETTI<br>      CSR No. 5111<br>25<br>Page 132 |

33 (Pages 129 to 132)

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855