HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

---

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

THE BOARD OF TRUSTEES OF THE
LELAND STANFORD JUNIOR
UNIVERSITY,
        Plaintiff,
    vs.                         No. C-05-04158-MHP
ROCHE MOLECULAR SYSTEMS, INC.,
et al.,
        Defendants.

AND RELATED COUNTERCLAIM.

---

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
VIDEOTAPED DEPOSITION OF MICHAEL W. KONRAD, Ph.D.
Redwood Shores, California
Friday, July 28, 2006

Reported by:
GINA GLANTZ
CSR No. 9795, RPR, RMR
JOB No. 3-50475

Page 1

---

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

THE BOARD OF TRUSTEES OF THE
LELAND STANFORD JUNIOR
UNIVERSITY,
        Plaintiff,
    vs.                         No. C-05-04158-MHP
ROCHE MOLECULAR SYSTEMS, INC.,
ROCHE DIAGNOSTICS CORPORATION;
ROCHE DIAGNOSTICS OPERATIONS, INC.;
ROCHE DIAGNOSTICS SYSTEMS, INC.,
        Defendants.

AND RELATED COUNTERCLAIM.

    Videotaped Deposition of MICHAEL W. KONRAD, Ph.D.,
taken on behalf of Plaintiff and Counterclaim
Defendants, at 555 Twin Dolphin Drive, Suite 560,
Redwood Shores, California, beginning at 10:15 a.m. and
ending at 2:07 p.m., on Friday, July 28, 2006, before
GINA GLANTZ, Certified Shorthand Reporter No. 9795.

Page 2

---

APPEARANCES:

For Plaintiff The Board of Trustees of The Leland
Stanford Junior University and Counterclaim Defendants
Thomas Merigan and Mark Holodniy:

    COOLEY GODWARD LLP
    BY: RICARDO RODRIGUEZ
    Attorney at Law
    Five Palo Alto Square, 3000 El Camino Real
    Palo Alto, California 94306-2155
    (650) 843-5000

For Defendants and Counterclaimants Roche Molecular
Systems, Inc., et al., and the Witness:
    QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
    BY: BRIAN C. CANNON
    BY: TUN-JEN CHIANG
    Attorneys at Law
    555 Twin Dolphin Drive, Suite 560
    Redwood Shores, California 94065
    (650) 801-5000

Also Present:

    RHEA NERESIAN

Videographer:
    RAY TYLER
    SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
    450 Sansome Street, Suite 1550
    San Francisco, California 94111
    (415) 274-9977

Page 3

---

                INDEX
WITNESS                      EXAMINATION
MICHAEL W. KONRAD, Ph.D.

        BY MR. RODRIGUEZ              9

                EXHIBITS

DEPOSITION                              PAGE

559  Four-page document, the first page is    8
     titled "Invention Disclosure" (RMS 00194
     - 197)

560  Four-page document titled "A Method and  8
     Apparatus for Detecting and Quantitating
     Specific DNA Sequences Generated Using
     the Polymerase Chain Reaction" by Michael
     Konrad, dated February 14, 1989 (RMS
     00198 - 201)

561  Six-page document titled "A Method and   8
     Apparatus for Detecting and Quantitating
     DNA Sequences Generated Using the
     Polymerase Chain Reaction," by Michael
     Konrad, dated February 20, 1989 (RMS
     00208 - 213)

562  Eight-page curriculum vitae of Michael W. 8
     Konrad, Ph.D. (RMS 0063534 - 3541)

563  Three-page document titled "Publication  40
     Clearance Request"; IP 89-225 (RMS 00096
     - 08)

Page 4

---

1 (Pages 1 to 4)

### Page 21

1  BY MR. RODRIGUEZ:
2  Q  Not necessarily. Just in general, what people
3  thought of him.
4     MR. CANNON: Object as to form.
5     THE WITNESS: I believe that he was a very
6  integral part of planning clinical -- in analyzing
7  clinical trials.
8  BY MR. RODRIGUEZ:
9  Q  Do you have any understanding of why he was
10 integral to planning clinical trials?
11    MR. CANNON: Objection. Calls for speculation,
12 object as to form.
13    THE WITNESS: Well, his -- if -- his experience
14 is in viral diseases, and Cetus, at various times, was
15 trying to develop therapeutics to treat viral diseases,
16 so there's a natural match there. He was also
17 influential in early work on interferon, and we were
18 trying to develop interferon.
19 BY MR. RODRIGUEZ:
20 Q  Did you have any understanding of the Cetus
21 folks with whom Dr. Merigan regularly interacted?
22 A  Would you repeat the question, please.
23 Q  Did you have any understanding of the Cetus
24 folks with whom Dr. Merigan had regular interactions
25 with?

### Page 22

1     MR. CANNON: Object as to form.
2     THE WITNESS: And by "understanding," do you
3  mean do I know which people he interacted with the most?
4  BY MR. RODRIGUEZ:
5  Q  Well, let's start with that.
6  A  He would tend to talk more to the M.D.s, to the
7  physicians at Cetus.
8  Q  Any ones in particular?
9  A  Well, there were only a few at Cetus. There
10 was Ed Bradley, who was the head of the clinical biology
11 group, so I'm sure he talked to Ed Bradley.
12 Q  Anybody else?
13 A  I'm sure he talked to all of the -- at one time
14 or other to all of the physicians at Cetus.
15 Q  And you said there were only a few of those?
16 A  I believe we had maybe five or six.
17 Q  Would you say that Dr. Merigan was generally
18 well thought of at Cetus?
19 A  Yes.
20 Q  Do you recall who the president or CEO of Cetus
21 was around the '89, '90 time frame?
22 A  I should, but let's -- I'm very bad at names.
23 Q  One name that has come up, and I apologize if I
24 mispronounce it, is a Mr. Fildes.
25 A  Bob Fildes, exactly, thank you. That was the

### Page 23

1  CEO of Cetus.
2  Q  And you do recall him to be the CEO --
3  A  Oh, yes, yes.
4  Q  -- of Cetus around '89 or '90?
5     Do you recall whether you were under the
6  impression that Dr. Merigan had any kind of regular
7  interactions with Mr. Fildes?
8  A  I don't know how often they talked.
9  Q  Do you ever recall anything negative being said
10 about Dr. Merigan?
11 A  No.
12 Q  Do you know a Dr. Mark Holodniy?
13 A  Yes.
14 Q  How do you know Dr. Holodniy?
15 A  He worked in the same lab that my group worked
16 in for a number of months.
17 Q  Do you recall --
18 A  And I'm a coauthor of two papers of his -- with
19 him.
20 Q  Do -- I'm sorry. Do you recall when that was,
21 these number of months that you referred to?
22 A  They were about 1989, about, something like
23 that.
24 Q  And when you say your group, you're referring
25 to the clinical biology group?

### Page 24

1  A  Well, I wasn't the head of the whole clinical
2  biology group. There were, I believe, three technicians
3  that reported to me. So I was just a part of the
4  clinical biology group.
5  Q  But that's the group that you're referring to?
6  A  Yes, yes.
7  Q  "Your group" not as in the group that you ran,
8  but the group that you're a part of?
9  A  Right, right.
10 Q  And what did Dr. Holodniy do in connection with
11 that group?
12 A  He -- I don't believe that he worked
13 extensively with my group, that he -- it was my
14 impression that he mostly worked with the PCR group,
15 which was on a different floor.
16 Q  But -- so --
17 A  Although he did certainly talk to some of the
18 technicians that worked with me, and he talked to me
19 very occasionally.
20 Q  What was the nature of the conversations that
21 he had with you?
22 A  Well, the only one that I remember was when he
23 came into my office and said he was having trouble with
24 his assays, and I told him that I thought it was the
25 heparin that was in the blood that he was using.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Page 25**

1  Q  Which assays was he referring to?
2  A  It was an assay for HIV RNA or DNA, I can't
3  remember which.
4  Q  Did you previous- -- let me start the question
5  again.
6     Prior to this conversation you had with
7  Dr. Holodniy, were you aware that there was being work
8  done on an assay related to HIV RNA?
9  A  Yes.
10 Q  How were you aware of that?
11 A  Well, when -- when he -- when he first started
12 working in the same lab that I was working, he may have
13 introduced himself or somebody else introduced him to
14 me, so that I would know who this new person was and
15 wouldn't think that some strange person was working in
16 the lab.  But I didn't make -- I didn't make the
17 arrangements for him to work in my lab, but I was
18 probably informed that he was going to be working in my
19 lab.
20 Q  Prior to initially meeting Dr. Holodniy, were
21 you aware of any work that was being done at Cetus with
22 respect to an assay for HIV RNA or DNA?
23 A  I don't know.
24 Q  You don't recall one way or the other?
25 A  I don't recall.

**Page 26**

1  Q  So let's go back to this conversation in which
2  you said he came to your office, and you had a
3  discussion about his assays.  You mentioned that you
4  referred to heparin as a possible problem in connection
5  with that conversation; is that right?
6  A  Yes, that's right.
7  Q  And what was the issue with heparin?
8  A  Well, heparin is -- is a polymer with lots of
9  negative charges, and it resembles very much DNA and you
10 would never want to do an assay -- and RNA, and you'd
11 never want to do an assay for DNA and RNA with something
12 that was very similar to it in the same assay mixture
13 because you would get inhibition.
14 Q  Do you recall how Dr. Holodniy described the
15 issue to you?
16 A  Not in any detail, just that he was having --
17 he was getting erratic results.
18 Q  Do you recall what it was about your own
19 background and knowledge that caused you to focus on
20 heparin as a potential problem?
21 A  Well, I'm a biochemist who's worked with DNA
22 before, and -- but I don't remember -- it is possible
23 that -- that Holodniy asked me if I thought that heparin
24 might be a problem, and it's possible that he didn't.
25 Q  You just don't recall either way?

**Page 27**

1  A  I just don't recall either way, but I do recall
2  telling him that it would be a problem and he should get
3  rid of it.
4  Q  Do you recall anything else about that
5  conversation?
6  A  Only that he seemed to agree with my suggestion
7  and left and said that he would try doing assays without
8  heparin.
9  Q  Do you know whether that was done?
10 A  I found out later, because he -- I found out
11 that my name was included on a paper describing that
12 effect.
13 Q  Had -- did you not get a chance to review that
14 paper before it was submitted?
15 A  He may have given me a draft, I don't remember.
16 Q  You don't remember one way or the other?
17 A  That's correct.
18 Q  Do you recall or did you have any impression of
19 how often Dr. Holodniy was at Cetus?
20    MR. CANNON:  Object as to form.
21    THE WITNESS:  I remember him being in the lab
22 maybe for an afternoon several days a week, but it's --
23 for several months, but it's sort of a very vague
24 impression.
25 BY MR. RODRIGUEZ:

**Page 28**

1  Q  Do you recall anytime at which his presence
2  there at Cetus, for all practical purposes, stopped?
3  A  No.
4  Q  Was Dr. Holodniy well thought of at Cetus?
5  A  I don't know.
6  Q  Did you ever hear anybody -- let me rephrase
7  the question.
8     Do you recall anyone saying negative things
9  about Dr. Holodniy?
10 A  No.
11 Q  I want to just work our way through a few
12 invention disclosures that were produced, so if you
13 could take a look at the other stack of documents that's
14 in front of you, we can just start with whatever is
15 there on top.  What's the exhibit number there?
16 A  559 is on top.
17 Q  Okay.  So the reporter has handed you what has
18 been marked as Exhibit 559.  This is a document entitled
19 "Invention Disclosure," having Bates number RMS 00194
20 through 00197.  Would you please take a look at Exhibit
21 559 and tell me if you recognize it.
22    MR. CANNON:  Ricardo, are these for me?
23    MR. RODRIGUEZ:  Yes.
24    THE WITNESS:  I don't remember it.  I see that
25 my name is on it, but it isn't my handwriting in the

7 (Pages 25 to 28)

## Page 29

```
 1  body of the disclosure.
 2  BY MR. RODRIGUEZ:
 3     Q  Do you recall having seen this document before?
 4     A  No, I don't.
 5     Q  Would you go ahead and read through it, and let
 6  me know when you're done.
 7     A  Yes.
 8        MR. CANNON: Would you like him to read the
 9  whole thing?
10        MR. RODRIGUEZ: Yes, please.
11        MR. CANNON: So take your time and read the
12  whole thing.
13        THE WITNESS: Yes, I think I understand it now.
14  BY MR. RODRIGUEZ:
15     Q  Would you describe what it is.
16        MR. CANNON: Objection as to form. Objection.
17  Incomplete hypothetical. Objection. Calls for an
18  expert opinion.
19        THE WITNESS: I agree.
20  BY MR. RODRIGUEZ:
21     Q  Just do your best.
22     A  Would you repeat the question again now.
23     Q  Just describe what it is.
24     A  It's an invention disclosure.
25     Q  And what do you recall about it?
```

## Page 30

```
 1     A  I don't recall seeing it before, even though my
 2  name is -- is on it, along with Eric Grove, and I don't
 3  see -- Shirley Kwok maybe. Yeah, Shirley Kwok.
 4     Q  Do you recall anything about --
 5     A  I don't know why my name is on it. I don't
 6  happen to remember this.
 7     Q  You don't recall the technology that's
 8  described in that disclosure?
 9     A  No, I don't.
10     Q  Do you recall submitting invention disclosures
11  to Cetus from time to time?
12     A  Yes.
13     Q  What was your understanding of the timing for
14  providing those to the appropriate person at Cetus?
15        MR. CANNON: Objection as to form.
16        THE WITNESS: You want to know what Cetus'
17  policy was for scientists submitting invention
18  disclosures?
19  BY MR. RODRIGUEZ:
20     Q  Let's start with that. Do -- were you aware of
21  the policy at the time?
22     A  I believe that scientists were encouraged to
23  submit invention disclosures as soon as they had an
24  invention to disclose.
25     Q  To whom --
```

## Page 31

```
 1     A  I don't remember -- I don't remember the
 2  specific policy, if there were specific guidelines.
 3     Q  To whom would they make the invention
 4  disclosures?
 5     A  I believe there was a patent office, and that
 6  you sent it to them.
 7     Q  And was there a procedure for hearing back
 8  regarding whether the invention disclosures would
 9  actually be filed as patent applications?
10     A  I'm not aware of such a procedure.
11     Q  Were you aware of that actually happening, that
12  you -- sometimes people would hear back about whether or
13  not the invention disclosure would result in a patent
14  application?
15     A  Well, I made -- I made two disclosures years
16  before this one in a completely -- when I was in a
17  different department, it was on a completely different
18  subject, and I actually -- or Cetus actually got a
19  patent on it, so I heard back from -- from those
20  disclosures, but I don't remember hearing -- but often,
21  disclosures just sort of disappear into a black hole.
22     Q  So based on your own experience -- and "your
23  own experience," I'm including discussions with
24  others -- there was no common practice to get back to
25  you one way or the other with respect to whether
```

## Page 32

```
 1  invention disclosures would be submitted as patent
 2  applications?
 3        MR. CANNON: Objection as to form.
 4        THE WITNESS: There may have been a policy, but
 5  I'm not aware of what it was.
 6  BY MR. RODRIGUEZ:
 7     Q  And policies aside, do you recall any kind of
 8  standard practice or common practice in terms of getting
 9  back to the folks that submitted invention disclosures?
10     A  No.
11     Q  I have a couple of other invention disclosures
12  in front of you. If you could turn to the one that's
13  marked Exhibit 560.
14     A  560, yes.
15     Q  Exhibit 560 is a document that has a technical
16  title at the top and has Bates numbers RMS 00198 through
17  00201. Would you please take a look at Exhibit 560 and
18  tell me if you recognize it.
19     A  Yes, I do recognize this one.
20     Q  Would you describe --
21     A  And I believe I typed it, and I certainly
22  signed it, and I do remember it, yes.
23     Q  And is this one of the invention disclosures
24  that you referenced earlier that you said did actually
25  get filed as a patent application?
```

**Page 49**

1  Dr. Merigan?
2   A  No.
3   Q  Do you recall giving any material at all to
4  Dr. Schwartz?
5   A  No.
6   Q  Do you know a Dr. David Katzenstein?
7   A  No.
8   Q  Dr. Katzenstein is one of the inventors on one
9  of the patents.
10   A  I see.
11   Q  So I'm just going to ask you the same question
12  again.
13   A  I don't believe I know him, no.
14   Q  You've never met a Dr. Katzenstein?
15   A  I don't remember ever meeting him.
16   Q  So you don't recall giving any --
17   A  That's right.
18   Q  -- material to Dr. Katzenstein?
19   A  That's right.
20   Q  We just need to -- you just need to let me
21  finish my question. I'm sorry.
22   A  Oh, I'm sorry.
23   Q  The reporter needs to take it down. Even
24  though you're good at anticipating what I'm going to
25  say, you still have to wait.

**Page 50**

1  I can just hand this one to you directly.
2  I've handed you what has been previously marked
3  as Exhibit 1. Would you please take a look at Exhibit 1
4  and tell me if you recognize it.
5   A  Yes, I do recognize it.
6   Q  What is Exhibit 1?
7   A  It's a reprint of a paper on a virus RNA assay.
8   Q  When was the last time that you saw Exhibit 1,
9  or a copy thereof?
10       MR. CANNON: I'd caution the witness not to
11  get -- not to reveal communications that you might have
12  had with your attorneys concerning documents in
13  preparation for this deposition.
14       THE WITNESS: I think I looked at this reprint
15  last night, just to refresh my memory.
16  BY MR. RODRIGUEZ:
17   Q  Did it actually refresh your memory?
18   A  No.
19   Q  Do you know about how much time you spent
20  looking at it last night?
21   A  Three minutes.
22   Q  And when you looked at it last night, was that
23  in connection with preparation with counsel for the
24  deposition, or separately on your own?
25   A  Separately on my own.

**Page 51**

1   Q  Did you look at any other documents separately
2  on your own?
3   A  I believe I looked at the other paper that I'm
4  a coauthor of, on the inhibitory effect of heparin.
5   Q  Did that refresh your recollection as to
6  anything?
7   A  No.
8   Q  Did you review any documents in connection with
9  your preparation for the deposition with counsel?
10       MR. CANNON: That's a yes-or-no question he's
11  asking you.
12  BY MR. RODRIGUEZ:
13   Q  Let me back up --
14   A  Yes.
15   Q  -- and do a foundational question.
16  Did you spend some time with your counsel in
17  preparation for the deposition?
18   A  Yes.
19   Q  How much time did you spend?
20   A  I don't -- the total time that I've spent
21  talking to lawyers at Quinn; is that what you're asking?
22   Q  Let's start with that.
23   A  I'm guessing that it's about two hours.
24   Q  Did you spend time also yesterday with counsel
25  from Quinn Emanuel in connection with preparation for

**Page 52**

1  this deposition?
2   A  No.
3   Q  When was the most recent time that you spent
4  time with them in preparation for the deposition?
5   A  This morning at 8:30 or 9:00.
6   Q  At that time, did you review any documents?
7   A  I don't remember which documents I might have
8  looked at.
9   Q  Did any of the documents that you reviewed
10  refresh your recollection?
11   A  No.
12   Q  Do you have a sense at all with respect to
13  Exhibit 1 of your contribution to what is described
14  there?
15       MR. CANNON: Object as to form.
16       THE WITNESS: No. I don't remember discussing
17  this paper with Mark Holodniy before he wrote it or --
18  so I really couldn't tell you very much.
19  BY MR. RODRIGUEZ:
20   Q  Do you recall seeing a draft at all of the
21  paper?
22   A  No.
23   Q  Do you recall any discussion with anyone in
24  connection with the preparation and submission of the
25  paper?

**Page 53**

1  A  No.
2  Q  Do you recall any discussion with anyone in
3  connection with the publication of the paper?
4  A  No.
5  Q  Did you review the paper after it was
6  published?
7  A  No.
8  Q  When was the first time that you recall
9  reviewing the paper? Let me actually rephrase that
10 question.
11      When is the first time that you recall
12 reviewing Exhibit 1?
13 A  I believe it was about a year afterwards, when
14 I was collecting reprints, all the reprints from my
15 career, and I happened to look at it then.
16 Q  I'm just going to have to backtrack to make
17 sure I've got Exhibit 1 covered, so this is going to
18 sound -- these questions are going to sound a little bit
19 familiar.
20     Do you recall any discussion with anyone in
21 connection with the preparation and submission of
22 Exhibit 1?
23 A  No.
24 Q  Do you recall any discussion with anyone in
25 connection with the publication of Exhibit 1?

**Page 54**

1  A  No.
2  Q  Did you review Exhibit 1 after it was
3  published?
4      MR. CANNON: Object as to form.
5  BY MR. RODRIGUEZ:
6  Q  Let me rephrase that one in light of the
7  answers that you've given since.
8      Did you review Exhibit 1 immediately after it
9  was published?
10 A  No.
11 Q  Do you recall any impressions you had with
12 respect to Exhibit 1 when you finally did review it in
13 connection with your compilation of your papers?
14 A  No.
15 Q  Were there other papers that you reviewed in
16 connection with the compilation of your papers that you
17 had not recalled being an author on?
18     MR. CANNON: Object as to form.
19     THE WITNESS: I don't believe so.
20 BY MR. RODRIGUEZ:
21 Q  I've handed you what has been previously marked
22 as Exhibit 46. This is a document having Bates number
23 PENNIE 001219 through 001223. Would you please take a
24 look at Exhibit 46 and tell me if you recognize it.
25 A  No, I do not recognize it.

**Page 55**

1  Q  Do you have any sense of whether you may have
2  seen Exhibit 46 before?
3  A  I don't believe I have.
4  Q  Did you ever become aware that there were
5  studies being conducted either at Cetus or Stanford with
6  respect to the use of the quantification of HIV in order
7  to monitor treatment for HIV?
8      MR. CANNON: Object as to form.
9      THE WITNESS: Would you repeat the question,
10 the first part of the question.
11 BY MR. RODRIGUEZ:
12 Q  Let me see if I can -- why don't you go ahead
13 and just read to yourself, with respect to Exhibit 46,
14 the final paragraph, just before the acknowledgments,
15 and just tell me when you're done.
16     MR. CANNON: Is that the paragraph beginning
17 "In summary"?
18     MR. RODRIGUEZ: Yes, the paragraph beginning
19 "In summary."
20     THE WITNESS: Yes, I've finished reading the
21 paragraph.
22 BY MR. RODRIGUEZ:
23 Q  Did you ever become aware that there was work
24 such as that described in that last paragraph of Exhibit
25 46 that was being conducted either at Stanford or Cetus?

**Page 56**

1  A  I don't really remember becoming aware of it,
2  no.
3  Q  This one I'll give to you directly. I've
4  handed you what's been previously marked as Exhibit 13,
5  it is a document having Bates number RMS 01460 through
6  01463. Would you please take a look at Exhibit 13 and
7  tell me if you recognize it.
8  A  Yes, I recognize it.
9  Q  What is Exhibit 13?
10 A  It's a reprint of a paper that I am a coauthor
11 on, on the inhibition of gene amplification by heparin.
12 Q  And what do you recall about the actual
13 discussion in the paper?
14     MR. CANNON: Objection as to form.
15     THE WITNESS: You asked -- would you repeat the
16 question.
17 BY MR. RODRIGUEZ:
18 Q  Let me just rephrase it.
19 A  Yes.
20 Q  What do you recall with respect to your
21 contribution as to what's described in the paper?
22 A  I believe my conversation was limited to
23 advising Mark Holodniy to not use blood containing
24 heparin in his assay.
25 Q  The paper goes through and identifies materials

14 (Pages 53 to 56)

## Page 89

1  U.S. patents that were assigned to and owned by Stanford
2  University?
3     A  No.
4        MR. RODRIGUEZ:  Why don't we take a short
5  break.
6        MR. CANNON:  Sounds good.
7        THE VIDEOGRAPHER:  The time is 1:40. We're
8  going off the record.
9        (Recess.)
10       THE VIDEOGRAPHER:  The time is 1:52 p.m.
11 Please -- we're on record.  Please go ahead.
12 BY MR. RODRIGUEZ:
13    Q  Dr. Konrad, if I could direct your attention to
14 what has been previously marked as Exhibit 29.  This is
15 a document entitled "Materials Transfer Agreement."
16 Would you please take a look at Exhibit 29 and tell me
17 if you recognize it.
18    A  No, I don't recognize it.
19    Q  To the best of your recollection, have you ever
20 seen Exhibit 29 before?
21    A  I don't believe I have.
22    Q  I've handed you a copy of what has been
23 previously marked as Exhibit 30.  This is a document
24 entitled "Visitor's Confidentiality Agreement."  Would
25 you please take a look at it and tell me if you

## Page 90

1  recognize it.
2     A  I don't recognize it.
3        (Deposition Exhibit 576 marked.)
4  BY MR. RODRIGUEZ:
5     Q  The reporter has placed in front of you a
6  document having Exhibit No. 576.  It is a multipage fax
7  from Ricardo -- to Ricardo Rodriguez.  This packet
8  actually has one of the documents that you've just
9  looked at already in it, but it also has a copy of the
10 consulting agreements with Dr. Merigan that I had
11 mentioned earlier in the deposition.  So -- and it
12 appears that those have not already been marked
13 otherwise, but I'm going to leave them to be officially
14 marked separately when they're actually discussed
15 specifically in a deposition.  So for right now, I would
16 just ask you, if you could look through Exhibit 576,
17 beginning on -- I actually wish they had kept the fax
18 page on it.
19       If I could direct your attention to the portion
20 of Exhibit 576 where it states at the top "Non-Exclusive
21 Consulting Agreement," and at the bottom says, "Page 1,"
22 and has Bates number STAN 003857.
23    A  Yes, I see it.
24    Q  If you could just review from there to the end,
25 and that will be two different consulting agreements.

## Page 91

1  And my question for each will just be if you recognize
2  them.
3     A  I don't -- I haven't seen it before, either one
4  of them before.
5        MR. RODRIGUEZ:  And just for clarity for the
6  record, Exhibit 576 has a date on the front of July
7  28th, 2006, and is a 25-page fax document.
8        (Deposition Exhibit 577 marked.)
9  BY MR. RODRIGUEZ:
10    Q  The reporter has handed you what has been
11 marked as Exhibit 577.  This is a memorandum having
12 Bates numbers RMS 00215 through RMS 00218.  Would you
13 please take a look at Exhibit 577 and tell me if you
14 recognize it.
15    A  I see this as my work, but I don't recognize
16 it.  I don't remember it.
17    Q  Does it refresh your recollection -- let me
18 start again.
19       Does Exhibit 577 refresh your recollection at
20 all as to work related to PCR that you did at Cetus,
21 other than the work related to the internal standard?
22    A  No.
23       (Deposition Exhibit 578 marked.)
24 BY MR. RODRIGUEZ:
25    Q  The reporter has handed you what has been

## Page 92

1  marked as Exhibit 578.  This is a document entitled
2  "Patent Disclosure," having Bates number RMS 00221
3  through 225.  Would you please take a look at Exhibit
4  578 and tell me if you recognize it.
5     A  I just barely remember it, yes.
6     Q  What do you remember about Exhibit 578?
7     A  I remember the general idea that I was
8  proposing at this time, the outline of the idea that is
9  described in some detail in this disclosure.
10    Q  Did you actually do any -- let me start that
11 again.
12       Did you actually carry out any studies related
13 to what is described in Exhibit 578?
14    A  No, this was merely a proposal.
15    Q  Do you recall why you did not carry out any
16 work related to Exhibit 578?
17       MR. CANNON:  Objection as to form.
18       THE WITNESS:  It wasn't a funded project.  It
19 was an idea I had.  It wasn't a project that had any
20 status in the company.
21 BY MR. RODRIGUEZ:
22    Q  Does Exhibit 578 reflect (sic) your
23 recollection as to any work that you did relating to PCR
24 other than the work relating to the internal standard?
25       MR. CANNON:  Objection as to form.

23 (Pages 89 to 92)

```
 1
 2
 3          I, the undersigned, a Certified Shorthand
 4   Reporter of the State of California, do hereby certify:
 5          That the foregoing proceedings were taken
 6   before me at the time and place herein set forth; that
 7   any witnesses in the foregoing proceedings, prior to
 8   testifying, were placed under oath; that a verbatim
 9   record of the proceedings was made by me using machine
10   shorthand which was thereafter transcribed under my
11   direction; further, that the foregoing is an accurate
12   transcription thereof.
13          I further certify that I am neither
14   financially interested in the action nor a relative or
15   employee of any attorney of any of the parties.
16          IN WITNESS WHEREOF, I have this date
17   subscribed my name.
18
19   DATED: _____
20
21
22   _____
     GINA GLANTZ
23   CSR No. 9795
24
25
                              Page 97
```

25 (Page 97)