CONFIDENTIAL

---

**Page 1**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

THE BOARD OF TRUSTEES OF THE LELAND
STANFORD JUNIOR UNIVERSITY,

  Plaintiff,

vs.                    Case No.: C 05 04158 MHP

ROCHE MOLECULAR SYSTEMS, ET AL.,

  Defendants.

ROCHE MOLECULAR SYSTEMS, ET AL.,

  Counterclaimants,

vs.

THE BOARD OF TRUSTEES OF THE LELAND
STANFORD JUNIOR UNIVERSITY; AND THOMAS
MERIGAN,

  Counterclaim Defendants.

C O N F I D E N T I A L
(THIS MATERIAL IS CONFIDENTIAL PURSUANT
TO COURT ORDER)

DEPOSITION OF ERIC GROVES

San Diego, California
Friday, August 11, 2006

Reported by:
BROOKE SILVAS, RPR
CSR No. 10988
Job No. 51122

---

**Page 2**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

THE BOARD OF TRUSTEES OF THE LELAND
STANFORD JUNIOR UNIVERSITY,

  Plaintiff,

vs.   Case No.: C 05 04158 MHP

ROCHE MOLECULAR SYSTEMS, ET AL.,

  Defendants.

ROCHE MOLECULAR SYSTEMS, ET AL.,

  Counterclaimants,

vs.

THE BOARD OF TRUSTEES OF THE LELAND
STANFORD JUNIOR UNIVERSITY; AND THOMAS
MERIGAN,

  Counterclaim Defendants.

Deposition of ERIC GROVES, taken on behalf of Plaintiff and Counterclaim Defendant, at 4445 Eastgate Mall, Suite 200, San Diego, California, beginning at 9:02 a.m., Friday, August 11, 2006, before BROOKE SILVAS, CSR No. 10988, RPR.

---

**Page 3**

APPEARANCES OF COUNSEL:

For the Plaintiff and Counterclaim Defendant, The Board of Trustees of the Leleand Standford Junior University and Counterclaim Defendants Thomas Merigan and Mark Holodniy:

  COOLEY GODWARD, LLP
  BY: RICARDO RODRIGUEZ, ESQ.
  Five Palo Alto Square
  3000 El Camino Real
  Palo Alto, California 94306-2155
  (650) 843-5000
  rr@cooley.com

For the Defendants and Counterclaimant Roche Systems:

  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  BY: JEFFREY N. BOOZELL, ESQ.
  865 South Figueroa Street
  10th Floor
  Los Angeles, California 90017
  (213) 624-7707
  jeffboozell@quinnemanuel.com

Also Present:
  CATALINA AMPARANO, Videographer

---

**Page 4**

I N D E X

| WITNESS | | EXAMINATION |
|---|---|---|
| ERIC GROVES | | |
| BY MR. RODRIGUEZ | | 6 |

E X H I B I T S

| PLAINTIFF'S | | PAGE: |
|---|---|---|
| 600 | Curriculum Vitae | 83 |
| 601 | Consulting Agreement, Bates stamped RMS 06272-6288 | 128 |
| 602 | Non-Exclusive Consulting Agreement between Cetus Corporation and Thomas Merigan, Bates stamped 00048-50 | 128 |
| 603 | Publication Clearance Request, Bates stamped RMS 00588-590 | 138 |
| 604 | Letter to Mark Holodniy, Thomas Merigan, and David Schwartz from Eric Groves, January 29, 1990 | 140 |
| 605 | Publication Clearance Request, Bates stamped RMS 00921-942 | 141 |

---

### Page 93

11:13  1  BY MR. RODRIGUEZ:
11:13  2    Q   And do you recall actually reviewing
       3  publications for that purpose?
11:13  4    A   Yes.
11:13  5    Q   Do you recall actually asking the
       6  publications -- let me rephrase that.
11:13  7        Do you ever recall suggesting that proposed
       8  publications not be published or delayed -- be
       9  delayed in publication in connection with
       10 confidentiality concerns?
11:13  11   A   Counsel made me aware yesterday of a
       12 document where we asked that a specific abstract be
       13 held confidential prior to its actual publication
       14 because of potential intellectual property issues.
       15 And that's the one thing that I now remember.
11:14  16   Q   Do you remember any -- anything else in
       17 that similar vein?
11:14  18   A   No, not explicitly.
11:14  19   Q   And setting aside intellectual property
       20 concerns, can you think of any other issues that
       21 might have posed a problem for you in terms of
       22 allowing proposed publications to go ahead and
       23 publish?
11:14  24       MR. BOOZELL:  Vague and ambiguous.
11:14  25       THE WITNESS:  So publications can bring

### Page 94

       1  incorrect interpretations of data and immortalize
       2  them. So we would review them to see whether we
       3  thought there was correct interpretations of the
       4  data. If we disagreed, we would discuss the matter
       5  with the investigator.
11:14  6  BY MR. RODRIGUEZ:
11:14  7    Q   Do you recall when Cetus became interested
       8  specifically in the quantitation of HIV RNA?
11:15  9       MR. BOOZELL:  Objection. Vague and ambiguous.
       10 Calls for speculation. Lacks foundation as to all
       11 of Cetus.
11:15  12      THE WITNESS:  Cetus is a big place. Lots of
       13 people were thinking all the time.
11:15  14 BY MR. RODRIGUEZ:
11:15  15   Q   Can you give any additional information?
11:15  16   A   No.
11:15  17   Q   When -- when did you become aware that
       18 Cetus was looking to investigate the quantitation of
       19 HIV RNA?
11:15  20      MR. BOOZELL:  Same objections.
11:15  21 BY MR. RODRIGUEZ:
11:15  22   Q   Actually, let me be a tad more general.
       23 When did -- when did you become aware that Cetus was
       24 interested in investigating the quantitation of HIV?
11:15  25   A   So Cetus is not -- was not an universal

### Page 95

       1  entity. Cetus was a series of people. Those people
       2  worked in different disciplines. The issue about
       3  how to properly monitor patients is -- is something
       4  that is always present in any pharmaceutical
       5  corporation. So methods to do that are being
       6  discussed at any given time all the time everywhere.
       7  So exactly when it was that somebody first started
       8  to talk about how to quantitate HIV with PCR, I
       9  don't know. But I would imagine it would have been
       10 shortly after PCR was first used to identify the
       11 virus. But I -- that's just a speculation.
11:16  12   Q   Was there actually a particular project
       13 that was directly targeted towards quantifying HIV
       14 using PCR?
11:16  15      MR. BOOZELL:  Objection. Vague. Ambiguous.
       16 And calls for speculation. Lacks foundation.
11:16  17      THE WITNESS:  So the laboratory that I
       18 supervised endeavored to build a refined technology
       19 for doing that. But I do not remember that Cetus
       20 per se was attempting to develop a clinical
       21 commercial assay which would be appropriate for that
       22 task.
11:17  23 BY MR. RODRIGUEZ:
11:17  24   Q   With respect to your lab, when do you
       25 recall that your lab began to undertake to develop a

### Page 96

       1  way to quantify HIV?
11:17  2    A   So when we first started doing the assays
       3  from the samples from the AZT/IL-2 Stanford trial,
       4  the goal was to try to qualitatively quantitate the
       5  virus. And then with time, the technology got more
       6  refined. So...
11:17  7    Q   And you used the term qualitatively
       8  quantitate just to identify the fact that early on
       9  it was more of a qualitative issue -- result than a
       10 quantitative result?
11:18  11   A   That is correct.
11:18  12   Q   Do you recall there ever being a project at
       13 Cetus that was directed at using the quantitation of
       14 HIV for purposes of detecting HIV?
11:18  15      MR. BOOZELL:  Vague and ambiguous.
11:18  16      THE WITNESS:  I'm sorry. Can you restate that?
11:18  17 BY MR. RODRIGUEZ:
11:18  18   Q   Yeah.
11:18  19   A   I got confused where you were going.
11:18  20   Q   Just to give you the context in terms of
       21 what I'm getting at in terms of, say, blood banks,
       22 people that come in to determine if they have HIV,
       23 you know, that kind of detection.
11:18  24      So with that background, did you ever
       25 become aware that Cetus became interested in using

### Page 113

11:39  1  BY MR. RODRIGUEZ:
11:39  2     Q  And was there a particular way in which
       3  Cetus tracked which materials were being sent
       4  pursuant to which materials transfer agreements?
11:39  5     MR. BOOZELL: Calls for speculation.
11:39  6     THE WITNESS: There was a log maintained for the
       7  materials that were shipped, but I don't know where
       8  that log is or who maintained it.
11:39  9  BY MR. RODRIGUEZ:
11:39  10     Q  Did that log include information that
       11  identified whether the material was being sent
       12  pursuant to an MTA?
11:39  13     A  It would not have been shipped without an
       14  MTA.
11:39  15     Q  But did -- but did the log actually state
       16  which MTA --
11:40  17     A  I didn't read the log, so I can't tell you
       18  that.
11:40  19     Q  But your recollection is that nothing was
       20  shipped out of the company unless it was affiliated
       21  with an MTA?
11:40  22     A  That's correct.
11:40  23     Q  Did you ever become aware during your time
       24  at Cetus of any material that was transferred out of
       25  Cetus that was not subject to an MTA?

### Page 114

11:40  1     A  No, I do not recall.
11:40  2     Q  Were there any procedures in place to
       3  insure that material was -- that was being sent was
       4  actually being sent pursuant to an MTA?
11:40  5     A  The process whereby material was shipped
       6  out of the company was at least centralized within
       7  various disciplines so that it was controlled. So
       8  that was the method used, the controls. There was a
       9  procedure to insure that things had happened before.
       10  That the appropriate steps had occurred prior to
       11  this material being shipped.
11:41  12     Q  And how does the MTA, Exhibit 29, relate to
       13  the IL-2/AZT clinical trials?
11:41  14     A  Dr. Merigan's group wanted to be able to do
       15  more of the work down at Stanford. So this was an
       16  effort to support that goal.
11:41  17     Q  Were there any other materials -- so -- let
       18  me see if I understand. The MTA, Exhibit 29, was
       19  entered into for the purpose of -- let me start
       20  again.
11:42  21     The MTA, Exhibit 29, was entered into in
       22  connection with the IL-2/AZT clinical trials?
11:42  23     A  Yes.
11:42  24     Q  Did the MTA --
11:42  25     A  Excuse me.

### Page 115

11:42  1     Q  -- Exhibit 29 --
11:42  2     A  Let me -- let me -- that was the initiating
       3  factor, but that would not have been the sole --
       4  once information was transferred to Dr. Merigan,
       5  if -- if other things occurred in the future, that
       6  would certainly have been governed by such an
       7  agreement.
11:42  8     Q  Okay.
11:42  9     A  The relationship doesn't terminate with the
       10  termination of the trial.
11:42  11     Q  And that was my follow-up question. So was
       12  the MTA, Exhibit 29, intended to cover the transfer
       13  of materials other than materials related to the
       14  IL-2/AZT clinical trial?
11:43  15     MR. BOOZELL: Calls for speculation. Lacks
       16  foundation.
11:43  17     THE WITNESS: The reagents that were transferred
       18  could have been used for many purposes that were not
       19  explicitly related to that trial. The MTA wasn't
       20  designed to cover all uses of the reagents, not just
       21  some. The obligation between Dr. Merigan and the
       22  Stanford University and Cetus was for all possible
       23  things to do with this.
11:43  24  BY MR. RODRIGUEZ:
11:43  25     Q  And I guess what I'm getting at is not so

### Page 116

1  much what they're used for, but what -- how they get
2  there in the first place. So as an example, if
3  there was an unrelated -- a lab that was unrelated
4  to IL-2 and the AZT was not dealing with that study,
5  just wanted to have PCR agents for a wholly
6  different purpose. So with that background, my
7  question is Exhibit 29, the MTA, intended to cover
8  the transfer of materials from Cetus to Stanford for
9  the purpose of things other than things related to
10  the IL-2/AZT clinical trial?
11:44  11     MR. BOOZELL: Vague and ambiguous. Calls for
12  speculation. Lacks foundation. It's an incomplete
13  hypothetical. Calls for a legal conclusion.
11:44  14     THE WITNESS: So let me see. The modis -- the
15  reason for initiating the MTA was to support the
16  AZT/IL-2 trial. But Cetus was well aware that the
17  reagents and knowledge could be used in different
18  settings. And the obligation extended to all of
19  those.
11:44  20  BY MR. RODRIGUEZ:
11:44  21     Q  And what I'm getting at is actually just
22  the purpose. Let me just give you a hypothetical.
11:44  23     A  Yeah.
11:44  24     Q  Let's say there was a separate lab
25  unrelated to HIV, unrelated to IL-2 or AZT, and that

29 (Pages 113 to 116)

**Page 117**

```
          1    lab wanted to get some PCR reagents.
11:45     2    A   Uh-huh.
11:45     3    Q   Did the MTA, Exhibit 29, cover the transfer
          4    of materials in such a circumstance or would a new
          5    MTA be required?
11:45     6    A   A new --
11:45     7    MR. BOOZELL: Calls for speculation. Lacks
          8    foundation. Calls for a legal conclusion. And it's
          9    vague and ambiguous as to -- are you talking about
         10    another lab at Stanford?
11:45    11    MR. RODRIGUEZ: Yes.
11:45    12    MR. BOOZELL: Okay.
11:45    13    THE WITNESS: So --
11:45    14    MR. BOOZELL: Same objections.
11:45    15    THE WITNESS: So the agreement was between
         16    Dr. Merigan's group and Cetus. And it was not
         17    between anybody else and Cetus. So if Dr. Merigan
         18    chose to release the agents to somebody else, that
         19    would have been considered something outside of the
         20    range of the agreement and at some level a breach.
11:45    21    BY MR. RODRIGUEZ:
11:45    22    Q   Okay. So let me see if I get the -- let me
         23    see if I can get the metes and bounds here. The MTA
         24    was intended to cover transfer of materials between
         25    Cetus and Dr. Merigan's lab.
```

**Page 118**

```
11:45     1    MR. BOOZELL: Calls for --
11:45     2    BY MR. RODRIGUEZ:
11:45     3    Q   Is that right?
11:46     4    MR. BOOZELL: Calls for speculation. Lacks
          5    foundation. Calls for a legal conclusion.
11:46     6    BY MR. RODRIGUEZ:
11:46     7    Q   You can answer.
11:46     8    A   This agreement was created to cover a
          9    specific transfer. Okay. That was the transfer
         10    between Cetus and Dr. Merigan's laboratory. Okay.
         11    So as -- okay. So that's what I know about it. So
         12    let's -- I guess I should stop there.
11:46    13    BY MR. RODRIGUEZ:
11:46    14    Q   And so once the -- once material
         15    transferred under the MTA, Exhibit 29, got to
         16    Dr. Merigan, Dr. Merigan's lab could use it for
         17    other purposes and still be within the MTA; is that
         18    right?
11:46    19    MR. BOOZELL: Vague and ambiguous. Calls for
         20    speculation. Lacks foundation. Calls for a legal
         21    conclusion.
11:46    22    THE WITNESS: It was not our expectation that he
         23    would do that.
11:46    24    BY MR. RODRIGUEZ:
11:46    25    Q   But would it -- would it have been --
```

**Page 119**

```
11:46     1    A   We had no controls to establish whether he
          2    was using it within the spirit of that agreement.
11:47     3    Q   And the spirit that you're referring to
          4    is --
11:47     5    A   We said, we're doing this to support this
          6    trial. Okay. That's fine. If he decides to do
          7    something else in his laboratory and not tell us
          8    about it, we had no controls to monitor that kind of
          9    activity.
11:47    10    Q   Would that have been considered a breach?
11:47    11    MR. BOOZELL: Vague and ambiguous. Calls for a
         12    legal conclusion. Calls for speculation. Lacks
         13    foundation.
11:47    14    THE WITNESS: It would have been perceived to be
         15    a problem.
11:47    16    BY MR. RODRIGUEZ:
11:47    17    Q   And if there were different labs that
         18    wanted access to PCR reagents, they would have to
         19    sign up with a separate MTA?
11:48    20    MR. BOOZELL: Calls for a legal conclusion.
         21    Lacks foundation. Calls for speculation.
11:48    22    THE WITNESS: That would be my speculation.
11:48    23    BY MR. RODRIGUEZ:
11:48    24    Q   Did you have an understanding at the time
         25    that Exhibit 29 was signed, this is the MTA, with
```

**Page 120**

```
          1    respect to how it addressed who had rights to
          2    intellectual property?
11:48     3    MR. BOOZELL: Vague and ambiguous. Calls for
          4    speculation. Lacks foundation. Calls for a legal
          5    conclusion.
11:48     6    THE WITNESS: My appreciation was that Cetus's
          7    intellectual property people would conduct
          8    themselves in a manner that would sustain the
          9    intellectual property position of the company and
         10    that I would abide by their requirements and
         11    restrictions to support that work. That's as much
         12    as I can say.
11:49    13    BY MR. RODRIGUEZ:
11:49    14    Q   Did you have an understanding, specific to
         15    Exhibit 29, the MTA, as to how that agreement dealt
         16    with the allocation of intellectual property as
         17    between Cetus and Dr. Merigan's lab?
11:49    18    MR. BOOZELL: Vague and ambiguous. Lacks
         19    foundation. Calls for speculation. And calls for a
         20    legal conclusion. It's an incomplete hypothetical.
11:49    21    THE WITNESS: I'm not competent to make that
         22    judgment.
11:49    23    BY MR. RODRIGUEZ:
11:49    24    Q   Right. But did you have an understanding
         25    at the time?
```

## Page 121

```
11:49  1    MR. BOOZELL: Same objections.
11:49  2    THE WITNESS: I'm still not competent to make
       3  that judgment. They were supposed to do it right.
       4  I don't know what they did.
11:49  5    BY MR. RODRIGUEZ:
11:49  6    Q   And what would you consider doing it right?
11:49  7    A   This was Cetus proprietary technology. It
       8  should be properly protected.
11:49  9    Q   In -- in what way in terms of who gets
       10 rights as between a third party and Cetus?
11:49  11   MR. BOOZELL: Same objections. Calls for a
       12 legal conclusion. Lacks foundation. Calls for
       13 speculation. Incomplete hypothetical.
11:49  14   THE WITNESS: So that -- the question that you
       15 asked is generic and covers a great many different
       16 possible combinations. The particular work that
       17 we're describing here, it was our view that
       18 Dr. Holodniy was learning everything he knew how to
       19 do with us, and that the -- the improvements that
       20 occurred to him under our explicit guidance were
       21 Cetus's.
11:50  22   BY MR. RODRIGUEZ:
11:50  23   Q   And what about with respect to the MTA,
       24 Exhibit 29?
11:50  25   A   I -- I don't actually quite understand your
```

## Page 122

```
       1  question.
11:50  2    Q   Your comment just went -- was directed to
       3  Dr. Holodniy and his work.
11:50  4    A   So that specific problem is addressed here
       5  somehow, but I'm not competent to judge how it's
       6  addressed.
11:50  7    Q   When you say "here," you're talking about
       8  the MTA, Exhibit 29?
11:50  9    A   Yeah.
11:51  10   MR. RODRIGUEZ: Should we break for lunch?
11:51  11   MR. BOOZELL: You have enough after lunch to
       12 justify a whole lunch break?
11:51  13   MR. RODRIGUEZ: Probably. I probably have
       14 another hour or so, I'm guessing.
11:51  15   MR. BOOZELL: It's up to you.
11:51  16   MR. RODRIGUEZ: I can go straight through if you
       17 want.
11:51  18   THE WITNESS: If you want to go straight
       19 through.
11:51  20   MR. RODRIGUEZ: Let's just take a short break.
11:51  21   MR. BOOZELL: Okay.
11:51  22   THE VIDEOGRAPHER: Going off the record. The
       23 time is 11:51 a.m.
12:02  24   (A recess was taken.)
12:02  25   THE VIDEOGRAPHER: We're back on the record.
```

## Page 123

```
       1  The time is 12:03 p.m.
12:02  2    BY MR. RODRIGUEZ:
12:02  3    Q   Dr. Groves, did your lab, while were you at
       4  Cetus, have any involvement in the non-isotopic
       5  detection of HIV?
12:03  6    A   Yes.
12:03  7    Q   Can you describe that?
12:03  8    A   Not well. There was a desire to make the
       9  process for detecting the positive samples and the
       10 quantitative samples in an efficient way that used
       11 technology that made it inexpensive to read, easy to
       12 use, and so on. And the technologies that are used
       13 for this kind of work are actually quite
       14 sophisticated technologies. And you have to spend a
       15 fair amount of time learning how to best use them
       16 and so on. And so there was -- I -- there was
       17 discussion within the company about what
       18 technologies were useful and what might be the best.
       19 And some of them -- there were visions that they
       20 might go on to develop -- be developed as commercial
       21 assays. So there was some -- some constraints on
       22 what technologies were appropriate for commercial
       23 assaying. So all those things factored into the
       24 work that was done. And Dr. Conrad was very
       25 interested in that kind of problem. Although he was
```

## Page 124

```
       1  not necessarily an inventor on a specific
       2  technology, he wanted to use such technologies to
       3  make the assays work better and faster. And --
12:04  4    Q   Which scientists or technicians at Cetus
       5  were actually involved in the technical aspects of
       6  non-isotopic detection of HIV?
12:04  7    MR. BOOZELL: Calls for speculation. Lacks
       8  foundation.
12:04  9    THE WITNESS: I can't recall specific people.
       10 But the laboratory was involved in that work. And
       11 so the technicians and the various people in the
       12 laboratory would have been working on that. And
       13 then there were people outside the laboratory that
       14 were interested in the general problem because the
       15 same technology could be used for assays which were
       16 not designed to quantitate, but were just simply
       17 designed to just be positive or negative.
12:05  18   BY MR. RODRIGUEZ:
12:05  19   Q   Do you know whether anybody at Cetus
       20 performed non-isotopic detection protocol or methods
       21 for HIV/RNA from plasma?
12:05  22   MR. BOOZELL: Calls for speculation. Lacks
       23 foundation.
12:05  24   THE WITNESS: I no longer recall.
```

**Page 125**

12:05 1  BY MR. RODRIGUEZ:
12:05 2    Q  Who would know that, assuming they recall?
12:05 3    A  Members of the PCR group and maybe the
      4  members of the laboratory.
12:05 5    Q  Are you familiar at all with avidinated
      6  beads?
12:05 7    A  That's a technology that's used for
      8  detecting labeled proteins or labeled entities,
      9  molecular entities.
12:05 10   Q  Do you have any understanding technically
      11 in terms of when those beads became available
      12 generally for purchase?
12:05 13   MR. BOOZELL:  Calls for speculation.  Lacks
      14 foundation.
12:06 15   THE WITNESS:  I have no personal knowledge of
      16 that.
12:06 17 BY MR. RODRIGUEZ:
12:06 18   Q  Do you have any -- any general knowledge at
      19 all?
12:06 20   A  (Witness shakes head.)
12:06 21   Q  Do you recall at all a problem that was
      22 caused by heparin in connection with the
      23 quantitation of HIV using PCR?
12:06 24   A  Yes.
12:06 25   Q  Can you describe what you recall about

**Page 126**

      1  that?
12:06 2    A  As I told -- said earlier, we were
      3  interested in adequate sample collection to assure
      4  that the samples were collected in media or in a
      5  manner in which permitted the best assessment of the
      6  contents.  And heparin is a component of some of
      7  those sample collection tubes.  And as part of that,
      8  we explored whether or not -- we explored all the
      9  tubes that you could get.  And it turned out that
      10 heparin was -- interfered with the process of PCR.
      11 And exactly how that happened, I don't know, but it
      12 did.  And we went on to publish that because we were
      13 concerned that other people not be waylaid by us and
      14 the problem.  It's not intrinsically a major
      15 scientific breakthrough, but it was a piece of
      16 information that we wanted to make sure was publicly
      17 available so that other users of PCR would be
      18 collecting their samples appropriately.
12:07 19   Q  What was your particular involvement in the
      20 analysis to determine the inhibitory effect of
      21 heparin with respect to PCR quantitation of HIV?
12:07 22   A  I was concerned that we establish property
      23 conditions.  Then once some inappropriate conditions
      24 were established, I was concerned that that be --
      25 information be made available within the company and

**Page 127**

      1  then eventually outside the company.  But with
      2  regard to actually doing assays, I told you, I
      3  didn't do any assays.
12:07 4    Q  Did you actually work at the bench at all
      5  during your time at Cetus?
12:08 6    A  No, I did not.
12:08 7    Q  Your role was management and supervisory?
12:08 8    A  Yes.
12:08 9    Q  Do you recall providing any technical input
      10 or insight with respect to this heparin issue?
12:08 11   A  Other than to say I wanted the general
      12 problem examined, no.
12:08 13   MR. BOOZELL:  Before we go into details of 601
      14 here, I notice that Dr. Groves has made himself a
      15 note on the exhibit.  I don't know if you want to
      16 switch it for one that is clean in the record.
12:08 17   MR. RODRIGUEZ:  Shame on you.
12:08 18   THE WITNESS:  I was trying to do some
      19 arithmetic.
12:08 20   MR. BOOZELL:  You should switch it for yours
      21 because I wrote on mine.
12:08 22   MR. RODRIGUEZ:  That's fine.  I'll put the
      23 sticker as best I can over my writing without
      24 putting the RMS number in jeopardy.
12:08 25   MR. BOOZELL:  Please don't write on that.

**Page 128**

12:08 1    THE WITNESS:  I didn't realize I wasn't supposed
      2  to do that.  Excuse me.
12:09 3    MR. RODRIGUEZ:  I hope you brought your
      4  toothbrush because you're going to jail now.
12:09 5      (Plaintiff's Exhibit 601 was marked for
      6      identification by the deposition
      7      officer.  Said exhibit is attached
      8      hereto.)
12:09 9  BY MR. RODRIGUEZ:
12:09 10   Q  So let's go ahead and get to these exhibits
      11 that I put in front of you.  If I could direct your
      12 attention to what is marked as Exhibit 601.  This is
      13 a document entitled "Consulting Agreement," having
      14 Bates number RMS 06272 through 288.
12:09 15     Would you please take a look at Exhibit 601
      16 and tell me if you recognize it?
12:09 17   A  I do not recognize it.
12:09 18   Q  You don't think you've ever seen it before?
12:09 19   A  I have not seen it before.
12:09 20     (Plaintiff's Exhibit 602 was marked for
      21     identification by the deposition
      22     officer.  Said exhibit is attached
      23     hereto.)
12:09 24 BY MR. RODRIGUEZ:
12:09 25   Q  If I could direct your attention to

## Page 129

1  Exhibit 602. This is a document entitled
2  "Nonexclusive Consulting Agreement," having Bates
3  number RMS 00048 through 00050.
12:09  4      Would you please take look at Exhibit 602
5  and tell me if you recognize it?
12:10  6  A   I do not recognize it.
12:10  7  Q   You don't think you've ever seen it?
12:10  8  A   I don't think I've ever seen it.
12:10  9  Q   I want to turn now to the topic of one of
10  these articles relating to the quantitation of HIV
11  RNA, the publication of that and some disclosures
12  related to it. So I'll walk you through some
13  documents here.
12:10 14      I have handed you what has been previously
15  marked as Exhibit 563. This is a document having
16  Bates number RMS 00096 through 98. Would you please
17  take look at Exhibit 563 and tell me if you
18  recognize it.
12:11 19  A   I recognize it. I was shown it yesterday
20  by counsel.
12:11 21  Q   What do you remember about it?
12:11 22  MR. BOOZELL: You can -- you can answer to the
23  extent that you remember something independent of
24  any discussions that we had yesterday.
12:11 25  THE WITNESS: Nothing explicit about it. This

## Page 130

1  is a -- something that was submitted as part of a
2  publication effort.
12:11  3  BY MR. RODRIGUEZ:
12:11  4  Q   Do you have any recollections at all about
5  the particular publication that was being asked to
6  be cleared?
12:11  7  MR. BOOZELL: Go ahead and look at the whole
8  document if you need to answer.
12:11  9  THE WITNESS: Maybe you could -- can you
10  rephrase -- can you restate the question?
12:11 11  BY MR. RODRIGUEZ:
12:11 12  Q   Do you remember anything at all about this
13  particular publication clearance request?
12:11 14  A   Not -- other than that that's my
15  handwriting at the top of the page saying that other
16  authors needed to be included in the work. And
17  after that, I don't remember anything specific.
12:12 18  Q   You don't remember receiving it?
12:12 19  A   No, I don't remember.
12:12 20  MR. BOOZELL: For the record, there --
12:12 21  THE WITNESS: That is my handwriting on it. I
22  received it. It is my handwriting on the front page
23  of the document.
12:12 24  BY MR. RODRIGUEZ:
12:12 25  Q   RMS 00096, you recognize your -- your

## Page 131

1  written handwriting there throughout; is that right?
12:12  2  A   On page -- on 506719, that is my
3  handwriting.
12:12  4  Q   You have to read the RMS numbers. I'm
5  sorry.
12:12  6  A   Oh, I'm sorry. I was reading the wrong
7  one. See the RMS 00096, that was my handwriting on
8  that page. The next page, I don't recognize the
9  handwriting. And then on RMS 00098, that is my
10  handwriting.
12:12 11  Q   Do you actually -- do you have any
12  recollection of why you were suggesting that Alice
13  Wang and Michael Conrad be added as coauthors?
12:13 14  A   Because they had significant input into the
15  work.
12:13 16  Q   Is that something that you -- that you are
17  recalling now as to why you wanted them added or is
18  that your conclusion based on looking at the
19  document? I'm just trying to get at whether this is
20  a specific recollection of yours or whether this is
21  a conclusion that you're drawing now based on your
22  review of it.
12:13 23  A   It would be a specific recollection.
12:13 24  Q   Do you recall how you determined that Alice
25  Wang and Michael Conrad should also be added as

## Page 132

1  coauthors?
12:13  2  A   They were both significant contributors to
3  the work. They were in a senior position in the
4  course of the work. And those are the appropriate
5  people for inclusion as authors in such an abstract.
12:14  6  Q   What was your understanding of their
7  contribution to the work?
12:14  8  A   That they had major rules. And I can's say
9  they did this assay or that assay. But that they
10  had major roles in the work.
12:14 11  Q   You are also listed as a coauthor for the
12  abstract listed on RMS 0098. Is that right?
12:14 13  A   That's correct.
12:14 14  Q   And what is the purpose or reason for
15  listing of you as a coauthor as well?
12:14 16  MR. BOOZELL: Calls for speculation. Lacks
17  foundation.
12:14 18  THE WITNESS: I was a contributor to the
19  initiation of this work and its conduct. And in
20  that role, I have author rights or -- or excuse me.
21  Not rights. I should say that's an appropriate role
22  for an author.
12:15 23  BY MR. RODRIGUEZ:
12:15 24  Q   And when you say that you were involved in
25  the conduct of what's disclosed in the abstract on

**Page 133**

```
           1    RMS 00098, what do you mean by that?
12:15      2       A   I supervised the laboratory that was doing
           3    the work and the relationship between -- from the
           4    Cetus side, between Dr. Merigan's group and the
           5    laboratory.
12:15      6       Q   Do you recall who you sent the publication
           7    clearance request, Exhibit 53, to?
12:15      8       A   No.
12:15      9       Q   Do you recall having any discussions with
          10    anybody about the publication clearance request,
          11    Exhibit 563?
12:15     12       A   No.
12:15     13       Q   Do you recall that somebody eventually told
          14    you that it was cleared?
12:15     15       A   No, I don't recall that.
12:16     16       Q   Here is another one for you.
12:16     17           I've handed you what's been previously
          18    marked as Exhibit 33, having Bates number RMS 00070
          19    through 72. Would you please take a look at
          20    Exhibit 33 and tell me if you recognize it?
12:16     21       A   I recognize it after seeing it with counsel
          22    yesterday.
12:16     23       Q   What do you recall about it?
12:16     24       A   That it covered the submission of this
          25    abstract to this meeting and that there was concern
```

**Page 134**

```
           1    that the information not be released prematurely in
           2    the course of -- of -- by the people who received
           3    the abstract.
12:16      4       Q   Do you see that it refers to -- let me
           5    start the question again. If I could direct your
           6    attention again to RMS 00071.
12:17      7       A   Yes.
12:17      8       Q   Do you see that that letter refers to the
           9    information being the subject of a patent
          10    application?
12:17     11       A   I see that phrase.
12:17     12       Q   Do you recall that a patent application was
          13    filed in connection with the subject matter that's
          14    disclosed in the abstract on the page that follows,
          15    RMS 00072?
12:17     16       A   I do not recall.
12:17     17       Q   Do you have any general recollection at all
          18    with respect to a patent application being
          19    contemplated or filed with respect to the abstract
          20    that's on RMS 00072?
12:17     21       A   I recall there was an invention disclosure
          22    that covered material which is related to the
          23    content of the abstract.
12:18     24       Q   Did you -- did you recall ever actually
          25    learning that the content was the subject of a
```

**Page 135**

```
           1    patent application?
12:18      2       A   No, I do not.
12:18      3       Q   Nobody ever got back to you to let you know
           4    if it was actually filed as a patent application?
12:18      5       A   I don't recall.
12:18      6           MR. BOOZELL: Misstates his testimony.
12:18      7           THE WITNESS: I don't recall.
12:18      8       BY MR. RODRIGUEZ:
12:18      9       Q   I've handed you a document that has been
          10    previously marked Exhibit 34, having Bates number
          11    RMS 000542 to 544.
12:19     12           Would you please take a look at Exhibit 34
          13    and tell me if you recognize it?
12:19     14       A   I recognize it after reviewing it with
          15    counsel yesterday.
12:19     16       Q   Can you tell me what you recall about it?
12:19     17       A   The work had matured to the point where it
          18    was appropriate to consider an invention disclosure
          19    with potential to file a patent. And so the people
          20    who had done the work were asked to fill out -- the
          21    hands-on work were asked to fill out an invention
          22    disclosure. And this is that invention disclosure.
12:19     23       Q   Do you recognize the handwriting?
12:19     24       A   No, I do not explicitly recognize the
          25    handwriting.
```

**Page 136**

```
12:19      1       Q   But to what extent were you involved in the
           2    preparation or submission of this invention
           3    disclosure, Exhibit 34?
12:19      4       A   I would have asked that it happen. But I
           5    would not have written it.
12:20      6       Q   And you don't recall hearing back one way
           7    or the other as to whether the invention disclosure
           8    was actually filed as a patent application?
12:20      9       A   I do not recall.
12:20     10       Q   Do you recall anything else with respect to
          11    Exhibit 34?
12:20     12       A   No.
12:20     13           MR. BOOZELL: For the record, it also includes
          14    an abstract on the back. Go ahead and look at the
          15    whole document before you answer.
12:20     16           THE WITNESS: Pardon me.
12:20     17           MR. BOOZELL: Whether you remember anything
          18    about the document.
12:20     19           THE WITNESS: So the abstract in the back is the
          20    abstract, I believe -- I have not checked it word
          21    for word -- that you showed me previously, minus --
          22    with Alice Wang and Conrad added to it. And I have
          23    a note which I believe is in Mark Holodniy's on the
          24    bottom of page 000544 saying we have done this. And
          25    this is included as part of the information for the
```

## Page 145

12:38  1   Q   If I could -- start that one again. I have
       2   handed you what has previously been marked as
       3   Exhibit 46.
12:38  4       Would you please take look at Exhibit 46
       5   and tell me if you recognize it?
12:38  6   A   I do. I reviewed it with counsel
       7   yesterday. But --
12:38  8   Q   Do you --
12:38  9   A   -- only in that sense.
12:38 10   Q   Do you recall seeing Exhibit 46 prior to
      11   your review yesterday?
12:38 12   A   No. Excuse me. I review not having seen
      13   it before yesterday.
12:38 14   Q   And so let me just see if I'm clear then.
      15   It's not that you recall one way or the other. You
      16   don't believe that you saw it before yesterday?
12:39 17   A   That's correct.
12:39 18   Q   Are there any other documents that you
      19   reviewed in connection with counsel that refreshed
      20   your recollection that you can remember?
12:39 21   A   I think we basically covered them.
12:39 22   Q   Are there any others that you can remember?
12:39 23   A   No.
12:39 24   MR. RODRIGUEZ: Subject to continuing document
      25   issues, I have no further questions. Thank you for

## Page 146

       1   your time.
12:39  2   MR. BOOZELL: Okay. And given the documents
       3   that have been entered into the record in the
       4   deposition and Dr. Groves's testimony, Roche would
       5   like to designate the transcript as attorney's eyes
       6   only, restricted -- highly restricted. And
       7   Dr. Groves requests the opportunity to review his
       8   transcript and make any changes before it becomes
       9   final.
12:39 10   MR. RODRIGUEZ: Thank you for your time.
12:39 11   MR. BOOZELL: Thank you.
12:39 12   THE VIDEOGRAPHER: This concludes today's
      13   deposition of Eric Groves. The number of media used
      14   was two. We're going off the record. The time is
      15   12:40 p.m.
12:40 16   (Deposition session concluded at 12:40
      17   p.m.)
      18                -oOo-

## Page 147

 9   I, ERIC GROVES, do hereby declare under
10   penalty of perjury that I have read the foregoing
11   transcript; that I have made any corrections as appear
12   noted, in ink, initialed by me, or attached hereto; that
13   my testimony as contained herein, as corrected, is true
14   and correct.
15       EXECUTED this _____ day of _____,
16   20____, at _____, _____.
                  (City)            (State)

                    _____
                         ERIC GROVES

## Page 148

 1   STATE OF CALIFORNIA  )
                          ) ss.
 2   COUNTY OF RIVERSIDE  )
 3
 4       I, Brooke Silvas, Certified Shorthand Reporter,
 5   Certificate No. 10988, for the State of California, hereby
 6   certify:
 7       I am the deposition officer that stenographically
 8   recorded the testimony in the foregoing deposition;
 9       Prior to being examined the deponent was first
10   duly sworn by me;
11       The foregoing transcript is a true record of the
12   testimony given;
13       Before completion of the deposition, review of the
14   transcript {X} was { } was not requested. If requested, any
15   changes made by the deponent (and provided to the reporter)
16   during the period allowed are appended hereto.
17
18   Dated _____.

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855