CONFIDENTIAL - ATTORNEYS' EYES ONLY

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

THE BOARD OF TRUSTEES OF THE LELAND
STANFORD JUNIOR UNIVERSITY,

    Plaintiff

      vs.         CASE NUMBER:
                 C-05-04158 MHP

ROCHE MOLECULAR SYSTEMS, INC.,
ROCHE DIAGNOSTICS CORPORATION;
ROCHE DIAGNOSTICS OPERATIONS, INC.
    Defendants

ROCHE MOLECULAR SYSTEMS, INC.
ROCHE DIAGNOSTICS CORPORATION;
ROCHE DIAGNOSTICS OPERATIONS, INC.,

    Counter-Claimants
      vs.
THE BOARD OF TRUSTEES OF THE
LELAND STANFORD JUNIOR UNIVERSITY;
AND THOMAS MERIGAN.
    Counter-claim Defendants

CONFIDENTIAL - ATTORNEYS' EYES ONLY
    The video deposition of DAVID H. SCHWARTZ,
M.D. was held on Monday, October 16th, 2006, commencing
at 9:15 a.m. at the Law Offices of Bowie & Jensen, LLC,
29 West Susquehanna Avenue, Suite 600, Towson,
Maryland, 21204, Baltimore, Maryland, before R. Dwayne
Harrison, Notary Public.
JOB NO. 54638

Page 1

APPEARANCES:
    JOSHUA A. GLIKIN, ESQUIRE
    VINCENT M. GUIDA, JR., ESQUIRE
3  Bowie & Jensen, LLC
    29 Susquehanna Avenue, Suite 600
4  Towson, Maryland, 21204
    Tel: 410.583.2400 Fax: 410.583.2437
5  E-mail: guida@bowie-jensen.com
    E-mail: glikin@bowie-jensen.com
6      On behalf of Plaintiff
7

8  JEFFREY N. BOOZELL, ESQUIRE
    Quinn, Emanuel, Urquhart, Oliver &
    Hedges, LLP
9  865 South Figueroa Street, 10th Floor
    Los Angeles, California, 90017
10  Tel: 213.624.7707 Fax: 213.624.0643
    E-mail: jeffboozell@quinnemanuel.com
11      On behalf of Roche Molecular
      Systems, Inc., Roche Diagnostics
12     Corporation; Roche Diagnostics
      Operations, Inc.
13

    MICHELLE S. RHYU, ESQUIRE
14  Cooley, Godward, Kronish, LLP
    Five Palo Alto Square, 4th Floor
15  3000 El Camino Real
    Palo Alto, California, 94306-2155
16  Tel: 650.843.5505 Fax: 650.857.0663
    E-mail: mrhyu@cooley.com
17      On behalf of Board of Trustees of
      the Leland Stanford Junior
18     University; and Thomas Merigan
19 ALSO PRESENT:
20  SUJATHA IYENGAR, Ph.D.
21  JANET THOMAS, VIDEOGRAPHER
22
23

Page 2

1         STIPULATION
2     It is stipulated and agreed by and between
3  counsel for the respective parties that the filing of
4  this deposition with the Clerk of Court be and the same
5  are hereby waived.
6       - - - - - - -
7  follows:
8     VIDEOGRAPHER:  Here begins media number one
9  of the deposition of Dr. David Schwartz in the matter
10  of the Board of Trustees of Leland Stanford Junior
11  University vs. Roche Molecular Systems, et al. and
12  Roche Molecular Systems, et al. vs. the Board of
13  Trustees of Leland Stanford Junior University.  This
14  case is in the court of the United States District
15  Court Northern District of California and the case
16  number is C-05-04158 MHP.  Today's date is
17  October 16th, 2006 and the time is 9:18.  The
18  deposition is taking place at 29 West Susquehanna
19  Avenue, Suite 600, Towson, Maryland 21204 and it's
20  being taken on behalf of the -- is it the Plaintiffs?
21     MR. BOOZELL:  Both.
22     VIDEOGRAPHER:  Plaintiffs and defendants.
23  The videographer is Janet Thomas appearing on behalf of
24  Sarnoff Court Reporters & Legal Technologies located in
25  Irvine, Los Angeles, San Francisco, California.

Page 3

1     Would counsel please identify yourselves
2  and state who you represent?
3     MR. BOOZELL:  Jeff Boozell from Quinn,
4  Emanuel, Urquhart, Oliver & Hedges representing the
5  Roche defendants.
6     MS. RHYU:  Michelle Rhyu from Cooley,
7  Godward, Kronish representing Stanford University and
8  the counter-defendants.
9     MR. GLIKIN:  Joshua Glikin from Bowie &
10  Jensen in Towson, Maryland representing Dr. Schwartz.
11  Whereupon,
12     DAVID H. SCHWARTZ, M.D.,
13  called as a witness, having been first duly sworn
14  to tell the truth, the whole truth, and nothing
15  but the truth, was examined and testified as
16  follows:
17     EXAMINATION BY MR. BOOZELL:
18    Q  Good morning, Dr. Schwartz.  Thank you for
19  being here.  As we said, I am Jeff Boozell.  I
20  represent Roche in this patent litigation where
21  Stanford has sued Roche.  We appreciate you taking time
22  out of your busy schedule.  I know that time is short
23  and we will get right into it.
24     Can you please state your name for the
25  record?

Page 4

1 (Pages 1 to 4)

Dockets.Justia.com

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A    The goal had already been articulated.
2    Q    By who?
3    A    When I joined Stanford, Dr. Merigan
4    approached me about the project and said that Cetus
5    Corporation had developed polymerase chain reaction and
6    that he and Cetus now wanted to quantitate it.
7    Q    When did you join --
8    A    And that would be my project.
9    Q    When did you join Stanford?
10   A    I don't recall exactly.
11   Q    Do you recall the year?
12   A    1988.
13   Q    What was your position at Stanford in 1988?
14   A    My title was, I believe, physician
15   specialist.
16   Q    And did you work in there Dr. Merigan's
17   lab?
18   A    Yes.
19   Q    And did Dr. Merigan hire you?
20   A    That was my understanding.
21   Q    Would you consider Dr. Merigan your
22   supervisor during the time '88, '89?
23   A    Yes.
24   Q    And you said that Dr. Merigan and Cetus had
25   a goal of quantification.  What was the ultimate

Page 29

1    purpose of the quantification?  Did it have a higher
2    purpose or was it just to quantitate?
3        MS. RHYU:  Objection, vague.
4    Q    Why was Stanford and Cetus trying to
5    quantitate HIV?
6        MS. RHYU:  Vague, calls for speculation.
7    A    There are many reasons why one would want
8    to quantitate the presence of a pathogen.
9    Q    Was one of the purposes of quantitating the
10   pathogen to monitor therapy?
11       MS. RHYU:  Objection.  Calls for
12   speculation, vague as to time.
13   A    That was an objective at some point shortly
14   after I arrived.
15   Q    So sometime in 1988 the objective was to
16   quantitate HIV in order to monitor therapy?
17       MS. RHYU:  Objection.  Lacks foundation,
18   misstates testimony.
19   A    I don't recall the exact date at which that
20   objective was clarified.
21   Q    Do you recall it being an objective in
22   1988 shortly after you joined?
23   A    I recall it being an objective of a trial
24   of AZT and interleukin-2 --
25       MS. RHYU:  Objection, vague.

Page 30

1    A    -- which was ongoing when I joined, I
2    believe.
3    Q    Okay.  Do you have any understanding as to
4    what Dr. Holodniy's level of knowledge with respect to
5    PCR was when he joined Stanford?
6        MS. RHYU:  Objection, calls for
7    speculation.
8    A    Yes.
9        MS. RHYU:  Misstates prior testimony as to
10   joined.
11   Q    Your answer was yes?
12   A    Yes.
13   Q    Do you know whether he had ever conducted a
14   PCR reaction before?
15   A    I do.
16   Q    Did he?
17   A    He had not.
18   Q    He had not?  Had he conducted a PCR
19   reaction before he started visiting Cetus?
20       MS. RHYU:  Objection, calls for
21   speculation.
22   A    To the best of my recollection, we
23   conducted a PCR reaction in the Stanford lab quite
24   early after Dr. Holodniy joined using reagents that we
25   had obtained from Cetus.  I do not recall whether that

Page 31

1    was the very first time Dr. Holodniy performed the
2    reaction or whether he had visited Cetus on occasion
3    prior to us doing that.
4    Q    Prior to Dr. Holodniy's going to Cetus, do
5    you know whether Dr. Holodniy had any experience with
6    gene expression?
7    A    I don't know for a fact.
8    Q    How about DNR or RNA extraction?  Did he
9    have any experience with that before he went to Cetus?
10       MS. RHYU:  Objection, calls for
11   speculation.
12   A    I don't know for a fact.  To the best of my
13   recollection, Dr. Holodniy's training prior to joining
14   Stanford had been as a medical physician.  I don't
15   recollect that he had laboratory research training
16   prior to that.
17   Q    Do you recall whether going to -- prior to
18   Dr. Holodniy going to Cetus, whether he had any
19   experience in preparing primers, PCR primers?
20       MS. RHYU:  Objection.  Vague, lacks
21   foundation.
22   A    Dr. Holodniy did not have experience
23   generating primers prior to joining the Stanford lab.
24   I can't recollect whether he ever selected sequences
25   off a known gene sequence prior to going up to Cetus or

Page 32

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q    Do you know where that HRP labeled SK-19
2    probe came from that you were using in 1988 and '89?
3    A    To the best of my --
4         MS. RHYU:  Objection, lacks foundation.
5    A    To the best of my knowledge, that was
6    obtained from Cetus.
7    Q    I think you testified earlier that the
8    standard that was used in Exhibit 1 also was obtained
9    from Cetus?
10        MS. RHYU:  Objection, vague.
11   A    To the best of my knowledge, the standards
12   were synthesized and generated at Cetus.
13        MS. RHYU:  Jeff, we've been going for an
14   hour and 20 minutes.  Do you want to take a little
15   break now?
16        MR. BOOZELL:  I think it's an hour and 15
17   minutes but we'll take a five-minute break.
18        VIDEOGRAPHER:  We're going off the record.
19   It's 10:32.
20        (There was a brief recess taken.)
21        VIDEOGRAPHER:  We're now back on the
22   record.  It's 10:46.
23   BY MR. BOOZELL:
24   Q    Dr. Schwartz, did you ever have occasion to
25   review Dr. Holodniy's lab notebooks in 1989?

Page 41

1    A    I don't recall.
2    Q    Do you know if Dr. Holodniy brought back
3    any protocols with him from Cetus?
4         MS. RHYU:  Objection, vague.
5    A    The conditions for ramping up, extending,
6    cooling down have to be optimized for polymerase chain
7    reactions.  To the best of my knowledge, those
8    conditions were worked out collaboratively by
9    Dr. Holodniy and Cetus scientists on some occasions at
10   Cetus.
11   Q    Do you know if Dr. Holodniy brought back
12   any protocols related to reverse transcriptase of HIV?
13   A    I don't know.
14        MS. RHYU:  Objection, calls for
15   speculation.
16   Q    I'll show you something real quick here,
17   hopefully, a previously marked Exhibit 15.  It's US
18   patent number 5968730.  Have you ever seen this patent
19   before, Dr. Schwartz?
20   A    I have.
21   Q    Do you understand that on RMS00012, column
22   four --
23        MR. GLIKIN:  He's referring to the Bates
24   number at the bottom right-hand corner, right there,
25   and they're numbered sequentially for litigation.

Page 42

1    Q    Do you see in column four, section 5.1, PCR
2    assay of plasma HIV RNA?
3    A    Which page?
4         MR. GLIKIN:  12.
5    A    Please repeat your question.
6    Q    Do you see the assay set forth in column
7    four under section 5.1, the description of the assay?
8    A    Yes.
9         MS. RHYU:  Are you referring to the section
10   that continues to column five and six?
11        MR. BOOZELL:  Column five, yeah.
12   A    I see that, yes.
13   Q    Do you know whether this is the same assay
14   that we just looked at in the JID paper, Exhibit 1?
15        MS. RHYU:  Do you want him to compare the
16   two now?
17        MR. BOOZELL:  I want his opinion.
18   A    I have to read it.
19   Q    You have to read the whole thing?  Okay.
20   Let me ask this, then.  I see that you are not an
21   inventor on patent number 730.  If I refer to it as the
22   730 patent, you'll understand what I'm saying?
23   A    Yes.
24   Q    I see that you are not an inventor.  Do you
25   know why you are not an inventor on this patent?

Page 43

1         MS. RHYU:  Objection.  Calls for a legal
2    conclusion.
3    A    No.
4    Q    You said earlier you are familiar with the
5    patent, though, correct?
6         MR. GLIKIN:  Objection.
7    A    No.
8    Q    But you've seen it before?
9    A    Yes.
10   Q    Do you have any reason to believe you
11   should have been an inventor on this patent?
12        MS. RHYU:  Objection.  Lacks foundation,
13   calls for a legal conclusion.
14   A    I don't know.
15   Q    While you were at Stanford, did you have
16   any occasion to sign any agreements with Cetus
17   Corporation?
18   A    To the best of my recollection, I did sign
19   at least one agreement at some point.
20   Q    What was that agreement?
21   A    I don't recall --
22   Q    You don't recall?
23   A    -- the precise contents.
24   Q    Let me show you what's been marked as
25   Exhibit 29.  Oops, that's right.  When you are done

Page 44

11 (Pages 41 to 44)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  looking it over, if you can, just let me know whether
2  you remember this document.
3      (Pause.)
4      Do you recall this document?
5      A    I don't specifically recall it but that is
6  my signature.
7      Q    That is your signature on page STAN003863?
8      A    Yes.
9      Q    Do you recall the circumstances surrounding
10  your execution of this agreement?
11      A    To the best of my recollection, this would
12  have been shortly after I joined and Dr. Merigan had
13  asked me to spearhead this effort to quantitate HIV.
14      Q    To the best of your recollection, this
15  relates to the project that you referred to earlier
16  that you and Dr. Holodniy were working on related to
17  quantification of HIV?
18      MS. RHYU: Objection. Lacks foundation,
19  misstates prior testimony.
20      A    To the best of my recollection, this was
21  prior to, I believe -- the project that was outlined to
22  me prior to Dr. Holodniy joining. As I said, I don't
23  recall exactly when he joined and what state the
24  project was at the time this was signed. There was one
25  other Cetus-related project I was involved in. This

Page 45

1  appears to apply, however, to the polymerase chain
2  reaction only. I don't see a reference to --
3  specifically to the other project.
4      Q    But you do recall that Dr. Holodniy visited
5  Cetus in mid to late 1989; isn't that right?
6      MS. RHYU: Objection, misstates prior
7  testimony.
8      A    I recall that Dr. Holodniy visited Cetus
9  frequently from shortly after he joined the lab
10  until -- well, for many months. I don't recall exactly
11  dates and I assume you don't want me to start doing
12  calculations based on the dates of this document.
13      Q    Okay. Do you recall whether this document
14  preceded Dr. Holodniy's first visit to Cetus?
15      A    I don't.
16      Q    Do you recall whether it related at all to
17  his going to Cetus or was his going to Cetus one of the
18  impetuses for this contract?
19      MS. RHYU: Objection, calls for
20  speculation.
21      A    I don't know what the impetus for this
22  particular document was.
23      Q    You said earlier that you recall
24  Dr. Holodniy bringing back primers and probes and a
25  standard from Cetus; is that correct?

Page 46

1      MS. RHYU: Objection, misstates prior
2  testimony, lacks foundation.
3      A    I don't recall whether or not he brought
4  back a standard. I recall primers and probes at some
5  point.
6      Q    To the best of your understanding, were
7  those primers and probes to be covered by this
8  agreement, Exhibit 29?
9      MS. RHYU: Objection. Calls for a legal
10  conclusion, lacks foundation.
11      A    Can you clarify the question?
12      Q    I'm just wondering if you have -- reading
13  this agreement and, in particular, paragraph two,
14  whether you have any recollection of whether this
15  agreement was designed to cover Dr. Holodniy's bringing
16  back of probes from Cetus to Stanford?
17      MS. RHYU: Lacks foundation, calls for a
18  legal conclusion.
19      A    I can only tell you what my understanding
20  was at the time in signing such a document.
21      Q    And what is that?
22      A    My understanding at the time of signing
23  this document was that the polymerase chain reaction
24  project being developed was a project involving the
25  proprietary technology of Cetus and that the data from

Page 47

1  that and any results of that would be considered Cetus
2  proprietary data and that was my understanding at the
3  time.
4      Q    Do you know whether this agreement was
5  designed to cover information that Holodniy may have
6  gathered during his trips to Cetus?
7      MS. RHYU: Objection. Calls for
8  speculation, lacks foundation, calls for a legal
9  conclusion.
10      A    I have no way of knowing what the intent of
11  this document was on the part of different parties.
12      Q    Did you ever discuss this document with
13  anybody prior to signing it?
14      A    I did not, other than perhaps with
15  Dr. Merigan.
16      Q    Would Dr. Merigan have given you this
17  document to sign?
18      A    I don't recall who handed it to me. It
19  could have been him.
20      Q    Let me show you a document previously
21  marked as Exhibit 28. Dr. Schwartz, do you recall
22  Exhibit 28?
23      A    It brings back memories, yes.
24      Q    What is Exhibit 28?
25      A    At this time, I was involved -- at this

Page 48

12 (Pages 45 to 48)

1    A    On occasion we would look at results. I
2  did not review them as his daily or weekly supervisor.
3  He did not report to me his results.
4    Q    Do you recall an entry in Dr. Mark
5  Holodniy's notebooks that consists of an invoice from
6  Operon Technologies ordering primers?
7    A    I don't recall.
8    Q    You don't recall it one way or the other?
9    A    Correct.
10    Q    But it's possible that Dr. Mark Holodniy
11  had ordered primers from Operon Technologies?
12    MR. BOOZELL:  Vague and ambiguous, calls
13  for speculation, lacks foundation.
14    A    Yes, it's possible.
15    Q    And with respect to the publications that
16  you mentioned earlier describing amplification of HIV
17  sequences, those publications would have described the
18  sequences of the HIV primers that were used for
19  amplification, correct?
20    MR. BOOZELL:  Calls for speculation, lacks
21  foundation, vague and ambiguous. It's a leading
22  question. You want him to testify whether each and
23  every one of the publications mentioned the actual
24  sequence of the primers? It's compound also.
25    A    I don't recall the particular articles,

Page 73

1  therefore, I can't answer particularly. Typically, in
2  a molecular biology article on such a technique,
3  primers would either be listed or referenced.
4    Q    You mentioned that you recall that primers
5  and probes were obtained from Cetus and used at
6  Stanford. I'd like to know everything you recall about
7  the transfer of primers and probes from Stanford -- I'm
8  sorry, from Cetus to Stanford. So let's start with
9  what do you recall about obtaining primers or probes
10  from Cetus?
11    A    What do I personally recall?
12    Q    Yes. Let me start with the question: Who
13  sent you primers or probes?
14    MR. BOOZELL:  Assumes facts not in
15  evidence, vague and ambiguous.
16    A    I don't recall who would have personally
17  sent them.
18    Q    Do you recall whether there was any
19  correspondence associated with the transfer of a primer
20  or probe such as a letter or a sheet that described
21  what was being transferred?
22    MR. BOOZELL:  It's compound, vague and
23  ambiguous. Calls for speculation, lacks foundation.
24    A    I mean, I now recall the letter where I
25  requested those materials. I don't recall further

Page 74

1  correspondence. I just recall that the relationship
2  with the company was positive in the sense that there
3  was cooperation and collaboration.
4    Q    But you don't recall any specific transfer?
5    MR. BOOZELL:  Assumes facts not in
6  evidence, vague and ambiguous.
7    A    I can't recall a particular day on which
8  SK-38 or 39 arrived in a package that I opened.
9    Q    Do you recall anyone handing you SK-38 or
10  39 or any other primer?
11    MR. BOOZELL:  Vague and ambiguous.
12    Q    I'm speaking of someone from Cetus
13  handing --
14    A    Handing me personally?
15    Q    Handing you.
16    A    I don't recall that, no.
17    Q    Do you recall observing someone from Cetus
18  handing primers or probes to anyone else at Stanford?
19    MR. BOOZELL:  Vague and ambiguous, calls
20  for speculation, lacks foundation.
21    A    I don't recall observing that.
22    Q    Do you recall anyone at Stanford receiving
23  a package from Cetus that contained primers or probes?
24    MR. BOOZELL:  Same objections.
25    A    I don't recall specifically packages

Page 75

1  arriving through the mail.
2    Q    And do you recall any specific instances of
3  Mark Holodniy bringing primers or probes from Cetus
4  into the lab at Stanford?
5    A    It is my recollection that once Mark
6  started on the project, he made frequent trips back and
7  forth sometimes at Cetus, sometimes Stanford,
8  occasionally both places in the same day. And then at
9  some point he began doing PCR reactions at Stanford and
10  that, at least initially, those were done with reagents
11  obtained at Cetus. Of course, with respect to sequence
12  and synthesizing, I mean, the capability to sequence
13  and produce a small audio nucleotide was generally
14  available. So I don't recall whether on some occasions
15  only sequences were brought back and synthesized at
16  Stanford. But it's my recollection that he obtained
17  actual reagents on several occasions, at least
18  initially when we were starting.
19    Q    And I just want to know everything about
20  that recollection that you have. Do you have -- can
21  you say anything specific about that recollection that
22  you have?
23    MR. BOOZELL:  Vague and ambiguous.
24    A    I recollect that at the time I think we
25  had -- we thought we had two of the only thermocyclers

Page 76

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A    I believe the name Sninsky came up in that
2  conversation but I can't be certain. We discussed it
3  several times. So I don't recall whether on the first
   time he told me whether he mentioned any particular
5  names.
6    Q    Do you recall having this conversation in
7  the context of regular meetings that you had with
8  Dr. Merigan or was it just a single conversation that
9  stands out? What do you recall about that?
10       MR. BOOZELL: Vague and ambiguous,
11 compound, leading.
12    A    I recall the first conversation because it
13 seemed like quite a huge undertaking for someone who
14 had not had, like myself, extensive molecular biology
15 background. I remember him reassuring me at that time
16 that Cetus had tremendous expertise. I remember
17 subsequent conversations as I became more familiar with
18 the problem where I indicated to him that there were
19 certain real obstacles to developing it that way and I
20 recall him indicating that these problems could be
21 overcome because there was a lot of expertise at Cetus.
22 That's the extent.
23    Q    What problems do you recall discussing with
24 Dr. Merigan?
25       MR. BOOZELL: Vague and ambiguous.

Page 81

1  that you had identified?
2       MR. BOOZELL: Vague and ambiguous,
3  misstates his testimony, calls for speculation, lacks
4  foundation, leading.
5    A    I recall discussions with, I believe,
6  Dr. Sninsky regarding the need to really be sure that
7  we had extracted essentially all of the DNA from the
8  sample to be sure that we didn't have inhibiters in the
9  biological samples of the change in efficiency to be
10 sure that the regions we were using didn't contain
11 common mutations and variations that might affect the
12 efficiency of amplification.
13       There was also a discussion, I believe,
14 with Dr. Sninsky about whether a technique called
15 nested PCR could still be used in quantitation. It
16 increased the specificity of the assay but it added
17 another level of quantitative variability. Once
18 Dr. Holodniy joined, I had most of my discussions about
19 these issues with him.
20    Q    When did you have these discussions with
21 Dr. Sninsky?
22    A    Prior to and shortly after Mark joined --
23 after Dr. Holodniy joined and then I believe on one
24 occasion when we went up to discuss the Heparin issue.
25    Q    So when you say prior to when Mark

Page 83

1    A    The problems I recall discussing with him
2  were that the intrasample interassay variability was
3  quite large and that in order to generate reliable
4  data, it would be extremely difficult to do it with a
5  single sample and a single run which as I recall had
6  been what he envisioned might be possible. And there
7  were multiple discussions initially about sources of
8  variability with the probes with the idea that one
9  could run PCR to its maximum amplification and end up
10 with something that was sufficiently quantitative
11 because at least in theory I was concerned that very
12 different starting concentrations could yield the same
13 amount of product. So we discussed those sorts of
14 issues.
15       Once Mark Holodniy came on board, really the
16 discussion on the scientific matters were largely
17 Dr. Holodniy and he would report back to Dr. Merigan
18 much more frequently than I and eventually took over
19 much of that responsibility. So once Mark joined that,
20 he became really the focus of these discussions of
21 concerns about reproducibility or technical aspects
22 more than Dr. Merigan.
23    Q    After you had identified these problems for
24 Dr. Merigan, did you have any discussions with
   employees of Cetus to try to overcome the difficulties

Page 82

1  joined --
2    A    When I was first given the project and read
3  up on it and got involved in it, it just struck me that
4  they were -- and also once we got some early results,
5  it struck me that there were some formidable obstacles
6  to doing this reproducibly enough to get meaningful
7  data.
8       One of the problems was at that time the
9  drugs available, which were essentially AZT, really did
10 not give more than a log reduction in virus. So we
11 were dealing with the question of developing an assay
12 that was capable of reliably detecting relatively small
13 changes in viral log. So this made the problem very
14 difficult. The advent of much more potent therapy, to
15 some extent, minimized some of those issues.
16    Q    Do you remember where you had discussions
17 with John Sninsky about the problems that you had
18 identified?
19    A    Some were over the phone as I recall. Once
20 or twice there were meetings at Cetus and I don't
21 recall whether he ever came to Stanford.
22       MR. BOOZELL: Objection as vague and
23 ambiguous, misstates his testimony, leading.
24    Q    Did Dr. Sninsky ever show you how to do any
25 experiments?

Page 84

21 (Pages 81 to 84)

1    MS. RHYU: Lacks foundation. Asked and
2 answered.
3    A    I'm not an expert on what the tracking
4 requirements were at that time.
5    Q    Do you recall entering -- Michelle pointed
6 out to you that this says amend MTA research to
7 cover -- I read that completely wrong. "Amend research
8 MTA to cover research as part of clinical study." Do
9 you see that on the document?
10    A   Yes.
11    Q    Do you recall entering into an MTA
12 specifically related to IL-2 in November of '88?
13    A    I don't recall. It could have happened, I
14 just don't recall.
15    Q    Do you recall, at some point prior to the
16 publication of the JID paper that we looked at earlier,
17 that certain abstracts setting forth the work that was
18 done in collaboration with Cetus were submitted to UCLA
19 or ESF AIDS conference?
20    MS. RHYU: Objection, lacks foundation.
21    A    I don't specifically recollect those
22 abstracts.
23    Q    I show you one here. Exhibit 41,
24 previously marked. I don't have another one. Do you
25 recall this abstract?
Page 141

1    A    I don't recall it. I mean, I'm reading it
2 but I don't recall the circumstances under which it was
3 submitted.
4    Q    Do you recall whether Dr. Holodniy asked
5 for Cetus approval before publishing this abstract?
6    MS. RHYU: Objection. Lack of foundation,
7 calls for speculation.
8    A    I wouldn't know that.
9    Q    Did you attend the Sixth International
10 Conference on AIDS in San Francisco between June 20th
11 and 24th 1990?
12    A    I don't know. I don't recollect.
13    Q    Let me show you what's been previously
14 marked as Exhibit 604. Do you recall this letter?
15    A    No.
16    Q    You don't know if you ever received it?
17    A    I don't recall. I don't know whether I
18 received it.
19    Q    Do you have any reason to believe that you
20 didn't receive it?
21    A    I don't have any reason to believe I didn't
22 receive it. At that time, I would have assumed that
23 that things were being done appropriately.
24    Q    Do you see where it asks Dr. Groves, on
25 behalf of Cetus, asks that Stanford make sure the
Page 142

1 scientific program committee people keep this
2 information in the abstract confidential?
3    A    Yes.
4    Q    Is that consistent with your recollection
5 of the work that was ongoing at Cetus, that Cetus
6 viewed it as confidential?
7    MS. RHYU: Objection. Lacks foundation,
8 misstates prior testimony, calls for speculation.
9    A    My understanding was that proprietary
10 information was confidential. I don't recollect which
11 aspects of this would have been considered confidential
12 and which weren't.
13    Q    But it's your recollection that some of the
14 work that Dr. Holodniy was doing at Cetus related to
15 the project we were talking about earlier involved
16 Cetus proprietary and confidential information?
17    MS. RHYU: Objection. Lack foundation,
18 calls for speculation, calls for legal conclusion.
19    A    I mean, to the best of my recollection, I
20 believed that PCR work was proprietary. I was never
21 particularly aware of which aspects of the work were in
22 the public domain and which aspects had already been
23 presented by Cetus at meetings and which aspects of the
24 technology were new. I knew that the data would be new
25 but I don't know whether I focused on the
Page 143

1 confidentiality aspect of it. I assumed that Cetus was
2 protected with respect to data we generated. I didn't
3 spend a lot of time worrying that something with Cetus
4 individuals on it would be -- in other words, if Cetus
5 individuals were on it, I guess I naively or perhaps
6 not naively assumed that this had been looked at
7 internally at Cetus and was going forward with the
8 approval of all the authors.
9    Q    And that last answer when you say you
10 assumed that Cetus was protected, was that through the
11 various agreements that we looked at?
12    MS. RHYU: Objection. Lacks foundation,
13 calls for speculation, calls for legal conclusion.
14    A    It was through agreement and through my own
15 perception as a junior person that the company involved
16 with a big university, for a long time it would seem to
17 me on multiple things would have worked out their
18 issues. I mean, I just -- it never would have crossed
19 my mind that there were areas of conflict or descension
20 on this. I guess it's a reflection of my state of mind
21 which was not really focused on these legalistic
22 aspects of it. I guess I went into this assuming that
23 the relationships had been worked out, the agreements
24 had all been worked out and now the business at hand
25 was to get the science done.
Page 144

36 (Pages 141 to 144)

**Page 153**

1 you mean by proprietary technology? What is the
2 proprietary technology?
3     MR. BOOZELL: Vague and ambiguous, calls
4 for speculation, lacks foundation and it is a legal
5 question.
6     A   My assumption was that this exciting PCR
7 technology that had been so much in the news and was so
8 promising, that was the technology I was thinking
9 about. I believed or I was under the impression that
10 the company owned that technology and, again, perhaps
11 naively, I don't know, but that things accomplished
12 with that technology in our lab would be part of that.
13     Q   So you're referring to the CPR technology
14 invented by Kary Mullis?
15     A   Yes.
16     Q   Do you have any opinion of Dr. Mark
17 Holodniy?
18     MR. BOOZELL: Vague, ambiguous, calls for
19 speculation.
20     A   In what respect?
21     Q   You interacted with him regularly?
22     A   Yes, I liked him. I liked him very much.
23     Q   Was he a competent scientist?
24     MR. BOOZELL: Vague, ambiguous.
25     A   I thought he was a very competent

**Page 154**

1 scientist. I have the highest regard for Dr. Holodniy,
2 his competence and professionalism. I thought he was
3 excellent.
4     Q   Is it fair to say that he took the lead in
5 the project relating to developing an assay for
6 quantitating HIV RNA using PCR?
7     MR. BOOZELL: It's vague, ambiguous and
8 calls for speculation.
9     A   It's fair to say he took the lead from me
10 in the development of the quantitative assay. I have
11 no knowledge, for example, on whether David Katzenstein
12 was more influential in pushing the switch over to RNA,
13 nor do I have any knowledge about the specific role or
14 the magnitude of the role played by Cetus employees.
15 But certainly I passed the baton to Dr. Holodniy at the
16 stage when we were still looking at DNA.
17     MS. RHYU: I have no further questions.
18     MR. BOOZELL: And it's 3:00. So given the
19 testimony that we've elicited and the documents
20 reviewed, I'd like to designate the transcript as
21 confidential "attorneys eyes only."
22     VIDEOGRAPHER: This concludes the third
23 media used. We are off the record at 3:01.
24     (Deposition was concluded at 3:01 p.m.)
25

**Page 155**

9     I, DAVID H. SCHWARTZ, M.D., do hereby declare under
10 penalty of perjury that I have read the foregoing
11 transcript; that I have made any corrections as appear
12 noted, in ink, initialed by me, or attached hereto; that
13 my testimony as contained herein, as corrected, is true
14 and correct.
15     EXECUTED this _____ day of _____,
16 20____, at _____, _____.
         (City)          (State)

         _____
         DAVID H. SCHWARTZ, M.D.

**Page 156**

1 State of Maryland
2 County of Baltimore, to wit:
3     I, R. DWAYNE HARRISON, a Notary Public of
4 the State of Maryland, City of Baltimore, do hereby
5 certify that the within-named witness personally
6 appeared before me at the time and place herein set
7 out, and after having been duly sworn by me, according
8 to law, was examined by counsel.
9     I further certify that the examination was
10 recorded stenographically by me and this transcript is
11 a true record of the proceedings.
12     I further certify that I am not of counsel
13 to any of the parties, nor in any way interested in the
14 outcome of this action.
15     As witness my hand and notarial seal this
16 19th day of October 2006.

         _____
         R. DWAYNE HARRISON
         Notary Public

20 My Commission Expires:
21 September 15th, 2009

39 (Pages 153 to 156)