QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  Adrian M. Pruetz (Bar No. 118215)
  Jeffrey N. Boozell (Bar No. 199507)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:    (213) 443-3000
Facsimile:    (213) 443-3100
E-Mail:        adrianpruetz@quinnemanuel.com
              jeffboozell@quinnemanuel.com

  Robert W. Stone (Bar No. 163513)
  Brian C. Cannon (Bar No. 193071)
  T.J. Chiang (Bar No. 235165)
555 Twin Dolphin Drive, Suite 560
Redwood Shores, California 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100
E-Mail:        robertstone@quinnemanuel.com
              briancannon@quinnemanuel.com
              tjchiang@quinnemanuel.com

Attorneys for Defendants and Counterclaimants Roche
Molecular Systems, Inc.; Roche Diagnostics
Corporation; and Roche Diagnostics Operations, Inc.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY,<br><br>Plaintiff,<br><br>vs.<br><br>ROCHE MOLECULAR SYSTEMS, INC.; ROCHE DIAGNOSTICS CORPORATION; ROCHE DIAGNOSTICS OPERATIONS, INC.,<br><br>Defendants. | CASE NO. C-05-04158 MHP<br><br><br>ROCHE'S OPPOSITION TO COUNTERCLAIM DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| ROCHE MOLECULAR SYSTEMS, INC. ROCHE DIAGNOSTICS CORPORATION; ROCHE DIAGNOSTICS OPERATIONS, INC.,<br><br>Counterclaimants,<br><br>vs.<br><br>THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY; THOMAS MERIGAN; AND MARK HOLODNIY,<br><br>Counterclaim Defendants. | Date:    December 4, 2006<br>Time:    2:00 p.m.<br>Place:    Hon. Marilyn H. Patel |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...............................................................................................1

ARGUMENT .........................................................................................................................2

I.  AT A MINIMUM, ROCHE HAS PRO RATA OWNERSHIP OF AND THE
    RIGHT TO USE THE PATENTS-IN-SUIT.................................................................4

    A.  Holodniy's Visitor Agreement Affords Roche An Ownership Interest in the
        '730 and '705 Patents .........................................................................................4

        1.  Conception Of The Patented Methods Occurred At Cetus .........................4

        2.  Section 16600 Does Not Vitiate Roche's Rights Under the Visitor
            Agreement ..............................................................................................9

    B.  Roche Has Shop Rights To Use The '730 And '705 Patents ...................................10

        1.  Reduction To Practice Is Not Necessary For A Shop Right ........................10

        2.  Inducement and Consent of the Contractor is Not a Per Se
            Requirement and, In Any Event, Is Present Here...........................................11

    C.  Roche Has A Non-Exclusive, Royalty-Free License To The '730 And '705
        Patents Pursuant To The MTA ...............................................................................12

II. ROCHE'S DEFENSES ARE NOT TIME BARRED ......................................................14

    A.  Statute of Limitations and Laches Claims Do Not Apply to Roche's
        Defenses. ..............................................................................................................14

    B.  Roche Had No Obligation to Sue and, Therefore, Is Not Time-Barred...................16

III. EQUITABLE ESTOPPEL DOES NOT BAR ROCHE'S DEFENSES .............................17

IV. THE MERIGAN CONSULTING AGREEMENTS ALSO PROVIDE ROCHE
    WITH OWNERSHIP, OR, AT A MINIMUM, A LICENSE ...........................................19

    A.  Stanford Has Failed To Meet Its Burden As To The 1984 Agreement....................19

    B.  The 1991 Agreement is Applicable.........................................................................21

    C.  Ownership of the Invention Under The Merigan Agreements Was
        Transferred From Cetus to Roche ..........................................................................22

    D.  At a Minimum, Roche has a License to Cetus's Rights under the Merigan
        Agreements under the Assets Purchase Agreement's License Provisions ...............24

CONCLUSION .....................................................................................................................24

# TABLE OF AUTHORITIES

**Page**

## CASES

*Boggs v. Merced Mining Co.*,
   14 Cal. 279 (1859).................................................................................. 17

*Budget Way Cleaners & Laundry, Inc. v. Simon*,
   311 P.2d 591 (Cal. App. 1957)........................................................... 13

*Burroughs Wellcome Co. v. Barr Labs., Inc.*,
   40 F.3d 1223 (Fed. Cir. 1994).......................................................... 7, 8

*Cal. Eastern Labs., Inc. v. Gould*,
   896 F.2d 400 (1990).................................................................... 13, 14

*Chun Chew Pang v. Chun Chew Kee*,
   412 P.2d 326 (Hawaii 1966)............................................................. 15

*City of Long Beach v. Mansell*,
   3 Cal. 3d 462 (1970)....................................................................... 17

*Cubic Corp. v. Marty*,
   185 Cal. App. 3d 438 (1986)............................................................... 9

*Curtis, Collins & Holbrook Co. v. United States*,
   262 U.S. 215 (1923)......................................................................... 16

*Doryon v. Salant*,
   75 Cal. App. 3d 706 (1977).............................................................. 13

*E.D.Sys. Corp. v. Southwestern Bell Tel. Co.*,
   674 F.2d 453 (5th Cir. 1982)............................................................ 15

*Engineered Prods. Co. v. Donaldson Co., Inc.*,
   313 F. Supp. 2d 951 (N.D. Iowa 2004)............................................... 5

*Erie R.R. Co. v. Tompkins*,
   304 U.S. 64 (1938).......................................................................... 14

*Ethicon, Inc. v. U.S. Surgical Corp.*,
   135 F.3d 1456 (Fed. Cir. 1998)......................................................... 24

*Farmland Irrigation Co. v. Dopplmaier*,
   48 Cal. 2d 208 (1957)...................................................................... 14

*FilmTec Corp. v. Allied- Signal Inc.*,
   939 F.2d 1568 (Fed. Cir. 1991)....................................................... 9, 16

*Fort James Corp. v. Solo Cup Co.*,
   412 F.3d 1340 (Fed. Cir. 2005)........................................................... 5

*Gen. Motors Acceptance Corp. v. Gandy,*
    200 Cal. 284 (1927) ................................................................................ 17

*Golden West Baseball Co. v. City of Anaheim,*
    25 Cal. App. 4th 11 (1994) ...................................................................... 18

*Halcon Int'l, Inc. v. Monsanto Australia Ltd.,*
    446 F.2d 156 (7th Cir. 1971) ................................................................... 15

*Hammond v. Mason & Hamlin Organ Co.,*
    92 U.S. 724 (1875) .................................................................................. 14

*Huntington v. Donovan,*
    183 Cal. 746 (1920) ................................................................................ 16

*In re Paul Potts Builders, Inc.,*
    608 F.2d 1279 (9th Cir. 1979) ................................................................. 15

*Jacobs & Youngs v. Kent,*
    230 N.Y. 239 (1921) ............................................................................... 13

*Lack v. Western Loan & Building Co.,*
    134 F.2d 1017 (9th Cir. 1943) ................................................................. 14

*Lackner v. LaCroix,*
    25 Cal. 3d 747 (1979) ............................................................................. 15

*Lane & Bodley Co. v. Locke,*
    150 U.S. 193 (1893) ................................................................................ 13

*LaPrade v. Rosinsky,*
    882 A.2d 192 (D.C. 2005) ...................................................................... 15

*McElmurry v. Arkansas Power & Light Co.,*
    995 F.2d 1576 (Fed. Cir. 1993) ............................................................... 11

*Medichem, S.A. v. Rolabo,*
    S.L., 437 F.3d 1157 (Fed. Cir. 2006) ...................................................... 21

*Melin v. United States,*
    478 F.2d 1210 (Ct. Cl. 1973) .................................................................. 11

*Pearl-Wick Corp. v. John Hancock Mut. Life Ins. Co.*
    26 B.R. 604 (S.D.N.Y 1982) .................................................................. 23

*Property Asset Mgmt., Inc. v. Chicago Title Ins. Co.,*
    173 F.3d 84 (2d Cir. 1999) ...................................................................... 23

*Short v. Rapping,*
    135 A.D.2d 624 (1987) ........................................................................... 15

*Silverman v. Eastrich Multiple Investor Fund, L.P.,*
    51 F.3d 28 (3rd Cir. 1995) ....................................................................... 16

*Simmons Creek Coal Co. v. Doran,*
    142 U. S. 417 (1892) .................................................................................. 16

*South Corp. v. United States,*
    690 F.2d 1368 (Fed. Cir. 1982) ................................................................ 11

*Speedplay, Inc. v. Bebop, Inc.,*
    211 F.3d 1245 (Fed. Cir. 2000) ............................................................ 9, 23

*Strategical Demolition Torpedo Co. v. United States,*
    96 F. Supp. 315 (Ct. Cl. 1951) ................................................................ 11

*Styne v. Stevens,*
    26 Cal. 4th 42 (2001) ................................................................................ 15

*United States v. Diebold, Inc.,*
    369 U.S. 654 (1962) .................................................................................. 19

*United States v. Western Pacific R.R. Co.,*
    352 U.S. 59 (1956) .................................................................................... 15

*Venus Music Corp. v. Mills Music, Inc.,*
    261 F.2d 577 (2d Cir. 1958) ..................................................................... 16

*Villiarimo v. Aloha Island Air, Inc.,*
    281 F.3d 1054 (9th Cir. 2002) .................................................................. 19

*Wommack v. Durham Pecan Co., Inc.,*
    715 F.2d 962 (5th Cir. 1983) .................................................................... 11

## **STATUTES**

35 U.S.C. § 200-212 ........................................................................................ 20

35 U.S.C. § 261 ................................................................................................ 17

Cal. Bus. & Prof. Code § 16600 ................................................................ 9, 10

*Federal Rule of Civil Procedure* 9(b) ............................................................ 17

*Federal Rule of Evidence* 1002 ...................................................................... 21

## **Preliminary Statement**

In its Motion, Stanford goes to great lengths to distract the Court from the central issue now before it: namely, do the agreements among the parties and the doctrine of shop rights vest rights in Roche related to the subject matter of the '730 and '705 Patents. The undisputed facts -- indeed, the conceded facts in Stanford's Motion -- conclusively demonstrate that this is so. No amount of Stanford rhetoric and legal maneuvering can alter this unavoidable conclusion.

As demonstrated in Roche's Motion, Roche's affirmative defenses provide three separate and independent reasons why Roche is entitled to continue making, using, and selling its life-saving HIV PCR quantitation products without interference from Stanford. First, pursuant to contract, Roche received a self-executing ownership interest in any inventions conceived by Stanford's Mark Holodniy as a consequence of his access to Cetus. Second, because the alleged invention in question was made at Cetus, using Cetus equipment, reagents and know-how, Cetus and its successor Roche have shop rights. Third, pursuant to a second contract, Stanford and Dr. Merigan agreed that Cetus would be "free to use" the results of the parties' PCR HIV collaboration for any purpose and would have a non-exclusive license to any resulting inventions. These ultimate facts cannot be disputed -- Stanford's, Merigan's, and Holodniy's unqualified admissions confirm this. Indeed, Stanford admits in its Motion that the HIV RNA Quantitation Assay in question was developed at Cetus.

In light of this overwhelming factual record, Stanford makes a number of legal arguments in an effort to forestall defeat. Each lacks merit. Principally, Stanford seeks refuge from Roche's defenses behind its statute of limitations arguments. It is black letter law, however, that statutes of limitation do not apply to defenses. Similarly, Stanford argues that Roche's requested relief should be barred under the doctrines of laches or equitable estoppel. Stanford's arguments, however, are neither supported by law or facts. As Stanford and Dr. Merigan have always been aware, Roche has offered its test for quantitating HIV RNA using PCR since the mid-1990s -- years before the patents-in-suit issued. Indeed, Stanford and Dr. Merigan used Roche's test at that time. Stanford's argument that Roche expressed any intent to abandon this technology flies in the

1   face of reality and the undisputed record evidence.  Accordingly, summary judgment in favor of

2   Roche is now warranted.

3                                        **Argument**

4          Before analyzing each of the three independent bases entitling Roche to summary

5   judgment, it is important to underscore the operative facts that underlie Roche's legal positions.

6   These undisputed facts -- set forth below -- demonstrate Roche's ownership interest with respect to

7   the _two_ Stanford patents concerning HIV quantitation using PCR being asserted against Roche.[1]

8   •   Holodniy admits that he went to Cetus to learn PCR techniques for quantitating
        HIV for the purpose of monitoring therapy and disease status.  Declaration of T.J.
9       Chiang in support of Roche's Motion for Summary Judgment ("Chiang Decl."),
        Dkt. No. 84, Ex. 46 (Holodniy Dep.) at 152:20-153:22.
10

11  •   Holodniy admits in a 2006 retrospective article concerning his time at Cetus:
        "[Thomas Merigan] felt I should spend some time at the Cetus Corporation in
12      Emeryville . . . [and t]hrough Tom's ongoing collaboration and contact with Cetus
        scientists, I was fortunate to be able to spend the next year at Cetus working with
        some great molecular biologists and other scientists."  Declaration of Jeffrey N.
13      Boozell in Support of Roche's Opposition to Counterclaim Defendants' Motion for
        Summary Judgment ("Boozell Decl."), Ex. 1 (Holodniy 2006 Article) at S39.
14

15  •   In February 1989, Holodniy signed a Visitor's Confidentiality Agreement (the
        "Visitor Agreement") with Cetus.  Joint Statement of Undisputed Facts, Undisputed
16      Fact (hereinafter "UF __") 10; Chiang Decl., Ex. 11.  Also in February 1989,
        Merigan and Stanford entered a Materials Transfer Agreement (the "MTA") with
17      Cetus.  UF 7; Chiang Decl., Ex. 10.

18  •   Holodniy's Visitor Agreement provided, "I will assign and hereby do assign to
        CETUS, my right, title, and interest" in inventions developed as a consequence of
19      access to Cetus.  UF 11; Chiang Decl., Ex. 11, ¶ 3.

20  _____

21      [1]  Confusingly, Stanford defines the "Merigan patents" to include not only the '730 and '705
    Patents upon which Stanford has sued Roche (the "Quantitation Patents"), but also the '128, '086,
22  '268, and '352 Patents directed to DNA mutations (the "Mutation Patents").  *See* Stanford Motion
    at 5; Declaration of Luis Mejia in Support of Stanford's Motion for Summary Judgment, Dkt. No.
23  94 ("Mejia Declaration"), ¶ 4.  From the outset of this litigation, Stanford repeatedly argued that
    discovery concerning the Mutation Patents should not proceed during the ownership phase.  The
24  Court agreed and ruled that the first stage of the litigation was to be limited to ownership of the
    Quantitation Patents pursuant to the parties' agreements and that other issues such as inventorship
25  under the U.S. Patent Laws would be dealt with in a subsequent phase.  In particular, the Court
    ordered that discovery related to the Mutation Patents should not proceed unless it overlapped
26  with discovery concerning the Quantitation Patents.  *See* Docket No. 34, Transcript of May 23,
    2006 Telephonic Hearing at 17:1-15.  Nonetheless, Stanford moved for summary judgment related
27  to the Mutation Patents.  In light of Stanford's previous position and the Court's Order, Stanford's
    Motion, to the extent it relates to the Mutation Patents, is untimely and should be denied.
28

- The MTA provided that Cetus shall be "free to use" the results of the research and that Stanford "hereby grants" license rights to Cetus including a non-exclusive license. UF 56-57; Chiang Decl., Ex. 10, ¶¶ 7, 8.

- Holodniy admits he consulted with Cetus personnel about PCR HIV quantitation. Declaration of Mark Holodniy in Support of Stanford's Motion for Summary Judgment ("Holodniy Decl."), Dkt. No. 93, ¶ 12.

- Holodniy admits he received Cetus reagents including primers SK38, SK39 and SK19-HRP developed by Cetus researcher Shirley Kwok (or "SK") and the quantitation standard CC2 built by Cetus researcher Clayton Casipit (or "CC") used to build the standard curves needed to quantitate HIV. UF 12, 14, 17; Holodniy Decl. ¶ 17.[2]

- Holodniy admits that before he went to Cetus he lacked experience with each of the steps of the assay for quantitating HIV RNA using PCR (the "HIV RNA Quantitation Assay"), and that he learned how to perform each such step through his interaction with Cetus scientists. UF 18-30; Chiang Decl., Ex. 46 (Holodniy Dep.) at 254:2-262:3.

- Stanford admits that "an assay for quantitation of HIV in serum was developed during the term of Holodniy's visitor's agreement at Cetus." Stanford Motion at 29:6-8.

- In his 2006 retrospective article, Holodniy admits: "We focused on quantitation of HIV-1 RNA in serum or plasma, using PCR techniques, in the hope that RNA levels would also correlate with the stage of HIV disease and response to treatment." Boozell Decl., Ex. 1 (Holodniy 2006 Article) at S39.

- In January 1990, Holodniy submitted a Cetus invention disclosure disclosing the HIV RNA Quantitation Assay and attaching a December 1989 abstract with Cetus co-authors for a UCLA conference entitled "Quantitation of HIV-1 RNA in Serum and Correlation with Disease Status Using Polymerase Chain Reaction" (the "UCLA Abstract"). The UCLA Abstract describes the HIV RNA Quantitation Assay as well as its intended use: "Quantitation of HIV-1 viral RNA in serum by PCR may be a useful marker for disease progression or monitoring antiviral therapy." Chiang Decl., Ex. 21 at RMS 544.

- In April 1991, the *Journal of Infectious Disease* published a paper authored by Cetus researchers and Holodniy, Merigan, and Katzenstein. Just like the UCLA Abstract, this paper describes the intended use for the HIV RNA Quantitation Assay: "Quantification of infectious HIV RNA in cell-free serum by PCR may be useful as a marker for disease progression or in monitoring antiretroviral therapy." Chiang Decl., Ex. 22.

- In 1991, pursuant to Roche's purchase of Cetus' PCR assets, Cetus expressly transferred to Roche Holodniy's Visitor Agreement, Holodniy's Cetus invention

---

[2] Holodniy makes the self-serving assertion in his declaration that these reagents were not "trade secrets" in February to October 1989 when he received them because they were described in the literature in 1990. *See* Holodniy Decl., ¶ 17. Apart from the internal inconsistency of this position, it is irrelevant to the operative agreements.

disclosure, and the MTA. UF 97-98; Chiang Decl., Ex. 44 at RMS 6481, 6460, 6524.

These facts support each of Roche's theories. The HIV RNA Quantitation Assay was developed at Cetus for the express purpose of monitoring HIV therapy. Under Stanford's own theory, that is the claimed invention of the '730 and '705 Patents. Thus, pursuant to the contracts and the doctrine of shop rights, Roche has vested rights in these patents.

I.    AT A MINIMUM, ROCHE HAS PRO RATA OWNERSHIP OF AND THE RIGHT TO USE THE PATENTS-IN-SUIT[3]

    A.    Holodniy's Visitor Agreement Affords Roche An Ownership Interest in the '730 and '705 Patents

As set forth above, the pertinent facts concerning Holodniy's self-executing agreement to assign rights in any intellectual property developed by virtue of his access to Cetus are not disputed: Holodniy executed the Visitor Agreement, worked at Cetus learning information about using PCR to quantitate HIV, and co-authored papers and abstracts with Cetus scientists about that work. As Stanford concedes in its Motion, the HIV RNA Quantitation Assay at issue was developed at Cetus. *See* Stanford Motion at 29:6-8 (acknowledging that "an assay for quantitation of HIV in serum was developed during the term of Holodniy's visitor's agreement at Cetus"); Boozell Decl., Ex. 16 (Holodniy Dep.) at 252:20-24 (assay developed "at Cetus"). Nonetheless, Stanford argues that the Visitor Agreement affords Roche no ownership interest in the '730 and '705 Patents because the alleged invention contained therein was developed after Holodniy left Cetus using non-confidential information. Stanford's argument is contrary to law and fact and should be rejected.

    1.    Conception Of The Patented Methods Occurred At Cetus

In its Motion, Stanford argues that conception of the patented methods in the '730 and '705 Patents occurred after Holodniy left Cetus. *See* Stanford Motion at 6:8-7:8. While conceding that

---

[3] Roche reserves the right to argue questions of inventorship and Stanford's inequitable conduct in connection with the patents-in-suit in subsequent proceedings.

1    the HIV RNA Quantitation Assay was developed at Cetus, Stanford argues that the idea to use that

2    assay for monitoring therapy was not. *See id.* at 29:5-14.  Stanford's argument misconstrues the

3    law of conception.  As a preliminary matter, Stanford offers no proof of such later conception.

4    Nor can it, given its discovery abuses[4] and the overwhelming undisputed evidence to the contrary

5    including Stanford's and Holodniy's own unqualified admissions.  Indeed, Holodniy's

6    contemporaneous documents establish that Holodniy went to Cetus to learn information from

7    Cetus about the viability of a PCR-based assay for monitoring HIV therapy and that before he left

8    Cetus, Cetus and Holodniy had developed such an assay.[5]

9        In 1988, Cetus's Dr. Eric Groves and Merigan, Schwartz, and Stanford were engaged in

10   efforts to monitor the efficacy of using IL-2 and AZT in AIDS patients by measuring the amount

11   of HIV in patients using PCR.  UF 71; *see* Groves Decl., ¶ 4; Chiang Decl., Ex. 47 (Schwartz

13   [4]  Stanford's arguments concerning the timing of conception should be rejected due to its
     refusal to produce responsive, non-privileged documents concerning the date of conception.  In
14   discovery, Stanford refused to produce a Stanford invention disclosure relating to the patents-in-
     suit on the basis of privilege.  Roche was forced to file a motion to compel, and the Court agreed
15   with Roche's position.  Docket No. 63.  Thereafter, Stanford produced, among other things, a
     Stanford invention disclosure document.  *See* Boozell Decl., Ex. 6 (Stanford Invention
16   Disclosure).  Inexplicably, the dates of conception and reduction to practice were redacted on the
     basis that such dates constituted privileged information.  *See id.; see also* Dkt. No. 72, Transcript
17   of Sept. 26, 2006 Telephonic Hearing at 21:15-18.  Stanford similarly instructed its witnesses not
     to answer questions regarding the date of conception reflected in the invention disclosure on the
18   basis of privilege.  *See, e.g.,* Boozell Decl., Ex. 8 (Merigan Dep.) at 176:6-177:7.  Given this
     record, Stanford should not now be permitted to put the date of conception in issue, while
19   continuing to withhold that date from discovery on the basis of privilege.  To permit otherwise
     would be to allow Stanford to use the privilege as both a sword and a shield which black letter law
20   prohibits.  *See, e.g., Fort James Corp. v. Solo Cup Co.,* 412 F.3d 1340, 1349 (Fed. Cir. 2005)
     ("[A] privilege holder 'cannot be allowed, after disclosing as much as he pleases, to withhold the
21   remainder.'"); *Engineered Prods. Co. v. Donaldson Co., Inc.,* 313 F. Supp. 2d 951, 1022-23 (N.D.
     Iowa 2004).

22   [5]  The idea of quantitating HIV to monitor therapy was not new.  Merigan admits that he had
     first considered this idea as early as 1984.  Boozell Decl., Ex. 8 (Merigan Dep.) at 21:17-22:17.
23   Similarly, beginning in at least 1985, Cetus had a project aimed at developing methods and
     techniques for detecting and quantifying HIV in patient blood using PCR.  *See* Declaration of John
24   J. Sninsky, Ph.D. in Support of Roche's Motion for Summary Judgment ("Sninsky Decl."), ¶¶ 5-9;
     *see also* Chiang Decl., Ex. 51 (Kwok Dep.) at 46:8-15.  By 1986, Cetus had filed for a patent on
25   detecting HIV in patients using PCR, specifically disclosing that the test may be "useful in
     monitoring patients treated with various therapeutic agents."  Sninsky Decl., Ex. 2 (U.S. Patent
26   No. 5,008,182) at col. 3, ll. 56-60.  In 1988, Sninsky applied for another patent that disclosed a
     method for detecting and quantitating HIV nucleic acid, including copy number, and taught that
27   determining the "viral load of an individual . . . can reveal whether a patient is responding to
     therapy."  *See* Sninsky Decl., ¶ 9; Ex. 3 (U.S. Patent No. 5,389,512) at col. 2, ll. 6-9.

28

1   Dep.) at 48:20-50:20.  In other words, Cetus and Stanford were using quantitative PCR to monitor

2   the effectiveness of therapy.  In its Motion, Stanford admits that this was the goal of this effort, but

3   claims that the tests were "inconclusive, because the assay that Cetus was using was too blunt an

4   instrument to provider reproducible, clinically useful information."  Stanford Motion at 4:16-19.

5          Thereafter, Holodniy joined Merigan's lab and went to Cetus for the express purpose of

6   obtaining information from Cetus about the feasibility of developing a PCR assay for monitoring

7   treatment:

8       Q.      When you had these discussions with Drs. Merigan and Schwartz about
                obtaining information from Cetus relating to quantitation of HIV, this is like
9               the January, February 1989 time frame, what did they describe your role to
                be?
10

11      A.      My role, to the best of my recollection, was that I would go up to Cetus and
                have some discussions with Cetus scientists about the feasibility of
                establishing a quantitative assay.
12

13      Q.      And the goal then was for you to obtain information from Cetus related to
                that endeavor?

14      A.      The goal was for us to develop an assay at Stanford that we could use to
                monitor treatment.
15

16   Chiang Decl., Ex. 46 (Holodniy Dep.) at 152:20-153:11; *see also id.* at 146:13-149:1, 152:20-

17   154:13; Ex. 47 (Schwartz Dep.) at 26:11-28:11; Ex. 48 (Merigan Dep.) at 71:18-22.  Of course,

18   the assay was not developed at Stanford; as Holodniy admits, the assay was developed "with

19   assistance from Cetus scientists while I was at Cetus."  Boozell Decl., Ex. 16 (Holodniy Dep.) at

20   252:20-24.  After nine months of collaboration at Cetus, the HIV RNA Quantitation Assay was

21   developed using Cetus personnel, facilities, equipment, materials, know-how, and information

22   including Cetus's proprietary cRNA standard, CC2, which was designed by Alice Wang and built

23   by Clayton Casipit.  *See* Roche Motion at 6:13-13:16.

24          Stanford cannot argue to the contrary.  Indeed, Holodniy's invention disclosure submitted

25   to Cetus conclusively establishes that conception of the patented methods in the '730 and '705

26   Patents occurred at Cetus.  *See* UF 44; Chiang Decl., Ex. 21 (Invention Disclosure).  The UCLA

27   Abstract attached to the invention disclosure, entitled "Quantitation of HIV-1 RNA in Serum and

28   Correlation with Disease Status Using the Polymerase Chain Reaction," concludes that its authors

1   had demonstrated that HIV viral RNA can be detected and quantitated using the HIV RNA

2   Quantitation Assay and that quantitation using that assay "may be a useful marker for disease

3   progression or monitoring antiviral therapy." UF 31, 41, 46; Chiang Decl., Ex. 21 (Invention

4   Disclosure) at RMS 544.  This conclusion was repeated in the joint Cetus/Stanford JID Article

5   which added that "further studies will be necessary to *validate* this approach." UF 43, Chiang

6   Decl., Ex. 22, (JID Article) at RMS 1471 (emphasis added).

7          In efforts to establish his claim to inventorship, Holodniy admitted that the assay set forth

8   in the invention disclosure and the JID Article is contained in the '730 and '705 Patents.  *See*

9   Chiang Decl., Ex. 26 at PENNIE 1381 (in a letter to his attorney, Holodniy admits that his

10  contribution to the patents-in-suit is disclosed in the JID Article).  Another named inventor on the

11  Quantitation Patents, Dr. David Katzenstein also admitted that the patented method was fully

12  disclosed in the JID Article: "the JID article is the fulfillment of that idea [of measuring HIV RNA

13  to monitor therapy] through a whole series of technical assay development issues that went on

14  over perhaps two years" and the "JID article is the first description . . . of all of the technical

15  requirements to achieve measurement of HIV RNA in the plasma using a PCR reaction."  Boozell

16  Decl., Ex. 10 (Katzenstein Dep.) at 60:1-62:15; Chiang Decl. Ex. 49 (Katzenstein Dep.) at  90:16-

17  91:6.

18         Thus, there can be no dispute that the invention disclosed in the Holodniy invention

19  disclosure, the UCLA Abstract, and the JID Article reflected conception -- the formation in the

20  mind of the inventor of a definite and permanent idea of the complete and operative invention as it

21  is thereafter to be applied in practice -- including the idea that the HIV RNA Quantitation Assay

22  could be used to monitor HIV therapy.  *See Burroughs Wellcome Co. v. Barr Labs., Inc.,* 40 F.3d

23  1223, 1228 (Fed. Cir. 1994).  Stanford's arguments that subsequent confirmation of the invention

24  constituted conception misapplies the law.  "[A]n inventor need not know that his invention will

25  work for conception to be complete." *Id.*

26         *Burroughs* is controlling here.  In *Burroughs*, the Federal Circuit considered whether

27  conception of the idea of using AZT to treat AIDS patients required confirmation that AZT was

28  actually effective in treating AIDS.  Burroughs researchers did tests that found AZT to be effective

1   against retroviruses in rodents at low concentrations, but never tested AZT on HIV in humans. *Id.*

2   at 1226.  Based on their rodent retrovirus results, the Burroughs researchers suggested the use of

3   AZT in treating AIDS in December 1984. *Id.*  Subsequently, in February 1985, National Institute

4   of Health ("NIH") tests confirmed that AZT was in fact effective in treating AIDS in humans. *Id.*

5   The question before the *Burroughs* court was whether the NIH confirmation testing of AZT on

6   HIV in humans was part of the conception.  The Federal Circuit held that conception was

7   complete when Burroughs researchers had the idea that AZT *may* be effective in treating AIDS,

8   and the NIH's subsequent validation of that idea did not form part of the conception. *Id.* at 1230.

9        In this context, it is clear that any alleged subsequent work by Stanford, which it admits

10  simply "confirm[ed] the workability of the . . . invention," did not affect conception. *See* Stanford

11  Motion at 29; *Burroughs* , 40 F.3d at 1228-31.  At best, Stanford's alleged post-Cetus work

12  parallels the work done by the NIH in *Burroughs*:

13          That is not to say, however, that the NIH scientists merely acted as a "pair of
            hands" for the Burroughs Wellcome inventors. [The NIH scientists] exercised
14          considerable skill in conducting the tests, using their patented cell line to model the
            responses of human cells infected with HIV. . . .  [The testing] necessarily involved
15          interpretation of results for which [the NIH scientists], and very few others, were
            uniquely qualified. But because the testing confirmed the operability of the
16          inventions, it showed that the Burroughs Wellcome inventors had a definite and
            permanent idea of the inventions.
17

18  40 F.3d at 1230.  Here, like in *Burroughs*, Stanford claims that after Holodniy left Cetus, he and

19  Stanford obtained additional patient samples, performed statistical analysis, and confirmed that

20  plasma HIV levels would correspond to effectiveness of treatment.  Stanford Motion at 6:9-26.  As

21  with the NIH work in *Burroughs,* however, any alleged post-Cetus validation work done by the

22  Stanford scientists in conducting the tests and interpreting the results was not part of conception as

23  a matter of law.

24

25

26

27

28

2.   Section 16600 Does Not Vitiate Roche's Rights Under the Visitor Agreement[6]

Because the undisputed evidence demonstrates as a matter of law that the method disclosed in the '730 and '705 Patents was conceived at Cetus, Stanford's arguments that the Visitor Agreement is unenforceable under California Business and Professions Code section 16600 fail. As a preliminary matter, Stanford cites no case for the proposition that Section 16600 applies to assignment of inventions conceived *during* the term of employment. None exist. This is no surprise given that the statute relates only to post-employment assignment or non-compete agreements. *See* Cal. Bus. & Prof. Code § 16600; Stanford Motion at 26. Indeed, numerous cases have enforced agreements to assign inventions conceived during employment without reference to Section 16600 or inquiry into whether the invention was created using the employer's confidential information. *See e.g. FilmTec Corp. v. Allied- Signal Inc.*, 939 F.2d 1568, 1572 (Fed. Cir. 1991); *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1253 (Fed. Cir. 2000); *Cubic Corp. v. Marty*, 185 Cal. App. 3d 438, 452 (1986).

Furthermore, Section 16600 can have no application to the present situation because it is undeniable that the HIV RNA Quantitation Assay and the resulting patented method were conceived using Cetus's *confidential* information.[7] Holodniy admitted at deposition that he was obligated to submit an Invention Disclosure to Cetus because Cetus considered the HIV RNA Quantitation Assay to be proprietary. Chiang Decl., Ex. 46 (Holodniy Depo.) at 277:10-278:1; *see*

_____

[6] Stanford's suggestion that Roche is asserting "broad rights to *any use* of polymerase chain reaction ("PCR") technology that was *ever* learned from Cetus" is fallacious. As set forth here and in Roche's Motion, Roche asserts ownership concerning *the very invention* created at Cetus during Holodniy's time there. The Visitor Agreement applies to this work.

[7] Stanford's argument that Cetus took *no* steps to protect the confidentiality of its information is belied by the very agreements at issue here. *See* Stanford Motion at 27. In addition to specific requests by Groves that information be kept confidential, both the MTA and the Visitor Agreement contain provisions designed to ensure confidentiality. UF 35-36, 64; Chiang Decl., Ex. 18 at RMS 71; Ex. 10, ¶ 3; Ex. 11, ¶ 2. It is disingenuous for Stanford and Holodniy to argue that Cetus took no steps to protect its confidential information when Stanford and Holodniy entered the agreements, both with confidentiality provisions, precisely so that Stanford and Holodniy could have unfettered access to Cetus's expertise and reagents. Having received the benefit of access to Cetus, Stanford and Holodniy now seek to void the agreements after the fact.

1  *also id.* at 270:6-273:7; Groves Decl., ¶ 11.  Moreover, although Cetus consented in late

2  December 1989 to the publication of the UCLA Abstract at a symposium in March/April 1990,

3  Cetus concurrently requested that the information in the UCLA Abstract be kept confidential until

4  publication because it was proprietary to Cetus -- Holodniy readily agreed.  UF 33-38; Chiang

5  Decl., Ex. 18 (Letter to Merigan and Holodniy) at RMS 71; Ex. 19 (Letter to UCLA); Ex. 46

6  (Holodniy Dep.) at 266:17-268:11 (Holodniy acknowledged compliance).  Finally, Stanford offers

7  no proof, nor does it even argue, that the cRNA standard at the heart of the HIV RNA Quantitation

8  Assay, CC2, was anything other than confidential at all times.[8]  Accordingly, Stanford's misplaced

9  reliance on Section 16600 should be rejected.[9]

10        B.    Roche Has Shop Rights To Use The '730 And '705 Patents

11        As explained in Roche's Motion, the doctrine of shop rights provides Roche with an

12  independent basis for concluding that Roche has the right to use the patented methods of the '730

13  and '705 Patents because, as described above and in Roche's Motion, the work that led to the

14  patents took place at Cetus.  *See* Roche Motion at 25-27.  Stanford offers two contrary arguments.

15  Neither withstands scrutiny.

16              1.    Reduction To Practice Is Not Necessary For A Shop Right

17        First, Stanford urges a per se rule that both conception and reduction to practice must occur

18  at the employer claiming a shop right.  *See* Stanford Motion at 28:26-29:14.  This rigid rule is

19  _____

20  [8]  Although Stanford argues that **some** of the information Holodniy learned at Cetus became

21  public after Holodniy left Cetus and before the filing of the parent patent application, it offers no
    evidence that **all** such information was non-confidential while Holodniy was at Cetus.  *See*

22  Stanford Motion at 28; Holodniy Decl., ¶ 17.

23  [9]  Finally, Stanford cites no authority for the proposition that Section 16600 applies to
    Holodniy's use of the voluminous physical materials he had access to at Cetus and brought back

24  with him to Stanford, including, for example, Cetus's CC2 and Cetus's HRP-labeled SK19.
    Holodniy used the materials in connection with the patented invention up to the filing of Stanford's

25  original patent application on May 14, 1992.  *See* UF 12, 14-17, 20, 23-24; Chiang Decl., Ex. 46
    (Holodniy Dep.) at 72:7-19, 261:11-25, 303:15-305:8, 310:10-13, 345:24-347:10; Ex. 15 (Casipit

26  Notebook) at CH 524; Ex. 41 (Holodniy Notebook) at STAN 16165; *see also* Chiang Decl.,
    Ex. 20 (UCLA Abstract); Ex. 22 (JID Art.); Ex. 25 (JCI Art.).  The use of these materials alone,

27  which Holodniy received "as a consequence of his access to CETUS facilities," required the
    assignment of Holodniy's rights in the invention to Cetus under the Visitor Agreement,

28  irrespective of Section 16600.

1  contrary to the equitable test outlined by the Federal Circuit under which courts must "look to the

2  totality of the circumstances on a case by case basis and determine whether the facts of a particular

3  case demand, under principles of equity and fairness, a finding that a 'shop right' exists."

4  *McElmurry v. Arkansas Power & Light Co.*, 995 F.2d 1576, 1581-82 (Fed. Cir. 1993).  Moreover,

5  Stanford's proposed test is contradicted by precedent which makes clear that when the equities

6  demand it, neither conception nor reduction to practice need occur at the employer's facility.  *See*

7  *Melin v. United States*, 478 F.2d 1210, 1215 (Ct. Cl. 1973) (shop right may attach to invention

8  conceived in employee's own time); *Wommack v. Durham Pecan Co., Inc.*, 715 F.2d 962, 966

9  (5th Cir. 1983) ("The employer's assistance in the reduction to practice of an idea is not necessary

10  to his obtaining a shop right in the invention.").  Here, by contrast, it cannot be disputed that the

11  conception of the invention in the patents was created using the materials, tools, and workplace of

12  Cetus.  Thus, the equities demand a "shop right" for Cetus and Roche.[10]  *See* Section I.A.1, *supra*.

13          2.      Inducement and Consent of the Contractor is Not a Per Se Requirement and,
                    In Any Event, Is Present Here
14

15          Second, Stanford argues that a shop right attaches only if Stanford, Merigan, or Holodniy

16  somehow induced Cetus or Roche to use the invention because independent contractors are subject

17  to a heightened standard.  *See* Stanford Motion at 29:15-30:14.  Stanford is wrong, and its

18  argument once again flies in the face of the totality of the circumstances test.  *See McElmurry*, 995

19  F.2d at 1583 n.15 (shop rights equally available to independent contractors).  Indeed, as the

20  Federal Circuit made clear in *McElmurry,* a case involving independent contractors, an employer's

21  contribution to the invention can in itself be a sufficient ground for a finding of shop rights: "An

22  employer *will* have shop rights in an invention where the employer has financed an employee's

23  invention by providing wages, materials, tools and a work place.  Other factors creating a shop

_____

24

25  [10]  In a footnote, Stanford appears to suggest that Cetus must give materials, workspace, and

26  equipment to all of the named inventors to have a shop right, notwithstanding the fact that Cetus
    materials, workspace, equipment, and information enabled Holodniy's inventive contribution and
    thus made the invention itself possible.  Stanford's argument is contradicted by binding precedent.

27  *Strategical Demolition Torpedo Co. v. United States*, 96 F. Supp. 315 (Ct. Cl. 1951); see *also*
    *South Corp. v. United States*, 690 F.2d 1368, 1370 (Fed. Cir. 1982) (*en banc*) (Court of Claims
    precedent is binding precedent in the Federal Circuit).

28

1   right include and employee's consent, acquiescence, inducement or assistance to the employer in

2   using the invention. . . ." *Id.* at 1582 (emphasis added). Thus, inducement and consent are simply

3   two of many factors that may be evidence of a shop right.

4          Even assuming, *arguendo*, that inducement and/or consent are required, both inducement

5   and consent are present here. As described by Cetus's Dr. Sninsky, by 1991 Cetus had initiated a

6   project to develop a commercial product to quantitate HIV using PCR. Declaration of John

7   Sninsky in Support of Roche's Opposition to Counterclaim Defendants' Motion for Summary

8   Judgment ("Sninsky Opposition Decl."), ¶ 8. Roche then conducted clinical trials of its prototype

9   commercial HIV PCR assay at Stanford. Declaration of Rhea Nersesian in Support of Roche's

10  Opposition to Counterclaim Defendants' Motion for Summary Judgment ("Nersesian Opposition

11  Declaration"), ¶ 5. Indeed, one of the named inventors of the '730 and '705 Patents, Dr. David

12  Katzenstein admitted that he met with former Cetus (then Roche) employees Shirley Kwok and

13  John Sninsky in the mid-1990s "in connection with clinical trials relating to Roche's Amplicor

14  [HIV RNA quantitation] product." Boozell Decl., Ex. 10 (Katzenstein Dep.) at 178:23-180:1.

15  And Dr. Katzenstein admitted that the clinical protocol for that trial was developed by Merigan.

16  *Id.* at 181:22-182:14. According to Stanford's own witness, Roche provided Stanford its

17  "prototype" HIV RNA quantitation assay for the trial. *Id.* at 186:1-187:1; *see also id.* at 180:23-

18  184:25.

19         Thus, while its secret patent application was pending, Stanford participated in a clinical

20  trial validating the very product that it now accuses of infringement -- and said nothing.

21  Accordingly, because a multitude of factors support Roche's position, the equities compel a

22  finding that Roche has shop rights to the subject matter of the '730 and '705 Patents.

23         C.     Roche Has A Non-Exclusive, Royalty-Free License To The '730 And '705 Patents
                  Pursuant To The MTA

24

25         As described in Roche's Motion, the MTA also provides an independent basis for summary

26  judgment for Roche. *See* Roche Motion at 27:10-29:18. To wit, because Stanford, through

27  Holodniy and Merigan, used Cetus "materials" in connection with their alleged invention, Roche

28  is entitled to a non-exclusive royalty-free license thereto. *See id.* Stanford's Motion does not

1  dispute the operative facts.[11]  Instead, Stanford makes two arguments why the MTA has no

2  application here:  (1) no patent license under the MTA could be transferred from Cetus to Roche;

3  and (2) neither Cetus nor Roche ever exercised an option to a license under the MTA.  Stanford is

4  wrong on both counts.

5      As a preliminary matter, it is well established that patent licenses are freely transferable in

6  at least two situations:  (1) where the license agreement itself permits assignment; or (2) where the

7  license is transferred in connection with the sale of a business.  *Lane & Bodley Co. v. Locke*, 150

8  U.S. 193, 196 (1893); *Cal. Eastern Labs., Inc. v. Gould*, 896 F.2d 400, 402 (1990).  Here, the

9  MTA meets both conditions.  Paragraph 12 of the MTA expressly contemplates its assignment by

10  Cetus and provides that the MTA "is not assignable, whether by operation of law or otherwise,

11  without the prior written consent of the Senior Vice President of Research and Development at

12  CETUS."  Chiang Decl., Ex. 10 (MTA), ¶ 12.  Given the express language of the MTA, Stanford

13  cannot argue that it was not expressly transferable by its terms.  Moreover, the fact that it was

14  expressly transferred under the terms of the Assets Purchase Agreement between Cetus and Roche

15  is not in dispute.  UF 97; Chiang Decl., Ex. 44 (APA) at RMS 6524.  Thus, Stanford cannot

16  legitimately argue that such transfer was not approved by Cetus.[12]

17      Furthermore, it is not disputed that Roche acquired Cetus's entire PCR business.  Boozell

18  Decl., Ex. 13 (Gerber Dep.) at 76:14-24, 84:24-85:9, 86:1-8; Ex. 12 (Kentz Dep.) at 32:13-34:2.

19  Thus, under controlling precedent, such a sale necessarily included patent licenses associated with

20  that business.  *See Lane & Bodley Co. v. Locke*, 150 U.S. 193, 196 (1893); *Hammond v. Mason &*

---

22  [11]  Stanford appears to admit that the MTA covered Holodniy's work, conceding that
Merigan's 1988 request for Cetus PCR protocols (a request that Merigan admits was to help
23  Holodniy's quantitation efforts) "triggered the preparation" of the MTA.  *See* Stanford Motion at
4:12-14; UF 5-6; Chiang Decl., Ex. 48 (Merigan Dep.) at 281:13-21.  In addition, Stanford makes
24  no claim that a non-exclusive license would be royalty bearing.

25  [12]  Although Paragraph 12 suggests that the "Senior Vice President of Research and
Development" should provide Cetus's consent, that officer's consent was not a condition and thus
26  substantial compliance is sufficient to avoid forfeiture of the entire transfer.  *Budget Way Cleaners
& Laundry, Inc. v. Simon*, 311 P.2d 591, 593-94 (Cal. App. 1957); *Jacobs & Youngs v. Kent*, 230
27  N.Y. 239, 241 (1921).  Moreover, even if the specific Cetus employee was a condition, the
condition was for Cetus's benefit and may be waived by Cetus.  *Doryon v. Salant*, 75 Cal. App. 3d
28  706, 712 (1977).

1   *Hamlin Organ Co.*, 92 U.S. 724, 726-27 (1875); *Cal. Eastern Labs., Inc. v. Gould*, 896 F.2d 400,

2   402 (1990) (shop right license passed to company that "purchased the entire business and assets"

3   of original licensee).  Accordingly, the license under the MTA was transferred from Cetus to

4   Roche.[13]

5           Finally, Stanford's suggestion that Roche never exercised its option to a license under the

6   MTA is misleading.  As a preliminary matter, the MTA requires no timeframe nor specific manner

7   for obtaining a license.[14]  In any event, in numerous discussions and communications with

8   Stanford in the years preceding this litigation, Roche consistently maintained that it had rights

9   under the MTA including a non-exclusive license to the patents-in-suit.  *See, e.g.*, Boozell Decl.,

10  Exs. 4 & 5 (Letters from George Jen).  *See Lack v. Western Loan & Building Co.*, 134 F.2d 1017,

11  1021 (9th Cir. 1943) (no particular form needed to exercise option).  Indeed, this was a central

12  focus of the parties' pre-litigation mediation before Judge Infante.  Such communications were

13  made directly to Stanford's declarant Luis Mejia, who claimed in support of Stanford's Motion that

14  Roche had never exercised such option.  *Id.*; *see also* Mejia Decl. ¶ 13.  His assertions, however,

15  are plainly belied by the record and should be disregarded.

16  II.    ROCHE'S DEFENSES ARE NOT TIME BARRED

17          A.    Statute of Limitations and Laches Claims Do Not Apply to Roche's Defenses.

18          Stanford's statute of limitations and laches arguments have a simple refutation: "statutes of

19  limitations do not apply to defenses. . . .  Under well-established authority, a defense may be

---

21  [13] California law also supports this proposition because it provides for free assignability of
    patent licenses.  *Farmland Irrigation Co. v. Dopplmaier*, 48 Cal. 2d 208, 222 (1957); *see Erie R.R.*
22  *Co. v. Tompkins*, 304 U.S. 64 (1938).

23  [14] The MTA contemplates that a non-exclusive license would be self-executing.  By its terms,
    the MTA entitled Cetus, at a minimum, to an immediate, royalty-free, non-exclusive license, in
24  consideration for its provision of the materials to Stanford in order to prevent Stanford or anyone
    else that received confidential and proprietary information from Cetus from blocking Cetus's
25  access to an invention created using that material.  UF 57; Chiang Decl., Ex. 10 (MTA), ¶ 8.  Only
    an exclusive license, which would be royalty bearing, would require further negotiation.  *See*
26  Boozell Decl., Ex. 9 (Price Dep.) at 200:7-201:23.  Such an interpretation is consistent with the
    balance of the agreement.  For example, paragraph seven of the MTA which provides that Cetus
27  shall be "free to use" any results of the collaboration.  *See* UF 56; Chiang Decl., Ex. 10 (MTA),
    ¶ 7.
28

1   raised at any time, even if the matter alleged would be barred by a statute of limitations if asserted

2   as the basis for affirmative relief." *Styne v. Stevens*, 26 Cal. 4th 42, 51 (2001); *accord United*

3   *States v. Western Pacific R.R. Co.*, 352 U.S. 59, 71-72 (1956). In other words, statutes of

4   limitations "may be used only as a 'shield' and not as a 'sword,' i.e., it can only be set up as a

5   defense to a suit . . . and cannot be invoked affirmatively . . . as the foundation of a right."

6   *Lackner v. LaCroix*, 25 Cal. 3d 747, 752 (1979) (ellipses in original); *accord In re Paul Potts*

7   *Builders, Inc.*, 608 F.2d 1279, 1282 (9th Cir. 1979). Similarly, it is universally recognized that

8   claims of laches also do not apply to defenses. *Styne*, 26 Cal. 4th at 52; *E.D. Sys. Corp. v.*

9   *Southwestern Bell Tel. Co.*, 674 F.2d 453, 461 (5th Cir. 1982); *Halcon Int'l, Inc. v. Monsanto*

10  *Australia Ltd.*, 446 F.2d 156, 159 (7th Cir. 1971); *LaPrade v. Rosinsky*, 882 A.2d 192, 198 (D.C.

11  2005); *Short v. Rapping*, 135 A.D.2d 624, 625 (1987); *Chun Chew Pang v. Chun Chew Kee*, 412

12  P.2d 326, 334 (Hawaii 1966).

13          Here, Stanford sued Roche for infringement, pleading in its Complaint that "Stanford owns

14  the entire right, title, and interest" in the '730 and '705 Patents. Complaint, Dkt. No. 1, ¶¶ 12, 18.

15  In response, Roche asserted three defenses, any of which independently defeats Stanford's claims:

16  (1) Roche is an owner of the patents-in-suit; (2) Roche has license rights to the patents; and (3)

17  Stanford lacks standing because it is not the exclusive owner of the patents. Roche's Amended

18  Answer and Counterclaims, Dkt. No. 54, ¶¶ 27, 29, 30. Stanford cannot, as a matter of law, rely

19  on a statute of limitations and laches bar as a sword to defeat these defenses and establish the

20  foundation of its right to sue for infringement. *See Lackner v. LaCroix*, 25 Cal. 3d at 752; *Styne*,

21  26 Cal. 4th at 51-52. Moreover, because Roche's instant declaratory judgment counterclaims were

22  asserted in defense of the infringement suit, they should likewise not be barred.[15] *See Silverman v.*

23

24

25

---

26  [15]  Roche's counterclaims also seek affirmative relief with respect to Holodniy and Merigan's
failure to comply with ongoing obligations under the terms of their respective agreements with
27  Roche. *See, e.g.*, Roche's Amended Answer and Counterclaims, Dkt. No. 54, ¶¶ 78, 87. Those
claims, however, are not at issue at this stage of the litigation.

28

1    *Eastrich Multiple Investor Fund, L.P.*, 51 F.3d 28 (3rd Cir. 1995) (declaratory judgment action

2    brought in defense not barred by the statute of limitations).[16]

3        B.    <u>Roche Had No Obligation to Sue and, Therefore, Is Not Time-Barred</u>

4        Not only do statutes of limitations not apply to defenses, Stanford's basic assertion that

5    Roche was somehow required to sue Stanford defies logic. As set forth in Roche's Motion,

6    Cetus's ownership and license rights in the invention vested by at least 1991. *See* Roche's Motion

7    at 22-24. Those rights were transferred to Roche that same year. *See id.* at 18-19. As such, the

8    subsequent purported assignment of the patents by Holodniy and Merigan to Stanford in 1995 is "a

9    nullity." *Filmtec*, 939 F.3d at 1572. This is the true even though Stanford is the assignee of record

10   in the Patent and Trademark Office. *See id.* at 1570, 1572 (plaintiff FilmTec Corporation's status

11   as assignee of record did not prevent its later acquired interest from being declared a "nullity.");

12   Chiang Decl., Ex. 35 (1995 Assignment).[17] Therefore, as the true legal owner of Holodniy and

---

[16] Furthermore, Stanford cannot establish that this case involves facts sufficient to prove laches. Although Stanford baldly asserts that Roche "made no ownership, license, or even co-authorship claims until it crafted its counterclaims in this lawsuit," (*see* Stanford Motion at 11:3-9), Stanford's Motion ignores years of pre-litigation discussions between the parties in which Roche made exactly those claims. *See* Boozell Decl., Exs. 2-6 (Jen/Mejia letters). Furthermore, Roche has offered its Amplicor Monitor product since the mid-1990s with Stanford's express knowledge -- and assistance. Nersesian Opposition Decl., ¶¶ 3 & 5; Exs. A & B; Boozell Decl., Ex. 10 (Katzenstein Dep.) 180:23-184:25, 186:1-187:1; Ex. 7 at 1092. In light of this, Stanford can hardly argue that Roche has acted as if it had no ownership right related to the subject matter of the '730 and '705 Patents. Finally, Stanford's suggestion that it has suffered prejudice as a result of its licensing efforts and litigation concerning the Merigan patents does not withstand scrutiny. Those efforts did not relate to the '730 and '705 Patents -- instead, those efforts related to the Mutation Patents not at issue in this phase.

[17] The only significance of recording in the Patent and Trademark Office is to obtain the benefit of the bona fide purchaser doctrine under 35 U.S.C. § 261. Stanford, however, has not pled or argued a bona fide purchaser claim -- nor could it. Indeed, the undisputed record precludes such a claim because Stanford did not pay consideration to the inventors for their purported assignment to Stanford. *See* Boozell Decl., Ex. 8 (Merigan Dep.) at 182:25-183:18; Ex. 10 (Katzenstein Dep.) at 172:22-173:21; Ex. 14 (Albertson Dep.) at 161:19-162:8. Recited consideration is not competent evidence of such consideration vis-a-vis third parties such as Roche. *Simmons Creek Coal Co. v. Doran*, 142 U. S. 417, 437 (1892); *Huntington v. Donovan*, 183 Cal. 746, 753 (1920). Nor is a promise to pay future royalties proper consideration in the context of the bona fide purchaser defense. *See Venus Music Corp. v. Mills Music, Inc.*, 261 F.2d 577, 580 (2d Cir. 1958). In addition, because Holodniy and Merigan both signed their consulting agreements in the scope of their Stanford employment, notice of those agreements is imputed to Stanford. *Curtis, Collins & Holbrook Co. v. United States*, 262 U.S. 215, 222-23 (1923).

1  Merigan's portion of the patents, Roche was under no obligation to take any action to enforce its

2  ownership rights against Stanford's meritless claims of exclusive ownership.

3         Under Stanford's logic, should Stanford wrongfully assert that it is the owner of the

4  formula to Coke, Coca-Cola would be obligated to sue Stanford or lose its rights to the formula.

5  This is not and cannot be the law.  Roche has at all relevant times owned the right to practice the

6  subject matter of the '730 and '705 Patents.  Only in response to Stanford's 2005 complaint

7  seeking to wrest Roche's rights away from it did Roche have any obligation to assert defenses and

8  counterclaims, which it did.

9  III.    <u>EQUITABLE ESTOPPEL DOES NOT BAR ROCHE'S DEFENSES</u>

10         Stanford also argues that Roche should be equitably estopped from defending itself in this

11  lawsuit.  Like its other arguments, this assertion lacks factual and legal support and should be

12  rejected.

13         The burden of proving equitable estoppel "rests upon the party asserting such estoppel to

14  prove all the elements constituting it." *Gen. Motors Acceptance Corp. v. Gandy*, 200 Cal. 284,

15  295 (1927).  As the California Supreme Court made clear, in cases involving property subject to

16  the statute of frauds, equitable estoppel only occurs under extreme circumstances where there is

17  "conduct tantamount to actual or constructive fraud on the part of the party to be estopped." *City*

18  *of Long Beach v. Mansell*, 3 Cal. 3d 462, 490 (1970); *Boggs v. Merced Mining Co.*, 14 Cal. 279,

19  367-69 (1859).  This is because using equitable estoppel to effect a transfer of property by

20  conduct, without a writing, is "essentially contrary to the intent and purpose, if not the letter, of the

21  statute of frauds." *Mansell*, 3 Cal. 3d at 489.  Patents are property subject to the statute of frauds,

22  (*see* 35 U.S.C. § 261 (assignment of patent must be in writing)) and the result of Stanford's

23  equitable estoppel claim would be to transfer Roche's title in the '730 and '705 Patents to Stanford.

24  Nonetheless, Stanford has not alleged fraud in its pleadings in compliance with *Federal Rule of*

25  *Civil Procedure* 9(b), nor does it even contend in its Motion that Roche or Cetus committed actual

26  or constructive fraud.  Accordingly, because Stanford's equitable estoppel arguments fail to meet

27  the heightened standards of California law, they should be rejected.

28

1    Furthermore, Stanford cannot prove that its purported belief that Roche had "abandoned its

2    rights to the Merigan patents" was reasonable under the circumstances. *Golden West Baseball Co.*

3    *v. City of Anaheim*, 25 Cal. App. 4th 11, 48 (1994) ("Given these facts, no reasonably

4    sophisticated business person would rely upon oral pronouncements of general support in lieu of

5    written permission."). Indeed, Stanford's arguments fly in the face of the reality. Although

6    ignored by Stanford, the undisputed evidence proves that Cetus/Roche at all times asserted its

7    rights to the inventions, conduct which would have prevented a reasonable person from

8    concluding that Cetus/Roche had abandoned its rights.

9    The very agreements here set the stage. Before accessing Cetus's facilities, materials and

10   information, Merigan, Holodniy, and Stanford each agreed to protect Cetus's confidential

11   information and to assign Cetus ownership or license rights in any inventions created as a result of

12   that access. Chiang Decl., Exs. 10 (MTA) & 11 (Visitor Agreement). Cetus/Roche acted in

13   accordance with those rights at all times. As Holodniy admits, once the alleged invention was

14   conceived, Groves required him to submit an Invention Disclosure because the invention was

15   proprietary to Cetus. UF 44-46; Chiang Decl., Ex. 46 (Holodniy Dep.) at 277:10-278:4. In

16   addition, Groves specifically requested that the UCLA Abstract be kept confidential pending

17   publication because Cetus had a pending patent application covering its contents. UF 35-36;

18   Chiang Decl. Ex. 18 (Groves letter) at RMS 71. Holodniy complied with these requests and

19   admits that the subject matter of the UCLA Abstract was Cetus property. UF 37-38; Chiang Decl.

20   Ex. 19 (Holodniy Letter to UCLA); Ex. 46 (Holodniy Dep.) at 266:17-268:11, 270:6-273:7.

21   Thereafter, Cetus, and later Roche, developed the Amplicor Monitor HIV quantitation test

22   and clinically tested it with the assistance of Stanford, including Drs. Merigan and Katzenstein.

23   *See* Section I.B.2, *supra*. The product has been available since the mid-1990s with Stanford's

24   express knowledge. Nersesian Opposition Decl., ¶¶ 3 & 5; Exs. A & B; Boozell Decl., Ex. 10

25   (Katzenstein Dep.) at 180:23-184:25, 186:1-187:1; Ex. 7 at 1092 (Stanford Article in 1996 noting

26   use of the "Amplicor polymerase-chain-reaction test"). Moreover, prior to the initiation of this

27   lawsuit, Roche, for years, rejected Stanford's efforts to obtain a royalty bearing license to the '730

28   and '705 Patents on the basis that it already had ownership and license rights thereto. *See* note 16,

1  *supra.* Under these circumstances, no reasonable person, let alone Stanford, could have concluded

2  that Cetus/Roche had abandoned its rights relating to the Patented Methods. As such, Stanford's

3  equitable estoppel claims must fail.[18]

4  IV.    THE MERIGAN CONSULTING AGREEMENTS ALSO PROVIDE ROCHE WITH
       OWNERSHIP, OR, AT A MINIMUM, A LICENSE

5

6        Finally, Stanford also seeks summary judgment with respect to two agreements between

7  Merigan and Cetus: (1) the 1984 Consulting Agreement (the "1984 Agreement"); and (2) the

8  1991 Non-Exclusive Consulting Agreement (the "1991 Agreement") (collectively, the "Merigan

9  Agreements"). Neither of these agreements were addressed in Roche's Motion because the two

10  contracts raised by Roche in its Motion provide independent and indisputable bases for Roche to

11  prevail. As discussed below, however, should this case proceed, the Merigan Agreements provide

12  additional grounds for Roche to prevail.

13        A.    Stanford Has Failed To Meet Its Burden As To The 1984 Agreement

14        In its Motion, Stanford seeks summary judgment that the 1984 Agreement does not

15  provide rights to Cetus under the patents-in-suit. Stanford Motion at 22:1-23:4.[19] Because

16  Stanford moves for summary judgment, all evidence is viewed in the light most favorable to

17  Roche. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

18        As a threshold matter, Merigan's 1984 Agreement includes a self-executing invention

19  assignment clause like Holodniy's Visitor Agreement. Declaration of Michelle Rhyu in Support of

20  _____

21        [18] In its Motion, Stanford asserts that Merigan "understood" from Cetus's Dr. Sninsky that
22  Cetus had no interest in pursuing the monitoring of therapy using the HIV RNA Quantitation
   Assay. *See* Stanford Motion at 18:25-19:5. As a preliminary matter, Stanford provides no
23  evidence demonstrating that Merigan's subjective understanding was reasonable. Indeed, Dr.
   Sninsky denies that any such conversation with Merigan ever took place, and the
24  contemporaneous Cetus and Roche documents show that Cetus and Roche were certainly pursuing
   a commercial assay. Sninsky Opposition Decl., ¶ 9. Merigan's self-serving, uncorroborated, and
25  entirely subjective recollection about a conversation with Sninsky should be disregarded for
   summary judgment. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002)
26  (uncorroborated and self-serving testimony does not create genuine issue of material fact).

27        [19] Even if the Court were to agree with Stanford with respect to the 1984 Agreement, that does
   not affect the rights transferred under the Visitor Agreement and MTA. The 1984 Agreement is a
28  separate agreement and has no bearing on Roche's motion for summary judgment.

1    Stanford's Motion for Summary Judgment ("Rhyu Declaration"), Ex. 356, ¶ 6.1. Stanford does

2    not challenge this provision, but argues that Roche has no rights because the invention falls under

3    exclusion 6.1(y) of the 1984 Agreement's invention assignment clause, which provides that the

4    particular assignment provision does not apply to the extent contrary to "existing" agreements

5    with Merigan's institution. Rhyu Decl., Ex. 356, ¶ 6.1(y). Fatal to Stanford's Motion is that

6    Stanford has produced no evidence that the patents-in-suit fall within this exclusion. It has not

7    produced a Merigan employment agreement with Stanford operative in 1984. The only document

8    offered by Stanford as proof of an "existing agreement" with Merigan in 1984 is an unsigned form

9    agreement; there is no evidence Merigan ever executed this document.[20] *See* Rhyu Decl., Ex. 123.

10   Stanford cannot claim rights "in accordance with [Merigan's] existing agreement with" Stanford

11   without actually producing the agreement under which it claims such rights.

12        Even if somehow the unsigned form agreement offered by Stanford is accepted as the 1984

13   employment agreement between Merigan and Stanford, Stanford has not demonstrated that

14   exclusion 6.1(y) applies. The form Patent and Copyright Agreement offered by Stanford does not

15   require assignment of all inventions by employees of Stanford, rather, it only obligates employees

16   to assign rights to Stanford "as required by Contracts or Grants" with outside sponsors, like the

17   U.S. government. Rhyu Decl, Ex. 123, ¶ 2. Stanford, however, has again completely failed in its

18   proof, offering *no contract or grant* document containing terms that require an assignment from

19   Merigan to Stanford.[21]

20   _____

21   [20]  The only employment agreement signed by Merigan that Stanford has produced in
     discovery is dated January 27, 1995, was by its own terms effective September 1, 1994, and has
22   different terms than the 1984 form agreement that Stanford offers. *See* Boozell Decl., Ex. 15. As
     such, Stanford has failed to adduce evidence as to what Merigan's contract was in 1984. This may
23   be no surprise because, as Stanford's 30(b)(6) witness testified: (1) not all employees were given
     form employment agreements when hired, and (2) no one was in charge of ensuring that such
24   agreements were ever executed by Stanford employees. Boozell Decl., Ex. 14 (Albertson Dep.) at
     199:15-200:10.
25

26   [21]  To the extent that Stanford claims that the Bayh-Dole Act, 35 U.S.C. §§ 200-212, confers it
     any rights against Roche, it is mistaken. The Bayh-Dole Act permits Stanford to "retain" title
27   against the government in cases where inventions are made under government contract. 35 U.S.C.
     § 202(a). Nothing in the Act, however, gives Stanford the ability to obtain title that it otherwise
28   does not have from a third-party such as Cetus or Roche.  Indeed, such a result would be
            (footnote continued)

1    Instead, in an attempt to skirt these failures of proof and without explanation as to why the

2  contracts were not produced, Stanford relies upon three pieces of secondary evidence to prove the

3  contents of both the absent Merigan employment agreement and the U.S. government contract or

4  grant: (1) a passage from Merigan's deposition which indicates that he received two government

5  grants to build physical facilities at Stanford (Rhyu Decl., Ex. A at 26:16-27:10); (2) the

6  declaration of Luis Mejia, who testifies, without any apparent foundation, that he "understand[s]

7  that the research performed and the inventions described in the Merigan patents were all funded by

8  at least two U.S. government grants" (Mejia Decl., ¶ 8); and (3) Merigan's 1992 declaration to the

9  PTO, which is inadmissible hearsay when offered by Stanford, stating that he had the obligation to

10 assign his rights to Stanford in 1992 (Rhyu Decl., Ex. 87). Under *Federal Rule of Evidence* 1002,

11 however, none of Stanford's proffered evidence is admissible to prove the contents of Stanford's

12 missing evidence. *See id.* ("To prove the content of a writing . . . the original writing . . . is

13 required."). As Stanford has offered no admissible evidence of Merigan's contractual obligation to

14 assign his inventions to Stanford, its case under exclusion 6.1(y) necessarily fails.

15    B.    The 1991 Agreement is Applicable

16    Stanford also argues that the patented invention does not fall under Merigan's 1991

17 Agreement. Stanford Motion at 23:5-14. Stanford's only support for this argument is Holodniy's

18 vague attestation that he is "confident," based on the May 14, 1991 submission of the JCI Article,

19 that the alleged invention was reduced to practice before April 19, 1991, the effective date of the

20 agreement. Holodniy Decl., ¶ 31. Holodniy's unsupported declaration, however, is insufficient as

21 a matter of law to prove reduction to practice prior to April 19, 1991. Under Federal Circuit

22 precedent, evidence of reduction to practice must be independently witnessed and corroborated to

23 be admissible. *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1169-71 (Fed. Cir. 2006).

24 ———————————

25 inconsistent with the policy of Bayh-Dole which, as expressed, is "to promote collaboration
   between commercial concerns and nonprofit organizations, including universities."  35 U.S.C.

26 § 200.  Furthermore, Stanford adduces no admissible evidence in support of its claims that the
   work in question was, in fact, completed pursuant to government grant.  Accordingly, to allow

27 Stanford to wrest ownership of the patents-in-suit from Roche for Stanford's benefit pursuant to
   Bayh-Dole is not permitted under the law.

28

1   Holodniy's testimony is neither.  In addition, Stanford produced only a redacted version of the

2   invention disclosure.  It should not be permitted to argue for a particular date for reduction to

3   practice while simultaneously depriving Roche of evidence relevant to that point.  *See* note 4,

4   *supra*.  Thus, because there is no other admissible evidence of reduction to practice in the record,

5   the JCI Article itself provides the earliest arguable date of reduction to practice, i.e. May 14, 1991.

6   As such, Merigan's 1991 Agreement, which assigned certain inventions "reduced to practice" after

7   April 19, 1991, is applicable.  Rhyu Decl., Ex. 369, ¶ 5.

8

9          C.      Ownership of the Invention Under The Merigan Agreements Was Transferred
                   From Cetus to Roche
10

11         Stanford also argues that Roche does not have standing to assert rights in the patents-in-

12  suit under the Merigan Agreements because those agreements were not expressly transferred from

13  Cetus to Roche in the Cetus/Roche Assets Purchase Agreement.[22]  Stanford Motion at 19:21-

14  21:24.  Stanford's argument misses the point.  As of the closing of the Assets Purchase Agreement,

15  December 11, 1991, Cetus's ownership rights in the inventions under the Merigan agreement had

16  vested, i.e. was an asset of Cetus, and, as such, was transferred under the Assets Purchase

17  Agreement.

18         Under the 1984 Agreement, Merigan agreed that:

19         All Inventions . . . made, conceived, or completed by CONSULTANT, individually
           or in conjunction with others during the Consulting Period . . . *shall be* the sole and
20         exclusive property of CETUS, provided such Inventions (i) are made conceived or
           completed with equipment, supplies, facilities or Confidential Information of
21         CETUS . . . .

22  Rhyu Decl. Ex. 356 at ¶ 6.1 (emphasis added).  Under the 1991 Agreement, Merigan similarly

23  agreed that "Cetus *shall own* all right, title, and interest in any Invention."  Rhyu Decl. Ex. 369 at

24  ¶ 5(b) (emphasis added).  As with the Visitor Agreement and the MTA, the provisions that Cetus

25  _____

26     [22]   In its preliminary statement, Stanford argues that the Merigan agreements "were evaluated
       in connection with the purchase of PCR assets from Cetus to Roche."  Stanford Motion at 1:17-18.
27     Stanford, however, provides no support for this proposition in its brief.  Such unsupported bald
       assertions must be ignored for purposes of summary judgment.

28

1    *shall* own the covered inventions effectuated an assignment immediately upon invention. *See*

2    *Speedplay*, 211 F.3d at 1253 (The use of "shall belong" language effected an immediate

3    assignment; it was not a promise to make an assignment in the future.). Thus, Merigan's alleged

4    invention was a Cetus PCR asset.[23]

5         Subsequently, Cetus sold that PCR asset to Roche pursuant to the terms of the Assets

6    Purchase Agreement. Section 2.1(c) of the Assets Purchase Agreements transferred from Cetus to

7    Roche "[a]ll of the PCR Intellectual Property listed on Schedule 2.1(c) . . . ." Chiang Decl., Ex. 44

8    at RMS 6333. As set forth in Schedule 2.1(c), the Transferred Intellectual Property specifically

9    includes the Holodniy invention disclosure and attached UCLA Abstract—identifying Merigan as

10   a contributor—and detailing the fully conceived invention in the '730 and '705 Patents. UF 59;

11   Chiang Decl., Ex. 44 at RMS 06460 ("Invention Disclosure 90-003 Quant of HIV DNA,

12   Konrad"). The transfer of the invention disclosure, therefore, effectuated the transfer of Cetus's

13   then existing rights in the invention, both of the Merigan portion already vested pursuant to the

14   Merigan Agreements, and the Holodniy portion already vested pursuant to the Visitor

15   Agreement.[24] Thus, Roche has standing to assert its rights to the '730 and '705 Patents transferred

16   to Cetus under the Merigan Agreements, as it purchased Cetus's then-expectant ownership interest

17   in the patents.

18

19

20

21
_____

22   [23]   As set forth above, the conception of the invention was complete in 1989. *See* Section
      I.A.1, *supra*. Moreover, Stanford admits that the JCI Article discloses the invention in the patents
23   and, as set forth above, has offered no admissible evidence of a date earlier than the submission of
      this article on May 14, 1991 for the reduction to practice of the invention. *See* Section III.B.
24
      [24]   Stanford's citation to *Pearl-Wick Corp. v. John Hancock Mut. Life Ins. Co.* 26 B.R. 604,
25   608 (S.D.N.Y 1982) and *Property Asset Mgmt., Inc. v. Chicago Title Ins. Co.*, 173 F.3d 84, 87 (2d
      Cir. 1999) in support of its argument that there was no intent to transfer the Merigan *contracts* is
26   inapposite. *See* Stanford Motion at 21:9-18. The parties clearly communicated the mutual intent
      of the APA to transfer *all Cetus's PCR assets* to Roche, specifically including Cetus's expectant
27   property interest in the invention claimed by the '730 and '705 Patents, from both Merigan and
      Holodniy, as reflected in the Holodniy invention disclosure that was expressly transferred.
28

1         D.     <u>At a Minimum, Roche has a License to Cetus's Rights under the Merigan</u>
          <u>Agreements under the Assets Purchase Agreement's License Provisions</u>

2

3         Even if Cetus's pre-existing ownership rights under the Merigan Agreements were not

4    transferred by the Assets Purchase Agreement, that agreement makes clear that Cetus sold Roche a

5    license to all of Cetus's rights to the '730 and '705 Patents. Every co-owner of a patent may license

6    the patent. *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1468 (Fed. Cir. 1998). Under

7    Section 2.8(b) of the Assets Purchase Agreement, Cetus granted to Roche "a nonexclusive,

8    irrevocable, royalty-free, worldwide license under all the Licensed Intellectual Property . . . ." As

9    defined therein:

10        "Licensed Intellectual Property" means all *PCR Intellectual Property*, other than
     Transferred Intellectual Property, which has been conceived or reduced to practice,

11        as of the Closing Date . . . .

12        "PCR Intellectual Property" means all *Intellectual Property* which is owned
     by . . . Seller or any of its Affiliates, which in any case is required for, or which is

13        or could be used or useful in connection with, the operation of the PCR Business
     other than Intellectual Property with respect to which Seller acquires its rights after

14        the Closing Date.

15        "Intellectual Property" means, collectively . . . (iii) *interests in inventions* . . .
     whether reduced to practice or not, on which no application for letters patent has

16        been filed but as *to which Seller has a Right or option to obtain an assignment or*
     *license by reason of an existing contract with or employment of the inventor*. . . .

17

18   Chiang Decl., Ex. 44 at RMS 6339, 6326, 6329, 6324 (emphasis added). Because the Merigan

19   Agreements, at a minimum, gave Cetus "a Right . . . to obtain an assignment . . . [to the invention]

20   by reason of an existing contract with . . . the inventor," the Merigan Agreements clearly fall

21   within the definition of "Licensed Intellectual Property" in the Assets Purchase Agreement. It is

22   therefore beyond dispute that Roche, at a minimum, purchased an "nonexclusive, irrevocable,

23   royalty-free, worldwide license" to those patents. Thus, the evidence demonstrates that the

24   Merigan Agreements provided ownership to Cetus and these rights were either licensed or

25   transferred to Roche. As such Stanford's summary judgment motion on these contracts must fail.

26                      **Conclusion**

27        For the foregoing reasons, Roche respectfully requests that Stanford's Motion for

28   Summary Judgment be denied in its entirety.

1

2  DATED: November 15, 2006          Respectfully submitted,

3                                    QUINN EMANUEL URQUHART OLIVER &
                                     HEDGES, LLP

4

5                                    By   /s/ Jeffrey N. Boozell
6                                        Jeffrey N. Boozell
                                         Attorneys for Defendants and Counterclaimants
7                                        Roche Molecular Systems, Inc.; Roche Diagnostics
                                         Corporation; and Roche Diagnostics
8                                        Operations, Inc.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28