COOLEY GODWARD KRONISH LLP
STEPHEN C. NEAL (No. 170085) (nealsc@cooley.com)
RICARDO RODRIGUEZ (No. 173003) (rr@cooley.com)
MICHELLE S. RHYU (No. 212922) (mrhyu@cooley.com)
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA  94306-2155
Tel:    (650) 843-5000
Fax:    (650) 857-0663

Attorneys for Plaintiff and Counterclaim Defendant,
THE BOARD OF TRUSTEES OF THE LELAND STANFORD
JUNIOR UNIVERSITY and Counterclaim Defendants THOMAS
MERIGAN and MARK HOLODNIY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY, <br><br>    Plaintiff, <br><br>    v. <br><br> ROCHE MOLECULAR SYSTEMS, ET AL., <br><br>    Defendants. | Case No.  C 05 04158 MHP <br><br> **STANFORD UNIVERSITY, DR. MERIGAN AND DR. HOLODNIY'S OPPOSITION TO DEFENDANTS' MOTION TO STRIKE** <br><br> Hearing Date:  December 4, 2006 <br> Time: 2:00 p.m. <br> Dept: 15, 18th Floor <br><br> Hon. Marilyn Hall Patel |
| ROCHE MOLECULAR SYSTEMS, ET AL., <br><br>    Counterclaimants, <br><br>    v. <br><br> THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY; THOMAS MERIGAN; AND MARK HOLODNIY, <br><br>    Counterclaim Defendants. | |

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

742418 v2/PA

**OPP. TO DEFS' MOT. TO STRIKE**
**CASE NO. C 05 04158 MHP**

**TABLE OF CONTENTS**

**PAGE**

I. PARAGRAPHS 7-9 OF THE MERIGAN DECLARATION SHOULD NOT BE STRICKEN ................................................................................................................. 1

    A. Paragraphs 7-9 Do Not Contradict Dr. Merigan's Deposition Testimony .............. 1

    B. RMS's Arguments About the Weight of the Merigan Declaration Are Irrelevant ................................................................................................................. 5

    C. Ms. Albertson's Testimony Provides No Basis To Strike Any Portion of Dr. Merigan's Declaration ...................................................................................... 5

II. COUNTERDEFENDANTS PROPERLY RAISED AND SUPPORTED THEIR ARGUMENT THAT THE PATENTS WERE NOT ASSIGNABLE TO CETUS BECAUSE THEY WERE FUNDED BY GOVERNMENT GRANTS ............................ 7

    A. Counterdefendants' Argument is Timely ................................................................ 7

    B. Counterdefendants' Evidence Is Admissible, but the Bayh-Dole Act Precludes Ownership by Cetus Even Without Consideration of the Challenged Evidence .............................................................................................. 9

III. CONCLUSION .................................................................................................................. 11

# TABLE OF AUTHORITIES

**PAGE**

**CASES**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) .................................................................................................... 5, 9

*Becton Dickinson & Co. v. C.R. Bard, Inc.*,
    922 F.2d 792 (Fed. Cir. 1990) ......................................................................................... 9

*Cool Fuel, Inc. v. Connett*,
    685 F.2d 309 (9th Cir. 1982) ........................................................................................... 9

*Kennedy v. Allied Mut. Ins. Co.*,
    952 F.2d 262 (9th Cir. 1991) ........................................................................................... 1

*Messick v. Horizon Indus. Inc.*,
    62 F.3d 1227 (9th Cir. 1995) ....................................................................................... 1, 4

*Stallcop v. Kaiser Foundation Hospitals*,
    820 F.2d 1044 (9th Cir. 1987) ......................................................................................... 9

*Stuart v. UNUM Life Ins. Co. of Am.*,
    217 F.3d 1145 (9th Cir. 2000) ................................................................................. 10, 11

*Tippens v. Celotex Corp.*,
    805 F.2d 949 (11th Cir. 1986) ..................................................................................... 1, 4

*Transclean Corp. v. Bridgewood Servs., Inc.*,
    290 F.3d 1364 (Fed. Cir. 2002) ....................................................................................... 9

*United States v. Boulware*,
    384 F.3d 794 (9th Cir. 2004) ......................................................................................... 10

*United States v. One Parcel of Real Property*,
    904 F.2d 487 (9th Cir. 1990) ........................................................................................... 5

*United States v. Pang*,
    362 F.3d 1187 (9th Cir. 2004) ....................................................................................... 10

*United States v. Weinstock*,
    863 F. Supp. 1529 (D. Utah 1994) ................................................................................ 10

*Villiarimo v. Aloha Island Air, Inc.*,
    281 F.3d 1054 (9th Cir. 2002) ......................................................................................... 5

**STATUTES**

35 U.S.C. §§ 200-212 ........................................................................................................ 8, 10

35 U.S.C. §§ 202(c)(7) & 202(d) ........................................................................................... 10

**RULES**

Fed. R. Evid. 1002 ................................................................................................................... 8

Filed less than a week before the hearing on the cross-motions for summary judgment, counterclaimants' (collectively, "RMS's") motion to strike is a belated, transparent attempt to exclude evidence that it cannot dispute and legal issues to which it has no valid response. Because the evidence is admissible and RMS has had notice and an opportunity to respond to the legal issues, the Court should not exclude them from its summary judgment analysis. RMS has provided no basis or reason to withhold consideration of the evidence and issues until trial. RMS's motion to strike should be denied in its entirety.

## I. PARAGRAPHS 7-9 OF THE MERIGAN DECLARATION SHOULD NOT BE STRICKEN.

### A. Paragraphs 7-9 Do Not Contradict Dr. Merigan's Deposition Testimony.

The Court should not strike paragraphs 7-9 of the Merigan Declaration (Docket No. 112) because these paragraphs do not contradict Dr. Merigan's deposition and are not a "sham." The Ninth Circuit has imposed a high legal standard for striking a statement in a declaration, allowing only statements that "flatly contradict[]" earlier sworn testimony to be excluded. *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266-67 (9th Cir. 1991). Accordingly, a declarant "is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition . . . ." *Messick v. Horizon Indus. Inc.*, 62 F.3d 1227, 1231 (9th Cir. 1995). Further, even if a statement in a declaration flatly contradicts prior sworn testimony, the statement may be excluded only if it is found to be a "sham." *Kennedy*, 952 F.2d at 267; *see also Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986) (distinguishing "discrepancies which create transparent shams" from "discrepancies which create an issue of credibility or go to the weight of the evidence").

RMS has failed to show that any of these paragraphs flatly contradict Dr. Merigan's deposition testimony. These paragraphs relate to Dr. Merigan's memory regarding a particular material transfer agreement between Stanford, Dr. Merigan, and Dr. Schwartz on the one hand and Cetus on the other ("1988 MTA"). (Docket No. 95, Ex. 29.)

COOLEY GODWARD KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

742418 v2/PA

1.

**OPP. TO DEFS' MOT. TO STRIKE**
**CASE NO. C 05 04158 MHP**

In paragraph 7, Dr. Merigan testifies that he understood the 1988 MTA to be limited to materials given to himself and Dr. Schwartz in relation to a protocol used in an interleukin-2 study.[1] This testimony is consistent with Dr. Merigan's deposition testimony, where he stated:

> My memory and my sense of what was going on from my papers and the information that I had was that this MTA was directed toward allowing us to look at virus in the blood of patients in an IL-2 study that was partially supported by Cetus, but also the National Institutes of Health.
>
> . . . .
>
> But it appears to be that it [the 1988 MTA] was between myself and David Schwartz and not Mark Holodniy. That's really an important issue to me, is that I see no signature of Mark Holodniy here and I don't see him listed in the agreement. So you're -- you're adding that out and I think you're wrong.
>
> . . . .
>
> No, I do know that it -- that this concerns Schwartz and that the work that Cetus was interested in most of all was the IL-2 work. And Schwartz was involved in the IL-2 work, and we saw some reports there. But this might have been an attempt to get David Schwartz to start working on the work, and this might be equipping him with material. But I don't know whether any material ever came because I never saw any results from it. And -- but that's -- that's what this document's about. Not about Mark Holodniy, even though you've tried to bring it in several times.
>
> . . . .
>
> I've got to say that I'm a little suspicious that this -- this Material Transfer Agreement was never fulfilled, that it -- it was written to cover work that Schwartz would do, but I'm -- since I've never seen -- I never saw a positive work with Schwartz and it -- and there was nothing for Mark to build on from Schwartz that it never took place.

(Damstedt Decl.,[2] Ex. A at 61:4-18, 289:10-291:8.)

---

[1] In full, paragraph 7 reads "It was my understanding at that time that the MTA applied to the Cetus proprietary PCR protocol that Dr. Schwartz and I intended to repeat using the interleukin-2 study samples corresponding to the samples we had previously sent to Cetus (the 'interleukin-2 PCR experiments'). The proprietary protocol is specifically referred to in paragraph 2 of the MTA. It was my understanding that the MTA applied only to materials given to either myself or Dr. Schwartz in relation to use of the proprietary protocol that Cetus had in December of 1988." (Merigan Decl., ¶ 7.)

[2] Declaration of Benjamin G. Damstedt in Support of Stanford University, Dr. Merigan and Dr. Holodniy's Opposition to Defendants' Motion to Strike, ("Damstedt Decl.").

1  RMS's only argument related to paragraph 7 relies on its assertion that Dr. Merigan had
2  no recollection of the 1988 MTA during his deposition. (RMS Mot. To Strike, ("RMS Mot.") at
3  4:21-5:2.) But that assertion misrepresents the record. As quoted above, Dr. Merigan gave
4  extensive testimony about his memory regarding the 1988 MTA during his deposition. (*E.g.*,
5  Damstedt Decl., Ex. A at 61:4-18, 289:10-291:8.) Further, the passage cited by RMS simply
6  indicates that during this litigation Dr. Merigan's memory about the 1988 MTA—an agreement
7  he signed over fifteen years ago—has been refreshed, not that he currently has no memory. (*Id.*
8  at 65:10-22.)[3]

9  In paragraph 8 of his declaration, Dr. Merigan testifies about his understanding of the
10 obligations to Cetus if the interleukin-2 PCR experiments resulted in an invention.[4] The
11 declaration specifically sets forth Dr. Merigan's understanding that Cetus would not have a
12 blanket nonexclusive license with no royalty in the case of an invention. This testimony does not
13 contradict any deposition testimony because Dr. Merigan was not asked any questions about his
14 understanding of Cetus's rights with respect to the terms of a nonexclusive license. Specifically,
15 Dr. Merigan was not asked about his understanding with respect to royalties. Furthermore, Dr.
16 Merigan's testimony is consistent with the testimony of Mary Albertson, as explained below.

17 RMS's identification of Dr. Merigan's deposition testimony regarding the "drafting" and
18 "preparation" of the 1988 MTA (RMS Mot. at 4:8-21) does not contradict Dr. Merigan's
19 declaration testimony regarding his understanding of the royalty provisions. RMS's argument
20 also misrepresents Dr. Merigan's deposition testimony. In response to the question, "You had *no*
21 discussions with anyone at Stanford or Cetus relating to the preparation of this MTA?," Dr.

---

[3] RMS also cited to Dr. Merigan's testimony related to different material transfer agreements. That testimony is irrelevant to Dr. Merigan's recollection of the 1988 MTA at issue in this case. (*See* RMS Mot. at 5:1-2 (citing Merigan Dep. at 230:16-22 & 251:22-252:12).)

[4] In full, paragraph 8 reads: "It was also my understanding at that time that if the interleukin-2 PCR experiments resulted in an invention, Cetus would have the first option to an exclusive license at a reasonable royalty rate to be negotiated at a later time. If Cetus did not want an exclusive license, it also had the option to take a nonexclusive license to that invention, also at a reasonable royalty rate to be negotiated at a later time. I never understood and never would have understood the MTA to grant Cetus a blanket nonexclusive license with no royalty." (Merigan Decl., ¶ 8.)

Merigan unequivocally disagreed with the statement, saying "No." (Damstedt Decl., Ex. A at 63:2-4 (emphasis added).) Following up on this insistence that he did have discussions, Dr. Merigan offered testimony concerning discussions related to the 1988 MTA with "scientists and administrative people at Cetus," including Dr. Groves and Dr. Kwok. (*Id.* at 62:24-63:22.)

In paragraph 9, Dr. Merigan testifies that he "discussed these understandings with Cetus employees, including Jeff Price, at this time." (Merigan Decl., ¶ 9.) This paragraph involves two issues, (1) whether Dr. Merigan discussed his understandings with any Cetus employees and (2) whether Dr. Merigan discussed them with Jeffrey Price in particular. As to the first issue, Dr. Merigan testified in his deposition that he had discussions relating to the 1988 MTA with at least Dr. Groves and Dr. Kwok, who were Cetus employees, and was not asked further about the content of these discussions. (*See* Damstedt Decl., Ex. A at 63:16-64:17.)

As to the second issue, RMS points to a passage in Dr. Merigan's deposition that is too ambiguous to flatly contradict Dr. Merigan's declaration. (RMS Mot. at 5:3-13 (citing Merigan Dep. at 224:16-225:8).) Indeed, RMS has ripped this passage out of context; the portion of Dr. Merigan's deposition testimony cited by RMS actually appears to refer to a different MTA from the 1988 MTA referred to in his declaration. The excerpted deposition testimony is from a discussion of a 1985 MTA addressed to "Drs. Basham and Merigan," marked in the deposition as Exhibit 357. (Damstedt Decl., Ex. A at 223:12-225:8; *id.*, Ex. 357.) Dr. Merigan's answer, which refers to "immunologic work" and "Dr. Basham," relates to discussions he had with Mr. Price regarding the 1985 MTA. (*Id.*, Ex. A at 224:24-225:8.) However, even if Dr. Merigan's deposition statement is construed to respond to a question about material transfer agreements in general, it does not contradict his declaration testimony that he discussed his understanding of the 1988 MTA with Dr. Price, but instead states that he had "several discussions" with Price "about many things." (*Id.*) He was not asked to elaborate on his memory of these conversations. (*See id.* at 225:9-18.) Accordingly, at most this ambiguity presents a discrepancy that goes to his credibility, not to the admissibility of his declaration. *Messick*, 62 F.3d at 1231; *Tippens*, 805 F.2d at 953.

In sum, RMS has not shown that any of the statements in paragraphs 7-9 of Dr. Merigan's declaration flatly contradict his deposition testimony. Nor has RMS shown that anything in Dr. Merigan's declaration is a "sham." Accordingly, RMS's motion to strike paragraphs 7-9 of Dr. Merigan's declaration should be denied.

### B. RMS's Arguments About the Weight of the Merigan Declaration Are Irrelevant.

RMS also argues that the Court may strike Dr. Merigan's testimony because it is "uncorroborated," "self-serving," and "contradicted" by Dr. Schwartz's testimony, citing *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002). (RMS Mot. at 5:16-20.) The Court should reject RMS's argument for two reasons. First, *Villiarimo* is inapposite because the declaration at issue in that case was not stricken but was, in fact, considered in the court's summary judgment analysis. *Villiarimo*, 281 F.3d at 1059 & n.5, 1061-64. Thus, *Villiarimo* provides no basis for the Court to exclude this evidence prior to its summary judgment analysis.

Second, at the summary judgment stage, the Court's task is to determine whether "genuine issues" remain for trial, *i.e.*, whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). RMS's arguments about the weight of the Merigan declaration and its citation to passages from the deposition of Dr. Schwartz, who is not a paid Stanford consultant, are insufficient to show the absence of a disputed issue. *See United States v. One Parcel of Real Property*, 904 F.2d 487, 491-92 (9th Cir. 1990); *Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."). To the contrary, as the counterdefendants demonstrated in their opposition brief, if these issues are reached, they are "genuine." (Counterdefendants' Opp., Docket No. 111, at 21-22.)

### C. Ms. Albertson's Testimony Provides No Basis To Strike Any Portion of Dr. Merigan's Declaration.

RMS also erroneously argues that the Court should strike paragraphs 7-9 of the Merigan Declaration due to testimony given by Mary Albertson, Stanford's designated witness for some of

the twenty-eight 30(b)(6) topics propounded by RMS. (Damstedt Decl., Ex. B at 12:21-13:2.) Globally, this argument fails to provide a basis to strike the paragraphs because, even if Ms. Albertson made admissions that could bind Stanford, RMS has provided no authority that such admissions could bind Dr. Merigan or Dr. Holodniy, whom RMS has named as individual counterclaim defendants in this suit.

As to paragraph 7, because RMS did not identify any questions it asked Ms. Albertson about whether the scope of the 1988 MTA included persons other than Dr. Merigan or Dr. Schwartz, RMS has not placed that part of Dr. Merigan's testimony at issue.

As to paragraphs 8 and 9, Ms. Albertson testified that Stanford's practice was to require a royalty-bearing non-exclusive license with regard to material transfer agreements. (Damstedt Decl., Ex. B at 279:15-281:9.) That testimony from Ms. Albertson supports the testimony in paragraph 8 of Dr. Merigan's declaration that he understood the 1988 MTA to require Cetus to pay a royalty for a non-exclusive license. The portion of Ms. Albertson's testimony cited by RMS refers to knowledge about any *negotiation* relating to paragraph 8 of the 1988 MTA. Dr. Merigan, however, does not claim in his declaration that he was involved in the negotiation, but rather provides his personal understanding of the royalty provision and the fact that he discussed his understanding with Cetus employees including Jeff Price. Ms. Albertson's statements are thus consistent with Dr. Merigan's deposition testimony that he did have discussions about the 1988 MTA with Cetus employees as noted above. Dr. Merigan's deposition testimony is important because Dr. Merigan was a designated 30(b)(6) witness on "non-OTL facts" relating to, *inter alia*, topic 16, which broadly covered "[a]ny collaboration, cooperation, or joint work undertaken between CETUS and STANFORD RELATED TO polymerase chain reaction technology or methods." (Damstedt Decl., Ex. C at 6 (Area of Inquiry No. 16).) Dr. Merigan should not be precluded from providing his understanding of the royalty provisions simply because RMS failed to question him about them during their two days of deposition.

II. **COUNTERDEFENDANTS PROPERLY RAISED AND SUPPORTED THEIR ARGUMENT THAT THE PATENTS WERE NOT ASSIGNABLE TO CETUS BECAUSE THEY WERE FUNDED BY GOVERNMENT GRANTS.**

A. **Counterdefendants' Argument is Timely.**

Despite much bluster, RMS has failed to identify any factual or legal basis for striking counterdefendants' contention that the inventions in the patents-in-suit resulted from research funded by government grants and, therefore, were not assignable to Cetus pursuant to, *inter alia*, the Bayh-Dole Act. Instead, RMS has had ample notice and opportunity to respond to this argument. In fact, RMS itself requested a 30(b)(6) witness on the topic of "[a]ll grant applications submitted by STANFORD" relating to the patents-in-suit. (Damstedt Decl., Ex. C at 8 (Area of Inquiry No. 21).) During that deposition, Ms. Albertson was questioned at length about the Bayh-Dole Act and its implications on inventions resulting at Stanford from research funded by the Federal Government. For example:

> Q  And I think you said, under Bayh-Dole, the statute requires that the university get first rights; is that right?
>
> A  Correct. Gets the first option to take right in any invention created under government-sponsored research.
>
> Q  To your knowledge, does the Bayh-Dole Act have any provisions that require an inventor to assign his rights to the university?
>
> A  Yes, that's -- that's what I'm saying.
>
> Q  You're saying the Bayh-Dole Act requires an inventor who works for a university to assign his rights to the university if there -- if that work is covered by a government contract?
>
> A  It's not exactly even a question for them to assign their rights. It's that the university has the rights to that invention.
>
> . . . .
>
> Q  . . . I think I asked this before, but you said that you believed that Dr. Merigan's understanding that he was required to assign his rights came from a university policy and the Bayh-Dole Act?
>
> A  Yes.
>
> Q  And the fact that the work was covered by an NIH grant; right?
>
> A  Correct.

> . . . .
>
> Q  In 1989.  Between 1989 and 1992, what does it [Stanford's policy] say?
>
> A  That -- it says that an inventor can have the -- that the rights remain with the inventors unless the work is -- unless the invention is created under a grant requiring that they assign the rights to Stanford, which would mean the government-sponsored grant.

(*Id.*, Ex. B at 122:9-25, 124:13-23, 125:11-17; *see generally id.* at 120:9-125:17, 202:16-205:7.)

Ms. Albertson also testified that these rights and obligations applied to each of the named inventors, specifically naming Dr. Holodniy as an employee to whom the rights and obligations applied. (*Id.* at 125:18-126:13.) Additionally, Dr. Holodniy himself testified that his executed Copyright and Patent Agreement with Stanford obligated him to assign to Stanford or the U.S. government his rights to any inventions as required by contracts between Stanford and the U.S. government. (Damstedt Decl., Ex. D at 127:11-128:13.) Even Michael Ostrach, Cetus's general counsel and RMS's designated 30(b)(6) witness, testified that he was aware of the Bayh-Dole Act's provisions and that Stanford employees may be required to assign their inventions to the University if federal funding was involved. (Docket No. 113, Ex. Q at 57:18-58:8.)

Moreover, counterdefendants explicitly raised this argument in their opening brief ***and RMS responded in its opposition brief***. (Counterdefendants' Mot. at 22-23 & n.17; RMS Opp., Docket No. 118, at 20-21 n.21.) In its opposition, RMS specifically disputed the "claim[] that the Bayh-Dole Act, 35 U.S.C. §§ 200-212, confers [Stanford] any rights against Roche." (RMS Opp. at 20-21 n.21.) Indeed, RMS's motion to strike simply reiterates the same substantive arguments it made in its opposition brief. (RMS Mot. at 7-8.)[5]

---

[5] RMS's arguments are broad, unsupported assertions that counterdefendants have not established either a legal or factual basis for the Court to rule in its favor. But the legal basis of counterdefendants' argument is set forth in detail in its opening brief at 22-23 & n.17 and in its opposition brief at 7-10. Further, RMS's contention that counterdefendants' evidence fails to satisfy the best evidence rule in Fed. R. Evid. 1002 should be rejected because counterdefendants are not attempting to prove the "content of a writing." Instead, counterdefendants provided evidence establishing that Dr. Merigan received funds from two federal grants, this funding was used to sponsor the research that resulted in the patents-in-suit, and that Stanford had title to the patents-in-suit and granted the government a license pursuant to its obligations under the Bayh-Dole Act. (*See* Counterdefendants' Mot. at 22-23 & n.17; Counterdefendants' Opp., Docket No. 111, at 7-10.) None of this evidence requires the proof of the "content of a writing," and thus

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

742418 v2/PA                   8.                   **OPP. TO DEFS' MOT. TO STRIKE**
                                                    **CASE NO. C-05-04158 MHP**

1    Accordingly, RMS has had sufficient notice and opportunity to respond to this issue. Nothing more is required to raise an issue for purposes of summary judgment. *See Cool Fuel, Inc. v. Connett*, 685 F.2d 309, 311-12 (9th Cir. 1982); *Anderson*, 477 U.S. at 247-52. None of the three cases cited by RMS in this section is to the contrary. First, *Becton Dickinson & Co. v. C.R. Bard, Inc.* is limited to new issues raised *on appeal* in a reply brief, a situation far removed from the current summary judgment context. 922 F.2d 792, 800-01 (Fed. Cir. 1990) (holding further that the doctrine is "a matter of discretion," not a universal rule). Second, the terse statement from footnote 5 of the *Stallcop v. Kaiser Foundation Hospitals* case cited by RMS is ambiguous but appears to hold only that a party must raise a claim for deprivation of due process rights in the pleadings, not merely in a summary judgment opposition. 820 F.2d 1044, 1050 n.5 (9th Cir. 1987). Finally, *Transclean Corp. v. Bridgewood Servs., Inc.*, applies Eighth Circuit law in holding that a district court may sanction a party for discovery abuses. 290 F.3d 1364, 1373-74 (Fed. Cir. 2002). But RMS cannot make the legal or factual showing sufficient to justify such sanctions given, *inter alia*, Ms. Albertson's testimony on Bayh-Dole.

**B.    Counterdefendants' Evidence Is Admissible, but the Bayh-Dole Act Precludes Ownership by Cetus Even Without Consideration of the Challenged Evidence.**

Lacking any substantive response to Stanford's arguments based on the Bayh-Dole Act, RMS seeks to strike three exhibits that Stanford submitted in support of the Bayh-Dole argument. As an initial matter, summary judgment in favor of Stanford is in order, even without considering Exhibits 710, 711 and 712. RMS has failed to raise even a shred of evidence to establish a genuine dispute as to the fact that the inventions of the patents were supported by the Center for AIDS Research grant (AI27762) and the AIDS Clinical Trial Group grant (AI27666 or AI27766). (Merigan Decl., ¶ 14; Mejia Decl., ¶ 8.) RMS moves to strike paragraph 14 of the Merigan Declaration, arguing that his "faulty memory" means it is "unlikely that he has any such recollection." (RMS Mot. at 11.) However, RMS's counsel's opinion of Dr. Merigan's memory and his credibility is irrelevant to whether his testimony has foundation.

---

none is barred by the best evidence rule.

Instead, the undisputed facts are that (1) Dr. Merigan was the Director of the Center for AIDS Research at Stanford (Joint Statement of Undisputed Facts, Docket No. 107, ¶ 1); (2) he is an inventor on the patents in suit (Docket No. 95, Exs. 15 & 16); (3) as the Principal Investigator on the inventions, he submitted an Invention and Technology Disclosure form in April 1992, in which he noted that the inventions were sponsored by the NIH (Docket No. 110, Ex. 6); (4) in the same disclosure, he identified grants AI27762 and AI27666 as grants under which the inventions were made (*id.*); (5) Dr. Holodniy's post doctoral salary was paid by a U.S. National Research Service Award (Merigan Decl., ¶ 13); (6) the patents state that "[t]his invention was made with Government support under contracts AI27762-04 and AI27766-07 awarded by the National Institutes of Health," and state that the Government has certain rights in the patents (Joint Statement of Undisputed Facts, ¶ 93). These unrefuted facts establish that the inventions were made under government grants. Accordingly, the inventions were subject to the Bayh-Dole Act, 35 U.S.C. §§ 200-212. On these facts, by operation of law, none of the inventors could assign title to Cetus without express permission from the U.S. government. 35 U.S.C. §§ 202(c)(7) & 202(d). It cannot be disputed that permission from the government was neither sought nor given.

Moreover, RMS's hearsay objections relating to Exhibits 710, 711 and 712 do not withstand scrutiny. These exhibits are not hearsay because they are "legally operative document[s] that define[] the rights and liabilities" of Stanford and the government. *Stuart v. UNUM Life Ins. Co. of Am.*, 217 F.3d 1145, 1154 (9th Cir. 2000); *United States v. Pang*, 362 F.3d 1187, 1192 (9th Cir. 2004) ("verbal acts" are not hearsay). They also qualify for hearsay exceptions under Rule 803(6) (business record), 803(8) (public record), 803(14) (records of documents affecting interest in property) and 803(15) (statements in documents affecting interest in property). *See United States v. Boulware*, 384 F.3d 794, 803-09 (9th Cir. 2004); *United States v. Weinstock*, 863 F. Supp. 1529, 1532-34 (D. Utah 1994). Moreover, these exhibits, particularly the PTO's certified record of Stanford's license to the government, Exhibit 712, reinforce the undisputed fact that the inventions were made under U.S. government grants, and are "Subject Invention[s] under 35 U.S.C. 200, et seq. (the Bayh-Dole Act)." (Docket No. 113, Ex. 712, at STAN 015523.)

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

1  RMS's remaining assertion that Exhibit 710 was not properly authenticated is thus
2  inconsequential. For completeness, Stanford submits a supplemental declaration from Luis Mejia
3  curing any admissibility defects. (Mejia Supp. Decl., ¶¶ 4-7.) Finally, Mr. Mejia's supplemental
4  declaration provides additional foundation for his testimony in paragraph 8 of his October 26,
5  2006 declaration, which RMS disputes. (*Id.*, ¶ 3.) *See Stuart*, 217 F.3d at 1154-55.

## III. CONCLUSION

For the reasons given above, counterdefendants respectfully request that RMS's motion to strike be denied in its entirety.

Dated: December 1, 2006                    COOLEY GODWARD KRONISH LLP


by: /s/ *Michelle S. Rhyu*
       Michelle S. Rhyu

Attorneys for Counter Defendants The Board of Trustees of the Leland Stanford Junior University, Thomas Merigan and Mark Holodniy

742418 v2/PA                    11.                    **OPP. TO DEFS' MOT. TO STRIKE**
                                                   **CASE NO. C-05-04158 MHP**