# Exhibit B

Dockets.Justia.com

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY,

Plaintiff,

vs. No. C-05-04158-MHP

ROCHE MOLECULAR SYSTEMS, INC., et al.,

Defendants.

CERTIFIED COPY

AND RELATED COUNTERCLAIM.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

(30)(b)(6) DEPOSITION OF THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY

Through MARY ALBERTSON

Palo Alto, California

Friday, August 25, 2006

Reported by:
GINA GLANTZ
CSR No. 9795, RPR, RMR

JOB No. 3-52398

www.sarnoffcourtreporters.com

Irvine • Los Angeles • San Francisco

phone 877.955.3855 • fax 949.955.3854

SARNOFF
Court Reporters and
Legal Technologies

09:08:19 THE VIDEOGRAPHER: Would the court reporter
09:08:20 please swear the witness.

MARY ALBERTSON,

having been administered an oath, was examined and testified as follows:

09:08:31 EXAMINATION

09:08:31 BY MR. BOOZELL:

09:08:31 Q Good morning, Ms. Albertson.

09:08:33 A Good morning.

09:08:34 Q Can you please state your full name for the
09:08:36 record.

09:08:36 A Mary Katherine Albertson.

09:08:38 Q Do you also go by Watanabe?

09:08:40 A Yes.

09:08:41 Q Is that a married name?

09:08:42 A Yes.

09:08:43 Q Can you state your home address, please.

09:08:45 A 1531 Marcia Avenue, San Jose, California 95125.

09:08:52 Q And what's your current business address?

09:08:54 A 1705 El Camino Real, Palo Alto, California
09:09:02 94306.

09:09:02 Q Is that the Office of Technology Licensing --

09:09:04 A Yes.

Q -- at Stanford University?
A Yes, it is.
Q Have you ever been deposed before?
A No.
Q Okay. So at the risk of repeating some of what Ricardo may have told you in anticipation of the deposition, I'm going to go over a couple of the ground rules.
A Okay.
Q As you can see, we have a fine court reporter here taking down everything that we say, and what that means for us, you and me and Ricardo also, is that we're going to have to make efforts to make her job easier by not talking over each other. So I'll agree to let you finish your answer before I start my next question if you agree to let me finish my question before you start your answer. Is that all right?
A Okay.
Q Okay. Also, we need to make sure that we have audible answers. No shaking heads, nodding heads, uh-huhs. We need to say yes, no, or some sort of verbal answer. Do you understand that?
A Okay.
Q Do you understand that you're under penalty of perjury today?

11:25:42 grant applications --

11:25:42 A Right. I don't recall --

11:25:44 Q -- but you don't know which one?

11:25:47 A Sorry.

11:25:47 Q You don't know which one covered the work

11:25:49 that's set forth --

11:25:50 A No.

11:25:50 Q -- as referenced here?

11:26:10 Did Dr. Merigan have some sort of agreement in

11:26:14 1992 with the university that he would assign rights and

11:26:16 inventions to the university?

11:26:21 MR. RODRIGUEZ: Objection. Vague.

11:26:22 THE WITNESS: The univ- -- excuse me, the

11:26:28 university policy, and under Bayh-Dole, any -- any

11:26:35 inventions created under government-sponsored research

11:26:38 fell under Bayh-Dole, and under Bayh-Dole, if there

11:26:43 is -- the university gets a first right to the

11:26:45 invention.

11:26:46 BY MR. BOOZELL:

11:26:46 Q Do you know whether he had an agreement that

11:26:50 related to that in any way with Stanford University?

11:26:53 MR. RODRIGUEZ: Objection. Vague.

11:26:54 THE WITNESS: As part of their employment,

11:27:04 faculty have an agreement that they will follow the

11:27:07 university's policies.

11:27:08 BY MR. BOOZELL:

11:27:08 Q Do you know whether that's been produced in
11:27:10 this litigation, for Dr. Merigan?

11:27:12 A That what has been produced?

11:27:16 Q Some sort of written agreement that says what
11:27:18 you just said.

11:27:19 MR. RODRIGUEZ: Objection. Vague.

11:27:20 THE WITNESS: I don't know -- I don't know that
11:27:31 there is something that's been produced for 1992.

11:27:34 BY MR. BOOZELL:

11:27:34 Q Prior to 1992, something that was executed by
11:27:36 Dr. Merigan prior to 1992?

11:27:40 MR. RODRIGUEZ: Same objection.

11:27:41 THE WITNESS: Unlikely that something written
11:27:45 has been produced.

11:27:46 BY MR. BOOZELL:

11:27:46 Q And why do you say that? Why is it unlikely?

11:27:50 A Because I don't think that it was.

11:27:52 Q Do you know whether something exists?

11:27:54 A I think it exists.

11:27:58 Q Where would it exist?

11:28:01 A I don't know. If we could have found it, we
11:28:05 would have produced it.

11:28:06 Q So you think it exists somewhere but you don't
11:28:08 know where because, if you had known where, it would

11:28:11 have been produced in this litigation?

11:28:13 A Correct.

11:28:13 Q But you don't know one way or the other, 11:28:16 really, whether it exists?

11:28:19 MR. RODRIGUEZ: Objection. Mischaracterizes 11:28:21 testimony, lacks foundation.

11:28:23 THE WITNESS: Correct.

11:28:24 BY MR. BOOZELL:

11:28:29 Q And I think you said, under Bayh-Dole, the 11:28:34 statute requires that the university get first rights; 11:28:38 is that right?

11:28:39 A Correct. Gets the first option to take right 11:28:43 in any invention created under government-sponsored 11:28:48 research.

11:28:49 Q To your knowledge, does the Bayh-Dole Act have 11:28:53 any provisions that require an inventor to assign his 11:28:56 rights to the university?

11:28:58 A Yes, that's -- that's what I'm saying.

11:29:01 Q You're saying the Bayh-Dole Act requires an 11:29:04 inventor who works for a university to assign his rights 11:29:07 to the university if there -- if that work is covered by 11:29:11 a government contract?

11:29:12 A It's not exactly even a question for them to 11:29:17 assign their rights. It's that the university has the 11:29:23 rights to that invention.

11:29:25 Q But he says here that he's required to assign them; right?

11:29:31 MR. RODRIGUEZ: Objection. Vague.

11:29:32 BY MR. BOOZELL:

11:29:33 Q I'm just asking if that's what the document says. Does it say, "I am required to assign my rights in the above-referenced application to the University"?

11:29:40 MR. RODRIGUEZ: Same objection.

11:29:41 THE WITNESS: That's what the document says.

11:29:42 BY MR. BOOZELL:

11:29:45 Q But according to your understanding, the university just has rights?

11:29:49 A The university --

11:29:50 MR. RODRIGUEZ: Objection. Vague, mischaracterizes testimony.

11:29:53 THE WITNESS: Yeah.

11:29:53 BY MR. BOOZELL:

11:29:54 Q Sorry, you can go ahead and answer.

11:29:56 A The university has the rights.

11:30:02 Q Without an assignment from the inventor?

11:30:05 MR. RODRIGUEZ: Objection. Objection. Calls for a legal conclusion.

11:30:11 THE WITNESS: Pardon me, what was your question?

11:30:13 BY MR. BOOZELL:

Q Without an assignment from the inventor?

MR. RODRIGUEZ: Same objection.

THE WITNESS: Well, when you have -- when you have -- you know, file a patent with the PTO, the inventor signs a piece of paper, certainly.

BY MR. BOOZELL:

Q So an actual assignment is required in order to give the university rights in the invention; correct?

MR. RODRIGUEZ: Objection. Calls for a legal conclusion, calls for speculation, lacks foundation.

THE WITNESS: Certainly.

BY MR. BOOZELL:

Q And I prob- -- I think I asked this before, but you said that you believed that Dr. Merigan's understanding that he was required to assign his rights came from a university policy and the Bayh-Dole Act?

MR. RODRIGUEZ: Objection. Lacks foundation, calls for speculation.

THE WITNESS: Yes.

BY MR. BOOZELL:

Q And the fact that the work was covered by an NIH grant; right?

A Correct.

Q But sitting here right now, you can't tell me which NIH grant covers the work; right?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

11:31:12 A Correct.

11:31:14 Q Now, you referred to a policy. What's the policy say --

11:31:21 MR. RODRIGUEZ: Objection.

11:31:21 BY MR. BOOZELL:

11:31:21 Q -- Stanford policy --

11:31:23 MR. RODRIGUEZ: Objection. Vague.

11:31:23 BY MR. BOOZELL:

11:31:25 Q -- About assignment and invention?

11:31:26 A At what time?

11:31:27 Q In 1989. Between 1989 and 1992, what does it say?

11:31:33 A That -- it says that an inventor can have the -- that the rights remain with the inventors unless the work is -- unless the invention is created under a grant requiring that they assign the rights to Stanford, which would mean the government-sponsored grant.

11:32:06 Q Okay. You see at the bottom of this paragraph, he also says -- Dr. Merigan also says, "Furthermore, to the best of my knowledge, Dr. Kozal, Dr. Katzenstein and Dr. Holodniy, at the time of making their contributions to the Invention, were also employees of Stanford University"?

11:32:27 A Yes, I see that.

11:32:27 Q Do you agree that at the time of making his

contribution, Dr. Kozal was an employee of Stanford University?

A To the best of my knowledge.

Q You believe he was?

A Yes, I do.

Q Dr. Katzenstein, was he an employee of the university at the time he made his contributions to the invention?

A I believe he was.

Q And Dr. Holodniy, was he an employee of Stanford University at the time he made his contributions to the invention?

A I believe he was.

Q Ms. Albertson, I'm going to hand you what will be marked by the court reporter as Exhibit 115. It's a multipage document bearing Bates number STANFORD 06335 through 06336.

(Deposition Exhibit 115 marked.)

BY MR. BOOZELL:

Q If you could review this document and let me know if you've seen it before.

A I've seen this document before.

Q And what is it?

A It's a declaration of Barry Elledge.

Q Does this document refresh your recollection as

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

13:38:55 contractually to Stanford's policy related to
13:38:58 inventions; is that right?

13:38:59 MR. RODRIGUEZ: Objection. Lacks foundation,
13:39:00 calls for speculation.

13:39:01 THE WITNESS: I wouldn't characterize it that
13:39:09 way.

13:39:11 BY MR. BOOZELL:

13:39:11 Q How would you characterize it?

13:39:12 MR. RODRIGUEZ: Objection. Vague.

13:39:14 THE WITNESS: I would -- I would say this is a
13:39:22 layer of protection, one layer of protection as far as
13:39:32 assigning -- assigning rights or educating employees of
13:39:38 the university as to their obligations. It's not very
13:39:43 well policed, as I've mentioned.

13:39:47 BY MR. BOOZELL:

13:39:47 Q But without an employee signing this agreement,
13:39:50 Stanford has no contractual relationship with an
13:39:53 employee with respect to assignment of inventions; isn't
13:39:56 that correct?

13:39:56 MR. RODRIGUEZ: Objection. Lacks foundation,
13:39:58 calls for a legal conclusion, calls for speculation.

13:40:01 THE WITNESS: I don't agree with that either.

13:40:03 BY MR. BOOZELL:

13:40:04 Q Why not?

13:40:04 MR. RODRIGUEZ: Same objections.

13:40:05 THE WITNESS: Because there are -- there are several different places where people do sign things in several different areas, and they're assigning their rights in those areas, and it just depends on what stage they are. Sometimes they've -- they do have contractual obligations with the universities, whether it's through signing a grant application, or if they have already disclosed an invention, they sign things that -- that they're making a contractual obligation with the university through those -- those -- excuse me -- those documents.

13:40:43 BY MR. BOOZELL:

13:40:43 Q So prior to disclosing the invention, this is Stanford's attempt to contractually bind employees to the Stanford policy related to inventions; isn't that correct?

13:40:55 MR. RODRIGUEZ: Objection. Mischaracterizes the testimony, calls for speculation.

13:41:02 THE WITNESS: This is one mechanism. There's also a general -- a general understanding, and I think by agreeing to -- I'm not an attorney, but agreeing to employment, they have other obligations. I don't know what else they agree to when they're employed. But there's a general understanding, when you're employed by Stanford, there is a policy, an overreaching policy at

13:41:23 the university, that you will not make personal gain
13:41:26 from the use of university resources, period. And
13:41:30 everything -- everything that occurs at the university
13:41:34 falls under that policy, so --
13:41:36 BY MR. BOOZELL:
13:41:36 Q How does that policy relate to this?
13:41:39 MR. RODRIGUEZ: Objection. Vague.
13:41:40 THE WITNESS: That you can't file patents on
13:41:44 your own if there's a potential for making personal gain
13:41:49 from the use of university resources. If you invent
13:41:52 something at the university and go off and do something
13:41:55 with it, you'd be making personal gain from university
13:41:57 resources. I mean, there's a -- there's a lot of
13:41:59 things. You could go on and on about this, but --
13:42:02 BY MR. BOOZELL:
13:42:02 Q Other than documents that they sign after an
13:42:06 invention is disclosed, are you aware of any other
13:42:09 documents that employees are asked to sign which would
13:42:14 bind them to the Stanford policy related to assignment
13:42:18 of inventions?
13:42:18 MR. RODRIGUEZ: Objection. Mischaracterizes
13:42:20 testimony.
13:42:20 THE WITNESS: Grants, grant applications.
13:42:24 BY MR. BOOZELL:
13:42:24 Q Signing a grant application would bind them to

13:42:27 the Stanford policy?
13:42:29 A Yes.
13:42:29 Q In what way?
13:42:30 A When they sign a grant application, they're
13:42:32 agreeing to follow rules and policies, and under
13:42:38 Bayh-Dole, that gives the university the rights to the
13:42:42 invention.
13:42:42 Q So other than this document and grant
13:42:46 applications, are you aware of any other documents?
13:42:49 MR. RODRIGUEZ: Objection. Vague.
13:42:50 THE WITNESS: I don't know, so I guess I'm not
13:42:58 aware of anything else.
13:43:00 BY MR. BOOZELL:
13:43:03 Q If you look at paragraph 2, the first
13:43:05 sentence -- why don't you just read paragraph 2 for me.
13:43:27 A Okay.
13:43:27 Q Do you agree that this document is basically an
13:43:32 agreement to assign?
13:43:34 MR. RODRIGUEZ: Objection. Calls for a legal
13:43:37 conclusion, lacks foundation, calls for speculation.
13:43:51 THE WITNESS: No, I don't necessarily agree.
13:43:53 BY MR. BOOZELL:
13:43:54 Q Why not?
13:43:54 A Because it is -- it says to -- "I agree to
13:43:57 assign or confirm in writing."

15:25:08 (Record read.)

15:25:09 MR. RODRIGUEZ: Same objections.

15:25:13 THE WITNESS: Cetus was entitled to negotiate a

15:25:25 license, it didn't automatically get a license.

15:25:29 BY MR. BOOZELL:

15:25:32 Q And what do you base that on?

15:25:33 MR. RODRIGUEZ: Same objections.

15:25:34 THE WITNESS: The fact that the language says

15:25:40 first option to an exclusive license at a reasonable

15:25:43 royalty to be negotiated in good faith, et cetera.

15:25:47 BY MR. BOOZELL:

15:25:47 Q It con- -- the agreement continues on "or

15:25:49 Cetus's option or non-exclusive license"; correct?

15:25:52 A Correct.

15:25:53 Q It's your understanding that Cetus would have

15:26:08 to negotiate a license --

15:26:08 A Correct.

15:26:08 Q -- if it arose under this agreement?

15:26:08 MR. RODRIGUEZ: Same objections.

15:26:08 THE WITNESS: Correct.

15:26:08 BY MR. BOOZELL:

15:26:14 Q And that's based on just your reading of this

15:26:16 language today; correct?

15:26:17 MR. RODRIGUEZ: Same objections.

15:26:18 THE WITNESS: No, it's based on my

understanding of how a material transfer agreement is drafted and what the rights are that we grant in a material transfer agreement.

BY MR. BOOZELL:

Q And what is that understanding?

MR. RODRIGUEZ: Same objections.

THE WITNESS: In exchange for using materials from a company, there are certain rights that we grant in exchange, and those -- except in the -- those are typically that we will negotiate with that company a license.

BY MR. BOOZELL:

Q What if Cetus wanted a nonexclusive license, would that require negotiation?

A We would negotiate a license.

Q Even if it was nonexclusive?

A Correct.

Q If it was a nonexclusive license, what would you be negotiating?

A The royalties for a nonexclusive license.

Q So it's your position under this agreement that a nonexclusive license would be for a fee?

MR. RODRIGUEZ: Objection. Calls for speculation, calls for a legal conclusion and outside the scope.

15:27:25 You can answer to the extent you have your own knowledge.

15:27:28 THE WITNESS: Yes.

15:27:29 BY MR. BOOZELL:

15:27:29 Q Based on what?

15:27:30 MR. RODRIGUEZ: Same objections.

15:27:31 THE WITNESS: Based on the fact that it would be a license for a reasonable royalty, whether it's exclusive or nonexclusive.

15:27:39 BY MR. BOOZELL:

15:27:51 Q Do you know whether that was the subject of any negotiation with Stanford and Cetus at the time that this was signed in '89?

15:27:58 A I don't know.

15:28:00 Q You don't know if they discussed it one way or the other?

15:28:06 A I don't know.

15:28:06 Q And you said earlier that you're not sure whether this is a standard Cetus form or a standard Stanford form; is that correct?

15:28:13 A That's correct.

15:28:13 Q So you don't know whether that was negotiated, that provision was negotiated with respect to the standard form back whenever that was created?

15:28:25 MR. RODRIGUEZ: Objection. Vague.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

I, MARY ALBERTSON, do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear noted, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

EXECUTED this 3rd day of October, 2006, at Palo Alto (City), CA (State).

Mary Albertson
MARY ALBERTSON

364

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney of any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: SEP 08 2006

GINA GLANTZ
CSR NO. 9795