PRUETZ LAW GROUP LLP
  Adrian M. Pruetz (Bar No. 118215)
1600 Rosecrans Avenue, 4th Floor
Manhattan Beach, CA 90266
Telephone:    (310) 321-7640
Facsimile:     (310) 321-7641
E-Mail:       ampruetz@pruetzlaw.com

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  Jeffrey N. Boozell (Bar No. 199507)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:    (213) 443-3000
Facsimile:     (213) 443-3100
E-Mail:       jeffboozell@quinnemanuel.com

  Brian C. Cannon (Bar No. 193071)
  TJ Chiang (Bar No. 235165)
555 Twin Dolphin Drive, Suite 560
Redwood Shores, California 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100
E-Mail:       briancannon@quinnemanuel.com
           tjchiang@quinnemanuel.com

Attorneys for Defendants and Counterclaimants Roche
Molecular Systems, Inc.; Roche Diagnostics Corporation;
and Roche Diagnostics Operations, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY, | CASE NO. C-05-04158 MHP |
| Plaintiff, | |
| vs. | DEFENDANTS' ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT AND AMENDED COUNTERCLAIMS |
| ROCHE MOLECULAR SYSTEMS, INC.; ROCHE DIAGNOSTICS CORPORATION; ROCHE DIAGNOSTICS OPERATIONS, INC., | |
| Defendants. | |

04972/2095458.24972/209
5458.1

ROCHE MOLECULAR SYSTEMS, INC. ROCHE
DIAGNOSTICS CORPORATION; ROCHE
DIAGNOSTICS OPERATIONS, INC.,

Counterclaimants,

vs.

THE BOARD OF TRUSTEES OF THE LELAND
STANFORD JUNIOR UNIVERSITY; THOMAS
MERIGAN; AND MARK HOLODNIY.

Counterclaim Defendants.

## ANSWER

Defendants Roche Molecular Systems, Inc. ("RMS"); Roche Diagnostics
Corporation; and Roche Diagnostics Operations, Inc. (collectively "Answering Defendants"), state
for their Answer and Affirmative Defenses ("Answer") to the First Amended Complaint of
plaintiff The Board of Trustees of The Leland Stanford Junior University ("Plaintiff" or
"Stanford"), as follows:

### Nature of the Action

1.      Answering Defendants admit that Plaintiff's First Amended Complaint alleges
patent infringement, but Answering Defendants deny liability with respect to such claims.

### Parties

2.      Answering Defendants lack sufficient knowledge or information to form a belief as
to the truth of the allegations in paragraph 2 of the First Amended Complaint, and on that basis
deny each and every allegation.

3.      Answering Defendants admit the allegations of paragraph 3 of the First Amended
Complaint.

4.      Answering Defendants admit the allegations of paragraph 4 of the First Amended
Complaint.

1    5.    Answering Defendants admit the allegations of paragraph 5 of the First Amended

2  Complaint.

3

4    **Jurisdiction and Venue**

5    6.    Answering Defendants admit that this Court has subject matter jurisdiction under

6  28 U.S.C. §§ 1331 and 1338(a), except that Answering Defendants deny that Stanford has

7  standing to pursue an action for patent infringement.

8    7.    Answering Defendants admit that RMS; Roche Diagnostics Corporation; and

9  Roche Diagnostics Operations, Inc. do business in this district and that personal jurisdiction is

10  proper in this Court but deny that the First Amended Complaint states a cause of action for patent

11  infringement against them and that they have committed the acts of infringement complained of in

12  the Complaint.

13    8.    Answering Defendants admit that venue is proper in this Court with respect to

14  RMS; Roche Diagnostics Corporation; and Roche Diagnostics Operations, Inc. under the

15  provisions of 28 U.S.C. § 1391(c) and 28 U.S.C. § 1400(b).

16

17    **Intradistrict Assignment**

18    9.    Answering Defendants admit the allegations of paragraph 9 of the First Amended

19  Complaint.

20

21    **Count 1:  Patent Infringement**

22    **(U.S. Patents No. 5,958,730)**

23    10.    Answering Defendants respond to paragraph 10 of the First Amended Complaint

24  by incorporating their responses to paragraphs 1 through 9 of this Answer as though fully set forth

25  herein.

26    11.    Answering Defendants admit that the United States Patent and Trademark Office

27  issued Patent No. 5,968,730 (the "'730 Patent") on October 19, 1999, and that a copy of the '730

28

1  Patent is attached to the Complaint as Exhibit A.  Answering Defendants deny that the '730 Patent
2  was duly and legally issued.

3          12.      Answering Defendants lack sufficient knowledge or information to form a belief as
4  to the truth of the allegations in paragraph 12 but admit that Thomas Merigan, M.D., David
5  Katzenstein, M.D., and Mark Holodniy, M.D. were employed by Plaintiff in 1989.  Answering
6  Defendants deny the remaining allegations in paragraph 12 of the First Amended Complaint
7  including, but not limited to, the allegation that Drs. Merigan, Katzenstein, and Holodniy are the
8  sole and true inventors of the '730 Patent and that Stanford owns the entire right, title, and interest
9  to and in the '730 Patent.

10          13.      Answering Defendants deny the allegations in paragraph 13 of the First Amended
11  Complaint.

12          14.      Answering Defendants deny the allegations in paragraph 14 of the First Amended
13  Complaint.

14          15.      Answering Defendants deny the allegations in paragraph 15 of the First Amended
15  Complaint.

16          16.      Answering Defendants deny the allegations in paragraph 16 of the First Amended
17  Complaint.

18                              **Count 2:  Patent Infringement**
19                              **(U.S. Patents No. 6,503,705)**

20          17.      Answering Defendants respond to paragraph 17 of the First Amended Complaint
21  by incorporating their responses to paragraphs 1 through 16 of this Answer as though fully set
22  forth herein.

23          18.      Answering Defendants admit that the United States Patent and Trademark Office
24  issued Patent No. 6,503,705 (the "'705 Patent") on January 7, 2003, and that a copy of the '705
25  Patent is attached to the Complaint as Exhibit B.  Answering Defendants deny that the '705 Patent
26  was duly and legally issued.

27          19.      Answering Defendants lack sufficient knowledge or information to form a belief as
28  to the truth of the allegations in paragraph 19 but admit that Thomas Merigan, M.D., David

Katzenstein, M.D., and Mark Holodniy, M.D., were employed by Plaintiff in 1989. Answering Defendants deny the remaining allegations in paragraph 19 of the First Amended Complaint including, but not limited to, the allegation that Drs. Merigan, Katzenstein, and Holodniy, are the sole and true inventors of the '705 Patent and that Stanford owns the entire right, title, and interest to and in the '705 Patent.

20.    Answering Defendants deny the allegations in paragraph 20 of the Complaint.

21.    Answering Defendants deny the allegations in paragraph 21 of the Complaint.

22.    Answering Defendants deny the allegations in paragraph 22 of the Complaint.

23.    Answering Defendants deny the allegations in paragraph 23 of the Complaint.

**Count 3:  Patent Infringement**

**(U.S. Patents No. 7,129,041)**

24.    Answering Defendants respond to paragraph 24 of the First Amended Complaint by incorporating their responses to paragraphs 1 through 23 of this Answer as though fully set forth herein.

25.    Answering Defendants admit that the United States Patent and Trademark Office issued Patent No. 7,129,041 (the "'041 Patent") on October 31, 2006, and that a copy of the '041 Patent is attached to the Complaint as Exhibit C. Answering Defendants deny that the '041 Patent was duly and legally issued.

26.    Answering Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 26 but admit that Thomas Merigan, M.D., David Katzenstein, M.D., and Mark Holodniy, M.D., were employed by Plaintiff in 1989. Answering Defendants deny the remaining allegations in paragraph 26 of the First Amended Complaint including, but not limited to, the allegation that Drs. Merigan, Katzenstein, and Holodniy are the sole and true inventors of the '041 Patent and that Stanford owns the entire right, title, and interest to and in the '041 Patent.

27.    Answering Defendants deny the allegations in paragraph 27 of the Complaint.

28.    Answering Defendants deny the allegations in paragraph 28 of the Complaint.

29.    Answering Defendants deny the allegations in paragraph 29 of the Complaint.

1    30.    Answering Defendants deny the allegations in paragraph 30 of the Complaint.

2

3    **AFFIRMATIVE DEFENSES**

4    Further answering the First Amended Complaint and as additional defenses thereto,

5    Answering Defendants assert the following Affirmative Defenses, without assuming the burden of

6    proof when such burden would otherwise be on Plaintiff.

7

8    **FIRST AFFIRMATIVE DEFENSE**

9    **(Failure to State a Claim)**

10    31.    The First Amended Complaint fails to state a cause of action against Answering

11    Defendants upon which relief can be granted.

12    **SECOND AFFIRMATIVE DEFENSE**

13    **(Non-Infringement)**

14    32.    Answering Defendants are not infringing and have not infringed the '730,'705, and

15    '041 Patents either directly or by inducing others to infringe or contributing to others' infringement

16    of any valid claim of the '730, '705, or '041 Patents.

17    33.    Answering Defendants are not willfully infringing and have not willfully infringed

18    any valid claim of the '730, '705, or '041 Patents.

19

20    **THIRD AFFIRMATIVE DEFENSE**

21    **(Invalidity)**

22    34.    The claims of the '705, '730, and '041 Patents are invalid for failure to meet one or

23    more of the requirements for patentability set forth in 35 U.S.C. §§ 101, 102, 103 and/or 112.

24

25    **FOURTH AFFIRMATIVE DEFENSE**

26    **(Ownership)**

27    35.    Answering Defendants are not liable for the acts that Plaintiff alleges infringe the

28    '730, '705, and '041 Patents because RMS is the owner of the '730, '705, and '041 Patents by virtue

1    of at least one or more of the following: (1) the consulting/confidentiality agreements entered into

2    between RMS's predecessor-in-interest, Cetus Corporation ("Cetus"), and Drs. Thomas Merigan

3    and Mark Holodniy of Stanford, among others; and/or (2) the collaboration between employees of

4    RMS's predecessor-in-interest, Cetus, and employees and/or agents of Plaintiff and the inventive

5    contributions of those Cetus employees to the subject matter claimed in the '730,  '705, and '041

6    Patents which requires that Cetus employees be named as joint inventors of the '730, '705, and

7    '041 Patents.

8

9                             **FIFTH AFFIRMATIVE DEFENSE**

10                                   **(Unenforceability)**

11           36.       On information and belief, the '730, '705, and '041 Patents are unenforceable by

12    Plaintiff due to Plaintiff's and the named inventors' willful violation of the provisions of 37 C.F.R.

13    1.56 in procuring the '730, '705, and '041 Patents.  Answering Defendants believe that further

14    investigation and discovery will provide additional evidentiary support showing that Plaintiff and

15    the named inventors willfully misrepresented and omitted information from the United States

16    Patent and Trademark Office ("PTO") that was material to the PTO's decision to grant the '730,

17    '705, and '041 Patents, including at least the following:

18           a.       Plaintiff and the named inventors failed to disclose to the PTO the

19    collaboration between employees of RMS's predecessor-in-interest, Cetus, and employees of

20    Stanford, and the inventive contributions of those Cetus employees to the subject matter claimed

21    in the '730, '705, and '041 Patents.  Despite the fact that inventorship is material to patentability,

22    Plaintiff and the named inventors actively concealed from the PTO the contributions of Cetus

23    employees to the subject matter of the claimed inventions, including that Cetus employees played

24    key roles in the development of:  (1) the specific steps in the method developed for quantitating

25    HIV using PCR; (2) the first-of-their-kind standards or controls for quantitation of HIV RNA

26    which made quantitation possible; (3) the 30 cycle assay for detection and quantitation of HIV;

27    and (4) the amplification of RNA extracted from plasma samples.  Although, these contributions

28    entitled Cetus employees to be named as joint inventors on the '730, '705, and '041 Patents,

1   Stanford and the named inventors affirmatively misrepresented to the PTO that they were the only

2   true inventors of the claims in the '730, '705, and '041 Patents.  The initial application listed only

3   Drs. Thomas Merigan and Michael Kozal as inventors.  Subsequently, in November 1992, the

4   applicants petitioned to correct inventorship and sought to add Drs. Mark Holodniy and David

5   Katzenstein as joint inventors.  In connection with the petition, Merigan declared under penalty of

6   perjury that at the time of filing, he did not discuss the issue of inventorship with his counsel.

7   Thereafter, however, Merigan began to question whether Katzenstein and Holodniy also should be

8   included as inventors.  After discussing this issue with both counsel and Katzenstein and

9   Holodniy, the decision was made to add Katzenstein and Holodniy as inventors.  According to the

10  declaration of Barry Elledge, Stanford's prosecution counsel, Holodniy had the following

11  comments concerning his inventorship role:

12      Dr. Holodniy stated that he was until the summer of 1991 a research fellow in the Division
        of Infectious Disease at Stanford University.  His inventive contribution to the subject
13      matter of the present application occurred (sic) during this period, and principally concerns
        quantitation of HIV RNA in plasma of AIDS patients.
14

15  These statements and omissions were intentional and were designed to mislead the PTO with

16  respect to the true inventorship of the '730, '705, and '041 Patents.

17          b.      Plaintiff and the named inventors failed to properly disclose to the PTO an

18  April 1991 article authored by Stanford's Drs. Merigan, Katzenstein, and Holodniy entitled

19  *Detection and Quantification of Human Immuno-deficiency Virus RNA in Patient Serum by Use of*

20  *the Polymerase Chain Reaction*, 163 J. INFECT. DIS. 862-866 (1991) (the "Serum Paper").  The

21  Serum Paper disclosed each of the features that Stanford claims in the '730, '705, and '041 Patents

22  more than one year prior to the filing of the application which resulted in the '730, '705, and '041

23  Patents.  The Serum Paper describes the PCR amplification and quantitation of HIV RNA

24  extracted from blood of patients and discloses exactly the same quantitative PCR method that is

25  described in the '730, '705, and '041 Patents, including the use of 30 cycles of amplification and

26  the same PCR standard for quantitation.  The paper also demonstrates that there is a correlation

27  between the level of HIV RNA molecules in the blood and the clinical status of the HIV-positive

28  patient - i.e., HIV RNA level is a "marker" of disease progression.  Despite its clear materiality

1  and the fact that it would likely have supported a rejection of the claims in the '730, '705, and '041

2  Patents, Plaintiff failed to properly highlight this prior art in its information disclosure statements

3  and failed to bring it to the attention of the examiners during the prosecution of the '730, '705, and

4  '041 Patents with the intent to mislead the PTO.

5

6  ## SIXTH AFFIRMATIVE DEFENSE

7  ### (License)

8      37.    Answering Defendants are not liable for the acts that Plaintiff alleges infringe the

9  '730, '705, and '041 Patents because Answering Defendants hold a non-exclusive, irrevocable,

10  royalty-free, worldwide license under the '730, '705, and '041 Patents from the date of alleged

11  invention of the subject matter claimed in the '730, '705, and '041 Patents by virtue of at least one

12  or more of the following: (1) the materials transfer agreement entered into between RMS's

13  predecessor-in-interest, Cetus, and Plaintiff, Dr. Thomas Merigan and others at Stanford; and/or

14  (2) the consulting/confidentiality agreements entered into between RMS's predecessor-in-interest,

15  Cetus, and Drs. Thomas Merigan and Mark Holodniy, among others.

16  ## SEVENTH AFFIRMATIVE DEFENSE

17  ### (Standing)

18      38.    By virtue of the consulting/confidentiality agreements entered into between RMS's

19  predecessor-in-interest, Cetus, and Drs. Thomas Merigan and Mark Holodniy of Stanford,

20  Drs. Merigan and Holodniy assigned all right, title and interest in the claimed invention that is the

21  subject matter of the '730, '705, and '041 Patents to Cetus prior to their assignment of those same

22  rights to Stanford. On information and belief, Stanford had notice of these prior assignments and

23  did not purchase the subsequent assignments for valuable consideration. Accordingly, Stanford is

24  not the sole and exclusive owner of the '730, '705, and '041 Patents, and Stanford lacks standing to

25  sue for the infringement of those patents.

26

27  ## EIGHTH AFFIRMATIVE DEFENSE

28  ### (Estoppel)

39.     Plaintiff is estopped from asserting the claims of the '730, '705, or '041 Patents against Answering Defendants.

## NINTH AFFIRMATIVE DEFENSE

### (Laches)

40.     The purported claims for relief set forth in the Complaint are barred by the doctrine of laches.

## TENTH AFFIRMATIVE DEFENSE

### (Waiver)

41.     Plaintiff has waived its right to seek the relief set forth in the Complaint.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Assignment)

42.     Plaintiff, and Drs. Merigan and Holodniy have assigned all right, title and interest in the claimed invention that is the subject matter of the '730, '705, and '041 Patents.

## TWELFTH AFFIRMATIVE DEFENSE

### (Bayh-Dole Act)

43.     On information and belief, Stanford lacks standing to assert the patents in suit because, *inter alia*, it has not complied with the provisions of the Bayh-Dole Act, 35 U.S.C. § 200, *et seq.*, as set forth in the Act and as construed by this Court.

## COUNTERCLAIMS

Defendants and Counterclaimants Roche Molecular Systems, Inc. ("RMS"); Roche Diagnostics Corporation; and Roche Diagnostics Operations, Inc. (collectively "Counterclaimants"), for their Amended Counterclaims against Plaintiff and Counterclaim

1  Defendant The Board of Trustees of The Leland Stanford Junior University ("Stanford") and

2  Counterclaim Defendants Thomas Merigan and Mark Holodniy (collectively "Counterclaim

3  Defendants"), alleges as follows:

4

5                    **Jurisdiction and Venue as to Counterclaim Defendant Stanford**

6         1.      The counterclaims below as to Counterclaim Defendant Stanford arise under the

7  Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.* and the patent laws of the United States, 35

8  U.S.C. § 1, *et seq.*

9         2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and

10  1338(a).

11        3.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)-(c) and

12  1400(b) because this suit was filed in this district by Counterclaim Defendant Stanford and

13  Counterclaim Defendant Stanford is found in this district.

14        4.      Counterclaim Defendant Stanford claims to be the assignee and owner of the entire

15  right, title and interest in and to United States Patent Nos. 5,968,730 (the "'730 Patent"), 6,503,705

16  (the "'705 Patent"), and 7,129,041 (the "'041 Patent") .

17        5.      An immediate, real, and justiciable controversy exists between and

18  Counterclaimants and Counterclaim Defendant Stanford with respect to validity and infringement

19  of the '730, '705, and '041 Patents.

20

21                    **Jurisdiction and Venue as to Counterclaim Defendant Merigan**

22        6.      This Court has supplemental jurisdiction over the claims against Counterclaim

23  Defendant Merigan pursuant to 28 U.S.C. § 1367.

24        7.      Personal jurisdiction over Counterclaim Defendant Merigan is proper in this Court

25  because the acts giving rise to this action took place within this district and, upon information and

26  belief, Counterclaim Defendant Merigan resides in this district.

27        8.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)-(c) and 1400(b) at

28  least because, on information and belief, Counterclaim Defendant Merigan resides in this district.

1

2 **Jurisdiction and Venue as to Counterclaim Defendant Holodniy**

3      9.      This Court has supplemental jurisdiction over the claims against Counterclaim

4 Defendant Holodniy pursuant to 28 U.S.C. § 1367.

5      10.     Personal jurisdiction over Counterclaim Defendant Holodniy is proper in this Court

6 because the acts giving rise to this action took place within this district and, upon information and

7 belief, Counterclaim Defendant Holodniy resides in this district.

8      11.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)-(c) and 1400(b) at

9 least because, on information and belief, Counterclaim Defendant Holodniy resides in this district.

10

11 **General Allegations**

12     12.     Cetus Corporation ("Cetus") was one of the earliest recombinant DNA

13 biotechnology start-ups.  Cetus was founded in 1971 by Drs. Ronald Cape, Peter Farley, and

14 Donald Glaser, the winner of the 1960 Nobel Prize in physics.  By the late 1980s, Cetus had

15 become one of the most pre-eminent biotech companies in the world.

16     13.     Cetus researchers are universally recognized as the discoverers of PCR - or

17 Polymerase Chain Reaction.  In the mid-1980s, Kary Mullis, a Cetus scientist, conceived of a

18 method for making billions of copies of any DNA or RNA in the laboratory.  Ultimately,

19 Dr. Mullins would share the Nobel Prize for this discovery.  The development of this method by

20 Cetus researchers allowed scientists for the first time to practically detect, examine, and

21 manipulate DNA and RNA that were only available in a few molecules.

22     14.     Shortly after conceiving PCR, Cetus turned its attention to potential applications

23 for the technique.  One such application concerned the use of PCR as a diagnostic tool for HIV.

24 By historical coincidence, HIV, the primary virus that causes AIDS, was discovered at the time

25 that PCR emerged as a new technology.  As a result, it was an attractive target for the early use of

26 PCR.

27     15.     Beginning in 1985, Cetus began a project aimed at developing methods and

28 techniques for detecting HIV extracted from blood using PCR.

1    16.    At that time, Counterclaim Defendant Merigan was the Director of the Center for

2  AIDS Research ("CFAR") at Stanford University.  The CFAR was established in 1988.

3  Counterclaim Defendant Merigan, a long time collaborator with Cetus, was also a member of

4  Cetus' Scientific Advisory Board - a post he held from 1979 through 1991.

5    17.    In connection with his work on the Cetus Scientific Advisory Board and as a

6  consultant to Cetus, Counterclaim Defendant Merigan executed a number of

7  consulting/confidentiality agreements, including agreements dated April 13, 1984 and April 19,

8  1991.  These agreements gave Counterclaim Defendant Merigan unfettered access to Cetus

9  facilities, confidential materials, employees, and know-how and provided that any invention made

10  pursuant to those agreements would be the sole and exclusive property of Cetus.

11    18.    In addition, by letter dated December 19, 1988, Cetus, on the one hand, and

12  Drs. Merigan, David Schwartz, and Stanford, on the other, entered into a Materials Transfer

13  Agreement (the "MTA") pursuant to which Cetus provided Counterclaim Defendant Stanford with

14  certain research substances and know-how for the purpose of scientific collaboration relating to

15  HIV research using PCR including physical products, biological materials, and technical know-

16  how relating to HIV and PCR.  The MTA also provides that should Counterclaim Defendant

17  Merigan's, or any other Stanford scientist's research, involving material or know-how transferred

18  under the MTA result in an invention or substance that may be commercially useful, Counterclaim

19  Defendant Stanford will, among other things, give Cetus the right to either an exclusive license to

20  the invention, at a reasonable royalty, or a non-exclusive license, at Cetus' option.

21    19.    As the MTA suggests, Cetus and Counterclaim Defendant Stanford began jointly

22  exploring techniques for detecting and quantitating HIV extracted from blood using PCR.

23  "Detection" refers generally to the ability of a researcher to ascertain whether a target DNA or

24  RNA exists in a sample.  By contrast, "quantitation" refers generally to the ability of one to

25  ascertain how much of a target DNA or RNA exists in a sample.  Counterclaim Defendant

26  Holodniy, a Stanford post-doctoral fellow working with Drs. Merigan and Schwartz, was

27  principally responsible for interfacing with Cetus concerning this effort and gained access to Cetus

28  as a result of the MTA.

20.    Accordingly, Counterclaim Defendant Holodniy first began working with Cetus around the time of the MTA, and, like Counterclaim Defendant Merigan, Counterclaim Defendant Holodniy signed a consulting/confidentiality agreement with Cetus, dated February 14, 1989.  As a result, Counterclaim Defendant Holodniy spent many days working at the Cetus facilities in Emeryville, California where he too had unfettered access to Cetus researchers, equipment, and technical expertise.  Counterclaim Defendant Holodniy's first efforts with Cetus involved learning basic PCR techniques and went on to include learning PCR methods for detecting HIV RNA.  In conjunction with that effort, Counterclaim Defendant Holodniy and Counterclaim Defendant Stanford were provided with Cetus HIV primers (a critical reagent required for PCR amplification and detection of HIV) and other materials used in the PCR process.

21.    Once Counterclaim Defendant Holodniy had knowledge concerning the basics of PCR and its application for detecting HIV RNA, he and Cetus employees collaborated on techniques needed to quantitate HIV RNA.  Together they eventually developed a PCR method for quantitating HIV RNA and refined it through experiments with HIV RNA that was extracted from both patient serum and plasma.

22.    Beginning in or about late 1987, Cetus employees also worked to develop first-of-their-kind standards or controls for quantitation by PCR of any type of RNA and DNA.  Cetus employees spent many months constructing, testing, and validating that standard.  Without such a standard, PCR quantitation of HIV RNA was not possible.

23.    Armed with the knowledge and experience provided to him by Cetus, in late 1989 Counterclaim Defendant Holodniy, along with Counterclaim Defendant Merigan, sought to publish the results of the Cetus/Stanford work relating to the PCR quantification of HIV RNA extracted from serum.  In December 1989, as required by the MTA and his consulting/confidentiality agreement, Counterclaim Defendant Holodniy sought permission from Cetus to publish an abstract at a UCLA symposium.  Although Cetus contributors were initially excluded from the abstract, after correcting this omission, permission to publish was granted.  The abstract, entitled *Quantitation of HIV-1 RNA in Serum and Correlation with Disease Status Using the Polymerase Chain Reaction*, concludes that the authors have demonstrated that PCR can be

1  used to detect and quantitate HIV viral RNA extracted from patient serum and that such

2  quantitation may be a useful marker for AIDS disease progression or the monitoring of anti-HIV

3  therapy.

4      24.    This abstract later formed the basis of an article published in the Journal of

5  Infectious Diseases in April 1991, entitled *Detection and Quantification of Human*

6  *Immunodeficiency Virus RNA in Patient Serum by Use of the Polymerase Chain Reaction* (the

7  "Serum Paper").  Listed authors include Stanford and Cetus researchers.  As the title suggests, the

8  Serum Paper describes the results of joint work conducted by Cetus and Counterclaim Defendant

9  Stanford relating to HIV RNA quantification.

10     25.    The April 1991 article begins by noting that HIV RNA was detected and quantified

11 after extraction from the serum of HIV positive individuals by PCR and that such quantification

12 "may be useful as a marker for disease progression or in monitoring antiviral therapy."  The article

13 then describes the work that Cetus did which made PCR quantification of HIV RNA possible.

14 The article goes on to refer to unpublished work by the authors that suggests that the virus may be

15 recovered even more easily from plasma.  Finally, the article concludes that "[s]erum PCR may

16 provide an additional marker of disease progression and drug efficacy that could improve our

17 ability to monitor the course of HIV infection."

18     26.    Despite Counterclaim Defendant Stanford's obligations to Cetus, Counterclaim

19 Defendants Holodniy, Merigan, and Stanford, after the publication of the Serum Paper, repeatedly

20 took sole credit for work conducted jointly with Cetus.  For example, in May 1991, Counterclaim

21 Defendant Holodniy submitted a paper to the Journal of Clinical Investigation entitled *Reduction*

22 *in Plasma Human Immunodeficiency Virus Ribonucleic Acid after Dideoxynucleoside Therapy as*

23 *Determined by the Polymerase Chain Reaction* (the "Plasma Paper").  The named authors are

24 Counterclaim Defendant Holodniy, David Katzenstein, and Counterclaim Defendant Merigan

25 from Stanford.  No Cetus employees were identified as authors, and there is no evidence that

26 Counterclaim Defendant Stanford sought approval from Cetus in connection with this publication.

27     27.    In the Plasma Paper, which was first published in November 1991, the authors

28 describe the use of PCR to detect and quantitate HIV RNA extracted from plasma.  The methods

1  and reagents used are virtually identical to those described in the Serum Paper for PCR detection

2  and quantitation of HIV RNA extracted from serum. Nonetheless, Cetus researchers are given no

3  credit for their critical contributions.

4          28.     The Plasma Paper was only the beginning of Counterclaim Defendant Stanford's

5  efforts to take sole credit for the parties' joint work. In published paper after published paper that

6  followed, including those that reference earlier joint publications, Counterclaim Defendant

7  Stanford intentionally omits reference to Cetus - either by claiming independent invention or by

8  deleting reference to Cetus employees as authors, or both. Internal Stanford documents also

9  routinely credit only Counterclaim Defendant Stanford for the parties' joint work. Moreover, such

10  claims are also contained in statements made to government agencies related to grants obtained by

11  Counterclaim Defendant Stanford concerning its AIDS-related work.

12          29.     Counterclaim Defendant Stanford also sought credit for the joint Stanford/Cetus

13  work in the United States Patent & Trademark Office (the "PTO"). On May 14, 1992, Stanford's

14  counsel submitted the parent for the '730 Patent Family application ("the May 1992 Application").

15  U.S. Patent No. 5,968,730, which ultimately issued on October 19, 1999 is entitled "Polymerase

16  Chain Reaction Assays for Monitoring Antiviral Therapy and Making Therapeutic Decisions in

17  the Treatment of Acquired Immunodeficiency Syndrome." The named inventors of the '730

18  Patent are Drs. Thomas Merigan, Mark Holodniy, and David Katzenstein. The methods claimed

19  in the '730 Patent were the subject of the joint collaboration between Cetus and Stanford

20  researchers and were covered by, among other things, the MTA, and the 1984 and 1991

21  consulting/confidentiality agreements between Counterclaimant RMS's predecessor, Cetus, and

22  Counterclaim Defendant Merigan, and the 1989 consulting/confidentiality agreement between

23  Counterclaim Defendant Holodniy and Cetus.

24          30.     Subsequently, U.S. Patent No. 6,503,705, a continuation of the '730 Patent, issued

25  on January 7, 2003. The '705 Patent contains claims that are substantially the same as those found

26  in the '730 Patent. The named inventors of the '705 patent are Drs. Thomas Merigan, Mark

27  Holodniy, and David Katzenstein . As with the '730 Patent, the methods claimed in the '705

28  Patent were the subject of the joint collaboration between Cetus and Stanford researchers and are

1  covered by, among other things, the MTA, and the 1984 and 1991 consulting/confidentiality

2  agreements between Counterclaimant RMS's predecessor, Cetus, and Counterclaim Defendant

3  Merigan, and the 1989 consulting/confidentiality agreement between Counterclaim Defendant

4  Holodniy and Cetus.

5      31.    U.S. Patent No. 7,129,041, a division of the '705 Patent, issued on October 31,

6  2006.  The '041 Patent contains claims that are substantially the same as those found in the '730

7  and '705 Patents.  The named inventors of the '041 patent are Drs. Thomas Merigan, Mark

8  Holodniy, and David Katzenstein.  As with the '730 and '705 Patents, the methods claimed in the

9  '041 Patent were the subject of the joint collaboration between Cetus and Stanford researchers and

10  are covered by, among other things, the MTA, and the 1984 and 1991 consulting/confidentiality

11  agreements between Counterclaimant RMS's predecessor, Cetus, and Counterclaim Defendant

12  Merigan, and the 1989 consulting/confidentiality agreement between Counterclaim Defendant

13  Holodniy and Cetus.

14      32.    The May 1992 Application is also the parent of several additional patents/patent

15  families and pending applications.  Through a series of continuations and divisions the May 1992

16  Application ultimately resulted in:  (1) U.S. Patent No. 5,631,128 entitled "Polymerase Chain

17  Reaction Assays for Monitoring Antiviral Therapy and Making Therapeutic Decisions in the

18  Treatment of Acquired Immunodeficiency Syndrome" issued on May 20, 1997 (the "'128 Patent");

19  (2) U.S. Patent No. 5,856,086, a continuation of the '128 Patent, entitled "Polymerase Chain

20  Reaction Assays for Monitoring Antiviral Therapy and Making Therapeutic Decisions in the

21  Treatment of Acquired Immunodeficiency Syndrome" issued on January 5, 1999 (the "'086

22  Patent"); (3) U.S. Reissued Patent No. US RE38,352 E, a reissue of the '086 Patent, entitled

23  "Polymerase Chain Reaction Assays for Monitoring Antiviral Therapy and Making Therapeutic

24  Decisions in the Treatment of Acquired Immunodeficiency Syndrome" issued on December 16,

25  2003 (the "'352 Patent"); and (4) U.S. Patent No. 5,650,268, entitled "Polymerase Chain Reaction

26  Assays for Monitoring Antiviral Therapy and Making Therapeutic Decisions in the Treatment of

27  Acquired Immunodeficiency Syndrome" issued on July 22, 1997 (the "'268 Patent").The named

28  inventors of the '128, '086, '352, and '268 Patents are Merigan and Kozal.    The methods claimed

1    in the '128, '086, '352, and '268 Patents comprise the result of Counterclaim Defendant Merigan's

2    and Holodniy's work at Cetus and are therefore covered by, among other things, the MTA, the

3    1984 and 1991 consulting/confidentiality agreements between Counterclaimant RMS's

4    predecessor, Cetus, and Counterclaim Defendant Merigan, and the 1989 consulting/confidentiality

5    agreement between Counterclaim Defendant Holodniy and Cetus.

6         33.     Through a December 1991 Acquisition agreement, Hoffmann-LaRoche, Inc.

7    acquired Cetus' PCR business together with its PCR patent portfolio, both of which were

8    subsequently transferred to Counterclaimant RMS.  As a result of that acquisition and subsequent

9    transfer, Counterclaimant RMS was assigned rights in all the agreements between and among

10   Stanford, Merigan, Holodniy and Cetus and the related intellectual property identified above.

11

12   **First Counterclaim for Relief**

13   **(Declaratory Judgment of Non-Infringement of the '730, '705, and '041 Patents by All**

14   **Counterclaimants against Counterclaim Defendant Stanford)**

15        34.     Counterclaimants reallege and incorporate by reference their Affirmative Defenses

16   and paragraphs 1 through 33 of their Counterclaims, inclusive, as if fully set forth in this

17   paragraph.

18        35.     As evidenced by the allegations in the First Amended Complaint, Counterclaim

19   Defendant Stanford alleges that it is the owner of all right, title and interest in the '730, '705, and

20   '041 Patents and that the '730, '705, and '041 Patents were duly and lawfully issued.  Counterclaim

21   Defendant Stanford also alleges that Counterclaimants have infringed, and continue to infringe,

22   the '730, '705, and '041 Patents.

23        36.     Counterclaimants deny Counterclaim Defendant Stanford's allegations of

24   infringement.  Accordingly, there exists a substantial and continuing justiciable controversy as to

25   the infringement of the '730, '705, and '041 Patents.

26        37.     Counterclaimants seek a declaratory judgment that the '730, '705, and '041 Patents

27   are not infringed, either directly, indirectly, under the doctrine of equivalents, or by contributory

28   infringement or inducement, by any act of Counterclaimants either individually or collectively.

38.     On information and belief, Counterclaim Defendant Stanford served the Complaint on Counterclaimants with knowledge that the '730, '705, and '041 Patents were not infringed.

**Second Counterclaim for Relief**

**(Declaratory Judgment of Invalidity of the '730, '705, and '041 Patents by All Counterclaimants against Counterclaim Defendant Stanford)**

39.     Counterclaimants reallege and incorporate by reference their Affirmative Defenses and paragraphs 1 through 38 of their Counterclaims, inclusive, as if fully set forth in this paragraph.

40.     As evidenced by the allegations in the First Amended Complaint, Counterclaim Defendant Stanford alleges that it is the owner of all right, title and interest in the '730, '705, and '041 Patents and that the '730, '705, and '041 Patents were duly and lawfully issued.

41.     Counterclaimants deny that the '730, '705, and '041 Patents are valid.  Accordingly, there exists a substantial and continuing justiciable controversy as to the validity of the '730, '705, and '041 Patents.

42.     Counterclaimants seek a declaratory judgment that the '730, '705, and '041 Patents are invalid and/or unenforceable for failure to satisfy one or more of the requirements of Title 35, including without limitation, Sections 101, 102, 103, 112 and/or 282.

43.     On information and belief, Counterclaim Defendant Stanford served the Complaint on Counterclaimants with knowledge that the '730, '705, and '041 Patents were invalid.

**Third Counterclaim for Relief**

**(Declaratory Judgment of Inventorship of the '730, '705, and '041 Patents by Counterclaimant RMS against Counterclaim Defendant Stanford)**

44.     Counterclaimant RMS realleges and incorporates by reference its Affirmative Defenses and paragraphs 1 through 43 of its Counterclaims, inclusive, as if fully set forth in this paragraph.

45.     As evidenced by the allegations in the First Amended Complaint, Counterclaim Defendant Stanford alleges Counterclaim Defendant Merigan, Katzenstein and Counterclaim Defendant Holodniy are the sole and true inventors of the '730, '705, and '041 Patents.

46.     Former employees of Counterclaimant RMS's predecessor-in-interest, Cetus, are joint inventors of the '730, '705, and '041 Patents by virtue of the collaboration between those employees and employees of Counterclaim Defendant Stanford, and the inventive contributions of those Cetus employees to the subject matter claimed in the '730, '705, and '041 Patents.

47.     As such Counterclaimants seeks declaratory relief that certain former employees of Counterclaimant RMS's predecessor-in-interest, Cetus, are joint inventors of the '730, '705, and '041 Patents.

**Fourth Counterclaim for Relief**

**(Declaratory Judgment of Ownership of the '730, '705, and '041 Patents by Counterclaimant RMS against Counterclaim Defendant Stanford)**

48.     Counterclaimant RMS realleges and incorporates by reference its Affirmative Defenses and paragraphs 1 through 47 of its Counterclaims, inclusive, as if fully set forth in this paragraph.

49.     As evidenced by the allegations in the Complaint, Counterclaim Defendant Stanford alleges that it is the owner of all right, title and interest in the '730,  '705, and '041 Patents by assignment from the named inventors.

50.     Counterclaimant RMS is the owner of the '730,  '705, and '041 Patents by virtue of at least one or more of the following: (1) the consulting/confidentiality agreements entered into between Counterclaimant RMS's predecessor-in-interest, Cetus, and Counterclaim Defendants Merigan and Holodniy, among others; and/or (2) the collaboration between employees of Counterclaimant RMS's predecessor-in-interest, Cetus, and employees of Counterclaim Defendant Stanford, and the inventive contributions of those Cetus employees to the subject matter claimed in the '730, '705, and '041 Patents which requires that Cetus employees be named as joint inventors of the '730, '705, and '041 Patents.

51.    As such Counterclaimant RMS seeks declaratory relief that it is the sole and exclusive owner of the '730, '705, and '041 Patents or, in the alternative, that it owns a pro rata undivided interest in the '730, '705, and '041 Patents.

**Fifth Counterclaim for Relief**

**(Declaratory Judgment of Unenforceability of the '730, '705, and '041 Patents by All Counterclaimants against Counterclaim Defendant Stanford)**

52.    Counterclaimants reallege and incorporate by reference their Affirmative Defenses and paragraphs 1 through 51 of their Counterclaims, inclusive, as if fully set forth in this paragraph.

53.    On information and belief, the '730, '705, and '041 Patents are unenforceable by Counterclaim Defendant Stanford or any of the named inventors due to Counterclaim Defendant Stanford's and the named inventors' willful violation of the provisions of 37 C.F.R. 1.56 in procuring the '730, '705, and '041 Patent. Counterclaimants believe that further investigation and discovery will provide additional evidentiary support showing that Counterclaim Defendant Stanford and the named inventors willfully misrepresented and omitted information from the United States Patent and Trademark Office ("PTO") that was material to the PTO's decision to grant the '730, '705, and '041 Patents, including at least the following:

a.    Counterclaim Defendant Stanford and the named inventors failed to disclose to the PTO the collaboration between employees of Counterclaimant RMS's predecessor-in-interest, Cetus, and employees of Counterclaim Defendant Stanford, and the inventive contributions of those Cetus employees to the subject matter claimed in the '730, '705, and '041 Patents. Despite the fact that inventorship is material to patentability, Counterclaim Defendant Stanford and the named inventors actively concealed from the PTO the contributions of Cetus employees to the subject matter of the claimed inventions, including that Cetus employees played key roles in the development of: (1) the specific steps in the method developed for quantitating HIV using PCR; (2) the first-of-their-kind standards or controls for quantitation of HIV RNA which made quantitation possible; (3) the 30 cycle assay for detection and quantitation of HIV;

and (4) the amplification of RNA extracted from plasma samples.  Although these contributions

entitled Cetus employees to be named as joint inventors on the '730, '705, and '041 Patents,

Counterclaim Defendant Stanford and the named inventors affirmatively misrepresented to the

PTO that they were the only true inventors of the claims in the '730, '705, and '041 Patents.  The

initial application listed only Counterclaim Defendant Merigan and Kozal as inventors.

Subsequently, in November 1992, the applicants petitioned to correct inventorship and sought to

add Counterclaim Defendant Holodniy and Katzenstein as joint inventors.  In connection with the

petition, Merigan declared under penalty of perjury that at the time of filing, he did not discuss the

issue of inventorship with his counsel.  Thereafter, however, Merigan began to question whether

Katzenstein and Holodniy also should be included as inventors.  After discussing this issue with

both counsel and Katzenstein and Holodniy, the decision was made to add Katzenstein and

Holodniy as inventors.  According to the declaration of Barry Elledge, Stanford's prosecution

counsel, Holodniy had the following comments concerning his inventorship role:

> Dr. Holodniy stated that he was until the summer of 1991 a research fellow in the Division
> of Infectious Disease at Stanford University.  His inventive contribution to the subject
> matter of the present application occured (sic) during this period, and principally concerns
> quantitation of HIV RNA in plasma of AIDS patients.

Upon information and belief, these statements and omissions, among others, were intentional and

were designed to mislead the PTO with respect to the true inventorship of the '730, '705, and '041

Patents.

        b.      Counterclaim Defendant Stanford and the named inventors failed to

properly disclose to the PTO an April 1991 article authored by Stanford's Drs. Merigan,

Katzenstein, and Holodniy entitled Detection and Quantification of Human Immuno-deficiency

Virus RNA in Patient Serum by Use of the Polymerase Chain Reaction, 163 J. INFECT. DIS. 862-

866 (1991) (the "Serum Paper").  The Serum Paper disclosed each of the features that Stanford

claims in the '730, '705, '041 Patents more than one year prior to the filing of the application

which resulted in the '730, '705, and '041 Patents.  The Serum Paper describes the PCR

amplification and quantitation of HIV RNA extracted from blood of patients and discloses exactly

the same quantitative PCR method that is described in the '730, '705, and '041 Patents, including

1   the use of 30 cycles of amplification and the same PCR standard for quantitation. The paper also

2   demonstrates that there is a correlation between the level of HIV RNA molecules in the blood and

3   the clinical status of the HIV-positive patient - i.e., HIV RNA level is a "marker" of disease

4   progression. Despite its materiality and the fact that it would likely have supported a rejection of

5   the claims in the '730, '705, and '041 Patents, Counterclaim Defendant Stanford and the named

6   inventors failed to properly highlight this prior art in its information disclosure statements and

7   failed to bring it to the attention of the examiners during the prosecution of the '730 and '705

8   Patents with the intent to mislead the PTO.

9       54.    Accordingly, Counterclaimants seek declaratory relief that the '730, '705, and '041

10  Patents are unenforceable by Counterclaim Defendant Stanford.

11

12                              **Sixth Counterclaim for Relief**

13  **(Declaratory Judgment of License to the '730, '705, and '041 Patents by Counterclaimant**

14                      **RMS against Counterclaim Defendant Stanford)**

15      55.    Counterclaimant RMS realleges and incorporates by reference its Affirmative

16  Defenses and paragraphs 1 through 54 of their Counterclaims, inclusive, as if fully set forth in this

17  paragraph.

18      56.    Counterclaimants RMS holds a non-exclusive, irrevocable, royalty-free, worldwide

19  license under the '730, '705, and '041 Patents from the date of alleged invention of the subject

20  matter claimed in the '730, '705 and '041 Patents by virtue of at least one or more of the following:

21  (1) the materials transfer agreement entered into between Counterclaimant RMS's predecessor-in-

22  interest, Cetus, and Counterclaim Defendant Merigan and others at Counterclaim Defendant

23  Stanford; and/or (2) the consulting/confidentiality agreements entered into between

24  Counterclaimant RMS's predecessor-in-interest, Cetus, and Counterclaim Defendants Merigan and

25  Holodniy, among others.

26      57.    Accordingly, Counterclaimants seek declaratory relief that Counterclaimant RMS

27  holds non-exclusive, irrevocable, royalty-free, worldwide license in the '730, '705, and '041

28  Patents.

1

2                           **Seventh Counterclaim for Relief**

3      **(Declaratory Judgment of Ownership of the '128, '086, '352, and '268 Patents by**

4                  **Counterclaimant RMS against Counterclaim Defendant Stanford)**

5          58.    Counterclaimant RMS realleges and incorporates by reference its Affirmative

6    Defenses and paragraphs 1 through 57 of its Counterclaims, inclusive, as if fully set forth in this

7    paragraph.

8          59.    According to the Patents, Counterclaim Defendant Stanford holds all right, title and

9    interest in the '128, '086, '352, and '268 Patents by assignment from the named inventors.

10         60.    On information and belief, Counterclaimant RMS is the owner of the '128, '086,

11   '352, and '268 Patents by virtue of the consulting/confidentiality agreements entered into between

12   Counterclaimant RMS's predecessor-in-interest, Cetus, and Counterclaim Defendant Merigan,

13   among others.

14         61.    As such Counterclaimant RMS seeks declaratory relief that it is the sole and

15   exclusive owner of the '128, '086, '352, and '268 Patents.

16

17                            **Eighth Counterclaim for Relief**

18      **(Declaratory Judgment of License to the '128, '086, '352, and '268 Patents by**

19                  **Counterclaimant RMS against Counterclaim Defendant Stanford)**

20         62.    Counterclaimant RMS realleges and incorporates by reference its Affirmative

21   Defenses and paragraphs 1 through 61 of their Counterclaims, inclusive, as if fully set forth in this

22   paragraph.

23         63.    Counterclaimants RMS holds a non-exclusive, irrevocable, royalty-free, worldwide

24   license under the '128, '086, '352, and '268 Patents from the date of alleged invention of the subject

25   matter claimed in the Patents by virtue of at least one or more of the following:  (1) the materials

26   transfer agreement entered into between Counterclaimant RMS's predecessor-in-interest, Cetus,

27   and Counterclaim Defendant Merigan and others at Counterclaim Defendant Stanford; and/or

28

(2) the consulting/confidentiality agreements entered into between Counterclaimant RMS's predecessor-in-interest, Cetus, and Counterclaim Defendant Merigan, among others.

64.     Accordingly, Counterclaimants seek declaratory relief that Counterclaimant RMS holds non-exclusive, irrevocable, royalty-free, worldwide license in the '128, '086, '352, and '268 Patents.

## Ninth Counterclaim for Relief

**(Breach of Contract by Counterclaimant RMS against Counterclaim Defendant Merigan)**

65.     Counterclaimant RMS realleges and incorporates by reference its Affirmative Defenses and paragraphs 1 through 64 of its Counterclaims, inclusive, as if fully set forth in this paragraph.

66.     By virtue of the 1984 and 1991 consulting/confidentiality agreements entered into between Counterclaimant RMS's predecessor-in-interest, Cetus, and Counterclaim Defendant Merigan of Stanford, Counterclaim Defendant Merigan was required upon the termination of the agreements, or at any time upon Cetus's request, to, among other things, surrender to Cetus all confidential information in Counterclaim Defendant Merigan's possession after the termination of the consulting/confidentiality agreements.

67.     Cetus performed all of its obligations under its agreements with Merigan and as Cetus's successor-in-interest, Counterclaimant RMS is entitled to the return of all of Cetus's confidential information in Counterclaim Defendant Merigan's possession.

68.     Counterclaimant RMS demanded, among other things, the immediate return of all Cetus's confidential information in Counterclaim Defendant Merigan's possession by letter dated November 4, 2005.  Counterclaim Defendant Merigan has refused to comply.

69.     Accordingly, Counterclaim Defendant Merigan is in breach of the terms of the 1984 and 1991 consulting/confidentiality agreements and, as a result of that conduct, Counterclaimant RMS has been damaged in an amount to be proven at trial.

**Tenth Counterclaim for Relief**

**(Specific Performance by Counterclaimant RMS against Counterclaim Defendant Merigan)**

70.    Counterclaimant RMS realleges and incorporates by reference its Affirmative Defenses and paragraphs 1 through 69 of its Counterclaims, inclusive, as if fully set forth in this paragraph.

71.    As set forth above, by virtue of the 1984 and 1991 consulting/confidentiality agreements Counterclaim Defendant Merigan was required upon termination of the agreements and/or at any time upon Cetus's request to return all Cetus confidential information in Counterclaim Defendant Merigan's possession.

72.    In addition, by virtue of the 1984 consulting/confidentiality agreement entered into between Counterclaimant RMS's predecessor-in-interest, Cetus, and Counterclaim Defendant Merigan, Counterclaim Defendant Merigan was also required upon demand at any time to assign and convey to Cetus the sole and exclusive right, title, and interest in and to any inventions (and patents thereon) made or completed during the seven year consulting period covered by the agreement, or made during the consulting period and completed within one year of the expiration of the consulting period, which inventions were:  (1) made or conceived using Cetus's equipment, facilities, supplies, or confidential information; (2) made or conceived during hours in which Counterclaim Defendant Merigan was performing work for Cetus; or (3) which resulted from work performed by Counterclaim Defendant Merigan for Cetus during the consulting period.  On information and belief, the inventions claimed in the '730, '705, '041, '128, '086, '352, and '268 Patents are covered by this agreement.

73.    Cetus performed all of its obligations under its agreements with Merigan and Counterclaimant RMS, as Cetus's successor-in-interest, demanded, among other things, the immediate return of all of Cetus's confidential information in Counterclaim Defendant Merigan's possession by letter dated November 4, 2005.  Counterclaim Defendant Merigan has refused to comply.  Counterclaimant RMS also hereby demands that Counterclaim Defendant Merigan take all steps necessary to effectuate an assignment of all right, title, and interest in the '730, '705, '041, '128, '086, '352, and '268 Patents to Counterclaimant RMS.

74.    The confidential information of Cetus possessed by Counterclaim Defendant Merigan, and the '730, '705, '041, '128, '086, '352, and '268 Patents are unique such that the legal remedy for Counterclaim Defendant Merigan's breach of his obligations under the 1984 and 1991 consulting/confidentiality agreements is inadequate and, therefore, Counterclaimant RMS is entitled to specific performance of the agreements.

### **Eleventh Counterclaim for Relief**

**(Breach of Contract by Counterclaimant RMS against Counterclaim Defendant Holodniy)**

75.    Counterclaimant RMS realleges and incorporates by reference its Affirmative Defenses and paragraphs 1 through 74 of its Counterclaims, inclusive, as if fully set forth in this paragraph.

76.    By virtue of the 1989 consulting/confidentiality agreement entered into between Counterclaimant RMS's predecessor-in-interest, Cetus, and Counterclaim Defendant Holodniy of Stanford, Counterclaim Defendant Holodniy was required to maintain all Cetus confidential information in Counterclaim Defendant Holodniy's possession in confidence.

77.    Cetus performed all of its obligations under its agreement with Holodniy.

78.    By, among other things, publishing the various papers cited above and seeking patents based on and disclosing confidential information of Cetus without Cetus' written consent, Counterclaim Defendant Holodniy is in breach of the terms of the 1989 consulting/confidentiality agreements and, as a result of that conduct, Counterclaimant RMS has been damaged in an amount to be proven at trial.

### **Twelfth Counterclaim for Relief**

**(Specific Performance by Counterclaimant RMS against Counterclaim Defendant Holodniy)**

79.    Counterclaimant RMS realleges and incorporates by reference its Affirmative Defenses and paragraphs 1 through 78 of its Counterclaims, inclusive, as if fully set forth in this paragraph.

80.    As set forth above, by virtue of the 1989 consulting/confidentiality agreement entered into between Counterclaimant RMS's predecessor-in-interest, Cetus, and Counterclaim

1   Defendant Holodniy, Counterclaim Defendant Holodniy was required to maintain all Cetus

2   confidential information in Counterclaim Defendant Holodniy's possession in confidence.

3        81.     In addition, by virtue of the 1989 consulting/confidentiality agreement,

4   Counterclaim Defendant Holodniy assigned to Cetus the sole and exclusive right, title, and interest

5   in and to any inventions (and patents thereon) made or completed as a consequence of his access

6   to Cetus facilities or information.  The agreement further required Counterclaim Defendant

7   Holodniy to execute all documents necessary to effectuate the vesting of all rights assigned to

8   Cetus.  On information and belief, the inventions claimed in the '730, '705, and '041 Patents  are

9   covered by this agreement.

10        82.     Cetus performed all of its obligations under its agreement with Counterclaim

11   Defendant Holodniy and Counterclaimant RMS, as Cetus's successor-in-interest, hereby demands

12   that Counterclaim Defendant Holodniy maintain all Cetus confidential information in confidence

13   and/or immediately return all of Cetus's confidential information in Counterclaim Defendant

14   Holodniy's possession.  Counterclaimant RMS further demands that Counterclaim Defendant

15   Holodniy take all steps necessary to effectuate the vesting of the assignment of all right, title, and

16   interest in the '730, '705, and '041 Patents to Counterclaimant RMS.

17        83.     The confidential information of Cetus possessed by Counterclaim Defendant

18   Holodniy, the '730, '705 and '041 Patents are unique such that the legal remedy for Counterclaim

19   Defendant Holodniy's breach of his obligations under the 1989 consulting/confidentiality

20   agreement is inadequate and, therefore, Counterclaimant RMS is entitled to specific performance

21   of the agreement.

22

23                              **PRAYER FOR RELIEF**

24        Wherefore, Defendants and Counterclaimants Roche Molecular Systems, Inc.;

25   Roche Diagnostics Corporation; and Roche Diagnostics Operations, Inc. (collectively

26   "Counterclaimants") pray for entry of judgment:

27        (1)     dismissing the Complaint with prejudice;

28

1          (2)      that Counterclaim Defendant Stanford take nothing by way of its

2    Complaint;

3          (3)      declaring that Counterclaimant RMS is the sole and exclusive owners of all

4    right, title and interest in the '730, '705, '041, '128, '086, '352, and '268 Patents;

5          (4)      declaring that Counterclaimant RMS holds an undivided pro rata ownership

6    interest in the '730, '705, and '041 Patents;

7          (5)      declaring that Counterclaimant RMS is entitled to retroactive and non-

8    exclusive, irrevocable, royalty-free, worldwide license under the '730, '705, '041, '128, '086, '352,

9    and '268 Patents;

10          (6)      ordering Counterclaim Defendants Merigan and Holodniy return all Cetus

11    Corporation's confidential information in Counterclaim Defendant Merigan's and Holodniy's

12    possession to Counterclaimant RMS, and to take all steps necessary to assign all right, title and

13    interest in the '730, '705, '041, '128, '086, '352, and '268 Patents to Counterclaimant RMS as

14    required by the consulting/confidentiality agreements between Cetus and Counterclaim

15    Defendants Merigan and Holodniy;

16          (7)      awarding damages in an amount to be proven at trial to Counterclaimant

17    RMS for Counterclaim Defendant Merigan's and Holodniy's failure to return of all Cetus

18    Corporation's confidential information in Counterclaim Defendant Merigan's and Holodniy's

19    possession;

20          (8)      ordering disgorgement of all profits realized by Counterclaim Defendants

21    due Roche due to the licensing of the '730, '705, '041, '128, '086, '352, and '268 Patents ;

22          (9)      ordering that Counterclaim Defendants hold and have held the '730, '705,

23    '041 '128, '086, '352, and '268 Patents and any royalties or other profits derived due Roche from

24    licensing the Patents or the subject matter claimed in the Patents or Patent Applications in trust for

25    Counterclaimants;

26          (10)      declaring that the '730, '705, and '041 Patents have not been infringed by

27    Counterclaimants;

28          (11)      declaring that each claim of the '730, '705, and '041 Patents is invalid;

1    (12)    enjoining Counterclaim Defendant Stanford, its officers, agents, servants,

2  employees, and attorneys, and all persons in active concert or participation with them, from

3  directly or indirectly charging infringement, or instituting any further action for infringement of

4  the '730, 705, and '041 Patents against Counterclaimants or any of their customers;

5    (13)    declaring that this case is exceptional pursuant to 35 U.S.C. § 285, and

6  awarding Counterclaimants their reasonable attorneys' fees, expenses and costs incurred in this

7  action; and

8    (14)    awarding to Counterclaimants such other and further relief as may be just

9  and proper.

10

11  DATED:  April 13, 2007                QUINN EMANUEL URQUHART OLIVER &
                                          HEDGES, LLP

12

13                                        By_____/s/_____

14                                           Brian C. Cannon (Bar No. 193071)
                                             Attorneys for Defendants and Counterclaimants Roche

15                                           Molecular Systems, Inc.; Roche Diagnostics
                                             Corporation; and Roche Diagnostics Operations, Inc.

16

17

18

19

20

21

22

23

24

25

26

27

28