COOLEY GODWARD KRONISH LLP
STEPHEN C. NEAL (No. 170085) (nealsc@cooley.com)
RICARDO RODRIGUEZ (No. 173003) (rr@cooley.com)
MICHELLE S. RHYU (No. 212922) (mrhyu@cooley.com)
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306-2155
Tel: (650) 843-5000
Fax: (650) 857-0663

Attorneys for Plaintiff and Counterclaim Defendant
THE BOARD OF TRUSTEES OF THE LELAND STANFORD
JUNIOR UNIVERSITY and Counterclaim Defendants THOMAS
MERIGAN and MARK HOLODNIY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>ROCHE MOLECULAR SYSTEMS, ET AL.,<br><br>　　　　Defendants. | Case No. C 05 04158 MHP<br><br>**EXHIBIT D TO THE JOINT CLAIM CONSTRUCTION AND PREHEARING STATEMENT UNDER PATENT LOCAL RULE 4-3(D) — STANFORD'S SUMMARY OF EXPERT OPINIONS** |
| ROCHE MOLECULAR SYSTEMS, ET AL.,<br><br>　　　　Counterclaimants,<br><br>　v.<br><br>THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY; THOMAS MERIGAN; AND MARK HOLODNIY,<br><br>　　　　Counterclaim Defendants. | |

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

755985 v3/PA

**EX. D TO THE JOINT STATEMENT
CASE NO. C 05 04158 MHP**

1    Pursuant to Patent Local Rule 4-3(d), Stanford provides the following disclosure of expert testimony that may be offered by Dr. Paul Volberding and/or Dr. Fred Kramer. Stanford submits this disclosure without the benefit of complete discovery and thus reserves the right to supplement or amend as further evidence is discovered during the course of discovery, as Roche identifies its positions in the case, and as a result of further investigation and/or discussions with Roche. Further, this disclosure is intended to provide a "summary of each opinion" of these experts as specified in Patent Local Rule 4-3(d), which sets forth different requirements from Fed. R. Civ. P. 26(a)(2).

## I. TESTIMONY OF DR. PAUL VOLBERDING

### A. Qualifications

Dr. Paul Volberding is a Professor of Medicine and the Director of the Center for AIDS Research at the University of California, San Francisco ("UCSF"), and Director of the AIDS Program and Medical Oncology at San Francisco General Hospital ("SFGH"). He received his undergraduate and medical degrees at the University of Chicago and the University of Minnesota, respectively, and finished training at the University of Utah and at UCSF, where he studied for two years as a research fellow in the virology laboratory of Dr. Jay Levy, later a co-discoverer of HIV. Dr. Volberding's professional activities have centered at SFGH where he established a model program of AIDS patient care, research, and professional education. His research career began with investigations of HIV related malignancies. His primary research focus, however, shifted to clinical trials of antiretroviral drugs. He has been instrumental in testing many compounds, but is best known for groundbreaking trials establishing standards of care for the use of zidovudine in asymptomatic HIV infection. Dr. Volberding has written many research and review articles. He is the co-editor in chief of the Journal of Acquired Immune Deficiency Syndrome, and is the founder and Chair of the Board of the International AIDS Society-USA. A copy of his CV is attached in Exhibit C, filed concurrently herewith.

### B. Testimony

Dr. Volberding may provide testimony on background scientific issues related to claim construction, including the nature of retroviruses and HIV, the use and mode of action of

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

1.
755985 v3/PA

**EX. D TO THE JOINT STATEMENT**
**CASE NO. C 05 04158 MHP**

1  antiretroviral agents, the evaluation of antiretroviral agents and antiretroviral therapy, the level of
2  ordinary skill in the relevant art, and the state of the art at the time of the relevant inventions.  Dr.
3  Volberding may provide this testimony in the context of a technology tutorial and/or in support of
4  Stanford's proposed claim constructions.

5  Dr. Volberding may also offer testimony regarding the understanding of persons of
6  ordinary skill in the art at the time of the inventions in support of Stanford's constructions or in
7  opposition to Roche's constructions of the following claim terms.  Dr. Volberding may also
8  testify on any other related subject matter raised by the Court or Roche.

**1.  "[E]valuating the effectiveness of anti-HIV therapy of a patient," "evaluating the effectiveness of anti-HIV therapy of an HIV-infected patient," "evaluating the effectiveness," "therapeutically effective," "therapeutically ineffective," and "conclusion"**

Dr. Volberding may offer testimony that no construction is necessary for these terms because the words in these terms are used in their ordinary and common sense and a person of ordinary skill in the art who has reviewed the evidence would give the same meaning to the words as a lay person.  Dr. Volberding may also offer alternative testimony that a person of ordinary skill in the art would construe the terms "evaluating the effectiveness of anti-HIV therapy of a patient" and "evaluating the effectiveness of anti-HIV therapy of an HIV-infected patient" to mean "examining whether a treatment of a patient has the ability to provide therapeutic benefits with regard to an HIV infection," would construe the term "evaluating the effectiveness" consistent with the construction of the immediately preceding terms, would construe "therapeutically effective" to mean "providing therapeutic benefits," would construe "therapeutically ineffective" to mean "not providing therapeutic benefits," and would construe the term "conclusion" to mean "a judgment or decision reached after deliberation."

Further, Dr. Volberding may offer testimony that Roche's proposed constructions do not conform to the understanding of a person of ordinary skill in the art.  For example, Roche's proposed constructions improperly limit the evaluation of "effectiveness" to determining "whether treatment should be modified" and allow effectiveness to be found only if the anti-HIV therapy achieves only an "intended effect."  It is unclear what Roche means by "whether

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

755985 v3/PA                                2.                    **EX. D TO THE JOINT STATEMENT**
                                                                   **CASE NO. C-05-04158 MHP**

1  treatment should be modified." A person of ordinary skill reading the patents, however, would
2  understand that a variety of actions may be considered in evaluating therapeutic effectiveness,
3  including considering changing to a different antiretroviral agent, increasing the dosage of the
4  antiretroviral agent(s) being administered, or adding one or more additional agents to the patient's
5  therapeutic regimen. (*E.g.*, '730 patent, col. 7, l. 63 to col. 8, l. 14.) Further, a person of ordinary
6  skill in the art would understand that evaluating effectiveness is not limited to determining
7  whether treatment should be modified due to drug resistance, but instead may include a variety of
8  considerations, such as a patient's adherence to the treatment regimen. Finally, a person of
9  ordinary skill would understand the above claim terms to refer generally to providing or failing to
10 provide therapeutic benefits rather than to whatever specific intended effect a treating physician
11 may have anticipated for the antiretroviral agent.

12     Further evidence supporting Dr. Volberding's analysis includes his own experience in the
13 field and the knowledge of those skilled in the art regarding the technical aspects of the
14 inventions of the patents-in-suit. Additional evidence supporting Dr. Volberding's analysis is set
15 forth in detail on a term-by-term basis in the exhibits to the parties' Joint Claim Construction and
16 Prehearing Statement Under Patent Local Rule 4-3(d) filed concurrently herewith and
17 incorporated by reference herein. He may also rely on any publications cited in the patents.

18     **2.     "[A]n antiretroviral agent"**

19     Dr. Volberding may offer testimony that a person of ordinary skill in the art would
20 construe the term "an antiretroviral agent" to mean "at least one substance having, capable of
21 having, or intended to have an effect against a retrovirus, such as HIV." Dr. Volberding also may
22 offer testimony that Roche's proposed construction contradicts the understanding of a person of
23 ordinary skill in the art. For example, a person of ordinary skill in the art would not limit the
24 definition of "an antiretroviral agent" to only those substances that were available in 1992.
25 Further evidence supporting Dr. Volberding's analysis includes his own experience in the field
26 and the knowledge of those skilled in the art regarding the technical aspects of the inventions of
27 the patents-in-suit. Additional evidence supporting Dr. Volberding's analysis is set forth in detail
28 on a term-by-term basis in the exhibits to the parties' Joint Claim Construction and Prehearing

1  Statement Under Patent Local Rule 4-3(d) filed concurrently herewith and incorporated by
2  reference herein.  He may also rely on any publications cited in the patents.

      **3.      "[P]resence of detectable HIV-encoding nucleic acid," "absence of detectable HIV-encoding nucleic acid," and "measuring the HIV RNA copy number"**

5        Dr. Volberding may offer testimony that no construction is necessary for these terms
6  because the words in these terms are used in their ordinary and common sense and a person of
7  ordinary skill in the art who has reviewed the evidence would give the same meaning to the words
8  as a lay person.  Dr. Volberding may also offer alternative testimony that a person of ordinary
9  skill in the art would construe the term "presence of detectable HIV-encoding nucleic acid" to
10 mean "the existence or occurrence of HIV-encoding nucleic acid above the lower level of
11 sensitivity of the quantitative PCR assay," would construe the term "absence of detectable HIV-
12 encoding nucleic acid" to mean "the non-existence of HIV-encoding nucleic acid above the lower
13 level of sensitivity of the quantitative PCR assay," and would construe the term "measuring the
14 HIV RNA copy number" to mean "estimating the number of copies of an HIV RNA sequence by
15 evaluation."

16       Dr. Volberding may also offer testimony that Roche's proposed constructions of these
17 terms contradict the understanding of a person of ordinary skill in the art.  As an example,
18 Roche's description of "presence" and "absence" as referring to a "qualitative result" contradicts
19 the understanding of a person of skill in the art reading the prosecution history of the patents,
20 which refers to the inventions as exhibiting "quantitative results" and the prior art as being limited
21 to "non-quantitative" assays.  (*E.g.*, STAN 1435, 1458.)  Further, a person of ordinary skill in the
22 art would not understand the patent as requiring that the detection limit be 40 copies.  Instead, a
23 person of ordinary skill would understand that the patent uses the term "40 copies" only in a
24 section giving an example of one of the ways in which the patents may be practiced, not a
25 description of the only detection limit consistent with the patented invention.  Finally, a person of
26 ordinary skill in the art would not limit the term "measuring the HIV RNA copy numbers" to only
27 enzyme linked affinity assays or other techniques available in 1992, as Roche proposes.

28

**4.   "[C]ollecting statistically significant data useful for determining whether a decline in HIV RNA copy numbers exists," "statistically significant data," "useful for determining whether a decline in HIV RNA copy numbers exists," and "statistically significant decline"**

Dr. Volberding may offer testimony that a person of ordinary skill in the art would construe the term "collecting statistically significant data useful for determining whether a decline in HIV RNA copy numbers exists" to mean "gathering data from the patient and/or other sources that is useful in assessing whether any decline in HIV RNA copy number was the result of chance," would construe the terms "statistically significant data" and "useful for determining whether a decline in HIV RNA copy numbers exists" consistent with the construction of the immediately preceding term, and would construe the term "statistically significant decline" to mean "a decrease that is large enough, by itself or when compared to other data, that it was not likely the result of chance."

Dr. Volberding may also offer testimony that Roche's proposed constructions of these terms contradict the understanding of a person of ordinary skill in the art. For example, Roche improperly proposed that these terms be construed generally as "data upon which a physician can rely in order to make a medical diagnosis." A person of ordinary skill in the art would not interpret the terms as Roche has proposed, however, because the term specifically refers to "statistically significant data" but Roche's definitions would improperly include an array of qualitative information regardless of its statistical significance.

Further evidence supporting Dr. Volberding's analysis includes his own experience in the field and the knowledge of those skilled in the art regarding the technical aspects of the inventions of the patents-in-suit. Additional evidence supporting Dr. Volberding's analysis is set forth in detail on a term-by-term basis in the exhibits to the parties' Joint Claim Construction and Prehearing Statement Under Patent Local Rule 4-3(d) filed concurrently herewith and incorporated by reference herein. He may also rely on any publications cited in the patents.

**5.   "[C]orrelating"**

Dr. Volberding may offer testimony that a person of ordinary skill in the art would construe the term "correlating" to mean "establishing a mutual relationship between." Further,

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

755985 v3/PA                                5.                    **EX. D TO THE JOINT STATEMENT
CASE NO. C-05-04158 MHP**

1  Dr. Volberding may offer testimony disputing Roche's proposed construction of this term, which
2  is "the relationship in a patient between viral load and a particular condition." The term
3  "correlating" occurs only in the phrase "correlating the presence or absence of detectable HIV-
4  encoding nucleic acid in a plasma sample of an HIV infected patient with an absolute CD4 count"
5  in claim 1 of the '041 patent. When Roche's definition of "correlating" is added to this phrase,
6  Roche's definition does not make sense, because the phrase would read "the relationship in a
7  patient between viral load and a particular condition the presence or absence of detectable HIV-
8  encoding nucleic acid in a plasma sample of an HIV infected patient with an absolute CD4
9  count." A person of ordinary skill would not adopt a nonsensical definition. Instead, one of
10 ordinary skill in the art would define "correlating" simply to mean "establishing a mutual
11 relationship between."

12 Further evidence supporting Dr. Volberding's analysis includes his own experience in the
13 field and the knowledge of those skilled in the art regarding the technical aspects of the
14 inventions of the patents-in-suit. Additional evidence supporting Dr. Volberding's analysis is set
15 forth in detail on a term-by-term basis in the exhibits to the parties' Joint Claim Construction and
16 Prehearing Statement Under Patent Local Rule 4-3(d) filed concurrently herewith and
17 incorporated by reference herein. He may also rely on any publications cited in the patents.

18 **II.   TESTIMONY OF DR. FRED KRAMER**

19 **A.   Qualifications**

20 Dr. Fred Kramer is a Member and Chairman of the Department of Molecular Genetics and
21 Director of the Office of Technology Transfer of The Public Health Research Institute, an
22 Adjunct Professor in the Department of Microbiology in the New York University School of
23 Medicine, and a Professor of Microbiology and Molecular Genetics at New Jersey Medical
24 School in the University of Medicine and Dentistry of New Jersey. He received his
25 undergraduate degree from the University of Michigan, received his Ph.D. from The Rockefeller
26 University, and performed postdoctoral training with Sol Spiegelman at Columbia University.
27 After finishing his postdoctoral training, Dr. Kramer has continued to perform cutting-edge
28 research in molecular genetics and microbiology. Dr. Kramer has written many research and

review articles and is a member of a number of professional societies. A copy of his CV is attached in Exhibit C, filed concurrently herewith.

### B. Testimony

Dr. Kramer may provide testimony on background scientific issues related to claim construction, including the development and use of assays, the polymerase chain reaction, the evaluation of antiretroviral agents and antiretroviral therapy, the level of ordinary skill in the relevant art, and the state of the art at the time of the relevant inventions. Dr. Kramer may provide this testimony in the context of a technology tutorial and/or in support of Stanford's proposed claim constructions.

Dr. Kramer may also offer testimony regarding the understanding of persons of ordinary skill in the art at the time of the inventions in support of Stanford's constructions or in opposition to Roche's constructions of the following claim terms. Dr. Kramer may also testify on any other related subject matter raised by the Court or Roche.

#### 1. "[A]bout 30 cycles"

Dr. Kramer may offer testimony that no construction is necessary for this term or that it be construed as "approximately 30 cycles." Further, Dr. Kramer may offer testimony disputing Roche's proposed construction of this term. For example, Roche arbitrarily limits the term to a range of "29 to 31 cycles of PCR." A person of ordinary skill reading the intrinsic and extrinsic evidence, however, would understand that the term was not intended to be limited to a specific range of cycles, but was instead intended to be flexible and to allow for "somewhat fewer as well as somewhat more than 30 cycles." (STAN 997-1002; STAN 1026-28.) This flexibility may account for factors such as the tradeoff between quantitation and sensitivity, as well as the different characteristics of various primers.

Further evidence supporting Dr. Kramer's analysis includes his own experience in the field and the knowledge of those skilled in the art regarding the technical aspects of the inventions of the patents-in-suit. Additional evidence supporting Dr. Kramer's analysis is set forth in detail on a term-by-term basis in the exhibits to the parties' Joint Claim Construction and

COOLEY GODWARD KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

755985 v3/PA

7.

EX. D TO THE JOINT STATEMENT
CASE NO. C-05-04158 MHP

1 Prehearing Statement Under Patent Local Rule 4-3(d) filed concurrently herewith and
2 incorporated by reference herein. He may also rely on any publications cited in the patents.

**2. "[P]resence of detectable HIV-encoding nucleic acid," "absence of detectable HIV-encoding nucleic acid," and "measuring the HIV RNA copy number"**

5 Dr. Kramer may offer testimony that no construction is necessary for these terms because the words in these terms are used in their ordinary and common sense and a person of ordinary skill in the art who has reviewed the evidence would give the same meaning to the words as a lay person. Dr. Kramer may also offer alternative testimony that a person of ordinary skill in the art would construe the term "presence of detectable HIV-encoding nucleic acid" to mean "the existence or occurrence of HIV-encoding nucleic acid above the lower level of sensitivity of the quantitative PCR assay," would construe the term "absence of detectable HIV-encoding nucleic acid" to mean "the non-existence of HIV-encoding nucleic acid above the lower level of sensitivity of the quantitative PCR assay," and would construe the term "measuring the HIV RNA copy number" to mean "estimating the number of copies of an HIV RNA sequence by evaluation."

16 Dr. Kramer may also offer testimony that Roche's proposed constructions of these terms contradict the understanding of a person of ordinary skill in the art. As an example, Roche's description of "presence" and "absence" as referring to a "qualitative result" contradicts the understanding of a person of skill in the art reading the prosecution history of the patents, which refers to the inventions as exhibiting "quantitative results" and the prior art as being limited to "non-quantitative" assays. (*E.g.*, STAN 1435, 1458.) Further, a person of ordinary skill in the art would not understand the patent as requiring that the detection limit be 40 copies. Instead, a person of ordinary skill would understand that the patent uses the term "40 copies" only in a section giving an example of one of the ways in which the patents may be practiced, not a description of the only detection limit consistent with the patented invention. Finally, a person of ordinary skill in the art would not limit the term "measuring the HIV RNA copy numbers" to only enzyme linked affinity assays or other techniques available in 1992, as Roche proposes.

1      Further evidence supporting Dr. Kramer's analysis includes his own experience in the
2 field and the knowledge of those skilled in the art regarding the technical aspects of the
3 inventions of the patents-in-suit.  Additional evidence supporting Dr. Kramer's analysis is set
4 forth in detail on a term-by-term basis in the exhibits to the parties' Joint Claim Construction and
5 Prehearing Statement Under Patent Local Rule 4-3(d) filed concurrently herewith and
6 incorporated by reference herein.  He may also rely on any publications cited in the patents.

8  Dated: July 6, 2007                              COOLEY GODWARD KRONISH LLP

                                                    by:            /s/
                                                              Ricardo Rodriguez

                                                    Attorneys for Counter Defendants The Board of
                                                    Trustees of the Leland Stanford Junior University,
                                                    Thomas Merigan and Mark Holodniy