1   COOLEY GODWARD KRONISH LLP
    STEPHEN C. NEAL (No. 170085) (nealsc@cooley.com)
2   RICARDO RODRIGUEZ (No. 173003) (rr@cooley.com)
    MICHELLE S. RHYU (No. 212922) (mrhyu@cooley.com)
3   Five Palo Alto Square
    3000 El Camino Real
4   Palo Alto, CA  94306-2155
    Tel:    (650) 843-5000
5   Fax:    (650) 857-0663

6   Attorneys for Plaintiff and Counterclaim Defendant
    THE BOARD OF TRUSTEES OF THE LELAND STANFORD
7   JUNIOR UNIVERSITY and Counterclaim Defendants THOMAS
    MERIGAN and MARK HOLODNIY

8

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11

12
    THE BOARD OF TRUSTEES OF THE          Case No.  C 05 04158 MHP
13  LELAND STANFORD JUNIOR
    UNIVERSITY,
14
                      Plaintiff,          **DECLARATION OF DR. PAUL
15                                        VOLBERDING SUPPORTING STANFORD'S
        v.                                OPENING CLAIM CONSTRUCTION BRIEF**
16
17  ROCHE MOLECULAR SYSTEMS, ET AL.,

18                    Defendants.

19
    ROCHE MOLECULAR SYSTEMS, ET AL.,
20
                      Counterclaimants,
21
        v.
22
23  THE BOARD OF TRUSTEES OF THE
    LELAND STANFORD JUNIOR
24  UNIVERSITY; THOMAS MERIGAN; AND
    MARK HOLODNIY,
25
                      Counterclaim Defendants.
26

27

28

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

DECLARATION OF DR. PAUL VOLBERDING
CASE NO. C 05 04158 MHP

Dockets.Justia.com

1    I, PAUL VOLBERDING declare:

2    **1.**    I have been retained by Cooley Godward Kronish LLP, which represents Plaintiff

3    The Board of Trustees of the Leland Stanford Junior University ("Stanford") in connection with

4    its litigation against Roche Molecular Systems, et al. in the United States District Court for the

5    Northern District of California.  In this declaration, I explain how a person of ordinary skill in the

6    art at the time of the inventions would understand certain terms in U.S. Patent No. 5,968,730

7    ("'730 patent"), U.S. Patent No. 6,503,705 ("'705 patent"), and U.S. Patent No. 7,129,041 ("'041

8    patent").

9    **Qualifications**

10    **2.**    Attached to this declaration as Exhibit A is a copy of my curriculum vitae.  As

11    shown in my curriculum vitae, I am a Professor and Vice-Chair of the University of California

12    San Francisco ("UCSF") Department of Medicine and Chief of Medical Service at the San

13    Francisco VA Medical Center.  I am also Co-Director of the UCSF-Gladstone Institute for

14    Virology and Immunology Center for AIDS Research.  I received my undergraduate and medical

15    degrees at the University of Chicago and the University of Minnesota, respectively.  I completed

16    an Internal Medicine residency at the University of Utah and a research fellowship in hematology

17    and oncology at UCSF, where I studied for two years in the virology laboratory of Dr. Jay Levy,

18    later a co-discoverer of HIV.  My early professional activities centered at San Francisco General

19    Hospital ("SFGH") where I established a program of AIDS patient care, research, and

20    professional education, which was the first of its kind in the world.   More recently, my

21    professional activities have centered at the San Francisco Veterans Administration Medical

22    Center.  I have served thousands of HIV patients since 1981.  My research career began with

23    investigations of HIV-related malignancies but shifted to clinical trials of antiretroviral drugs.  I

24    have been involved in trials establishing standards of care for the use of zidovudine in

25    asymptomatic HIV infection.  I have been continuously funded by the National Institutes of

26    Health in HIV and AIDS research  since 1983 and was one of the founding members of the AIDS

27    Clinical Trials Group.  I have written over 200 research and review articles.  I am also the Editor

28    of several leading HIV and AIDS textbooks.  I am the co-editor in chief of the Journal of

Acquired Immune Deficiency Syndrome and the founder and Chair of the Board of the International AIDS Society-USA. I have received a number of professional awards, including the Humanitarian Award, American Cancer Association (1996) and the American Liver Foundation Achievement Award (2004). I was elected to the Institute of Medicine of the National Academy of Sciences in 2000. In the early 1990s, I was a clinical researcher studying HIV and treating HIV-infected patients at SFGH.

### Background

**3.**    In forming my opinions, I have reviewed the patents and the prosecution histories of the patents. I have also reviewed various publications that illustrate the meanings of certain claim terms. Further, I have reviewed the Joint Claim Construction and Prehearing Statement Under Patent Local Rule 4-3 filed on July 6, 2007, and the intrinsic and extrinsic evidence cited therein. A full list of the materials I have reviewed in arriving at the opinions offered in this declaration is provided in Exhibit B.

**4.**    I am providing an opinion in this declaration on the following terms: "therapeutically effective," "therapeutically ineffective," "an antiretroviral agent," "collecting statistically significant data useful for determining whether a decline in HIV RNA copy numbers exists," "statistically significant data," "useful for determining whether a decline in HIV RNA copy numbers exists," and "statistically significant decline." To the extent Roche's experts offer testimony on any other terms, I may provide opinions rebutting such testimony.

**5.**    I understand that the patent claims are to be viewed from the perspective of one of ordinary skill in the art at the time of the invention. I understand that each of the patents claims priority to an application filed on May 14, 1992. I have reached my opinions from the perspective of a person of ordinary skill in the art at that time ("person of ordinary skill") based on my review of the patents and the prosecution histories, as well as the extrinsic evidence cited by Stanford and Roche.

**6.**    On reviewing the patents-in-suit, I conclude that the field of art to which the patent claims pertain is the field of clinical HIV research, including work involving the molecular methods that are applied in that clinical HIV research. Considering the practitioners in this field

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

2.    DECLARATION OF DR. PAUL VOLBERDING
CASE NO. C 05 04158 MHP

1  in the early-1990 timeframe, it is my opinion that a person of ordinary skill was a Medical Doctor

2  working on clinical HIV research involving antiretroviral agents or a Ph.D. researcher working on

3  molecular methods relating to clinical HIV research involving antiretroviral agents.

4  **"therapeutically effective" and "therapeutically ineffective"**

5      **7.**    It is my opinion that the plain meanings of the terms "therapeutically effective"

6  and "therapeutically ineffective" to a lay juror are consistent with the way those terms were

7  understood by persons of ordinary skill.  A person of ordinary skill would understand the above

8  claim terms to refer generally to providing or failing to provide therapeutic benefits.  My opinion

9  is based on my experience and understanding of these terms.  My opinion is also based on my

10  review of the use of these terms in the patents and the examples given in the patents.  (*See* '730

11  patent at abstract, 1:18-25, 1:58-2:11, 2:14-52, 2:64-3:6, 7:50-8:14, 12:57-13:8.)  Further, I have

12  seen nothing in the prosecution histories that detracts from my opinion.

13      **8.**    I understand that Roche proposes that the terms "therapeutically effective" and

14  "therapeutically ineffective" be construed as "elicits the medical effect intended by the treating

15  physician such that the course of treatment is not modified" and "fails to elicit the medical effect

16  intended by the treating physician as a result of drug resistance such that the course of treatment

17  is not modified," respectively.  I disagree that a person of ordinary skill reading the patents and

18  the prosecution histories would interpret the terms as narrowly as Roche proposes.

19      **9.**    I have reviewed the portions of the patents and the file histories that Roche claims

20  support its definition, and it is my opinion that the definitions of the terms "therapeutically

21  effective" and "therapeutically ineffective" do not depend on the "medical effect intended by the

22  treating physician."   Because "medical effect intended by the treating physician" is not

23  terminology used by persons of ordinary skill, it is unclear to me what Roche's phrase means.  If

24  "intent" is considered from an objective perspective, the "intended effect" in the context of the

25  patents is simply to provide therapeutic benefits to an HIV-infected patient and is consistent with

26  Stanford's definition.  I disagree, however, that a person of ordinary skill would restrict the

27  meaning of the effectiveness terms to idiosyncratic views of individual physicians.  Persons of

28  ordinary skill have a general understanding of effectiveness of a therapy as working against HIV,

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

3.

**DECLARATION OF DR. PAUL VOLBERDING
CASE NO. C 05 04158 MHP**

1    and it would make no sense for that general understanding to be restricted by any given

2    physician's intentions or expectations.  In my experience, a treatment is not considered effective

3    only if it exactly matches the intentions or hopes the treating physician had for the treatment.  For

4    example, a treatment that exceeds the benefits anticipated by the treating physician is not

5    "therapeutically ineffective" simply because it did not exactly match the physician's intent.

6    Similarly, a treatment might be deemed effective even if it did not fully meet the hopes of the

7    treating physician.  Furthermore, I have seen nothing in the patents or prosecution histories that

8    suggests to me that the assessment of therapeutic effectiveness varies depending on the

9    expectations of the treating physician.

10        10.    It is further my opinion that a person of ordinary skill would not have read the

11   claim term "therapeutically effective" as preventing modifications to the therapeutic regimen.  In

12   my experience, a treatment may properly be modified for a number of reasons, even if testing

13   suggests that the treatment is effective.  For example, the side effects associated with an otherwise

14   effective antiretroviral agent may be unusually severe for an individual patient or exceed that

15   patient's tolerance, in which case a modification of antiretroviral therapy may be warranted.  A

16   patient may also be unwilling or unable to adhere to particular requirements for certain otherwise

17   effective agents.  Further, a change in other medications taken by the patient, such as for an

18   opportunistic infection, may be incompatible with a particular, otherwise effective antiretroviral

19   agent.  In addition, the availability and financial cost of certain otherwise effective antiretroviral

20   agents may warrant a modification in treatment in certain circumstances.  I see nothing in the

21   patents or prosecution histories that would bar such modifications of treatment.

22        11.    Likewise, it is my opinion that a person of ordinary skill would not have read the

23   claim term "therapeutically ineffective" as requiring treatment to be modified every time testing

24   suggests that therapy might be ineffective.  As the examples in the patent suggest, modifying

25   therapy is one prominent consideration when testing suggests the antiretroviral agent is

26   ineffective in a particular patient.  (*E.g.*, '730 patent at 2:41-52.)  But a person of ordinary skill

27   would not have read the patents as requiring therapy to be modified every time testing suggests

28   the antiretroviral agent is ineffective.  For example, in assessing whether therapy is ineffective, a

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

4.

DECLARATION OF DR. PAUL VOLBERDING
CASE NO. C 05 04158 MHP

1    person of ordinary skill understood that a patient's non-compliance with the treatment regimen

2    could lead to testing suggesting the therapy was ineffective.    Also, a patient may have

3    misunderstood the treatment regimen.  In such situations, a change in treatment is not necessarily

4    required.  Instead, the treatment regimen may be further explained or the patient encouraged to

5    comply with the regimen.

6          **12.**    It is also my opinion that a person of ordinary skill would not consider the term

7    "therapeutically ineffective" to include only situations in which the patient has developed

8    resistance to a particular drug.  Instead, a person of ordinary skill understood that testing may

9    suggest that therapy is ineffective for a variety of reasons unrelated to drug resistance.  As

10   mentioned above, a patient's non-compliance with, or misunderstanding of, a therapeutic regimen

11   may lead to testing suggesting ineffectiveness that has nothing to do with drug resistance.

12   Another example is that certain antiretroviral agents may not be absorbed properly in particular

13   patients.  Indeed, a person of ordinary skill understood monitoring the effectiveness of therapy as

14   a way to suggest changes in treatment *before* drug resistance occurs.

15                                        **"an antiretroviral agent"**

16         **13.**    The term "antiretroviral agent" is a common term in this field of art that has been

17   used regularly since before 1992.  The term refers to a substance that has or is capable of having

18   an effect against a retrovirus.  My review of the patent and file history leads me to conclude that

19   the patents used the term consistently with this common definition.  For example, the patent

20   defines the term inclusively, stating that "[a]ntiretroviral agent, as used herein, includes any

21   known antiretroviral agent, including, but not limited to, dideoxynucleosides."  ('730 patent at

22   8:39-51.)  The use of related terms in the patents similarly imply broad definitions.  ('730 patent

23   at 2:15-26, 2:41-52, 7:50-8:14.)   The discussion of "antiretroviral therapy" in the prosecution

24   history of a related application also supports my opinion.  (STAN 6372-73.)  Finally, dictionary

25   definitions from the relevant time period and today confirm my opinion.  (STAN 31811; STAN

26   31814; STAN 34159-62.)

27         **14.**    I understand that Roche proposes that the term "an antiretroviral agent" be

28   construed as "antiretroviral agents available to doctors for the treatment of AIDS/HIV infected

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

5.

DECLARATION OF DR. PAUL VOLBERDING
CASE NO. C 05 04158 MHP

1    patients in 1992." I disagree that a person of ordinary skill would understand the term as Roche

2    proposes, because the meaning of that term has never depended on whether the substance was

3    available in 1992 or not.

4    **15.**    Furthermore, it is clear from reading the patents and the claims that the invention

5    as claimed is intended to be used to determine the effectiveness of therapies, even as different

6    therapies become available over time. In the early 1990s, it was a blunt reality known to persons

7    of ordinary skill that new antiretroviral therapies were necessary, given the virus's known ability

8    to mutate and develop resistance to once-effective therapies. Against that backdrop, investigators

9    had been working at fever pitch to identify and test any possible targets for antiretroviral therapy.

10   These efforts and attitudes are documented in numerous publications. (*See generally, e.g.*, M.

11   Hirsh & J. Kaplan, *Treatment of Human Immunodeficiency Virus Infections*, 31 Antimicrobial

12   Agents & Chemotherapy 839 (1987); H. Mitsuya et al., *Molecular Targets for Aids Therapy*, 249

13   Science 1533 (1990); R. Yarchoan et al., *Anti-Retroviral Therapy of Human Immunodeficiency

14   Virus Infection: Current Strategies and Challenges for the Future*, 78 Blood 859 (1991); *see also*

15   European Patent Publication No. 0 402 646 A1 (filed May 17, 1990, published Dec. 19, 1990)

16   (Abbott Laboratories); European Patent Publication No. 0 432 695 A2 (filed December 10, 1990,

17   published June 19, 1991) (F. Hoffman-La Roche AG).)

18   **16.**    Based on my experience, and as exemplified by the foregoing publications, I

19   disagree with Roche's assertion that "the only drugs in this category that were available before

20   1995 were the nucleosides." To the extent testimony about what antiretroviral agents were

21   considered by persons of ordinary skill in 1992 is relevant to claim construction, I disagree with

22   the narrow characterization offered by Roche. A person of ordinary skill would understand that

23   the meanings of "antiretroviral agent" or "antiretroviral drug" are not limited to compounds that

24   have already received FDA approval. Instead, those terms include compounds at a variety of

25   stages of development, from initial identification as potential targets through clinical trials to

26   FDA approval. Further, antiretroviral agents are not limited to drugs effective in reducing or

27   stopping the genome "replication" step. Instead, antiretroviral agents include any compound that

28   has an effect against a retrovirus, whether that effect applies to the replication step or another step

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

6.

DECLARATION OF DR. PAUL VOLBERDING
CASE NO. C 05 04158 MHP

1    in the propagation of the retrovirus.  (See sources cited in preceding paragraph.)

2    **"[C]ollecting statistically significant data useful for determining whether a decline in HIV RNA copy numbers exists," "statistically significant data," "useful for determining whether a decline in HIV RNA copy numbers exists," and "statistically significant decline"**

3

4    17.    It is my understanding that Roche has stated that "Dr. Bartlett may also testify that

5    he is not aware of statistical analysis being used to measure effectiveness of therapy for a

6    particular patient."  I agree that a person of ordinary skill would not have read the claims as

7    requiring statistical analysis to be performed on data gathered solely from a single patient.

8    Rather, a person of ordinary skill would understand that statistical analyses published in studies

9    and incorporated into guidelines may be consulted in assessing whether observed results in a

10   particular patient are meaningful.  Applying this understanding of persons of ordinary skill to

11   these patents, a person "collecting statistically significant data" can gather data from the patient

12   and other sources, such as published studies and guidelines, in assessing whether an observed

13   decline is statistically meaningful.  Likewise, when considering whether an observed decline is

14   "statistically significant" for purposes of the patent, a person may consult other data.

### Compensation

16   18.    I am being compensated as an expert witness in this case at the rate of $500 per

17   hour.  This is my standard rate and is not contingent in any way upon the outcome of cases or any

18   issues in them.

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

7.

DECLARATION OF DR. PAUL VOLBERDING
CASE NO. C 05 04158 MHP

1    I declare under penalty of perjury under the laws of the United States of America that the

2    foregoing is true and correct, and that this declaration was executed in _San Francisco_,

3    California on _9 August_, 2007.

4                                                    _PAUL VOLBERDING_

5

756949/PA

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

8.

DECLARATION OF DR. PAUL VOLBERDING
CASE NO. C 05 04158 MHP