# Exhibit 27

Dockets.Justia.com


Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

THE BOARD OF TRUSTEES OF THE      :
LELAND STANFORD JUNIOR            :
UNIVERSITY                        :
    Plaintiff                     :
v.                                : Case No.
ROCHE MOLECULAR SYSTEMS, et al:  C 05 04158 MHP
    Defendants                    :

\* \* \* \* \* \* \* \* \* \*

ROCHE MOLECULAR SYSTEMS, et al:
    Counterclaimants              :
v.                                :
THE BOARD OF TRUSTEES OF THE      :
LELAND STANFORD JUNIOR            :
UNIVERSITY; THOMAS MERIGAN;       :
AND MARK HOLODNIY                 :
    Counterclaim Defendants       :

-----------

Deposition of JOHN G. BARTLETT, M.D.

Baltimore, Maryland

Wednesday, September 5, 2007

3:19 p.m.

Job No.: 399424

Pages: 1 - 59

Page 6

1  A  Okay.
2  Q  Also, if any of my questions are not clear,
3  please let me know and I'll try and rephrase, or if
4  the question is lost, I have access here and I will
5  restate it pretty quickly as well if that's needed.
6  A  Fine.
7  Q  Also if you need to take a break at any
8  time, just let me know and we'll get that done as
9  well. I may need breaks myself on a fairly regular
10 basis.
11     MR. CANNON: Just let us know if you need a
12 break.
13     THE WITNESS: Yes, I will.
14 Q  Any questions?
15 A  No.
16 Q  Where are you currently employed?
17 A  Johns Hopkins University.
18 Q  And what is your position?
19 A  I'm Professor of Medicine in the Department
20 of Medicine in the Division of Infectious Disease.
21 Q  How long have you been at Johns Hopkins?
22 A  1980 to the present.
23 Q  Where were you before that?
24 A  Tufts University School of Medicine.
25     MR. DAMSTEDT: I'd like to mark as the next

Page 7

1  in order the Declaration that was filed. It's titled
2  the Declaration of John G. Bartlett, M.D. in support
3  of Roche's Responsive Claim Construction Brief.
4      (Exhibit No. 700 was marked for identification
5  and was attached to the transcript.)
6     MR. CANNON: I note for the record that this
7  Exhibit does not contain the attachments that were
8  filed along with it.
9  A  (Reviewing.)
10 BY MR. DAMSTEDT:
11 Q  Have you had a chance to review the
12 document?
13 A  Yes, I have.
14 Q  Is it the Declaration that was filed on your
15 behalf?
16 A  Yes, it is.
17 Q  If you could turn to Paragraphs 7 to 11, do
18 those paragraphs recite your qualifications?
19 A  (Reviewing.)
20     Yes, I think they do. If I was going to
21 make any additions to what is here, it would be that I
22 founded the AIDS service at Johns Hopkins in 1983, and
23 am the Director of the AIDS Service at Johns Hopkins,
24 and I am not sure that that information is here.
25 Q  Great. Appreciate it. In Paragraph 11 it

Page 8

1  says -- I'm going to just read a sentence here. It's
2  the last sentence, Paragraph 11. It says, I have
3  received a number of honors and awards in connection
4  with my medical career, as well as my research and
5  treatment of HIV patients, including the 1992 Medical
6  Writers Association Award for Best Medical Book (Guide
7  to Living with HIV Infection, Johns Hopkins University
8  Press), the 1993 HERO Award for AIDS Patient Care for
9  1983 to 1993, and the 2005 Alexander Fleming Award for
10 Lifetime Achievement by the Infectious Diseases
11 Society of America.
12     Did I read that correctly?
13 A  Yes.
14 Q  Do you have any other awards?
15 A  Yeah. I have the Max Finland Award for
16 Lifetime Achievement from the Infectious -- the
17 National Foundation for Infectious Disease. I think
18 that's it.
19 Q  Great. So this is not a comprehensive list
20 of the awards you have. It's just a sampling --
21 A  No --
22 Q  -- right?
23 A  -- but it's hard to know when to draw the
24 line.
25 Q  Great. Have you had your deposition taken

Page 9

1  before?
2  A  Yes, I have.
3  Q  How many times?
4  A  In the last 15 years, perhaps twice.
5  Q  Okay. What types of cases were those?
6  A  Clostridium difficile-associated colitis,
7  and I think both cases involved that complication.
8  Q  Were you testifying in those cases as an
9  expert or a fact witness?
10 A  An expert.
11 Q  Have you ever been involved in a patent
12 case?
13 A  No.
14 Q  Is there any reason today that you cannot
15 give true and accurate, complete and truthful
16 testimony?
17 A  No.
18 Q  Are you taking any medications that would
19 impair your ability to give complete and truthful
20 testimony?
21 A  I'm taking medications; none that would
22 impair me. I'm on things like Lipitor.
23 Q  I understand you've been engaged by Roche to
24 serve as an expert; is that correct?
25 A  Yes.

Page 22

1  Q  Do you have an opinion as to what level of
2  skill is ordinary in that field?
3  A  Well, it's not really officially defined by
4  anyone, and it's not a field in which I would claim
5  expertise, and perhaps that means that I'm not the
6  right person to make the definition. I can -- I can
7  try if you want me to.
8  Q  Sorry, I have --
9  A  My -- I mean you have to be able to do it.
10 You have to have experience with it.
11 Q  So in your Declaration, in Paragraph 30 you
12 state, with respect to the development and use of PCR
13 techniques, I agree with Roche's statement that a
14 person of ordinary skill in the art would have a
15 medical or graduate degree in biochemistry or a
16 related field and at least two years of relevant
17 laboratory bench experience conducting PCR assays.
18    Did I read that correctly?
19 A  I was just going to say the same thing,
20 yeah.
21 Q  What is the basis for that opinion?
22 A  Well, it -- it makes sense. It's a highly
23 technical field, and it -- it would seem that if
24 you're going to try to define it, that would be
25 reasonable.

Page 23

1  Q  Have you ever conducted laboratory bench
2  experiments using PCR?
3  A  No.
4  Q  Have you ever supervised anyone --
5  A  No.
6  Q  -- conduct -- sorry. Let me finish my
7  question.
8  A  I'm sorry.
9  Q  Have you ever supervised anyone conducting
10 laboratory bench experiments using PCR?
11 A  No.
12 Q  Going back just a second to the patient
13 care --
14 A  Yes.
15 Q  -- field of art. Is the definition you gave
16 me the definition that would apply today, or the
17 definition that would apply in 1992?
18 A  Today it's official.
19 Q  Do you have a definition of the level of
20 skill in the art for a person of ordinary skill in
21 1992?
22 A  There were definitions at that time, but
23 none that were agreed on. That would be hard for me
24 to do it.
25 Q  So sitting here today, you do not have an

Page 24

1  opinion as to the level of ordinary skill of a person
2  in the field of art of patient care in 1992; is that
3  correct?
4     MR. CANNON: Objection. Lacks foundation.
5  Misstates testimony.
6  A  Well, you changed the phraseology a little
7  bit.
8  Q  Okay.
9  A  You said -- I thought the first question was
10 to define it, and the second was do I have an opinion
11 about it. And I can have an opinion, but what I gave
12 you the first time was, was an officially-reviewed
13 consensus statement, and we don't have that for 1992.
14 Q  Okay. Well, what is your opinion?
15 A  For 1992 it would probably be a physician
16 who had experience in primary care infectious disease
17 or infectious disease as a background and experience
18 with HIV-infected patients, but that's not official.
19 Q  And is that description or opinion as to the
20 level of skill of a person of ordinary skill in the
21 art stated anywhere in your Declaration?
22 A  No.
23 Q  Continuing on with your Declaration,
24 Paragraph 39.
25 A  Yes.

Page 25

1  Q  Okay. The first sentence reads,
2  antiretroviral agents are drugs that are effective in
3  reducing or stopping replication of retroviruses.
4     Did I read that correctly?
5  A  Yes.
6  Q  Is that your understanding as to what the
7  words antiretroviral agent meant to a person of
8  ordinary skill in 1992?
9     MR. CANNON: Objection. Lacks foundation.
10 A  Yes.
11 Q  And you used that term in 1992, correct?
12 A  I don't know.
13 Q  Was that a term with which you were familiar
14 in 1992?
15 A  Yes.
16 Q  Persons of ordinary skill in the art still
17 use antiretroviral agent, that term in the same way
18 today; is that correct?
19    MR. CANNON: Objection. Lacks foundation.
20 A  I think the concept is the same. The field
21 is so much different.
22 Q  So is it your opinion that the words
23 antiretroviral agent mean the same thing today that
24 they did in 1992, but that there are new
25 antiretroviral agents and new ways of using

Page 26

1  antiretroviral agents today?
2       MR. CANNON: Objection. Misstates
3  testimony. Object to the form of the question.
4     A   I think the fundamentals are the same. The
5  nuances are probably different.
6     Q   In your view, do -- in your opinion, excuse
7  me, do the patents and prosecution history use the
8  term antiretroviral agent consistent with the meaning
9  of antiretroviral agent that we have just been talking
10 about?
11      MR. CANNON: Object to the form of the
12 question.
13    A   I'm not sure that I can answer questions
14 about the patent part of this.
15    Q   I'm sorry, I missed the last part.
16    A   I'm --
17    Q   You are not sure --
18    A   I can answer questions about the patent part
19 of this. I don't know enough about patents.
20    Q   Have you read through the patents?
21    A   Yes, I did.
22    Q   Did you read through portions of the
23 prosecution history?
24    A   Yes, I did.
25    Q   Was there anything in the patents or the

Page 27

1  prosecution history as you were reading through it
2  that used the term antiretroviral agent in a way that
3  was inconsistent with the definition you gave just a
4  moment ago?
5     A   I don't remember.
6     Q   Turning back to that sentence in Paragraph
7  39 --
8     A   Yes.
9     Q   -- the first sentence, you say
10 antiretroviral agents are drugs. What do you mean by
11 the word drugs there?
12    A   Well, I guess drugs are synonymous with
13 medications.
14    Q   Are you restricting antiretroviral agents to
15 only FDA-approved medications in that sentence?
16    A   No. No.
17    Q   Would it be fair to say that antiretroviral
18 agents are substances that are effective in reducing
19 or stopping replication of retroviruses?
20      MR. CANNON: Object to the form of the
21 question.
22    A   I think there needs to be a distinction
23 between the word substance and drugs.
24    Q   Okay. What is that distinction?
25    A   Well, drugs are medications that can be

Page 28

1  given to patients. A substance could be acid.
2     Q   So by drug or medication, you're referring
3  to something that could be given to a person?
4     A   I think so, yes.
5     Q   In Paragraph 39 you also use the phrase
6  reducing or stopping replication of retroviruses?
7     A   Yes.
8     Q   Is this statement limited to any specific
9  step in the replication cycle or does it include all
10 the steps, such as fusion, reverse transcription,
11 integration, et cetera?
12    A   It can apply to any step in the process.
13    Q   Persons of ordinary skill in the art in 1992
14 knew of the different steps in the replication cycle
15 of HIV; is that correct?
16    A   I think they knew most of them, yes.
17    Q   Okay. Which steps were not known by persons
18 of ordinary skill in the art in 1992?
19    A   I don't know.
20    Q   Persons of ordinary skill in the art in 1992
21 also understood that stopping or inhibiting any of the
22 steps in the replication cycle could reduce or stop
23 replication of HIV; is that correct?
24    A   Yes.
25      MR. DAMSTEDT: Handing to the Court Reporter

Page 29

1  an article titled Antiretroviral Therapy of Human
2  Immunodeficiency Virus Infection: Current Strategies
3  and Challenges for the Future.
4     (Exhibit No. 703 was marked for identification
5  and was attached to the transcript.)
6  BY MR. DAMSTEDT:
7     Q   Please take a moment to look through the
8  document, and I'm going to point you to Table 1
9  eventually.
10      MR. CANNON: Take your time and read what
11 you need to read, but then he'll ask you follow-up
12 questions.
13    A   (Reviewing).
14    Q   Okay. Have you had a chance to review the
15 document?
16    A   Well, I've looked at Table 1.
17    Q   Are you familiar with any of the authors of
18 this article?
19    A   Sam Broder -- well, I'm sorry. The answer
20 is that I know the names of three.
21    Q   Okay. Who are those?
22    A   I don't know them.
23    Q   Who are those three?
24    A   Robert Yarchoan, Sam Broder, and Mitsuya.
25    Q   Now, turning to Table 1.

Page 34

1    A    I'll say what I said before. Some would,
2    and many would not. Clinical research is different.
3    Q    Was it understood by people of ordinary
4    skill in the art in 1992 that inhibiting protease
5    could reduce or stop replication of HIV?
6         MR. CANNON: Object to the form of the
7    question.
8    A    Person of ordinary skill?
9    Q    Yes.
10   A    No.
11   Q    And why not?
12   A    Because protease is in a long list here.
13   I've already said that the person that -- of ordinary
14   skill in taking care of AIDS patients does not know
15   this list -- need to know this list.
16   Q    And that's because they're involved solely
17   in patient care; is that your opinion?
18        MR. CANNON: Object to the form of the
19   question.
20   A    I didn't say they were involved solely in
21   patient care.
22   Q    Then why is it that a person of ordinary
23   skill would not need to know the list of these steps
24   of the HIV replication cycle?
25   A    Because the person taking care of patients

Page 35

1    does not need to know the basic science of every
2    disease they take care of.
3    Q    Let's go to Paragraph 5 -- or excuse me,
4    Paragraph 6 of your Declaration.
5    A    (Complying), yes.
6    Q    All right. Paragraph 6, the third sentence,
7    I believe it says --
8    A    Wait. I'm sorry, Paragraph 5 or 6?
9    Q    6. Excuse me.
10        MR. CANNON: 6.
11   A    (Complying), okay.
12   Q    The third sentence says, in May 1992 there
13   were only a limited number of antiretroviral agents
14   known to AIDS doctors and researchers, and an even
15   smaller number that were both known and available.
16   Did I read that correctly?
17   A    Yes.
18   Q    What is the difference between an
19   antiretroviral agent being known and it being
20   available?
21   A    Known means that it has been in some part of
22   the development of a drug, and available means that
23   it's in drugstores.
24   Q    Could you describe more precisely what you
25   mean by it having been in some part of the development

Page 36

1    of the drug?
2    A    There is a process for developing drugs that
3    begins with the chemistry and then some -- I don't
4    know if you want me to go through the whole process.
5    It begins with the discovery of a chemical that
6    usually, or often works in a test tube, and then is
7    tested for safety in animals, and then is tested for
8    pharmacology in people, and then is given to patients
9    with a disease process, and then is put through a
10   large therapeutic trial starting with Phase 1, Phase
11   2, and Phase 3, and then presented to an Advisory
12   Board to the FDA, and then approved or disapproved by
13   the FDA, and then becomes part of the pharmacopeia.
14   Q    Great. So those are all parts of the
15   development process?
16   A    Yes.
17   Q    So in Paragraph 41 of your Declaration you
18   say, protease inhibitors and HAART therapy were
19   neither known or available for therapy until well
20   after May 1992.
21        Did I read that correctly?
22   A    Yes.
23   Q    What is the basis for your opinion that
24   protease inhibitors were neither known or available
25   for therapy until well after May 1992?

Page 37

1    A    Well, the phrase known -- I guess you'd have
2    to say that protease, or the potential to inhibit
3    protease was at least on a long list of drugs before
4    that, but my statement of neither known is, really
5    means what, what did we know about or hear in 1992 and
6    when did those drugs become available.
7         My view is that protease inhibitors became
8    known to my field about 1994 or 1995, and they became
9    available in December of 1995 and early 1996.
10   Q    Are you aware of any publicly available
11   documents that describe protease inhibitors before May
12   of 1992?
13   A    Oh, there were publications that go back to
14   the 1980s.
15   Q    Okay. And what are those publications?
16   A    I don't have them, but I can get them. You
17   can get them in PubMed. Just type in protease
18   inhibitor and it will give you a thousand citations
19   and go back to the first. I think it's 1980.
20   Q    Okay. And those would apply to HIV or
21   those --
22   A    Protease inhibitors in other -- no, it's
23   before HIV.
24   Q    So were there, to your knowledge,
25   publications relating to protease inhibitors of HIV

Page 38

1  protease prior to 1992?
2     A   Yes.
3     Q   What is HAART therapy?
4     A   The letters mean highly active
5  antiretroviral therapy.
6     Q   Other than defining or spelling out what the
7  acronym means, can you describe HAART therapy more
8  generally?
9     A   It refers to therapy using drugs that are
10 effective against HIV infection.
11    Q   Okay. Are dietyoxy nucleicides (phonetic)
12 used in HAART therapy?
13    A   Yes.
14        MR. DAMSTEDT: Is this a good time for a
15 break?
16        MR. CANNON: Sure.
17        THE WITNESS: Yes.
18        (Break taken.)
19 BY MR. DAMSTEDT:
20    Q   I'd like to put before you the '730 patent
21 which was marked previously in the earlier deposition
22 as, I believe Exhibit 695.
23        Have you seen this document before?
24    A   I've seen something like it.
25    Q   What do you mean by that?

Page 39

1     A   Well, I've seen these charts and graphs. I
2  don't know if it's this exact document.
3     Q   Can you confirm that you have read the U.S.
4  Patent No. 5,968,730 before your deposition?
5     A   Yes.
6     Q   And is this a copy of what I'll call the
7  '730 patent?
8         MR. CANNON: Objection. The document is
9  what it is.
10    A   Yes.
11    Q   You reviewed this document before your
12 deposition, correct?
13    A   Yes.
14    Q   In reviewing this document, did you come to
15 an opinion as to what the field of art that is
16 described in this patent is?
17        MR. CANNON: Objection. Asked and answered.
18    A   You're going to have to break it down. The
19 art of what? The art of? You're using that term art
20 again, and I am upset about that because it's not a
21 phrase I use.
22    Q   Did you come to an opinion about the field
23 of art that is described in the patent?
24        MR. CANNON: Objection. Lacks foundation.
25    A   The art of PCR? Of patient care? Of --

Page 40

1     Q   Well, that's the question for you. Did you
2  come to an opinion as to what field of art was
3  described in the patent?
4     A   No.
5     Q   So your opinions in your Declaration were
6  not based on any understanding or opinion as to what
7  the field of art in the patent was; is that correct?
8         MR. CANNON: Objection to -- object to the
9  form of the question. Lacks foundation.
10    A   I'm not sure exactly how to answer your,
11 your question. You're asking about art, and that's
12 where I'm having trouble. What do you mean by art?
13    Q   The area of science, and that's what I would
14 mean. What do you mean by art? Do you have a
15 definition that you would use for field of art?
16        MR. CANNON: Objection. Lacks foundation.
17    A   No. I -- not, not for art. It might be a
18 field of -- for -- of science.
19    Q   So in your Declaration, you offer a number
20 of opinions, correct?
21    A   Uh-huh.
22    Q   But you did not, or at least I think you
23 said that you did not come to an opinion as to what
24 field of art was described in the patent; is that
25 correct?

Page 41

1         MR. CANNON: Objection. Misstates prior
2  testimony. Lacks foundation. Asked and answered.
3     A   I'm -- I think I have defined art as best I
4  can for laboratory performance of PCR and for patient
5  care.
6     Q   I'm just going to go on.
7         It is your opinion that the treating
8  physician is the person who evaluates the
9  effectiveness of the antiretroviral agent, correct?
10        MR. CANNON: Object to the form of the
11 question.
12        Go ahead and answer if you can.
13    A   Yes. To a large extent, yes.
14    Q   Okay. What do you mean by to a large
15 extent?
16    A   Well, I think the patient probably has to
17 have an opinion about whether the drug they take is
18 good for them.
19    Q   Anybody else?
20    A   Well, I guess anybody can have an opinion,
21 but I think it's the physician that is the one that is
22 ultimately responsible for this judgment.
23    Q   Okay. What factors were considered in
24 evaluating effectiveness of antiretroviral agents in
25 1992?

Page 42

1  A  We wanted to know if the Cd4 count
2  increased. We wanted to know if there was a new AIDS-
3  defining event or death. We wanted to know if the
4  patient tolerated the medicine. And we wanted to know
5  if the regimen was demanding to the point that
6  patients struggled with adherence.
7  Q  Are there any other factors that were
8  considered in evaluating effectiveness of
9  antiretroviral agents in 1992?
10  A  Well, I'm trying to think of when they
11  started doing the viral load testing, and I think that
12  came a bit later.
13  Q  So today you would also include viral load
14  testing --
15  A  Yes, I would.
16  Q  -- in that?
17     All right. Were there any other factors
18  that were considered in 1992?
19  A  I think I've covered the major ones.
20  Q  Are there any others that you're aware of at
21  this point?
22  A  I can't think of any right now.
23  Q  Are --
24  A  Oh, cost would be another.
25  Q  Cost?

Page 43

1  A  Cost would be an issue.
2  Q  Are these factors objective?
3     MR. CANNON: Object to the form of the
4  question.
5  A  Most of them are objective.
6  Q  Which ones are not objective?
7  A  Tolerance.
8  Q  And --
9  A  Pill burden.
10  Q  I'm sorry?
11  A  Pill burden.
12  Q  And how are those not objective?
13  A  It's hard for us to know when a patient says
14  that a drug makes them tired, makes them sleepy, makes
15  them nauseated. We don't have metrics. Gives them a
16  headache.
17  Q  So those factors are not objective, but they
18  don't depend on the physician's subjective state of
19  mind, do they?
20  A  They require the patient's report to the
21  physician.
22  Q  In evaluating effectiveness, is the
23  physician's subjective intent as to whether the
24  treatment was going to be effective or not an
25  important factor?

Page 44

1     MR. CANNON: Object to the form of the
2  question.
3  A  I missed the first part of it. Physician's
4  what?
5  Q  Subjective intent.
6     Let me restate the question.
7  A  Yeah.
8  Q  In evaluating effectiveness of
9  antiretroviral therapy, is the physician's subjective
10  intent as to whether or not the therapy was going to
11  be effective important?
12     MR. CANNON: Objection. Lacks foundation.
13  A  I think you're asking me if the physician is
14  going to prescribe something they think works, and I
15  would say that was important.
16  Q  In evaluating whether the antiretroviral
17  agent was effective, does it matter whether the
18  physician thought it was going to be very effective,
19  thought it was only going to be kind of effective, or
20  is the decision based on the objective and the
21  tolerance, pill burden factors that we discussed
22  before?
23     MR. CANNON: Objection. Compound question.
24  Lacks foundation.
25  A  I think physicians always -- almost always

Page 45

1  prescribe drugs with some notion about whether they're
2  likely to work, possibly going to work, or not likely
3  to work.
4  Q  In looking backward and evaluating whether
5  or not they were effective, is the physician's
6  prediction as to whether or not they were effective
7  important, or is the fact as to whether or not it was
8  effective important?
9  A  For objective results, the results are
10  probably the most important.
11  Q  So I'm going to ask you just a couple of
12  hypotheticals, and if you don't understand them,
13  please let me know, or if you think there's something
14  missing, please let me know as well.
15     Suppose that an antiretroviral agent was
16  effective in reducing replication of HIV but was not
17  quite as effective as the treating physician initially
18  hoped and intended. In that situation would the
19  treatment be effective, or ineffective under the
20  patents?
21     MR. CANNON: Object. Incomplete
22  hypothetical. Lacks foundation.
23  A  I can't answer a question about the patent
24  statement.
25  Q  Why is that?

Page 46

1   A   Because I don't remember whether the,
2   whether the patent specifically said the treating
3   physician's impression versus an objective endpoint.
4   Q   So sitting here today you do not have an
5   opinion as to whether the patent term therapeutically
6   effective refers to the physician's subjective intent
7   or objective factors?
8       MR. CANNON:  Objection.
9   Q   Is that your opinion?
10      MR. CANNON:  Objection.  Misstates
11  testimony.
12  A   Well, you -- I thought you asked me a
13  different question.
14  Q   Okay.
15  A   I thought you asked me about a physician's
16  preconceived notions about whether a drug was going to
17  work or not work, and what I said was I do not
18  remember seeing that specifically stated in the
19  patent.  I did not see that the physician's
20  preconceived notion about the drug determined whether
21  it was therapeutically effective.  The term
22  therapeutically effective was there.
23  Q   Is it true that the physician's intent is to
24  improve the patient's clinical outcome?
25  A   Yes.

Page 47

1   Q   What are some ways in which antiretroviral
2   therapy can improve a patient's clinical outcome?
3       MR. CANNON:  Objection.  Lacks foundation.
4   A   For any disease, or for HIV?
5   Q   For HIV.
6   A   There are probably several parameters.  One
7   is the patient's subjective impression of how they
8   feel.  Second is objective observations, such as
9   weight, fever.  There are laboratory tests, such as
10  the Cd4 count, the viral load, the large number of
11  laboratory studies, that indicate drug toxicity.  All
12  of those would be factors.
13  Q   Are there any others that you can think of?
14  A   Well, cost I guess would be an additional
15  factor.  Inconvenience, pill burden, requirement to
16  take food or not take food, the co-morbidities that
17  interfere with the response, like hepatitis, the drug
18  interactions, because of the enormous number of them
19  that we encounter.  That's a list I can come up with
20  at this moment.
21  Q   So are those all factors you consider in
22  evaluating effectiveness, or are those ways in which
23  antiretroviral therapy can improve a patient's
24  clinical outcome?
25  A   I think that those are synonymous.

Page 48

1   Q   Okay.  Do you have an opinion as to what the
2   phrase medical decision meant to a person of skill in
3   1992?
4   A   The term medical decision?
5   Q   Yes.
6   A   It's -- I guess it's a term that I would use
7   and not necessarily try to define.  Did you want me to
8   define it?
9   Q   Do you have an opinion as to what it means?
10  A   I think it's when someone makes a decision
11  that has -- in a medical context.
12  Q   What does medical context mean to you?
13  A   Well, it means in -- I think in, I think
14  medical has a connotation in terms of medical care, so
15  that it could be a medical decision to send a patient
16  to a nursing home, medical decision to get a
17  laboratory test.
18  Q   For purposes of the patents-in-suit, is it
19  your opinion that treatment may not be modified if
20  viral load testing suggests that an antiretroviral
21  agent is effective?
22      MR. CANNON:  Object to the form of the
23  question.
24  A   No.
25  Q   That is not your opinion?

Page 49

1   A   That it should not be modified?
2   Q   That --
3   A   Could we put it in a positive?  It is --
4   Q   Okay, I'll restate.
5   A   Okay.  To change the therapy even though it
6   is effective in stopping the virus?
7   Q   All right -- well, let me rephrase that
8   question.
9   A   Okay.
10  Q   Is it your opinion that it is okay to change
11  the therapy even though it is effective in stopping
12  the virus?
13  A   Yes.
14  Q   Why is that?
15  A   Because -- or for a lot of reasons, many of
16  which I've talked about.  For example, if the drug
17  causes a terrible side effect, we have to stop it.
18  That would be one example.
19  Q   Are there any others?
20  A   Well, if there's drug interactions, if it's
21  a regimen that's impossible.  If it's a treatment that
22  you can't afford.  I mean there is -- there's a number
23  of reasons.
24  Q   Okay.  On the flip side of that, is it your
25  opinion that antiretroviral treatment must be modified

13 (Pages 46 to 49)

Page 50

1  if viral load testing suggests that it is ineffective?
2       MR. CANNON: Objection. Lacks foundation.
3  Object to the form of the question.
4    A  The answer is no.
5    Q  And why is that?
6    A  It's complicated, but therapy that does not
7  work works.
8    Q  Could you explain that a little more?
9    A  Yes. Patients who have virologic failure
10 and take antiretroviral drugs deteriorate when you
11 stop the drugs that have failed. The Cd4 count goes
12 down and the viral load goes up.
13   Q  Is it also the case that a patient who fails
14 to adhere to a treatment regimen could cause an
15 otherwise effective antiretroviral treatment to
16 register as ineffective according to a viral load
17 test?
18      MR. CANNON: Objection. Lacks foundation.
19   A  Hard to answer in a legal sense. Do we say
20 a drug is ineffective if someone doesn't take it,
21 that's what you're asking, and I'm not sure that that
22 would satisfy my definition of a drug failure. I
23 think every drug will fail if a patient doesn't take
24 it.
25   Q  So you could get a viral load test that

Page 51

1  suggests that the drug is failing but in fact the drug
2  is not failing because the patient is just simply not
3  taking the drug; is that correct?
4    A  Yes.
5    Q  When did you come up with the opinions that
6  are in your Declaration?
7       MR. CANNON: Object to the form of the
8  question. To the extent this is getting into
9  discovery that we agreed would not be part of the
10 mutual expert discovery, I object.
11      But please answer the question, if you can.
12   A  I'm not good at recalling dates so I would
13 say probably three or four months ago.
14   Q  Do you recall looking at a Disclosure that
15 was filed with the Court explaining what your
16 testimony might include?
17   A  Yes.
18      (Discussion off the record.)
19      (Handing Exhibit No. 699.)
20 BY MR. DAMSTEDT:
21   Q  Have you had a chance to look at the
22 document?
23   A  Yes, I have.
24   Q  Is this the Disclosure that we were talking
25 about?

Page 52

1    A  Yes.
2    Q  On Page 3 --
3    A  Yes -- oh, I'm sorry, 3.
4       I'm there now.
5    Q  Great. Up at the top it says Doctor
6  Bartlett may testify that protease inhibitors and
7  HAART therapy (highly active antiretroviral therapy)
8  were not available to those of skill in the art of
9  treating HIV patients and evaluating the effectiveness
10 of therapy until after May 1992.
11      Did I read that correctly?
12   A  Yes.
13   Q  In your Declaration, did you state that
14 protease inhibitors and HAART therapy were neither
15 known nor available to persons -- to those of skill in
16 the art of treating HIV patients until well after May
17 of 1992?
18      MR. CANNON: Objection. The Declaration is
19 what it is.
20   A  Yes.
21   Q  Is that a new opinion?
22   A  No.
23      MR. CANNON: Object to the form of the
24 question.
25   A  By new, do you mean new with this case, or

Page 53

1  new with this today, or --
2    Q  New as in after the Disclosure, Exhibit 699,
3  was filed.
4       MR. CANNON: Object to the form of the
5  question. The documents speak for themselves.
6    A  I'm not exactly sure what you're saying. I
7  agree with this statement that protease inhibitors and
8  HAART therapy were not available, neither one of them.
9    Q  Okay. My question is, is your opinion in
10 your Declaration that neither were -- neither were
11 known or available new after the Disclosure? The
12 Disclosure says available. Your Declaration says
13 known or available. Is that additional opinion new?
14      MR. CANNON: Object to the form of the
15 question.
16   A  It says known in the art of treating HIV
17 infection and the term is HAART. And my opinion now
18 is neither one of those, the phrase was not used, and
19 the effectiveness of protease inhibitors in treating
20 patients with HIV infection was not known.
21   Q  So -- my question is slightly different from
22 that. It's -- I'm sorry if I've been vague about it.
23      MR. CANNON: It's a trick question. You're
24 trying to trick him.
25      MR. DAMSTEDT: Come on, Brian.

JOHN G. BARTLETT, M.D.                September 5, 2007

Page 54

1   MR. CANNON: Trying to trick him. I mean
2 ask the question, but -- go ahead.
3   Q   So in your Declaration you say that protease
4 inhibitors and HAART therapy were neither known nor
5 available; is that correct?
6   A   Right.
7   Q   And in the Disclosure it says that they were
8 not available; is that correct?
9   A   Yes.
10  Q   Is the additional part that they were not
11 known, is that a new opinion that was made after your
12 Disclosure?
13      MR. CANNON: Object to the form of the
14 question. Lacks foundation. It's argumentative.
15  A   So we're breaking this down, and we're
16 separating HAART and protease inhibitors?
17  Q   No. It would be separating known versus
18 available.
19  A   They were not available for clinical care in
20 1992, and HAART was a term that was not used in 1992.
21      MR. DAMSTEDT: Okay. Do you mind if we take
22 a break.
23      MR. CANNON: No. Sure.
24      (Break taken.)
25      MR. DAMSTEDT: I appreciate your time. I'm

Page 55

1 done for now.
2       MR. CANNON: I don't have any questions for
3 Doctor Bartlett, but we'd appreciate the opportunity
4 to review the transcript consistent with the parties'
5 agreement with the Federal Rules. Thank you.
6       (Signature having not been waived, the
7 examination of John G. Bartlett, M.D., was concluded
8 at 5:02 p.m.)

Page 56

1           ACKNOWLEDGMENT OF DEPONENT
2       I, John G. Bartlett, M.D., do hereby acknowledge
3 that I have read and examined the foregoing testimony,
4 and the same is a true, correct and complete
5 transcription of the testimony given by me, and any
6 corrections appear on the attached Errata sheet signed
7 by me.

10  _____    _____
11       (DATE)                    (SIGNATURE)

Page 57

1   CERTIFICATE OF SHORTHAND REPORTER/NOTARY PUBLIC
2       I, Dawn M. Hart, Registered Professional
3 Reporter, the officer before whom the foregoing
4 proceedings were taken, do hereby certify that the
5 foregoing transcript is a true and correct record of
6 the proceedings; that said proceedings were taken by
7 me stenographically and thereafter reduced to
8 typewriting under my supervision; and that I am
9 neither counsel for, related to, nor employed by any
10 of the parties to this case and have no interest,
11 financial or otherwise, in its outcome.
12      IN WITNESS WHEREOF, I have hereunto set my hand
13 and affixed my notarial seal this 5th day of September
14 2007.
15 My Commission Expires:
16 January 1, 2009

19 _____
20 NOTARY PUBLIC IN AND FOR THE
21 STATE OF MARYLAND

15 (Pages 54 to 57)