# EXHIBIT A

Dockets.Justia.com



#17

Express Mail No.:  EM 061 036 176 US

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Application of: Merigan et al.

Application No.: 08/470,885    Group Art Unit:  1809

Filed:  June 6, 1995          Examiner:  A. Marschel

For: POLYMERASE CHAIN REACTION Attorney Docket No.:  7627-009
     ASSAYS FOR MONITORING
     ANTIVIRAL THERAPY AND
     MAKING THERAPEUTIC
     DECISIONS IN THE
     TREATMENT OF ACQUIRED
     IMMUNODEFICIENCY. SYNDROME

### SUBMISSION UNDER 37 C.F.R. § 1.129(a)

BOX AF
Assistant Commissioner for Patents
Washington, D.C.  20231

RECEIVED
DEC 2 3 1997
GROUP 1800

Sir:

      Pursuant to 37 C.F.R. §1.129(a), Applicants respectfully request entry of the present submission in the above-identified patent application.  In response to the Final Office Action dated March 3, 1997 in this application, a Response Under 37 C.F.R. § 1.116 was filed on August 4, 1997. This Response was entered on this record in an Advisory Action dated September 3, 1997.  A Notice of Appeal was also filed in this case on September 3, 1997.  The present submission seeks to respond to arguments contained in the Office Actions as well as the recent Advisory Action issued in this application.

      Submitted herewith, as Exhibit 1, is a Declaration of Dr. Michael J. Kozal Under 37 C.F.R. § 1.132.  Applicants also submit herewith a Petition To Extend Time for responding to the Notice of Appeal filed September 3, 1997, for two

FENY4-651052.1

STAN 000995

months up to and including January 3, 1998, accompanied by the appropriate fee.

Applicants request reconsideration of the above-identified patent application in view of the arguments and submissions contained _infra_.

### REMARKS

Claims 1-23 are pending in this application.  Claims 1-23 have been rejected under 35 U.S.C. § 103(a) as being unpatentable over either Cantin or Hart, taken in view of Ottmann and further taken in view of Murakawa, all of record. In view of the arguments and submissions contained in this paper, Applicants submit that the present rejection of the claims should be withdrawn and the pending claims should be allowed to issue.

### 1.   The Claimed Invention

The pending claims relate to methods of evaluating the effectiveness of anti-HIV therapy using various criteria/correlations for determining the therapeutic efficacy of an antiretroviral agent.  In claims 1-6, the method involves a correlation between the presence or absence of detectable HIV-encoding nucleic acid in a plasma sample of a treated patient and the effectiveness of the therapy.  In claims 7-8, the method involves a correlation between the presence or absence of detectable HIV sequences and an absolute CD4 count of less than or greater than 200 cells per cubic mm, respectively.  In claims 9-18, the method involves a correlation between an HIV RNA copy number of greater than or

– 2 –                              PENY4-651052.1

STAN 000996

less than 200 per 200 $\mu$l of plasma and the ineffectiveness or effectiveness of the therapy, respectively.  Finally, in claims 19-23, the method involves a correlation between efficacy and a ratio of HIV RNA copy number in pre-treatment and post-treatment plasma samples of greater than about 4 to 1.

In addition to these specific correlations, the claimed methods involve several other specific elements, e.g., the use of plasma as the source of the HIV sequences to be tested, and amplification of the HIV sequences using about 30 cycles of PCR.  Thus, the methods of this invention utilize specific PCR parameters, i.e., <u>about 30 cycles of PCR</u>, to identify <u>the presence of, or specific recited levels of,</u> HIV sequences in the <u>plasma</u> of HIV-infected patients and provide <u>specific correlations</u> to determine whether the antiretroviral agent administered to the patient is effective.  The present methods thus enable an early determination of the onset of drug resistance or immunological decline in an HIV-infected patient and allow alteration of a patient's therapeutic regimen to promote survival.

2.  **The Claimed Methods Are Patentable Over The Cited References Under 35 U.S.C. § 103(a)**

2a.  **The Claimed Invention Must Be Properly Analyzed In Determining Obviousness Under 35 U.S.C. § 103**

As noted above, claims 1-23 have been rejected under 35 U.S.C. § 103(a) as being unpatentable over either Cantin or Hart, taken in view of Ottmann and further taken in view of Murakawa, all of record.  In the Advisory Action dated

- 3 -

PIINY4-651032.1

STAN 000997

September 3, 1997 in this case, the Examiner continues to assert that the cited references render obvious the presently-claimed methods. However, Applicants respectfully request reconsideration of the disclosures of the cited references in view of the true nature of the claimed invention as set forth above. Thus, Applicants respectfully submit that, when the claimed methods are viewed <u>in their entireties, including all of the elements recited therein</u>, it becomes apparent that the cited references do not suggest <u>the claimed methods of therapy evaluation</u>.

In this regard, Applicants note that, in the Office Action dated May 31, 1996 wherein the present rejection was first raised, the claimed invention was characterized as being directed to "the PCR detection of HIV nucleic acid in subject samples to evaluate the effectiveness or ineffectiveness of therapy against HIV infection." (May 1996 Office Action, p. 5). However, a review of the pending claims and the discussion in Section 1 <u>supra</u> reveals that this is not an accurate description of the claimed methods and in fact, this characterization omits numerous recited elements of the claimed invention. But failure to consider all of the elements of a claimed invention in determining obviousness under § 103 has been found impermissible by the Courts. See, e.g., <u>Panduit Corp. v. Dennison Manufacturing Co.</u>, 1 USPQ2d 1593, 1604 (Fed. Cir. 1987), wherein the Court of Appeals for the Federal Circuit ("CAFC") cautioned against erroneous claim interpretations in determining obviousness:

> "The district court improperly
> dismissed the novel structural claim
> limitations that defined the disposition,

- 4 -

PBNY4-651052.1

STAN 000998

positioning, relationship, and operation of the elements in the claims.  The ignored claim limitations, however, define crucial structural elements of the invention as a whole, and clearly distinguish (and bind the inventor to the distinction) the whole claimed device from those in prior patents....  The district court pointed to nothing in the prior art that suggested any of the <u>claimed</u> constructions." (emphasis in the original).

In explaining the legal error involved in ignoring claim limitations, the Court noted:

"The court's interpretations were doubly contrary to Congress's statutory scheme.... [T]he 'subject matter' that must have been obvious to deny patentability under § 103 is <u>the entirety of the claimed invention</u>, a concept Congress nailed down with the next statutory phrase 'as a whole'." <u>Id.</u> at 1603 (emphasis added)

See also, <u>Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve</u>, 230 USPQ 416, 420 (Fed. Cir. 1986) and <u>Loctite Corp. v. Ultraseal Ltd.</u>, 228 USPQ 90 (Fed. Cir. 1985): "...[W]hen determining obviousness there is no legally recognizable or protected 'essential', 'gist', or 'heart' of the invention." 228 USPQ at 99.

As noted above, the present invention relates to specific methods of evaluating the effectiveness of anti-HIV therapy, whereby <u>plasma samples</u> are collected from HIV-infected patients being treated with an antiretroviral agent and <u>the presence or specific levels of HIV sequences</u>, e.g., HIV RNA copy number of less than or greater than 500 per 200 $\mu$l of plasma, are determined using <u>about 30 cycles</u> of PCR and those findings are then used in <u>specific recited correlations</u> to determine efficacy.  This is the claimed invention and it

- 5. -

PENY4-651052.1

STAN 000999

is this invention against which the disclosures of the cited references must be compared.

Using the correct standard of review, it is apparent that the characterization of the invention in the May 1996 Office Action omitted reference to (a) the isolation of the HIV sequences from plasma, (b) the use of about 30 cycles of PCR, (c) the determination of specific levels of HIV sequences such as HIV RNA copy numbers and (d) the use of the specific correlations recited in the claims to determine efficacy.

Similarly, in the March 3, 1997 Office Action, the Examiner dismissed Applicants' arguments that the claimed invention was distinguished from the cited references due to its specific requirement of about 30 cycles of PCR, stating that the claims' specific recitation of about 30 cycles of PCR is "reasonably interpretable as being directed to that number of PCR cycles that are functional", and thus includes the cycle numbers used in the cited references (March 1997 Office Action, p. 4).

Applicants respectfully submit that it is legally impermissible under § 103 (as discussed supra) to simply ignore the specific recited element of approximately 30 PCR cycles in the claimed invention and extrapolate that recited element to any number of cycles that are functional. Moreover, in the recent Advisory Action (at p. 3), the Examiner acknowledged that, in fact, different cycle numbers are useful for different functions; e.g., high cycle numbers such as the 40 cycles disclosed in the cited Ottmann reference are useful for maximizing detectability, whereas monitoring therapy would require some lower number.  If the Examiner's

- 6 -

STAN 001000

interpretation of the cycle number element of the claimed invention were to be accepted, the claim would encompass such a wide range of cycle numbers (e.g., for different functions) so as to essentially nullify the requirement under § 103 that the claimed invention be compared to, and distinguished from, the prior art.  The Examiner's interpretation of the "about 30 cycles" element of this invention is not legally permissible under 35 U.S.C. § 103 and should be discarded.

Furthermore, while it is true that the pending claims' recitation of "about 30" PCR cycles encompasses somewhat fewer as well as somewhat more than 30 cycles, the phrase would not be read as encompassing "more than 30 cycles as long as the PCR is functional" as suggested in the March 1997 Office Action.  Rather, as noted by the Patent Office Board of Appeals in <u>Ex parte Eastwood, Brindle, and Kolb</u>, 163 USPQ 316, 317 (POBA 1968): "The descriptive word 'about' is not indefinite....  Its meaning is not as broad and arbitrary as contended by the Examiner.  Rather, the term is clear but flexible and is deemed to be similar in meaning to terms such as 'approximately' or 'nearly'."  See also, <u>Conopco Inc. v. May Department Co.</u>, 32 USPQ2d 1225, 1227, footnote 2 (Fed. Cir. 1994), wherein the Court found the term "about" to mean "approximately".  In the present case, the claimed methods recite the use of about 30 cycles of PCR, an element that is not suggested by any of the cited references (as discussed <u>supra</u>).

In view of the foregoing, Applicants request at the outset that the claimed invention, including each and every one of its recited elements, be evaluated against the

- 7 -

STAN 001001

disclosures of the cited references. As Applicants will demonstrate _infra_, when this is done, it becomes apparent that the cited references, alone or in combination, do not render the claimed methods obvious under § 103.

### 2b. The Claimed Methods Are Not Obvious Over The Cited References

In the original § 103 rejection contained in the May 1996 Office Action, the cited Cantin reference was characterized as disclosing the use of PCR for detecting HIV RNA synthesis in cells isolatable from plasma to determine the effect of OMP treatment on HIV RNA synthesis. The cited Hart reference was characterized as disclosing PCR detection in patient samples for therapy evaluation and including therapy evaluation with AZT but only utilizing serum samples for said detection. The cited Ottmann reference was characterized as disclosing that PCR detection of HIV nucleic acid is equivalently detectable in serum as well as plasma and Murakawa was characterized as disclosing the entire HIV viral sequence. The Examiner concluded that it would have been obvious to one of ordinary skill in the art to carry out PCR from a variety of samples inclusive of plasma for amplification and detection for therapy evaluation because either Cantin or Hart taken in view of Ottmann disclose such evaluation and Murakawa discloses the existence of the entire HIV sequence thus permitting the preparation of various primers.

Applicants respectfully disagree. A review of the cited Cantin reference reveals that the reference merely

- 8 -

STAN 001002

discloses a single experiment in which HIV RNA was <u>detected</u> in HIV-infected <u>H9 human lymphoid cells</u>[1] using <u>20 cycles of PCR</u>. While the reference does state that this experiment was run to determine the effect of OMP treatment on viral RNA synthesis in the cultured cells, this disclosure does not suggest the presently-claimed methods for evaluating the efficacy of anti-HIV therapy in human patients using PCR.  Indeed, Cantin contains no suggestion of any of the specific correlations recited in the pending claims, e.g., that the presence of HIV sequences correlates with an absolute CD4 count of greater than 200 cells/cubic mm or that an HIV copy number less than about 500 per 200 $\mu$l of plasma correlates with efficacy.

The Cantin reference does not even suggest that the presence or absence of HIV sequences correlates with OMP efficacy since the data generated from its PCR experiment indicates that <u>both</u> the CPE-inhibiting OMP-A sequence and <u>the OMP-C control</u> were quite effective in reducing HIV sequences in the tested cells.  Compare lane D of Figure 2 which represents untreated HIV-infected cells, with either lane E, which represents infected cells treated with the OMP-C control or lane F, which represents treatment with OMP-A.  <u>Both</u> the OMP-C control as well as the CPE-inhibitory OMP-A sequence caused a major reduction in the HIV sequences in the infected cells, clearly teaching away from the use of PCR to

---

[1]  There is no suggestion or evidence that the H9 cells in Cantin were "isolatable from plasma" as suggested in this rejection and even if this were so, it would be irrelevant to the issue of whether Cantin suggests the claimed invention since the claimed invention relates to the use of plasma as the source of HIV sequences; it does not relate to the use of cells from plasma.

– 9 –                    PENY4-651052.1

STAN 001003

distinguish between agents that are effective and those that are ineffective in inhibiting HIV.

Applicants have reviewed the characterization of this disclosure of Cantin as contained in the Advisory Action and respectfully submit that the Examiner's arguments focus unduly on whether a detectable PCR signal is generated or not in Figure 2 of Cantin, without considering what the results of Figure 2 actually represent.  Thus, in Cantin, it is disclosed that OMP-A was effective in inhibiting HIV in the CPE assay, which tests for inhibition of syncytial giant cell formation; the control, OMP-C, demonstrated no such inhibition (see Cantin, column 3 over to column 4; particularly, column 4, lines 23-25: "As shown in Table I below, the control OMP-C produced no inhibition of CPE").  Cantin then ran its PCR experiment to determine the effect of OMP-A (with OMP-C as control) on HIV RNA synthesis in the HIV-infected cells.  As the Examiner must concede, Figure 2 of Cantin demonstrates that not only was OMP-A effective in reducing HIV sequences in the infected cells (lane F vs. lane D) but the OMP-C control was also effective in greatly reducing the HIV sequences (lane E vs. lane D).  Thus, the PCR experiment of Cantin appears to have a failed control and does not demonstrate a correlation between OMP-A treatment and virus inhibition (as did the CPE assay) because the control produces essentially the same result as the CPE-inhibitory OMP agent.  The PCR results of Cantin clearly do not demonstrate a valid correlation between OMP-A treatment and the presence or absence of HIV RNA and if accepted, can be said to teach away from such a correlation.

As to the Examiner's argument in the Advisory Action

- 10 -

PENY4-651092.1

STAN 001004

to the effect that "the Figure 2 result of the reference is
identical to the PCR results in the instant claims wherein
effective drug treatment gives an absence of PCR signal and an
ineffective drug treatment results in a positive PCR signal",
Applicants submit that, as discussed above, the PCR experiment
of Cantin is defective, the control sequence being essentially
as active as the CPE-inhibitory OMP-A sequence.  Therefore,
the PCR results of Cantin cannot be relied on in any valid
comparison with the present invention.  Additionally, it is
not valid to compare the results of Cantin's PCR experiment to
that of the claimed invention because the parameters of
Cantin's PCR experiment were very different from those claimed
in the present invention.  As noted supra, Cantin's PCR used
cultured cells as the source of its HIV RNA and utilized only
20 cycles of PCR.

       In summary, the Cantin reference does not disclose
or suggest any of the major elements of the present claims.
It does not relate to the use of plasma as the source of the
HIV RNA to be detected and it does not suggest PCR cycles of
about 30.  Moreover, the single PCR experiment disclosed in
Cantin to determine the effect on HIV RNA synthesis of a
single OMP-A sequence has a failed control and does not
demonstrate a correlation between that OMP-A's efficacy and
virus inhibition.[2]  Furthermore, Cantin in no way suggests

_____

[2]  In the March 1997 Office Action, the Examiner appears to
concede the failed control in Cantin's PCR (Office Action, p.
4) but seems to argue that one could avoid such failed
controls.  The fact remains, however, that it is the
disclosure of Cantin that is relied on in this rejection and
that disclosure describes only a defective and hence,
inconclusive PCR experiment.

PENY4-651052.1

STAN 001005

that PCR could be used to evaluate the efficacy of drug treatment in HIV-infected patients, i.e., in a clinical setting, nor does Cantin suggest the specific correlations recited in the pending claims.

Moving on to the cited Hart reference, that reference is described in the present rejection as disclosing PCR detection in patient samples for therapy evaluation and including therapy evaluation with AZT but only utilizing serum samples for said detection (May 1996 Office Action, p.6). Applicants agree with the Examiner that Hart relates to the detection of HIV RNA by PCR but respectfully take issue with the further characterization that this detection was for therapy evaluation including therapy evaluation with AZT.  The only disclosure in Hart relating to therapy is a general statement in the abstract of the article to the effect that PCR "will be" suitable for monitoring antiviral therapy and a similar general statement at the conclusion of the article. These general statements are speculative, relate to what might happen in the future and are totally non-enabling.  As noted by the Court in Beckman Instruments Inc. v. LKB Produkter AB, 13 USPQ2d 1301, 1304 (Fed. Cir. 1989):"[i]n order to render a claimed apparatus or method obvious, the prior art must enable one skilled in the art to make and use the apparatus or method."

In the present case, there is absolutely no disclosure or suggestion in Hart as to how one would use PCR to evaluate anti-HIV drug efficacy; e.g., what are the parameters for the PCR methodology and for evaluations, e.g., which sources of HIV sequences are the most appropriate, how

- 12 -

PENY4-651052.1

STAN 001006

many PCR amplification cycles should be used, what
correlations should be looked for. None of these parameters
(as recited in the pending claims) are disclosed or even
suggested in Hart.

Rather, a fair review of Hart indicates that the
disclosure therein involves only the <u>detection</u> of HIV RNA
using PCR. See, e.g., Hart, p. 598, column 2: "The use of PCR
for direct detection of nucleic acid sequences provides a
technique that will determine whether a sample is HIV infected
... and whether it is expressing viral RNA." Moreover,
Applicants cannot find any disclosure in Hart relating to
therapy evaluation with AZT as suggested in this rejection.
AZT was merely the drug used in individuals whose cells were
used as a source of the HIV sequences for the <u>detection</u>
experiments of Hart.

In this regard, Applicants also point out that, as
was the case with Cantin, the experiments of Hart all involve
the use of <u>cells</u>, not plasma, as the source of HIV RNA to be
detected by PCR. In the case of Hart, either <u>cultured H9</u>
<u>cells</u> were used (as in Cantin) or <u>peripheral blood mononuclear</u>
<u>cells</u> of seropositive people was used. As noted in the
Declaration of Dr. Michael J. Kozal Under 37 C.F.R. § 1.132
attached hereto as Exhibit 1, it would have been understood by
those of ordinary skill in the art at the time this invention
was made that the use of cells as the source of HIV RNA to be
detected by PCR would not be appropriate or applicable for any
clinical evaluation of anti-HIV therapy (see Kozal
Declaration, pp. 6-7).

- 13 -

PENY4-651052.1

STAN 001007

Applicants note that Hart does refer to unpublished reports that certain scientists were using PCR to <u>detect</u> HIV RNA in <u>serum samples</u> but there is no indication whether those unpublished experiments were successful or how they were carried out.  Thus, Applicants respectfully dispute the characterization of Hart (in the May 1996 Office Action) as <u>utilizing</u> serum samples for detection[3].  In the Office Action dated March 3, 1997, the Examiner more accurately states that Hart <u>cites</u> "serum HIV detection methodology."  While this characterization is closer to the disclosure of Hart, it is still not accurate since, as noted above, Hart merely notes that experiments were being carried out "using PCR to detect HIV RNA of whole virus in serum samples (unpublished)". (Hart, p. 598, column 2).  There is, however, no disclosure in Hart of any serum HIV detection <u>methodology</u> or any description, much less an enabling description, as to how to detect HIV sequences by PCR from serum samples.

Applicants further note the Examiner's argument in the Office Action dated March 1997 that Hart's mention in passing of serum samples "are still disclosures of such assays that someone of ordinary skill in the art could and would easily put into practice..." (Office Action, p. 4 over to p. 5).  First, Hart only mentions serum samples for the <u>detection</u> of HIV, not for any evaluation of drug efficacy based on PCR technology.  Furthermore, Applicants respectfully submit that

---

[3] Applicants assume that this rejection's recitation of the use of serum samples for detection refers to such samples' use in PCR and not their use for the antigen assays described in Hart at p. 596, column 2.  Those antigen assays are irrelevant to the presently-claimed invention.

PENY4-651052.1

STAN 001008

there is no evidence on this record that the mere mention of
the use of serum samples would have enabled one of skill in
the art at the time this invention was made to "easily" carry
out even the detection experiments of Hart, much less the drug
therapy evaluation methods of the present invention.  In fact,
as noted in the accompanying Declaration of Dr. Michael J.
Kozal (Exhibit 1), it was known in the art at the time this
invention was made that it was difficult to isolate sufficient
amounts of cell-free HIV RNA from plasma or serum for use in
PCR (even for detection purposes) and so the mere mention in
Hart of the use of serum for the detection of HIV RNA via PCR
would not have suggested to one of ordinary skill in the art
that such experiments could be successfully performed (even
for the purpose of detection) or how they could be
successfully performed (Kozal Declaration, pp. 7-8).

In view of the foregoing, Applicants respectfully
submit that the cited Hart reference does not suggest or in
any way enable the specific methods of this invention.
Rather, the reference relates specifically to the use of PCR
to detect HIV RNA in cells.  Applicants point out further that
neither Hart nor Cantin, or any combination thereof, in any
way suggests the specific correlations contained in the
methods of this invention wherein, e.g., the presence or
absence of detectable HIV sequences correlates with an
absolute CD4 count of less than or greater than 200 cells per
cubic mm, respectively, or wherein an HIV RNA copy number of
greater than or less than 200 per 200 µl of plasma correlates
with the ineffectiveness or effectiveness of the therapy,
respectively, or wherein efficacy correlates with a ratio of

- 15 -

PFNY4-651052.1

STAN 001009

HIV RNA copy number in pre-treatment and post-treatment plasma samples of greater than about 4 to 1.

The specific methods of this invention for the evaluation of anti-HIV therapy are just not suggested or enabled by the cited Hart or Cantin references, either alone or in combination. Moreover, as the Examiner acknowledges in the Advisory Action, the cited Ottmann reference does not relate to or in any way suggest evaluating drug efficacy via PCR as presently claimed but rather, the reference relates only to the <u>detection</u> of HIV sequences by PCR. Ottmann is cited "only to support the equivalent <u>detectability</u> of HIV nucleic acid in serum and plasma...." (Advisory Action, p. 3). Clearly, Ottmann's disclosure of the use of PCR to detect HIV particles in serum or plasma does not suggest the presently-claimed methods of evaluating anti-HIV drug efficacy. Moreover, since neither Hart nor Cantin, or any combination thereof, suggests the claimed methods of evaluating anti-HIV drug efficacy (as discussed above), Ottmann adds nothing to the disclosures of the Hart and/or Cantin references to render this invention obvious under § 103.[4] At best, the combined disclosures of Hart and/or Cantin in view of Ottmann suggest the use of either cells or plasma as the source of HIV sequences for detecting such sequences by PCR using high cycle numbers. Such a combined disclosure in no way suggests or

---

[4] Applicants note and appreciate the Examiner's agreement that the 40 cycles of PCR described in Ottmann for detection does not suggest the approximately 30 cycles recited in the pending claims for evaluating efficacy.

- 16 -

PENY4-651052.1

STAN 001010

enables the specific methods of the present invention for the evaluation of anti-HIV therapy.

Finally, the Murakawa reference is cited only for its disclosure of the existence of HIV sequences from which various primers could be prepared for PCR.[5] It also does not suggest in any way the claimed methods for evaluating anti-HIV therapy.

Applicants respectfully submit that none of the cited references, alone or in any combination, suggests or makes obvious the presently-claimed invention. In further support of their position, Applicants submit herewith the Declaration of Dr. Michael J. Kozal Under 37 C.F.R. § 1.132 noted supra. Dr. Kozal is a respected physician, professor and researcher in the areas of AIDS treatment and the study of the development of drug resistance to HIV. In his Declaration, Dr. Kozal testifies that he has reviewed the references that form the basis of the present rejection and that, as one of ordinary skill in the art at the time this invention was made, the disclosures of the cited references would not have suggested the claimed invention to him (see Kozal Declaration, pp. 5 and 9).

In explaining his position, Dr. Kozal begins by agreeing with the arguments presented herein with respect to the Cantin reference, i.e., that the PCR data of Cantin with its failed control cannot be relied upon for any valid comparison and does not suggest a correlation between drug

---

[5] Please note that the PCR experiments of Murakawa utilize cells as samples and involve PCR cycle numbers as low as 4 and no greater than 25.

- 17 -

STAN 001011

efficacy and HIV RNA reduction. Dr. Kozal further states that one of ordinary skill in the art would not extrapolate from the one in vitro PCR experiment of Cantin to the use of PCR in a clinical context for the evaluation of anti-HIV therapy in patients. Finally, Dr. Kozal states that Cantin does not suggest (a) the use of PCR for the evaluation of anti-HIV drug therapy in a clinical setting or (b) any of the specific parameters of the present invention, e.g., the use of plasma or about 30 cycles of amplification in PCR or any of the specific correlations recited in the pending claims (Kozal Declaration, pp. 5-6).

As to the cited Hart reference, Dr. Kozal confirms the arguments set forth supra that the Hart reference relates only to the detection of HIV RNA in HIV-infected cells. Dr. Kozal notes that, while Hart does vaguely mention that PCR may be useful for monitoring therapy in the future, there is no suggestion in Hart as to how such monitoring would be carried out.

Dr. Kozal further points out that Hart's use of cells as the source of the HIV RNA identified by PCR would not have been favored by those of skill in the art at the time this invention was made for any clinical evaluation of anti-HIV therapy. Dr. Kozal explains that HIV RNA from cellular sources may not reflect the true extent and nature of HIV viral infection in the patient. For example, HIV RNA from cellular sources will contain not only full-length virus but various HIV mRNA transcripts and therefore the amount of HIV RNA present in the cells may not accurately reflect the true extent of virus infection in the patient. Moreover, the HIV

- 18 -

PENY4-651052.1

STAN 001012

virus in an infected cell is generally older and may not be representative of the virus strain that is currently active in the patient. For these reasons, Dr. Kozal points out, one of ordinary skill in the art would not have extrapolated from the detection experiments of Hart using cellular HIV RNA to any clinical evaluation of anti-HIV treatment in a clinical setting (Kozal Declaration, pp. 6-7).

Dr. Kozal does note that plasma would be an appropriate source of HIV RNA for clinical evaluation but Dr. Kozal points out that Hart does not indicate how one would use plasma as a source of HIV RNA -- even for detection, much less for evaluation of therapeutic efficacy. In this connection, Dr. Kozal points out that, at the time this invention was made, it was known in the art that the detection of HIV RNA from plasma via PCR was problematic (citing Ottmann, p. 274), and therefore, the mere mention in Hart that PCR could be performed using plasma or serum for the detection of HIV RNA would not have suggested to one of skill in the art that (a) even this detection could be accomplished or (b) how it could be accomplished (Kozal Declaration, p. 7).

Moreover, Dr. Kozal notes that, while Ottmann discloses the use of plasma as the source of HIV RNA in PCR, Ottmann is also limited to detection, and, in fact, the only way Ottmann could achieve its detection of HIV RNA was by using a very high number of amplification cycles, a technique that is not applicable to the clinical evaluation of drug efficacy. Dr. Kozal concludes:

"[T]he disclosure of Ottmann does not supplement the disclosure of Hart (or Cantin) in any way that would suggest the methods of

— 19 —

PENY4-651052.1

STAN 001013

this invention for the evaluation of anti-HIV therapy. Ottmann's PCR methodology using HIV RNA in plasma samples is clearly restricted to high cycle numbers for detection, while Hart does not even indicate how plasma HIV RNA can be used for <u>detection</u> via PCR. Thus, the combination of cited references -- Cantin, Hart, Ottmann and Murakawa -- at best suggests the use of PCR for the detection of HIV sequences in cells or in plasma but using high cycle numbers. None of these references, alone or in combination, suggests or provides a reasonable expectation of success in carrying out the claimed methods of evaluating anti-HIV drug therapy or even that such methods could be developed." (Kozal Declaration, p. 8)

Finally, in Paragraph 5 of his Declaration, Dr. Kozal discusses a very important element of any obviousness determination, i.e., the state of the art at the time this invention was made. Dr. Kozal notes that, at that time, it was <u>not</u> known that PCR would be useful for the clinical evaluation of anti-HIV therapy. All that was known was that PCR could be used to <u>detect</u> HIV sequences. However, it was not known or suggested that PCR would allow the <u>quantitation</u> of <u>cell-free plasma HIV RNA</u> for the evaluation of drug efficacy. Moreover, it was not known what the parameters might be for the quantitation of plasma HIV RNA by PCR; for example, how many PCR amplification cycles should be used to quantitate HIV RNA in plasma samples to assess anti-HIV therapy. As noted by Dr. Kozal, it was Applicants in the present application that determined the applicability of PCR for clinical evaluation of anti-HIV therapy and the appropriate parameters to be used.

In addition, at the time this invention was made, it was not known or suggested that cell-free plasma HIV RNA could be used as a marker of circulating HIV viral load to assess

- 20 -

PENY4-651052.1

STAN 001014

anti-HIV treatment or clinical outcome. In this regard, it should be remembered that, at the time this invention was made, cell-free HIV viral RNA was hard to detect in plasma and researchers believed that HIV proviral DNA might be the correct marker of viral load since proviral DNA was the replicative form of the virus. Thus, it was not at all known or suggested that cell-free plasma HIV RNA could be used as a marker of circulating HIV viral load for the assessment of therapeutic efficacy <u>or</u> clinical outcome.

In view of Dr. Kozal's Declaration and the arguments submitted <u>supra</u>, it is clear that the cited references, whether considered alone or in combination, do not render the presently-claimed methods obvious under the standard for obviousness of § 103. As stated by the CAFC in <u>In re Dow Chemical Co.</u>, 837 F.2d 469, 473, 5 USPQ2d 1529, 1531-1532 (Fed. Cir. 1988):

> "The consistent criterion for determination of obviousness is whether the prior art would have suggested to one of ordinary skill in the art that <u>this process should be carried out</u> and <u>would have a reasonable likelihood of success,</u> viewed in light of the prior art. [citation] <u>Both the suggestion and the expectation of success must be found in the prior art, not in the applicant's disclosure.</u>" (emphasis added)

Applying this legal standard to the present case, it is clear that none of the cited references, alone or in any combination, suggests or provides a reasonable expectation of success in carrying out the presently-claimed methods for the evaluation of anti-HIV therapy. Applicants must also reiterate that a fair reading of the cited references actually indicates that, at the time this invention was made, PCR may

- 21 -

PENY4-651052.1

STAN 001015

not have appeared to be a suitable means for determining
therapeutic efficacy.  As noted on this record, Cantin's PCR
data did _not_ support a correlation between a specific drug
treatment and reduced HIV sequences.  In addition, Hart did
_not_ find a correlation between a low CD4 cell count and the
presence of HIV sequences.[6]  And in Ottmann's study, HIV
sequences were detected by PCR _regardless_ of anti-HIV
treatment or the clinical status of the patient.[7]  Thus, not
only do the cited references _not_ suggest the methods of
evaluation of anti-HIV therapy claimed in this application,
the references actually contain disclosures that would have
led one of skill in the art to at least doubt whether PCR
would be useful for such evaluation.

The only suggestion at all in any of the references
as to the possibility of using PCR for therapeutic evaluation
is the speculative and highly general statements contained in
Hart as to a future potential for monitoring antiviral
therapy.  However, as noted above as well as in Dr. Kozal's

---

[6]  Although the Examiner seeks in the Advisory Action to point
to other indicators of AIDS prognosis referred to in Hart, the
fact remains that, with respect to CD4 T cell counts, Hart
discloses that, in their PCR studies, there was no correlation
between a low CD4 T cell count and the presence of HIV
sequences, a disclosure that specifically teaches away from
the specific correlation recited in pending claims 7 and 8.

[7]  While the Examiner in the Advisory Action correctly notes
that the PCR of Ottmann was quite different from that of the
present invention as was the purpose of Ottmann's study, the
fact remains that Ottmann also discloses that PCR was not
helpful in distinguishing between effective versus ineffective
treatment or clinical stage of the infection.  As noted by the
Court, in determining obviousness, the disclosures of prior
art references must be viewed in their entireties for all that
they teach including "disclosures that may diverge from or
teach away from the invention at hand." W.L. Gore &
Associates, Inc. v. Garlock, Inc., 220 USPQ 303, 311 (Fed.
Cir. 1983).

- 22 -

Declaration, Hart does not disclose any parameters for carrying out such monitoring and certainly does not suggest the specific parameters and correlations recited in the pending claims. At most, Hart might be viewed as an invitation to try to use PCR techniques to monitor antiviral therapy. However, the law is quite clear that an "obvious to try" standard is not the proper standard for determining obviousness under 35 U.S.C. § 103. In re Dow Chemical Co., 5 USPQ2d 1529, 1532 (Fed. Cir. 1988); In re Deuel, 34 USPQ2d 1210, 1216 (Fed. Cir. 1995):"'Obvious to try' has long been held not to constitute obviousness [citation omitted]. A general incentive does not make obvious a particular result, nor does the existence of techniques by which those effects can be carried out."

Given the specific elements recited in the pending claims, as discussed in Section 1 supra and throughout this submission, and the extremely vague as well as negative disclosures of the cited references with regard to the use of PCR for evaluating anti-HIV drug therapy, the cited references, alone or in any combination, just do not suggest the methods of this invention or provide a reasonable expectation of success in carrying out those methods. Applicants request that the Examiner reconsider and withdraw the outstanding rejection of the claims under § 103.

## CONCLUSION

Applicants respectfully submit that the outstanding rejection of the claims under 35 U.S.C. § 103(a) has been fully addressed herein. Applicants have demonstrated that the

- 23 -

PBNY4-651052.1

STAN 001017

claimed methods are patentably distinct from each of the cited references under 35 U.S.C. § 103, whether those references are considered alone or in any combination.  Applicants request that the Examiner withdraw the rejection of the claims.  An early allowance of the claims is earnestly requested.

Respectfully submitted,

Date:   December 17, 1997          _Laura A. Coruzzi_  30,742
                                   LAURA A. CORUZZI     (Reg. No.)

PENNIE & EDMONDS LLP
1155 Avenue of the Americas
New York, New York  10036-2711
(212) 790-9090

PENY4-651052.1

STAN 001018