1  PRUETZ LAW GROUP LLP
     Adrian M. Pruetz (Bar No. 118215)
2    ampruetz@pruetzlaw.com
   200 N. Sepulveda Blvd., Suite 1525
3  El Segundo, California 90245
   Telephone:    (310) 765-7650
4  Facsimile:    (310) 765-7641

5  QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
     Brian C. Cannon (Bar No. 193071)
6    briancannon@quinnemanuel.com
     Tun-Jen Chiang (Bar No. 235165)
7    tjchiang@quinnemanuel.com
     Gabriel S. Gross (Bar No. 254672)
8    gabegross@quinnemanuel.com
   555 Twin Dolphin Drive, Suite 560
9  Redwood Shores, California  94065
   Telephone:  (650) 801-5000
10 Facsimile:  (650) 801-5100

11 Attorneys for Defendants and Counterclaimants
   Roche Molecular Systems, Inc.; Roche
12 Diagnostics Corporation; and Roche Diagnostics
   Operations, Inc.

13

                    UNITED STATES DISTRICT COURT
14
                   NORTHERN DISTRICT OF CALIFORNIA
15

16 | THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY, | CASE NO. C-05-04158 MHP |

17                 Plaintiff,

18        vs.                                    ROCHE DEFENDANTS' NOTICE
                                                 OF MOTION AND MOTION FOR
19 ROCHE MOLECULAR SYSTEMS, INC.; ROCHE          SUMMARY JUDGMENT OF
   DIAGNOSTICS CORPORATION; ROCHE                INVALIDITY OF PATENTS
20 DIAGNOSTICS OPERATIONS, INC.,
                                                 Judge:   Hon. Marilyn H. Patel
21                 Defendants.                   Date:    March 31, 2008
                                                 Time:    2:00 p.m.
22 ROCHE MOLECULAR SYSTEMS, INC. ROCHE           Ctrm:    15, 18th Floor
   DIAGNOSTICS CORPORATION; ROCHE
23 DIAGNOSTICS OPERATIONS, INC.,

24                 Counterclaimants,

25        vs.

26 THE BOARD OF TRUSTEES OF THE LELAND
   STANFORD JUNIOR UNIVERSITY et al.
27
                   Counterclaim Defendants.
28

# **TABLE OF CONTENTS**

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................1

I.      INTRODUCTION.................................................................................................................1

II.     BACKGROUND....................................................................................................................4

        A.      Nature and Stage of the Proceedings..............................................................4

        B.      Development, Conception, and Publication of the Patented PCR
               HIV Assays ..........................................................................................................4

               1.      Cetus Invents PCR And Begins Applying It To HIV .......................5

               2.      Stanford Collaborates With Cetus......................................................5

               3.      The Materials Transfer Agreements and Patent Assignment............6

               4.      The Patents In Suit Are Conceived At Cetus ....................................6

               5.      Stanford Files For Patents ................................................................10

        C.      Stanford's Patent Claims And Claim Construction......................................11

        D.      Testimony From One of Ordinary Skill In 1992 As Defined By The
               Court Confirms That The Patents Are Obvious ............................................12

        E.      Stanford Did Not Timely Submit The 1991 JID Article To The
               Patent Office ......................................................................................................16

III.    LEGAL STANDARDS........................................................................................................17

        A.      Summary Judgment..........................................................................................17

        B.      Obviousness ......................................................................................................18

IV.     THE PATENTS ARE OBVIOUS IN LIGHT OF THE 1991 JID ARTICLE ...................19

V.      SPECIFIC PATIENT CORRELATIONS ARE UNPATENTABLE SUBJECT
        MATTER UNDER SECTION 101 ....................................................................................21

# TABLE OF AUTHORITIES

**Page**

### Cases

Apple Computer, Inc. v. Burst.com,
  2007 WL 3342829 (N. D. Cal. 2007)........................................................................21

Bd. of Trs. of Stanford University v. Roche Molecular Sys.,
  487 F. Supp. 2d 1099 (N.D. Cal. 2007) (Dkt. No. 157)........................................2

Celotex Corp. v. Catrett,
  477 U.S. 317 (1986)..............................................................................................17, 18

Daiichi Sankyo Co., Ltd. v. Apotex, Inc.,
  501 F.3d 1254 (Fed. Cir. 2007)..............................................................................18

Diamond v. Chakrabarty,
  447 U.S. 303 (1980)................................................................................................22

Diamond v. Diehr,
  450 U.S. 175 (1981)................................................................................................22

DyStar Textilfarben GmbH v. C.H. Patrick Co.,
  464 F.3d 1356 (Fed.Cir.2006)................................................................................19

Funk Bros. Seed Co. v. Kalo Inoculant Co.,
  333 U.S. 127 (1948)................................................................................................22

Gottschalk v. Benson,
  409 U.S. 63 (1972)..................................................................................................22

Graham v. John Deere Co.,
  383 U.S. 1 (1966)....................................................................................................18

KSR Int'l Co. v. Teleflex Inc.,
  127 S. Ct. 1727 (2007)....................................................................................3, 18, 19

Laboratory Corp. of America v. Metabolite Labs., Inc.,
  126 S. Ct. 2921 (2006)....................................................................................4, 22, 23

Panoptx. Inc. v. Protective Optics Inc.,
  2007 WL 3344453 (N.D. Cal. 2007)......................................................................18

Parker v. Flook,
  437 U.S. 584 (1978)................................................................................................22

PharmaStem Therapeutics, Inc. v. ViaCell, Inc.,
  491 F.3d 1342 (Fed. Cir. 2007)..............................................................................18

Semiconductor Energy Laboratory Company Ltd. v. Chi Mei Optoelectronics Corp.,
  2007 WL 1793770 (N.D. Cal. 2007)......................................................................21

1

**<u>Statutes</u>**

2   35 U.S.C. § 101 ...................................................................................................4, 22

3   35 U.S.C. § 102(b) ...................................................................................................19

4   35 U.S.C. § 103 .............................................................................................2, 18, 19

5   37 C.F.R. § 1.97(e) ...................................................................................................17

6   Fed. R. Civ. P. 56(c) .................................................................................................17

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**NOTICE OF MOTION AND MOTION**

2  PLEASE TAKE NOTICE that at 2 p.m. on March 31, 2008, or as soon thereafter as

3  counsel may be heard, Defendants and Counterclaim Plaintiffs Roche Molecular Systems, Inc.,

4  Roche Diagnostics Corp., and Roche Diagnostics Operations, Inc. (collectively, "Roche"), will,

5  and hereby do, move pursuant to Federal Rule of Civil Procedure 56 for summary judgment in

6  favor of Roche that U.S. Patents Nos. 5,968,730; 6,503,705; and 7,129,041 asserted by plaintiff in

7  this action are invalid as a matter of law.

8  This motion is supported by the following memorandum of points and authorities, the

9  evidence on file in this action, this Court's decisions on claim construction (Dkt. No. 212) and

10  partial summary judgment (Dkt. No. 157), the declaration of HIV PCR expert Jeffery Lifson,

11  M.D., and the declaration of Gabriel Gross, attaching documents.

12

**MEMORANDUM OF POINTS AND AUTHORITIES**

13  I.    INTRODUCTION

14  The inventions claimed in Stanford's asserted patents are invalid as obvious and should

15  never have issued.  Each of the three patents in suit claims PCR assays for measuring the amount

16  of HIV in a patient's blood.  All of the claims are *method* claims; Stanford does not claim to have

17  invented a product or test kit, but rather a series of steps that yields a useful result.  Each and every

18  claim in the patents includes the steps of

19  (1) "collecting" a sample from an HIV infected patient;

20  (2)  "amplifying" the HIV using the biochemical technique called polymerase chain

21  reaction (PCR); and

22  (3) "measuring" or "testing" the amplified product of the PCR to determine the amount of

23  HIV virus in the blood.

24  The stated purpose of conducting the PCR assays and measuring the amount of HIV in a

25  patient's blood is to evaluate the effectiveness of anti-viral therapy.  Anti-HIV therapy exists to

26  interfere with the replication of the HIV virus and to kill it off.  Thus, the less virus in the blood,

27  the more effective is the anti-viral therapy.

28

1    As this Court knows, a patent is invalid under Section 103 of the Patent Act, when "the

2  differences between the subject matter sought to be patented and the prior art are such that the

3  subject matter as a whole would have been obvious at the time the invention was made to a person

4  having ordinary skill in the art to which said subject matter pertains."  35 U.S.C. §103.

5    This case is ripe for summary judgment because in the first phase of this case, this Court

6  made findings about the development of the claimed PCR assay, the conception of the invention

7  and the publication of the PCR HIV assay in the prior art.  *Bd. of Trs. of Stanford University v.*

8  *Roche Molecular Sys.*, 487 F. Supp. 2d 1099, 1116-17, 1120 (N.D. Cal. 2007) (Dkt. No. 157).

9  This Court has also issued its claim construction order, interpreting the patent claims and defining

10  the qualifications and PCR skills of a person of ordinary skill in the art—the same "person" for

11  whom obviousness is evaluated.  Dkt. No. 212 (November 27, 2007).  Obviousness is a matter of

12  law, based on underlying facts, and the record in this case lays out the complete premise for

13  finding that these patents would have been obvious to one of ordinary skill in the art as of the

14  filing date of Stanford's May 1992 patent application. In particular, in its prior decision, this Court

15  found that the precise PCR assays for HIV that Stanford claims as its "invention"—collecting,

16  amplifying, and quantifying HIV—were published by the Stanford named inventors and their

17  Cetus collaborators and co-authors in Holodniy, et al., "Detection and Quantitation of Human

18  Immunodeficiency Virus RNA in Patient Serum by Use of the Polymerase Chain Reaction," THE

19  JOURNAL OF INFECTIOUS DISEASES, 163:862-866 (April 1991) (the "1991 JID Article").  After

20  publication of this article, Stanford should not have obtained a patent on the same PCR methods;

21  Stanford's patent claims were obvious in light of this prior art disclosing the complete assay.

22  Some of Stanford's claims also contain reference to *correlating* HIV viral levels with CD4

23  [immune cell] counts and the effectiveness of anti-HIV therapy.  These elements are also taught in

24  the 1991 JID Article, which contains the explicit suggestion to use the PCR HIV assay to monitor

25  the effectiveness of therapy:

26    "In conclusion, virion HIV RNA was detected and quantified in the serum
     of HIV positive patients by PCR.  These findings provide evidence that the
27    amount of cell-free virus in circulation correlates with the presence of HIV
     infectious titer, serum p24 antigen positivity, CD4 counts<400/mm$^3$, and
28    the presence of HIV-related symptoms. [] Serum PCR may provide an

1  |  additional marker of disease progression and drug efficacy that could
2  |  improve our ability to monitor the course of HIV infection."

3  1991 JID Article at page 865 (final ¶).

4     The Stanford inventors and their Cetus collaborators and co-authors presented to the world

5  the PCR assay for quanitifying HIV, described that HIV levels correlated with HIV symptoms and

6  immune cell counts, and suggested that the assay be used to monitor therapy.  HIV researchers

7  were highly motivated at the time because HIV patients were dying despite available treatments

8  and new drug therapies were actively being developed; using the HIV PCR assay published in the

9  art to monitor therapy and measure HIV levels of patients on therapy is not just a natural use of the

10 assay, it was the express purpose for its development.  In light of this publication, Stanford's

11 patent claims would have been obvious to a person of ordinary skill in the art.  The law does not

12 allow Stanford to pull this published work out of the public domain and subject it to patent

13 protection.

14     In the recent seminal Supreme Court case, *KSR Int'l Co. v. Teleflex Inc.*, 127 S.Ct. 1727

15 (2007), a unanimous Supreme Court made clear that obviousness analysis is a flexible inquiry,

16 relying upon common sense as well as the level of skill of those in the art and the motivations of

17 those in the field.  These inquiries are directly relevant to Stanford's patents and lead to one

18 indisputable result—the patents are invalid as obvious.

19     Stanford may argue that some (but not all) of the claims in the patents contain specific HIV

20 virus level correlations derived from using the PCR assay on a series of patient samples that is not

21 explicitly set forth in the 1991 JID Article.  For instance, claim 19 of U.S. Patent No. 5,968,730,

22 as well as including the "collecting", "amplifying", and "measuring" steps, includes the following

23 phrase about the results of the assay:

24  |  "in which a ratio of HIV RNA copy number in pre-treatment and post-
    |  treatment plasma samples of greater than about 4 to 1 correlates positively
25  |  with the conclusion that the anti-HIV agent is therapeutically effective."

26     This clinical data derived from the obvious use of the assay is not enough to create a valid

27 "invention" and save these remaining claims.  First, the finding that viral load correlates with drug

28 therapy was taught and suggested by the 1991 JID Article.  Second, deriving specific patient data

1   by using the assay in the way it was intended is an obvious and common sense result.  Third, using

2   the PCR HIV assay to "discover" specific data about patients does not create patentable subject

3   matter.  Section 101 of the Patent Act forbids patenting alleged discoveries of laws of nature or

4   natural phenomena.  Likewise, the Supreme Court has recently indicated that "correlations" in

5   patient samples cannot be patented because such correlations are laws of nature, existing in the

6   patient independent of any human-made invention.  *Laboratory Corp. of America v. Metabolite*

7   *Labs., Inc.,* 126 S. Ct. 2921 (2006).  Thus, although a PCR assay method is potentially patentable

8   (if non-obvious) because it is human-made invention, the results of that assay method are not

9   patentable and do not add patentable subject matter to an otherwise obvious method that is

10  disclosed in the prior art.

11  II.      BACKGROUND

12          A.      Nature and Stage of the Proceedings

13          Stanford filed its complaint in October 2005, asserting that the Roche defendants infringed

14  U.S. Patent Nos. 5,968,730 (the "'730 patent," which issued October 19, 1999) and 6,503,705 (the

15  "'705 patent," which issued January 7, 2003).  Dkt. No. 1.  Roche answered and counterclaimed

16  seeking, *inter alia*, a declaration that the patents are invalid.  Dkt. No. 15.  Each patent derives

17  from the same original application filed in May 1992, and shares the same named inventors, the

18  same specification and same title, "Polymerase chain reaction assays for monitoring antiviral

19  therapy and making therapeutic decisions in the treatment of acquired immunodeficiency

20  syndrome."  Dkt. No 1, pages 7, 29.  As the title makes clear, these patents concern "assays" that

21  use the "polymerase chain reaction" or "PCR."  On October 31, 2006, a third patent issued from

22  the same application, No. 7,129,041 (the "'041 patent"); Stanford amended its complaint to add

23  this patent, and Roche answered and sought a declaration that this patent, like the others, is

24  invalid.  Dkt. Nos. 149, 155.

25          B.      Development, Conception, and Publication of the Patented PCR HIV Assays

26          What makes this case particularly well suited for summary judgment of invalidity is that

27  this Court has decided (or the parties have stipulated to) all the facts upon which a summary

28  judgment of obviousness can be based.  The fact section below, with the exception of a quoted

1    admission from Stanford inventor David Katzenstein, is drawn entirely from (a) this Court's prior

2    summary judgment order; (b) this Court's claim construction order; (c) the Joint Statement of

3    Undisputed Facts submitted with the prior summary judgment briefs; and (d) the text of the 1991

4    JID Article.  Following the fact section is a description of an accompanying declaration from PCR

5    expert Dr. Jeffrey Lifson, who was a person of ordinary skill in the art in May 1992, in which he

6    confirms what common sense independently provides: the claimed assay methods were obvious to

7    those of ordinary skill because the invention was conceived in 1989 and the PCR assay was

8    published in 1991 with an express teaching to use it to monitor the effectiveness of anti-HIV

9    therapy—exactly as claimed in Stanford's patents.

10                1.        Cetus Invents PCR And Begins Applying It To HIV

11            Polymerase Chain Reaction ("PCR") was developed by scientists at Cetus in the mid-

12    1980's.[1]  PCR is a groundbreaking discovery that enables scientists to make billions of copies of

13    specific sequences of DNA from a small number of starting molecules.[2]  Cetus scientist Kary

14    Mullis received the Nobel Prize in chemistry for his work developing PCR.[3]  In 1985, Cetus

15    became interested in using PCR to detect and quantify the presence of HIV in blood.[4]

16                2.        Stanford Collaborates With Cetus

17            Around the same time, one of the named inventors, Dr. Thomas Merigan, a Professor of

18    Medicine at Stanford, became focused on the treatment of AIDS in his own research.[5]  The

19    collaboration between Cetus and Stanford concerning the use of PCR in HIV/AIDS research

20    began in 1988, when the two entities were involved in a clinical trial exploring the efficacy of

21    using the anti-HIV drug Interleukin-2 ("Il-2") to treat AIDS patients.[6]  As part of the clinical trials,

22    the Cetus team used PCR to quantitate the HIV levels of the participating patients.[7]

---

[1] Dkt. No. 157 at 3:5.
[2] *Id.* at 3:6-7.
[3] *Id.* at 3: 7-8.
[4] *Id.* at 3:8-9.
[5] *Id.* at 3:10-11.
[6] *Id.* at 3:14-16.
[7] *Id.* at 3:22-23.

3.    The Materials Transfer Agreements and Patent Assignment

As part of the collaboration, Dr. Merigan entered into Materials Transfer Agreements ("MTA") with Cetus in 1988 and 1989, which allowed Merigan the right to use Cetus' proprietary materials and information in exchange for a non-exclusive, royalty-free license to Cetus for any intellectual property developed as a result of the MTA.[8]  Within a few weeks of the 1988 MTA agreement, Stanford sent Dr. Mark Holodniy, then a fellow of Stanford's Division of Infectious Diseases, to Cetus in order to explore the use of PCR techniques in his work.[9]  Holodniy would also be later named as an inventor on Stanford's PCR HIV patents.

Holodniy had no previous PCR experience prior to joining Stanford in 1988.[10]  Merigan suggested that Holdniy spend time at Cetus to develop a better assay for quantitating the level of HIV nucleic acids.[11]  Holodniy began commuting daily to Cetus and was assigned a lab bench in Cetus' Clinical Group, where he had access to Cetus personnel, materials and equipment.[12]  In February 1989, Holodniy signed a Visitor Confidentiality Agreement ("VCA") required by Cetus when he began working at Cetus, which included a provision that if as a consequence of his access to Cetus, Holodniy conceived of an invention, "I will assign and do hereby assign to CETUS" his rights to the invention.[13]

4.    The Patents In Suit Are Conceived At Cetus

Holodniy spent the next nine months working at Cetus, receiving technical information from Cetus scientists and proprietary physical materials from Cetus.[14]  By fall 1989, an assay for quantitating HIV RNA using PCR was developed at Cetus that was comprised of five steps: (1) extraction of the HIV RNA from serum or plasma ("extraction"), (2) copying the single-stranded HIV RNA into a double-stranded DNA molecule ("reverse transcription"), (3) using PCR to make

---

[8] *Id*. at 3:17-21.
[9] *Id*. at 4:24-26.
[10] *Id*. at 5:2.
[11] *Id*. at 5:7-8.
[12] *Id*. at 5:9, 13-14.
[13] *Id*. at 5:16-23.
[14] *Id*. at 5:24-26.

1   millions of copies of the DNA using primers developed by Cetus ("amplification"), (4) detecting

2   the amplified DNA using a DNA probe ("detection"), and (5) generation of a standard curve used

3   to calculate the amount of virus in a patient's blood using a cRNA standard ("quantitation").[15]

4          At the time the assay was developed, Holodniy had no experience creating or using

5   standards such as the cRNA standard for quantitation.[16]  Accordingly, Holdodniy sought the

6   assistance of Cetus scientist Alice Wang to develop the quantitation portion of the assay.[17]  The

7   cRNA standard was developed by Clayton Casipit, who worked in Wang's lab.[18]  The cRNA

8   standard was provided to Holodniy in October 1989.[19]  This Court held that "Holodniy has

9   testified that he had never performed any of the five steps comprising the assay prior to working at

10  Cetus."[20]

11                          (a)      1991 JID Article Published

12         In December 1989, Holodniy requested permission from Cetus to publish the HIV RNA

13  Quantitation Assay in two abstracts, one to be presented at the UCLA Keystone Symposium on

14  Molecular and Cell Biology and the other to be presented at the Sixth International AIDS

15  Conference in San Francisco. [21]  The abstract, titled "Quantitation of HIV-1 in Serum and

16  Correlation with Disease Status Using the Polymerase Chain Reaction," concludes that the authors

17  have demonstrated that HIV viral RNA can be detected and quantified in patient serum and that

18  such quantitation "may be a useful marker for disease progression or monitoring antiviral

19  therapy."  The abstract was presented at the UCLA Symposium in March or April 1990.[22]

20         In April 1991, the Journal of Infectious Diseases published an article titled "Detection and

21  Quantification of Human Immunodeficiency Virus RNA in Patient Serum by Use of the

22  Polymerase Chain Reaction ("the 1991 JID article"), with Holodniy as the lead author and

23  _____

24         [15] Id. at 6:1-8.
        [16] Id. at 6:9-10.
25         [17] Id. at 6:9-12.
        [18] Id. at 6:12-13.
26         [19] Id. at 6:14.
        [20] Id. at 6:15-16 (citing testimony).
27         [21] Id. at 6:18-21.
        [22] Id. at 6:25 to 7:2.

28

1   Merigan, Wang, Casipit and other scientists from both Stanford and Cetus listed as co-authors.[23]

2   The article describes in detail the five steps of the PCR assay for quantifying HIV developed by

3   Holodniy at Cetus.[24]

4         The 1991 JID article states that "[t]hese results demonstrate that HIV RNA in serum can be

5   detected and quantitated by reverse transcription, PCR, and a nonisotopic enzyme-linked affinity

6   assay."[25]  In addition, the article states that HIV RNA may be recovered and used more efficiently

7   from plasma.[26]

8         This Court noted that the 1991 JID Article stated that "[q]uantitation of infectious HIV

9   RNA in cell-free serum by PCR may be a useful as a marker for disease progression or in the

10   monitoring of anti-viral therapy," and that "[s]erum PCR may provide an additional marker of

11   disease progression and drug efficacy that could improve our ability to monitor the course of HIV

12   infection."[27]

13         This Court closely evaluated the evidence, the article, and the Joint Statement of

14   Undisputed Facts and found the inventions of the patents in suit were conceived when the PCR

15   Assay was developed at Cetus and published in the 1991 JID Article:

16         While the record demonstrates that the patented invention was not
       completed until after Holodniy left Cetus, the invention was clearly conceived at
17      the latest when Holodniy had developed the PCR assay. Holodniy came to Cetus
       with the goal of "develop[ing] an assay at Stanford that [they] could use to monitor
18      treatment." Holodniy Dep. at 152:20-153:11. Holodniy therefore arrived at Cetus
       with the specific intent to develop a PCR assay that could be used to monitor HIV
19      treatment, **which is precisely the method claimed in the patents-in-suit**.
       Holodniy developed the assay at Cetus, and the assay was complete by the time
20      Holodniy left. The UCLA abstract, in which the assay was published, stated that
       the assay "may be a useful marker for disease progression or monitoring antiviral
21      therapy." Chiang Dec., Exh. 20. The JID article also stated that "[q]uantitation of
       infectious HIV RNA in cell-free serum by PCR may be useful as a marker for
22      disease progression or in monitoring anti-viral therapy," and that "[s]erum PCR
       may provide an additional marker of disease progression and drug efficacy that
23      could improve our ability to monitor the course of HIV infection." Chiang Dec.,
       Exh. 22 at RMS 01471. Following this latter statement, the article concludes that

24   _____

25   [23] *Id.* at 7:17-20.

26   [24] *Id.* at 7:21-22.
     [25] *Id.* at 7:24-25.

27   [26] *Id.* at 7:17-20.
     [27] *Id.* at 19: 9-12 (quoting 1991 JID Article)

28

"[f]urther studies will be necessary to validate this approach." Id. at RMS 01471.
**The specific method of using the assay to monitor HIV treatment was therefore clear in the minds of Holodniy and the other Stanford scientists when the assay was completed at Cetus.[28]**

Thus, in comparing Stanford's patents to the JID Article, this Court concluded it is "undisputed that Holodniy developed the PCR assay disclosed in the patents while working with Cetus Corporation ("Cetus"), which later sold its PCR assets and business to Roche."[29]  In addition, "the Stanford scientists here had settled upon a particular PCR assay to use in monitoring HIV treatment before Holodniy left Cetus.  Although substantial work remained to 'validate' the effectiveness of the assay for its intended use, the scientists 'had more than a general hope or expectation.'  **Accordingly, the patented invention was conceived when the PCR assay was completed."[30]**

This 1991 JID Article is the publication that alone, or combined with others, renders all of the claims obvious.  Indeed, with respect to the JID Article one of the Stanford inventors, David Katzenstein, candidly admitted under oath that the 1991 JID Article was the "fulfillment" of the complete idea that he had to use PCR to measure HIV RNA in order monitor therapy and/or disease progression:

> Q.  If you could look, Dr. Katzenstein, at page 3 of the exhibit previously marked 31, which is the [UCLA] abstract.  And this describes a -- an assay for HIV using PCR, right?
> A.  Correct.
>
> . . .
>
> Q.  Getting back to the specific assay set forth in this abstract, and we identified some steps, the extraction, reverse transcription, the amplification, the capture step and the quantification step.  Do you recall the circumstances of the idea to put these components together to quantify HIV?
> A:  What I recall in a clear fashion is an early meeting with Tom and Mark when I first came to Stanford, where we were discussing what we could do together that would be innovative and important, and I raised the PCR quantification technique.
>
> . . .

---

[28] Id. at 19:1-15 (emphasis added)
[29] Id. at 2:18-20.
[30] Id. at 20:11-15.

Q.  Getting back to the idea and the discussion -- I'll call it a discussion or meeting that you had with Dr. Merigan and Dr. Holodniy.  **At that initial meeting where you -- you discussed the idea, did -- did you discuss or did you propose using this quantification technique to monitor the effectiveness of therapy?**

A.  **Yes**.

Q.  And was it your idea at that time in mid-1989 to quantify viral RNA?

A.  Yes.

. . .

Q.  And then there were a subsequent series of experiments done, and I think you used the term realize, to realize this idea.  **And did the experiments that were done verify the idea that you had back in 1989?**

**A.:  I think so.**

**Q.  They were successful, right?**

**A.  They were.**

Q.  And you published the results of those experiments, right?

A.:  That's -- well, the -- **I believe the JID article is the fulfillment of that idea** through a whole series of technical assay development issues that went on over perhaps two years.

Q.  Let's jump to that.  Previously marked Exhibit 72.

(Previously marked Exhibit 72 was presented to the witness.)

Q.  If you could look at that for a moment, please, Dr. Katzenstein, and confirm for me that this is the JID article you just referred to.

A.  Yes, it is.

Q.  And just for the record, this article is entitled "Detection and Quantification of Human Immunodeficiency Virus RNA in Patient Serum by Use of the Polymerase Chain Reaction."  And the named authors are Mark Holodniy, David Katzenstein, Sohini Sengupta, Alice Wang, Clayton Casipit, David Schwartz, Michael Konrad, Eric Groves and Thomas Merigan.

Gross Dec., Ex. C at 49:20-24; 57: 10-23, 60:1-11; 61:20 to 63:8 (objections omitted).

5.      Stanford Files For Patents

On May 14, 1992, Stanford submitted the parent application for the patent family that would include the patents-in-suit.[31]  In November 1992, Stanford petitioned to correct inventorship to add Holodniy as a joint inventor.   In a letter from Holodniy to Stanford's patent counsel, Holodniy stated that the section of the patent application beginning "PCR assay of plasma HIV RNA" is a "body of work published in the Journal of Infectious Diseases."[32]

---

[31] Dkt. No. 157 at 8:24-26.
[32] *Id*. at 9:5-8

1

   C.     Stanford's Patent Claims And Claim Construction

2

   The Court issued its claim construction order on November 27, 2007.  Dkt. No. 212.  As

3

the Court described, there are two types of method claims in these patents.  The first type includes

4

a step for "measuring" the HIV copy number.  See '730 patent, claims 9, 14 and 19 and '705 patent

5

claims 1 and 8.  For instance, claim 9 of the '730 patent reads:

6

   9. A method of evaluating the effectiveness of anti-HIV therapy of a patient
   comprising

7

   (i) <u>collecting</u> a plasma sample from an HIV-infected patient who is being
   treated with an antiretroviral agent;

8

   (ii) <u>amplifying</u> the HIV-encoding nucleic acid in the plasma sample using
   HIV primers in about 30 cycles of PCR; and

9

   (iii) <u>measuring</u> the HIV RNA copy number using the product of the PCR, in

10

   which an HIV RNA copy number greater than about 500 per 200 ul of
   plasma correlates positively with the conclusion that the antiretroviral agent

11

   is therapeutically ineffective.

12

Dkt. 212, p. 2 (emphasis added).  As can be seen, the claimed method of this claim comprises

13

three "steps."  Other method claims do not include a "measuring" step, but instead include a step

14

for "testing" for the "presence" or "absence" of detectable HIV-encoding nucleic acid.  See '730

15

Patent, claim 1:

16

   1.  A method of evaluating the effectiveness of anti-HIV therapy of a
   patient comprising:

17

      (i) <u>collecting</u> a plasma sample from an HIV-infected patient who is being
      treated with an antiretroviral agent;

18

      (ii) <u>amplifying</u> the HIV-encoding nucleic acid in the plasma sample

19

      using HIV primers in about 30 cycles of PCR; and
      (iii) <u>testing</u> for the presence of HIV-encoding nucleic acid, in the product

20

      of the PCR;
   in which the absence of detectable HIV-encoding nucleic acid correlates

21

   positively with the conclusion that the antiretroviral agent is therapeutically

22

   effective.

23

   Significantly, the Court has defined a person of ordinary skill in the field as: "A medical

24

doctor working on clinical HIV research involving antiretroviral agents or a Ph.D. researcher

25

working on molecular methods relating to clinical HIV research involving antiretroviral agents.

26

Any person of ordinary skill in the art must have conducted numerous PCR assays in conjunction

27

with his research."  Dkt. No. 212 at p. 7, lines 9-12.  As can be seen, the level of skill for this field

28

1    is high, and those of ordinary skill are presumed to have conducted numerous PCR assays and

2    therefore are adept at PCR.

3        D.    Testimony From One of Ordinary Skill In 1992 As Defined By The Court

4              Confirms That The Patents Are Obvious

5        The facts already established by the Court in this case demonstrate that these patents are

6    invalid as obvious.  The PCR HIV assay for quantifying HIV was in the prior art, published by the

7    Stanford inventors, who even suggested using the PCR assay for drug efficacy and to monitor

8    patient progress.  Given the high level of education in the biomedical research field and the PCR

9    experience possessed by those of ordinary skill in the art and the motivations—both express and

10   generally known to help HIV patients—it would have been obvious to persons of ordinary skill in

11   the art to take the PCR assays and use them to monitor HIV levels over time to monitor the

12   progress of anti-HIV therapy.

13       However, to confirm this common sense conclusion, Roche submits the declaration of

14   Jeffrey Lifson, M.D., a PCR and HIV expert who meets this Court's definition of a person of

15   ordinary skill in the art as of May 1992. Dr. Lifson confirms the common sense understanding

16   reflected by the record—that the JID Article reveals the precise assay used to quantify HIV in the

17   patents, and that the express suggestion in the JID Article, as well as the motivations in the field,

18   would have prompted those of ordinary skill to use the PCR HIV assay to monitor the

19   effectiveness of anti-HIV therapy over time.

20       Dr. Lifson is currently the Director of the AIDS Vaccine Program and is also Senior

21   Principal Scientist and Head of the Retroviral Pathogenesis Laboratory for SAIC Frederick, Inc. at

22   the National Cancer Institute in Frederick, Maryland.  He received his B.S. Med. and M.D.

23   degrees from Northwestern University and Northwestern University Medical School and pursued

24   postgraduate medical and research Fellowship training at Stanford University Medical Center.  He

25   has been involved in AIDS research since 1983 while at Stanford and a significant part of his

26   research efforts and recognized expertise involve the development and application of assays for

27   monitoring the replication of HIV and related retroviruses.  He has published more than 170

28   scientific papers and serves on multiple professional journal editorial boards and expert advisory

1  committees. Lifson ¶ 1.  He has reviewed the Court's claim construction order and meets the

2  definition of a person of ordinary skill in the field as of May 1992. Lifson ¶ 5.

3      In the early 1990's, Dr. Lifson and others were involved in research aimed at developing

4  methods for quantitative measurement of HIV to enable monitoring of responses to antiviral

5  treatment.  Dr. Lifson states that it was reasonable at this time to expect that an effective antiviral

6  treatment would result in a decrease in the amount of viral replication, and it was in principle

7  attractive to try to measure such a decrease in readily accessible blood samples. Lifson ¶ 6.

8      Dr. Lifson describes that prior results using plasma virus cultures had indicated that levels

9  of plasma virus measured by this technique correlated with disease stage and treatment status, and

10  that initiation of treatment was associated with decreases in plasma virus.  *See* Ho et al.,

11  "Quantitation of Human Immunodeficiency Virus Type 1 in the Blood of Infected Persons," NEW

12  ENGLAND JOURNAL OF MEDICINE, Vol. 321, 1621-1625 (1989), attached as Exhibit C to Dr.

13  Lifson's Declaration.  As assay sensitivity was a limitation on the plasma virus culture method,

14  and as PCR/Reverse Transcription ("RT") PCR based methods were notable for their exquisite

15  sensitivity, it was obvious to try to apply PCR/RT PCR based methods for monitoring HIV viral

16  load.  While PCR was originally developed as a qualitative method, and there are significant

17  challenges in applying PCR/RT PCR for quantitative applications, there was considerable interest

18  in the field in doing so in general, and as applied to quantification of HIV, and various

19  investigators were working on such methods.  *See* Sninsky and Kwok, ARCH. PATHOL. LAB. MED.

20  1990;114;259-262 at 262 ("[E]xperiments on the quantitation of PCR product suggest that the

21  procedure could be used for the monitoring of viral load in patients receiving therapeutic agents.").

22  Lifson ¶ 7.

23      In 1991, Stanford's Mark Holodniy andThomas Merigan, along with Cetus scientist Alice

24  Wang and others, co-authored the 1991 JID Article.  According to Dr. Lifson at ¶8 of his

25  Declaration and consistent with the Court's analysis, the 1991 JID Article discloses a five-step

26  procedure to quantify HIV copy number from a patient sample:

27          i.      First, RNA is extracted from the patient sample ("extraction");

28          ii.     Second, RNA is reverse transcribed to DNA with M-MLV reverse
       transcriptase ("reverse transcription");

iii.     Third, PCR amplification is carried out for 30 cycles with primers including SK38, SK39 ("amplification");

iv.     Fourth, the PCR product is captured using a biotin tag on one of the primers and captured product is detected using a horseradish peroxidase (HRP) conjugated hybridization probe and a colorimetric enzyme based substrate conversion reaction ("detection"); and

v.     Fifth, quantification is accomplished by constructing a standard curve of optical density values from a dilution series of known copy numbers of a RNA standard derived from the HIV *gag* gene ("quantification") and interpolation of the measured optical density values for unknown samples onto this standard curve.

Dr. Lifson provides additional details of the assay at ¶¶ 9, 10. The following chart compares the assays of the 1991 JIF Article to the examples of Stanford's alleged invention set forth in the patents:

|  | *1991 JID Article* | *'730 Patent: Cols 4-5* | *'730 Patent: Cols. 9-10* |
|---|---|---|---|
| **1. Extraction** | "Total RNA from 200 µl of serum was extracted using guanidinium thiocyanate" | "RNA may be extracted from plasma using standard techniques . . . For example 200 µl of clarified plasma to which 200 µl of 5M guanidinium thiocyanate had previously been added": lines 11-16 | "RNA was extracted from plasma using standard techniques" . . . for example "200 µl of clarified plasma to which 200 µl of 5M guanidinium thiocyanate had previously been added": col. 9, lines 63-66 |
| **2. Reverse Transcription** | "reverse transcribed with M-MLV reverse transcriptase" [Note: M-MLV refers to Moloney murine leukemia virus] | "From plasma RNA, HIV RNA may be transcribed to cDNA using a suitable reverse transcriptase (for example Moloney murine leukemia virus reverse transcriptase)": lines 21-23 | "HIV RNA was transcribed to cDNA using Moloney murine leukemia virus reverse transcriptase": col. 10, lines 5-6 |
| **3. Amplification** | "PCR was carried out . . . for 30 cycles of amplification in a DNA thermal cycler (Perkin-Elmer Cetus)" | "tubes containing the reaction may be placed in a DNA thermal cycler (e.g., Perkin-Elmer Cetus) for about 30 cycles of amplification": lines 39-42 | "Tubes were placed in a DNA thermal cycler (Perkin-Elmer Cetus) for 30 cycles of amplification": col 10, lines 26-27 |
| **4. Detection** | SK19 probe labeled with HRP for enzyme linked affinity assay read at 490 nm | In a preferred embodiment, "probe may be labeled with horseradish peroxidase (HRP) and copy number may be evaluated by an enzyme linked affinity assay . . . measured at 490 nm": lines 64-67 and col. 5, lines 27-28 | "Enzyme linked affinity assay . . . measured at 490 nm": col 10, lines 33 and 58. The probe used was "SK19" labeled with "horseradish peroxidase (HRP)": col 10, lines 15-16 |
| **5. Quantification** | External standard curve with cRNA *gag* gene standard of known copy number | "Copy number from subject samples may be determined from the absorbances obtained from a dilution | "Copy number from subject samples may be determined from the absorbances obtained from a dilution |

| | | series of an RNA gag gene construct of known copy number. (Holodniy et al., 1991, J. Infect. Dis. 163:862-866)": col. 5, lines 32-36. | series of an RNA gag gene construct of known copy number. (Holodniy et al., 1991, J. Infect. Dis. 163:862-866)": col. 10, lines 62-66 |
|---|---|---|---|

Dr. Lifson concludes that the 1991 JID Article discloses a working PCR assay that tells a doctor how much HIV is in a person's blood plasma. The 1991 JID Article expressly suggests that the PCR assay "may provide an additional marker of disease progression and drug efficacy that could improve our ability to monitor the course of HIV infection." Lifson ¶ 16, Ex. B at p. 865. By May 1992, HIV patients were being treated with antiretroviral therapies such as AZT to inhibit HIV and therefore it was important to HIV/AIDS doctors to monitor the effect of those therapies on HIV. Lifson ¶ 22.

For example, if test results showed continued high viral load despite antiretroviral treatment, the doctor would reasonably conclude that the treatment was not active to inhibit viral replication. Conversely, if sequential tests showed decreasing viral load measurements temporally linked to institution of antiretroviral treatment, the doctor would reasonably conclude that the treatment was active. Thus, the concept of using the assays to monitor the progress of therapy was an inherent use of the PCR assay set forth in the 1991 JID Article and was an explicit purpose of developing such an assay. Lifson ¶ 23.

Dr. Lifson also provides the following information:

- The relationships between viral load (albeit measured by plasma culture and not PCR) and disease stage and treatment status, and response to treatment, were already known in the art, as described, for example, in the 1989 Ho Article.

- The 1991 JID Article concludes with an explicit suggestion to use the assay to monitor drug efficacy.

- The 1991 JID Article concludes with a suggestion to validate the use of the assay for such applications, with the obvious implication of validation on appropriate patient samples.

- While decreases in HIV viral load in response to antiretroviral treatment had been demonstrated previously, it would be obvious to one of ordinary skill in the art to apply a suitable PCR assay for quantification of plasma HIV levels as a more sensitive approach for the evaluation of antiretroviral drug treatment.

- As measurement of treatment-related changes in plasma viral load could be considered evidence of the activity of antiretroviral drug treatment, there would be obvious incentive for one of ordinary skill in the art to apply such assays to the

1    monitoring of antiretroviral drug treatment, and the assessment of new
     antiretroviral treatments. Numerous publications from the early 1990's describing
2    various different approaches for applying PCR based methods for quantification of
     HIV viral load to assess disease status and responses to treatment demonstrate
3    widespread interest in and motivation for developing such methods.

4        •    Prior results showing decreases in plasma viral load in response to antiretroviral
              treatment using other techniques provided the reasonable expectation that use of the
5             PCR assays of the 1991 JID Article would also show decreases in viral load in
              association with effective therapy.

6    Lifson ¶ 24.  Thus, Dr. Lifson concludes that it is his opinion that it would have been obvious to

7    one of ordinary skill in the art to take the HIV RNA quantification assay of the 1991 JID Article

8    and apply such measurements to the evaluation of antiretroviral treatments as set forth in the

9    claims.  Lifson ¶ 18.  Dr. Lifson has submitted an Exhibit D to his Declaration, which is a claim

10   chart breaking down the asserted claims of the patents and demonstrating that the subject matter of

11   the claims was obvious.

12           E.      Stanford Did Not Timely Submit The 1991 JID Article To The Patent Office

13           Stanford may argue that it submitted the 1991 JID Article to the patent office where it was

14   reviewed by the patent examiner.  Examination of the file history, however, demonstrates that the

15   1991 JID Article—indisputably the most relevant piece of prior art—was not timely submitted or,

16   apparently, even reviewed by the patent examiner.  When the original "parent" application (No.

17   07/883,327) was first filed on May 14, 1992, Stanford did _not_ submit a copy of the 1991 JID

18   Article or any other references.  Gross Dec., Ex. A at STAN 006253-006325.  The PTO issued

19   office actions rejecting all of Stanford's claims.  _Id_. at STAN 006360-6367; 006396-406.  _After_

20   the final office action rejecting the claims, Stanford submitted an information disclosure statement,

21   or "IDS," listing 45 relevant references and enclosing several hundred pages of copies of those

22   references.  _Id_. at STAN 006422-6424, 006464-6465.  Stanford included the 1991 JID Article as

23   the 29th reference within this lengthy submission.  _Id_.  The patent examiner did _not_ mark his

24   initials next to the references, which would have indicated he had reviewed them.  _Id_.  Stanford

25   abandoned the application, and the Supervisory Patent Examiner noted:  "IDS's filed 3-13-95 & 3-

26   14-95, **are placed in the file but not considered** at this time due to a lack of a certification under

27   37 CFR § 1.97(e) and a Petition with Petition fee as required for IDS submissions after a final

28   office action has been mailed."  _Id_. at STAN 006627 (emphasis added).

1    Before abandoning the original application, Stanford filed a divisional application, in

2 which is sought (and ultimately received) patent claims.  Gross Dec., Ex. B at STAN 01257-1307.

3 On Dec. 17, 1997, after final rejection in the divisional application, Stanford submitted the

4 Declaration of Dr. Michael Kozal to advocate for the allowance of the claims.  *Id*. at STAN

5 000995-1028.  The Kozal Declaration states:

> It should be understood that, at the time this invention was made, nobody knew that
> PCR would be useful for the clinical evaluation of anti-HIV therapy.  As the cited
> references demonstrate, all that was known was that PCR could be used to detect
> HIV sequences, either in cells or, under certain conditions, in plasma.  **However, it
> was not known or suggested that PCR would allow the quantitation of cell-free
> plasma HIV RNA for the evaluation of drug efficacy.**  Moreover, it was not
> known or suggested that cell-free plasma HIV RNA, e.g., in the form of RNA copy
> number, could be used as a marker of circulating HIV viral load to assess anti-HIV
> treatment of clinical outcome.

11 *Id*. at STAN 001026-1027 (emphasis added).  These statements are misleading at best.  To say to

12 the PTO that all that was known in the art was "detection" of HIV by PCR and that "it was not

13 known or suggested that PCR would allow the quantitation of cell-free plasma HIV RNA for the

14 evaluation of drug efficiency" fundamentally misconstrues the prior art.  The 1991 JID Article

15 teaches and suggests precisely what Stanford told the PTO did not exist.  After this submission,

16 Stanford's claims were allowed on March 3, 1998.  *Id*. at STAN 001034.

17 III.    LEGAL STANDARDS

18    A.    Summary Judgment

19    Summary judgment is appropriate when the "pleadings, depositions, answers to

20 interrogatories, admissions on file, together with the affidavits, if any, show that there is no

21 genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

22 of law." Fed. R. Civ. P. 56(c).  While the party moving for summary judgment bears the initial

23 burden of informing the Court of the basis for its motion and demonstrating that no genuine issue

24 of material fact exists for trial, it is not required to negate those portions of the nonmoving's

25 party's claim on which the nonmoving party bears the burden of proof.  *Celotex Corp. v. Catrett*,

26 477 U.S. 317, 322-23 (1986).  Once the moving party demonstrates that there is no genuine issue

27 of material fact, the nonmoving party must designate "specific facts showing that there is a

28 genuine issue for trial."  *Id*. at 325.  There is no genuine issue of material fact if "the evidence . . .

1   is of insufficient caliber or quantity to allow a rational finder of fact" to find that for the

2   nonmoving party.

3        B.      Obviousness

4        With respect to obviousness, the Patent Act provides that a patent may not be obtained if

5   the differences between the subject matter sought to be patented and the prior art are such that the

6   subject matter as a whole would have been obvious at the time the invention was made to a person

7   having ordinary skill in the art to which said subject matter pertains."  35 U.S.C. § 103.

8   Obviousness is a question of law based on underlying questions of fact.  *Daiichi Sankyo Co., Ltd.*

9   *v. Apotex, Inc.,* 501 F.3d 1254, 1256 (Fed. Cir. 2007).  The analysis is objective, and has been

10  described as follows:

11       "Under § 103, the scope and content of the prior art are to be determined;
         differences between the prior art and the claims at issue are to be ascertained; and
12       the level of ordinary skill in the pertinent art resolved.  Against this background the
         obviousness or nonobviousness of the subject matter is determined.  Such
13       secondary considerations as commercial success, long felt but unsolved needs,
         failure of others, etc., might be utilized to give light to the circumstances
14       surrounding the origin of the subject matter sought to be patented."

15  *KSR Int'l Co. v. Teleflex Inc.*, 127 S.Ct. 1727 (2007) (quoting *Graham v. John Deere Co.*, 383

16  U.S. 1, 17-18 (1966)).  The burden falls on the movant to show that a person of ordinary skill in

17  the art would have had reason to carry out the claimed process, and would have had a reasonable

18  expectation of success in doing so.  *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d

19  1342, 1360 (Fed. Cir. 2007).  Where "the content of the prior art, the scope of the patent claim,

20  and the level of ordinary skill in the art are not in material dispute, and the obviousness of the

21  claim is apparent in light of these factors, summary judgment is appropriate."  *KSR*, 127 S.Ct. at

22  1746; *Panoptx. Inc. v. Protective Optics Inc.*, 2007 WL 3344453 (N.D. Cal. 2007) (Patel., J.)

23  (summary judgment of obviousness).

24       The *KSR* case is significant because it confirmed that obviousness analysis is flexible,

25  taking into account the understandings of those in the field:  "the analysis need not seek out

26  precise teachings directed to the specific subject matter of the challenged claim, for a court can

27  take account of the inferences and creative steps that a person of ordinary skill in the art would

28  employ."  *Id*., 127 S.Ct at 1741.  Significantly for the patents in this case, obviousness analysis

1   requires use of "common sense" and "[a] person of ordinary skill is also a person of ordinary

2   creativity, not an automaton." *Id.*, 127 S.Ct. at 1742.  With respect to motivations that would

3   make an invention obvious to try, the Court provides:

> 4   When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense. In that instance the fact that a combination was obvious to try might show that it was obvious under § 103.

8   *Id.*  Likewise, the Federal Circuit has recently emphasized the flexibility of the analysis in *DyStar*

9   *Textilfarben GmbH v. C.H. Patrick Co.*, 464 F.3d 1356 (Fed.Cir.2006) (holding that the

10   "suggestion test is in actuality quite flexible and not only permits, but requires, consideration of

11   common knowledge and common sense." *Id.* at 1367.  Another important factor is the level of

12   skill held by those of ordinary skill in the field, as those with greater skill are more likely to be

13   motivated to combine.  *Id.* at 1370.

14   IV.    <u>THE PATENTS ARE OBVIOUS IN LIGHT OF THE 1991 JID ARTICLE</u>

15        Each and every claim of the patents in suit is an obvious application of the PCR HIV assay

16   disclosed in the 1991 JID Article.  The assay was developed to be used to monitor the

17   effectiveness of therapy and was demonstrated to be useful for that task.  The next step of actually

18   using it with patients who are on anti-HIV therapy is obvious.  Stanford should be not be allowed

19   to obtain a patent for an assay that was in the public domain or for a method for using that assay

20   that was the expressly suggested and understood by those of ordinary skill in the art.

21        *Scope and content of the prior art*.  As a threshold matter, the JID Article is in the prior art:

22   it was published in April 1991, more than a year before the filing date of the patent.  Dkt No. 107

23   at ¶ 39 (Joint Statement of Undisputed Facts).  Because it was published more than a year prior, it

24   is statutory prior art under 35 U.S.C. § 102(b).  This Court has analyzed the scope of the 1991 JID

25   Article in detail, as set forth above.  In brief, the 1991 JID Article discloses the same PCR HIV

26   assay as disclosed in the patents.

27        *Differences between prior art and the claimed methods*.  The claimed methods set forth

28   using the PCR HIV assay of the 1991 JID Article on patients that are receiving therapy and using

1   the results to evaluate the effectiveness of therapy.  There is no new device at issue here, or no

2   new reagent.  The PCR assay is the same.  The 1991 JID Article expressly teaches to use the assay

3   as a marker of drug efficacy, which inherently would require collecting samples from patients on

4   anti-HIV drugs.  Indeed, Stanford inventor Dr. Katzenstein admitted that the 1991 JID Article was

5   the fulfillment of his idea to develop a PCR to measure viral load so as to monitor the

6   effectiveness of therapy.  Any differences between the claims and the JID Article are just the

7   specifics of carrying out the suggested assay, which would be readily understood by one of

8   ordinary skill in the art.  See Lifson Declaration and accompanying claim chart, Ex. D.

9        In addition, this Court has construed the disputed terms of the patents in suit.  Dkt. No.

10   212.  The Court found that the "patent is indeed silent as to what is to be considered

11   therapeutically effective or ineffective." *Id*. at p. 11, lines 26-27.  This effectiveness of therapy,

12   the Court found, "ordinarily would be within the purview of the physician." *Id*.  Thus, "the

13   patents merely aid the physician in that determination by pointing her in the right direction--

14   correlating certain results with effectiveness or ineffectiveness." *Id.*, p. 12, lines 1-2.  This

15   analysis lines up with the 1991 JID Article, which discloses the PCR assay, "correlates" the

16   amount of virus with immunological state and HIV symptoms, and suggests using the PCR assay

17   as a "marker of disease progression and drug efficacy."  Lifson, Ex. B at p. 865.  As such the assay

18   taught in the JID Article are an "aid" to the physician.

19        *Persons of ordinary skill*.  The Court has determined the level of skill of this person.  Dkt.

20   No. 212.  Such a person had clear motivation to carry out the claimed process.  In the 1980s and

21   early 1990s, HIV/AIDS was killing patients.  Effective therapies were actively being developed.

22   In May 1992, there were some anti-HIV drugs available, but HAART (Highly Active

23   Antiretroviral Therapy) combination therapy although known and under development, was not

24   available until 1995-96.  Dkt. No. 212 at p. 15, lines 19-27.  PCR assays that would measure the

25   level of HIV virus in a patient would clearly be attractive for those of ordinary skill to use to

26   measure the effectiveness of anti-HIV therapy.

27        Not only were the motivations apparent from the state of medicine and the pressing

28   research into new drugs to save patients' lives, the 1991 JID Article expressly teaches that the

1   PCR assays could be used for drug efficacy and to monitor disease progression.  Given the high

2   level of skill, a person of ordinary skill in the art would have had a reasonable expectation of

3   success in deciding to perform the claimed methods.  "[A] high level of skill renders a finding of

4   implicit motivation more likely, as skilled individuals are more likely to combine references

5   without being told to do so."  *See, e.g., Apple Computer, Inc. v. Burst.com*, 2007 WL 3342829 at

6   *6 (N. D. Cal. 2007) (Patel, J.); *Semiconductor Energy Laboratory Company Ltd. v. Chi Mei*

7   *Optoelectronics Corp.* 2007 WL 1793770 at *17 (N.D. Cal. 2007) (Patel, J.) (granting summary

8   judgment as to obviousness and noting that "[i]n light of the highly sophisticated nature of the

9   relevant art, the court easily concludes that a person skilled in the art [would have known to

10  combine references in the prior art]").

11        With respect to secondary considerations, it is significant that the "origin" of the invention

12  derived from the collaboration at Cetus.  This Court has already found that the inventions of the

13  patents in suit were conceived at Cetus when Holodniy completed the PCR assay.  This assay was

14  then published in the prior art.  This origin of the invention demonstrates that the invention was

15  put into the public domain; use of this prior art assay for intended use should not be taken away

16  and subject to patent protection.  Summary judgment should be granted.

17  V.        SPECIFIC PATIENT CORRELATIONS ARE UNPATENTABLE SUBJECT MATTER

18            UNDER SECTION 101

19        Stanford may argue that some (but not all) of the claims in the patents contain specific HIV

20  virus level correlations derived from using the PCR assay on a series of patient samples that is not

21  explicitly set forth in the 1991 JID Article.  For instance, after Stanford took the PCR HIV assay

22  back to Stanford, the named inventors ran the assay on HIV patients, both before and after the

23  initiation of anti-HIV therapy and derived data.  Stanford now claims as an "invention" using the

24  assay on these patients and deriving clinical data that demonstrates that HIV levels go down when

25  a patient is taking effective therapy.  See '705 patent, claim 8.

26        This clinical data derived from the obvious use of the assay is not enough to create a valid

27  "invention" and save these remaining claims.  First, the finding that viral load correlates with drug

28  therapy was taught and suggested by the 1991 JID Article.  Second, deriving specific patient data

1   by using the assay in the way it was intended is an obvious and common sense result.  Third,

2   extending patent coverage to specific correlations that are found in nature is beyond the scope of

3   patentable subject matter and violates 35 U.S.C. § 101.

4   Although the scope of patentable subject matter is broad under section 101, not every

5   discovery is patentable.  A bedrock principle of United States patent law is that:  "Excluded from

6   such patent protection are laws of nature, natural phenomena, and abstract ideas."  *Diamond v.*

7   *Diehr*, 450 U.S. 175, 185 (1981).  Accordingly: "[A] new mineral discovered in the earth or a new

8   plant found in the wild is not patentable subject matter.  Likewise, Einstein could not patent his

9   celebrated law that $E = mc^2$; nor could Newton have patented the law of gravity.  Such discoveries

10  are "manifestations of ... nature, free to all men and reserved exclusively to none."  *Diamond v.*

11  *Chakrabarty*, 447 U.S. 303, 309 (1980) (quoting *Funk Bros. Seed Co. v. Kalo Inoculant Co.*, 333

12  U.S. 127, 130 (1948)).  *See Parker v. Flook*, 437 U.S. 584, 593 n.15 (1978) ("[R]ecognition of a

13  theretofore existing phenomenon or relationship carries with it no rights to exclude others from its

14  enjoyment."); *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972) ("Phenomena of nature, though just

15  discovered, mental processes, and abstract intellectual concepts are not patentable, as they are the

16  basic tools of scientific and technological work.").

17  The Supreme Court has recently confirmed the principle in *Laboratory Corp. of Am.*

18  *Holdings v. Metabolite Laboratories, Inc.*, 126 S.Ct. 2921 (2006) (dismissing writ of certiorari as

19  improvidently granted).  Although a majority of the Supreme Court did not decide the case

20  because the issue had not been fully briefed below, Justice Breyer (joined by Justices Stevens and

21  Souter) made clear that medical "correlations" could not be patented as they exist in nature.  This

22  analysis is directly applicable to Stanford's attempt to get around the fact that the PCR assay was

23  in the prior art by arguing that Stanford's invention was the correlation between viral load and

24  disease state or therapy.

25  The patent claims in *Labcorp* "cover the researchers new methods for testing homocysteine

26  [amino acid] levels using gas chromatography and mass spectroscopy."  *Id*. at 2923.  The claim is

27  analogous to the Stanford method claims, which claim a method for testing HIV levels using the

28  PCR techinque.  In *Labcorp*, the disputed claim contained the limitation, "correlating an elevated

level of total homocysteine in said body fluid with a deficiency of cobalamin or folate [vitamins]." *Id.* at 2924.  Again, this is directly analogous to Stanford's claim that includes correlating between HIV levels and effectiveness of therapy.  In *Labcorp*, Justice Breyer concluded that the correlation is invalid subject matter because "it is an observable aspect of biochemistry in at least some human populations."  *Id.* at 2927 ("[T]his case is not at the boundary. It does not require us to consider the precise scope of the 'natural phenomenon' doctrine or any other difficult issue . . . claim 13 is invalid no matter how narrowly one reasonably interprets that doctrine.") (Breyer, J.).  The same is true for Stanford's "correlation" limitations.

The patient data setting forth correlations between immune cell levels, HIV levels and the effectiveness of therapy are observable results derived from use the PCR assay disclosed in the 1991 JID Article.  The correlations would have existed in the patients whether or not the assay was used to report them.  Stanford should not be allowed to remove from the public domain, or escape a finding of obviousness, information that exists in nature.  Because the determination of patentable subject matter is a question of law, summary judgment on this question is proper.

To the extent there is a potentially patentable invention disclosed in the Stanford patents, it is the PCR assay for quantifying HIV.  This PCR assay was created by men and woman and serves a useful purpose: it is an aid to doctors.  However, Stanford's patent claims are invalid because this assay was published in the prior art, the 1991 JID Article.  Adding a limitation that the data and correlations derived from using the PCR assay for its intended purpose on patient populations somehow creates a new invention violates section 101 of the Patent Act.

## CONCLUSION

For the reasons set forth, Roche respectfully requests that summary judgment be granted in its favor that all of the claims of the asserted patents in suit be found invalid.

1   DATED:  February 25, 2008          Respectfully submitted,

2                                      PRUETZ LAW GROUP LLP

3                                      QUINN EMANUEL URQUHART OLIVER &
                                       HEDGES, LLP
4

5                                         By  /s/
6                                             Brian Cannon (Bar No. 193071)
                                              Gabriel S. Gross (Bar No. 254672)
7                                             Attorneys for Defendants and Counterclaimants
                                              Roche Molecular Systems, Inc.; Roche Diagnostics
8                                             Corporation; and Roche Diagnostics Operations,
                                              Inc.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                          -24-                     Case No. C-05-04158 MHP