1

2

3

4            UNITED STATES DISTRICT COURT

5          NORTHERN DISTRICT OF CALIFORNIA

6

7   THE BOARD OF TRUSTEES OF THE              No. C 05-04158 MHP
    LELAND STANFORD JUNIOR
    UNIVERSITY,

8                                             **MEMORANDUM & ORDER**
                    Plaintiff,

9                                             **Re: Defendants' Motion for Summary**
         v.                                   **Judgment on Invalidity of Patents**

10
    ROCHE MOLECULAR SYSTEMS, INC.,

11  et al.,

12                  Defendants.
                                         /

13  ─────────────────────────────────────

14         The Board of Trustees of the Leland Stanford Junior University ("Stanford") brought this

15  action against Roche Molecular Systems, Inc., et al. (collectively "Roche"), alleging infringement of

16  various U.S. Patents.  Now before the court is Roche's Motion for Summary Judgment on Invalidity

17  of the asserted patents.  Having considered the parties' arguments and submissions, and for the

18  reasons set forth below, the court rules as follows.

19

20  BACKGROUND

21         This patent dispute concerns the application of Polymerase Chain Reaction ("PCR")

22  technology in the context of research related to the Human Immunodeficiency Virus ("HIV") and

23  the Acquired Immunodeficiency Syndrome ("AIDS").  Stanford currently owns three patents

24  entitled "Polymerase Chain Reaction Assays for Monitoring Antiviral Therapy and Making

25  Therapeutic Decisions in the Treatment of Acquired Immunodeficiency Syndrome."  United States

26  Patent Nos. 5,968,730 ("the '730 patent"); 6,503,705 ("the '705 patent"); 7,129,041 ("the '041

27  patent").  The patents involve correlating measurements of HIV nucleic acids obtained via a PCR

28  assay with determining whether or not a particular therapy is effective.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

Claims 1, 5–9, 13–14, 18–19 and 23 of the '730 patent, Claims 1 and 5–10 of the '705 patent and Claims 1–4 and 8 of the '041 patent are asserted in this litigation.  In general, there are two types of method claims in these patents.  The first type includes a step for measuring the HIV copy number.  See '730 patent, claims 9, 14, 19; '705 patent, claims 1, 8.  For example, claim 9 of the '730 patent reads:

> 9. A method of evaluating the effectiveness of anti-HIV therapy of a patient comprising
>> (i) collecting a plasma sample from an HIV-infected patient who is being treated with an antiretroviral agent;
>> (ii) amplifying the HIV-encoding nucleic acid in the plasma sample using HIV primers in about 30 cycles of PCR; and
>> (iii) measuring the HIV RNA copy number using the product of the PCR, in which an HIV RNA copy number greater than about 500 per 200 ul of plasma correlates positively with the conclusion that the antiretroviral agent is therapeutically ineffective.

The other type of method claims do not include a measuring step, but instead include a step testing for the presence or absence of detectable HIV-encoding nucleic acid.  See '730 patent, claims 1, 6, 7, 8; '041 Patent, claim 1.  For example, claim 1 of the '041 patent reads:

> 1. A method of evaluating the effectiveness of anti-HIV therapy of a patient comprising correlating the presence or absence of detectable HIV-encoding nucleic acid in a plasma sample of an HIV infected patient with an absolute CD4 count, wherein the presence or absence of said detectable HIV-encoding nucleic acid is determined by
>> (i) collecting a plasma sample[] from an HIV-infected patient who is being treated with an antiretroviral agent;
>> (ii) amplifying HIV-encoding nucleic acid that may be present in the plasma sample using HIV primers via PCR and;
>> (iii) testing for the presence of HIV-encoding nucleic acid sequence in the product of the PCR.

All three patents-in-suit issued from the same patent application, filed in May 1992.

LEGAL STANDARD

I.      Summary Judgment

Summary judgment is proper when the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those which may affect the outcome of the

2

case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  Id.  The party moving for summary judgment bears the burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986).  On an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case."  Id. at 325.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  Mere allegations or denials do not defeat a moving party's allegations.  Id.; Gasaway v. Nw. Mut. Life Ins. Co., 26 F.3d 957, 959–60 (9th Cir. 1994).  The court may not make credibility determinations, and inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the motion.  Masson v. New Yorker Magazine, 501 U.S. 496, 520 (1991); Anderson, 477 U.S. at 255.

II.   Invalidity Based on Obviousness Under Section 103[1]

35 U.S.C. section 103(a) requires that a patent be nonobvious to one skilled in the art at the time the patent issues.  This section provides:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in [35 U.S.C. section 102], if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

Once the patent issues, each claim in an issued patent is presumed valid.  35 U.S.C. § 282. To prove that a patented invention is invalid as obvious, the party asserting invalidity must identify prior art references "which alone or combined with other references would have rendered the invention obvious to one of ordinary skill in the art at the time of invention."  Al-Site Corp. v. VSI Int'l, Inc., 174 F.3d 1308, 1323 (Fed. Cir. 1999) (citations omitted).  The relevant "question is not

whether the combination was obvious to the patentee but whether the combination was obvious to a person with ordinary skill in the art." KSR Int'l Co. v. Teleflex Inc., 550 U.S. ___, 127 S. Ct. 1727, 1742 (2007). When a patent is challenged as being invalid, the moving party must prove a claim of obviousness by clear and convincing evidence. Oakley, Inc. v. Sunglass Hut Int'l, 316 F.3d 1331, 1339 (Fed. Cir. 2003).

The question of "[o]bviousness is a question of law premised on underlying findings of fact." Eolas Techs. Inc. v. Microsoft Corp., 399 F.3d 1325, 1332 (Fed. Cir. 2005), cert denied, 126 S. Ct. 568 (2005) (citing Graham v. John Deere Co., 383 U.S. 1, 17–18 (1966)). These fact questions are: 1) the scope and content of the prior art; 2) the differences between the prior art and the claims at issue; 3) the level of ordinary skill in the art; and 4) secondary evidence of nonobviousness. Graham, 383 U.S. at 17–18; Para-Ordnance Mfg., Inc. v. SGS Imps. Int'l, Inc., 73 F.3d 1085, 1087–88 (Fed. Cir. 1995).

In Graham, the Supreme Court noted the difficulties in applying the nonobviousness test. 383 U.S. at 18. As a result of these difficulties, the Supreme Court had reason to recently revisit the obviousness analysis. In KSR, the Supreme Court clarified the test for obviousness, criticizing the teaching, suggestion or motivation ("TSM") standard previously formulated by the Federal Circuit. The Court pointed out that the TSM test should be utilized as a "helpful insight," rather than a rigid formula and held that "the analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." KSR, 127 S. Ct. at 1741. The Court further emphasized the need for courts to value "common sense" over "[r]igid preventative rules," id. at 1741–42, commenting that "[t]he obviousness analysis cannot be confined by a formalistic conception of the words teaching, suggestion, and motivation, or by overemphasis on the importance of published articles and the explicit content of issued patents," id. at 1741. The Court also noted the importance of an articulated reasoning regarding obviousness:

> Often, it will be necessary for a court to look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the

4

United States District Court

For the Northern District of California

1  
2  
3  

marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue. To facilitate review, this analysis should be made explicit.

4   Id. at 1740–41 (internal citations omitted).

5   Before the Supreme Court decided KSR, the Federal Circuit emphasized the flexibility of the

6   TSM analysis in DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co., 464 F.3d

7   1356 (Fed. Cir. 2006), cert. denied, 127 S. Ct. 2937 (2007).  There the Federal Circuit held that the

8   "suggestion test is in actuality quite flexible and not only permits, but *requires*, consideration of

9   common knowledge and common sense."  Id. at 1367.  Furthermore, the Federal Circuit

10   acknowledged the possibility of an implicit motivation to combine—one not explicitly apparent in

11   the prior art: "[i]f, as is usually the case, no prior art reference contains an express suggestion to

12   combine references, then the level of ordinary skill will often predetermine whether an implicit

13   suggestion exists."  Id. at 1370.  Thus, a high-skill level renders a finding of implicit motivation

14   more likely, as skilled individuals are more likely to combine references "without being told to do

15   so."  Id.

16   Accordingly, this court's analysis of the parties' arguments regarding obviousness must be

17   explicit, flexible and guided by common sense.

18  

19   DISCUSSION

20   Roche argues that an article published in 1991 in the Journal of Infectious Diseases renders

21   Stanford's asserted patents invalid as obvious.  See Damstedt Dec., Exh. 10 (hereinafter "JID

22   article").[2]  The JID article describes an assay for quantitating HIV RNA using PCR, which

23   comprises of five steps: 1) extraction of the HIV RNA from serum or plasma ("extraction");

24   2) copying the single-stranded HIV RNA into a double-stranded DNA molecule ("reverse

25   transcription"); 3) using PCR to make millions of copies of the DNA using primers

26   ("amplification"); 4) detecting the amplified DNA using a DNA probe ("detection"); and 5)

27  

28  

5

generation of a standard curve used to calculate the amount of virus in a patient's blood using a

cRNA standard ("quantitation").

Contents of the JID article were presented at the UCLA Keystone Symposium on Molecular

and Cell Biology in 1990 and at the Sixth International AIDS Conference in San Francisco in 1990.

See Docket No. 157 at 6:18–21.  The presentations conclude that the authors have demonstrated that

HIV viral RNA can be detected and quantified in patient serum and that such quantitation "may be a

useful marker for disease progression or monitoring antiviral therapy."  Id. at 6:25–7:2.  The JID

article, which is statutory prior art, discloses the same PCR HIV assay that is disclosed in the

asserted patents.  Roche asserts that the JID article differs from the asserted patents only to the

extent that the patent claims teach the use of this assay to determine therapy effectiveness using

results of the assay performed on patients receiving drug therapy.

Stanford argues that Roche's perfunctory analysis, limited to two specific articles, fails to

take into account the entirety of the scope and content of the prior art at the time the patents issued,

in contravention of Graham, 383 U.S. 1, and that numerous fact issues preclude summary judgment

on this issue.  This court will first go through an explicit and thorough evaluation of the Graham

factors including any factual issues presented, before analyzing how these factors assist in

determining whether the claimed methods were obvious to one skilled in the art at the relevant time.

I.    Graham factors

    A.    Scope and Content of Prior Art

Prior art references should be considered in whole to determine the disclosed teachings.

Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc., 796 F.2d 443, 448–49 (Fed. Cir. 1986).

Prior art is pertinent if it is "within the field of the inventor's endeavor," or if the reference

"logically would have commended itself to an inventor's attention in considering" the particular

problem the inventor was attempting to solve.  Princeton Biochems., Inc. v. Beckman Coulter, Inc.,

411 F.3d 1332, 1339 (Fed. Cir. 2005) (citations omitted).

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

Stanford asserts that at the time of invention, the understanding and teachings of those skilled in the art contradicted and taught away from the idea that HIV RNA could be detected and quantified as an effective marker of HIV infection and therapy effectiveness.  Stanford contends that the prevailing theories taught that monitoring disease progression and drug efficacy would effectively result from observing the stable, proviral HIV DNA—*not* HIV RNA.  Minimally, Stanford contends, these contradictory theories create a genuine issue of material fact sufficient to preclude summary judgment.

Roche focuses the bulk of its argument on the JID article, which discloses the results and conclusions from tests attempting to detect and quantify HIV RNA in blood serum from HIV-infected patients *not* undergoing antiretroviral therapy.  The article teaches that HIV RNA in serum can be detected and quantified, and it outlines the parameters for such quantification of DNA and RNA.  JID article, supra note 2, at 865.  The JID article also discloses a relationship between CD4 counts and PCR measurement of HIV RNA.  Id. at 864 ("[s]erum from patients with <400 CD4 cells/mm$^3$ was more likely to be PCR-positive").  The authors concluded that:

> these findings provide evidence that the amount of cell-free virus in circulation correlates with the presence of HIV infectious titer . . . and the presence of HIV-related symptoms. . . . Serum PCR *may provide* an additional marker of disease progression and drug efficacy that could improve our ability to monitor the course of HIV infection.  Further studies will be necessary to validate this approach.

Id. at 865 (emphasis added).  While this article teaches the principles that form the basis for the claimed inventions at issue, Stanford argues that the prior art, as a whole, is replete with skepticism regarding the claimed methods because the prevailing theories at the time taught that researchers should focus on proviral DNA as a surrogate marker for monitoring the effectiveness of anti-HIV treatment—not HIV RNA.  Stanford has submitted scores of academic articles to this effect and the court considers the most relevant ones.

First, Stanford cites to an article by Bagnarelli as a reference which allegedly teaches away from the methods taught by the patents-in-suit.  Damstedt Dec., Exh. 19 (hereinafter "Bagnerelli").[3] Bagnerelli, which was published after the 1991 JID article, does not attempt to quantify HIV RNA, id. at 93–94, nor does it teach that measuring RNA would not be useful in monitoring drug therapy

efficacy, id. at 89.  The article teaches simply that reverse-transcription PCR may be used to detect HIV-1.

Second, Stanford cites to an article by Fauci as evidence that the prevailing theory in 1991 taught that proviral DNA, not RNA, was the proper marker for monitoring HIV levels.  Damstedt Dec., Exh. 9 (hereinafter "Fauci").[4]  Fauci teaches that:

> Previous studies using in-situ hybridization techniques to detect cells expressing viral mRNA and immunofluorescence to detect cells expressing viral proteins have shown a low frequency of circulating lymphocytes expressing viral RNA or protein in HIV-infected individuals. . . . Because of the possibility that a larger proportion of cells may be latently infected, that is, containing proviral DNA but not expressing viral mRNA or protein, it was necessary to use methods sensitive enough to detect HIV proviral DNA.

Id. at 681.  Indeed, this article focuses on a number of potential surrogate markers and the relationship between infection and drug therapy, none of which include HIV RNA.  Id.

Third, Stanford cites to an article by Ottmann as proof that persons of ordinary skill in the art did not expect HIV RNA to be a viable surrogate marker for drug efficacy.  Damstedt Dec., Exh. 21 (hereinafter "Ottmann").[5]  In this reference, Ottmann investigated a PCR-plus-reverse transcription method of detecting HIV-1 RNA without nucleic acid extraction.  The detection of HIV-1 RNA resulted in no discernible difference between untreated patients and patients treated with zidovudine ("AZT")—a reverse transcriptase inhibitor.  Id. at 273.  Although this study arguably suggests that RNA was not a proper marker for disease progression since almost all HIV-infected patients had detectable levels of RNA, the study was aimed primarily at HIV detection, not quantification.

As further evidence that the prevailing theory taught that proviral DNA was the proper marker for monitoring HIV levels, Stanford and its experts point to the work of Cetus' scientists, which focused on HIV DNA throughout this period.[6]  Stanford points to U.S. Patent Nos. 5,008,182 ("'182 patent") and 5,389,512 ("'512 patent"), both invented by Cetus scientists Sninsky and Kwok and which issued, respectively, on April 16, 1991 and February 14, 1995.[7]  Damstedt Dec., Exhs. 12, 49.  The '182 patent discloses that viral particles, such as HIV RNA, may be an insufficient means of detecting the virus.  '182 patent at 1:52–63.  The '512 patent teaches a method of determining the viral load in a patient sample, where viral load is defined as copies of viral genome per cell.  '512

8

United States District Court

For the Northern District of California

patent at 3:14–16.  This definition necessarily excludes HIV RNA in plasma as a means of determining viral load.

In its analysis, Stanford fails to note that two Cetus references acknowledge the potential for HIV RNA as a marker.  First, an article written by Sninsky acknowledges the potential for RNA to serve as a template for PCR.  Damstedt Dec., Exh. 51.[8]  The article states:

> Single- and double-stranded DNA serve as effective templates for amplification. With the addition of an intervening reverse-transcription step, single- or double-stranded RNA can also serve as a template for PCR. . . . If RNA is the desired template, plasmid vectors capable of in vitro production of transcribed RNA are useful.

Id. at 94.  This article explicitly contemplates the use of RNA as a template for PCR, though not specifically in the HIV context.  Second, an article co-written by Sninsky and Kwok acknowledges that the PCR procedure has been applied to HIV RNA, and that such a procedure may be a productive area of research to monitor mRNAs.  Damstedt Dec., Exh. 11.[9]

There are three other prior art references worth noting.  First, an article by Ho discloses methods of measuring the levels of HIV-1 in cells and plasma using virus cultures—not PCR. Damstedt Dec., Exh. 15 (hereinafter "Ho").[10]  This reference shows that HIV-1 virus was found in the plasma and PBMC of every seropositive HIV patient.  In essence, this test found that titers of virus in plasma were a useful marker since the number of titers were higher in patients with more advanced disease.  Id. at 1622.  This reference also disclosed that short-term AZT therapy decreased HIV-1 levels in plasma, id. at 1621–22, and long-term AZT therapy showed significantly decreased plasma titers, id. at 1622.

Second, an article by Coombs similarly discloses methods of correlating plasma viremia with the stage of HIV infection using virus cultures—not PCR.  Demstadt Dec., Exh. 17 (hereinafter "Coombs").[11]  Coombs disclosed that among the four virologic markers of HIV infection he evaluated, plasma viremia was the best indicator of clinical disease progression.  Id. at 1629. However, Combs discloses a wide range of plasma HIV titers among patients with similar illness progression.  Id.

9

Third, the 1990 State-of-the-Art Conference Report disclosed that "there is no laboratory marker other than the CD4 count that is necessary in deciding when to initiate zidovudine therapy." Damstedt Dec., Exh. 24 at 341 (hereinafter "1990 State-of-the-Art Report").[12]  The Report concluded that "further research is needed on the use of CD4 lymphocyte counts and other immunologic markers for the initiation of therapy and the management of patients.  Each of these markers can be subject to considerable variability within individual patients."  Id. at 343.

In sum, the prior art includes references that disclose: 1) methods of detecting and quantifying HIV RNA in patient serum using PCR; 2) methods of monitoring the status of the infection and drug efficacy that fail to contemplate HIV RNA as a possibility; 3) notations regarding the problematic nature of surrogate markers associated with circulating virus; and 4) notations regarding a lack of a discernible difference between the detection of HIV RNA in treated and untreated patients.  While this survey of the scope and content of the prior art is necessarily limited to a subset of the myriad references submitted by the parties, the remaining references serve merely to corroborate the discordance amongst those skilled in the art at the time the patents were issued.  The only thing that is clear from the library of references submitted by the parties is that HIV research—particularly quantification using PCR and identification of surrogate markers—was in a state of uncertainty.


B.    Differences Between the Prior Art and the Claims at Issue

The second Graham factor examines the differences between the prior art and the claims at issue.  When surveying the differences between the prior art and the claims at issue, "section 103 specifically requires consideration of the claimed invention as a whole."  Princeton Biochems., 411 F.3d at 1337 (internal quotations omitted); see also W.L. Gore & Assocs, Inc. v. Garlock, Inc., 721 F.2d 1540, 1548–51 (Fed. Cir. 1983) ("Each claimed invention must be considered as a whole. . . . Claims 3 and 19 must be considered individually and separately.").

> The 'as a whole' instruction in title 35 prevents evaluation of the invention part by part.  Without this important requirement, an obviousness assessment might successfully break an invention into its component parts, then find a prior art

United States District Court

For the Northern District of California

1   reference corresponding to each component.  This line of reasoning would import
2   hindsight into the obviousness determination by using the invention as a roadmap
    to find its prior art components. Further, this improper method would discount the
3   value of combining various existing features or principles in a new way to
    achieve a new result-often the essence of invention.

4   Princeton Biochems., 411 F.3d at 1337 (internal quotations and citations omitted).

5          Roche asserts that the JID article differs from the asserted patents only to the extent that the

6   patent claims teach the use of the prior art PCR assay on patients receiving drug therapy in order to

7   determine therapeutic effectiveness.

8          While the prior art does disclose the use of the PCR assay for quantifying and detecting

9   HIV RNA, the prior art does not disclose the specific correlation limitations disclosed in the asserted

10  patents.  See, e.g., 730 patent, claims 7–9, 13, 14, 19, 23; '705 patent, claims 9–10; '041 patent,

11  claims 2–3.  In fact, none of the prior art references disclose specific information that would lead to

12  the conclusion that quantifying levels of HIV RNA in patient plasma could be correlated with the

13  efficacy of drug therapy.  Speculation to this effect is suggested in some of the references, see JID

14  article, supra note 2, at 865 ("Serum PCR may provide an additional marker of disease progression

15  and drug efficacy that could improve our ability to monitor the course of HIV infection.  Further

16  studies will be necessary to validate this approach."); Bagnerelli, supra note 3, at 89 ("although this

17  qualitative laboratory method may have diagnostic value, a quantitative assay for HIV-1 viremia in

18  treated and untreated seropositive patients would probably be of greater clinical interest"); however,

19  these statements merely suggest the necessary next steps in this field of research.

20         Looking at each asserted claim, the differences help clarify the obviousness analysis.[13]

21         1.   The '730 Patent

22         The '730 patent discloses methods of monitoring the clinical progression of HIV infection

23  and determining antiviral drug efficacy using PCR to quantify HIV RNA as a surrogate marker.  In

24  each of the asserted claims, the collecting, amplifying, and testing—or measuring—steps are

25  disclosed and taught by the JID article.  Thus, the differences discussed in the following sections

26  will focus on the correlations disclosed in each claim.

27

28                                                      11

a.   <u>Claim 1</u>

The correlation standard of claim 1 discloses that "the absence of detectable HIV-encoding nucleic acid correlates positively with the conclusion that the antiretroviral agent is therapeutically effective." '730 patent, claim 1 at 21:57–67, 22:56–58.  No subjects of the tests disclosed in the JID article were receiving antiretroviral therapy, and as a result, the methods described in the JID article fail to evaluate the effectiveness of anti-HIV therapy.  The Ho article discloses that patients undergoing AZT therapy showed a decreased HIV-titer in plasma.  Yet, the claimed subject matter at issue is broader than the links disclosed in the Ho article.  For instance, a protease inhibitor—as an antiretroviral agent—would be included in claim 1 of the '730 patent for evaluation of effectiveness, but the prior art fails to disclose a correlation between HIV RNA and protease inhibitor efficacy.

b.   <u>Claim 5</u>

Claim 5 discloses "[t]he method of claim 1, 2, 3, or 4 in which the antiretroviral agent is zidovudine [AZT]." '730 patent, claim 5 at 22:66–67.  As previously noted, the JID article does not include data or information regarding patients receiving *any* anti-HIV therapy.  The Ho article, however, discloses that patients undergoing AZT therapy showed a decrease in HIV-titer in plasma.

c.   <u>Claim 6</u>

The correlation standard of claim 6 discloses that "the presence of detectable HIV-encoding nucleic acid correlates positively with the conclusion that the antiretroviral agent is therapeutically ineffective." '730 patent, claim 6 at 23:1–14.  This correlation is merely the converse of that disclosed in claim 1.

d.   <u>Claim 7</u>

The correlation standard of claim 7 discloses that "the presence of detectable HIV-encoding nucleic acid correlates positively with an absolute CD4 count of less than 200 cells per cubic millimeter." '730 patent, claim 7 at 23:15–27.  The JID article considered the relationship between PCR measurement of HIV RNA and CD4, and it disclosed that "[s]erum from patients with <400 CD4 cells/mm$^3$ was more likely to be PCR positive." JID article, <u>supra</u> note 2, at 864.  The authors concluded that "[t]hese findings provide evidence that the amount of cell-free virus in circulation

correlates with the presence of . . . CD4 counts < 400/mm$^3$." Id. at 865.  While the standard

disclosed in the claimed methods—200 cells per cubic millimeter—is consistent with the correlation

disclosed in the JID article, this specific standard is not disclosed in any of the prior art references.

e.     Claim 8

The correlation standard of claim 8 discloses that "the absence of detectable HIV-encoding

nucleic acid correlates positively with an absolute CD4 count of greater than 200 cells per cubic

millimeter." '730 patent, claim 8 at 23:29–41.  This correlation is merely the converse of that

disclosed in claim 7, discussed previously.

f.     Claim 9

The correlation in claim 9 discloses that "an HIV RNA copy number greater than about 500

per 200 ul of plasma correlates positively with the conclusion that the antiretroviral agent is

therapeutically ineffective." '730 patent, claim 9 at 23:42–55.  The JID article quantified HIV RNA

using a relationship between absorbance and known copy number of gag gene RNA.  JID article,

supra note 2, at 862.  It discloses HIV RNA copy numbers ranging from 100 to greater than 50,000

per 200 ul of serum from patients at differing stages of the disease.  Id.  Neither the specific

correlation, nor the correlation standard in this claim, however, are disclosed in any prior art

reference.

.     g.     Claim 13

Claim 13 of the '730 patent discloses "[t]he method of claim 9, 10, 11, or 12  in which the

antiretroviral agent is zidovudine." '730 patent, claim 13 at 24:3–4.  As discussed above, no prior

art reference discloses the specific correlation disclosed in claim 9.   The Ho article discloses that

patients undergoing AZT therapy showed a decreased HIV-titer in plasma without correlating HIV

RNA copy number, as in this claim.

h.     Claim 14

The correlation standard in claim 14 discloses that "an HIV RNA copy number less than

about 200 per 200 ul of plasma correlates positively with the conclusion that the antiretroviral agent

in therapeutically effective." '730 patent, claim 14 at 24:5–18.  This standard is merely the converse

13

United States District Court

For the Northern District of California

of that disclosed in claim 9, discussed previously, with a different standard for the correlation. Claim 9 discloses a standard "greater than about 500 per 200 ul of plasma" as correlating with therapeutic ineffectiveness.  Claim 14, however, discloses a standard "less than about 200 per 200 ul of plasma" as correlating with therapeutic effectiveness.  Like claim 9, neither the specific correlation, nor the correlation standard in this claim are disclosed in any prior art reference.

i.   <u>Claim 18</u>

Claim 18 of the '730 patent discloses "[t]he method of claim 14, 15, 16, or 17 in which the antiretroviral agent is zidovudine."  '730 patent, claim 18 at 24:26–27.  As previously noted, no prior art references disclose the specific correlation disclosed in claim 14.   The Ho article discloses that patients undergoing AZT therapy showed a decreased HIV-titer in plasma, but does not correlate HIV RNA copy number, as in this claim.

j.   <u>Claim 19</u>

Claim 19 of the '730 patent discloses:

> A method of evaluating the effectiveness of anti-HIV therapy of a patient comprising:
> > (i) collecting one pre-treatment plasma sample from an HIV-infected patient who is about to be treated with an antiretroviral agent;
> > (ii) collecting a post-treatment plasma sample from the HIV-infected patient after the patient has been treated with the antiretroviral agent;
> > (iii) amplifying the HIV-encoding nucleic acid in the pre-treatment and post-treatment plasma samples using HIV primers in about 30 cycles of PCR;
> > (iv) measuring the HIV RNA copy number using the products of the PCRs of step (iii); and
> > (v) comparing the HIV RNA copy number in pre-treatment and post-treatment plasma samples,
> in which a ratio of HIV RNA copy number in pre-treatment and post-treatment plasma samples of greater than about 4 to 1 correlates positively with the conclusion that the anti-HIV agent is therapeutically effective.

'730 patent, claim 19 at 24:28–47.

This claim discloses a method of monitoring the change in HIV RNA copy number using a ratio and correlating that ratio to therapeutic effectiveness.  No prior art reference discloses the method of quantifying HIV RNA over time, the ratio method of correlating, nor this specific 4 to 1 ratio for determining therapeutic effectiveness.

14

United States District Court

For the Northern District of California

k.      Claim 23

Claim 23 of the '730 patent discloses "[t]he method of claim 19, 20, 21, or 22 in which the antiretroviral agent is zidovudine." '730 patent, claim 23 at 24:56–57. As previously noted, no prior art references disclose the specific correlation disclosed in claim 19. The Ho article discloses that patients undergoing AZT therapy showed a decrease in HIV-titer in plasma, but does not correlate a ratio of pre-treatment and post-treatment HIV RNA copy numbers, as in this claim.

2.      The '705 Patent

Like the '730 patent, the '705 patent discloses methods of monitoring the clinical progression of HIV infection and determining antiviral drug efficacy using PCR to quantify HIV RNA as a surrogate marker.

a.      Claim 1

Claim 1 of the '705 patent discloses:

A method of evaluating the effectiveness of anti-HIV therapy of an HIV-infected patient comprising:
a) collecting statistically significant data useful for determining whether or not a decline in plasma HIV RNA copy numbers exists after initiating treatment of an HIV-infected patient with an antiretroviral agent by:
(i) collecting more than one plasma sample from the HIV-infected patient at time intervals sufficient to ascertain the existence of a statistically significant decline in plasma HIV RNA copy numbers;
(ii) amplifying the HIV-encoding nucleic acid in the plasma samples using HIV primers via PCR for about 30 cycles;
(iii) measuring HIV RNA copy numbers using the products of the PCR step (ii);
(iv) comparing the HIV RNA copy numbers in the plasma samples collected during the treatment; and
b) evaluating whether a statistically significant decline in plasma HIV RNA copy numbers exists in evaluating the effectiveness of anti-HIV therapy of a patient.

'705 patent, claim 1 at 23:1–22. The JID article discloses the collecting, amplifying, and measuring steps of this claim. However, it does not disclose collecting more than one sample of plasma for comparison purposes, nor does it disclose the comparing or evaluating steps. The Ho article discloses that HIV-titer in blood decreases when undergoing AZT therapy.

b.      Claim 5

15

1    Claim 5 discloses "[t]he method of claim 1 in which the antiretroviral agent is zidovudine

2  [AZT]." '705 patent, claim 5 at 23:29–30.  As previously noted, the JID article does not include

3  data or information regarding patients receiving *any* anti-HIV therapy.  The Ho article, however,

4  discloses that patients undergoing AZT therapy showed a decrease in HIV-titer in plasma.

5                                    c.    Claim 6

6    Claim 6 discloses "[t]he method of claim 1, wherein the presence of a statistically significant

7  decline in plasma HIV RNA copy number correlates positively that the antiretroviral agent is

8  therapeutically effective." '705 patent, claim 6 at 23:32–35.  No subjects of the tests disclosed in the

9  JID article were receiving antiretroviral therapy, and as a result, the methods described in the JID

10 article fail to evaluate the effectiveness of anti-HIV therapy.  The Ho article discloses that patients

11 undergoing AZT therapy showed a decrease in HIV-titer in plasma.

12                                   d.    Claim 7

13   Claim 7 discloses "[t]he method of claim 1, wherein the absence of a statistically significant

14 decline in plasma HIV RNA copy number correlates positively that the antiretroviral agent is

15 therapeutically ineffective." '705 patent, claim 7 at 23:36–39.  This claim is merely the converse of

16 that disclosed in claim 6.

17                                   e.    Claim 8

18   Claim 8 of the '705 patent discloses:

19       A method of evaluating the effectiveness of anti-HIV therapy of an HIV-infected
         patient comprising:
20               (i) collecting a pre-treatment plasma sample from the HIV-infected patient
                    who is about to be treated with an antiretroviral agent;
21               (ii) collecting a plasma sample after initiation of treatment with an
                    antiretroviral agent and at a time interval sufficient to ascertain the
22                  existence of a statistically significant decline in plasma HIV RNA
                    copy numbers;
23               (iii) amplifying the HIV-encoding nucleic acid in the plasma samples
                    using HIV primers via PCR for about 30 cycles;
24               (iv) measuring HIV RNA copy numbers using the products of the PCR
                    step (iii);
25               (v) comparing the HIV RNA copy numbers in the plasma samples
                    collected in the pre-treatment plasma sample and the plasma
26                  sample(s) collecting after initiation of the treatment; and

27

28                                          16

United States District Court

For the Northern District of California

1        (vi) evaluating whether a statistically significant decline in plasma HIV
              RNA copy numbers exists in evaluating the effectiveness of anti-
2             HIV therapy of a patient.

3   '705 patent, claim 8 at 24:1–22.  The JID article discloses the collecting, amplifying and measuring

4   steps of this claim.  However, it does not disclose collecting more than one sample of plasma for

5   comparison purposes, nor does it disclose the comparing or evaluating steps.

6                        f.        Claim 9

7        Claim 9 discloses "[t]he method of claim 8, wherein comparing the HIV RNA copy numbers

8   of step (v) further comprises determining a ratio of HIV RNA copy numbers in the pre-treatment and

9   the post-treatment plasma samples, wherein the ratio being greater than about 7 to 1 correlates

10  positively with the conclusion that the antiretroviral agent is therapeutically effectiveness [sic]."

11  '705 patent, claim 9 at 24:23–29.  This claim sets forth a specific standard for therapeutic

12  effectiveness, measured by determining a ratio of HIV RNA copy numbers from before and after

13  anti-HIV treatment.  This claim therefore adds to claim 8 a particularized standard for determining

14  therapeutic effectiveness that is not disclosed by any prior art.

15                       g.        Claim 10

16       Claim 10 discloses "[t]he method of claim 7, wherein comparing the HIV RNA copy

17  numbers of step (v) further comprises determining a ratio of HIV RNA copy numbers in the pre-

18  treatment and the post-treatment plasma samples, wherein the ratio being greater than about 4 to 1

19  correlates positively with the conclusion that the antiretroviral agent is therapeutically effectiveness

20  [sic]."  '705 patent, claim 9 at 24:23–29.  This claim is identical to claim 9, with merely a different

21  correlation standard.

22               3.       The '041 Patent

23       Like the '730 and '705 patents, the '041 patent discloses methods of monitoring the clinical

24  progression of HIV infection and determining antiviral drug efficacy using PCR to quantify HIV

25  RNA as a surrogate marker.

26                       a.        Claim 1

27       Claim 1 of the '041 patent discloses:

28                                                    17

A method of evaluating the effectiveness of anti-HIV therapy of a patient comprising:

> correlating the presence or absence of detectable HIV-encoding nucleic acid in a plasma sample of an HIV infected patient with an absolute CD4 count, wherein the presence or absence of said detectable HIV-encoding nucleic acid is determined by
>> (i) collecting a plasma samples [sic] from the HIV-infected patient who is being treated with an antiretroviral agent;
>> (ii) amplifying the HIV-encoding nucleic acid that may be present in the plasma sample using HIV primers via PCR; and
>> (iii) testing for the presence of HIV-encoding nucleic acid sequence in the product of the PCR.

'041 patent, claim 1 at 23:22–37.  This method is substantially similar to that disclosed in claims 7 and 8 of the '730 patent.  This claim, however, lacks the 30 cycles of amplification limitation and the specific standards set forth in claims 7 and 8 of the '730 patent.  As noted previously, with respect to those two claims, the JID article considered the relationship between PCR measurement of HIV RNA and CD4, and it disclosed that "[s]erum from patients with <400 CD4 cells/mm$^3$ was more likely to be PCR positive."  JID article, <u>supra</u> note 2, at 864.  The authors concluded that "[t]hese findings provide evidence that the amount of cell-free virus in circulation correlates with the presence of . . . CD4 counts < 400/mm$^3$."  <u>Id.</u> at 865.

### b.    Claim 2

Claim 2 discloses, "[t]he method of claim 1, wherein the absence of HIV-encoding nucleic acid and the absolute CD4 count being greater than about 200 cells per cubic millimeter correlate positively with the conclusion that the antiretroviral agent is therapeutically effective."  '041 patent, claim 2 at 23:38–42.  This method is substantially similar to that disclosed in claim 8 of the '730 patent, except this claim is structured in a different manner.  The substance of the methods taught, however, is virtually identical.

### c.    Claim 3

Claim 3 discloses, "[t]he method of claim 1, wherein the presence of HIV-encoding nucleic acid and the absolute CD4 count being less than about 200 cells per cubic millimeter correlate positively with the conclusion that the antiretroviral agent is therapeutically ineffective."  '041 patent, claim 3 at 24:23–27.  This claim is merely the converse of that disclosed in claim 2.  It

United States District Court

For the Northern District of California

also discloses a method that is substantially similar to claim 7 of the '730 patent. While the standard disclosed in this claim—a CD4 count of less than 200 cells per cubic millimeter—is consistent with the correlation disclosed in the JID article, this specific standard is not disclosed in any of the prior art references.

### d.   Claim 4

Claim 4 discloses, "[t]he method of any one of claims 1–3, wherein the PCR is performed for about 30 cycles." '041 patent, claim 4 at 24:28–29. Like claims 7 and 8 of the '730 patent, the steps of this claim are disclosed in the JID article, with the exception of the CD4/HIV RNA correlation set forth in claims 2 and 3, discussed above. This claim adds the "about 30 cycles" of PCR limitation, and therefore the differences between the prior art and this claim are identical to the differences between claims 7 or 8 of the '730 patent and the prior art.

### e.   Claim 8

Claim 8 discloses "[t]he method of any one of claims 1–3 in which the antiretroviral agent is zidovudine [AZT]." '041 patent, claim 8 at 24:38–39. This claim merely adds to the claimed methods standards for evaluating the efficacy of AZT therapy. The JID article discloses the collecting, amplifying, and testing steps, and as previously discussed, the Ho article teaches that effective AZT therapy results in a decrease in HIV-titer in plasma.

### C.   Level of Ordinary Skill in the Art[14]

With respect to the third Graham factor, this court has previously defined a person having ordinary skill in the art in this action as, "[a] medical doctor working on clinical HIV research involving antiretroviral agents or a Ph.D. researcher working on molecular methods relating to clinical HIV research involving antiretroviral agents. Any person of ordinary skill in the art must have conducted numerous PCR assays in conjunction with his research." Docket No. 212 at 7.

### D.   Secondary Considerations[15]

United States District Court

For the Northern District of California

1    The fourth and final factor in the Graham obviousness inquiry directs the court to look at

2    objective evidence of non-obviousness—secondary considerations.  383 U.S. 1.  In KSR, the

3    Supreme Court noted that, "Graham set forth a broad inquiry and invited courts, where appropriate,

4    to look at any secondary considerations that would prove instructive."  127 S. Ct. at 1739 (("Such

5    secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc.,

6    might be utilized to give light to the circumstances surrounding the origin of the subject matter

7    sought to be patented.") (quoting Graham, 383 U.S. at 17–18)).[16]

8    Secondary considerations do not control the obviousness inquiry, Richardson-Vicks v.

9    Upjohn Co., 122 F.3d 1476, 1483 (Fed. Cir. 1997), but they assist the court in evaluating objective

10   indicia of non-obviousness.  See Friskit, Inc. v. RealNetworks, Inc., 499 F. Supp. 2d 1145, 1153–54

11   (N.D. Cal. 2007) (Schwarzer, J.) ("secondary considerations are but part of the totality of the

12   evidence that is used to reach the ultimate conclusion of obviousness").

13          1.    Commercial Success

14   The National Institute of Health ("NIH") publishes guidelines for the treatment of AIDS/HIV

15   which are regularly updated by experts in the field.  The latest guidelines for antiretroviral treatment

16   prescribe a plasma HIV RNA laboratory test during the initial patient visit and state that "viral load

17   is critical for evaluating response to therapy."  Cf. Damstedt Dec., Exh. 41.[17]

18   Similarly, the International AIDS Society published Recommendations for Treatment of

19   Adult HIV Infection in 2006 which mirror this conclusion.[18]  These guidelines also provide for

20   regular HIV RNA screening:

21          The aim of antiretroviral therapy remains the maintenance of the plasma HIV-1
            RNA level below the limits of detection of the most sensitive assays
22          commercially available. . . . After 48 weeks, measures of HIV-1 RNA should be
            obtained at regular intervals (eg, every [sic] 3 or 4 monthly) to confirm that the
23          plasma HIV-1 RNA level remains below the limits of detection.

24   Cf. id., Exh. 44 at 831–32.

25   Both of these sources—in providing general guidance to practitioners—confirm the success

26   of the patented inventions.  The patented invention claims a method of viral load testing which

27   correlates the presence of detectable HIV RNA to therapeutic effectiveness, and both of these

28                                             20

1    guidelines for practitioners specifically state that maintaining HIV RNA levels below detectable

2    limits is desirable for effective drug therapy.  The former theory, however, was effectively disclosed

3    in the JID article.  Indeed, the JID article suggested further testing of HIV RNA as a possible

4    surrogate marker.  The latter theory—minimizing the level of the surrogate marker is

5    desirable—would be clear to one of ordinary skill in the art.  Consequently, to the extent that this

6    factor plays a part in the analysis, it hinges upon the *choice* of HIV RNA as the surrogate marker.

7    This is because the remaining differences between the patent claims and the prior art—specifically

8    the correlations disclosed in the claims—cannot be specifically linked to any commercial success.

9                        2.    Long Felt but Unsolved Need and Failure of Others

10       In the early 1990s, NIH and the National Institute of Allergy and Infectious Diseases

11   ("NIAID") sponsored State-of-the-Art conferences on AZT therapy.  The 1990 State-of-the-Art

12   Conference Report stated that "there is no laboratory marker other than the CD4 count that is

13   necessary in deciding when to initiate zidovudine therapy," and it concluded that "further research is

14   needed on the use of CD4 lymphocyte counts and other immunologic markers for the initiation of

15   therapy and the management of patients.  Each of these markers can be subject to considerable

16   variability within individual patients."  1990 State-of-the-Art Report, supra note 12, at 341, 343.

17       The 1993 State-of-the-Art Conference Report added:

18           [l]aboratory parameters suggestive of progression would include rapidly declining
             $CD4^+$ cell counts (or percentages) or [other non-HIV RNA counts].  More
19           sophisticated assays, such as those that detect . . . [other markers including]
             increased quantitative viral load in serum or tissue . . . may become useful in the
20           future for detecting disease progression.

21   Damstedt Dec., Exh. 25 at 2587.[19]  These references show that amidst the uncertainty in this field,

22   even after the publication of the JID article it was not clear to persons of ordinary skill that HIV-

23   RNA was a proper marker.  See also id., Exh. 26.[20]  However, the JID article did suggest that HIV-

24   RNA could be a proper marker and that further research was necessary to confirm the same.

25       Stanford also cites to the AIDS/HIV Reference Guide for Medical Professionals published in

26   1997, which discusses PCR techniques for detecting and quantifying DNA and RNA.

27

28                                              21

> A promising area of research for early diagnosis and for quantitation of HIV involves detection and quantitation of HIV nucleic acid (RNA or DNA) sequences by gene amplification techniques, such as PCR. . . . Much of viral RNA is defective and nonpathogenic and, thus may not reflect infectious virus production, which poses problems in evaluating its measurements.  Assays using PCR . . . methods were developed as used for measurement of HIV RNA in plasma (19).  Several studies have demonstrated an association between levels of plasma RNA and stage of HIV disease and clinical progression.  However, there are still unresolved issues such as the effect of the biological variability, the variability of reverse transcription step, the effect of processing and storage condition on genomic RNA stability, etc.  At this time, a standardized quantitative RNA PCR assay is not available.

Damstedt Dec., Exh. 16 at 86–87.[21]  This study recognizes that even though HIV RNA poses certain problems, it could be used as a potential surrogate marker.  However, even as late as 1997, professionals working in this field were explicating a need for a "standardized quantitative RNA PCR assay" and referring to this technology only as a "promising area of research."  Id.

These references, collectively, show that long after the application for the patents-in-suit had been made, researchers and practitioners were still expressing a need for a solution to the problem which the asserted patents purport to solve.  This long felt need, however, was only for a proper surrogate marker to monitor therapy.  Consequently, to the extent that this factor plays a part in the obviousness analysis, its focus is on the *choice* of HIV RNA as a surrogate marker.  Because there exist no genuine issues of material fact—as outlined in this section—the court will now discuss the validity of the patents-in-suit.

II.        Invalidity Based on Obviousness

As previously discussed, the Supreme Court recently reiterated the framework for courts to use in an obviousness analysis in KSR, 127 S. Ct 1727.  The Court reaffirmed Graham and elaborated that "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results," id. at 1739, and "when the prior art teaches away from combining certain known elements, discovery of a successful means of combining them is more likely to be nonobvious," id. at 1740.  Finally, the Court acknowledged that

1   courts should be aware of the bias of hindsight because the genius of invention is often a

2   combination of known elements, which in hindsight seems self-evident.  Id. at 1742.

3          After KSR, the United States Patent and Trademark Office ("USPTO") published new

4   guidelines to assist patent examiners in determining whether a claimed invention is obvious.[22]

5   *Examination Guidelines for Determining Obviousness Under 35 U.S.C. 103 in View of the Supreme*

6   *Court Decision in KSR International Co. v. Teleflex Inc.*, 72 Fed. Reg. 57526-01 (Oct. 10, 2007).

7   These guidelines establish seven rationales under KSR which justify a finding of obviousness:

8          (A) Combining prior art elements according to known methods to yield predictable
                 results;
9          (B) Simple substitution of one known element for another to obtain predictable
                 results;
10         (C) Use of known technique to improve similar devices (methods, or products) in the
                 same way;
11         (D) Applying a known technique to a known device (method, or product) ready for
                 improvement to yield predictable results;
12         (E) "Obvious to try"--choosing from a finite number of identified, predictable
                 solutions, with a reasonable expectation of success;
13         (F) Known work in one field of endeavor may prompt variations of it for use in either
                 the same field or a different one based on design incentives or other market
14                forces if the variations would have been predictable to one of ordinary skill in
                 the art;
15         (G) Some teaching, suggestion, or motivation in the prior art that would have led one
                 of ordinary skill to modify the prior art reference or to combine prior art
16                reference teachings to arrive at the claimed invention.

17   Id. at 57529.

18         Here, when considering both the prior art references and the claimed inventions as a whole,

19   the focus of the obviousness inquiry is directed at two portions of the claimed inventions: 1) the use

20   of HIV RNA as a surrogate marker for drug efficacy; and 2) the correlations that use HIV RNA as a

21   surrogate marker for drug efficacy.  Each of the asserted claims is similar in that all disclose the use

22   of HIV RNA as a surrogate marker for drug efficacy, yet all differ in that each discloses a unique

23   correlation for evaluating drug efficacy.

24

25         A.       The Use of HIV RNA As a Surrogate Marker

26                  1.       Improper Focus

27

28                                                        23

*United States District Court*
For the Northern District of California

**United States District Court**
For the Northern District of California

Stanford argues that the choice to use HIV RNA in plasma as a potential surrogate marker was not obvious.  This argument, however, focuses on a preliminary matter in the research methodology that resulted in the patents-in-suit.  Stanford vehemently asserts that when Holodniy began focusing on HIV RNA as a surrogate marker, others skilled in the art were looking at, *inter alia*, DNA, CD4, and p24 antigens.  See, e.g., Fauci, supra note 4 (listing numerous options for further research into potential surrogate markers, but failing to consider HIV RNA in plasma).  Stanford also argues that in addition to the prevalent focus on other potential surrogate markers, particular skepticism surrounded the use of HIV RNA in plasma for this purpose.  Thus, it argues the use of HIV RNA in plasma as a surrogate marker was non-obvious.

Even assuming the Stanford scientists were defying prevailing wisdom by choosing to study HIV RNA in plasma as a potential surrogate marker, this choice is not explicitly embodied in the patents-in-suit, nor did it immediately result in the patents-in-suit.  After the choice was made to research HIV RNA in plasma as a potential surrogate marker, Stanford scientists still had to complete a number of subsequent steps before the claimed methods were reduced to practice—the choice to use HIV RNA was therefore merely a preliminary choice on the route to developing methods to evaluate therapy efficacy.  Subsequent to the choice to focus on HIV RNA, Stanford scientists went on to: 1) quantify HIV RNA in plasma, as disclosed in the JID article; 2) correlate the results of the quantitation with then-currently detectable indications of disease progression; 3) further correlate the results of the quantitation with then-currently detectable indications of drug efficacy; and 4) evaluate the utility of the correlations.  The patents-in-suit incorporate all four of the above steps.

Unlike Takeda Chem. Indus., Ltd. v. Alphaparhm Pty, Ltd., 492 F.3d 1350 (Fed. Cir. 2007), where the asserted patents claimed a genus and particular pharmaceutical chemical compounds, the claims in the instant action are method claims.  The researchers there were making cognizant modifications to known compounds "in order to improve the antidiabetic activity and obtain a compound with better activity."  Id. at 1357.  The Federal Circuit in Takeda discussed the options available to the researchers at the time the claimed compounds were invented when determining

whether the claimed compounds were obvious.  In determining that the claimed compounds were

non-obvious, the court explained that "one of ordinary skill in the art would have chosen one of the

[over ninety] compounds disclosed in [the prior art] . . . rather than to choose as a starting point a

compound with identified adverse effects."  Id. at 1360 (internal quotations omitted).  Thus, in

Takeda, the choice to commence research into the particular compounds which led to the patents-in-

suit was a determinative factor in the obviousness analysis.  There the patents-in-suit directly related

to the choice of a particular compound as a starting point.  Id.  Here, however, the choice to research

HIV RNA as a potential marker was merely a preliminary step which led, ultimately, to the claimed

methods in the instant action.  The *choice* of HIV RNA as a surrogate marker is not what was

patented.  Consequently, this choice is not determinative in the obviousness analysis.

Common sense, along with coherence under the penumbra of patent law, dictate this result.

It is clear that if Stanford had patented the five-step method of quantifying HIV RNA that is

specifically disclosed in the JID article, it would have been anticipated by the prior art.  No analysis

regarding the state of the art at the time would have been necessary.  However, if any

changes—even obvious ones—are made to the process contemplated by the JID article, the analysis

shifts to one of obviousness, not anticipation.  Consequently, under Graham and KSR, this court is

required to analyze the scope and content of the prior art, an analysis wholly missing under the

anticipation rubric.  This prompts the question: can a purported inventor add an obvious limitation to

a piece of prior art in order to secure a method patent and then claim that because his choice of

selecting the particular piece of prior art was non-obvious, the patent cannot be invalid as obvious?

This cannot be so.  Unless the *selection process* is somehow incorporated into the patent *claims*, the

claims must be viewed independently of the selection process.

The proper focus for the obviousness inquiry is on the language of the claims—which do not

discuss the choice of HIV RNA as a surrogate marker.  The claims define the scope of the patented

invention, and the claims disclose methods of quantifying HIV RNA and using the results to

evaluate drug efficacy.  As discussed below, even if the choice to use HIV RNA as a marker is non-

obvious, the court must nevertheless evaluate the claim language.  However, before addressing the

25

United States District Court

For the Northern District of California

1    obviousness inquiry in this manner, the court disposes of Stanford's arguments.

2                    2.      Obviousness of Choosing HIV RNA as a Surrogate Marker

3           If Stanford is correct in its contention that its choice of using HIV RNA as a surrogate

4    marker is an implicit claim limitation, then the obviousness or non-obviousness of this choice must

5    be analyzed.

6           Roche argues that Pfizer, Inc. v. Apotex, 480 F.3d 1348 (2007), renders the selection of HIV

7    RNA as a marker to be obvious.  There, the Federal Circuit held that "a skilled artisan would have

8    had a reasonable expectation of success with the besylate salt form of amlodipine at the time the

9    invention was made" and therefore the particular patented salt at issue would have been obvious to

10   try.  Id. at 1368.  The court found that "on the particularized facts of this case, consideration of the

11   routine testing performed by Pfizer is appropriate because the prior art provided not only the means

12   of creating acid addition salts but also *predicted the results*, which Pfizer merely had to verify

13   through routine testing."  Id. at 1367 (emphasis added).  Unlike Pfizer, however, the JID article

14   provided no predictions to persons skilled in the art regarding the success of HIV RNA as a

15   surrogate marker for evaluating drug efficacy.

16          Similarly, PharmaStem Therapeutics, Inc. v. ViaCell, Inc., 491 F.3d 1342 (Fed. Cir. 2007),

17   does not aid Roche.  That court found that "[s]cientific confirmation of what was already believed to

18   be true may be a valuable contribution, but it does not give rise to a patentable invention."  Id. at

19   1363–64.  However, in that case, the "joint specification indicate[d] that each step of the

20   cryopreservation and transplantation procedure had been spelled out in the prior art."  Id.  That is not

21   the case here.  HIV RNA was not believed to be a proper marker, nor was each step disclosed in the

22   patents-in-suit spelled out in the prior art.

23          PharmaStem, however, did elucidate the obviousness analysis.  It found that:

24          obviousness does not require absolute predictability of success. Indeed, for many
            inventions that seem quite obvious, there is no absolute predictability of success until
25          the invention is reduced to practice. On the other hand . . . an invention would not be
            invalid for obviousness if the inventor would have been motivated to vary all
26          parameters or try each of numerous possible choices until one possibly arrived at a
            successful result, where the prior art gave either no indication of which parameters
27          were critical or no direction as to which of many possible choices is likely to be

28                                                      26

United States District Court

For the Northern District of California

successful.  Likewise, an invention would not be deemed obvious if all that was suggested was to explore a new technology or general approach that seemed to be a promising field of experimentation, where the prior art gave only general guidance as to the particular form of the claimed invention or how to achieve it.

Id. (internal quotations and citations omitted).  This case is not one in which "the prior art gave either no indication of which parameters were critical or no direction as to which of many possible choices is likely to be successful," nor is it one in which the prior art "gave only general guidance as to the particular form of the invention or how to achieve it."  The JID article specifically pointed scientists toward a possible solution—using HIV RNA as a potential marker—in a field where only a limited number of options were being pursued.  Though it listed HIV RNA as a promising possibility requiring experimental confirmation, it did provide a method of quantitating HIV RNA—an essential prerequisite to any further experimentation regarding the efficacy of HIV RNA as a potential surrogate marker.

It is clear that contemporaneous to the publication of the JID article, there was great confusion as to which marker would eventually be found successful.  See Damstedt Dec., Exh. 9 at 681 (focusing on different options for potential surrogate markers, but failing to consider HIV RNA); id., Exh. 48 at 1 (proposing a project for detecting HIV DNA using PCR); '182 patent at 1:52–63 (stating that viral particles, such as HIV RNA, may be insufficient for detecting the virus); 1990 State-of-the-Art Report, supra note 12, at 343 ("further research is needed on the use of CD4 lymphocyte counts and other immunologic markers for the initiation of therapy and the management of patients.  Each of these markers can be subject to considerable variability within individual patients").  A chosen path, however, need not be met with scientific consensus in the field in order to render it obvious.  HIV RNA was an option disclosed in the prior art, but it was merely one option amongst others.  Researchers in the field were still focusing, inter alia, on HIV DNA and CD4 as possible surrogate markers.  There were, however, only a limited number of markers to choose from.  See Fauci, supra note 4 (discussing mRNA, CD4 and proviral DNA); Chiang Dec., Exh. 1 (hereinafter "Volberding Dep.") at 323:15–324:4 (listing PMBC, PCR, plasma PCR, P24 antigen in various forms, neopterin and Beta-2-microglobulin as potential markers); Ottman, supra note 5

United States District Court

For the Northern District of California

(discussing p24 antigen, anti-p24 antibody, CD4, PMBC and HIV-1); see also Damistadt Dec., Exh. 16[23] at Table 3.3 (a 1997 reference discussing sIL-2R, sCD8, CD38, CD45RA, leu 8, HLA-DR, CD57, CD11b and CD71 but grouping them into seven categories because they "provide essential similar prognostic information."). Upon a review of the scientific articles submitted by the parties, the court is unable to identify more than twenty distinct surrogate markers.

In KSR, the Supreme Court held that a combination of elements that was "obvious to try" might be a sufficient prima facie showing of obviousness:

> When there is a . . . market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense. In that instance the fact that a combination was obvious to try *might show that it was obvious* under § 103.

KSR, 127 S. Ct. at 1742 (emphasis added). With a maximum of twenty options available as potential surrogate markers, it would behoove one skilled in the art to try any new possible marker to determine its robustness.

When the JID article was published, there was a long felt and unmet need to find a proper marker. This is clear from the various avenues of research being conduced. Indeed, patients afflicted with HIV/AIDS were dying due to the lack of proper therapies. The JID article teaches that HIV RNA can be detected and quantified using PCR technology and suggests that "[s]erum PCR may provide an additional marker of disease progression and drug efficacy that could improve our ability to monitor the course of HIV infection." JID article, supra note 2, at 864. In light of this state of affairs, it would have been obvious for one of skill in the art to follow the suggestion in the JID article, which prompted the reader to conduct further experimentation to determine whether HIV RNA in plasma could be an appropriate marker. Indeed, researchers were concurrently evaluating more than one potential marker to monitor the effectiveness of therapy. Volberding Dep. at 324:11–20.

Dr. Volberding summarizes the problems with determining whether a potential marker will be successful in aiding scientists and medical professionals:

United States District Court

For the Northern District of California

> Developing a potential surrogate marker generally involves significant work and unpredictability. Many targets prove difficult or impossible to quantify reliably. . . . [M]any targets that can be adequately quantified are ultimately found to correlate poorly with therapeutic efficacy. The attempted quantitation of HIV DNA and mRNA in cells, although once a promising potential surrogate marker for anti-HIV therapy, has now been largely abandoned.

Volberding Dec., ¶ 16. This argument, however, cuts against Stanford because the JID article specified a way to reliably quantify HIV RNA. It further suggested that HIV RNA be tested to determine whether it could be an appropriate marker. Though the risk remained that it could correlate poorly with therapeutic efficacy, those skilled in the art at the time had an incentive to test HIV RNA because a quantitation mechanism had been made public. Thus, some part of the multiple steps required to develop HIV RNA as a potential surrogate marker had already been performed. This would give one of skill in the art motivation to determine if HIV RNA did correlate with therapeutic efficacy.

From a cost/benefit perspective, there was a large incentive to pursue the option presented by the JID article. There was a great need for an effective marker. The JID article had already revealed that HIV RNA could be easily and precisely quantified—only experimental confirmation of HIV RNA as a marker remained unperformed. The financial benefits and scientific accolades inherent in finding a marker were known to all. In addition, the potential markers that were being considered at the time numbered less than twenty. Indeed, as is clear now, finding a marker could forever change the face of HIV/AIDS research.

Stanford argues that the focus on DNA as a possible marker at the time foreclosed HIV RNA as an obvious choice because: 1) HIV had a latent phase after infection where no RNA was being created; and 2) therapies in use at the time prevented replication of DNA. Neither argument is persuasive. First, assuming that HIV does have a latent phase, using HIV RNA as a marker would not be preferable *only* during the latent phase. It could certainly still be used as a marker during all other phases. Scientists at the time could discern which phase the disease was in generally—by way of other symptoms, such as deteriorating health—in order to determine if HIV RNA would serve as an effective marker during that phase. Second, if therapies at the time prevented formation of DNA,

29

1   then consequently, they would also prevent the formation of RNA—it was known in the art at the

2   time that HIV replicates by converting itself from DNA to RNA and vice versa.  Thus, if the

3   therapies were effective in preventing formation of DNA, the RNA count would be affected in the

4   same manner as the DNA count.

5          To the extent Takeda is instructive here, it supports this finding.  There, the prior art revealed

6   over ninety compounds which "did not disclose the existence of toxicity or side effects."  492 F.3d

7   at 1360 (internal quotations omitted).  That same prior art reference explicitly "taught away from

8   pyridyl compounds because it associated adverse side effects with compound b."  Id. at 1359.  The

9   patents-in-suit there nevertheless used compound b as the lead compound for anti-diabetic research.

10  The Federal Circuit found the choice of compound b to be non-obvious but concurrently found that

11  "one of ordinary skill in the art would have chosen one of the [over ninety] compounds disclosed in

12  [the prior art] . . . ."  Id. at 1360 (internal quotations omitted).  This supports a finding that when

13  presented with ninety equally attractive options, picking any one of those ninety options is

14  considered obvious.  Here, active research was being performed on only about twenty potential

15  markers.  The JID article suggested HIV RNA as a possible marker and provided a way to precisely

16  quantify it.  There is no evidence that scientists had scores of other possibilities for research.  In this

17  situation, choosing HIV RNA as a potential marker would have been obvious to one of skill in the

18  art.

19         Finally, Stanford insists that the Bagnarelli and Ottmann references teach away from the use

20  of HIV RNA as a marker.  The Federal Circuit has held that "mere disclosure of alternative designs

21  does not teach away."  In re Fulton, 391 F.3d 1195, 1201 (Fed. Cir. 2004).  Indeed, when dealing

22  with shoe designs, that court held that "the design patents in the prior art disclose a number of

23  alternative shoe sole designs but do not teach that hexagonal projections in a facing orientation are

24  undesirable and, therefore, do not teach away."  Id.  First, Bagnarelli teaches simply that reverse-

25  transcription PCR may be used to detect HIV-1 without commenting on whether using HIV RNA

26  would or would not be useful in monitoring drug therapy efficacy.  This does not teach away.

27  Second, Ottman was aimed at HIV detection, not quantification.  Indeed, it found that HIV RNA

28                                                          30

1   was detectable in infected patients independent of whether they were undergoing therapy or not.

2   This does not teach away from using HIV RNA as a surrogate marker.  Indeed, it may support the

3   use of HIV RNA as a marker because it shows that HIV RNA is detectable in all infected patients

4   and that quantifying the same may lead to an effective surrogate marker.  Stanford points to no other

5   reference that explicitly teaches away from using HIV RNA as a surrogate marker.

6           Thus, based on the court's finding that: 1) the JID article provides an explicit suggestion to

7   try HIV RNA as a potential surrogate marker in a world with limited possibilities; 2) the JID article

8   provides an efficient and precise method to quantify HIV RNA; 3) no prior art references taught

9   away from the use of HIV RNA as a marker; and 4) discovery of an effective marker carried a large

10  potential financial and professional reward, the court finds that the choice to investigate HIV RNA

11  as a potential marker was obvious.  In light of this determination, the court may now determine

12  whether other claim limitations in the patents-in-suit render it non-obvious.  However, before the

13  court does so, it entertains the argument that the universe of possible potential surrogate markers was

14  not limited to a select few, but was in fact infinite.

15          3.      Non-Obviousness of Choosing HIV RNA as a Surrogate Marker

16          The analysis changes if there are myriad options for one skilled in the art to choose from and

17  there is no indication that one option is preferable over the others.  Specifically, the Federal Circuit

18  has held that when multiple options are available to one skilled in the art, prior art which focuses on

19  options aside from the claimed invention make the invention non-obvious.  See In re Baird, 16 F.3d

20  380, 382–83 (Fed. Cir. 1994) (holding that claimed invention was not obvious in light of the large

21  number of options available to the patentee in solving his problem); In re Bell, 991 F.2d 781, 784

22  (Fed. Cir. 1993) ("given the nearly infinite number of possibilities suggested by the prior art, and the

23  failure of the cited prior art to suggest which of those possibilities [will be successful], the claimed

24  [invention] would not have been obvious").

25          The Federal Circuit recently issued a decision in Ortho-McNeil Pharm., Inc. v. Mylan Labs.,

26  Inc., __ F.3d__, No. 2007-1223,  2008 WL 834402 (Fed. Cir. Mar. 31, 2008), which provides further

27  support.  There, the district court held that a patent on the drug Topiramate—marketed by Ortho-

28                                                          31

United States District Court

For the Northern District of California

McNeil at TOPOMAX®—was nonobvious. Id., at *1. On appeal, the Federal Circuit affirmed that decision, holding that the Ortho-McNeil action was not "a situation with a finite, and in the context of the art, small or easily traversed, number of options that would convince an ordinarily skilled artisan of obviousness." Id., at *4. The court added that "the ordinarily skilled artisan would have to have some reason to select (among several unpredictable alternatives) the exact route that produced topiramate as an intermediate," id., and "this clearly is not the easily traversed, small and finite number of alternatives that KSR suggested might support an inference of obviousness," id. According to Stanford, such is precisely the case in the instant action. At the time the claimed methods were invented, arguably there were not—in the context of the relevant art—a finite, small, or easily traversed number of options available to an HIV/AIDS medical researcher.

Assuming that the prior art discloses no reason for a person with ordinary skill in the art to believe that HIV RNA held a greater potential for success than HIV DNA, mRNA, CD4 or the other allegedly infinite potential surrogate markers, it would arguably not have been obvious to that person that HIV RNA could lead to a successful means of monitoring disease progression and drug efficacy.[24] Here, the use of HIV RNA as a surrogate marker is the common thread among all the asserted claims in the patents-in-suit. Thus, the conclusion here that this thread was not obvious is consistent with the presumption of validity to issued patents. See 35 U.S.C. § 282. Affirmation of this presumption, however, does not end the analysis.

This court must nevertheless look at the specific claims at issue in order to determine the validity of each individual claim, in light of the prior art. Because the JID article—statutory prior art—specifically disclosed quantifying HIV RNA as claimed in the patents, the major differences between the claims and the prior art exist within the evaluation and correlation steps of the claims. Indeed, what keeps these claims outside the realm of anticipation is solely the correlation and evaluation steps in the patents. This is precisely why Graham requires an analysis of the differences between the claims and the prior art. Some of these correlation and evaluation steps are contemplated in other prior art references; for example Ho discloses that AZT therapy results in a decrease in HIV-1 titers. Therefore, although the use of HIV RNA as a surrogate marker was

32

1   arguably not obvious to try with any reasonable expectation of success, the claims-at-issue may still

2   be obvious, as that is the proper focus of the obviousness analysis.

3          Furthermore, even if it was not known that HIV RNA held a greater potential for success

4   than HIV DNA, mRNA, CD4 or other potential surrogate markers, it was nevertheless obvious to try

5   HIV RNA as a potential marker.  A potential marker must be capable of precise quantification to

6   serve as an effective marker.  The JID article defined how to precisely quantify HIV RNA.

7   Knowledge of this process sets HIV RNA apart from the other potential markers that could not be

8   precisely quantified at the time.  This knowledge also reduces the costs associated with

9   experimenting on HIV RNA since resources need not be expended on devising ways to quantify

10  HIV RNA.  Thus, HIV RNA was actually part of a subset of all potential markers—those that could

11  be easily quantified.  The combination of great motivation to solve this problem with the limited

12  number of available quantifiable options is sufficient to independently make HIV RNA an obvious

13  choice for further research.[25]  Consequently, the expectation of success of HIV RNA as a marker

14  then becomes proportionally less important.

15         In light of these findings, the court now turns to the individual claims.

16

17         B.      Specified Correlations Using HIV RNA as a Surrogate Marker

18                 1.      The '730 Patent

19         Claim 1 and its converse, claim 6, are obvious in light of the JID article and the Ho article.

20  The JID article discloses a method of detecting HIV RNA—collecting a plasma sample, amplifying

21  the HIV-encoding nucleic acid and testing for presence of HIV-encoding nucleic acid—using PCR.

22  A person having skill in the art at the time the claimed methods were invented would have found it

23  obvious to combine this technique with the teachings of the Ho article—namely that patients on

24  AZT therapy show a decrease in HIV-titer—resulting in a method where the absence of HIV-

25  encoding nucleic acid corresponds with therapeutic effectiveness of an antiretroviral agent.  The

26  same argument applies to the converse, where the presence of HIV-encoding nucleic acid

27  corresponds with the therapeutic ineffectiveness of an antiretroviral agent.  In other words, the

28
                                              33

**United States District Court**
For the Northern District of California

1   claims simply state that the antiretroviral agent is likely effective if HIV RNA cannot be detected

2   and likely ineffective if HIV RNA can be detected.

3       Claim 5 discloses a method of using PCR to detect the presence or absence of HIV-encoded

4   nucleic acid on patients on AZT therapy in order to evaluate the efficacy of such therapy.  This is

5   simply a subset of claim 1 and also obvious since every antiretroviral therapy contemplated by claim

6   1 is obvious.

7       Claim 7 is obvious in light of the JID article.  The JID article specifically discloses that HIV

8   RNA in circulation correlates with the presence of CD4 counts less than 400 cells per millimeter$^3$.

9   Claim 7 takes that conclusion and adds a factor of safety to it by decreasing the correlation limit to

10  200 cells per millimeter$^3$.  One skilled in the art would have predicted that if HIV RNA in circulation

11  correlates with the presence of CD4 counts less than 400 cells per millimeter$^3$, then the same applies

12  to CD4 counts of less than 200 cells per millimeter$^3$.  Therefore, one skilled in the art would have

13  known that substituting the lesser standard for that disclosed in the JID article would yield

14  predictable results, obviating claim 7.[26]

15      Claim 8 is the converse of claim 7, yet the analysis differs due to the CD4 standards

16  disclosed in the claims and the JID article, as previously noted.  Claim 8 discloses a method of

17  evaluating anti-HIV therapy by correlating the presence of HIV-encoding nucleic acid to a CD4

18  count of 200 cells per cubic millimeter or greater.  This standard is inconsistent with that set forth in

19  the JID article.  Yet, after the publication of the JID article it would have been obvious to one skilled

20  in the art to perform further testing to verify or correct the results disclosed in the JID article—using

21  a known technique to improve similar methods in the same way.  It is logical that this lower standard

22  resulted from further clinical-testing that helped adjust the precision of the standard.  Since the

23  premise behind this claim is the same as that in claim 7, though the standard is different, claim 8

24  would have been obvious to one skilled in the art at the time the methods were invented.

25      Claim 9 is obvious in light of the JID and Ho articles.  Claim 9 simply correlates to

26  therapeutic inefficacy an HIV RNA copy number within the range disclosed in the JID article.  It

27  merely adds precision to a previously known range by teaching a specific amount that determines

28                                              34

United States District Court

For the Northern District of California

drug effectiveness.  Conducting further testing to determine this amount would have been obvious to one skilled in the art at the time the methods were invented.  Similarly, claim 13—which is dependent on claim 9—is obvious because the Ho article specifically relates AZT efficacy to the amount of virus in plasma.

Claim 14, like claim 9, is obvious because it correlates an HIV copy number very near the lowest end of the range disclosed in the JID article to therapeutic efficacy.  Similar to claims 8 and 9, this method merely combines prior elements according to known methods to yield predictable results.  Specifically, it merely adds precision to a previously known range.  Therefore, claim 14 was obvious to one skilled in the art at the time the methods were invented.   Similarly, claim 18—which is dependent on claim 14—is obvious because the Ho article specifically relates AZT efficacy to the amount of virus in plasma.

Claim 19 encompasses any anti-HIV therapy which includes an antiretroviral agent.  For reasons similar to those discussed above regarding claims 1 and 6, claim 19 was obvious to one skilled in the art at the time these methods were invented.  Specifically, claim 19 states that if the antiretroviral therapy is successful in reducing the HIV RNA count to one-fourth of its initial amount, it is likely therapeutically effective.  It would have been obvious to one of skill in the art that if a therapy is successful in drastically reducing the amount of HIV RNA, it is likely therapeutically effective.

Claim 23 is obvious in light of the JID article and the Ho article because claim 23 merely teaches what the combination of these two articles would tell one skilled in the art: HIV RNA decreases over time when a patient is treated with AZT and this treatment is effective.  Although a specific ratio of pre-treatment to post-treatment HIV RNA copy numbers is disclosed in claim 23, this does not change the conclusion that claim 23 would have been obvious to one skilled in the art after reading the JID and Ho articles.  The specific ratio disclosed makes no difference here—any ratio consistent with the knowledge of one skilled in the art that was disclosed in this claim would have been obvious.

2.     <u>The '705 Patent</u>

35

United States District Court

For the Northern District of California

Claim 1 of the '705 patent would have been obvious to one skilled in the art at the time the patents issued in light of the JID and Ho articles. This claim takes the steps disclosed in the JID article and adds a second collecting step, a comparing step and a final evaluating step. It would have been obvious to one skilled in the art at the time the patents issued to combine the JID and Ho articles with a second plasma sample for comparison purposes. Since the Ho article discloses that effective AZT therapy results in decreased HIV-titers in plasma, the obvious next step for one skilled in the art would be to compare two or more plasma samples over a period of time while the patient was undergoing any anti-HIV therapy. Furthermore, this claim fails to add any new, specific correlation standard to the method. It instead uses a "statistically significant decline in plasma HIV RNA copy numbers" to evaluate drug efficacy—this standard is so general and well-known that it would have been obvious to one skilled in the art. This claim merely combines prior art elements—the collecting, amplifying and testing steps disclosed in the JID article—according to known methods to yield predictable results, rendering claim 1 of the '730 patent obvious. Similarly, claim 5, which depends on claim 1, is obvious in light of the JID and Ho articles because the Ho article discloses that effective AZT therapy results in decreased HIV-titers in plasma. The obvious next step for one skilled in the art would be to compare two or more plasma samples over a period of time while the patient was undergoing AZT therapy.

Claim 6 is dependent on claim 1 and adds a correlation—"the presence of a statistically significant decline in plasma HIV RNA copy number correlates positively that the antiretroviral agent is therapeutically effective." '705 patent, claim 6 at 23:32–35. While this adds a specific correlation standard to claim 1 of the '705 patent, it fails to claim subject matter not known or obvious to one skilled in the art at the time the patents issued. Given the JID and Ho articles, one skilled in the art would have found it obvious to correlate a statistically significant drop in HIV RNA with drug efficacy. Claim 7, as the converse of claim 6, also would have been obvious to one skilled in the art at the time the claimed methods were invented.

Claim 8 would have been obvious to one skilled in the art at the time the claimed methods were invented. Like claim 1, this claim discloses collecting two samples of patient plasma to

36

United States District Court

For the Northern District of California

1  compare the results.  Additionally, the evaluation step fails to disclose any specific standard for

2  correlation.  Consequently, it is obvious for the same reasons claim 1 is obvious.

3  Claims 9 and 10, which depend on claims 7 and 8, would have been obvious to one skilled in

4  the art at the time the claimed methods were invented.  The claims merely add that if, over time, the

5  antiretroviral therapy is successful in reducing the HIV RNA amount in plasma to one-seventh or

6  one-fourth of its initial amount, the antiretroviral therapy is likely effective.  It would have been

7  obvious to one of skill in the art that it the antiretroviral therapy is successful in drastically reducing

8  the amount of HIV RNA in plasma, the antiretroviral therapy is likely therapeutically effective.

9  Indeed, any standard whereby a reduction in HIV RNA was correlated positively with the

10  conclusion that the antiretroviral therapy was therapeutically effective would likely be obvious.

11  3.   The '041 Patent

12  In light of the JID article, claim 1 would have been obvious to one skilled in the art.  The JID

13  article discloses more information relating to the HIV-encoding nucleic acid/CD4 count correlation

14  than does this claim.  The JID article discloses that HIV RNA positive patients were likely to have a

15  CD4 count less than 400 cells/mm$^3$.  JID article, supra note 2, at 864.  Yet, claim 1 of the '041 patent

16  fails to disclose this or any other standard for correlation.  It merely teaches that one may evaluate

17  the efficacy of anti-HIV therapy by correlating the presence or absence of detectable HIV-encoding

18  nucleic acid with an absolute CD4 count.[27]

19  The lack of the "about 30 cycles of PCR" limitation here does not save this claim from

20  obviousness.  30 cycles of PCR is a specific amount of amplification of the HIV-encoding nucleic

21  acid.  In contrast, the claim here contemplates general amplification of the HIV-encoding nucleic

22  acid via PCR.  This allows for amplification for a different number of cycles, or potentially the use

23  of PCR methods other than end-point PCR.  The crux of the claim, however, is collecting,

24  amplification, testing and subsequent correlation of the presence or absence of detectable HIV-

25  encoding nucleic acid with therapeutic ineffectiveness or effectiveness.  It would have been obvious

26  to one of skill in the art to amplify for periods different than those disclosed in the JID article.  For

27  instance, if ten cycles of PCR were enough to detect the HIV-encoding nucleic acid, it would be

28

United States District Court

For the Northern District of California

obvious to one of skill in the art that amplification for 30 cycles was unnecessary.  The same would simply amplify the already detectable HIV-encoding nucleic acid.  Since the correlation here does not depend upon the presence of a *particular amount* of HIV-encoding nucleic acid, amplification after the acid is already detectable would be inefficient and unnecessary.  This argument applies equally as forcefully to methods other than end-point PCR.  If other types of PCR could be used to amplify the HIV-encoding nucleic acid, one of ordinary skill in the art would be sure to try those methods in order to determine the therapeutic effectiveness of the therapy.  Consequently, removing the "about 30 cycles of PCR" limitation is simply combining prior art elements according to known methods to yield predictable results, rendering this claim obvious.

Claims 2, 3 and 4 of the '041 patent would have also been obvious to one skilled in the art at the time the claimed methods were created.  As discussed above with respect to claims 7 and 8 of the '730 patent, the JID article specifically discloses that HIV RNA in circulation correlates with the presence of CD4 counts less than 400 cells per millimeter$^3$.  Like claim 7 of the '730 patent, one skilled in the art would have predicted that if HIV RNA in circulation correlates with the presence of CD4 counts less than 400 cells per millimeter$^3$, then the same applies to CD4 counts of less than 200 cells per millimeter$^3$.  Therefore, one skilled in the art would have known that substituting the lesser standard for that disclosed in the JID article would yield predictable results, obviating claim 3.

Claim 2 is the converse of claim 3, yet the analysis differs due to the CD4 standards disclosed in the claims and the JID article, as previously noted.  Claim 2 discloses a method of evaluating anti-HIV therapy by correlating the presence of HIV-encoding nucleic acid to a CD4 count of 200 cells per cubic millimeter or greater.  This standard is inconsistent with that set forth in the JID article.  Yet, after the publication of the JID article it would have been obvious to one skilled in the art to perform further testing to verify, correct or clarify the results disclosed in the JID article—using a known technique to improve similar methods in the same way.  Since the premise behind this claim is the same as that in claim 3, though the standard is different, claim 2 would have been obvious to one skilled in the art at the time the methods were invented.

Claim 4 merely adds the 30 cycles of PCR limitation, which was also disclosed in claims 7

38

1  and 8 of the '730 patent.  Consequently, this claim is also obvious.

2      Finally, claim 8 of the '041 patent limits the methods to AZT therapy—specifically studied

3  in the Ho article.  In light of the JID and Ho articles, this claim would also have been obvious to one

4  skilled in the art at the time the patents issued.[28]

5

6  CONCLUSION

7      For the foregoing reasons, defendant Roche's motion for summary judgment of invalidity

8  based on obviousness is GRANTED.  Claims 1, 5–9, 13–14, 18–19 and 23 of the '730 patent are

9  invalid as obvious.  Claims 1, 5–10 of the '705 patent are invalid as obvious.  Claims 1–4 and 8 of

10  the '041 patent are invalid as obvious.

11      IT IS SO ORDERED.

12

13  Dated: May 29, 2008

14                                            MARILYN HALL PATEL
                                            United States District Court Judge
15                                            Northern District of California

United States District Court
For the Northern District of California

39

United States District Court
For the Northern District of California

1

**ENDNOTES**

2   1.      All further statutory references are to Title 35 of the United States Code, unless otherwise noted.

3   2.      Holodniy, et al., *Detection and Quantification of Human Immunodeficiency Virus RNA in Patient Serum by Use of the Polymerase Chain Reaction,* THE JOURNAL OF INFECTIOUS DISEASES, April 1991, at 862. Some of the authors of this article—Holodniy, Katzenstein, and Merigan—are also some of the named inventors on the asserted patents.

4

5

6   3.      Bagnarelli, et al., *Detection of Human Immunodeficiency Virus Type 1 Genomic RNA in Plasma Samples by Reverse-Transcription Polymerase Chain Reaction*, JOURNAL OF MEDICAL VIROLOGY, June 1991.

7

8   4.      Fauci, et al., *Immunopathogenic Mechanisms in Human Immunodeficiency Virus (HIV) Infection*, ANNALS OF INTERNAL MEDICINE, April 1991.

9   5.      Ottmann, et al., *The polymerase chain reaction for the detection of HIV-1 genomic RNA in plasma from infected individuals*, JOURNAL OF VIROLOGICAL METHODS, February/March 1991.

10

11   6.      Around 1991, Cetus merged with Chiron Corporation and sold some of its assets—including PCR—to Roche. Stanford cites to a memorandum dated July 1985 from John J. Sninsky and Shirley Y. Kwok—scientists at Cetus—which proposed initiating a project to detect HIV DNA using PCR. Damstedt Dec., Exh. 48. This memorandum pre-dates the inventions at issue, and therefore is not considered by the court in the scope and content survey herein. It is mentioned solely to illuminate Stanford's argument with respect to the work of the Cetus scientists.

12

13

14   7.      While the '512 patent is not prior art—as it did not issue until 1995—it is discussed in this section in conjunction with the '182 patent to clarify Stanford's argument regarding the state of the prior art at the time the patents-in-suit issued. The scope and content of the '512 patent is not considered for the purposes of surveying the state of the art in this section. The scope and content will, however, be considered for the purposes of secondary considerations, discussed later.

15

16

17   8.      J.J. Sninsky, *The Polymerase Chain Reaction (PCR): A Valuable Method for Retroviral Detection*, LYMPHOLOGY, 1990, 92.

18

19   9.      John J. Sninsky and Shirley Kwok, *Detection of Human Immunodeficiency Viruses by Polymerase Chain Reaction*, ARCHIVES OF PATHOLOGY AND LABORATORY MEDICINE, March 1990, 259.

20   10.      Ho, et al., *Quantitation of Human Immunodeficiency Virus Type 1 in the Blood of Infected Persons*, 321 N.E. J. Med. 1621 (Dec. 14, 1989).

21

22   11.      Coombs, et al., *Plasma Viremia in Human Immunodeficiency Virus Infection*, 321 N. Engl. J. Med. 1626 (Dec. 14, 1989).

23   12.      *State-of-the-Art Conference on Azidothymidine Therapy for early HIV Infection*, THE AMERICAN JOURNAL OF MEDICINE (September 1990).

24

25   13.      In Dr. Volberding's claim chart, he continuously asserts that because the subjects of the JID article were not being treated with antiretroviral therapy, the collecting step—"collecting a plasma sample from an HIV-infected patient *who is being treated with an antiretroviral agent*"—of the asserted claims is not disclosed in that article. However, the JID article clearly discloses that plasma samples were collected from HIV-infected individuals for use in the PCR process. The claimed methods are

26

27

28

40

1    intended for evaluating anti-HIV therapy, therefore collecting plasma samples, as disclosed by the
2    JID article, is necessarily going to be from patients being treated with anti-HIV therapy. This nominal
     difference in the claimed method is not significant enough to render an asserted claim non-obvious.

3        14.    Dr. Volberding and Dr. Kramer are both qualified experts. Both doctors have spent substantial
4    time working in research laboratories focused on AIDS/HIV therapy and related diagnostic tools. Dr.
     Volberding is a medical doctor with clinical experience in evaluating anti-HIV therapy, including
     numerous clinical trials involving antiretroviral agents and PCR-based viral load testing. Docket No.
5    278 (hereinafter Volberding Dec.), ¶¶ 2–5. Dr. Volberding has also directed a laboratory at San
     Francisco General Hospital where PCR assays were performed. Docket No. 285, Chiang Dec., Exh. 1
6    at 27:1–4. Finally, Dr. Volberding serves on both the NIH and IAS guidelines panels. Volberding Dec.,
     ¶¶ 77, 79. Likewise, Dr. Kramer worked on exponential amplification assays, laying the foundation for
7    analyzing PCR reactions. Docket No. 291, Rhyu Dec., Exh. 1 at 65:19–68:16. For approximately
     sixteen years, Dr. Kramer has supervised a laboratory where thousands of PCR assays were performed.
8    Docket No. 279 (hereinafter Kramer Dec.), ¶ 2; Docket No. 285, Exh. 2 at 91:14–91:6. For around a
     decade, Dr. Kramer has worked in the field of HIV diagnostic assays and owns patents on a number of
9    PCR-related inventions. Kramer Dec., ¶ 2. Roche's objections to the declarations of Dr. Volberding
     and Dr. Kramer are therefore OVERRULED.
10       Similarly, Stanford's objections to Dr. Lifson's opinions are also OVERRULED. Dr. Lifson
     is currently the Director of the AIDS Vaccine Program and the Senior Principal Scientist and Head
11   of the Retroviral Pathogenesis Laboratory for SAIC Frederick, Inc. Docket No. 259 (hereinafter
     Lifson Dec.), ¶ 1. Dr. Lifson has been involved in AIDS research since 1983 and has expertise in
12   the development and application of assays for monitoring the replication of HIV and related
     retroviruses. Id. He is also currently a member of the NIH's Office of AIDS Research Coordinating
13   Committees on Etiology and Pathogenesis. Id., Exh. A at 2. From 1986 through 1995, Dr. Lifson
     was at Genelabs Inc.—a biotechnology startup in Redwood City, California—where he worked on
14   developing quantitative PCR/RT-PCR methods for accurate quantitation of HIV viral load. Id. at
     21. Like Dr. Volberding and Dr. Kramer, Dr. Lifson is similarly qualified to testify as an expert in
15   the instant action.

16       15.    Roche asserts that "with respect to secondary considerations, it is significant that the origin of
     the invention derived from the collaboration at Cetus." Motion at 21 (internal quotations omitted).
17   However, Roche fails to explain the significance, and this court independently attaches no such
     significance. See Docket. No. 157.
18
19       16.    This language departs from that previously used by the Federal Circuit regarding secondary
     considerations. See Ruiz, 234 F.3d at 667 ("Our precedents clearly hold that secondary considerations,
20   when present, must be considered in determining obviousness."); Stratoflex, Inc. v. Aeroquip Corp.,
     713 F.2d 1530, 1538 (Fed. Cir. 1983) ("evidence rising out of the so-called secondary considerations
21   must always when present be considered en route to a determination of obviousness") (internal
     quotations omitted). The above-quoted language from KSR is, arguably, dicta. Yet it is consistent with
22   the "expansive and flexible approach" set forth by the Supreme Court in rejecting the "rigid approach"
     of the Federal Circuit. 127 S. Ct. at 1739.

23       17.    Stanford attaches the Guidelines from December 1, 2007. However, NIH has since released
24   updated Guidelines, to which this Court refers. Panel on Antiretroviral Guidelines for Adults and
     Adolescents, Guidelines for the use of antiretroviral agents in HIV-1 infected adults and adolescents,
25   Department of Health and Human Services (January 29, 2008), at 3, 4, available at
     http://aidsinfo.nih.gov/contentfiles/AdultandAdolescentGL.pdf (last accessed March 28, 2008).
26
27
28
                                                41

18.     Stanford, again, attaches recommendations from 1997, while IAS has since released updated recommendations. Hammer, et al., *Treatment for Adult HIV Infection: 2006 Recommendations of the International AIDS Society–USA Panel*, Journal of the American Medical Association (Aug. 16, 2006), 827, *available at* http://www.iasusa.org/pub/arv_2006.pdf (last accessed April 3, 2008).

19.     Sande, et al., *Antiretroviral Therapy for Adult HIV-Infected Patients: Recommendations from a State-of-the-Art Conference*, The Journal of the American Medical Association, (Dec. 1993), 2583.

20.     David A. Kessler, Comm'r, Food and Drug Admin., Inst. of Med. ("IOM") 25th Anniversary Lecture (Nov. 7, 1994), *available at* http://www.fda.gov/bbs/topics/SPEECH/SPE00056.htm (last accessed March 28, 2008) ("A number of technologies are proving to be sensitive to detecting increases in viral RNA or the amount of circulating virus [which could prove useful in monitoring drug response. However, these markers] measure viral load only in serum, but in the early stage of infection the virus is in the lymph nodes where these markers don't reach.").

21.     Center for Interdisciplinary Research in Immunology and Disease at UCLA, AIDS/HIV Reference Guide for Medical Professionals, 86–87 (John L. Fahey and Diana M. Shin Flemmig ed., Williams and Wilkins) (1997).

22.     While the USPTO has no rule-making authority that affects the decisions of this court, the guidelines are discussed here to illuminate the changes required by KSR.

23.     Fahey & Nishanian, Chapter 3: *Laboratory Diagnosis and Evaluation of HIV Infection*, AIDS/HIV Reference Guide for Medical Professionals 87 (John L. Fahey & Diana Shin Fleming eds. 1997).

24.     The post-dated references that teach away from using HIV RNA as a marker may have made the choice of HIV RNA non-obvious when those references were published. At the time the JID article was published or when the patent applications related to the patents-in-suit were submitted, however, no reference explicitly taught away from the use of HIV RNA as a potential surrogate marker.

25.     An argument may also be made that there *was* a reasonable expectation of success because the patents-in-suit were applied for shortly after the JID article was published. Indeed, the JID article is barely prior art under the statutory definition.

26.     Although not argued by Roche and therefore not fully analyzed by this court, this claim may even be anticipated.

27.     This claim may even be anticipated by the JID article. Claim 1 of the '041 patent simply discloses the collecting, amplifying and testing steps, with a statement that the presence or absence of HIV-encoding nucleic acid correlates with an absolute CD4 count. The only portion of this claim which even refers to anti-HIV therapy is the non-limiting preamble.

28.     Since the court finds all asserted claims in the patents-in-suit to be invalid due to obviousness, the court has no occasion to reach Roche's argument that the patents include unpatentable subject matter under section 101.